## CONCLUSION AND PRAYER

WHEREFORE, PREMISES CONSIDERED, the State respectfully prays this Court to find particularized justifying circumstances to permit a 60-day extension to file its answer to the applicant's application for writ of habeas corpus.

Respectfully submitted,

ROSEMARY LEHMBERG
District Attorney
Travis County, Texas

*/s/ Lisa Stewart*
Lisa Stewart
Assistant District Attorney
Appellate Division
State Bar No. 06022700
P.O. Box 1748
Austin, Texas 78767
Phone No. (512) 854-3626
Fax. No. (512) 854-4810
Lisa.Stewart@traviscountytx.gov
AppellateTCDA@traviscountytx.gov

## CERTIFICATE OF COMPLIANCE

Pursuant to Texas Rule of Appellate Procedure 9.4(i), I hereby certify, based upon the computer program used to generate this motion, that this motion contains 5,550 words, excluding words contained in those parts of the motion that Rule 9.4(i) exempts from inclusion in the word count. I certify, further, that this motion is printed in a conventional, 14-point typeface.

*/s/ Lisa Stewart*
Lisa Stewart
Assistant District Attorney

4

## CERTIFICATE OF SERVICE

I hereby certify that, on this 13th day of June, 2016, a copy of the foregoing reply was sent, via U.S. mail, email, facsimile, or electronically through the electronic filing manager, to the following:

The Honorable Doug Shaver
Gavel1936@gmail.com

The Honorable Brenda Kennedy
Judge, 403rd District Court
Brenda.Kennedy@traviscountytx.gov

Benjamin B. Wolff
Director, Office of Capital and Forensic Writs
Benjamin.Wolff@ocfw.texas.gov

Gretchen Sween
Gretchen.Sween@ocfw.texas.gov

Jeremy Schepers
Jeremy.Schepers@ocfw.texas.gov

Ashley R. Steele
Ashley.Steele@ocfw.texas.gov
Stephen F. Austin Building
1700 N. Congress Avenue, Suite 460
Austin, Texas 78701
Fax: 512-463-8590

/s/ Lisa Stewart
Lisa Stewart
Assistant District Attorney

No. D1-DC-12-201718
CCA #83,459-01

| EX PARTE | § | IN THE DISTRICT COURT |
| | § | OF TRAVIS COUNTY, TEXAS |
| BRANDON DANIEL | § | 403RD JUDICIAL DISTRICT |

## ORDER

On this date the Court considered the State's Motion for Extension of Time to File Answer to Application for Writ of Habeas Corpus. On consideration of said motion the Court finds particularized justifying circumstances have been shown to grant a 60-day extension of time to file the State's answer, pursuant to Art. 11.071, §7(a), V.A.C.C.P.

IT IS THEREFORE ORDERED that the State's request for a 60-day extension of the deadline to file its answer is GRANTED.

IT IS FURTHER ORDERED that the State's answer shall be timely filed if done so on or before August 10, 2016.

Signed on this the _____ day of June, 2016.


_____
Brenda Kennedy, Judge Presiding


6

No. D1-DC-12-201718
CCA #83,459-01

| EX PARTE | § | IN THE DISTRICT COURT |
| | § | OF TRAVIS COUNTY, TEXAS |
| BRANDON DANIEL | § | 403RD JUDICIAL DISTRICT |

### ORDER

On this date the Court considered the State's Motion for Extension of Time to File Answer to Application for Writ of Habeas Corpus. On consideration of said motion the Court finds particularized justifying circumstances have been shown to grant a 60-day extension of time to file the State's answer, pursuant to Art. 11.071, §7(a), V.A.C.C.P.

IT IS THEREFORE ORDERED that the State's request for a 60-day extension of the deadline to file its answer is GRANTED.

IT IS FURTHER ORDERED that the State's answer shall be timely filed if done so on or before August 10, 2016.

Signed on this the 14 day of June, 2016.

_Brenda P Kennedy_

Brenda Kennedy, Judge Presiding

Filed In The District Court
of Travis County, Texas
on_____
at_____M.
Velva L. Price, District Clerk

6

947

No. WR-83,459-01

IN THE

COURT OF CRIMINAL APPEALS

OF THE STATE OF TEXAS

| EX PARTE | § | IN THE DISTRICT COURT |
| | § | OF TRAVIS COUNTY, TEXAS |
| BRANDON DANIEL | § | 403RD DISTRICT COURT |

Trial Court No. D-1-DC-12-201718-A

## STATE'S ORIGINAL ANSWER

ROSEMARY LEHMBERG
District Attorney
Travis County, Texas

LISA STEWART
Assistant District Attorney
State Bar No. 06022700
P.O. Box 1748
Austin, Texas 78767
(512) 854 - 9400
Lisa.Stewart@traviscountytx.gov
AppellateTCDA@traviscountytx.gov

No Oral Argument Requested

Filed In The District Court
of Travis County, Texas

on_____

at_____ M.

Velva L. Price, District Clerk

948

# Contents

Statement Of The Case ................................................................................... 6

Statement Of Facts ......................................................................................... 7

    Facts of this Capital Murder Committed at an Austin Walmart ................. 7
    Evidence Recovered After Applicant Taken into Custody .......................... 10
    Forensic Evidence .................................................................................... 13
    Evidence from Officer Padron's Autopsy .................................................. 13
    Defense Evidence at Guilt/Innocence ...................................................... 14

STATEMENT OF FACTS FROM PUNISHMENT PHASE ........................... 17

    The Night of this Capital Murder Offense ................................................ 17
    Lack of Remorse and Extraneous Bad Acts in Texas ................................ 17
    Extraneous Bad Acts Committed in Colorado .......................................... 21
    Extraneous Bad Acts and Disciplinary Violations in Jail ......................... 22
    Applicant's Mail and Recorded Phone Conversations in Jail .................... 25
    Inmate Classification System and Prison "Society" ................................ 27
    Officer Padron's Personal and Professional History ................................ 29
    Defense Evidence at the Punishment Phase ............................................ 31
    State's Rebuttal Evidence at Punishment .............................................. 37
    The Verdict at the Punishment Phase ..................................................... 39

Law Applicable To All Grounds For Relief ................................................... 40

STATE'S REPLY TO APPLICANT'S FIRST GROUND FOR RELIEF ...... 40

    Standard of Review ................................................................................. 41

State's Replies to Applicant's Claims Regarding Effectiveness of Counsel ..... 44

A.    Trial counsel did not fail to investigate whether applicant had Autism Spectrum Disorder (ASD). After reasonable investigation, the defense team

2

determined not to present evidence of ASD. Trial counsel investigated and presented substantial evidence of applicant's mental health issues at both phases of trial.................................................................................44

B.    Trial counsel did not fail to investigate or present mitigating evidence.................................................................................55

C.    Trial counsel was not ineffective for failing to suppress applicant's oral statements that were clearly admissible. Furthermore, as a matter of sound trial strategy, defense counsel determined to use the statements as evidence of applicant's profound intoxication the night of the offense. .....................58

D.    Applicant fails to satisfy his burden of proving facts which would entitle him to relief, as applicant's claim of a conflict is merely speculation. The record reflects counsel was adequately compensated, and the fee arrangement did not create a conflict. .............................................61

E.    Defense counsel were not ineffective for not challenging the constitutionality of Texas's voluntary intoxication statute, as such challenges have been repeatedly rejected by the courts. ...............................63

F.    Applicant fails to meet his burden of proving facts that would entitle him to relief. Moreover, defense counsel made an objectively reasonable, strategic decision based on the evidence in this case not to object to the limited victim impact evidence presented at guilt/innocence, and therefore their representation did not fall below an objective standard of reasonableness. .............................................................................66

G.    Defense counsel did not render ineffective assistance of counsel by failing to object to proper jury arguments by the State. ...............................69

H.    Defense counsel did not render ineffective assistance of counsel by failing to object to proper jury arguments by the State. ...............................72

I.    Defense counsel was not ineffective for failing to object to certain testimony of Louis Escalante. Defense counsel thoroughly cross-examined Escalante, and as a matter of sound trial strategy, used Escalante's testimony to attack his credibility. .............................................75

3

J.  Defense counsel was not ineffective for failing to retain an expert on prison classification.  Defense counsel effectively used the State's expert on cross-examination to educate the jury about behavior controls in prison.. .77

K.   Trial counsel was not ineffective for failing to present evidence of the reason applicant was tracking the movements and names of correctional officers in the Travis County Jail. .................................................................78

L.   Cumulative non-errors do not amount to ineffective assistance of counsel..................................................................................................80

State's Reply to Applicant's Second Ground for Relief.......................................81

Applicant's claims are not cognizable.  And, applicant fails to sustain his burden of proof as there is no competent evidence of a jury note. Finally, any alleged error was harmless .....................................................................81

State's Reply to Applicant's Third and Fourth Grounds for Relief ................87

Applicant's habeas claims are procedurally defaulted.  Alternatively, the State did not use or present false evidence.  Applicant takes the evidence out of context and misrepresents the testimony presented at trial.  Finally, assuming any evidence was misleading, applicant fails to meet his burden of showing it was material to the punishment verdict. .......................................87

State's Reply to Applicant's Fifth Ground for Relief .....................................100

Applicant procedurally defaulted this claim as it should have been raised by motion for new trial and on direct appeal.  Additionally, applicant fails to meet his burden of pleading and proving facts that would entitle him to relief. The trial court did not improperly or insufficiently fund the defense. .................................................................................................................100

4

State's Reply to Applicant's Sixth Ground for Relief.....................................104

Applicant fails in his burden to show that the State did not disclose material evidence relating to punishment witness Louis Escalante. Applicant's mere allegations are insufficient to satisfy his burden for relief. The trial record showed the State did not offer Louis Escalante a benefit in exchange for his testimony at trial. Further, evidentiary affidavits in the habeas record unequivocally establish that the State did not offer Escalante a benefit for his testimony and that Escalante's conditions of supervision were modified due to threats on his life for testifying in applicant's trial. Thus, the State did not violate applicant's rights under Brady v. Maryland. .............................................104

State's Reply to Applicant's Seventh Ground for Relief ................................106

Applicant fails to meet his burden of proof by merely alleging that Penal Code §8.04 is unconstitutional and by failing to show it was unconstitutional as applied to him. Alternatively, the voluntary intoxication statute is not unconstitutional. ........................................................................................106

State's Reply to Applicant's Eighth – Eleventh Grounds for Relief..............109

Article 37.071, the Texas death penalty statute, is constitutional. The Court of Criminal Appeals has repeatedly rejected appellant's constitutionality arguments regarding the statute. ..............................................................109

No. WR-83,459-01

IN THE

COURT OF CRIMINAL APPEALS

OF THE STATE OF TEXAS

| EX PARTE | § | IN THE DISTRICT COURT |
|---|---|---|
| | § | OF TRAVIS COUNTY, TEXAS |
| BRANDON DANIEL | § | 403RD DISTRICT COURT |

## STATE'S ORIGINAL ANSWER

**TO THE HONORABLE JUDGE OF SAID COURT:**

NOW COMES the State, by and through its Assistant District Attorney for Travis County, Texas, in the above numbered and entitled cause, and respectfully files the following answer:

### I.

Respondent generally and specially denies each and every allegation of fact made by applicant except that respondent has custody of applicant.

### II.

### Statement Of The Case

Respondent has custody of applicant pursuant to his conviction in Cause Number D1-DC-12-201718 in the 403rd District Court of Travis County, Texas.

6

The State indicted applicant for the capital murder of Austin Police Officer Jaime Padron. (CR 98, 100). The jury found applicant guilty of capital murder as alleged in the indictment. (CR 184). The trial court sentenced applicant to death based on the jury's answers to the punishment issues. (CR 189; RR 26: 221). Applicant timely filed a motion for new trial, which was overruled by operation of law. (CR 196). In a unanimous decision on direct appeal, the Texas Court of Criminal Appeals affirmed the trial court's judgment and sentence of death.[1] *Daniel v. State*, 485 S.W.3d 24 (Tex.Crim.App. 2016).

## III.

Respondent would show that applicant fails to meet his burden of proving facts which would entitle him to relief. *Ex parte Empey*, 757 S.W.2d 771 (Tex.Crim.App. 1988). Applicant should be denied relief.

## IV.

## Statement Of Facts

The State provides the statement of facts predominantly from its brief on direct appeal. The State will supplement the factual recitation as necessary in specific response to applicant's multitude of claims in this writ application.

### Facts of this Capital Murder Committed at an Austin Walmart

---

[1] Appeal to the Texas Court of Criminal Appeals is automatic in a death penalty case under Texas Code of Criminal Procedure Article 37.071 §2(h). See TEX. CODE CRIM. PROC. ANN. ART. 37.071§2(h) (Vernon Supp. 2010).

954

In the early hours[2] of April 6, 2012, Walmart employee Sean McCarthy

encountered applicant[3] in the store. (RR 18: 21). Applicant asked McCarthy to

hold his produce bags, and applicant left the store to obtain something. (RR 18:

22-24). Applicant looked "like he had a rough night," but McCarthy did not feel

threatened by him. (RR 18: 23). Walmart retail manager Lincoln LeMere called

311[4] because applicant appeared intoxicated, and LeMere feared he would be a

danger to himself and others. (RR 18: 54).

Austin Police Officer Jaime Padron responded to the call, and he and

LeMere entered the store and encountered applicant. (RR 18: 58-59, 177, 179).

Officer Padron announced that he was with the Austin Police Department and told

applicant to stop. (RR 18: 59-60, 132). Applicant lowered his shoulder, ducked

away from Officer Padron, and ran for the exit. (RR 18: 59). Officer Padron gave

chase and tackled applicant from behind. (RR 18: 60). Walmart employee Monica

Lawson saw applicant pull a gun from his waistband as Officer Padron attempted

to subdue applicant and take his gun. (RR 18: 95-96). As Officer Padron tackled

applicant, LeMere heard a gunshot, and he heard an additional gunshot when

applicant and Officer Padron fell to the ground. (RR 18: 60-61, 63). Lawson's co-

---

[2] The time was approximately midnight to 1 a.m. (RR 18: 24).

[3] McCarthy identified applicant in the courtroom. (RR 18: 32-34).

[4] The call was transferred to 911. (RR 18: 54).

955

worker, Alma Ramirez, testified that she saw applicant put the gun to Officer

Padron's neck and shoot him. (RR 18: 119-120).

LeMere realized applicant had a gun when he saw Officer Padron "bleeding

out." (RR 18: 61). LeMere immediately jumped on applicant who raised his arm

and fired a third shot, which just missed LeMere's right ear and night manager

Archie Jordy's left ear.[5] (RR 18: 61, 133-134). LeMere felt that that third shot

was meant for him. (RR 18: 62).

LeMere pushed applicant's arm to the ground, and McCarthy and Jordy

stomped on applicant's arm, making him release the gun, and kicked the gun aside.

(RR 18: 62). Applicant raised his head from the floor, looked at Officer Padron,

"kind of laughed, chuckled and said, I killed a cop." (RR 18: 64, 151). Officer

Padron never pulled a weapon of any kind when chasing applicant. (RR 18: 98).

It was obvious to the various Walmart employees[6] that Padron was a police

officer because of his uniform, "all the gadgets," and his apparent fitness. (RR 18:

38). Officer Padron was wearing a full Austin Police Department uniform. (RR

18: 38, 56). Officer Padron had not removed his gun from his gun belt. (RR 18:

---

[5] Jordy had followed applicant through the store because he suspected he was going to shoplift, but applicant did not appear armed. (RR 18: 56, 129, 153).

[6] Walmart employees Monica Lawson, Alma Ramirez, and William Garlow all immediately recognized that Officer Padron was a police officer because of his uniform and badge. (RR 18: 94, 118-119, 162). Austin police officer Steve Martinez was in full uniform during trial and displayed it for the jury since Officer Padron had worn the same type uniform. (RR 18: 217).

64). The security hood on Officer Padron's holster was still in the locked position with his gun inside the holster. (RR 18: 204-205).

Walmart employees tried to keep Officer Padron alive while police arrived at the scene and handcuffed applicant. (RR 18: 35). Will Garlow removed his shirt and applied pressure to Officer Padron's neck until the squirting blood stopped. (RR 18: 166-167). Garlow talked to Officer Padron and attempted to keep him awake. But, Officer Padron never responded verbally, and he barely focused his eyes. (RR 18: 166, 167-168). Garlow and Austin police officer Chris Kroger attempted to clear Officer Padron's airway, but it was too late, as Officer Padron had bled out. (RR 18: 167, 181). EMS pronounced Officer Padron dead at the scene. (RR 18: 205).

**Evidence Recovered After Applicant Taken into Custody**

Austin police officers removed applicant from the Walmart and searched him for additional weapons. (RR 18: 235). Police found a magazine with six .380 hollow point bullets[7] in applicant's pocket. (RR 19: 34). Homicide Detective Brett Bailey collected the applicant's firearm at the scene. (RR 19: 64). The firearm, a Jimenez Arms .380, still contained the magazine in the grip of the weapon. (RR 19: 65; SX49). The firearm had one live .380 cartridge in the

---

[7] Detective Bailey testified that hollow point bullets typically cause more damage upon impact than lead ball ammunition. (RR 19: 62).

chamber and one in the magazine. (RR 19: 65-66; SX27). Thus, when Detective Bailey found the firearm, it was capable of firing two more rounds. (RR 19: 66). Firearms examination determined that the three casings found at the scene had all been fired from applicant's gun. (RR 20: 145-146).

Police also searched applicant's backpack and found Reese's Peanut Butter ice cream bars, Little Debbie Oatmeal Crème Pies, three bags of peanuts, filet mignon steaks, beef jerky, Hostess CupCakes, and two bottles of Korbel Champagne. (RR 18: 235; RR 22: 57). Applicant had killed Officer Padron over $56.90 worth of shoplifted items. (RR 22: 62; SX78).[8]

Upon being taken into custody, applicant asked Austin police officer Albert Arevalo[9] questions regarding the county of the offense, the relative leniency of Travis County versus Williamson County, and if he would get life or death for what he had done. (RR 18: 245). Applicant winked and smiled at Officer Arevalo as he put him in a patrol car. (RR 18: 243). Officer Arevalo noticed that applicant had red, watery eyes and slurred speech and seemed sleepy. (RR 18: 248). Yet, applicant was alert and oriented according to EMS protocol and politely answered questions. (RR 18: 222). Applicant confirmed that he had no injuries or medical

---

[8] The evidence of the specific food items and the total coast thereof was admitted at the punishment phase. (RR 22: 57, 62).

[9] Officer Arevalo spelled his name for the court reporter as "Arevalo," but it is recorded in the record as "Arevelo." (RR 18: 238). The State uses the spelling of the name as dictated into the record by the officer.

problems, although he did have "blow back" blood on his face from Officer

Padron's fatal injury. (RR 18: 222; RR 19: 37-38; SX7). Applicant also told EMS

technicians that he had not consumed any alcohol or drugs. (RR 18: 222).

Applicant asked EMS technician Christopher Lester if he was going to get life in

prison for "this." (RR 18: 223). Applicant showed no emotion; he was "very

blank, very cold." (RR 18: 224).

During transport to police headquarters, applicant talked to himself and

made a comment about "blasting" one of the officers in the car. (RR 19: 39, 45;

SX15). At headquarters, applicant saw an old police department motorcycle that

he thought was cool, and he spontaneously admitted "I killed a cop." (RR 18: 248-

249; RR 19: 113). Applicant spoke matter of factly, without emotion. (RR 19:

114). Later, when a nurse drew applicant's blood pursuant to a warrant at the

Travis County Jail, applicant chuckled, looked at his hands, and said "I guess I got

that cop's blood on my hands." (RR 19: 98-99). Applicant, indeed, had blood on

his hands. (RR 19: 98).

Applicant waived his Miranda rights and spoke with police. (RR 19: 117-

118). The State played applicant's recorded interrogation for the jury. (RR 19:

142; SX59). Applicant appeared cognizant of his actions, used appropriate

terminology, and did not present any indication of mental illness or lack of mental

fitness. (RR 19: 119). Applicant admitted to have recently taken Xanax, but he did

not seem intoxicated. (RR 19: 120). Applicant knew every single detail involving his murder of Officer Padron, including that he held his gun against Officer Padron's skin. (RR 19: 131; RR 20: 57). He knew that he shot an Austin Police Officer, and he admitted numerous times that he was the one who shot Officer Padron. (RR 20: 57).

## Forensic Evidence

DNA testing confirmed the presence of Officer Padron's DNA profile on applicant's right hand. (RR 20: 84). Forensic testing of applicant's blood showed no alcohol in his blood but revealed a high level of alprazolam (aka Xanax) and marijuana. (RR 20: 89, 93-94, 100). Text messages recovered from applicant's cell phone revealed that on April 4, 2012, applicant arranged for the purchase of eight bars of Xanax and that, the next day, he increased that purchase request to ten bars. (RR 20: 24). Police executed a search warrant on applicant's apartment and discovered sticky notes reading "stop fucking yourself up" and "when I rise to power, you will be sterilized." (RR 20: 29-30, 32).

## Evidence from Officer Padron's Autopsy

Officer Padron suffered a gunshot wound to his neck, with the entrance wound under the left side of his neck (SX65) and the exit wound in the back right of his neck (SX66). (RR 20: 111). This gunshot travelled through Officer Padron's voice box, fractured his fifth cervical vertebra (neck bone), and damaged

13

two arteries that carried blood to his brain. (RR 20: 113). This gunshot created a large tear in the right common carotid artery and tore apart the vertebral artery. (RR 20: 113-114). The gunshot injuries to these arteries caused rapid hemorrhaging and were fatal.[10] (RR 20: 116-118).

Black gunpowder soot encircled the entrance wound on Officer Padron's neck, confirming applicant placed the gun against his skin when he fired. (RR 20: 122). The muzzle of the gun actually made contact with Officer Padron's skin, leaving a muzzle imprint. (RR 20: 123). The medical examiner had no doubt that applicant pressed the gun barrel up against Officer Padron's neck when he shot him. (RR 20: 124). The overall path of the bullet was front to back and to the right. (RR 20: 114).

Applicant had also shot Officer Padron in the chest through the right breast pocket of his uniform. (RR 20: 112). But, Officer Padron had been wearing an armored vest so he did not suffer any damage to his body from this gunshot. (RR 20: 112). Firearms examination revealed that the distance of the gun's muzzle to Officer Padron's uniform was less than 14 inches. (RR 20: 149).

### Defense Evidence at Guilt/Innocence

---

[10] The medical examiner confirmed that hollow point bullets cause more damage to a person's body than lead filled bullets. (RR 20: 116).

Jenna Feland dated applicant from July of 2008, till December of 2011, when he ended the relationship. (RR 20: 185). Applicant used drugs while the couple lived in Colorado, mostly using marijuana, but he also did mushrooms, acid, and Ecstasy. (RR 20: 189-190). In fact, applicant took Ecstasy daily. (RR 20: 190).

Feland claimed that applicant did not do well after their break up, and applicant told Feland he was really sad and "in a downward spiral." (RR 20: 12). Applicant started drinking and taking Xanax. (RR 20: 193). Despite the alleged downward spiral, applicant had a new girlfriend, Nikki Nance, that same December, and he and Feland barely had contact prior to this offense. (RR 20: 206, 231-232).

Feland confirmed that applicant did not have a mental illness. (RR 20: 207). By impeaching Feland with her grand jury testimony, the State established that applicant was not generally a depressed person and that Feland was not aware of applicant having mental problems. (RR 20: 228, 234). Feland described applicant as a quiet and reserved person who got depressed when he got in trouble. (RR 20: 234-235).

On cross-examination, the State also established that Feland and applicant discussed him selling his story for $100,000, although she denied it at trial. (RR 20: 200). State's exhibit 71, a videotaped recording of Feland visiting applicant in

jail on April 24, 2012, showed applicant had the idea to sell his story of this capital murder, and Feland laughed throughout the video. (RR 20: 214; RR 23: 76). Also, while in jail, applicant created a secret code so that he and Feland could communicate without law enforcement understanding what they had written. (RR 20: 215).

Dr. Matthew Masters, an addiction medicine practitioner, reviewed multiple evidentiary items from the defense in preparation for his trial testimony. (RR 21: 18). Dr. Masters testified that Xanax was a highly addictive drug and the number one benzodiazepine on the street because it was fast-acting. (RR 21: 5, 11-12). Dr. Masters observed applicant on the crime scene video at Walmart; the manner in which applicant exited his motorcycle was consistent with a person intoxicated by a benzodiazepine. (RR 21: 19). The SWIFS lab report showed applicant had toxic levels of alprazolam in his system seven hours after his arrest, and his toxicity level was consistent with having taken 8 to 10 Xanax pills. (RR 21: 20-21). Thus, Dr. Masters opined that applicant's statement to police the night of the offense was totally unreliable due to confabulation. (RR 21: 23-24). Dr. Masters described applicant as an addict based on his history, his behavior, and his lab reports. (RR 21: 27).

After approximately one hour of deliberations, the jury found applicant guilty of capital murder as alleged in the indictment. (RR 21: 99, 101).

## STATEMENT OF FACTS FROM PUNISHMENT PHASE

### The Night of this Capital Murder Offense

Applicant and his roommate Kelvin Davis[11] drank and smoked marijuana the night leading to the murder of Officer Padron. (RR 22: 123). Applicant drank tequila, at least a half a liter of it, and Davis drank rum. (RR 22: 124, 145-146). Applicant also took Xanax; in fact, he took approximately six pills, more than Davis thought applicant could handle. (RR 22: 125). That evening, Davis and applicant walked to a nearby convenience store, and applicant talked about robbing the store. (RR 22: 127-128). Davis tried to downplay applicant's idea to rob the store because applicant didn't need any further legal troubles. (RR 22: 128). Applicant responded that he had gotten "away with worse shit." (RR 22: 128-129).

### Lack of Remorse and Extraneous Bad Acts in Texas

Officer Cory Knop transported applicant from the Walmart to the Austin Police Department that fateful day. (RR 22: 18). Applicant nonchalantly admitted that he killed a cop. (RR 22: 19). Applicant also asked Officer Knop if he remembered him, which Officer Knop did. Officer Knop met applicant February 2, 2012, when he arrested him for driving while intoxicated. (RR 22: 19-20). Officer Knop conducted field sobriety tests on applicant and transported him to

---

[11] In January of 2012, Davis searched for a roommate in Austin on Craigslist and found Applicant. (RR 22: 116).

964

jail, all of which was videotaped. (RR 22: 21; SX72). During the DWI encounter, applicant volunteered that he had worked multiple times as an informant for the police in Colorado. (RR 22: 27). Applicant asked Officer Knop not to impound his vehicle and if he could help applicant with the charges. (RR 22: 28). Applicant pleaded that he was a productive member of society and not a bad guy. (RR 22: 28-29). Applicant asked Officer Knop if he thought the arrest was right and if he ever felt bad or if he had done the wrong thing. (RR 22: 29-30). Applicant was polite and did not seem threatening to Officer Knop. (RR 22: 22-23). But, applicant was also polite the night he murdered Officer Padron. (RR 22: 23).

About five weeks earlier, on December 27, 2011, DPS Trooper Charles Hoover stopped applicant for speeding on a highway between Amarillo and Lubbock. (RR 22: 167-168). The odor of marijuana from applicant's vehicle was quite strong, and Trooper Hoover found marijuana in applicant's vehicle and arrested him. (RR 22: 169, 171). Trooper Hoover seized from applicant's vehicle a grinder, marijuana pipe, and three pill bottles for prescription marijuana from Colorado that were not in applicant's name. (RR 22: 174-175; SX81, 82). Videotaped evidence from this arrest showed applicant was very compliant with the officer and stated that he wanted to be a productive member of society. (RR 22: 168-169, 173; SX80).

Austin Police Detective Roy Rector was a certified forensics examiner, and he analyzed evidence from two computers seized after applicant's arrest for murdering Officer Padron. (RR 22: 44). Rector retrieved four photographs (SX73-76) from the logical path Users\danielbra\documents\MY BACKUP\JENNA BACKUP\Pictures. (RR 22: 45-48). The file was created May, 26, 2011, but the pictures were taken in March and May of 2009, all by the same camera. (RR 22: 46-47). The pictures (SX 73-76) were of applicant's tattooed arm holding a gun and of a bullet hole in a wall. (RR 22: 45, 47; RR 23: 72; SX83). Nikki Nance had seen applicant's gun approximately ten times; applicant thought having a gun looked "cool." (RR 22: 95-96). Applicant also bragged to Nance that he would drive really fast on his motorcycle and that he had outrun the police in Colorado. (RR 22: 97).

Kristina "Nikki" Nance testified for the State with a testimonial immunity agreement. (RR 22: 87). In late 2011 or early 2012, applicant met Nance through a posting on Craigslist. (RR 22: 89). They used lots of drugs, to-wit: Xanax, cocaine, acid, mushrooms, and Ecstasy, most of which applicant purchased for them. (RR 22: 90-91). As Nance's and applicant's relationship continued, their drug usage increased. (RR 22: 101-102). Applicant began using heavier drugs and mixing them. (RR 22: 102). Nance recalled a time when applicant wanted to find

966

an "eight ball" of cocaine. (RR 22: 92). Applicant tried to get his roommate Davis to do cocaine, but he refused. (RR 22: 119-120).

Nance's and applicant's friendship ended when she fronted him $600 to purchase drugs, and he never paid her back even though he made a lot more money than Nance did and made her late on her rent. (RR 22: 93-94, 95). Applicant once told Davis that he would kill Nikki Nance if she damaged his car. (RR 22: 132). Yet, applicant did not seem psychotic or violent to Davis, even when applicant used drugs. (RR 22: 132-133).

Applicant seemed intelligent to Davis. (RR 22: 132). Applicant never discussed any family issues with his mother or father and never lamented a bad childhood. (RR 22: 133). Applicant told Davis about outrunning the police on his motorcycle. (RR 22: 129).

While in the Del Valle jail after his arrest for this capital murder, applicant met inmate Luis Escalante because Escalante was curious about the jail uniform[12] applicant was wearing. (RR 23: 33). Applicant asked Escalante if he had seen the person on the news who had killed the cop at Walmart. (RR 23: 34). Applicant showed Escalante a picture of himself from the newspaper, and applicant smirked and chuckled about the killing. (RR 23: 35). Escalante asked applicant if he had

---

[12] Escalante explained that persons wearing the orange and white stripes are "high felons," persons who committed aggravated crimes or murders. (RR 23: 33).

any remorse for the killing or sympathy for his victim, and applicant shook his head "no." (RR 23: 36).

Applicant admitted to Escalante that he grabbed Officer Padron by the neck and shot him and that he fired several times. (RR 23: 52-53). Applicant claimed he went to Walmart to get pills "to get his mind right." (RR 23: 53). He had planned to rob the Walmart pharmacy but not harm the police officer. (RR 23: 54). Applicant also told Escalante that Officer Padron told him he was taking him in because he was intoxicated. (RR 23: 54-55).

### Extraneous Bad Acts Committed in Colorado

On January 25, 2007, Shawn Wycoff of the Colorado State Patrol clocked applicant going 80 m.p.h. in a 55 m.p.h. speed zone on his "highlighter green" motorcycle. (RR 23: 8-9. 11). Wycoff attempted to pull over applicant for speeding, but applicant accelerated and fled, making numerous lane changes and reaching speeds of 90-95 m.p.h. (RR 23: 9, 14). Wycoff radioed another trooper for assistance who was able to stop applicant. (RR 23: 10-11). Applicant presented his driver's license for identification, but he did not have an endorsement allowing him to drive a motorcycle. (RR 23: 11). The trooper arrested applicant for improper endorsement on his license, eluding a police officer, and possession of marijuana, which the trooper found in applicant's pants pocket. (RR 23: 12-13). Applicant admitted that he was out joyriding, racing a friend on the interstate, and

he fled from police because he didn't want to get caught, lose his license, or lose his motorcycle, which was without plates. (RR 23: 12).

In April of 2012, Caresa Marino, a patrol officer in Cheyenne, Wyoming, saw a news report about applicant killing Officer Padron. (RR 23: 19-20). Marino's immediate reaction was "wow, I know that kid. He threatened me in the sixth grade." (RR 23: 20). Marino was not surprised to see applicant on the news. (RR 23: 20).

Marino and applicant attended school together in Parker, Colorado. (RR 23: 21). In November of 1999, applicant threatened Marino when she was playing soccer with her friends at recess. (RR 23: 22, 24). Totally unprovoked, applicant ran up to Marino, told her to lock her doors and windows because he was going to go to her house and rape her. (RR 23: 22). Applicant also called Marino a "bitch" and a "fucker." (RR 23: 22). Applicant and his friends claimed he was just joking, but Marino did not find it funny. (RR 23: 27, 28).

**Extraneous Bad Acts and Disciplinary Violations in Jail**

On May 20, 2012, applicant reported to corrections officer Farial Garrie in the maximum security section of the Del Valle jail that he had found a bunch of green and orange pills in the jail dayroom and that he had taken them in a suicide attempt. (RR 22: 149-151). Applicant was transported to Brackenridge Hospital for the apparent suicide attempt. (RR 23: 74). The physician's summary reflected

969

that applicant claimed to have taken a bag of pills he found taped under a chair.

(RR 23: 74; SX84). The records further reflected that applicant decompensated in

the emergency room and required intubation and mechanical ventilation. (RR 23:

75). But, applicant's urine and serum drug screens were negative. (RR 23: 75).[13]

Furthermore, corrections officers had searched the dayroom before allowing

inmates into it, and they had not found any pills. (RR 22: 152-153).

Corrections officers searched applicant's cell thereafter and found a strip of

paper with a key to decipher coded messages from Applicant. (RR 22: 162-163).

Corrections officers found further evidence that applicant intended to bypass jail

security by sending the coded paper to his mother through correspondence to his

attorney. (RR 22: 163).

In June of 2012, applicant was housed in a psychiatric observation cell in the

Del Valle jail. (RR 22: 64). On June 3, 2012, corrections officer Dustin Rade

searched applicant's cell for contraband and found hooch, ingredients for an

intoxicating beverage, hidden behind the toilet. (RR 22: 65-66). Applicant

violated jail rules by possessing the hooch. (RR 22: 67). Officer Rade again found

contraband items in applicant's cell on August 17, 2012. (RR 22: 68). Officer

Rade found six pills hidden in the window ledge. (RR 22: 68-69). Applicant

---

[13] During the defense presentation of evidence at the punishment phase, Dr. Harold Scott
testified that, from his review of applicant's medical records, he believed applicant took an
overdose of Haloperidol, an antipsychotic drug. (RR 25: 168, 173). Haloperidol was the generic
version of Haldol, the most common psychological drug in an institutional setting. (RR 25: 168,
173). Dr. Scott testified that the hospital did not screen for Haldol. (RR 25: 172).

violated jail rules by possessing the pills, which could only be prescribed by medical staff. (RR 22: 70). Applicant also kept in his cell a list with the jailers' names and their routines and activities. The list of names contained various descriptions of the officers, e.g., applicant said Officer Rade "equals the devil." (RR 22: 81-82).

In October of 2012, Escalante encountered applicant having a secret talk with another inmate, Troy Williams, who was housed across from applicant. (RR 23: 36-37, 67). Applicant and Williams admitted to Escalante that they were planning an escape when applicant was transported for his court hearing in January of 2013. (RR 23: 36-37, 67). Escalante actually overheard them discussing escape plans on two different occasions. (RR 23: 38). Williams explained to Escalante that applicant planned for someone to come to the jail with a gun and start shooting corrections officers. (RR 23: 37, 38). The day before Escalante testified in this trial, he overheard applicant telling another inmate that Escalante was not trustworthy and was a "snitch." (RR 23: 39).

On August 6, 2013, Travis County Sheriff's Deputy Donald MacIntyre heard a commotion and applause coming from the dayroom. (RR 23: 196). He looked into the dayroom and saw applicant taking a bow among the inmates. (RR 23: 196). The inmates had just watched a news story on the television regarding applicant and a court hearing in this capital murder. (RR 23: 196-197). After

24

applicant took his bow, an inmate yelled "fuck the police," and applicant acknowledged that inmate by raising his fist in the air. (RR 23: 202). A camera in the jail captured this event, and the video of it (SX97) was played for the jury. (RR 23: 204).

## Applicant's Mail and Recorded Phone Conversations in Jail

Due to the report that applicant planned to overtake a corrections officer to escape, Austin Police Detective David Fugitt realized that he needed to check applicant's phone calls daily for the officers' safety. (RR 23: 83-84). Detective Fugitt listened to approximately 16 hours of applicant's recorded phone conversations. (RR 23: 84). Fugitt also read applicant's mail and emails and watched video of his visitations. (RR 23: 84). Applicant never expressed remorse for killing Officer Padron in any of those communications. (RR 23: 84). His only expression of remorse came during his interrogation, and it was initially in regard to himself. (RR 23: 84).

The State played SX85, a phone conversation between applicant and his mother recorded on April 25, 2012, while applicant was in jail. (RR 23: 76-77). Applicant told his mother that he had been sent to the health services building in the jail for being depressed. (RR 23: 77). But, he disagreed with the depression diagnosis because he was joking about being depressed or committing suicide. (RR 23: 77). Applicant also wrote his sister after a hospital visit. (RR 23: 114;

25

SX91). Applicant wrote that he was put in the hospital after he joked about no sharp objects and called jail officials "stupid." (RR 23: 114).

On March 10, 2013, applicant had another recorded phone conversation with his mother. (RR 23: 79; SX86). In that conversation, applicant gave his mother a code for a secret alphabet so they could bypass security at the jail in regard to their mail. (RR 23: 79). Applicant had drawn an image of an alien utilizing a shading technique where the letters of the alphabet were written inside the image. (RR 23: 79-80). Applicant called his mother again on March 31, 2013, and discussed murderabilia. (RR 23: 81). In another phone conversation with his mother, applicant said an inmate offered him $30 for his artwork, the most money he knew of being offered for artwork. (RR 23: 101). So, applicant made a copy of the artwork to sell "just for the bragging rights." (RR 23: 101-102).

Anthony Angel, with the Travis County Sheriff's Office security threat unit, copied applicant's mail at the request of Detective Fugitt. (RR 23: 106). Applicant primarily wrote letters to his mother, sister, and Feland. (RR 23: 110). His mother set up a pen pal account for him on meet-an-inmate.com, and he asked her to make his profile sound "more bad" because people might be looking for someone "more criminal-ish." (RR 23: 112). Applicant wrote his mother that he was at the top of the prison pecking order in relation to crimes committed. (RR 23: 113; SX90). In letters to Feland, applicant said he did not like being in the general

prison population because he didn't particularly get along with inmates or cops because they were "not [his] type of people." (RR 23: 115). Applicant reminded Feland to allow him to run the defense and to not talk to anyone on his legal team because "they [were] only out for themselves." (RR 23: 116; SX93). In another letter, applicant told Feland "not much else going on. Just living the dream. I'm retired at 25." (RR 23: 118; SX95). He added a smiley face. (RR 23: 118).

According to Deputy Angel, coded mail presented security concerns regarding escape plans or attacks on officers or other inmates. (RR 23: 107). Inmates who kept notes on the movements of guards in the jail also presented security concerns regarding escape attempts or assaults on staff. (RR 23: 107).

### Inmate Classification System and Prison "Society"

Stephen Rogers, a retired warden and corrections officer, testified regarding the prison classification system for inmates. A person sentenced to life without parole was classified as a G3 and was in the general population. (RR 23: 134). A G3 classified inmate had all the privileges[14] of a minimum security G2 inmate except that he could not be housed in a dormitory outside the prison but within the outer fence. (RR 23: 135). The G3 inmate had the same contact with prison staff and volunteers as a G2 and went to chow and walked the hallways without handcuffs. (RR 23: 136). The prison provided food, beds, and television to the

---

[14] These privileges included contact visits and commissary eligibility. (RR 23: 135).

prisoner; radios were available for purchase in the commissary. (RR 23: 190).

Prisoners in the general population were allowed to make phone calls, receive emails, and have contact with family members. (RR 23: 160, 191). Yet, prisoners in the general population sometimes attacked, caused serious bodily injury, and/or killed prison guards. (RR 23: 191). On the other hand, a prisoner under a death sentence was classified like an administrative segregation prisoner, i.e., he was confined to his cell 23 hours a day and allowed one hour for recreation. (RR 23: 138).

Rogers discussed the problem with inmates making weapons in prison with some prisoners smart enough to make weapons out of "just about anything[.]" (RR 23: 148-154). And, if a prisoner couldn't make a weapon, he had the opportunity to obtain one from another inmate. (RR 23: 154). And, prisoners had access to dangerous items through prison industry. (RR 23: 155).

Prisoners also found ways to access contraband, with cell phones being the foremost problem.[15] (RR 23: 157). Prisoners often used cell phones to contact their victims or persons who testified against them. (RR 23: 157). Drugs were likewise a problem in the prison system and easier to smuggle than cell phones.

---

[15] One prisoner even managed to access Rogers' Facebook account even though he was in permanent lockup. (RR 23: 157).

(RR 23: 158). Many prisoners were adept at making alcoholic beverages, called hooch or chalk. (RR 23: 158-159).

As a warden, Rogers would have concerns with an inmate who attempted to communicate with people outside of prison through coded mail. (RR 23: 159). Such a prisoner presented a threat to correctional officers, other inmates, and even the public. (RR 23: 160-161). Rogers would also have security concerns about a prisoner who tracked the activities of correctional officers. (RR 23: 161). Prisoners inclined to commit acts of violence would have opportunities to commit acts of violence or kill while in prison. (RR 23: 164). And, prisoners who had animus toward police officers would have opportunities in prison to hurt them. (RR 23: 164).

### Officer Padron's Personal and Professional History

Officer Padron's older sister, Linda Diaz, testified that Officer Padron enlisted in the Marine Corps when he was just 17 years old and still in high school. (RR 23: 210). After service with the Marines, Officer Padron worked as a corrections officer, first for the Eden Detention Center and then the San Angelo Police Department. (RR 23: 210). Officer Padron moved to Austin and became employed with the airport police and then transferred to the Austin Police Department. (RR 23: 210-211). Killed at age 40, Officer Padron had given more

29

than half his life serving his country and his community and protecting the public. (RR 23: 211).

Diaz described her brother as a very honorable man of integrity and commitment. (RR 23: 211). She described Officer Padron's first act of bravery as a rookie police officer when he twice ran into a burning building to save victims. First, he attempted to save two children, and then he ran back into the house to save a fellow officer who had not emerged from the burning home. (RR 23: 212). Although divorced, Officer Padron was a dedicated father to his two young daughters, aged 6 and 10 at the time of his death. (RR 23: 212). He was even involved in their school because he loved being around children. (RR 23: 213).

While working full-time for the San Angelo Police Department, Officer Padron continued his education, earning degrees in psychology and criminal justice. (RR 23: 213). He graduated with honors. (RR 23: 213). And, Officer Padron had a positive impact on his nieces and nephews. (RR 23: 213). One nephew was following in his footsteps and had enlisted in the Marines. (RR 23: 213).

Officer Padron was "very caring" and "very loving." (RR 23: 214). His daughters missed their "tremendous daddy" time. (RR 23: 214). Officer Padron was also very close to his parents, especially his father who was not in very good health. (RR 23: 214). Officer Padron's parents and siblings attended the trial, and

977

having to hear the testimony was "horrifying" and "almost unbearable." (RR 23: 214). Diaz could see her parents' pain every day and testified that "no parent should have to go through this" and "[h]is little girls shouldn't have to go through their life without their father." (RR 23: 214).

## Defense Evidence at the Punishment Phase

Travis County corrections officer Richard Low had contact with applicant during his two-year time in the health services building. (RR 24: 10). Deputy Low described applicant as compliant and respectful to him. (RR 24: 11). But, on cross-examination, Deputy Low testified that an inmate was not compliant if he made hooch, hoarded prescription pills, or tracked the movements and activities of corrections officers. (RR 24: 14-15). All those activities were violations of jail regulations, as was sending coded messages to civilian persons through legal mail in the jail. (RR 24: 15). Applicant further violated jail regulations by giving himself a homemade tattoo. (RR 24: 39). Psychological evidence showed applicant was capable of following rules if he so chose, but he did not like to be controlled by other people. (RR 24: 127, 151).

Dr. James Ascough, employed with the USDA, testified via Skype for the defense. (RR 24: 43). He met applicant through a work-study program when applicant was a student at Colorado State University. (RR 24: 45). Dr. Ascough described applicant as a very good programmer. (RR 24:49). Applicant and Dr.

978

Ascough had co-authored a chapter in a book entitled *Advances in Nitrogen Management for Water Quality*. (RR 24: 53-54). Applicant worked with Dr. Ascough at the USDA for approximately 18 months, from 2009 to Christmas 2010. (RR 24: 56). Dr. Ascough encouraged applicant to continue working with him and to attend graduate school, but applicant wanted to begin working and earn money. (RR 24: 57-58). Applicant took the job with Hewlett-Packard in Austin, and the two ceased contact in early to mid 2011. (RR 24: 57-58). Dr. Ascough thought applicant was a quiet, hardworking, and respectful "kid," and he was "stunned" when he heard about applicant killing Officer Padron. (RR 24: 59).

Cross-examination revealed that Dr. Ascough actually knew very little about applicant. (RR 24: 66). He did not know that applicant used marijuana and alcohol daily and that he regularly used cocaine, mushrooms, ecstasy, and acid during his college career. (RR 24: 65-66). Dr. Ascough was aware that applicant had a girlfriend, but he didn't know her name. (RR 24: 65). Applicant told Dr. Ascough about his motorcycle, that he liked to go fast, and that he eluded police on it. (RR 24: 67). Applicant was not embarrassed about that. (RR 24: 67).

Dr. William Carter prepared a psychological study on applicant for the defense. (RR 24: 78). Dr. Carter twice interviewed applicant in 2014. (RR 24: 83). In early adolescence, applicant began to emotionally withdraw and about age

32

12 he fell into depression. (RR 24: 88, 91-92). Applicant began to experiment with drugs in middle school to escape his depression. (RR 24: 95-96).

Applicant avoided social contact, and Dr. Carter described him as humorless. (RR 24: 96). As a teenager, applicant felt lonely and isolated. (RR 24: 101). Dr. Carter thought applicant's depression probably worsened into his teenage years, and he felt helpless and suicidal and hated his life. (RR 24: 106). Yet, applicant was not depressed to the point of psychosis. (RR 24: 118). A common theme in applicant's life was his overstatement of his importance by bragging, pushing limits, or letting others know how smart he was. (RR 24: 102).

On cross-examination, Dr. Carter confirmed that the people he interviews have a personal bias to present themselves in a manner in accord with their perceived best interest. (RR 24: 154). Dr. Carter conceded that it was possible applicant claimed he was depressed only after meeting with Dr. Carter and deciding it was to his benefit to be depressed. (RR 24: 162). But, regardless of one's depression level, Dr. Carter confirmed that a person would know not to kill a police officer. (RR 24: 167).

Applicant's report to Dr. Carter of his lack of friends was disputed by his disciplinary records from high school and college. (RR 24: 157-158). The disciplinary records indicated applicant acted in concert with others in sneaking around the halls or out of classes, of using drugs behind Hobby Lobby with his

33

980

motorcycle-riding friends, and for showing affection on campus to a girl. (RR 24: 157-158). Applicant's disciplinary records also reflected assaultive conduct by him. (RR 24: 159). In one incident, applicant "sucker punched" another boy in the locker room. (RR 24: 159). The person writing the report was concerned because applicant showed no remorse for the assault. (RR 24: 159).

Dr. Carter admitted in cross-examination that applicant displayed manipulative and controlling behaviors before and after this capital offense. (RR 24: 162-163). Applicant used Nikki Nance to get drugs, and he told Jenna Feland not talk to anyone about him, including his lawyers, mitigator, private eye, etc. until he told her to. (RR 24: 162-164; SX93).

Applicant told Dr. Carter that he went to the Walmart to steal[16] and he took his gun with him "just in case." (RR 24: 167). Applicant knew he shot a police officer, and, by the extent of the injury, he knew the officer was dead. (RR 24: 169). Dr. Carter admitted that applicant lacked empathy. (RR 24: 164). The fact that applicant planned to profit from this capital murder was disturbing to one of his psychologists. (RR 25: 132).

The defense also presented Dr. Walter Harrell, a psychologist specializing in neuropsychology and rehabilitation psychology. (RR 24: 222). Based on

---

[16] Evidence showed Applicant had recently received a promotion at work and earned approximately $65,000 to $70,000 at his job. (RR 24: 180).

981

applicant's self-reported frontal lobe injuries,[17] Dr. Harrell thought applicant had

been struggling with depression and sadness his whole life. (RR 24: 249, 254).

Dr. Harrell opined that applicant's multiple concussive events[18] predisposed him to

have struggles with depression, suicidal idealization, and substance abuse. (RR

25:98). Dr. Harrell claimed applicant had a substance abuse disorder that had

been evident since third grade. (RR 24: 255). This testimony, however, was also

based on applicant's self-report that he began drinking alcohol and smoking

marijuana in third grade; applicant also claimed he did cocaine with his father.

(RR 24: 256).

Even Dr. Harrell reported that applicant showed a complete lack of remorse

for killing Officer Padron.[19] (RR 25: 131-132). Applicant told Dr. Harrell that he

went to Walmart to steal groceries, that he carried a gun, was pursued by an

officer, and shot him. (RR 25: 102). Dr. Harrell testified that applicant struggled

with impulse control all of his life. (RR 25: 104). But, he thought applicant's

---

[17] One such injury resulted from a skateboarding accident when applicant was 14 years old, but applicant's brain scan following this accident was normal. (RR 25: 79).

[18] On cross-examination, Dr. Harrell acknowledged that applicant was very intelligent, and he had no difficulty communicating with him. (RR 25:82-83). He also had to acknowledge that his assessment of applicant's frontal lobe injuries was merely an inference based on unsubstantiated reports of head injuries from applicant. (RR 25: 85-87). In one such report, applicant told Dr. Harrell of a head injury he sustained when he was 18 months old. Dr. Harrell admitted that at such a young age, applicant would not have an independent recollection of that event. (RR 25: 85-87).

[19] Applicant's aunt, who was the County Attorney for Pottawatomie County, Kansas, testified that applicant had never expressed remorse for killing Officer Padron. (RR 25: 22, 60).

killing of Officer Padron was a drug-related problem. (RR 25: 105). Applicant could become dangerous and commit acts of violence in prison if he was under the influence of alcohol or drugs. (RR 25: 111).

Dr. Harrell further confirmed on cross-examination that no mitigating factors of sexual abuse, physical abuse, mental retardation, homelessness, or lack of food were present in this case. (RR 25: 128-129). Even though applicant committed various offenses as a juvenile, he never did time in the juvenile system. (RR 25: 130). Applicant was highly intelligent, had excelled in school, and had even graduated Colorado State University with honors in a highly technical field. (RR 25: 129). At the time of this offense, applicant had a good job with a national company and had no work-related issues. (RR 25: 129-130).

Psychiatrist Dr. Harold Scott diagnosed applicant with depressive and addictive problems. (RR 25: 180). Dr. Scott testified applicant was highly addictive, having used substances since age nine to "obliterate reality" and self-medicate for his depression. (RR 25: 208-209). Applicant used alcohol, cough syrup, marijuana, and computer duster (an inhalant) by age thirteen. (RR 25: 208-209).

On August 26, 2012, corrections officer Stephen Crim found applicant on top of his bunk with his hands in the air vent. (RR 24: 199-200). Crim searched applicant's cell and found torn bedsheets fastened into a noose and a three-foot

long rope. (RR 24: 201). The noose was in the air vent. (RR 24: 201). Just expressing suicidal feelings would get an inmate transferred to the health services building in jail. (RR 24: 40). On another occasion, an inmate (Escalante) reported to Crim that he overheard applicant and another inmate discussing escape plans because they were tired of being in jail and wanted out. (RR 24: 203). The fellow inmate planned to overtake a guard, get his keys, and let applicant out of his cell. (RR 24: 203).

### State's Rebuttal Evidence at Punishment

In applicant's phone calls, letters, and visitation, he showed a fascination with major criminal events that had occurred since this capital murder. (RR 25: 248). He often spoke of the Aurora, Colorado, movie theater shooting, the Sandy Hook Elementary School shooting, the Boston Marathon bombing, and the DC capital police shooting. (RR 25: 248-249). Applicant was intrigued with the number of casualties and the type of weapons used. (RR 25: 249). His mother once commented that she felt sorry for the shooter in the movie theater massacre in Colorado. (RR 25: 249).

Dr. Marisa Mauro, a licensed psychologist, interviewed applicant on February 17, 2014, regarding his depression, family, substance abuse before, during, and after this offense, prognosis for recovery from depression and substance abuse, and his adjustment to incarceration. (RR 26: 13-15). Applicant

984

provided Dr. Mauro with little information and was very emotionless. (RR 26: 16). Dr. Mauro found no evidence of psychoses, and she disagreed with the diagnosis of major depression, severe and recurrent. (RR 26: 17). Dr. Mauro opined that applicant's alleged suicide attempt (the taking of the pills while in jail) was more of a gesture, and the circumstances of that event raised questions for her regarding applicant's intent of taking the pills. (RR 26: 20). After his break up with Feland, applicant threatened to kill himself with his gun but that was only a ruse to get her back. (RR 26: 24-25).

Dr. Mauro did not believe that depression impacted applicant before, during or after this capital offense. (RR 26: 31). Records also indicated that applicant said he made the nooses to "mess with" the jail psychiatrist and to get a cell change to a cell with a window where he could get radio reception. (RR 26: 69). Applicant displayed shockingly little difficulty adjusting to jail. (RR 26: 19). He socialized with other inmates, engaged in daily activities with them, and even called them "friends." (RR 26: 25-26, 36).

Applicant told Dr. Mauro that he had a "pretty normal" childhood with difficult issues being his parents' divorce, few friends, and a sometimes emotionally abusive mother. (RR 26:22-23). He reported to Dr. Mauro substantial more drug use than documented in his records. (RR 26: 28). Applicant reported abusing substances daily and using every classification of drug, from prescription

pills to opium, methadone, street drugs, Ecstasy, Xanax and alcohol. (RR 26: 28). Despite applicant's dependency on drugs and alcohol, he did not experience withdrawal symptoms while in jail. (RR 26: 29). Dr. Mauro knew from her work in prison systems that inmates had access to narcotics "pretty much all the time" and alcohol. (RR 26: 70). Dr. Mauro testified that psychiatric medications were valuable in prison and used for favors. (RR 26: 70).

Dr. Mauro used a psychopathy checklist to measure future dangerousness, but she did not use that tool in this case. (RR 26: 37). The psychopathy checklist defined asocial behaviors of not conforming to laws, violating the rights of others, having restricted or shallow ranged of affect and a lack of empathy, and being conning and manipulative. (RR 26: 37).

## The Verdict at the Punishment Phase

The jury found beyond a reasonable doubt that there was a probability that applicant would commit criminal acts of violence and constitute a continuing threat to society. (RR 26: 216). The jury also found that there were not sufficient mitigating circumstances to warrant a sentence of life imprisonment rather than a death sentence. (RR 26: 216). Applicant requested a jury poll, which revealed the jury's answers to the punishment verdict were unanimous. (RR 26: 217-218). In accordance with the jury's verdict, the trial judge sentenced applicant to death by lethal injection. (RR 26: 221).

# V.

## Law Applicable To All Grounds For Relief

Traditionally, habeas corpus is available only to review jurisdictional defects or denials of fundamental or constitutional rights. *Ex parte Watson*, 601 S.W.2d 350, 352 (Tex.Crim.App. 1980); *Ex parte Carmona*, 185 S.W.3d 492, 494-495 (Tex.Crim.App. 2006). A writ of habeas corpus cannot be used to litigate matters that could have been raised at trial or on direct appeal. *Ex parte Bagley*, 509 S.W.2d 332, 334 (Tex.Crim.App. 1974).

In post-conviction proceedings, applicant has the burden of proving facts which, if true, entitle him to relief. This means that the applicant must do more than state mere conclusions of law or allegations of error. Each claim must be supported by adequate facts. *Ex parte Maldonado*, 688 S.W.2d 114, 116 (Tex.Crim.App. 1985); *Ex parte McPherson*, 32 S.W.3d 860, 861 (Tex.Crim.App. 2000). The applicant must show how the alleged error "so infected the procedure that the applicant was denied a fair and impartial trial." *McPherson*, 32 S.W.3d at 861.

# VI.

## STATE'S REPLY TO APPLICANT'S FIRST GROUND FOR RELIEF

In his first ground for relief, applicant presents twelve claims in which he

alleges trial counsel rendered ineffective assistance. The standard of review for each allegation is the same.

## Standard of Review

The standard for review when ineffective assistance of counsel is alleged was set out in *Strickland v. Washington*, 466 U.S. 668 (1984), and was adopted by the Court of Criminal Appeals in *Hernandez v. State*, 726 S.W.2d 53 (Tex.Crim.App. 1986). In order to reverse a conviction, a court must find that the complainant has shown: (1) that counsel's representation fell below an objective standard of reasonableness, and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. 726 S.W.2d at 56-57. Applicant bears the burden to prove by a preponderance of the evidence that his trial counsel's performance was ineffective. *Ex parte McFarland*, 163 S.W.3d 743, 753 (Tex.Crim.App. 2005).

In applying the *Strickland* standard, counsel's representation is to be judged by the totality of the representation, not by isolated acts or omissions by counsel. *Moore v. State*, 700 S.W.2d 193, 205 (Tex.Crim.App. 1985). That is, when a reviewing court considers a claim of ineffective assistance of counsel, it must first analyze all allegations of deficient performance, decide whether counsel's conduct was constitutionally deficient, and, if so, then consider whether those specific deficient acts or omissions, in their totality, prejudiced the defense. *Ex parte*

41

988

*Nailor*, 149 S.W.3d 125, 130 (Tex.Crim.App. 2004). The constitutional right to counsel does not mean errorless counsel. *Ingham v. State*, 679 S.W.2d 503, 509 (Tex.Crim.App. 1984).

An attorney's efforts are not to be viewed through hindsight, and the fact that another attorney might have pursued a different course will not support a finding of ineffectiveness. *Hawkins v. State*, 660 S.W.2d 65, 75 (Tex.Crim.App. 1983). A fair assessment of counsel's performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances, and to evaluate the conduct from counsel's perspective at the time. *Ex parte Kunkle*, 852 S.W.2d 499, 505 (Tex.Crim.App. 1993). The *Strickland* test is judged by the viewpoint of counsel at the time he acted, rather than through hindsight. *Ex parte Jimenez*, 364 S.W.3d 866, 883 (Tex.Crim.App. 2012).

"Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Ex parte Kunkle*, 852 S.W.2d at 50, citing *Strickland v. Washington*, 466 U.S. at 688-689. The burden is on applicant to overcome the "strong presumption" that his counsel performed effectively. *Strickland*, 466 U.S. at 690.

Judicial scrutiny of counsel's performance must be highly deferential. *Ex parte Flores*, 387 S.W.3d 626, 636 (Tex.Crim.App. 2012); *Ingham*, 679 S.W.2d at 509. The reviewing court must indulge a strong presumption that said conduct fits within the wide range of reasonable professional assistance, or, that it might, under the circumstances, be considered sound trial strategy. *Strickland*, 466 U.S. at 689-90. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Ex parte Overton*, 444 S.W.3d 632, 640 (Tex.Crim.App. 2014), quoting *Strickland*, 466 U.S. at 690.

To show prejudice, the defendant must show that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different, with reasonable probability defined as "a probability sufficient to undermine confidence in the outcome". *Strickland*, 466 U.S. at 693-94.

Moreover, an ineffective assistance contention will be sustained only if it is firmly founded in the trial record and the record affirmatively demonstrates counsel's ineffectiveness. *See Salinas v. State*, 163 S.W.3d 734, 740 (Tex.Crim.App. 2005); *Thompson, supra* at 813; *Ex parte McWilliams*, 634 S.W.2d 815, 819 (Tex.Crim.App. 1980), *cert. denied*, 459 U.S. 1036 (1982). The appellate court must presume that counsel was better positioned than the appellate court to judge the case and that counsel had made all significant decisions in the exercise of reasonable professional judgment. *See Young v. State*, 991 S.W.2d 835,

990

837 (Tex.Crim.App. 1999); *Delrio v. State*, 840 S.W.2d 443, 447 (Tex.Crim.App. 1992). Furthermore, the record must contain evidence of counsel's reasoning, or lack thereof, to rebut that presumption. *See Jackson v. State*, 877 S.W.2d 768, 771 (Tex.Crim.App. 1994).

## State's Replies to Applicant's Claims Regarding Effectiveness of Counsel

The State first notes that throughout his lengthy writ application, applicant cites to American Bar Association guidelines as support for his contentions of ineffective assistance of counsel. Appellate courts refer to standards published by the ABA and other similar sources as guides to determine prevailing professional norms. *Ex parte Lahood*, 401 S.W.3d 45, 50 (Tex.Crim.App. 2013), citing *Strickland*, 466 U.S. at 688-89. But, publications of that sort are only guides because no set of detailed rules can completely dictate how best to represent a criminal defendant. *Ex parte Lahood*, 401 S.W.3d at 50.

### A. Trial counsel did not fail to investigate whether applicant had Autism Spectrum Disorder (ASD). After reasonable investigation, the defense team determined not to present evidence of ASD. Trial counsel investigated and presented substantial evidence of applicant's mental health issues at both phases of trial.

In his first ground for relief, applicant claims his trial counsel were ineffective for failing to investigate and present evidence that he has Autism Spectrum Disorder (ASD). Writ application at p. 22. Applicant contends that had

44

his counsel done an adequate investigation they would have learned that he "suffers" from ASD. *Id.* Applicant contends that he has presented "a wealth of documentation that he has ASD[.]" *Id.* Applicant argues that reasonably effective counsel would have used evidence of his mental health disorder at guilt/innocence to raise two possible defenses, viz: that he lacked the required culpable mental state to commit capital murder or that he was insane at the time of the offense, and to show that his statement to police after the offense "may have been involuntary[.]" *Id.* at pp. 63-66. And, as for the punishment phase of trial, applicant contends evidence of his mental health disability would have served as powerful mitigating evidence. *Id.* at p. 73.

One necessary facet of professional assistance is the investigation of facts and law applicable to the case. *Ex parte Lahood*, 401 S.W.3d at 50. Defense counsel has a duty to make a reasonable investigation or a reasonable decision that an investigation is unnecessary. *Id.*, citing *Strickland*, 466 U.S. at 691. "When assessing the reasonableness of an attorney's investigation, a reviewing court must consider the quantum of evidence already known to counsel and whether the known evidence would lead a reasonable attorney to investigate further." *Ex parte Lahood*, 401 S.W.3d at 50, quoting *Ex parte Martinez*, 195 S.W.3d 713, 721 (Tex.Crim.App. 2006). A decision not to present cumulative testimony does not constitute ineffective assistance of counsel. *See Coble v. Quarterman*, 496 F.3d

45

430, 437 (5th Cir. 2007) (refusing to find *Strickland* error when counsel presented similar mitigating evidence at trial, even if only in outline form).

The trial record shows that counsel rendered reasonably effective assistance at both phases of trial. Defense counsel clearly investigated applicant's background and social history and presented significant evidence of his mental health issues at both phases of trial. The habeas record establishes that defense counsel did, in fact, investigate whether applicant had Autism Spectrum Disorder (ASD). Defense counsel's affidavit reflects that he "wanted to obtain as much reliable and useful information and opinion as possible." *See* Affidavit of Russ Hunt, Jr., attached to the State's Answer as WX1 (Writ Exhibit 1). Defense counsel hired and consulted with a number of experts in preparing and presenting the defense case. (WX1). Specifically, defense counsel worked with Dr. Cecil Reynolds, a consulting neuropsychologist, Dr. Walter Harrell, a neuropsychologist, Dr. Harold Scott, a psychiatrist, and Lisa Lawrence, a mitigation specialist. (WX1).

Defense counsel attests that the entire defense team, which included these many experts, discussed the possibility that applicant had Asperger's syndrome or "another disorder in the autism spectrum" on several occasions. (WX1). Defense counsel specifically inquired of his experts whether a credible diagnosis of those or related disorders could be made. (WX1). Dr. Scott indicated that he did not

46

believe applicant had Asperger's syndrome, and Dr. Carter "adamantly" indicated that applicant did not suffer from ASD. (WX1). Dr. Carter later elaborated on his rejection of Asperger's and related diagnoses, noting that "[s]ome people are too quick to bring up that matter when a person is socially flawed or displays inappropriate affect." (WX1).

Defense counsel's affidavit further establishes that he used the investigation into applicant's mental health issues, particularly autism related disorders, and applicant's history to develop the most appropriate defense mitigation case. *See* State's WX1. Defense counsel sought to present a credible story about applicant to which the jury would give mitigating weight. (WX1). The defense team determined to present evidence of his psychological issues as part of that mitigating story, but, without a diagnosis of ASD, the defense team reasonably determined they could not present "a clear, powerful story about autism spectrum disorders[.]" (WX1). But, defense counsel further concluded that even if applicant fell somewhere on the spectrum of the disorder, it seemed that his disorder fell on the mild range. (WX1). And, with his own expert witness of the opinion that people are too quick to use ASD or Asperger's to explain a person's socially awkward or inappropriate behavior, counsel's decision to not present evidence of ASD was objectively reasonable.

Applicant contends that had his counsel adequately investigated his life and background, "they would have known that he suffers from ASD[.]" Writ application at p. 56. Yet, applicant had not been diagnosed with ASD during his childhood and adolescence or prior to trial. In fact, one of applicant's experts, Dr. Harold Scott, a board certified psychiatrist with 47 years' experience did not diagnose applicant with ASD despite having reviewed his records and meeting with applicant multiple times.[20] Applicant faults legal counsel for not presenting a medical diagnosis that had not been made or even recognized by a board certified psychiatrist prior to trial.

Although Dr. Scott has now presented applicant with an affidavit revising his diagnosis of applicant, it is important to note the specifics of that revision. Dr. Scott attests that his new diagnosis of ASD replaces only his diagnosis of Avoidant Personality Disorder, as "ASD better explains [applicant's] substantiated impairments in socialization." Applicant's Exhibit 11 at p. 3. Dr. Scott does not attest that ASD explains why applicant committed this offense or his behavior after the offense. And, there was substantial evidence at trial of applicant's impairments in socialization. There is no reasonable probability that the outcome of this trial would have been any different with this new, limited diagnosis from Dr. Scott.

---

[20] Through no fault of defense counsel, Dr. Scott was not able to fully interview applicant's father and investigate his social history in that regard due to applicant's father's fatal illness. *See* Writ Application, Exhibit 11, p. 1.

48

Thus, the habeas record clearly establishes that defense counsel did not fail to investigate whether applicant had ASD. In fact, the opposite is true. Defense counsel made a reasonable investigation into applicant's mental health issues, including the possibility of ASD. Applicant fails to overcome the strong presumption that his counsel performed effectively. *Strickland*, 466 U.S. at 690. Applicant's claim in the first ground for relief is without merit.

Furthermore, the trial record affirmatively reflects that defense counsel rendered effective assistance. Defense counsel utilized the defense team's investigation to develop a cogent defensive theory at guilt/innocence given the facts of this offense and to present mitigating evidence at punishment. Defense counsel in this case was presented with a well-educated, highly intelligent and successful soft-ware engineer who committed a senseless, cold-blooded murder. (RR 18: 12). The challenge was to explain applicant's behavior in light of these facts. (RR 18: 13, 14). In his opening statement to the jury, defense counsel explained that applicant suffered from depression and engaged in self-medication with Xanax, a highly addictive drug that could lead to changes in personality, changes in perception in recollection, and changes in response to external threats or events. (RR 18: 13). Counsel further noted that the evidence would show applicant was highly intoxicated on Xanax and that explained his confused state of mind, flat effect, his lack of intent to kill Officer Padron, and memory problems.

49

(RR 18: 14-15). Defense counsel utilized the facts and evidence of applicant's intoxication to challenge two elements of this capital murder, viz: applicant's intent and his knowledge that Office Padron was a police officer. (RR 21: 75-76).

Defense counsel presented the expert testimony of Dr. Masters, a board certified doctor in addiction medicine. (RR 21: 5). Dr. Masters described applicant's behavior as that of an addict with a coincidence of depression based on applicant's history, behavior, and lab reports. (RR 21: 27-28). He opined that applicant was not in a rationale state of mind at the time of the offense or when his blood was drawn seven hours later. (RR 21: 40). Dr. Masters noted that applicant was still toxic on a drug that would impair his mental capacities. (RR 21: 40).

The defense presented Dr. Masters' testimony to put into context applicant's statements to police in the back of the patrol car immediately following the offense and later at the police station in regard to applicant's state of mind. (RR 21: 80-81). Defense counsel asked the jury to carefully consider applicant's statement to police that explained what he saw and what was going on in his mind. (RR 18: 16). Defense counsel argued to the jury the inconsistencies between applicant's statement and the offense shown on the videotape from the Wal-Mart. (RR 21: 83-86). Defense counsel noted how applicant's intoxication had confused him and blurred his memory and how police extracted conflicting facts from him. (RR 21: 85). Thus, the record affirmatively reflects that defense counsel evaluated

50

applicant's statements to police in conjunction with his intoxication and facts of this offense. *See* Writ application at p. 54.

Dr. Mesibov's conclusion that, because of his alleged ASD, applicant did not appreciate the wrongfulness of his conduct is contradicted by the evidence in this trial. The overwhelming evidence at trial established that applicant fully appreciated the wrongfulness of his conduct. The evidence showed applicant anticipated a violent encounter at the Wal-Mart and that he understood the criminal nature and wrongfulness of his acts that fateful night (and in his past). Applicant entered the Wal-Mart store intending to shoplift and bearing a firearm, loaded with hollow point bullets for maximum damage, "just in case." (RR 24: 167). In his videotaped interview after the offense, applicant told Detective Fugitt that he took the gun to Wal-Mart because he anticipated an altercation with police, i.e. that police would prevent him from leaving the store. (RR 21: 69).

Applicant fired two shots at Officer Padron, putting the gun against his neck and firing the fatal shot. (RR 18; 119-120; RR 20: 122-123). Applicant then fired a third shot at Wal-Mart employees who came to Officer Padron's assistance. (RR 18: 61, 133-134). Immediately after killing Officer Padron, applicant chuckled and said "I killed a cop." (RR 18:64). Applicant was also cognizant that he could get

51

998

the death penalty for his actions. (RR 18: 245).[21] The evidence did not support an

insanity defense, as applicant argues in his writ application at p. 64.

The evidence also totally undermines Dr. Mesibov's opinion that applicant's

killing of Officer Padron in response to being tackled by him "was a function of his

disability[,]"[22] or the effects of "overstimulation."[23] The video from the Wal-Mart

showed applicant shooting Officer Padron as soon as they hit the ground, i.e. that

applicant "didn't have time to get on the ground, reach for the gun, pull the gun,

rack the gun." (RR 26: 127). Based on the video, State argued without objection

that applicant "hit the ground basically in a firing position and he did." (RR 26:

127). Applicant's firearm contained a magazine and was capable of firing two

more rounds. (RR 19: 65, 66). Police found an additional magazine with six .380

hollow point bullets in applicant's pocket. (RR 19: 34). The evidence clearly

showed applicant's murder of Officer Padron was a well-planned, premeditated,

intentional act.[24]

---

[21] Defense counsel utilized this video evidence as evidence of applicant's remorsefulness for
doing what he knew was a terrible thing. (RR 26: 163-164). Defense counsel argued at
punishment that the video showing applicant recognized the wrongfulness of his actions was
mitigating evidence. (RR 26: 163-164).

[22] Writ application at p. 53, citing Applicant's Exhibit 1 at 67.

[23] Writ application at p. 54.

[24] The evidence established that applicant had purchased this weapon years before on February
23, 2009, in Fort Collins, Colorado. (RR 20: 60-61; SX62).

This case was already a battle of dueling forensic experts on applicant's mental health and intoxication issues. Much of Dr. Mesibov's discussion of applicant's symptomology in his affidavit is cumulative of evidence already presented at trial through the defense's expert witnesses and based on the same material. *See Coble v. Quarterman*, 496 F.3d at 437 (decision not to present cumulative testimony does not constitute ineffective assistance of counsel). In fact, applicant notes that Dr. Harrell's testimony corroborated Dr. Mesibov's affidavit. Writ Application at p. 60.

In this first ground for relief, applicant inappropriately reviews counsel's performance in hindsight. Applicant takes the same evidence that counsel presented at both phases of trial, asserts that it should now be considered ASD, and contends counsel should have presented evidence of that disorder. The record clearly reflects that defense counsel had thoroughly investigated applicant's social, family, educational, and mental health history. Applicant's defense counsel did not fail to investigate whether applicant had ASD. Defense counsel's affidavit shows that the defense team, including multiple mental health experts, considered ASD as a possible diagnosis for applicant and rejected it. Counsel's affidavit further reflects that their investigation was more than reasonable. Applicant fails to show that counsel's representation fell below an objective standard of reasonableness.