# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

|  |  |
|---|---|
| **BRANDON DANIEL** § | |
| § | |
| Petitioner, § | **CIVIL NO. A-17-CV-1069-LY** |
| § | |
| v. § | **This is a Capital Case** |
| § | |
| **LORIE DAVIS, Director,** § | |
| **Texas Department of Criminal Justice,** § | |
| **Correctional Institutions Division** § | |
| § | |
| Respondent. § | |

---

## CONSOLIDATED AND AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND MEMORANDUM OF LAW BY A PRISONER IN STATE CUSTODY PURSUANT TO 28 U.S.C. § 2254 *et seq.*

---

SHAWN NOLAN
Pa. Bar No. 56535
Federal Community Defender for the
Eastern District of Pennsylvania
Suite 545 West, The Curtis Center
601 Walnut Street
Philadelphia, PA 19106
(215) 928-0520
Shawn_nolan@fd.org

Dated: March 4, 2019

# TABLE OF CONTENTS

STATEMENT ABOUT EXHAUSTION AND PROCEDURAL DEFAULT ................................... 3

EXCEPTIONS TO PROCEDURAL DEFAULT ................................................................. 3

STANDARD OF REVIEW UNDER THE AEDPA ............................................................. 4

    A. General Standards ............................................................................................ 4

    B. Because the State Habeas Court Engaged in Extensive Ex Parte Communications
    With the Prosecutor Before Adopting the State's Proposed Findings of Fact and
    Conclusions of Law Nearly Verbatim, AEDPA Deference Should Not Apply to
    Any Claims Adjudicated on the Merits. ............................................................ 6

    C. Because the State Habeas Court Denied the Opportunity for Evidentiary
    Development, Resulting in Unreasonable Factual Determinations Related to
    Petitioner's Claims, AEDPA Deference Should Not Apply to the Claims
    Adjudicated in State Habeas Proceedings. ....................................................... 9

STANDARDS RELATING TO INEFFECTIVE ASSISTANCE OF COUNSEL UNDER
*STRICKLAND V. WASHINGTON* ............................................................................... 14

REQUEST FOR AN EVIDENTIARY HEARING ............................................................ 15

STATEMENT OF THE CASE ..................................................................................... 16

    A. PROCEDURAL HISTORY ................................................................................ 16

        1. Trial Court Proceedings ......................................................................... 16

        2. State Appellate Proceedings ................................................................... 17

        3. State Habeas Proceedings ....................................................................... 17

    B. STATEMENT OF FACTS ................................................................................. 22

        1. Guilt Phase ............................................................................................ 22

        2. Penalty phase ......................................................................................... 23

I.    THE TRIAL JUDGE ENGAGED IN MULTIPLE EX PARTE
    COMMUNICATIONS WITH PROSECUTORS, WHICH REPEATEDLY
    DEMONSTRATED HER BIAS AGAINST MR. DANIEL IN VIOLATION
    OF HIS EIGHTH AND FOURTEENTH AMENDMENT RIGHTS ............................ 25

    A. The Trial Judge Engaged in Ex Parte Communications Throughout the Trial and
    State Habeas. .................................................................................................. 26

        1. Emails related to Mr. Daniel's recusal motion in state habeas .................. 26

2. Emails related to Mr. Daniel's competency and potential waiver in state habeas ....................................................................................27

3. Emails related to a potential plea during pretrial proceedings ..................................29

4. Emails related to ex parte discussions with an ADA about Mr. Daniel's trial..........30

5. The trial judge's continued impropriety following the ordered disclosures of the ex parte communications..................................................................................30

B. The Trial Judge's Ex Parte Emails Demonstrated Her Partiality to the State and Her Bias Against Mr. Daniel in Violation of Due Process......................................................31

C. State Court Proceedings ....................................................................................34

II. THE TRIAL JUDGE GAVE SUPPLEMENTAL INSTRUCTIONS TO THE JURY OUTSIDE THE PRESENCE OF COUNSEL IN VIOLATION OF MR. DANIEL'S SIXTH AMENDMENT RIGHTS TO COUNSEL AND A PUBLIC TRIAL, FIFTH AND FOURTEENTH AMENDMENT RIGHTS TO DUE PROCESS, AND EIGHTH AMENDMENT RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT. ..............................................................34

A. The Trial Judge Provided Supplemental Instructions to the Jury During Penalty Phase Deliberations Without Notice to Mr. Daniel or His Counsel. ..................................35

B. Mr. Daniel Was Denied His Sixth Amendment Right to Counsel During a Critical Stage of the Proceeding When the Trial Court Provided Supplemental Instructions to the Jury Without Notifying Counsel............................................37

C. Mr. Daniel Was Denied His Sixth Amendment Right to a Public Trial When the Trial Court Secretly Instructed the Jury, Without Making a Record of the Supplemental Instruction, and Without Making the Necessary Findings to Close the Proceedings...........................................................................................41

D. Mr. Daniel Was Denied His Right to Due Process When the Trial Court Instructed the Jury Outside His Presence...........................................................42

E. State Court Proceedings ...................................................................................43

III. MR. DANIEL WAS DENIED DUE PROCESS AND A FULL AND FAIR OPPORTUNITY TO LITIGATE HIS CONSTITUTIONAL CLAIMS UNDER TEXAS STATE HABEAS LAW, WHEN THE TRIAL JUDGE, AFTER ENGAGING IN EX PARTE COMMUNICATIONS WITH THE PROSECUTOR ABOUT THE MERITS OF MR. DANIEL'S STATE HABEAS PETITION, DENIED MR. DANIEL A HEARING, IGNORED THE AFFIDAVITS HE SUBMITTED IN SUPPORT OF HIS PETITION, AND ADOPTED THE STATE'S PROPOSED ORDER VERBATIM, IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS..............................................45

IV.  MR. DANIEL'S RIGHTS TO DUE PROCESS, EFFECTIVE ASSISTANCE
     OF COUNSEL, AND FREEDOM FROM CRUEL AND UNUSUAL
     PUNISHMENT WERE VIOLATED BY THE TRIAL COURT'S FAILURE
     TO PROPERLY FUND HIS DEFENSE, AND TRIAL COUNSEL'S
     AGREEMENT TO WORK ON MR. DANIEL'S CASE UNDER A FLAT FEE
     STRUCTURE CREATED A CONFLICT OF INTEREST BETWEEN MR.
     DANIEL AND HIS ATTORNEYS. ........................................................................47

     A.  Mr. Daniel's Defense Was Improperly And Deficiently Funded .......................48

     B.  Capital Defendants Are Entitled To A Properly Funded Defense Under The
         Fifth, Sixth, Eighth, And Fourteenth Amendments. ...............................52

         1.  Governing standards prohibit the use of flat fees and caps in capital cases. ..............52

         2.  Governing standards require authorizing sufficient funds to conduct the
             necessary mitigation investigation. ..............................................52

     C.  Trial Counsel's Flat Fee Created an Actual Conflict Of Interest. ........................53

         1.  Trial counsel's conflict of interest deprived Mr. Daniel of his Sixth
             Amendment right to conflict-free counsel. ..................................53

     D.  State Court Proceedings ......................................................................55

V.   MR. DANIEL'S RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL AND
     IMMUNITY FROM CRUEL AND UNUSUAL PUNISHMENT WERE
     VIOLATED BY TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND
     PRESENT MITIGATING EVIDENCE. ....................................................56

     A.  Mr. Daniel's Family Was Unstable. .....................................................57

     B.  Mr. Daniel's Parents Did Not Address His Drug Abuse, Depression, and
         Disability. ...................................................................................63

         1.  Mr. Daniel's drug abuse ...............................................................63

         2.  Mr. Daniel's depression and suicidal tendencies ...............................65

         3.  Mr. Daniel's undiagnosed disability ...............................................66

         4.  Consequences of Mr. Daniel's parents not addressing his problems with
             drugs, depression, and his disability ..............................................69

     C.  Mr. Daniel Continued to Struggle With Drug Abuse, Depression, and His
         Disability at College and After College. ...............................................70

     D.  Trial Counsel's Failure to Uncover and Present Relevant Mitigating Evidence
         Constituted Deficient Performance. ....................................................76

       1.  Trial counsel conducted a truncated investigation just weeks before trial.................78

E.  Trial Counsel Failed to Conduct a Thorough Investigation into Mr. Daniel's Social History..................................................................................................................81

F.  Trial Counsel's Lack of Investigation and Preparation Prejudiced Mr. Daniel.................83

G.  State Court Proceedings...........................................................................................84

       1. The state court process was unreasonable because the state courts denied relief without a hearing, and because the trial court adopted the state's proposed findings and conclusions verbatim.......................................................85

       2. The state court decision was unreasonable.......................................................85

H.  Exhaustion.................................................................................................................88

VI.  MR. DANIEL'S RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL AND FREEDOM FROM CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED BY TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT EVIDENCE THAT MR. DANIEL HAS AUTISM SPECTRUM DISORDER, WHICH WOULD HAVE MITIGATED THE CIRCUMSTANCES SURROUNDING THE OFFENSE AND WOULD HAVE EXPLAINED MR. DANIEL'S APPARENT LACK OF REMORSE. ...............................................88

A.  Autism Spectrum Disorder .........................................................................................89

B.  Diagnosing Autism Spectrum Disorder .......................................................................90

       1. Depression and Self-Medication........................................................................92

       2. Atypical Demonstrations of Emotion .................................................................93

C.  Trial Counsel Failed to Adequately Investigate, Develop, and Present Evidence of Mr. Daniel's Autism Spectrum Disorder..............................................................94

D.  There is a Reasonable Probability That the Jury Would Have Found the Diagnosis and Explanation of Autism Spectrum Disorder Mitigating..........................100

E.  State Court Proceedings........................................................................................... 103

       1. The state court decision rested on an unreasonable determination of fact. ..............104

       2. The state court decision was an unreasonable application of clearly established law.................................................................................................105

VII.  TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE AND PRESENT EVIDENCE OF THE ADVERSE EFFECTS OF XANAX IN VIOLATION OF MR. DANIEL'S SIXTH AMENDMENT RIGHT TO COUNSEL, FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS, AND

EIGHTH AMENDMENT RIGHT TO BE FREE FROM CRUEL AND
UNUSUAL PUNISHEMNT....................................................................... 107

A. Adverse Effects of Xanax .................................................................. 108

    1. Paradoxical Reaction ...............................................................108

    2. Paradoxical reactions under circumstances of frustration ...........................109

    3. How alcohol differs from Xanax ...............................................110

B. It was Objectively Unreasonable for Trial Counsel to Fail to Present an Expert to
Present Evidence of Paradoxical Reaction. ............................................. 110

C. Mr. Daniel was Prejudiced by Trial Counsel's Failure to Present an Expert to
Explain Paradoxical Reaction. ............................................................. 111

D. State Habeas Counsel Were Ineffective for Failing to Raise this Claim. ......... 113

    1. Deficient performance ............................................................114

    2. Prejudice............................................................................114

VIII. TRIAL COUNSEL WERE INEFFECTIVE FOR ABANDONING THEIR MOTION
TO SUPPRESS MR. DANIEL'S INADMISSIBLE ORAL STATEMENTS IN
VIOLATION OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE
ASSISTANCE OF COUNSEL, FOURTEENTH AMENDMENT RIGHT TO DUE
PROCESS, FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION,
AND EIGHTH AMENDMENT RIGHT TO BE FREE FROM CRUEL AND
UNUSUAL PUNISHMENT....................................................................... 115

A. Mr. Daniel's Incapacitating Intoxication and His Statements ..................... 116

    1. Extreme intoxication as evidenced by Mr. Daniel's behavior in Walmart................116

    2. Extreme intoxication as evidenced by the toxicology reports ....................117

B. Mr. Daniel's Statements and How They Were Used at Trial............................ 118

    1. Statements made during arrest and transportation to the police station..................118

    2. Statements made during interrogation..........................................119

    3. How the statements were used at trial..........................................121

C. Mr. Daniel's Statements Were Inadmissible.......................................... 124

D. Trial Counsel's Abandonment of Their Motion to Suppress Mr. Daniel's
Inadmissible Statements Constitutes Deficient Performance............................ 127

E. Trial Counsel's Failure to Protect Mr. Daniel from the Admission of His Involuntary and Unlawfully Obtained Statements Prejudiced Him. ............... 131

F. The State Court's Decision Should Not Receive AEDPA Deference. ........................... 132

IX. TRIAL COUNSEL WERE INEFFECTIVE AT BOTH GUILT AND PENALTY PHASES FOR FAILING TO CHALLENGE EVIDENCE AND ARGUMENT PRESENTED BY THE STATE THAT MR. DANIEL INTENTIONALLY KILLED OFFICER PADRON, IN VIOLATION OF MR. DANIEL'S SIXTH AND EIGHTH AMENDMENT RIGHTS. ............... 137

A. Evidence Presented by the State That Mr. Daniel Purposefully Shot Officer Padron in the Neck, With Bullets Designed to Cause the Most Damage, Was Misleading. ........... 138

   1. Alma Gutierrez's testimony was erroneous ............... 138

   2. Witness Testimony Related to Hollow Point Bullets ............... 142

B. Deficient Performance ............... 143

C. Prejudice ............... 145

D. State Habeas Counsel Were Ineffective for Failing to Raise this Claim. ............... 146

X. COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE AND PRESENT EVIDENCE IN SUPPORT OF MR. DANIEL'S ASSERTION THAT HE CARRIED A GUN FROM "TIME TO TIME" BECAUSE OF DEATH THREATS AND THAT HE PREVIOUSLY ASSISTED POLICE IN COLORADO. MR. DANIEL WAS DENIED HIS RIGHTS TO DUE PROCESS, EFFECTIVE ASSISTANCE OF COUNSEL, AND FREEDOM FROM CRUEL AND UNUSUAL PUNISHMENT ............... 147

A. Mr. Daniel's Statements That He Worked as a Confidential Informant and Evidence Presented at Trial ............... 147

B. Counsel Were Ineffective and Mr. Daniel was Prejudiced. ............... 149

C. Mr. Daniel's Due Process Rights Under *Brady* Were Violated. ............... 150

D. State Habeas Counsel Were Ineffective for Failing to Raise this Claim. ............... 150

   1. Deficient performance ............... 150

   2. Prejudice ............... 151

XI. TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO OBJECT TO INADMISSIBLE VICTIM IMPACT EVIDENCE AT THE GUILT AND PENALTY PHASES OF TRIAL, THUS DENYING MR. DANIEL DUE PROCESS, A FAIR TRIAL, AND HIS RIGHTS UNDER THE SIXTH, EIGHTH,

AND FOURTEENTH AMENDMENTS. .............................................. 151

    A.   Relevant Facts ........................................................................... 152

    B.   Trial Counsel Were Deficient. .................................................... 153

    C.   Mr. Daniel Was Prejudiced. ...................................................... 155

    D.   The State Court's Decision Should Not Receive AEDPA Deference. ........................... 156

        1.   Mr. Daniel Is Entitled to De Novo Review. ................................... 156

        2.   The State Court's Decision Was an Unreasonable Application of Clearly Established Federal Law. ................................................................ 156

XII.  THE PROSECUTOR COMMITTED MISCONDUCT AND COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO THE STATE'S IMPROPER ARGUMENTS AT THE GUILT PHASE, WHICH IMPUGNED THE CREDIBILITY OF COUNSEL AND STRUCK AT MR. DANIEL OVER THE SHOULDER OF HIS COUNSEL, DENYING MR. DANIEL DUE PROCESS, A FAIR TRIAL AND HIS RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS. .............................................. 158

    A.   Relevant Facts ........................................................................... 158

    B.   The Prosecutor Committed Misconduct by Impugning the Character and Credibility of Counsel and Striking Mr. Daniel "Over the Shoulder" of Counsel. ........ 159

    C.   Counsel Were Ineffective. .......................................................... 160

    D.   Mr. Daniel Was Prejudiced by Counsel's Deficient Performance. ................................ 161

    E.   The State Court's Decision Should Not Receive AEDPA Deference. .......................... 162

XIII. THE PROSECUTOR COMMITTED MISCONDUCT AND TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO THE STATE'S IMPROPER CLOSING ARGUMENTS AT THE PENALTY STAGE, DENYING MR. DANIEL DUE PROCESS, A FAIR SENTENCING, AND HIS RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS. ................. 164

    A.   The Prosecution Argued That Mr. Daniel's Defense Attorneys Were Not Trustworthy and Had Fabricated Evidence. ....................... 164

    B.   Counsel Were Ineffective, and Mr. Daniel Was Prejudiced. ........................... 166

    C.   The State Instructed the Jurors to Base Their Verdict On the Community's Alleged Desire for a Death Sentence. ........................ 167

    D.   The State Compared the Value of Officer Padron's Life to that of Mr. Daniel. ......... 168

E. The State Committed Misconduct When it Made Improper Arguments for the Purpose of Inflaming the Passions of the Jury and Injected Arbitrary and Unconstitutional Sentencing Factors Into the Jury's Deliberations. ............... 170

F. Counsel Were Ineffective And Mr. Daniel Was Prejudiced. ............... 173

G. The State Court's Decision Should Not Receive AEDPA Deference. ............... 173

   1. Mr. Daniel Exhausted this Claim in his State Habeas Petition. ............... 173

   2. The State Court's Decision is an Unreasonable Application of Clearly Established Federal Law. ............... 173

XIV. MR DANIEL'S RIGHTS TO DUE PROCESS AND TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED WHEN THE STATE OBTAINED A DEATH SENTENCE THROUGH THE KNOWING USE OF FALSE EVIDENCE. TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE AND PRESENT EVIDENCE TO REBUT THE STATE'S FALSE EVIDENCE. ............... 175

A. The Presentation of False Testimony Violates Due Process of Law. ............... 176

B. False Testimony Regarding the Prison System ............... 176

   1. The State presented false testimony regarding the prison system. ............... 176

   2. The False Testimony About The Prison System Was Material. ............... 180

C. Trial Counsel Were Ineffective for Failing to Investigate Prison Classification. ............... 181

D. The State Gave The Jury A False Impression Regarding the Reason Mr. Daniel Was Keeping Track Of Names Of Correctional Officers. ............... 184

E. Trial Counsel Were Ineffective For Failing To Explain To The Jury Why Mr. Daniel Was Writing Down The Names Of Correctional Officers. ............... 185

F. The State Presented False Testimony of Mr. Escalante. ............... 186

G. The Cumulative Materiality of the State Presentation of False Evidence and Trial Counsel's Ineffectiveness Requires a New Sentencing Hearing. ............... 187

H. State Court Proceedings ............... 187

I. The State Court's Fact-Finding on Both Claims was Unreasonable. ............... 188

J. Mr. Daniel Can Prove Cause and Prejudice for Any Default of His Napue Claims. ............... 192

K. Due Process and the Right to be Free from Cruel Punishment was Violated by the Presentation of Materially False Evidence. ............... 192

L.  Exhaustion........................................................................................................... 196

XV.  THE STATE VIOLATED MR. DANIEL'S RIGHTS TO DUE PROCESS AND
TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT UNDER
*BRADY V. MARYLAND* AND ITS PROGENY. ............................................. 196

A.  The State Promised Escalante A Reduced Sentence in Exchange for His Testimony
Against Brandon Daniel. ....................................................................... 197

B.  The State's failure to disclose its promise to Mr. Esclanate violated Mr. Daniel's due
process rights. ...................................................................................... 199

C.  The State Court's Decision is Not Entitled to AEDPA Deference ................. 201

D.  The State Court's Decision is an Unreasonable ...................................... 202

XVI.  TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE
INADMISSIBLE HEARSAY TESTIMONY OF MR. ESCALANTE IN VIOLATION
OF MR. DANIEL'S RIGHTS TO DUE PROCESS AND TO BE FREE FROM CRUEL
AND UNUSUAL PUNISHMENT........................................................... 203

A.  Mr. Daniel's Trial Counsels' Failure to Object was Deficient Performance. ................. 203

B.  Mr. Daniel Was Prejudiced. ................................................................. 204

C.  The State Court's Decision Should Not Receive AEDPA Deference. .......................... 205

1.  The State Habeas Court's Unexplained Ruling Should Receive De Novo
Review ..........................................................................................205

XVII.  MR. DANIEL'S FIFTH, SIXTH, EIGHTH, AND FOURTEENTH
AMENDEMENT RIGHTS WERE VIOLATED WHEN HE WAS
SENTENCED TO DEATH UNDER TEXAS'S UNCONSTITUTIONAL
SENTENCING STATUTE............................................................... 207

A.  Mr. Daniel's Constitutional Rights Were Violated when the Trial Court was
Prohibited from Instructing the Jury that a Vote by One Juror would Result in a
Life Sentence. ...................................................................................... 208

B.  Mr. Daniel's Death Sentence was Arbitrarily and Capriciously Assigned Based
on the Jury's Answer to the Unconstitutionally Vague Special Issue. ............................. 210

C.  Mr. Daniel's Death Sentence Should Be Vacated Because the Penalty Phase
Jury Instruction Restricted the Evidence That the Jury Could Determine Was
Mitigating. ........................................................................................... 210

D.  Mr. Daniel's Death Sentence Is Unconstitutional Because It Was Assigned Based
on Texas's Arbitrary System of Administering the Death Penalty................................... 212

E.  The State Court's Decision Should Not Receive AEDPA Deference. ............................ 214

XVIII. MR. DANIEL'S SENTENCE OF DEATH VIOLATES THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS. ......................................................... 215

A.  The Presentation of Evidence of "Extraneous" Conduct Violates the Fifth, Sixth, Eighth and Fourteenth Amendments. ................................................................. 215

B.  Mr. Daniel's Death Sentence Is Inconsistent with the Evolving Standards of Decency That Mark the Progress of a Maturing Society. .................................................. 216

C.  State Habeas Counsel Were Ineffective for Failing to Raise this Claim. ......................... 217

    1.  Deficient performance ........................................................................................... 218

    2.  Prejudice ............................................................................................................... 218

XIX. THE CUMULATIVE PREJUDICIAL EEFFECT OF THE ERRORS AT BOTH THE GUILT AND PENALTY PHASE DESCRIBED HEREIN DENIED MR. DANIEL DUE PROCESS AND EFFECTIVE ASSISTANCE OF COUNSEL. ............ 218

REQUEST FOR RELIEF .......................................................................................................... 221

# INTRODUCTORY STATEMENT

Brandon Daniel was doomed before his case ever made it to the courtroom. His first defense team, consisting of experienced death penalty lawyers and one of the best mitigation specialists in the state, withdrew *en masse* because the trial court would not give them the funding necessary to do what was ethically required to defend Mr. Daniel's case. Instead, Mr. Daniel was appointed two attorneys who, against every benchmark guiding capital defense, happily accepted a flat fee, meaning that every dollar that did not go into Mr. Daniel's defense went into their own pockets.

To make matters worse, up until one month before trial, his lawyers anticipated that this case would end in a plea bargain. Thinking that the hundreds and hundreds of hours of work that are necessary to prepare a capital murder case were unnecessary, they did not begin their preparation in earnest until the eleventh hour, one month before his case was scheduled for trial. As a result, his lawyers were totally unprepared, and it showed. Despite red flags that should have led them to investigate, his lawyers never learned that Mr. Daniel was autistic and presented no evidence of his disability to the jury. This was not a small oversight —Mr. Daniel's autism causes him to have a flat affect, to not make eye contact, and to not display emotion even when he feels emotion. Without explaining that it was autism that caused Mr. Daniel's demeanor throughout the trial, the jury was left thinking that Mr. Daniel did not care about his case and did not feel remorse about what happened. It was his lawyers' job to explain this to the jury and they failed: Mr. Daniel was instead sentenced to death.

Beyond missing his autism, the defense team barely spoke with any family members, presenting only one maternal aunt at his penalty phase, leaving out his entire family history of violence, instability, and drug and alcohol abuse. During the trial itself, they abandoned a motion to suppress an inflammatory and inculpatory statement Mr. Daniel gave to detectives when he was so

high on Xanax that he did not even know what day it was. They failed to object to hearsay, to inappropriate statements made by the prosecutors, and to the false evidence presented by the prosecution. Simply put, Mr. Daniel's lawyers put no effort into what they thought was an impossible case.

Not only did Mr. Daniel have unprepared and apathetic lawyers, the judge who presided over his trial acted inappropriately before, during, and after the trial. The judge made sure Mr. Daniel's defense team did not receive adequate funding to provide an effective defense. During trial the judge ignored objections from counsel. Most notably, during the penalty phase, the jury sent a note to the judge asking a question about the meaning of "future dangerousness." How the judge answered that question could have meant the difference between life and death for Mr. Daniel. But it is unknown how the judge answered it, because not only did she choose not to inform Mr. Daniel or his attorneys that the jury had a question, but she broke all norms and standards by answering the question for the jury *ex parte* and without making a record of the interaction, violating Mr. Daniel's right to a public trial.

The judge continued to deny Mr. Daniel his right to a fair trial by communicating with the District Attorney's Office *ex parte*. While some of the topics of those *ex parte* communications were ministerial, others went to heart of the case itself, including *ex parte* communications with the District Attorney's Office about her thoughts on claims in the state habeas petition while the state habeas petition was still pending. It is no surprise that she simply adopted the state's findings in denying the petition.

Because Mr. Daniel had no one presenting his person, his history, and his struggles to the jury, the verdicts at the guilt and penalty phases were preordained. We are asking this Court to undo these wrongs, and give Mr. Daniel what every person in this country is guaranteed under our Constitution: a fair trial.

## STATEMENT ABOUT EXHAUSTION AND PROCEDURAL DEFAULT

Federal habeas petitioners generally must exhaust state court remedies. 28 U.S.C. § 2254(b)(1)(A). Each of Mr. Daniel's claims either is exhausted or falls within an exception to the exhaustion requirement. No claims are procedurally barred. Where the state court deemed any claim procedurally barred, either it was mistaken or it was not an adequate and independent state ground, or there is cause and prejudice for any default. Though Mr. Daniel has addressed exhaustion and procedural default in the claims below, because failure to exhaust and procedural bars are affirmative defenses that Respondents must assert and can waive, Mr. Daniel reserves his right to reply to any such arguments.

## EXCEPTIONS TO PROCEDURAL DEFAULT

The procedural default doctrine is judge-made law designed "to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism." *Martinez v. Ryan*, 566 U.S. 1, 9 (2012). It imposes a bar on federal review of claims that "a state court declined to hear because the prisoner failed to abide by a state procedural rule." *Id.* This bar does not apply, however, unless "the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed." *Id.* (citations omitted). Moreover, the default may be overcome by showing "cause" for the default and "prejudice" from the violation of federal law, or a miscarriage of justice. *Id.* at 10 (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).

Post-conviction counsel's ineffective assistance constitutes "cause" to overcome a default. In *Martinez*, the Court held that when an initial-review collateral proceeding is the first time a petitioner can raise a claim for ineffective assistance of trial counsel, state habeas counsel's ineffective assistance could supply "cause" for the default of the trial counsel ineffectiveness claim. 566 U.S. at 16. This rule applies to Texas. *Trevino v. Thaler*, 569 U.S. 413, 429 (2013) (holding that

Texas's "state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal").

To establish cause under *Martinez,* a petitioner must show that (1) state habeas counsel's performance at an initial-review collateral proceeding was deficient as defined in *Strickland v. Washington*, 466 U.S. 668, 693 (1984), and (2) an ineffective-assistance-of-trial-counsel claim that state habeas counsel failed to raise has "some merit." *Canales v. Stephens*, 765 F.3d 551, 567-68 (5th Cir. 2014). Mr. Daniel makes these showings in the unexhausted claims below. In addition, Mr. Daniel must demonstrate prejudice, which "requires a showing that there is 'a reasonable probability that, but for [trial] counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 568 (quoting *Strickland,* 466 U.S. at 694) (alteration in original). The meritorious claims of trial counsel ineffectiveness outlined in this pleading establish prejudice.

## STANDARD OF REVIEW UNDER THE AEDPA

### A.    General Standards

This Court's review of a state-court decision is conducted pursuant to the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). While AEDPA places certain limitations on a federal court's ability to grant habeas relief, "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (*Miller-El* I).

For claims or parts of claims that received a state-court "adjudicat[ion] on the merits," 28 U.S.C. § 2254(d), a federal court may grant relief if the state-court decision is "contrary to" or "an unreasonable application of" clearly established Supreme Court law, or involves an "unreasonable determination of the facts." *See Williams v. Taylor*, 529 U.S. 362, 412 (2000). However, Section §2254(d) does not apply where the state-court ruling fails either: (1) to address the petitioner's actual

federal claim; or (2) to address the merits of the federal claim. Where those requirements are not met, habeas review is de novo. *See Cone v. Bell*, 556 U.S. 449, 472 (2009); *accord Porter v. McCollum*, 558 U.S. 30, 39 (2009) (per curiam); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (citing *Wiggins v. Smith*, 539 U.S. 510, 534 (2003)); *Carty v. Thaler*, 583 F.3d 244, 253 (5th Cir. 2009). Similarly, if a state court decides only part of a federal claim (for example, only the prejudice prong of an ineffective-assistance claim), only that part of the claim addressed by the state court receives AEDPA review. *See Porter*, 558 U.S. at 39; *Rompilla*, 545 U.S. at 390; *Wiggins*, 539 U.S. at 534.

Applying § 2254(d), a reviewing court must determine whether the state-court adjudication was "contrary to" clearly established federal law; whether the adjudication was an objectively unreasonable application of clearly established federal law; or, whether the adjudication was based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(2); *Harrington v. Richter*, 562 U.S. 86, 100-01 (2011).

"A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases." *Williams*, 529 U.S. at 405. A state-court ruling is also "contrary to" clearly established federal law where it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Id.* at 412-13. Under the "'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

In *Wilson v. Sellers*, 138 S. Ct. 1188 (2018), the Court held that when a federal court applies 28 U.S.C. § 2254(d) and the "relevant state-court decision on the merits" of a federal habeas claim "does not come accompanied with" an explanation of the state court's reasons for denying relief, the "federal court should 'look through' the unexplained decision to the last related state-court decision

that does provide a relevant rationale." *Id.* at 1192.

A court may also grant relief under § 2254(d)(2) where a state-court decision resulted from an unreasonable determination of the facts, meaning that the factual determination is "objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340. A state-court decision may likewise be unreasonable under § 2254(d)(2) where the state court decides the matter without holding an evidentiary hearing or granting the defendant the resources necessary to litigate the claim. *See Brumfield v. Cain*, 135 S. Ct. 2269, 2273 (2015).

**B.      Because the State Habeas Court Engaged in Extensive Ex Parte Communications With the Prosecutor Before Adopting the State's Proposed Findings of Fact and Conclusions of Law Nearly Verbatim, AEDPA Deference Should Not Apply to Any Claims Adjudicated on the Merits.**

Many of Mr. Daniel's federal habeas claims were raised in his state habeas petition, but were denied by the state court. However, the state court recommended denial by adopting, in large part, a verbatim recitation of the proposed findings of fact and legal conclusions written by the state's counsel, the very same party with whom the judge had engaged in extensive ex parte communications, including statements about the validity of some of the claims. *See, e.g.*, Claim I (ex parte emails from the trial judge to the prosecutor, including an email declaring that Mr. Daniel's allegation that the jury had submitted a question that the trial judge answered in secret was "all fiction and did not occur"). The Texas Court of Criminal Appeals ("CCA") then denied relief largely "[b]ased upon the trial court's findings and conclusions." App. 6. Deferring to an order drafted by the petitioner's party-opponent, all the while engaging in repeated ex parte communications with that party-opponent during the course of judicial review, is inappropriate and inconsistent with due process. Because the state courts abdicated their adjudicatory roles, this Court should exercise de novo review over these claims.

AEDPA deference is triggered only when there was a valid ""adjudicat[ion] on the merits in state court proceedings." 28 U.S.C. § 2254(d). The Supreme Court has recognized in the context of

judicial recusal that unconstitutional conduct by a reviewing judge undermines the state court's "whole adjudicatory framework." *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1910 (2016). In *Williams*, the Supreme Court vacated the state court's denial of relief because one of the state supreme court justices during appellate review had been the district attorney at the time of the petitioner's prosecution. The Court held that a petitioner is "entitle[d] . . . to 'a proceeding in which he may present his case with assurance' that no member of the court is 'predisposed to find against him'" and must, therefore, "be granted an opportunity to present his claims to a court unburdened by any 'possible temptation . . . not to hold the balance nice, clear and true between the state and the accused.'" *Id.* (first quoting *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980), then quoting *Tumey v. Ohio*, 273 U.S. 510, 532 (1927)).

Similarly, here, the trial judge failed to "hold the balance nice, clear and true" between the state and Mr. Daniel when she engaged in repeated ex parte communications with the prosecutor, including statements about the merits of the claims she was to review. *Tumey*, 273 U.S. at 532. In doing so, she undermined the "whole adjudicatory framework" of the state review process. *Williams*, 136 S. Ct. at 1910. Accordingly, the state court's denial of state habeas relief was not a valid adjudication on the merits and this Court does not owe those invalid adjudications AEDPA deference. *See Jefferson v. Upton*, 560 U.S. 284, 293-94 (2010) (vacating denial of habeas petition in pre-AEDPA case and remanding for district court to determine whether presumption of correctness applied to factual findings in state court order adopted verbatim from proposed order authored by Respondent's attorneys where court solicited the proposed order ex parte and gave petitioner no opportunity to criticize proposed findings or submit his own proposed order).

This case is distinct from those in which the Fifth Circuit has declined to withhold AEDPA deference for verbatim adoptions of the prosecutor's proposed findings of facts and conclusions of law, *see, e.g.*, *Nichols v. Scott*, 69 F.3d 1255, 1277 (5th Cir. 1995), because none of those cases involved

a judge who had discussed the merits of the petitioner's claim with the state's prosecutors in ex parte emails, and prejudged the allegations of a claim as "all fiction." Both the United States Supreme Court and the Fifth Circuit have criticized the adoption of a party's proposed order as a court's reasoned opinion. *See, e.g.*, *Anderson v. City of Bessemer*, 470 U.S. 564, 572 (1985) ("We, too, have criticized courts for their verbatim adoption of findings of fact by prevailing parties . . . . We are also aware of the potential for overreaching and exaggeration on the part of attorneys preparing findings of fact when they have already been informed that the judge has decided in their favor."); *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 657 n.4 (1964) (noting that lawyers who draft proposed orders "in their zeal and advocacy and their enthusiasm are going to state the case for their side . . . as strongly as they possibly can. When these [opinions] get to the courts of appeals they won't be worth the paper they are written on as far as assisting the court of appeals in determining why the judge decided the case."); *In re Complaint of Luhr Bros.*, 157 F.3d 333, 338 (5th Cir. 1998) ("[I]n cases such as the instant one, where the district court's Findings of Fact and Conclusions of Law are near-verbatim recitals of the prevailing party's proposed findings and conclusions, with minimal revisions, we should approach such findings with 'caution'") (quoting *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 574 (5th Cir. 1996)). In fact, in a non-habeas context, the Fifth Circuit has made clear that where, as here, a court adopts verbatim a party's lengthy proposed findings without making a single change, the findings are entitled to little weight. *Louis Dreyfus & Cie. v. Panama Canal Co.*, 298 F.2d 733, 738–39 (5th Cir. 1962).

The criticisms directed at state courts that fail to make their own factual finding and legal conclusions become all the more problematic in the circumstances here This sort of collaboration between the judge and the opposing party leads to a review process that is little more than theater, with the reviewing judge adopting the prosecutor's script, a script that itself was, in part, developed in ex parte emails between the prosecutor and judge.

These improper procedures undermine the judicial independence that is always vital, but is even more necessary in a capital proceeding. As the Supreme Court has repeatedly cautioned, "death is different," demanding that procedural and substantive safeguards in capital cases must be more robust to prevent the imposition of a death sentence in a way that is arbitrary and capricious. *See, e.g.*, *Ring v. Arizona*, 536 U.S. 584, 605-06 (2002); *Harmelin v. Michigan*, 501 U.S. 957, 993–94 (1991). Moreover, our legal system has long accorded more—not less—protection to the rights of criminal defendants. *See, e.g.*, *Jackson v. Virginia*, 443 U.S. 307, 315 (1979) (discussing the heightened beyond-reasonable-doubt standard).

This Court need not defer to a state habeas court's order that simply parroted Respondent's proposed order, where the state court and the prosecutor engaged in ex parte communication related to the merits of the habeas petition. A state-court decision concerning the constitutional rights of a capital defendant should not receive deference when it adopts an order written unilaterally by his adversary.

C.    **Because the State Habeas Court Denied the Opportunity for Evidentiary Development, Resulting in Unreasonable Factual Determinations Related to Petitioner's Claims, AEDPA Deference Should Not Apply to the Claims Adjudicated in State Habeas Proceedings.**

A petitioner who demonstrates that a state court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in a state court proceeding" may overcome § 2254(d)'s limitation for relief. An "unreasonable determination of the facts" may occur in a state court decision on the merits. *See, e.g.*, *Miller-El v. Dretke*, 545 U.S. 231, 236–37 (2005) (*Miller-El* II). But it may also occur in a state court decision on whether to grant or deny evidentiary development to a petitioner's claim. *See Brumfield*, 135 S. Ct. at 2273.

In *Brumfield*, petitioner sought an evidentiary hearing to prove his intellectual disability after *Atkins v. Virginia*, 536 U.S. 304 (2002), and the state court summarily denied the application. *Brumfield*, 135 S. Ct. at 2275. The Court ruled that none of the factual determinations on which the

state court had relied could "foreclose" relief, because the state court ruling denying a hearing rested on an unreasonable determination of the facts. *Id.* at 2277–78. It was "critical to remember" that the petitioner did not have to prove his case or even show that he "likely" was intellectually disabled. Instead, looking to the state-law standard for whether an *Atkins* hearing should be granted, the Supreme Court held that he needed only to raise a reasonable doubt. *Id.* at 2281.

Similarly, in *Panetti v. Quarterman*, 551 U.S. 930 (2007), the Supreme Court found that the state court "failed to provide petitioner with a constitutionally adequate opportunity to be heard." *Id.* at 952. Finding the state court's denial of the claim "cannot be reconciled with any reasonable application of the controlling standard" under § 2254(d), *id.* at 952–53, the Court considered the petitioner's claims on the merits without deferring to the state court's competency finding, *id.* at 954. The Fifth Circuit draws from *Panetti* "the lesson . . . that, where a petitioner has made a prima facie showing [of a constitutional violation], the state court's failure to provide him with the opportunity to develop his claim deprives the state court's decision of the deference normally due." *Rivera v. Quarterman*, 505 F.3d 349, 358 (5th Cir. 2007) (citing *Panetti*, 551 U.S. at 954); *see also Smith v. Cain*, 708 F.3d 628, 633–35 (5th Cir. 2013) (no review under § 2254(d) or (e) because state court unreasonably denied petitioner the opportunity to develop the factual basis of his claim).

Accordingly, where the state court process is procedurally unfair, and fails to provide the petitioner with a substantive and adequate review of the merits, the state court's decision should not receive deference under § 2254(d). *See, e.g.*, *Dist. Att'y Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 69 (2009) (petitioner entitled to due process in post-conviction procedures); *Tercero v. Stephens*, 783 F.3d 141, 148 (5th Cir. 2013) ("[T]he state court's decision is . . . deprived 'of the deference normally due' where the state court has failed 'to provide [petitioner] with the opportunity to develop his claims'").

In *Wardrip v. Davis*, the court found that the petitioner satisfied § 2254(d)(2) where, as here, the state court denied an evidentiary hearing, credited unchallenged trial counsel affidavits, and relied on those affidavits to resolve disputed issues of fact against the petitioner. No. 7:01-CV-247-G-BF, 2017 WL 8677939 (N.D. Tex. Nov. 29, 2017), *report and recommendation adopted as modified*, No. 7:01-CV-247-G, 2018 WL 1536279 (N.D. Tex. Mar. 29, 2018). The petitioner in *Wardrip* alleged trial counsel's ineffectiveness, and the state court denied an evidentiary hearing, finding that there were no disputed issues that were material to petitioner's confinement. *Id.* at *6. "Even though the state court found that no fact issues existed and denied any evidentiary development, it then proceeded to make findings that *resolved disputed factual issues* against Wardrip, accepting the state's version as true and finding Wardrip's version to be false." *Id.* at *7 ("After denying [petitioner] any opportunity to cross-examine trial counsel Curry, the state court quoted from the affidavit that Curry provided to the State.")

The state court did precisely the same here. Having denied Mr. Daniel a hearing in which he alleged extensive counsel ineffectiveness, the state court adopted, verbatim, the State's Proposed Order Designating Issues and Order for Filing Affidavits. Supp. App. 1789. In this proposed order, the state identified trial counsel's ineffectiveness as the only issue that needed to be resolved and directed trial counsel to submit affidavits within seven days. *Id.* The proposed order also ignored the factual disputes embodied in opposing affidavits

After denying the opportunity for evidentiary development beyond trial counsel's affidavits, and denying a hearing by which state habeas counsel could challenge the self-serving affidavits submitted by trial counsel, the state court found trial counsel's affidavits "credible," and adopted the state's proposed findings of fact nearly verbatim, which, themselves, were drawn extensively from the trial counsel's affidavits. App. 77–94.

Affidavits are a disfavored method of taking evidence where a judge must resolve controverted factual issues involving credibility determinations. In the post-conviction context, when claims of ineffective assistance of trial counsel are raised, trial counsel often occupy a position that is adverse to their former clients. *Cf. Christeson v. Roper*, 135 S. Ct. 891, 894–95 (2015) (recognizing the importance of policing conflicts of interest that can arise in capital post-conviction representation); *see also Jones v. Polk*, 401 F.3d 257, 274 (4th Cir. 2005) (discussing trial counsel's long-recognized "natural reluctance" to cooperate with habeas counsel in ineffectiveness claims). As adverse witnesses, defense counsel become interested parties, and affidavits from interested witnesses are an inadequate fact-finding mechanism.

The statements in affidavits of interested witnesses concerning their own state of mind are incontestable because "the mental workings of an individual's mind are matters about which adversaries have no knowledge or ready means of confirming or controverting." *Charles v. State*, 146 S.W.3d 204, 210 (Tex. Crim. App. 2004) (internal quotation marks omitted). For this reason the "crucible of cross-examination" is vital, and "with witnesses on the witness stand, such ambiguities may be cleared up by follow-up questions, pressing for the factual basis of a conclusion, and by cross-examination." *Id.* at 209–10.

This case provides a textbook example of why affidavits from interested witnesses are inadequate as the exclusive means of fact-finding. For instance, Mr. Daniel alleged that trial counsel failed to adequately investigate and present mitigation evidence of his social history, particularly his developmental years. This background information would have, alone, been powerful mitigation evidence, and would have provided the necessary social history for a diagnosis of Autism Spectrum Disorder ("ASD"), which would have further buttressed mitigation. In support of this claim, Petitioner offered the affidavit of Harold Scott, M.D., a defense expert at Mr. Daniel's trial, who affirmed that he did not have "access to the early developmental history" which would have been "a

critical component to confirming, or even suspecting that a person has ASD." App. 1547. In response to these allegations, trial counsel alleged that they had conducted a sufficient background investigation, and that they relied on their experts' opinions related to ASD. *See* App. 1427–28, 1433–34 Counsel failed to address Petitioner's allegations that the social history that counsel provided to their expert was incomplete and insufficient to permit an ASD diagnosis, or Dr. Scott's affidavit that such information was critical to even suspecting ASD, let alone diagnosing it.

The resolution of Petitioner's ineffective assistance claims depended, in part, on what was in the minds of trial counsel. The only direct evidence on those matters was the affiants' lock-step, assertions of litigation strategy and reliance on expert opinions, as described in their affidavits. The state court accepted and credited these affidavits without subjecting the affiants to cross-examination or otherwise allowing Petitioner to challenge their credibility. Without offering any explanation for finding the affidavits of these witnesses credible, or conducting any critical analysis of their credibility, the trial court simply concluded that the affidavits were credible evidence. App. 77–78. There is no articulated basis in the record supporting the court's credibility determination. And Petitioner was denied the opportunity to contest the credibility of these interested witnesses through examination, which would have enabled him to press for, obtain, and ultimately dispute trial counsel's assertions.

Compounding this error, the state court simply ignored affidavits offered by witnesses in support of Mr. Daniel's application, including Dr. Scott's affidavit, discussed above, which directly contradicted trial counsel's affidavits, and an affidavit from a juror affirming that the jury "submitted a question to the judge" and that it "received a note back from the judge." App. 642–63. In rejecting Petitioner's claim that the trial judge gave supplemental instructions to the jury without alerting the parties or counsel, and without putting those instructions on the record, the court made no mention

of this affidavit, either crediting it or discrediting it, when it found that "[t]he trial court did not provide any additional or supplemental written instruction to the jury." App. 96.

The court unreasonably deprived Mr. Daniel of the opportunity to develop his claims on disputed factual issues. Instead, having denied Mr. Daniel the ability to develop evidence and to test the credibility and reliability of the state's affidavits, the court, without explanation, credited the affidavits in support of the state's opposition and simply ignored the affidavits in support of Mr. Daniel's petition. Such a process for fact-finding contravenes the purposes of judicial review and any findings of fact based upon such unreasonable credibility determinations should be accorded no deference by this Court.

## STANDARDS RELATING TO INEFFECTIVE ASSISTANCE OF COUNSEL UNDER *STRICKLAND V. WASHINGTON*

Under *Strickland*, 466 U.S. 668, a petitioner seeking to establish the ineffective assistance of trial counsel must show: (1) that counsel's performance fell below "an objective standard of reasonableness" (deficient performance), *id.* at 688; and (2) that but for counsel's deficient performance there is a reasonable probability that the factfinder would have had a reasonable doubt with respect to the defendant's guilt or the appropriate punishment (prejudice), *id.* at 695; *see also Sears v. Upton*, 561 U.S. 945, 955-56 (2010); *Porter*, 558 U.S. at 32; *Rompilla,* 545 U.S. at 390; *Wiggins*, 539 U.S. at 538 (2003); and *Williams v. Taylor*, 529 U.S. 362, 398 (2000).

To establish ineffectiveness at trial, the petitioner need only show there is a reasonable probability that, but for counsel's errors, at least one juror would have come to a different result. *Buck v. Davis*, 137 S. Ct. 759, 776 (2017); *Wiggins*, 539 U.S. at 537. For a claim of ineffective assistance at the penalty phase of a capital case, a reasonable probability of a different result is assessed by considering "the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweighing it against the evidence in aggravation." *Porter*, 558 U.S. at 41 (quoting *Williams*, 529 U.S. at 397–98).

A federal habeas petitioner who challenges state habeas counsel's representation (as part of a showing of cause and prejudice to excuse a procedural default) must meet the *Strickland* standard as to that counsel's performance. *See Allen v. Stephens*, 805 F.3d 617, 626 (5th Cir. 2015).

## REQUEST FOR AN EVIDENTIARY HEARING

As a general rule, an evidentiary hearing is appropriate when the facts alleged in the habeas petition, if true, would entitle the petitioner to relief and there is a material dispute about those facts. *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007); *Townsend v. Sain*, 372 U.S. 293, 312–19 (1963), *overruled in part on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1, 5 (1992); *see also Wellons v. Hall*, 558 U.S. 220, 226 (2010) (per curiam) (remanding for determination "whether petitioner's allegations, together with the undisputed facts, warrant discovery and an evidentiary hearing"). Evidentiary "hearings are particularly important in capital cases . . . , where the 'irremediable' penalty demands factfinding at a 'heightened standard of reliability.'" *Farkus v. Delo*, 33 F.3d 933, 939 n.6 (8th Cir. 1994) (quoting *Ford v. Wainwright*, 477 U.S. 399, 411 (1986)); *cf. Banks v. Dretke*, 540 U.S. 668, 675 (2004) ("[T]hrough discovery and an evidentiary hearing . . . in a federal habeas corpus proceeding, . . . long-suppressed evidence came to light" and death sentence was vacated).

Here, the state court refused to allow factual development of some of the claims set forth in the petition and this memorandum. As the Supreme Court explained in *(Michael)Williams v. Taylor*, "28 U.S.C. § 2254(e)(2) works against a hearing only when the petitioner 'failed to develop the factual basis of a claim in state court proceedings.'" *Williams*, 529 U.S. at 430. Here, § 2254(e)(2) does not apply because Mr. Daniel did *not* "fail[] to develop the factual basis" of his claims in state court, or his failure must be excused because it resulted from his counsel's ineffectiveness. Under such circumstances, a federal hearing is appropriate.

To the extent this Court believes that any of Mr. Daniel's claims may be procedurally defaulted, this Court should grant a hearing so that Mr. Daniel can show cause and prejudice and/or

a fundamental miscarriage of justice to overcome any default. *See, e.g.*, *Trevino*, 569 U.S. at 429 (ineffective assistance of state postconviction counsel can establish cause for procedural default); *Jenkins v. Anderson*, 447 U.S. 231, 234 n. l (1980) (application of cause and prejudice test may require district-court fact finding).

## STATEMENT OF THE CASE

### A.  PROCEDURAL HISTORY

Mr. Daniel is confined under a sentence of death, which was rendered in Travis County, Texas, on February 28, 2014. CR 189.

### 1.  Trial Court Proceedings

On June 27, 2012, a grand jury indicted Mr. Daniel for capital murder for intentionally causing the death of Officer Jaime Padron while he was acting in the lawful discharge of an official duty. *Id.* at 98. On April 17, 2012, William White was appointed to represent Mr. Daniel as first chair counsel. *Id.* at 14. Brad Urrutia was appointed as second chair counsel. On December 10, 2012, after Mr. White—and both the investigator and mitigation specialist—withdrew from representing Mr. Daniel over concerns that the trial judge was unwilling to properly fund the defense, Russell Hunt Jr., was appointed as first chair counsel. *Id.* at 103. Mr. Urrutia remained on the case.

Voir dire was conducted in January and February 2014. Trial ran from February 18-21, 2014, with the defense presenting just two witnesses, after which Mr. Daniel was convicted of capital murder. Following a penalty hearing, the jury deliberated for approximately nine hours—seven hours on the question of future dangerousness. During these deliberations, the jury submitted a note to the trial court requesting clarification, to which the court responded, off the record, without notifying Mr. Daniel's counsel, and without memorializing the note in the court file. Following this secret supplemental instruction, the jury found that Mr. Daniel would be a future danger and, following two further hours of deliberation, that there was no mitigation. Mr. Daniel was sentenced to death.

## 2. State Appellate Proceedings

On April 16, 2015, the state filed a "Motion to Abate Appeal" after Mr. Daniel mailed a letter to the convicting court and District Attorney's Office requesting to dismiss his counsel, proceed *pro se*, and waive his appeals. The CCA denied that motion on April 27, 2015, but noted that Mr. Daniel might be able to waive his habeas review. On February 10, 2016, the CCA affirmed Mr. Daniel's conviction on appeal. *Daniel v. State*, 485 S.W.3d 24 (Tex. Crim. App. 2016).

## 3. State Habeas Proceedings

On February 28, 2014, the court appointed the Office of Capital and Forensic Writs ("OCFW") to represent Mr. Daniel in his post-conviction habeas litigation. Pursuant to the CCA's ruling on the state's motion to abate the appeal, the trial judge[1] determined—in chambers, without Mr. Daniel or his attorneys present—that Mr. Daniel was "knowingly and voluntarily requesting to waive his right of filing a habeas application," and removed OCFW as counsel. Supp. RR 4 (May 20, 2015). OCFW objected to the trial judge's procedure for dismissing it as counsel, and, following a hearing, the trial judge appointed a psychiatrist to evaluate Mr. Daniel's competency. Supp. RR 6 (June 19, 2015). On July 10, 2015, the trial judge determined that Mr. Daniel was competent to dismiss OCFW as counsel and proceed *pro se*. However, while OCFW was in the process of appealing that ruling, Mr. Daniel requested that OCFW be reappointed to represent him for his post-conviction proceedings. The court granted that request, rendering the appeal moot.

On February 12, 2016, OCFW filed Mr. Daniel's Initial Application, raising eleven claims that challenged the constitutionality of his confinement. Four days later, Mr. Daniel filed a motion seeking to recuse the trial judge, arguing that three of his claims involved the judge's improper

---

[1] The same jurist presided over Mr. Daniel's trial and reviewed his initial application on state habeas. This petition will refer to the jurist, throughout, as the trial judge.

conduct, thus making her a material fact witness. One of those claims alleged that the judge had provided supplemental jury instructions, without notice to defense counsel, and without ever making either the jury question or her response a part of the record.

The trial judge declined to recuse, and the motion was assigned to Judge Douglas Shaver to conduct a hearing on the motion. While the recusal motion was still pending, the trial judge engaged in several *ex parte* email exchanges with the Travis County District Attorney's Office. In one of these emails, which was forwarded by the state, the trial dismissed as "fiction" the allegation made in the Initial Application that she had provided supplemental jury instructions in secret.

Upon learning of the *ex parte* communications, OCFW filed a supplemental motion to recuse, raising the *ex parte* communications, and a motion for discovery, requesting "all communications between" the trial judge and the District Attorney's Office regarding Mr. Daniel's case. Judge Shaver, presiding over the recusal proceedings, granted the discovery motion on April 5, 2016. In response, the trial judge provided five email chains containing eight individual *ex parte* communications between the judge and the District Attorney's Office.

On April 14, 2016, Judge Shaver held a hearing on the recusal motions. Immediately before the hearing began, the state tendered to OCFW five email chains that contained four *ex parte* communications, which were distinct from the communications the judge had previously turned over. OCFW noted for the record that the state had provided *ex parte* communications the trial judge had not, and requested additional time to review the emails. Judge Shaver admitted the email chains received from the trial judge, but did not grant the additional time for OCFW to review the state's discovery, and ultimately denied Mr. Daniel's motion to recuse the trial judge. Following the denial of the recusal motion, OCFW received a response to a Public Information Act request for all communications between the state and trial judge related to Mr. Daniel's case. The District Attorney's Office sent thirteen individual *ex parte* emails between its employees and the trial judge.

Five of those emails were not previously submitted by the judge in response to the discovery order.[2]

The state filed its answer to Mr. Daniel's Initial Application on August 10, 2016, in which it "generally and specially denie[d] each and every allegation of fact made by applicant except that respondent has custody of applicant." Answer at 6. On August 26, 2016, Mr. Daniel filed a motion seeking designate material issues of fact and to request an evidentiary hearing. Mr. Daniel requested an order from the trial judge acknowledging: that controverted, previously unresolved factual issues material to Mr. Daniel's confinement exist, and designating what those controverted material facts were; that those controverted facts would be resolved through an evidentiary hearing; and that Mr. Daniel with notice and an opportunity to be heard regarding the trial court's decisions. The state responded to that motion on August 30, 2016, opposing the request for a hearing. The state requested the trial judge to resolve any factual disputes "on the affidavits and other evidentiary materials attached to the applicant's writ application and the State's Answer, the trial record, and the *court's personal recollection*." Response at 6 (emphasis added).

On September 7, 2016, the state filed a proposed order that only the ineffective assistance of counsel claim contained factual issues that needed to be resolved, and requesting Mr. Daniel's trial counsel, Mr. Hunt and Mr. Urrutia, submit affidavits within seven days, responding to the ineffectiveness claim. The proposed order also directed the parties to submit proposed findings of fact and conclusions of law within thirty days. The trial judge adopted the state's proposed order

---

[2] On October 10, 2016, Mr. Daniel filed a motion to supplement the record from the recusal proceedings with evidence that the state and trial judge had failed to comply with the discovery order, attaching all of the *ex parte* communications with a comparison of those disclosures. The supplement identified thirteen *ex parte* communications between the trial judge and the state. Motion to Supplement at 7. Of those thirteen, the trial judge had only provided eight in response to Judge Shaver's order, and the state had provided only four. *Id.* The District Attorney's Office filed a reply opposing the motion to supplement. The motion was never ruled on prior trial judge's denial of a hearing and any relief on the Initial Application.

verbatim, ordering counsels' affidavits to be submitted on September 15, 2016, and the parties' proposed findings submitted on October 8, 2016. Mr. Hunt filed his affidavit on September 20, 2016.

On October 7, 2016, a day before the findings of fact were due to be submitted, Mr. Daniel filed a motion notifying the court that he was still waiting for Mr. Urrutia's affidavit and, thus, could not comply with the trial judge's order to submit findings of fact by October 8. The motion also requested the trial judge to rescind her order, and to extend the process necessary to fairly decide Mr. Daniel's state habeas claims, which contained material disputes of fact. Specifically, the court's order did not provide a mechanism for Mr. Daniel to offer evidence in support of his allegations or challenge potential adverse evidence received by the trial judge, and it omitted numerous claims with material factual disputes that required resolution through the introduction of evidence. Furthermore, the order did not provide Mr. Daniel with notice of what evidence the trial judge intended to rely upon, absent a hearing, in making its recommendation.

On October 10, 2016, before Mr. Urrutia filed his affidavit, the state filed its proposed findings of fact and conclusions of law, arguing that relief be denied on the basis of its own documentary proffers, attached as exhibits to its Answer. These exhibits had not been admitted into evidence at that point.

Mr. Urrutia filed his affidavit on October 11, 2016. On the same day, the trial judge entered an Order giving notice that she would resolve the issues described in the Order Designating Issues through trial counsels' affidavits, the parties' filings and attached exhibits and "the court's personal recollection," and extending the time for filing proposed findings of fact and conclusions of law by seven days. Mr. Daniel did not receive notice or service of this order or Mr. Urrutia's affidavit, until October 18, 2016, the date the proposed findings of fact and conclusions of law were due. The state filed its amended findings on the 18th, and OCFW requested an extension of time to file, which the

trial court granted.

On November 10, Mr. Daniel simultaneously filed his proposed findings and motion requesting notice of the factual issues the trial court intended to resolve through personal recollection, what the court's personal recollection consisted of, and the opportunity to challenge the court's personal recollection if adverse to his allegations. He also asked for the opportunity to challenge his trial lawyers' affidavits, either by evidentiary hearing or by deposition. On November 21, 2016, the state filed a reply opposing the motion for a hearing, and arguing that trial judge need not "disclose to applicant her personal recollection." Reply at 5.

On November 30, 2016, the trial judge adopted the state's findings nearly verbatim and recommended that relief be denied. The trial judge's findings of fact and conclusions of law mirrored the state's amended proposed findings down to the different fonts for text and page numbers, with the exception of only seven word changes. In its dismissal, the trial judge found that she had not provided supplemental jury instructions in secret. At the same time the trial court issued its findings, it denied Mr. Daniel's motion requesting the opportunity to challenge adverse evidence against him.

On October 18, 2017, the CCA denied relief in a six page order. On March 26, 2018, the United States Supreme Court denied Mr. Daniel's Petition for Writ of Certiorari.

On November 21, 2017, this Court appointed undersigned counsel.

On October 15, 2018, Mr. Daniel filed his initial Petition for Writ of Habeas Corpus by a Prisoner in State Custody Pursuant to 28 U.S.C. § 2254.

On January 25, 2019, Mr. Daniel filed a Motion for Discovery requesting seven items of necessary discovery. On February 5, 2019, Respondent filed her Response in Opposition to Petitioner's Motion for Discovery. On February 11, 2019, Mr. Daniel filed a Reply. On February 13, 2019, Judge Yeakel issued an order dismissing without prejudice Petitioner's Motion for Discovery

on the grounds that it was premature.

### B. STATEMENT OF FACTS

#### 1. Guilt Phase

During the guilt phase of Mr. Daniel's trial, the state presented evidence that Mr. Daniel had entered a Walmart Superstore in the early morning hours on April 6, 2012. Walmart surveillance video showed Mr. Daniel moving through the store and filling produce bags and his backpack with groceries for about thirty minutes. *See* Walmart Surveillance Video. Based on Mr. Daniel's apparent intoxication and the employees' suspicions that he was attempting to shoplift, a Walmart employee called 311 to alert the police. ECF 4-31, 18 RR 54, 77, 129. Officer Jaime Padron responded to the call, dressed in his police uniform. *See, e.g.*, ECF 4-31, 18 RR 94. As Mr. Daniel walked towards the exit, he encountered Officer Padron. Walmart Surveillance Video; ECF 4-31, 18 RR 79-81. Witnesses testified that Officer Padron said something to Mr. Daniel and attempted to grab him, but Mr. Daniel ducked and ran towards the exit, and Officer Padron tackled him from behind. *See, e.g.*, ECF 4-31, 18 RR 81-82; Walmart Surveillance Video. Three shots were fired while Mr. Daniel and Officer Padron were on the floor, one of which hit Officer Padron in the neck. ECF 4-31, 18 RR 30, 134; ECF 4-33, 20 RR 123-25. Officer Padron died at the scene as a result of the shooting. Mr. Daniel was arrested immediately, and made inculpatory statements while being interrogated later that night by Detectives Heather Robinson and David Fugitt. *See* ECF 4-31, 18 RR 64, 249; Police Interrogation Video.

The defense presented Jenna Feland, Mr. Daniel's ex-girlfriend, who testified to Mr. Daniel's drug use and untreated depression. ECF 4-33, 20 RR 189-91, 193, 195, 198-99. Dr. Matthew Masters testified that Mr. Daniel was intoxicated on Xanax at the time of the offense and when he made statements to the police, and he described the effects of Xanax and addiction. ECF 4-34, 21 RR 10-31.

### 2. Penalty phase

At the penalty phase, the state presented evidence that Mr. Daniel lacked remorse and was a future danger to society. The state argued that Mr. Daniel's statements and conduct evidenced a lack of remorse because he believed he would be at the top of the pecking order in prison and "retired at 25," he planned to profit from his fame by selling "murderabilia," took a bow when his case came on the news, and pumped his fist when an inmate yelled "fuck the police." ECF 4-36, 23 RR 36, 81, 113, 84-85, 200-30. The state's presentation of Mr. Daniel's prior bad acts included the testimony of Caresa Marino that Mr. Daniel had threatened her in the sixth grade, and evidence that Mr. Daniel had punched another student while in high school. ECF 4-36, 23 RR 22-23; ECF 4-37, 24 RR 159. Other witnesses testified that Mr. Daniel had bragged about running from the police on his motorcycle, and that he was charged with possession of marijuana and driving while intoxicated. ECF 4-35, 22 RR 19-20, 169; ECF 4-36, 23 RR 9-10; ECF 4-37, 24 RR 66-67. Mr. Daniel's roommate testified that on the evening before the offense, Mr. Daniel talked about robbing a convenience store together. ECF 4-35, 22 RR 127-28. In jail, Mr. Daniel made "hooch," and hoarded and took pills. ECF 4-35, 22 RR 65-66; ECF 4-35, 22 RR 151; ECF 4-37, 24 RR 30. An inmate testified that Mr. Daniel and another inmate had been planning an escape from jail, and a jail guard testified that Mr. Daniel had kept a list of the guards' schedules. ECF 4-35, 22 RR 81; ECF 4-36, 23 RR 36-37. Detective Fugitt testified that Mr. Daniel sent coded messages by mail while he was detained in jail. *See, e.g.*, ECF 4-35, 22 RR 161-62. Finally, a Texas Department of Criminal Justice ("TDCJ") classifications expert testified to the freedoms Mr. Daniel would experience if he was sentenced to life in prison without parole. ECF No. 4-36, 23 RR 122-65.

The defense's theory at punishment was that Mr. Daniel had suffered from depression and addiction for most of his life, both of which got worse after he broke up with his girlfriend, and that Mr. Daniel would not constitute a future danger in prison. Psychologist William Carter testified that

Mr. Daniel was introverted, depressed, and started using drugs during his early adolescence. ECF 4-37, 24 RR 86-114. He also testified that Mr. Daniel was the type of person to follow the rules in prison. *Id.* at 127, 140-53. Additionally, the defense presented jail guards who testified that Mr. Daniel was respectful and compliant while awaiting trial in jail. ECF 4-34, 24 RR 11, 22, 35. One jail guard testified that Mr. Daniel had created a noose and hung it from the air vents in his jail cell. ECF 4-37, 24 RR 201.

Mr. Daniel's former coworkers and supervisors testified that Mr. Daniel was introverted and a promising computer programmer who had missed several days of work in the days before the offense. ECF 4-37, 24 RR 48-54, 177-83; ECF 4-38, 25 RR 5-19. The defense presented an officer to rebut the idea that Mr. Daniel had encountered Officer Padron in the days before the offense. ECF 4-37, 24 RR 195. A jail guard also testified to impeach the state's version of the escape plan. ECF 4-37, 24 RR 211-18.

Neuropsychologist Walter Harrell, M.D., testified for the defense that Mr. Daniel had experienced traumatic brain injuries, which could have contributed to his drug use and depression. ECF 4-37, 24 RR 234-40. He testified that he had administered a smell test to Mr. Daniel, who performed poorly, which was a sign of damage to the frontal lobe of the brain. ECF 4-37, 24 RR 244-48. Dr. Harrell also testified that Mr. Daniel was likely to do well in a structured prison environment. *Id.* at 263-70.

The only family member who testified was Mr. Daniel's maternal aunt, Sherri Schuck, with whom he had lived for a few months during high school. Mr. Daniel was depressed and drinking alcohol. ECF 4-38, 25 RR 27-30. She also testified that her sister, Mr. Daniel's mother, had a liberal attitude towards marijuana and drinking and treated Mr. Daniel like an adult and an equal when he was growing up. *Id.* at 21-27, 34. Her already strained relationship with Mr. Daniel's mother, whom she described as a very closed person, had broken down in the time before trial. *Id.* at 31-32. Ms.

Schuck testified that when she met Mr. Daniel's ex-girlfriend, she seemed to adore him and Mr. Daniel appeared happy. *Id.* at 40-45.

Dr. Harold Scott, a psychiatrist, testified for the defense that when Mr. Daniel went to the hospital while awaiting trial in jail, he had likely taken an overdose of Haldol, an antipsychotic drug, and that Mr. Daniel could not have faked his symptoms. ECF 4-38, 25 RR 145-75. He diagnosed Mr. Daniel with Major Depression and Avoidant Personality Disorder, suspected that Mr. Daniel was heavily addicted to drugs, described him as lacking confidence, and discussed Mr. Daniel's suicidal behaviors. *Id.* at 175-82, 194-96, 200-04, 219-22. Dr. Scott described Mr. Daniel's mother as controlling, emotionally unavailable, mistrustful of doctors, and a drug user, which contributed to Mr. Daniel's psychological issues. *Id.* at 182-90. He opined that Mr. Daniel's depression after his breakup and lack of coping skills led to his use of Xanax. *Id.* at 210-13. Dr. Scott testified that he thought Mr. Daniel could make a positive adjustment in prison. *Id.* at 225-28.

In rebuttal, the state presented the testimony of Dr. Marisa Mauro, who found Mr. Daniel to be unreliable and disputed Dr. Scott's diagnoses. *Id.* at 15-36. She also listed the definition and criteria for psychopathy, though she testified that she had been prohibited from administering any relevant. *Id.* at 36-38.

Finally, in surrebuttal, the defense presented Mr. Daniel's ex-girlfriend and her mother, who both testified that Mr. Daniel had sent a letter expressing his remorse for the offense. *Id.* at 71-86.

I. **THE TRIAL JUDGE ENGAGED IN MULTIPLE EX PARTE COMMUNICATIONS WITH PROSECUTORS, WHICH REPEATEDLY DEMONSTRATED HER BIAS AGAINST MR. DANIEL IN VIOLATION OF HIS EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.**

The trial judge[3] engaged in multiple ex parte email communications with the prosecutors throughout both pretrial and state habeas review. Some of these communications were simple administrative matters. However, some show a direct and deliberate intent to communicate with prosecutors about the merits of Mr. Daniel's case in the absence of his counsel, including the judge's rejection of the reliability of allegations in Mr. Daniel's state habeas application. Taken together, these emails demonstrate, not simply a cavalier disregard for the ethical guidelines prohibiting ex parte communication, but a disdain for the ideals of objectivity, fairness, and justice that those guidelines are created to protect. The trial judge "occupie[d] practically and seriously inconsistent positions, one partisan and the other judicial," *Tumey*, 273 U.S. at 534, when, in ex parte communications with prosecutors, she dismissed the validity of a claim she would ultimately decide. This communication created "a possible temptation" that the trial judge could "not hold the balance nice, clear, and true between the state and the accused." *Id.* at 532; *see also In re Murchison*, 349 U.S. 133, 136 (1955); *Williams*, 136 S. Ct. at 1903 (requiring recusal "when the likelihood of bias on the part of the judge 'is too high to be constitutionally tolerable'" (quoting *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 872 (2009)). Because a defendant is guaranteed "[a] fair trial in a fair tribunal," *In re Murchison*, 349 U.S. at 136, even the possibility or appearance of unfairness "necessarily involves a lack of due process," *Tumey*, 273 U.S. at 533, demanding a new trial.

A.    **The Trial Judge Engaged in Ex Parte Communications Throughout the Trial and State Habeas.**

1.    **Emails related to Mr. Daniel's recusal motion in state habeas**

In February 2016, after filing Mr. Daniel's Initial Application on state habeas and a recusal

---

[3] The trial judge assumed the role of state habeas judge following the filing of state habeas application. For consistency, Petitioner refers to the state habeas judge as "trial judge" throughout the Petition.

motion, state habeas counsel (OCFW) contacted the court's coordinator, Kamala White, copying ADA Lisa Stewart, requesting a ruling on the recusal motion. App. 462–63. Ms. White forwarded the email to the trial judge. App. 462–63. The trial judge then forwarded Mr. Daniel's inquiry to ADA Scott Taliaferro, without copying defense counsel, declaring in the ex parte email, "I've never seen the motion nor has it been set, presented, not discussed with me[.] BPK." App. 462. ADA Taliaferro responded to the trial judge, copying OCFW, and explained he was forwarding the trial judge's email to Mr. Daniel's counsel. *Id.* OCFW responded, notifying the trial judge that counsel would be "happy to appear at the court's convenience to present the motion," and attached a copy of the motion for the judge's convenience. App. 465. The motion included a request for recusal because the trial judge was a necessary fact witness for a claim raised on state habeas alleging that the trial judge had provided supplemental instructions to the jury while it was deliberating, without notifying Mr. Daniel or his counsel. *See infra* Claim II.

Undeterred by ADA Taliaferro's attempt to copy defense counsel on all case-related communications, the trial judge replied only to ADAs Taliaferro and Stewart, again removing OCFW from the communication, stating: "I have read the motion, and I have no idea of the source of the facts alleged, however, it is all fiction and did not occur." App. 464–65. Again, ADA Taliaferro forwarded the trial judge's email to OCFW, which alerted Mr. Daniel's counsel to the further communication by the trial judge. App. 464.

This email exchange, in which the trial judge announced to the state that she rejected the validity of Mr. Daniel's claim, even as Mr. Daniel's state habeas petition was pending before her, was not the first ex parte communication in which the trial judge engaged with the prosecutors in Mr. Daniel's case.

### 2. Emails related to Mr. Daniel's competency and potential waiver in state habeas

The trial judge also engaged in communications related to Mr. Daniel's competency and his

attempt to waive OCFW's representation. Shortly after his trial and sentence, Mr. Daniel wrote the court seeking to waive both direct appellate and state habeas counsel. The trial judge, without notice to counsel and based on findings she made while in chambers without the parties present, removed OCFW from Mr. Daniel's representation. App. 459–60. Concerned about Mr. Daniel's competency, OCFW requested a competency hearing on the record because it believed "the Court ha[d] erred in its ex parte findings" related to OCFW's representation. App. 460. OCFW emailed its request for a competency hearing to the court coordinator, Ms. White, copying ADA Stewart. App. 460. In the body of the email, OCFW explained that it remained Mr. Daniel's counsel despite his desire to waive because, under Texas law, a defendant's waiver does not take effect until after the date has passed to file an initial application. App. 460 (citing *Ex Parte Reynoso*, 228 S.W.3d 163, 164 (Tex. Crim. App. 2007)).

Ignoring OCFW's assertion that it remained counsel of record for Mr. Daniel, the trial judge again removed OCFW from the email and forwarded it to ADA Cobb, and former trial defense attorneys, Mr. Hunt and Mr. Urrutia.[4] App. 459–60. In this email, the trial judge explained that she had "discharge[ed] the[] services" of OCFW based on Mr. Daniel's request, but that "[n]ow th[ey] are raising the question of competency." App. 459–60. The trial judge further stated that she would have Mr. Daniel "brought back to see if he will make that request in person," "just to cover all [the] bases." App. 459–60. Ms. White, in a separate email, notified OCFW that Mr. Daniel would be brought to court for a competency evaluation. App. 538.

OCFW responded to Ms. White, clearly asserting that it "intend[ed] to be present at all court appearances of Mr. Daniel (formal or informal) as his currently appointed attorneys." App. 538.

---

[4] Mr. Hunt's and Mr. Urrutia's ineffectiveness was the subject of many of the claims raised by OCFW in the state habeas, and they were, thus, prevented by conflicts of interest from representing Mr. Daniel on state habeas.

OCFW also explained that it "must have the opportunity to respond to the results" of the competency evaluation, and that it was "requesting a hearing on the record" related to the competency determination. App. 538. This email was forwarded by Ms. White to the trial judge who again passed it on to ADA Cobb, without copying OCFW, stating in this ex parte communication: "This is the latest from the writs office. I don't believe that they are entitled to a hearing, etc. . . ." App 475.[5]

### 3. Emails related to a potential plea during pretrial proceedings

The trial judge's ex parte communications with prosecutors dated back to pre-trial. The first communication, which has since been disclosed, occurred a little over a month before voir dire was scheduled to commence, days before Mr. Daniel would learn that the state had finally declined to negotiate a plea agreement. On December 18, 2013, Manuel P. Garcia, the Victim/Witness Counselor for the 403rd District Court, emailed the trial judge, DA Rosemary Lehmberg, and ADA Bill Bishop, informing them that he had spoken with "Johnny Padron, brother of the victim" and told him that "DA Lehmberg, ADA Bishop, and ADA Cobb need to speak to the family," and that a meeting was scheduled for December 23. App. 471. Twenty minutes later, Mr. Garcia emailed again, stating that "Judge Kennedy will have the Defendant brought from jail that day. If this can be worked out, we can conclude this case in the afternoon of 12/23/13." App. 469.

Following the emails from Mr. Garcia, the trial judge herself emailed this same group, which included the DA and ADAs, but not defense counsel, discussing, *inter alia*, the "difficulties in managing the persons who have been assigned to the jury panel for January 6th as far as having an adequate turnout and willing participants." App. 472–73. DA Lehmberg responded in a forwarded

---

[5] Notably, when the court finally responded to OCFW's request for a hearing the next day, it copied ADA Cobb. App. 593.

message from another ADA in her office, stating "Judge Kennedy: it is highly unlikely this case will be disposed of on 12-23. RL." App. 472. Ultimately, DA Lehmberg's caution proved correct. On December 23, 2013, ADA Bishop gave the trial judge "the heads up" that "[f]ollowing our meeting with the family, Rosemary has elected to continue to seek the death penalty on Daniel." App. 493. Defense counsel was not privy to any of these emails shared between the prosecutor and the trial judge related to a potential plea negotiation, and it is not clear that defense counsel knew, at this point, that a plea had been rejected.

### 4. Emails related to ex parte discussions with an ADA about Mr. Daniel's trial

In April 2014, over a month after Mr. Daniel's trial ended, but prior to the judge's decision on direct appeal and state habeas, ADA Allison Wetzel emailed the trial judge about an intern who "comes to the DA's office for a few hours a week," asking whether the judge would meet with them so the intern could "ask you a few questions about being a judge and probably about the Brandon Daniel trial." App. 496. The trial judge "welcome[d them] to come by and try to talk very early." App. 496.[6]

### 5. The trial judge's continued impropriety following the ordered disclosures of the ex parte communications

The trial judge's improper conduct continued even after the ex parte communications were exposed. Upon learning of the improper communications, state habeas counsel sought discovery of further emails, which was granted. App. 457 (ordering the trial judge and the DA's office to provide

---

[6] Habeas counsel have been unable to locate the intern identified in this email to learn the nature and substance of the conversation that took place between the trial judge—who had matters in the Daniel case pending before her—and a representative of the DA's office and a member of the public. As counsel have been unable to independently locate this intern, Mr. Daniel requests the opportunity to depose ADA Wetzel to record her recollection of the ex parte conversation, and to determine if ADA Wetzel can locate the intern identified in the email communication.

"copies of all communications between them regarding Mr. Daniel's case"). In response to this discovery order, the trial judge provided five individual emails with employees of the District Attorney's Office. *See* App. 458–73 (emails the trial judge disclosed in response to the court's order). However, the judge failed to disclose five further communications, one of which included an email to the state that Mr. Daniel was not entitled to a competency hearing prior to his waiver. *See* App 525–605 (emails disclosed in response to a Public Information Act request); *see also* App. 537–38 (ex parte emails from the trial judge to the DA Cobb related to "the latest from the writs office," adding "I don't believe that they are entitled to a hearing, etc." and further discussing plans for a competency evaluation). Despite the discovery order, which had ordered the trial judge to provide "all communications" between the judge and the DA's office "regarding Mr. Daniel's case," these further emails were only revealed when Mr. Daniel's state habeas counsel filed a Public Information Act request.

> **B.** **The Trial Judge's Ex Parte Emails Demonstrated Her Partiality to the State and Her Bias Against Mr. Daniel in Violation of Due Process.**

"[T]he floor established by the Due Process Clause clearly requires a fair trial in a fair tribunal, before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997). "Every procedure . . . which might lead [the average person] not to hold the balance, nice, clear, and true between the state and the accused denies the latter due process of law." *Tumey*, 273 U.S. at 532.

In assessing whether that balance remains nice, clear, and true, "the inquiry must be not only whether there was actual bias" on the part of the court, "but also whether there was such a likelihood of bias or an appearance of bias that the judge was unable to hold the balance between vindicating the interests of the court and the interests of the accused." *Taylor v. Hayes*, 418 U.S. 488, 501 (1974). The Court has recognized that such a "stringent rule may sometimes bar trial by judges who have no actual bias," but concluded that "due process of law requires no less." *Id.* at 501

(quoting *In re Murchison*, 349 U.S. 133, 136 (1955) (internal quotation marks omitted)). It is not only the "biased decisionmaker" that is "constitutionally unacceptable," "our system of law has always endeavored to prevent even the probability of unfairness." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).[7] For this reason a petitioner is "entitle[d] . . . to 'a proceeding in which he may present his case with assurance' that no member of the court is 'predisposed to find against him'" and must, therefore, "be granted an opportunity to present his claims to a court unburdened by any 'possible temptation . . . not to hold the balance nice, clear and true between the State and the accused.'" *Williams*, 136 S. Ct. at 1910 (first quoting *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980), then quoting *Tumey*, 273 U.S. 510, 532 (1927)).

Given the trial judge's practice of communicating directly with the District Attorney's Office on substantive matters that she was actively deciding, even if there were no actual bias, the appearance of bias is certain. Some communications, like the email related to the problems with the jury pool, or the email inviting an ADA and an intern from the office to ask "a few questions . . . about the Brandon Daniel trial,"[8] App. 496, may be merely disquieting.

However, the ex parte communication related to OCFW's request for a competency hearing, which the judge derided as "the latest from the writs office" before declaring her position to the state—"I don't believe that they are entitled to a hearing"—when defense counsel had no

---

[7] The Texas Code of Judicial Conduct, likewise, prohibits judges from engaging in ex parte communications. Under the Judicial Code, a "judge shall not initiate, permit, or consider ex parte communications," Canon 3B(8), except for "communications concerning uncontested administrative or uncontested procedural matters," Canon 3B(8)(a), or "an effort to mediate or settle matters, provided, however, that the judge shall first give notice to all parties and not thereafter hear any contested matters between the` parties except with the consent of all parties," Canon 3B(8)(b). The trial judge's standing order also prohibited ex parte communications. *See* Supp. App. 1856.

[8] Mr. Daniel has no knowledge of the content of this conversation. This requires both discovery and an evidentiary hearing.

opportunity to respond, creates serous doubt as to the court's objectivity and separation from the prosecution. App. 475. Even as OCFW was insisting on its continued presence at "all court appearances of Mr. Daniel (formal or informal)" App. 538, the trial court was communicating behind the scenes with the ADAs and conflicted prior defense counsel, who could no longer represent Mr. Daniel's interests because of the extensive ineffective assistance of counsel claims raised in state habeas, App. 459–60. Ultimately, though the trial judge decided to grant the required hearing, as she told the ADAs, it was "[j]ust to cover all the bases." App. 460. And the judge ultimately found Mr. Daniel competent to waive.

The trial judge's bias became undeniable, however, when OCFW moved for her recusal. In response, the trial judge emailed the ADAs, contesting the truthfulness of the allegations raised in the state habeas petition and the accompanying recusal motion, declaring the allegations "all fiction" which "did not occur." App. 464–65. It is no wonder, then, that the trial judge ultimately dismissed the claim without a hearing, and without even addressing the juror's affidavit in support of the claim. The trial judge had already made clear in her ex parte email to the prosecutors that she was "predisposed to find against" Mr. Daniel. *See Williams*, 136 S. Ct. at 1910. Moreover, in rejecting the claim, the trial judge adopted, verbatim, the state's findings of fact—that is, the trial judge adopted the findings of fact written by the party with whom she had engaged in multiple ex parte communications. App. 96.

The judge's ex parte communications were not inadvertent oversights. Over and over, she systematically removed Mr. Daniel's counsel from email strings after the prosecutors had properly added them. Her biased conduct was deliberate and repeated.

Where a court works so closely with the prosecutor, repeatedly demonstrating its preference for the prosecutor's position, and dismissing in ex parte communications well-supported allegations and claims raised by defense counsel, it is impossible to conclude that the judge acted without bias.

*See Williams*, 136 S. Ct. at 1910; *Tumey*, 273 U.S. at 532; *In re Murchison*, 349 U.S. at 136.

### C.     State Court Proceedings

Mr. Daniel objected to the judicial bias stemming from the ex parte communications, when he learned about them, in a supplement to a recusal motion, App. 441–47, and in a motion to supplement the record of recusal proceedings, Supp. App. 1775.  The court denied recusal. Supp. App. 1859. Mr. Daniel then filed a petition for writ of mandamus, Supp. App. 1813 and reply, Supp. App. 1791, to the state's opposition in the CCA, arguing that the ex parte emails gave rise to a risk of unconstitutional bias. Specifically, Mr. Daniel argued that the trial judge's "impartiality might reasonably be questioned" because she had become a part of the "accusatory process" Supp. App. 1843-1846 (citing *In re Murchison*, 349 U.S. at 137); *see also* Supp. App. 1805-1809. The CCA summarily dismissed the petition a writ of mandamus. The judicial bias was again raised in Mr. Daniel's objections to the trial judge's findings of facts and conclusions of law, arguing that the ex parte emails gave rise to an unconstitutional appearance of impartiality, App. 45–49, which the CCA overruled without addressing the judicial bias arguments raised. As no state court addressed Mr. Daniel's claim related to the trial judge's bias stemming from her ex parte communications with the prosecutor, this Court reviews de novo. *See, e.g.*, *Cone,* 556 U.S. at 472.

The trial judge's bias violated Mr. Daniel's due process rights and demands that habeas relief be granted, conditioned on a new trial of both guilt or innocence and penalty before an unbiased jurist. At the very least, this court should condition habeas relief on new appellate and state habeas review, by a judge untainted with bias.

**II.     THE TRIAL JUDGE GAVE SUPPLEMENTAL INSTRUCTIONS TO THE JURY OUTSIDE THE PRESENCE OF COUNSEL IN VIOLATION OF MR. DANIEL'S SIXTH AMENDMENT RIGHTS TO COUNSEL AND A PUBLIC TRIAL, FIFTH AND FOURTEENTH AMENDMENT RIGHTS TO DUE PROCESS, AND EIGHTH AMENDMENT RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT.**

Mr. Daniel was deprived of his rights to counsel, a public trial, and due process when the

trial judge provided supplemental instructions to the jury, while the jury was deliberating, without notifying Mr. Daniel or his counsel. The trial judge received and answered the jury question in a way that allowed the jury to continue deliberating, without notifying counsel that there was a question at any point during the proceedings, without informing trial counsel that she had answered a question from the jury, or the content of that response, and without ever making the jury question and the judge's response a part of the record. After taking these secretive steps, the trial judge denied Mr. Daniel an opportunity at state habeas to develop a record related to the claim so that habeas counsel could learn the nature of the jury's question and the content of the trial judge's response. To this day, Mr. Daniel remains ignorant of the full content of jury question and the trial judge's supplemental instruction that ultimately led to the jury finding that he would be a future danger.

### A. The Trial Judge Provided Supplemental Instructions to the Jury During Penalty Phase Deliberations Without Notice to Mr. Daniel or His Counsel.

Mr. Daniel's jury deliberated during the penalty phase for just under nine hours total. ECF 4-1, pp. 186–89 (showing that deliberations began at 1:49 p.m. and concluded at 10:30 p.m.). For nearly seven hours it struggled over the question whether Mr. Daniel would be a future danger. *Id.* at 189 (showing that the deliberations for "Issue Number 1" concluded at 8:40 p.m.). During these deliberations, multiple jurors recall that the jury submitted a question to the trial judge. *See* App. 1604–05 (juror stating: "I remember we also had to ask the judge a procedural question regarding the case while we were deliberating. We asked the bailiff to relay the question to the judge."). The jurors received "a note back from the judge . . . that answered [their] question," App. 643, "and allowed [them] to continue deliberating," App. 1605. *See also* App. 642–43 (juror recalling that they "submitted a question to the judge requesting clarification," on terms related to future dangerousness); Supp. App. 1868-70. (juror recalling that they "had a question for clarification" related to "the term 'probability' in the phrase 'probability of future danger,'" submitted the question to the bailiff, and "received a response after a short time"); Supp. App. 1871 (juror recalling that they

35

"had a question about some of the jury instructions" during penalty phase related to "what a 'threat to society' meant," that they submitted the question to the bailiff who "wrote [the question in a note form and gave it to the judge" and the bailiff returned and "told [the jury] to come up with [their] own definition").

The trial judge received and answered the jury's question without notifying defense counsel that there was a question, much less informing counsel of the content of the question or the court's response. The jury's note and response were never made part of the record. Trial counsel Urrutia declared the following:

> I learned that during the penalty phase deliberations the jury submitted a question to the court concerning its deliberation. Neither I nor co-counsel, Russell Hunt, Jr., were present when the question was submitted by the jury or when the court responded to the question. The court never notified me or Mr. Hunt that the jury had a question, and we were not summoned back to court before the court responded to the question. We were never provided with a copy of any note from the jury, were never told the substance of the jury's question, and did not have an opportunity to object to the court's response to the question or ask for an alternative instruction.

Supp. App. 1862.

In his state habeas petition, Mr. Daniel filed a claim raising the constitutional violation arising from the supplemental jury instruction provided without notice to the parties or counsel and requesting an evidentiary hearing to "make a complete record of the missing information" and "to determine whether the trial court's response constituted an additional instruction." App. 925.

Shortly after filing the petition, Mr. Daniel moved to recuse the trial judge as she was now a material fact witness with information necessary to decide the claim. App. 617–37. As the recusal motion was pending, the trial judge engaged in ex parte communications with the District Attorney's Office, which are the basis for the judicial bias claim raised at Claim I, *supra*. In these emails with the prosecutor, the trial judge dismissed the factual basis for the claim related to the supplemental jury instruction, stating: "I have no idea of the source of the facts alleged, however, it is all fiction and

did not occur." App. 464–65.

The trial judge ultimately denied the claim without a hearing. Adopting, verbatim, the findings of fact and conclusions of law from the state—the opposing party with which it had engaged in ex parte communications related to this very claim—the trial judge found that she "did not provide any additional or supplemental written instruction to the jury during its punishment deliberations beyond what was contained in the court's charge." App. 96. In support of this finding, both the state and the trial judge cited to the written copy of the court's charge, which failed to address the material fact in dispute raised by the claim: that the trial judge secretly provided a supplemental instruction, while the jury was deliberating, without notice to Mr. Daniel or his counsel and without making the supplemental instruction a part of the record. The trial judge never addressed the affidavit from the juror affirming that, in fact, the jury had sent out a question and the court had answered.

**B.    Mr. Daniel Was Denied His Sixth Amendment Right to Counsel During a Critical Stage of the Proceeding When the Trial Court Provided Supplemental Instructions to the Jury Without Notifying Counsel.**

The Sixth Amendment guarantees to the accused the right to the assistance of counsel in his defense. U.S. Const. amend. VI. "This right, fundamental to our system of justice[,] is meant to assure fairness in the adversary criminal process." *United States v. Morrison*, 449 U.S. 361, 364 (1981) (citing *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963)). Recognizing that the "right to be represented by counsel is a fundamental component of our criminal justice system," the Supreme Court has described lawyers in criminal proceedings as "necessities, not luxuries." *United States v. Cronic*, 466 U.S. 648, 653 (1984) (internal quotation mark omitted). As the Court explained, counsel's "presence is essential because they are the means through which the other rights of the person on trial are secured," and, thus, "[w]ithout counsel, the right to a trial itself would be of little avail." *Id.* at 653–54; *see also Strickland*, 466 U.S. at 691-92 ("The purpose of the Sixth Amendment guarantee of

counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding.").

Because counsel's presence is "essential" to the administration of a fair trial, a trial is, by necessity, "unfair if the accused is denied counsel at a critical stage." *Cronic*, 466 U.S. at 659. Accordingly, the Supreme Court has "uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." *Id.* at 659 n.25; *see also Holloway v. Arkansas*, 435 U.S. 475, 489 (1978) (holding that where an accused is "deprived of the presence and assistance of his attorney . . . during a critical stage in . . . the prosecution of a capital offense, reversal is automatic"). This is because "the right to counsel is so basic to a fair trial that [its] infraction can never be treated as harmless." *Penson v. Ohio*, 488 U.S. 75, 88 (1988) (internal quotation marks omitted). Therefore, the accused need not "explain how having counsel would have altered the outcome of his specific case," in order to "justify a particular stage as critical." *Id.* (internal quotation marks omitted). Rather, the court must determine "whether the substantial rights of a defendant may be affected during th[e] type of proceeding" at which the accused was denied counsel. *Id.* (internal quotation marks omitted).

The Supreme Court has acknowledged that "the orderly conduct of a trial by jury, essential to the proper protection of the right to be heard, entitles the parties who attend for the purposes to be present in person or by counsel at all proceedings *from the time the jury is impaneled until it is discharged after rendering the verdict.*" *Fillippon v. Albion Vein Slate Co.,* 250 U.S. 76, 81 (1919) (emphasis added) (holding in a civil case that the trial judge had "erred in giving a supplementary instruction to the jury in the absence of the parties and without affording them an opportunity to either be present or to make timely objection to the instruction"). In *Rogers v. United States*, 422 U.S. 35 (1975), the Supreme Court vacated a jury's verdict because the trial judge had responded to the jury's query whether the court "would accept the Verdict—Guilty as with extreme mercy of the Court," without

notice to petitioner or his counsel. *Id.* at 37. The court instructed the marshal "to advise the jury that the Court's answer was in the affirmative." *Id.* In vacating, the Supreme Court reasoned that "the communication from the jury . . . was tantamount to a request for further instructions." *Id.* at 39. The Court declined to conduct a harmless error analysis, holding that "the nature of the information conveyed to the jury, in addition to the manner in which it was conveyed, does not permit" a finding of harmlessness. *Id.* at 40.

Here, Mr. Daniel was denied his counsel at a critical stage of the trial when, during penalty phase deliberations, the jury asked for supplemental instructions related to future dangerousness and the trial judge answered the question, in secret, without notice to Mr. Daniel or his counsel, and without making either the note or her response a part of the record. Mr. Daniel does not know precisely what the jury asked and how the trial judge resolved the jury's confusion on what it obviously regarded as a vital question related to Mr. Daniel's sentence of death. The jury's question and the judge's supplemental instruction indeed encompassed a critical stage. Because Mr. Daniel was denied his right to counsel at this critical stage, the proceeding was fundamentally unfair, prejudice is presumed, and Mr. Daniel is entitled to a new penalty phase hearing.

Even if the judge's supplemental did not constitute a *Cronic* total deprivation of counsel, the Supreme Court instructs that, where a trial judge fails to disclose ex parte communications with a juror, even if it is not at a critical stage of the trial, a court must "normally . . . determine[]" the prejudicial effect of the failure to disclose "by a post-trial hearing." *Rushen v. Spain*, 464 U.S. 114, 118-19 (1983). As the court explained, because the "adequacy of any remedy is determined solely by its ability to mitigate constitutional error," a "[p]ost-trial hearing[ is] adequately tailored to this task." *Id.* In *Spain*, the Court held that the ex parte communication between the trial court and a juror was error, but ultimately determined that the error was harmless. There, the ex parte communication consisted of a personal exchange between the trial judge and a single juror, and, thus, did not occur

at a critical stage of the proceeding. The Supreme Court was able to assess the harm from the error only because the state court conducted a hearing to determine "the substance of the ex parte communications and their effect on juror impartiality." *Id.* at 120-21.

Here, by contrast, not only did the trial judge refuse to conduct a post-trial hearing to determine the prejudicial effect of the supplemental instruction, as directed by the Supreme Court, she privately denied that the supplemental instruction occurred in improper ex parte communications with the state, declaring that the claim was "all fiction." App. 465. Her denial created a contested factual question between the jurors, who recalled sending the communication and receiving a response, and the judge. In fact, the trial judge's denial in the ex parte email, itself, contradicted her finding later on state habeas. In the ex parte email, the judge declared that the allegation that a jury sent a note to the trial judge and she responded was "all fiction and did not occur." However, the trial judge's finding in state habeas was tempered and more careful, asserting only that the she did "not provide any additional or supplemental *written* instruction to the jury during its punishment deliberations." App. 165 (emphasis added). The trial judge did not find that the allegation that a jury note went to the judge and an answer was returned, perhaps orally, was "all fiction," as she had asserted in her earlier ex parte email. Indeed Mr. Daniel's allegations that the jury sent a question to the trial judge and she responded to the question, as supported by multiple juror affidavits, remains unrebutted by the state, and there are no contrary findings of fact on those points.

As *Spain* makes clear, without a hearing and subsequent factual findings, including a disclosure of the ex parte communication, no court could assess whether the Mr. Daniel was prejudiced by the supplemental instruction provided to the jury, in secret. Accordingly, even if there were no *Cronic* error, it was necessary to conduct a hearing to determine the content and potential prejudicial effect of the ex parte communication with the jury. The state court's failure to do so

violated Mr. Daniel's Sixth Amendment and due process rights.

### C. Mr. Daniel Was Denied His Sixth Amendment Right to a Public Trial When the Trial Court Secretly Instructed the Jury, Without Making a Record of the Supplemental Instruction, and Without Making the Necessary Findings to Close the Proceedings.

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a . . . public trial." U.S. Const. amend. VI. The Supreme Court has long recognized that the value of the public trial "is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the import of their functions." *Waller v. Georgia*, 467 U.S. 39, 45 (1984). *See also Estes v. Texas*, 381 U.S. 532, 588 (1965) (Harlan, J., concurring) ("Essentially, the public-trial guarantee embodies a view of human nature, true as a general rule, that judges, lawyers, witnesses, and jurors will perform their respective functions more responsibly in an open court than in secret proceedings."). The very purpose of a public trial is to guard against secret proceedings and to act as "an effective restraint on possible abuse of judicial power." *In re Oliver*, 333 U.S. 257, 270 (1948).

Though the Supreme Court has allowed some exceptions to the general rule of the right to an open trial, where other rights or interests are implicated, those circumstances are "rare" and "the balance of interests must be struck with special care." *Waller*, 467 U.S. at 45. The "presumption of openness may be overcome" only where (1) there is "an overriding interest that is likely to be prejudiced"; (2) "the closure [is] no broader than necessary to protect that interest"; (3) "the trial court . . . consider[s] reasonable alternatives to closing the proceeding"; and (4) the trial court "make[s] findings adequate to support closure." *Id.* at 48.

The trial judge here failed to even notify counsel that there was a jury question, let alone advise them of the content of the question, and secretly provided supplemental jury instructions without making any record. When this issue was raised at state habeas, the trial judge denied an

opportunity to create a record regarding the secret proceeding and the supplemental jury instruction.

Without that process, there is no record on what "overriding interest" informed the trial judge's

decision to instruct the jury in secret, whether the closure was "no broader than necessary" to

protect that unknown interest, and whether the trial judge "consider[ed] reasonable alternatives" to

secretly instructing the jury. And there were certainly no "findings adequate to support closure," as a

public record was never made of the fact that there was even a jury question, let alone that the trial

judge intended to answer the question in secret. The violation of the public trial purpose to restrain

the "possible abuse of judicial power," *In re Oliver*, 333 U.S. at 270, is particularly troublesome here

where the trial judge regularly engaged in ex parte communications with the prosecutors, even

expressing opinions about matters pending before her, *see* Claim I, *supra*.

Like the total deprivation of counsel, a violation of the right to a public trial is structural

error and is, therefore, not subject to a finding of harmless error. *Weaver v. Massachusetts*, 137 S. Ct.

1899, 1908 (2017); *see also Presley v. Georgia*, 552 U.S. 209 215–16 (2010) (reversing a conviction

without assessing harmlessness when the trial court closed the courtroom during voir dire). The

trial judge's secret proceedings violated Mr. Daniel's right to a public trial.

### D. Mr. Daniel Was Denied His Right to Due Process When the Trial Court Instructed the Jury Outside His Presence.

The Due Process Clause under both the Fifth and Fourteenth Amendments likewise protect

an accused's right to be present at all stages of a criminal proceeding. As the Supreme Court has

explained, while the constitutional "right to presence is rooted to a large extent in the Confrontation

Clause of the Sixth Amendment," it has, nonetheless, "recognized that this right is protected by the

Due Process Clause in some situations where the defendant is not actually confronting witnesses or

evidence against him." *United States v. Gagnon*, 470 U.S. 522, 526 (1985). This right manifests

"whenever [the accused's] presence has a relation, reasonably substantial, to the fullness of his

opportunity to defend against the charge." *Snyder v. Massachusetts*, 291 U.S. 97, 105-06 (1934).

Accordingly, "the presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence." *Id.* at 107-08; *see also Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.").

As argued in his state habeas petition, Mr. Daniel was denied an opportunity to know that the jury had a question, to know what that question was, and to know how the court answered the question, all of which "thwarted" Mr. Daniel's "opportunity to defend against the charge," *Snyder*, 291 U.S. at 106, and to "present [his] objections," *Mullane*, 339 U.S. at 314. Each of these violations deprived him of his right to due process of law.

### E.     State Court Proceedings

Mr. Daniel raised this claim in his initial application. App. 925–32. The trial court denied the state habeas application, adopting verbatim the state's proposed findings of fact and conclusions of law. App. 95–97. The CCA affirmed. App. 02.

The state court process was unreasonable and unfair because the trial judge: never held an evidentiary hearing to consider Petitioner's well pleaded claim, which was supported by an affidavit; adopted verbatim the state's proposed findings of fact and conclusions of law, while ignoring the juror affidavit in support of the habeas petition. The state court then proceeded to find that the claim, raised under both state and federal grounds was non-cognizable on state habeas review. The process was also unreasonable because the CCA adopted these findings in its opinion. *See* Standard of Review under AEDPA, parts B and C, *supra.* Accordingly, this Court should review this claim de novo. To the extent that the state court ruling is nevertheless reviewed under 28 U.S.C. § 2254(d), the decision was an unreasonable determination of fact.

Mr. Daniel first learned that the jury had a question during penalty phase deliberations and that the trial judge had answered the question with a note during a jury interview conducted as part of the investigation for the state habeas petition. App. 642–43. As Mr. Daniel argued, neither the jury question, nor the judge's response were made part of the record, and trial counsel were not notified of either. As part of his state habeas petition, Mr. Daniel raised a claim, arguing state procedural, state constitutional, and federal constitutional grounds. Mr. Daniel also moved for the trial judge's recusal as a material witness necessary to create a record essential to adjudicating the claim. The motion to recuse was denied. Thereafter, the trial judge denied any hearing as to the claim. At the same time, the trial judge found that she had not "provide[d] any additional or supplemental written instruction to the jury during its punishment deliberation beyond what was contained in the court's charge." App. 96. In support of this finding, the trial judge cited to the written court charge she provided to the jury at the start of deliberations, which had been read into the record with counsel present. App. 96.

The trial judge's findings was unreasonable for two reasons. First, the trial judge failed to address the juror affidavit, discussed above, affirming that, in fact, the jury did send a note to the judge, and the judge responded with a note answering the question. *See* App. 642–43. The trial judge did not find the juror affidavit incredible or, in any other way, unreliable, she simply declined to acknowledge it existed. Instead, she relied on her own recollection to find that no "supplemental *written* instruction" was provided to the jury. App. 96 (emphasis added). Second, the judge's finding that no written instruction was provided to the jury, in addition to failing to address the juror affidavit affirming that a note was provided, also failed to address the claim as raised. Whether or not the supplemental instruction was written is beside the point—Mr. Daniel was denied his Sixth and Fourteenth Amendment rights when the trial judge denied him the opportunity to know about and respond to the juror question and the judge's response. When the trial judge responded in

secret, in closed courtroom proceedings, declining to notify counsel, and declining to put the question or her response on the record, she denied Mr. Daniel his right to be present at his own criminal proceeding, his right to be represented by counsel, and his right to an open courtroom, regardless of whether the trial judge wrote the response in a note, or provided it to the jury orally. Moreover, this new recollection from the trial judge—denying a supplemental instruction limited to only a written jury note—contradicts the earlier representation she made to the District Attorney's Office in an ex parte email. *See* Claim I, *supra.* In that email, unlike the findings of fact, the trial judge did not carefully avoid addressing whether she received a jury note, or whether she provided any supplemental instruction to the jury. The judge dismissed the allegation as "all fiction." That is, the judge's email to the prosecutors did not narrowly deny that any *written* instruction was provided; it denied the factual allegation in total. This more narrow factual finding was inconsistent with the earlier total denial of the allegation in the trial judge's ex parte email. For these reasons, the trial judge's factual findings were unreasonable.

The trial judge dismissed the claim as non-cognizable, but only addressed the claims based on state procedural rules. The trial judge did not address the claim as it relates to federal constitutional law. The CCA affirmed on the same basis. Because the state court declined to address the federal constitutional grounds, this court reviews de novo. *See, e.g., Cone,* 556 U.S. at 472.

To the extent any portion of this meritorious claim was not sufficiently exhausted in state court, state habeas counsel's ineffectiveness in failing to raise the claim excuses any procedural default. *See Martinez,* 566 U.S. at 17; *Trevino,* 569 U.S. at 428.

III. **MR. DANIEL WAS DENIED DUE PROCESS AND A FULL AND FAIR OPPORTUNITY TO LITIGATE HIS CONSTITUTIONAL CLAIMS UNDER TEXAS STATE HABEAS LAW, WHEN THE TRIAL JUDGE, AFTER ENGAGING IN EX PARTE COMMUNICATIONS WITH THE PROSECUTOR ABOUT THE MERITS OF MR. DANIEL'S STATE HABEAS PETITION, DENIED MR. DANIEL A HEARING, IGNORED THE AFFIDAVITS HE SUBMITTED IN SUPPORT OF HIS PETITION, AND ADOPTED THE STATE'S PROPOSED ORDER VERBATIM, IN VIOLATION OF THE EIGHTH**

**AND FOURTEENTH AMENDMENTS.**

As discussed above in Claims I and II, the trial judge engaged in biased and partial conduct in adjudicating Mr. Daniel's case.[9] The judge engaged in ex parte communications with the prosecutor, some of which directly addressed the merits of Mr. Daniel's pending claims on state habeas corpus proceedings. After communicating with the prosecutor ex parte about Mr. Daniel's claims, the trial judge adopted the state's findings nearly verbatim and recommended that relief be denied. The trial judge's findings of fact and conclusions of law mirrored the state's amended proposed findings down to the different fonts for text and page numbers. At the same time the trial court issued its findings, it denied Mr. Daniel's motion requesting the opportunity to challenge adverse evidence against him. Because the judge's conduct both at trial and in habeas proceedings denied Mr. Daniel a full and fair consideration of the federal claims arising out of the evidence described above, it also violated Mr. Daniel's federal due process and equal protection rights.

Texas law guarantees the right of a condemned prisoner to pursue relief of his conviction and sentence via state habeas corpus procedures. Tex. Code Crim. Proc. Art. 11.071. When, as here, a state mandates certain capital sentencing procedures or establishes the right to particular appellate, post-conviction, or post-sentencing review in capital cases, it creates Fourteenth Amendment life and liberty interests in those procedures. *Evitts v. Lucey*, 469 U.S. 387, 393 (1985) (due process interest in state created right to direct appeal). Although the right to the particular procedure is established by state law, the violation of the life and liberty interest it creates is governed by federal

---

[9] As previously discussed in this petition, the judge communicated ex parte with the prosecutor during trial and state habeas proceedings, removed OCFW's representation of Mr. Daniel ex parte, answered a question posed by the jury during their deliberations without the presence of Mr. Daniel or his counsel, and failed to fully comply with a discovery order from another court concerning the extent of her ex parte communications. These and other relevant facts are raised in Claims I and II are incorporated by reference herein.

constitutional law. *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980); *Ford v. Wainwright*, 477 U.S. 399, 428–29 (1986) ("[R]egardless of the procedures the State deems adequate for determining the preconditions to adverse official action, federal law defines the kind of process a State must afford prior to depriving an individual of a protected liberty or property interest."); *see also Evitts* 469 U.S. at 393 (state procedures employed "as 'an integral part of the . . . system for finally adjudicating the guilt or innocence of a defendant'" must comport with due process).

Here, the trial judge thwarted Mr. Daniel's right to a full and fair consideration of his claims at nearly every step of the trial and state habeas proceedings. This denial of due process culminated in the judge's denial of an evidentiary hearing on several claims that warranted one, the judge's ignoring affidavits raised submitted by state habeas counsel in support of Petitioner's claims, and the judge's wholesale adoption of the state's findings of facts and conclusions of law. Mr. Daniel's due process rights and equal protection rights under the federal constitution were denied. Mr. Daniel is entitled to new state habeas proceedings.

This claim was exhausted during state habeas proceedings. Petitioner repeatedly requested the opportunity to develop and present evidence in support of his claims and objected to the state court's adopting verbatim the prosecution's proposed findings of fact and conclusions of law. *See* Standard of Review Under the AEDPA, parts B and C, *supra*. Petitioner likewise repeatedly objected to the trial judge's bias as demonstrated in the ex parte emails, seeking recusal, and arguing the judicial bias during state habeas proceedings. *See* Claim I, *supra*. This Court should accordingly conduct de novo review and grant Petitioner the opportunity to pursue state habeas claims unburdened by the constitutional violations that thwarted fair review during state habeas proceedings.

**IV. MR. DANIEL'S RIGHTS TO DUE PROCESS, EFFECTIVE ASSISTANCE OF COUNSEL, AND FREEDOM FROM CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED BY THE TRIAL COURT'S FAILURE TO PROPERLY FUND HIS DEFENSE, AND TRIAL COUNSEL'S AGREEMENT TO WORK ON MR.**

**DANIEL'S CASE UNDER A FLAT FEE STRUCTURE CREATED A CONFLICT OF INTEREST BETWEEN MR. DANIEL AND HIS ATTORNEYS.**

Although Mr. Daniel had counsel appointed, the trial court imposed a fee cap on the defense team that created a conflict between Mr. Daniel and his lawyers. Moreover, this improper flat fee, arranged through backdoor negotiations, was imposed after the trial court had demonstrated an unwillingness to authorize the funds necessary to conduct a reasonable, professionally competent mitigation investigation. These limitations on adequate funding deprived Mr. Daniel of his rights under the Fifth and Fourteenth Amendment to due process, the Sixth Amendment to the effective assistance of counsel, and the Eighth Amendment to be free from cruel and unusual punishment.

### A.     Mr. Daniel's Defense Was Improperly and Deficiently Funded.

On April 9, 2012, the trial court appointed Mr. White to serve as lead counsel for Mr. Daniel's defense team. Mr. Urrutia was appointed co-counsel. The rest of the initial defense team consisted of David Watson, an investigator, and Alicia Amezcua-Rodriguez, a mitigation specialist. Mr. White had three decades of criminal defense experience, had been board certified in criminal law since 1983, and had extensive experience serving as counsel in death cases. Mr. Watson was a fifteen-year veteran of the Los Angeles Police Department and an experienced private investigator. Ms. Amezcua-Rodriguez was an attorney with extensive experience as a capital-defense mitigation specialist. These three core members of the defense team withdrew *en masse* from representing Mr. Daniel after the trial court refused to authorize the funding necessary to provide anything approximating constitutionally adequate representation. App. 1050.

On June 4, 2012, the trial court granted a motion to appoint Ms. Amezcua-Rodriguez as a mitigation specialist at the rate of $100 per hour. The order authorized initial funding of $3,500, specifically for a mitigation investigation. Ms. Amezcua-Rodriguez was paid once. But thereafter, her

vouchers were not paid,[10] making it virtually impossible for her to move forward with the requisite mitigation investigation. Similarly, Mr. Watson, the retained investigator, had trouble getting paid. On September 1, 2012, he sent a letter to lead trial counsel Mr. White, expressing concern that the presiding judge, who had approved his appointment, was indicating "NO" on his billing and making inexplicable cuts for reasonable and necessary work. App. 1151.

Meanwhile, Mr. White heard from the court that it was planning to cap the amount spent on mitigation at $20,000. Ms. Amezcua-Rodriguez saw that such a cap would mean that, at her hourly rate, she would be allotted only about 50 more hours to develop the mitigation evidence for Mr. Daniel's case even though, in her professional judgment, at least 700 more hours of work were warranted. She explained to Mr. White that she needed assurances from the court that the mitigation investigation would be properly funded pursuant to generally recognized professional standards, or she would be forced to withdraw.

To explain to the court why this funding was necessary, Ms. Amezcua-Rodriguez prepared an affidavit outlining the mitigation investigation the case required. App. 1609. That work included extensive record collection, record review, and witness interviews. The affidavit also explained that most of the witnesses with relevant information lived outside of Texas, thus necessitating considerable travel. On November 26, 2012, defense counsel filed a pretrial motion to seek funding for necessary investigation. App. 1058. The motion and Ms. Amezcua-Rodriguez's affidavit explicitly identified the concrete tasks that had yet to be performed to build a proper and constitutionally adequate mitigation case specific to Mr. Daniel. The motion also documented that after authorizing Ms. Amezcua-Rodriguez to conduct a mitigation investigation at the hourly rate of

---

[10] Ms. Amezcua-Rodriguez was finally paid $8,105.83 in January 2013 for work she had performed from May 4-July 18, 2012, as a result of an invoice resubmitted to the Court on December 3, 2013. The payment reflected a $3,327 cut from the actual fees and expenses incurred.

$100, the court changed its mind. According to the motion, the court told Mr. White in emails and in-person discussions that it intended to cap mitigation costs at $20,000. The motion, therefore, urged the court to clarify its intentions, emphasizing that "flat fees, caps on compensation, and lump-sum contracts are improper in death penalty cases."

The next day, November 27, 2012, the trial court denied the motion. The order did not refer to a plan to impose a cap or flat fee. On December 5, 2012, the mitigation specialist, the investigator, and lead defense counsel all filed motions to withdraw. App. 1051. The motions expressly cited the court's refusal to authorize sufficient funding as the basis for their decision to withdraw. Mr. Daniel's lead counsel also made clear his view of the stakes involved: "Without the necessary funding for the extensive mitigation work this case requires to generate a complete mitigation picture, Mr. White believes he cannot render effective assistance to Mr. Daniel." On December 10, 2012, the court granted Mr. White's motion to withdraw as lead counsel App. 1058, and appointed Mr. Hunt. The court seemingly conditioned the appointment on counsel's acceptance of a flat fee for all legal services to be provided to Mr. Daniel. Pursuant to that agreement, Mr. Hunt and Mr. Urrutia would be paid a total of $175,000.00. The flat-fee arrangement is confirmed by documentary evidence discovered during the post-conviction investigation.

The precise terms of the flat-fee deal and an explanation as to how it came to be imposed are spelled out in detail in a letter from Mr. Hunt to the court dated January 6, 2014:

> As you recall, when you, Brad, and I discussed payment arrangements on the day of my appointment, you had indicated your intention to pay us a total of $175,000.00. Brad and I discussed this payment arrangement and agreed among ourselves that we would split the fees so that Brad would receive $75,000.00 and I would receive $100,000.00. When you again discussed the matter with us yesterday you indicated that you would pay us half of the agreed-upon amount at this time, so half of my portion is the $50,000.00 figure.

App. 1149.

The letter recounting these terms was sent to the court in conjunction with a form requesting "a first interim payment of $50,000.00." Records from the Criminal District Courts of Travis County show that on January 7, 2014, the court received a payment request from Mr. Hunt seeking $50,000.00—exactly half of the flat fee he and his co-counsel had agreed would be earmarked for him. The court approved the payment requests that same day, and approved a payment request for the second $50,000.00 the day it was submitted, on March 4, 2014.

Likewise, Mr. Urrutia submitted payment request forms to the Criminal District Courts of Travis County—one on January 10, 2014, and a second on March 3, 2014—seeking payment each time for precisely $37,500.00. Each of these requests represented exactly half of the flat fee that he and his co-counsel had agreed would be earmarked for Mr. Urrutia. Each time, the court signed off on the payment requests on the same day, a remarkably quick turn-around given the difficulty the previous defense team had encountered in getting paid.

On February 11, 2013, the defense filed an ex parte motion seeking funds to hire a new mitigation specialist, and the court authorized initial funds of $7,500, at the hourly rate of $75. App. 1039. The new mitigation specialist was Lisa LeGuin Lawrence. For a period spanning over a year—from January 8, 2013 through February 28, 2014—Ms. Lawrence was paid a total of $13,587.42 to develop mitigation evidence.[11] This total means that, at a rate of $75 per hour, without even accounting for expenses, Ms. Lawrence was paid for at most 181 hours of work, a far cry from the 700 hours of essential remaining work estimated by Ms. Amezcua-Rodriguez. These facts show that Ms. Lawrence was unable to undertake work essential to making the case to save Mr. Daniel's life.

---

[11] As explained elsewhere, the paltry amount of time committed to the mitigation investigation is an example of trial counsel's deficient performance as well as an independent due process violation. *See* Claim V, VI.

**B.** **Capital defendants are entitled to a properly funded defense under the Fifth, Sixth, Eighth, and Fourteenth Amendments.**

    **1.** **Governing standards prohibit the use of flat fees and caps in capital cases.**

Because of the extraordinary demands on capital defense attorneys, the *ABA Guidelines* condemn the use of flat fees, caps on compensation, and lump-sum contracts in death penalty cases.[12] *ABA Guidelines*, Guideline 9.1(B)(1). Flat-fee arrangements in capital cases discourage and provide disincentives for comprehensive investigation and pre-trial preparation. As the Commentary to the *ABA Guidelines* emphasizes: "The Guideline's strong disapproval of flat fees, statutory caps, and other arbitrary limitations on attorney compensation is based upon the adverse effect such schemes have upon effective representation." *ABA Guidelines*, Guideline 9.1(B) at cmt. The risk of adverse incentives is why the *ABA Guidelines* insist that "compensation should be based on the number of hours expended plus the effort, efficiency, and skill of counsel." *Id.*

    **2.** **Governing standards require authorizing sufficient funds to conduct the necessary mitigation investigation.**

Capital trial counsel have an express duty to investigate and present mitigating evidence that could convince a jury to spare the client's life. Indeed, consistent with the Eighth Amendment, a capital defendant must be permitted to present any potentially mitigating evidence that might lessen his or her personal moral culpability. *Lockett v. Ohio,* 438 U.S. 586 (1978); *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Skipper v. South Carolina*, 476 U.S. 1 (1986); *Wiggins*, 539 U.S. 510; *Rompilla*, 545 U.S.

---

[12] The Supreme Court has urged compliance with the *ABA Guidelines. See, e.g., Rompilla,* 545 U.S. at 387 ("[W]e long have referred [to these ABA Standards] as 'guides to determining what is reasonable.'") (citing cases). Therefore, by 2012, when Mr. Daniel's original defense team put the funding issue before the trial court, there was no basis for disputing that the standards for counsel in capital cases are informed by the *ABA Guidelines* and the *Texas Guidelines*.

at 376. This constitutional mandate is captured in the relevant guidelines. *See ABA Guidelines*, Guideline 10.11(F)(2).

Relying on a thorough mitigation investigation, counsel must then draw from a capital defendant's social history and complete mental health profile to prepare a presentation to the jury that provides a comprehensive and sympathetic appreciation for the individual whose life is in their hands. *See ABA Guidelines*, Guideline 4.1 cmt. ("[T]he defendant's psychological and social history and his emotional and mental health are often of vital importance to a jury's decision at the punishment phase."). *See Sears v. Upton*, 561 U.S. 945 (2010); *Porter v. McCollum*, 558 U.S. 30 (2009); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000).

## C. Trial Counsel's Flat Fee Created an Actual Conflict Of Interest.

The problems inherent in flat-fee arrangements were manifest in Mr. Daniel's case. After working out a deal with the court to receive a flat fee, counsel invested very little time in investigating and developing a mitigation case for trial. *See* Claim V, VI (recounting that counsel believed the case would result in a plea and did not begin preparing for trial until just a month before voir dire). Moreover, because getting paid was not contingent upon documenting their actual work in such a way as to be accountable for their time, Mr. Daniel's trial team did not devote sufficient time to the case and did not ensure that the replacement mitigation specialist was adequately funded to do her job, as required by the constitution and applicable professional standards. The replacement mitigation specialist was well aware of the funding issues as she noted in correspondence with counsel that she is not being funded properly and her requests to investigate had gone unanswered. App. 1190.

### 1. Trial counsel's conflict of interest deprived Mr. Daniel of his Sixth Amendment right to conflict-free counsel.

In *Cuyler v. Sullivan*, 446 U.S. 335 (1980), the Supreme Court held that the Sixth Amendment right to the assistance of counsel encompassed a right to the assistance of conflict-free counsel. *Id.* at 345-50. Prejudice is presumed if a defendant demonstrates that counsel "actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance." *Strickland*, 466 U.S. at 692, citing *Cuyler*, 446 U.S. at 350 (internal quotation marks omitted). The Sixth Amendment guarantee of effective assistance of counsel includes the right to counsel's undivided loyalty. *Wood v. Georgia*, 450 U.S. 261, 271 (1981). When conflicting interests burden an attorney' representation, the precise impact on the defense is so difficult to measure, and the possibility of prejudice so great, that courts scrutinize the facts differently than in other ineffective assistance of counsel cases. *Hess v. Mazurkiewicz*, 135 F.3d 905, 910 (3d Cir. 1998) (citing *Strickland*, 466 U.S. at 692); *see also Von Moltke v. Gillies*, 332 U.S. 708, 725 (1948) ("Undivided allegiance and faithful, devoted service to a client are prized traditions of the American lawyer. It is this kind of service for which the Sixth Amendment makes provision."). Therefore, to obtain relief on a conflict of interest claim, a defendant need not demonstrate prejudice if he shows that "an actual conflict of interest adversely affected his lawyer's performance." *Cuyler*, 446 U.S. at 349-50.

Circumstances placing a client's interests at odds with those of his or her attorney create a conflict, and prejudice is presumed where the conflict adversely affects the attorney's performance. *See Wood*, 450 U.S. at 273-74; *Mickens*, 535 U.S. at 168. Mr. Daniel could have satisfied each of these criteria if the lower court had allowed him to present his proffered evidence.

In this case, trial counsel labored under an actual conflict of interest inherent in the flat-fee structure: with each hour they spent, their hourly wage decreased. When trial counsel accepts a flat fee in a capital case, the arrangement can create an actual conflict of interest in and of itself if it undermines counsel's incentive to undertake the necessary preparation for a trial with such severe

consequences. *See Stitt v. United States*, 369 F. Supp. 2d 679 (E.D. Va. 2005) (in capital case, counsel's flat fee, with other expenses to be paid by family members as they arose, created actual conflict of interest due to conflicting personal and financial interests); *State v. Cheatham*, 292 P.3d 318 (Kan. 2013) (holding that flat fee arrangement in a capital case created conflict of interest because unlikely that indigent defendant could pay fee, and thus financial disincentive for counsel to adequately investigate and prepare). This flat-fee structure, moreover, was contrary to professional norms—guidelines cited by the Supreme Court, the CCA, and trial counsel themselves as authoritative. As such, Mr. Daniel was deprived of his Sixth and Fourteenth Amendment right to the assistance of conflict-free counsel, and, as such, his conviction and sentence must be vacated.

As set out elsewhere in this petition, there was an enormous amount of mitigating evidence available for Mr. Daniel's defense that trial counsel failed to uncover due to their failure to conduct a reasonable background investigation of Mr. Daniel's life. *See* Claims V and VI, *infra*. The improper funding arrangement adopted in Mr. Daniel's case virtually guaranteed the failure to conduct a reasonable mitigation investigation. The deficiencies described elsewhere in this petition demonstrate that counsel's conflict of interest "actually affected" their representation. This deprived Mr. Daniel of his right to representation by conflict-free counsel, due process of law, and a reliable determination of Mr. Daniel's penalty under the Eighth Amendment. For all of these reasons, habeas relief must be granted on Mr. Daniel's conviction and sentence.

### D.     State Court Proceedings

Mr. Daniel raised this claim in his Initial Application for Writ of Habeas Corpus. App. 869-76. The trial court denied the state habeas application, adopting nearly verbatim the state's proposed findings of fact and conclusions of law. App. 84-85, *Ex parte Daniel*, No. D-1-DC-12-201718-A; App. 191, State's Proposed Findings of Fact, Conclusions of Law and Order (hereafter "FFCL"). The CCA affirmed, relying on the trial court's findings and conclusions. App. 6.

As discussed in Section Standards of Review Under AEDPA, *supra*, these findings are not entitled to deference and the court's review of this claim should be de novo. Although the CCA decision on this claim is not a one-word denial order, with respect to this claim the CCA simply described the claim and then asserted that Mr. Daniel did not meet his burden under *Strickland*, with no further analysis. App. 3. Moreover, the CCA explicitly relied on the trial court's findings and conclusions. *Id.* at 12. However, even under the deferential lens of § 2254(d), the state court decision was at best unreasonable in light of clearly established Supreme Court precedent. This Court should grant Mr. Daniel habeas relief.

## V.  MR. DANIEL'S RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL AND IMMUNITY FROM CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED BY TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT MITIGATING EVIDENCE.

Brandon Daniel was sentenced to die by a jury that lacked an understanding of powerful and readily available mitigating evidence because trial counsel failed to conduct the type of investigation into their client's life that the Constitution requires of capital counsel. Had they carried out their duty effectively, they would been able to present powerful mitigating evidence that Mr. Daniel's family history was rooted in violence, mental illness, multiple kinds of abuse, and generations of dysfunction. Due to trial counsel's ineffectiveness, the jury was not able to consider that Mr. Daniel was born with a developmental disability that shaped his entire life, combined with lifelong depression that led to his dependency on drugs and alcohol to self-medicate, starting when he was only ten years old. Instead, the jury heard from one aunt and from experts whose conclusions were undermined by their lack of knowledge of Mr. Daniel's life history, because trial counsel failed to provide them with critical background information. Trial counsel's failure to reasonably investigate readily available mitigating evidence deprived Mr. Daniel of his Sixth Amendment right to the effective assistance of counsel.

In a capital case, the defendant has an Eighth Amendment right to present as a mitigating factor any aspect of the defendant's character or record that "might serve 'as a basis for a sentence less than death.'" *Skipper*, 476 U.S. at 5 (quoting *Lockett*, 438 U.S. at 604). As a result of trial counsel's deficient performance, Mr. Daniel was denied that opportunity; but for counsel's deficient performance, it is reasonably probable that he would have been sentenced to life imprisonment. Therefore, he was deprived of his Sixth Amendment right to the effective assistance of counsel.

## A.    Mr. Daniel's Family Was Unstable.

Both of Brandon's grandfathers fought in the Korean War and married young, poor Korean women. Both grandfathers struggled with trauma from their service and became alcoholics. James, Brandon's maternal grandfather, married Brandon's maternal grandmother, Yong, in 1960. They had four children together, including Brandon's mother, Mary. James and Yong's relationship was unpredictable and volatile. The couple had horrible fights, often at night while their children were listening from their beds. The explosive, violent nature of their relationship traumatized the children. For Mary, "[i]t was scary to be so uncertain of when the fighting would start and so powerless to stop it." App. 1497. Yong's violence and rages extended to her children, whom she severely punished, beating them for minor issues or no reason at all. Mary's most vivid memory of her mother is a time that she went "ballistic and beat [Mary] until she wore herself out." App. 1496. Yong dragged Mary by her hair from the living room, hit her with a belt, and slapped her in the face. The beating was unforgettable, and Mary recalls that "[t]he pain from the welts, her handprint on my face, and the hair she had pulled out was terrible, but mostly I was confused and terrified. I do not know what I did to set her off." *Id.* In addition to the rage and violence, Yong had multiple affairs with other men, with Mary and her siblings witnessing these sexual relationships.

The relationship between James and Yong deteriorated until it came to a violent end in February 1973. James, angered by Yong's infidelity, packed their four young children away to their

grandparents' home before going to confront Yong. He shot and wounded Yong's lover, another soldier, and shot and killed Yong. After this trauma, Mary and her siblings witnessed James's trial, where he was acquitted of murder for killing their mother, after arguing that the shooting was an accident.

Upon his return home and less than a year after Yong's homicide, James married Karla Pritchett, a teenaged police dispatch worker whom he met while in jail. Karla had been a victim of her father's physical and sexual abuse. App. 1471-84. Her childhood and adolescence was so horrendous that she regarded James as a "rescue[r]" even though she knew he had killed his first wife. Karla, however, was unprepared to care for four young children and, drawing from her own abusive history, used violence to discipline Mary and her siblings. None of the children, including Mary, escaped Karla's arbitrary and unpredictable abuse, which included repeated beatings with rubber hoses. Mary's younger brother Tom, however, suffered the worst abuse, which included being forced to eat his own vomit, and beatings that led to hospitalization. App. 697. As a teen, Tom escaped to drugs, and by age seventeen he was convicted of second degree murder and robbery. Karla describes herself as "extremely abusive" toward her step-children, App. 1478, and admits to imposing severe physical punishment over the smallest perceived violations.

Mary spent her middle school years in Hanua, Germany, where James was stationed. Karla, who was unhappy and lonely, socialized with Mary and her friends. She threw huge parties, supplying alcohol and marijuana to Mary and her friends. These experiences led to Mary's liberal attitude towards drugs and alcohol for her own children.

Brandon's father, Ken, was a very reserved child and those around him found him unusually shy. He was uncomfortable in social settings with unfamiliar people and struggled to make eye contact with others while speaking. He had a strange habit of quickly looking up at someone, then immediately staring at the ground. When he had to speak in public or to a person whom he did not

know, the panic and fear of doing so was palpable and could be heard in the tone of his voice. App. 1508-1509.

Ken's father William died when Ken was thirteen years old, taken by cancer from Agent Orange exposure. The loss of his father and stress of being the man of the house overwhelmed young Ken, and he turned to drugs, alcohol, and crime. Ken's mother became addicted to gambling. He hid his drug use from his family as best he could, but eventually he checked into a drug rehabilitation facility. Ken's legal troubles started small, with vandalizing and stealing. One of his first brushes with the law ended with his serving time for burglary in a juvenile facility. Ken disappeared from his family for large parts of the 1980s, often because he was running from the law.

Mary and Ken first met in December of 1983. On New Year's Eve, Ken worked up the courage to ask Mary out on a date and, by June, Mary had moved in with Ken. They married on July 4, 1985. Their union represented a confluence of their inherited trauma histories.

It did not take long for fights between the new couple to break out. Family members noticed that yelling and screaming was common between the two; sometimes, they would throw things at one another or smash things in the house. Less than a year after they were married, Mary and Ken divorced after a particularly bad fight. Their divorce was finalized in 1986, but they nonetheless mostly continued living together, presenting to the outside world the picture of a happy family. Ken's and Mary's relationship was not what it appeared to be on the surface—they hid its demise from public view for decades. They buried their efforts in their jobs, and avoided fighting in public, but at home, threw plates and glasses, kicked doors, punched walls, exactly the way Mary's parents had.

In 1987, Mary was pregnant with Brandon. While Mary was several months into her pregnancy, her seventeen-year old brother, Tom, was arrested for killing a cab driver. Mary was devastated, and Brandon was exposed to her extreme stress in utero. Shortly after Brandon's birth,

Mary had a three-week-long postpartum episode where she had visions of monsters standing over Brandon's crib. While she realized the visions were caused by her hormones, it still terrified her and she moved Brandon into the bedroom with her and Ken to protect Brandon.

Ken experienced significant legal troubles during Brandon's early life. One day, Mary walked into her bedroom to find "a big mountain of cocaine on a huge tray" on the bed she shared with Ken. Ken was ultimately arrested in a sting operation, from which he jumped bail and fled to Florida. By the age of five, Brandon had been whisked between homes in California, Kansas, Tennessee, and Colorado, with Ken variously living with the family, incarcerated, or on the run.[13] Even after the family finally settled in Colorado, opening a mortgage company, Ken continued experiencing legal problems including arrests for driving under the influence and using false IDs.

In 1993, while they were in Colorado, Ken's and Mary's second child, Samantha Daniel, was born—almost six years Brandon's junior. When the children were small, their parents continued to have violent, screaming fights. Dishes and other items went crashing into walls. To Sam, "[t]he backdrop to our childhood was the sound of our parents arguing. It was almost like background noise to me because it happened so often." App. 1395. Both Mary and Ken had tempers, but Ken "went into rages." *Id.* During his rages, he would break things around the house and kick holes in the walls. In a fit of anger, he smashed a telescope that Mary bought Sam for Christmas.

Ken and Mary split up and got back together over and over. One morning in 2001, while Brandon and Sam were getting ready for school, Mary and Ken began arguing. Ken went into a rage and punched a hole in the wall; next, he grabbed a pot of boiling water from the stove and threw it up into the air. Brandon was terrified. The next day, Mary told Ken that he needed to leave. Ken ran

---

[13] The Army relocated Mary's family so often that she attended seventeen different schools before she graduated high school. It is not surprising that Brandon lived in five states by age five and attended ten different schools between kindergarten and high school.

around the house, furious, telling his children that the family would go bankrupt without him, and if they did not, he would bulldoze the house. Mary had had enough, and kicked Ken out of the home.

With nowhere else to stay, Ken began sleeping at his office. One night, while Mary was playing Monopoly with Brandon and Sam, Ken called and started screaming at Mary. He asked her if she was "fucking happy", App. 1533, with him out of the house. Powerless, both children listened to the fight. Brandon was only fourteen.

Mary and Ken sold the family home, and Mary and the kids moved into an apartment. Ken initially lived out of his office for a time. Eventually Mary allowed Ken to live with them again, but after a few months of living together in the apartment, the fights and explosions returned, and Mary decided on a more permanent solution. She moved into a house in Breckenridge. Ken bought a house in Parker, about two hours away.

Both Brandon and Sam struggled to deal with their parents' separation. They split time between living with Mary in the mountains and Ken in Parker. Sam developed a compulsive tendency to do the same thing, over and over again. She would wash her hands, repeatedly, in the hottest water that she could stand, to the point that she developed skin problems. Sam also began cleaning obsessively; she rubbed the handles on closets until the paint wore off to make sure they were immaculate. Brandon became more withdrawn and turned more to alcohol and drugs.

Ken was having his own struggles after the separation, both personally and professionally. He became extremely depressed, and turned to alcohol to cope, the same way his father had before him. Even when Sam and Brandon stayed at his house, Ken would go out and drink and leave them alone. At night, on weekdays, Ken headed to the casino and developed a gambling addiction like his mother's. Frequently, he left Brandon and Samantha at home without food for dinner. Sam, only ten years old, would get very scared being left alone. On one occasion, when she was home alone, the sprinklers turned on and began flooding the yard. She called Ken, not knowing what to do. When he

picked up, he was at a casino, obviously drunk, and slurring his words.

Other times, he would get home from work, go straight to his bedroom, and shut the door, without saying a word to either child. He became so depressed that some weekends he would stay in bed the entire time. Sam and Brandon found it difficult to be around him "because he seemed depressed and had a palpable sad energy around him." App. 1396. Because of this, they preferred to be with their mother. Their preference only contributed further to Ken's depression because he interpreted it as his children not wanting to see him.

Ken's mortgage business collapsed after the divorce, due in part to the recession. After closing his business, he struggled to make ends meet. He tried to start a trucking company, but found out that he could not pass necessary background checks due to his prior brushes with the law. Ken began working various low wage jobs.

Mary later bought Ken's house and he moved to Aurora, Colorado. After a few months he was unable to pay his rent, so Mary let him move back in with the rest of the family, allowing him to live in the basement. Shortly thereafter, he and Mary got into another fight, and yet again Ken was kicked out of the home. He first lived in his car for a time; then, Mary again allowed him to return and he moved into the garage, which they converted to a quasi-apartment. Brandon continued to shift from school to school, while his grades crashed, and he ultimately ended up quitting school and getting his G.E.D.

When Brandon went off to college, things were no better at home for Ken, Mary, and Sam. Around 2008, they were short on the mortgage on the house in Parker and the bank foreclosed. Ken's Hepatitis C, originally diagnosed in 2004 or 2005 and thought to be inherited from his mother, worsened and was exacerbated by his drinking. For years, he was in and out of hospitals, and was extremely sick. His weight ballooned, his skin yellowed, and his teeth began falling out. At one point, doctors had to drain forty pounds of fluid from his body. Sam remembers a time when

"he threw up orange blood and bile while lying out on the porch" and they had to call an ambulance for him. App. 1401. Ken died shortly after Mr. Daniel's trial.

### B. Mr. Daniel's Parents Did Not Address His Drug Abuse, Depression, and Disability.

Brandon's upbringing was marked, not only by instability, but by drug abuse, depression, and disability that his parents never addressed. Due to their own traumatic upbringing, his parents were ill-equipped to deal with their son's difficulties. Instability was the norm for them.

On one hand, Brandon's mother was excellent at providing a daily routine for him, especially when he was a small child. She was well-read on how to stimulate his mind as a baby, and later encouraged his teachers to challenge him with tougher assignments. App. 1494-1544. And she certainly loved her son dearly. But, on the other hand, because of her own childhood, she failed to adequately address his long-standing struggles with drugs, depression, and disability.

For example, Brandon began using drugs *every day* at age twelve, and his mother was aware of it. As a child, Brandon struggled with depression, thoughts of suicide and suicide attempts, and his mother knew it. Brandon struggled to make friends and function socially, and his parents did not seek to find out why. Rather than deal with his grave problems, his mother addressed them by moving him to a different town, sending him to a different school, and encouraging him to drop out of school. His mother's way of "dealing" with his problems inadvertently created more instability, and thus exacerbated his drug use, depression, and disability as discussed below.

#### 1. Mr. Daniel's drug abuse

In junior high, Brandon recognized that he was socially different than his peers, and began asking his parents what was wrong with him, why he did not fit in, and why he felt different. With no satisfactory answers to those questions, the signs of Brandon's deep depression became apparent starting around sixth grade, when Brandon was twelve. Around this time, he began using various drugs and alcohol to self-medicate and "escape because it gave him some relief from his

depression." ECF 4-37, 24 RR 95-96. He started with alcohol and marijuana, and later turned to harder drugs; however, this substance abuse did nothing to address the actual cause of his depression, it only temporarily blocked the pain from it.

Ken confided in his sister, Nina Hall, that he was worried about Brandon becoming addicted to drugs. Mary and Ken had smoked marijuana throughout their entire relationship, and had a liberal attitude towards drugs. When Mary discovered that Brandon was smoking marijuana after discovering his parents' paraphernalia, she did not get upset. Forbidding her son to smoke would make her a hypocritical parent since the adults around him smoked. Initially, Ken was embarrassed that Brandon had found their stash and insisted he was going to quit. Yet, later, he and Brandon began smoking together.

Brandon began drinking cough syrup to get high starting in middle school. A childhood friend remembers that Brandon's use far outpaced that of others who dabbled in drinking it. Sometimes, Brandon would drink Robitussin cough syrup for a week straight to be "robo-tripping."[14] Yet, this new intoxicant helped no more than the others he had already tried.

While Brandon was in high school in Breckenridge, the school had to call Mary over and over each morning to tell her that Brandon was throwing up. She initially attributed it to "mile-high" sickness from being in the mountains; later she came to realize that it was from his new-found addiction to cough syrup. Sam noticed that the empty cough syrup boxes "piled up next to his bed". App. 1397. He drank it until he got high. He "seemed like he got some relief when he was high on cough syrup" from the stress of life. *Id.* His friend observed him consume a couple of bottles and hallucinate. Supp. App. 1873. Brandon stopped going on family camping trips or other family

---

[14] Dextromethorphan is a drug in many cough and cold medicines. It is abused by teens because it can cause hallucinations and dissociative effects at high doses such as a loss of memory or a sense of being detached from reality. https://www.webmd.com/parenting/glossary-dxm-drug-abuse (last visited 10/5/18).

gatherings, instead staying home and drinking cough syrup. He would take his allowance and ride his bike to the store to buy it. When Mary became aware that Brandon was abusing cough syrup, her solution was to ask Sam, six years his junior and in elementary school, to watch him so that he would not drink any. When this did not work, Mary shipped Brandon off to Parker, Colorado to live with his mentally unstable, alcoholic father.

### 2. Mr. Daniel's depression and suicidal tendencies

Brandon's small group of friends did not know or understand what was wrong with him. One recalls:

> Around the end of middle school, a kid named Norman Harper shot himself in the head. I heard that he shot himself on the roof of the school, but everyone had a different version of what happened. While Brandon did not know Norman, I did. The whole school was affected by Norman's death. For weeks, it was like we were all in this depressed shock. I remember thinking that that was how Brandon normally was. I think that Brandon had some underlying condition that caused him to be depressed, but I did not know what it was because he so rarely spoke about himself.

App. 1409-10.

Brandon's disability and depression were overwhelming, and his self-medication through drugs and alcohol only provided temporary relief, while at the same time exacerbating his problems. With his parents' relationship deteriorating, the safety and security of home was lost. His teachers informed Mary that Brandon began rubbing his skin raw with an eraser. Later, they told her Brandon was contemplating suicide. App. 1176.

Rumors surfaced at school that Brandon was telling people he and a friend planned to go to Denver on April 20th, the anniversary of the Columbine mass shooting, and jump from the highest building. When the school called Mary, she informed the school counselor that she and her husband were pushing Brandon to excel academically, and he had not met his potential. The school should not give him any more attention over the matter but instead force him to buck up and march forward. The counselor strongly recommended that Brandon be evaluated by a psychologist, but

Mary refused. She also refused to come in for a "care and concern" meeting. Two weeks later, the day after the Columbine anniversary, the parents of another student contacted school counselors to report that they had spotted "cutting" marks on Brandon's wrists. *Id.*

When the assistant principal phoned Mary this time, reiterating the school's concerns—Brandon's plan to commit suicide, his skipping class, and now the cutting—Mary still adamantly refused to have Brandon evaluated and insisted her son was only seeking attention. In Mary's opinion, it was better for Brandon to fix his problems himself, through effort and hard work. In retrospect, Mary recognized the inadequacy of her response.

### 3.    Mr. Daniel's undiagnosed disability

Signs of Brandon's social struggles were readily apparent from a young age. At home, due to his mother's attention to a strict schedule and her responsiveness to his needs, Brandon seemed like an introverted and intelligent child. However, when Brandon began school, he found himself surrounded by sensory triggers that overwhelmed him and children whose social customs he could not understand. School meant managing multiple unfamiliar surroundings: various classrooms, the lunchroom, the library, the gym, the playground, the bathroom, even the bus on the ride home at the end of the day. He struggled with all of these activities.

While Brandon seemed bright, it was clear to those around him that something was different about him. They noticed that he was unusually shy and quiet, and that he had an aversion to playing with other children. Initially, those around him assumed that he was just an introvert and preferred solitary play; that was not surprising, considering how quiet his father was. It did not worry Mary; instead, she appreciated that her son was not social because she was not very social either. What they did not realize was that it was not just Brandon's personality they saw, it was the first signs of a developmental disability.

His school took note of his behavior and tried to get his parents to address it. For instance,

in third grade, Brandon was overwhelmed by his surroundings. He coped by fidgeting and rocking back and forth in his chair. When his teacher asked him to stop, he could not. For the teacher, the discipline issue was not how Brandon leaned in his chair; it was his refusal to obey. She sent a disciplinary "blue slip" home. Brandon's mother did not recognize this as a sign of his disability. Rather, she asked the teacher to give her son more difficult math problems.

Brandon's disability blocked him from making friends. Brandon was unable to either share his own emotions or to understand the emotions of those around him. He struggled to maintain a "normal" conversation; instead, he was either silent or engaged in long monologues about something that interested him, not recognizing that by monopolizing the conversation he alienated the person with whom he was speaking. Brandon was uninterested in playing pretend or games like his peers did. He could not understand what others were thinking or feeling, as his brain was wired differently. App. 1448. Similarly, Brandon did not understand that others might learn differently or struggle more with academics than he did. He would come home and explain to his family that he thought classmates were pretending not to understand if they could not answer questions to which he knew the answers. Not surprisingly, Brandon's classmates simply avoided him. He was different, and those differences alienated him from his peers.

While Brandon struggled to develop any close friendships, a small band of social outcasts and neighborhood misfits united over their shared differences. Even within that group, it was Brandon who stood out. Brandon "would just be there" and would rarely speak. App. 1405-6. When he would emerge from his own world to speak, his statement often made little sense and appeared random. The others laughed at him, because he made so little sense and seemed endearing. One remembers that "[i]f you did not know him and heard him say odd things out of the blue, you would think something was wrong with him." App. 1405. When "outsiders" were present, Brandon would be silent and looked uncomfortable.

Unable to fit in at school, Brandon turned to video games and riding bikes. On weekends, he would play video games "from the time he woke up until he fell asleep," sometimes forgetting even to eat. App. 1387. He was a perfectionist, and focused on completing every game with the best score possible. If he was not playing a video game, he was usually riding a bike: bicycles, dirt bikes, or a motorcycle. Even if he hurt himself, he would continue to ride. One time, he flew off his bike and knocked several of his braces off his teeth, but even then, he continued to ride rather than going home to take care of himself. Sam and Brandon liked to take long bicycle rides to the mall together. As always, he struggled with conversation. So on these rides, Brandon would yell out random things, which made Sam laugh.

The social aspects of school that came so easily to most were a challenge for Brandon. His disability left him ostracized, unable to fit in. He began avoiding others in school, to the point where he would not say "hi" in the hall and actively avoided engaging in small talk. Team activities and sports were out of the question. When a teacher called on him in class, he was clearly uncomfortable speaking in front of others. Brandon would shrug, make a random noise, or quickly claim he did not know the answer to get out of the spotlight. He was the first to leave class when the bell rang. Some of his peers picked on him for being different, but the other students thought he was weird and generally ignored him.

Brandon struggled to express his emotions, and not showing any was the norm for him. Others rarely saw him happy, sad, or mad. Even laughter was a struggle for him, and he seemed not to know when it was appropriate to laugh and about what. His laugh was very unnatural, quick and controlled. Those who knew him recognized that "[t]here is a disconnect between Brandon and his emotions." App. 1411.

Eventually, Brandon learned to mimic social conventions. One of his fellow students, Jennifer Duniphan, noticed that if she asked Brandon how he was doing, he would answer, "How

are you doing?" If she asked how things were at home, he would ask how things were at her home. He could not give answers to normative questions, but he knew, by his friend's example, that it was polite to ask these questions and so he did. Likewise, when Jennifer's mother died of alcoholism, Brandon did not know what to say, but he offered to fall off his skateboard if it would make her laugh. Brandon might have been unable to show his emotions in words, or carry on a genuine conversation, but he felt compassion. He cared, but struggled to show it. App. 1408-12.

A major reason for Mary's missing the signs of Brandon's disability was that he exhibited the same behaviors as his father. Ken was also a loner who had a laser-focus on the task at hand. Ken also struggled in social situations, even among family. Mary just thought, "like father, like son." App. 1515. She was not able to connect her son's drug use and depression to his underlying disability.

###    4.    Consequences of Mr. Daniel's parents not addressing his problems with drugs, depression, and his disability

The consequences for Brandon of not receiving treatment, or even acknowledgment, of his drug abuse, depression, and disability were dire. Once, Brandon attempted to quell his cough syrup addiction without any help. He was plagued with headaches, body aches, nausea, and more depression. He understood that curing himself of one medical problem would only generate another. He saw no end to his suffering. So, at sixteen, he parked his red Toyota Forerunner in the closed basement garage of his mother's Breckenridge home, turned the key, and let the motor run. Mary found him when she heard the car running, before he passed out.

And every day that Brandon ran the risk of overdosing, vomiting at school, coming so close to killing himself, he took more wild risks at the skateboard park. One time, Brandon cracked his head on the concrete ramp. Other skateboarders helped Brandon get to Ken's house, where they left him. When Ken and Sam came home, Brandon was incoherent and did not know where he was; his speech was slurred and he repeated words. Every few minutes he would ask them the same questions, forgetting that he had just done so. Ken called Mary, who told him to get Brandon to the

hospital right away. At the hospital, doctors diagnosed him with a concussion and a closed head injury App. 1177-88. When doctors sent him home, they told Ken to watch him overnight and bring him back to the emergency room if he became disoriented. They also recommended a follow-up exam with a neurologist, instructions which neither Ken nor Mary followed.

The one area where Brandon excelled—academics—was lost when he was forced to move to Parker, to live with his dad, after his mom found the empty couch syrup bottles. In his new school, Brandon's grades plummeted. In the 10th grade, he earned a 1.71 GPA. App. He earned F's in Geometry, College Algebra, European History, and Chemistry in the first semester of 11th grade. App. 1173-74. The next semester, his family sent him to St. John's Military School in Salina, Kansas. Brandon only attended for three weeks before running away. Mary agreed to let Brandon live with her sister Sherri for that semester, and Brandon got a job at McDonald's, went to classes at Wamego High School, and otherwise spent every free hour in his room. Sherri knew from the way he spent long hours lying on his bed, staring at the ceiling, that his depression was growing. And small bottles of alcohol were disappearing from her refrigerator and liquor cabinet. She sent Brandon home.

Brandon eventually had such a hard time and was so sick of bouncing from school to school that he dropped out of high school, with his mother's encouragement. He completed a GED and attended community college for a short time and then enrolled at Colorado State University.

### C. Mr. Daniel Continued to Struggle With Drug Abuse, Depression, and His Disability at College and After College.

At Colorado State University, Brandon continued to struggle socially, his disability apparent, yet still unknown to him and those around him. During his sophomore year, he saw a flyer advertising summer jobs at a summer camp in the mountains, Pingree Park. Brandon got a job in the kitchen, where he met his first real girlfriend, Jenna Feland. Brandon was thrilled that she approached him, but was terrified as well. Unfamiliar with relationships, he began quizzing Mary about what to do. Not knowing how to express his feelings, he had Sam help him respond to

Jenna's text messages. Other family members were pleasantly surprised that Brandon was in a relationship, as they had assumed his awkwardness and shy nature would have prevented that.

Jenna and Brandon started dating shortly after they met, with Jenna pushing the relationship forward. Jenna moved in with Brandon when he returned to CSU that fall. Soon, they fell into a routine together, shutting the world out and forming their own tight cocoon. She worked at Pizza Hut while Brandon attended classes. They lived together in his dorm, though that was not allowed. They went to Dave and Busters or headed into the mountains to hike or camp. Sometimes they played video games for the entire weekend.

Early on in their relationship, Jenna saw signs of Brandon's disability and depression. Jenna wanted to go out and be social, while Brandon did not want to interact with anyone besides her. Brandon was content to stay home and stay on the computer, play video games, or work. He was still a loner. At social events, on the rare occasions she could get Brandon out of the house, he would sweat because he was nervous, and because he was sweaty, he got more nervous. He would whisper things to her, but would not speak out loud, and did everything he could to avoid drawing attention to himself. When he would have no choice but to speak, he used a strange, low voice that Jenna would tease him about because it sounded so different than his normal voice. Brandon told her that he struggled to make friends since he was a kid, and it was clear to her that she was his only close friend during their relationship. Outside of herself and his family, there seemed to be no one else in whom Brandon had ever confided.

It was also obvious to Jenna that Brandon cycled through bouts of depression. Jenna told him that he should get counseling, but he did not want to go. This did not surprise her, because Brandon struggled so much with expressing emotions and did not want to talk about them. He thought, if he was depressed, he was doing something wrong or not working hard enough. His mother's disdain for professional help had rubbed off on him, as did her liberal attitude towards

drugs use. Jenna observed, "Mary and Brandon did drugs together. They smoked pot and snorted cocaine together. Drugs were a part of daily life at Mary's house. Brandon did so many drugs. I don't think that I ever really saw him sober for any length of time. When we were together we smoked pot and drank almost every day. Brandon seemed depressed to me. I think he took so many drugs to deal with that and his social anxiety. He wanted to be a part of things but it was such a struggle for him to be comfortable in society." Supp. App. 1864-68.

Due to his disability and inexperience with relationships, Brandon struggled to meet Jenna's emotional needs. He could not understand her feelings, nor read her emotions. Even when she would explicitly tell him how she was feeling, he was unable to respond appropriately. Others around Brandon noticed this as well. When Sam was upset, Brandon did not know how to comfort her. He would usually say something off-topic, as if he was trying to diffuse the tension. Brandon struggled the most with how to respond when someone around him was sad. Those closest to him recognized that he was emphatic, but that he did not know how to express it. Sam thought that at times he was "hyperaware of other people and gets overwhelmed" trying to relate to them. App. 1395.

Jenna noticed that Brandon's family was isolated from the rest of the world. When she would go over to the family home, they would drink, smoke marijuana, and play cards together. Ken was living in his car when Jenna first met the family, but later he moved into Mary's garage after she converted it into an apartment for him. She recognized that Ken was similar to Brandon in many respects, including that both were very quiet. App. 1413-19. Ken preferred to sit in a corner, by himself, and watch was what going on rather than be a part of the gathering.

While he was with Jenna, Brandon's drug and alcohol use somehow managed to increase even though it was already at very high levels. Brandon and Jenna got high most days—sometimes smoking marijuana, but other times using mushrooms, acid, cocaine, ecstasy, and other drugs. When

he did not have any other drugs around, he reverted to drinking cough syrup to get high. They consumed a 1.75-liter bottle of rum or whiskey every few nights, drinking up to fourteen shots apiece regularly and then playing video games together until they passed out. Jenna recognized that some of Brandon's drug use was to help him cope with social situations. He used ecstasy in particular for this reason. For example, she wanted him to meet her grandmother, but he only agreed to do so if she let him take ecstasy beforehand. When his drug or alcohol use affected his performance at school, or later at work, Brandon would tell Jenna that he needed to "buckle down," and would stop using for a time. But, time and time again, he would cycle back to depending on drugs and alcohol.

Jenna recognized that Brandon valued, and seemed to depend on, stability and organization. For example, he designed intricate spreadsheets to buy groceries. He would track how much specific items cost and meticulously planned out what he wanted to buy before going to the store. At the store, he would only buy items on his list and in the exact amount from the spreadsheet.

Though Brandon was encouraged to stay in college and get his Master's degree, he was in a hurry to make money. His drug habit was forcing him to live paycheck to paycheck. So he took the first computer programming job he was offered—at Hewlett-Packard in Austin, Texas.

For someone like Brandon, the change of environment from Colorado to Texas was exhausting. Jenna made it bearable by moving with him. However, Jenna could not seem to get a job anywhere, and soon, they began fighting about her not contributing to the bills. After almost a year of living in Austin, Jenna found a job at Guitar Center—an improvement that should have relieved the tension in their relationship. Instead, Brandon saw her working with a lot of musicians— charismatic men with social skills Brandon could not understand. She wanted to go out and spend time with her new friends; Brandon wanted to stay home as they always had. Her wanting to go out and his wanting to stay in had always been an issue in their relationship. And he grew scared and

then jealous, because Jenna went out with her friends anyway. She invited Brandon to join her, but his disability made that a terrifying prospect. The two of them repeatedly fought and then made up.

In November 2011, they broke up because Brandon worried that Jenna was cheating on him with one of her coworkers. He made Jenna move out because he did not know how to deal with his jealousy and emotions. But once she was gone, he missed her and wanted her back. In December 2011, after receiving a promotion, Brandon made an attempt to reconcile with Jenna. But it was too late; even though she cared about him, Jenna was not coming back. Jenna knew Brandon's loneliness and grief were driving him deeper into drugs. She encouraged him to join a chess or computer club, an organization where he could meet new friends.

Online, he met Nikki Nance, a personal shopper for the cable Liquidation Channel. She peddled jewelry over the phone when folks called in after seeing a product on TV. The two of them dated for two months, and during that time, she introduced Brandon to her roommate, Xavier Coffee, a drug dealer. Once or twice a week, the three of them gathered at Nikki's house, to watch movies, play video games, and get high. Nikki was a drug addict. Through them, Brandon was introduced to a new drug, Xanax. Brandon's intake of Xanax grew from two pills, to four, to six, and then ten at a time within his and Nikki's two-month relationship. By February, he was buying ten pills, and in three or four hours, they would be gone. Sometimes the drugs interfered with his ability to go to work, and he did not show up. He hated himself afterward, and Nikki told the jury that Brandon repeatedly said he wished he were dead. ECF 4-35, 22 RR 102.

During the early months of 2012 when he was in the relationship with Nikki, Brandon spent almost every night hunting drugs: cocaine, acid, mushrooms, marijuana, and opiates. Once, when he agreed to pick Jenna up from the airport, he arrived late and had Nikki in tow, both of them highly intoxicated—so intoxicated that Jenna insisted that Brandon give her the keys so she could drive to her apartment. She was happy that he appeared to have moved on, but was worried because Nikki

seemed like a drug addict.

Sometimes, even after his brief relationship with Nikki ended, he went to her house and banged on the door at 2 a.m., hounding Xavier for drugs. On February 26, 2012, he sent a text message to Jenna apologizing for being mean to her, explaining that he had consumed about $1,000 worth of different drugs the previous Sunday. Soon, he had racked up a $1,500 tab with Xavier and owed Nikki another $500. Even Nikki recognized that Brandon was on a destructive path.

Brandon knew he needed help. Certainly, he had come to recognize the symptoms of his depression: he ate too much and slept too little. Brandon wrote himself a series of sticky notes that law enforcement found at his computer workstation in his apartment, chronicling his attempts to "buckle down," cut down on drugs, and reunite with Jenna:

> STOP FUCKING YOURSELF UP
> BUY SHOES FOR JENNA. TAKE HER TO TOWN LAKE. WHAT WILL YOU GIVE
> HER FOR CHRISTMAS
> STEP DOWN PILLS OVER WEEK:
>                 MONDAY   2 MAX
>                 TUESDAY   1 MAX
>                 WEDNESDAY    0
>                 THURSDAY  1 MAX
>                 FRIDAY  TBD
> TAKE MY BREATH AWAY. . . JENNA PLAYLIST. GET A GUITAR THING FOR
> JENNA.

ECF 4-33, 20 RR 28. Unfortunately, it is very difficult to "step down" from an addiction to benzodiazepines like Xanax. The chances of his tapering off without the assistance of a recovery program were about nil. Brandon tried, but like other addicts, could not kick his habit without professional help.

He had become his father: a broke man abandoned by a woman. He owed money to Xavier and Nikki, had taken out pay day loans and pawned some of his electronics. He had not a dime to spare as long as he was still hooked on Xanax, sometimes taking it four and five days in a row, two or three pills every few hours.

On the night of the shooting, Brandon and his mother spoke on the phone. He sounded "completely out of it … slurring his words, talking nonsense … the phone falling from his face … [it sounded] like he had suffered a stroke." App. 1541-42. At 12:32 a.m., he sent a text to Jenna: "All ul know is that 100 yes. From know I'll u remember you, my dreams. But that will bs enough, just dreams., Life is pani."

### D. Trial Counsel's Failure to Uncover and Present Relevant Mitigating Evidence Constituted Deficient Performance.

Capital trial counsel have an explicit duty to investigate and present mitigating evidence in an effort to convince a jury to spare their client's life. *See Wiggins*, 539 U.S. at 523-24 (recognizing the importance of social history investigation and presentation in capital cases); *ABA Guidelines*, Guideline 10.11(F)(2); *Texas Guidelines*, Guideline 11.7(F)(2); *Texas Supplementary Guidelines*, Guideline 4.1(B). "[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989). Investigation and presentation of a capital defendant's social history is necessary to enable counsel to provide the jury with a comprehensive and sympathetic appreciation for the individual whose life is literally in their hands. *See ABA Guidelines*, Guideline 4.1 cmt. ("[T]he defendant's psychological and social history and his emotional and mental health are often of vital importance to a jury's decision at the punishment phase."). In view of these well-established standards, capital counsel are responsible for conducting a broad and thorough investigation in order to identify the full range of mitigating evidence and make informed decisions about how to " help the decision-maker to have a more complete view" of the defendant. *See ABA Guidelines*, Guideline 10.11 cmt.

As the Supreme Court has made clear in its decisions from *Strickland* to *Sears*, the duty to thoroughly investigate and reasonably prepare is fundamental to counsel's role as an advocate.

Counsel has "a duty to bring to bear such skill and knowledge as will render the [proceeding] a reliable adversarial testing process." *Strickland*, 466 U.S. at 688. Reliable adversarial testing will take place only if counsel prepares and investigates *thoroughly*. *Williams*, 529 U.S. at 397; *accord Porter*, 558 U.S. at 39. Failure to conduct a thorough investigation constitutes deficient performance under *Strickland*. *See Wiggins*, 539 U.S. at 523 (focus is on "whether the investigation supporting counsel's decisions . . . *was itself reasonable*") (emphasis in original). Counsel may not "ignore[] pertinent avenues for investigation of which he should have been aware." *Porter*, 558 U.S. at 40.

The Fifth Circuit has found that controlling Supreme Court precedent required habeas relief where counsel's investigation was similarly inadequate. *See Adams v. Quarterman*, 324 F. App'x 340, 349 (5th Cir. 2009) ("In the absence of a sufficient investigation of Adams's background, it was impossible for [counsel] to make a strategic decision to pursue his stated mitigation theory . . . ."); *Walbey v. Quarterman*, 309 F. App'x 795, 801 (5th Cir. 2009) (Supreme Court case law "firmly establishes a duty to investigate the background and character of a capital defendant, along with his family and social circumstances and mental health history."). Trial counsel here failed to conduct the required investigation.

Trial counsel have a duty to make reasonable investigations and "conduct a *prompt* investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty." *ABA Standards*, Standard 4-4.1 (emphasis added); *Texas Guidelines*, Guideline 11.1; *see also Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 690-91. The Texas Mitigation Guidelines dictate that "[t]he defense team must conduct an ongoing, exhaustive and independent investigation of every aspect of the client's character, history, record and any circumstances of the offense, or other factors, which may provide a basis for a sentence less than death." *Texas Supplementary Guidelines*, Guideline 10.5(B). Only once a reasonable investigation has occurred, is counsel able to craft a defense strategy "that will be effective in connection with both

guilt and penalty, and should seek to minimize any inconsistencies." *ABA Guidelines*, Guideline 10.10.1. Because Mr. Daniel's attorneys violated "well-defined" norms that require counsel to investigate all reasonably available mitigating evidence, their penalty phase presentation, based on "rudimentary knowledge" from "a narrow set of sources," was unreasonable and prejudicial. *See Wiggins*, 539 U.S. at 524-25; *see also Rompilla*, 545 U.S. 374; *Williams,* 529 U.S. 362. The Supreme Court has clearly established that counsel in a capital case must conduct a reasonably thorough background investigation even without any specific prompts. *See Rompilla*, 545 U.S. at 377 ("We hold that even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts" to investigate background); *Porter*, 558 U.S. at 40 (counsel's failure to conduct background investigation deficient although client "fatalistic and uncooperative" and several family members "not particularly helpful"). Mr. Daniel's trial attorneys never conducted that independent investigation.

In Mr. Daniel's case, trial counsel's investigation into mitigating evidence was unreasonably truncated. First, the team spent barely one-quarter of the hours necessary for an effective investigation, as assessed by a highly experienced mitigation specialist with extensive knowledge of Mr. Daniel's case. Second, they failed to conduct any trips outside of Texas to interview witnesses until a month prior to trial, despite the fact that nearly every potential mitigating witness with knowledge about Mr. Daniel lived out of state. Even then, only one trip was taken and it did not happen until after the defense experts had already assessed Mr. Daniel. Third, they failed to build the necessary relationships with critical family members to allow them access to crucial mitigating evidence. This deficient investigation prevented trial counsel from uncovering valuable mitigating evidence that could have convinced a juror to spare Mr. Daniel's life.

      1.      **Trial counsel conducted a truncated investigation just weeks before trial.**

Counsel conducted a delayed, abbreviated investigation into mitigating circumstances in Mr. Daniel's life history that fell short of prevailing professional norms. A proper mitigation investigation is a complex and time-consuming process. App. 1613. As explained in Claim IV, *supra*, Ms. Amezcua-Rodriguez, the initial mitigation investigator appointed to assist Mr. Daniel—who had a significant amount of experience investigating mitigating evidence in death penalty cases— estimated that at the time when she withdrew from representing Mr. Daniel, there remained at least 700 hours of additional investigation in the case. App. 1614. Because "nearly all of the important mitigation witnesses lived outside of Texas," investigation into Mr. Daniel's social history would require multiple trips to different states. App. 1612. Important mitigation witnesses lived in different parts of Colorado, Kansas, and Florida, so one trip to Colorado that focused on finding college professors did not constitute effective representation. As Ms. Lawrence recalls, the team was focused on finding teachers from CSU who could say Mr. Daniel was a good student and worker. App. The team did not try to locate childhood friends. *Id.*

Even on the one trip to Colorado, counsel failed to interview mitigation witnesses. For instance, counsel called Jenna's mother, Wendy Nesbitt, at the penalty phase to testify about a letter Jenna received wherein Mr. Daniel expressed remorse. That was all. Had counsel taken the time to speak with and prepare Ms. Nesbit to testify, they would have been able to present her view of Mr. Daniel- that he is a "sweet misunderstood person." Supp. App. 1875-79. Ms. Nesbit could have told the jury that Mr. Daniel was quiet, but got along with her family. She felt "maternal towards him." *Id.* Instead, Ms. Nesbit was called by trial counsel the night before she testified and was not prepared at all. *Id.*

Counsel's investigation paled in comparison to what was required to conduct a proper investigation into mitigating evidence in Mr. Daniel's life. Public records show that Lisa Lawrence, appointed as the mitigation specialist after Ms. Amezcua-Rodriguez withdrew, was paid a total of

$13,587.42. Ex. 14. Factoring in her hourly rate of $75 per hour, she billed a maximum of 181 hours for her work on Mr. Daniel's case. Itemized billing is not available for all of Ms. Lawrence's work. The actual number of hours she spent on the mitigation investigation is certainly lower than the 181 hour number, possibly substantially so, assuming that she billed for mileage, travel, and other expenses. The incomplete records available suggest that she did, in fact, bill for such expenses. However, the lack of itemized billing for all of Ms. Lawrence's work prevents a calculation of exactly how many hours she worked. Even assuming this best-case scenario for the number of hours she worked (i.e., even assuming she did not bill for any expenses), it is barely over *one-fourth* of the time that Ms. Amezcua-Rodriguez estimated would be necessary to conduct a proper mitigation investigation in accordance with prevailing professional norms. According to Ms. Amezcua-Rodriguez, "[b]ased on my experience as a mitigation specialist, and my particularized knowledge of Mr. Daniel's case, it is inconceivable that an effective mitigation investigation as required by prevailing professional norms occurred in that small number of hours." App. 1617.

Illustrative of the deficient investigation is the lack of travel to interview important witnesses. In Mr. Daniel's case, almost every witness who needed to be interviewed lived in a different state, as he had only lived in Texas for about a year prior to his arrest. App.1612. However, the trial team only took one trip to Colorado, where Mr. Daniel was raised and lived for the much of his early life. App. 1544. This last-minute trip was the only trip that was taken outside of Texas and did not occur until just over a month prior to Mr. Daniel's trial. Ms. Lawrence recognized the necessity of travelling to interview critical witness and that the mitigation investigation was lacking and falling behind. In an email sent to counsel on November 10, 2013, she pled for the resources to conduct the necessary investigation:

Gentlemen,

I feel like I've been left in limbo. As you are aware, we are well into November and are supposed to go to trial after the first of the year. However, funding for

> mitigation hasn't been renewed despite my repeated requests since August. I haven't submitted a bill since the July billing cycle even though I worked in both August and September. I have been requesting travel to Colorado to interview important witnesses since March. I am anxious to continue my work in this case. Please advise.
> Lisa LeGuin Lawrence, LMSW

DE 7-5 at 174. Despite her pleas, the trip to Colorado would not occur for another two months, which was ten months after Ms. Lawrence wanted to go and "interview important witnesses." *Id.*

Mr. Daniel's case presents this Court with a unique scenario. Rarely, if ever, does a court, considering whether counsel undertook a comprehensive investigation into mitigation evidence, have a contemporaneous estimate, from the time of trial, of the time needed to conduct that investigation in accordance with prevailing professional norms. Here, the court has not only a roadmap for what was necessary for a reasonable investigation, it can see that the actual work product fell far short of that. Trial counsel's last-minute investigation was unreasonably brief and failed to meet prevailing profession norms and constituted deficient performance. *See Strickland*, 466 U.S. at 688.

> ### E. Trial Counsel Failed to Conduct a Thorough Investigation into Mr. Daniel's Social History.

Under prevailing professional norms, "[i]t is . . . essential for the defense team to develop a relationship of trust with the client's family or others on whom the client relies for support and advice." *ABA Guidelines*, Guideline 10.5 cmt. This function is often accomplished by the mitigation specialist, as they:

> Must be able to establish rapport with witnesses, the client, the client's family and significant others that will be sufficient to overcome barriers those individuals may have against the disclosure of sensitive information and to assist the client with the emotional impact of such disclosures. They must have the ability to advise counsel on appropriate mental health and other expert assistance.

*Texas Supplementary Guidelines*, Guideline 4.1(C); *see also ABA Guidelines*, Guideline 4.1 cmt. ("The mitigation specialist often plays an important role as well in maintaining close contact with the client and his family while the case is pending.")

The last-minute and abbreviated nature of the investigation that counsel performed was quite apparent to Mr. Daniel's mother, Mary O'Dell, which led to a breakdown in the relationship between her and counsel. According to Ms. O'Dell, counsel stopped communicating with her, early on during their representation of her son, which was "very upsetting because [she] was concerned about what was going on with [her] son's case." App. 1543. The lack of information left her "very frustrated and terrified," particularly because the state was seeking a death sentence against her son. *Id.* Later, when she finally heard from second chair counsel, he told her "that he had other cases to work on. [Ms. O'Dell] could not believe that he told [her] that" and because of it she "lost all faith in [trial counsel] at that point," which caused her not to trust them. App. 1543-44. The state was actively and aggressively pursuing information to try to take her son's life; defense counsel were doing comparatively little to save him.[15] App. 1544.

Ms. Amezcua-Rodriguez recognized that Ms. O'Dell was "very emotional" about the pending charges against her son but that was "not unusual under the circumstances." App. 1611. Ms. Amezcua-Rodriguez was able to build a working relationship with Ms. O'Dell by taking time to work with her and build trust, and believes that relationship would have continued had she remained on the case. App. 1611-12. However, after Ms. Amezcua-Rodriguez withdrew from the case because of the court's unwillingness to properly fund this capital case, it appears the relationship that she had built up with Ms. O'Dell fell apart in the face of counsel's inattention to building a meaningful defense for her son. That failure to maintain the relationship with Ms. O'Dell fell below prevailing professional norms. *See Strickland*, 466 U.S. at 688.

_____

[15] Trial counsel were indeed very busy with their other cases. Ms. Lawrence recalls asking counsel to spend more time with Mr. Daniel in order to build a trusting relationship. Supp. App. 1860-61.

Counsel failed to investigate Mr. Daniel's family history of violence, alcohol and drug abuse, and trauma detailed above. Counsel failed to investigate Mr. Daniel's personal history of drug and alcohol abuse, depression, and disability. They did not seek out relatives to explain the family tree. They did not seek out friends to detail Mr. Daniel's drug and alcohol abuse, or his depression. They did not provide their experts with a full picture of their client's life. *See* Supp. App. 1860-61, 1864-67, 1873-78, 1886; App. 1386-1420, 1472-94.

### F.   Trial Counsel's Lack of Investigation and Preparation Prejudiced Mr. Daniel.

Trial counsel presented the jury with a disjointed picture of an intelligent man with some depression and drug use that made him do something out of character. As detailed above, that description barely scratched the surface of Mr. Daniel's life. Furthermore, the presentation of merely some mitigating evidence does not absolve trial counsel of their failure to conduct a thorough investigation and to present a well-developed social history that can provide many more reasons for a capital jury to spare a defendant's life. As the U.S. Supreme Court made clear in *Sears v. Upton*, "[w]e have never limited the prejudice inquiry under *Strickland* to cases in which there was only 'little or no mitigation evidence' presented . . . . We certainly have never held that counsel's effort to present *some* mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant." 561 U.S. 945, 954-55 (2010).

The convergence of untold factors spanning generations explain the true social history of Mr. Daniel. Deep in his genetic code, his grandmothers, immigrants from a war torn country, internalized their experiences of violence, poverty, and pervasive fear. Those experiences, and the concomitant psychological and emotional struggles they fueled, passed to Brandon's mother and father. In turn, his parents, who also experienced significant instances of trauma, from learning to survive with alcoholic fathers, abusive step-mothers, to losing loved ones to murder and the prison system, passed along their genes and methods of survival to their son. In the same way  that

knowledge and culture pass from generation to generation, children of those who have lived through war, violence, and poverty learn from, and experience their parents' trauma. Research shows that trauma can even alter an individual's genetic makeup so that it is passed from one generation to the next. As a result, Mr. Daniel was born with significant vulnerabilities to stress, change, discord, and trauma. His disability compounded these vulnerabilities and left him bereft of positive coping mechanisms. He turned to drugs to dull the debilitating ache of sadness, loneliness, and uncertainty that consumed him.

The prosecutor seized the opportunity to argue to the jury at the penalty phase closing that "all that stuff [the defense attorneys] have made up is not sufficient mitigation." ECF 4-39, 26 RR 21. Because defense counsel had not investigated and presented mitigation about Mr. Daniel's family's instability, parental neglect regarding his depression, drug use, and disability, the prosecutor hammered away to the jury that "He had the best household." ECF 4-39, 26 RR 206. Mr. Daniel was prejudiced by these arguments.

The image trial counsel presented of Mr. Daniel at trial was one devoid of substance and meaning. Lacking the history, culture, the genetic transmission of trauma, and a significant developmental disability, the attorneys focused only on Mr. Daniel's simple pathologies. Had trial counsel effectively presented the mitigation above, there is a reasonable probability that at least one juror would have voted to spare Mr. Daniel's life. Trial counsel's deficient performance undermines confidence in the outcome of his trial. *See Strickland*, 466 U.S. at 693-94. Trial counsel's failure to investigate and present mitigating evidence deprived Mr. Daniel of the effective assistance of counsel.

### G.      State Court Proceedings

Mr. Daniel raised this claim in his Initial Application for Writ of Habeas Corpus. App. 759-830. The trial court denied the state habeas application, adopting nearly verbatim the state's

proposed findings of fact and conclusions of law (hereafter "FFCL"). App. 76-105, *Ex parte Daniel*, No. D-1-DC-12-201718-A; App. 184-210, State's Proposed FFCL and Order. The CCA affirmed, relying on the trial court's findings and conclusions. App. 1-6.

For the reasons set forth in the Standard Under AEDPA section, *supra*, this Court should review this claim de novo. Additionally, we show that the state court decision was at best unreasonable in light of clearly established Supreme Court precedent, and in light of the state court record.

> **1.    The state court process was unreasonable because the state courts denied relief without a hearing, and because the trial court adopted the state's proposed findings and conclusions verbatim.**

As explained in detail, *supra*, in Petitioner's Standard of Review Under AEDPA, Section B, one of the ways in which a state court ruling may be found unreasonable under § 2254(d) is when the state court decision was procedurally unfair. When procedural unfairness in the state court deprives the petitioner of a fair opportunity to develop the facts, that ruling does not require deference or bar a federal evidentiary hearing because § 2254(d) has been satisfied.

Furthermore, as explained in detail, *supra*, in Petitioner's Standard of Review Under AEDPA, Section C, the state court process was unreasonable and unfair because the trial court never held an evidentiary hearing to consider Petitioner's well pled claim, which was supported by lay witness affidavits and expert reports, and because the trial court adopted nearly verbatim the state's proposed findings of fact and conclusions of law.

> **2.    The state court decision was unreasonable.**

To the extent that the state court ruling is nevertheless reviewed under 28 U.S.C. § 2254(d), the decision was unreasonable as a matter of fact and law. Where, as here, defense counsel fails to undertake a thorough investigation, it is unreasonable to rule that counsel's performance was not

deficient. *See Wiggins*, 539 U.S. at 527-28. Similarly, where, as here, the state court unreasonably discounts proffered mitigating evidence, its decision is unreasonable. *Porter*, 558 U.S. at 42-44.

The state habeas court denied this claim, finding trial counsel conducted a thorough investigation and made reasonable decisions. App. 81-83. The state court's analysis was at best unreasonable. It is unreasonable in light of the state court record, 28 U.S.C. § 2254(d)(2) to suggest that trial counsel conducted a thorough investigation of Mr. Daniel's life history for the reasons set forth above.

The life history outline presented at trial was basic and limited. The prosecutor summarized trial counsel's penalty phase presentation as follows: "all that stuff that [defense counsel] has made up is not sufficient mitigation … He had the best household." ECF 4-39, 26 RR 21, 206.

As explained in more detail, *supra*, in Petitioner's Standard of Review Under AEDPA, Section C, the state court unreasonably relied on trial counsel's affidavits as establishing that counsel's performance was not deficient.

Both of Mr. Daniel's trial attorneys filed affidavits asserting in conclusory fashion that they were not ineffective. App. 1427-38. The state court credited those affidavits and found, based solely on the affidavits, that counsel's investigation was reasonable and they made reasonable strategic decisions based on that investigation. App. 81-83. The state court ruling was unreasonable.

First, the state court ruling was procedurally unfair because the state habeas court found counsel's affidavits credible and relied on them to find facts without allowing a hearing or any other minimally adequate process to test the reliability and credibility of the affidavits.

Second, the state court decision was an unreasonable application of Supreme Court precedent. In *Strickland* and its progeny, the Supreme Court has made clear that adequate investigation is the sine qua non for adequate representation. For example, in *Williams*, the Court found that counsel's performance was deficient because "trial counsel did not fulfill their obligation

to conduct a thorough investigation of the defendant's background." *Williams*, 529 U.S. at 396. Similarly, in *Wiggins*, the Court held that the reviewing court's focus in such cases should be on "whether the investigation supporting counsel's decision not to introduce mitigating evidence . . . *was itself reasonable*." 539 U.S. at 523.

The affidavits presented by counsel are virtually identical. With respect to this issue, counsel essentially make two points: (1) they believed their mitigation specialist, Lisa Lawrence, did a thorough job and that (2) evidence of violence in Mr. Daniel's family would not persuade the jury to spare his life. The affidavits are rebutted by the record. Ms. Lawrence begged counsel to secure funding for her to travel to investigate Mr. Daniel's background. App. 1190. Ms. Lawrence and Mr. Urrutia did not even meet with family in Colorado until one month before trial. While they may have heard some family history of violence, there is no way they understood the depths of it and how it impacted Mr. Daniel's life. Without a constitutionally adequate investigation, the trial attorneys were in no position to make reasonable, informed decisions regarding the presentation of mitigation.

A crucial question for *Strickland* purposes is whether the "scope" of counsel's investigation was reasonable "in light of what counsel actually discovered" in the investigation they did conduct. *Wiggins*, 539 U.S. at 525. In *Wiggins* itself, counsel's investigation uncovered numerous leads for mitigating evidence, and "any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses." *Id.* The same thing was true here.

The state court's contrary ruling was an unreasonable application of *Williams* and *Wiggins*, as the Fifth Circuit explained in *Adams*:

> In the absence of a sufficient investigation of Adams's background, it was impossible for [counsel] to make a strategic decision to pursue his stated mitigation theory . . . . When, as here, counsel does not conduct an investigation sufficient to enable him to

reach an *informed decision,* we must reject the assertion that counsel made a strategic choice not to emphasize the defendant's background. . . .

[Counsel] failed to make even the most cursory inquiry into the existence of potentially mitigating evidence in Adams's background. The contrary state habeas court and TCCA rulings are not merely incorrect; both are contrary to and unreasonable interpretations of clearly established federal law.

*Adams*, 324 F. App'x at 349-50 (footnotes omitted); *see Lockett v. Anderson*, 230 F.3d 695, 715 (5th Cir. 2000) ("[T]he assertion of a 'strategic decision' must be rejected because no *informed* decision was made.") (emphasis in original) (quotation marks omitted).

## H. Exhaustion

This claim was exhausted in state habeas proceedings. App. 759-830. Because the state court ruling was contrary to or an unreasonable application of clearly established federal law, and because counsel's unreasonably truncated investigation resulted in an unreasonably superficial presentation that prejudiced the defense, this Court should grant habeas relief on this claim.

## VI. MR. DANIEL'S RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL AND FREEDOM FROM CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED BY TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT EVIDENCE THAT MR. DANIEL HAS AUTISM SPECTRUM DISORDER, WHICH WOULD HAVE MITIGATED THE CIRCUMSTANCES SURROUNDING THE OFFENSE AND WOULD HAVE EXPLAINED MR. DANIEL'S APPARENT LACK OF REMORSE.

As discussed more comprehensively in Claim V, *supra*, trial counsel unreasonably failed to conduct a complete and thorough investigation of Mr. Daniel's life, particularly his childhood. Had they done so, they could have provided the information they uncovered to their experts, which would have led at least one expert to diagnose Mr. Daniel with Autism Spectrum Disorder ("ASD"). That expert could have contextualized for the jury Mr. Daniel's atypical demonstration of emotion, particularly remorse, explaining that Mr. Daniel's apparently emotionless demeanor ("flat affect") was a product of his disability, rather than evidence of callousness or lack of remorse. Due to their failure to investigate Mr. Daniel's early life, trial counsel were unable to provide their mental health

experts with available evidence of Mr. Daniel's ASD symptoms.

An expert adequately informed about Mr. Daniel's background could have explained to the jury how ASD significantly impacted and impaired Mr. Daniel's life, prevented him from being able to develop typical interpersonal relationships, and limited his ability to express and understand emotions. These impairments were significant contributing factors to Mr. Daniel's depression and his reliance on substances to self-medicate, leading to his intoxication at the time of the offense. Moreover, an understanding of Mr. Daniel's disability was critical to accurately interpreting his demeanor and statements made after the offense and his atypical demonstration of emotion. Had the jury been adequately educated about Mr. Daniel's disability and the overarching impact of ASD in both his functioning and his emotional expression, there is a reasonable probability that at least one juror would have spared his life.

### A.       Autism Spectrum Disorder

ASD is a lifelong, neurodevelopmental disability, characterized by significant challenges with social communication and interaction, and the presence of narrow or restricted behaviors. American Psychiatric Association, Diagnostic and Statistical Manual-5 (2013) ("DSM-5"). The "cognitive, social, and communication impairments associated with ASD greatly affect an individual's ability to function independently" and, thus, the overall quality of his life. App. 1443. Neuroimaging studies of brains of individuals with ASD "demonstrate a disruption in communication between the frontal and posterior brain regions," which, in part, explain many of the behaviors typical of ASD. App. 1446.

The brain of a person with ASD "organizes, processes, and uses information differently" than that of typical individuals. App. 1443. Individuals with ASD have "impaired social interactions" that others consider "abnormal." App. 1443. These include "an atypical approach to social settings, . . . a failure to comprehend and respond appropriately to social cues, . . . a flat or otherwise odd

affect, [and a] fail[ure] to understand others[’] emotions.” App. 1444.

Individuals with ASD have “deficits in Theory of Mind,” which refers to an “individual’s ability to understand the feelings, perspectives, intentions, and motivations of others.” App. 1444. This deficit creates the appearance that a person with ASD lacks emotions, such as empathy and remorse. App. 1467. However, though people with ASD struggle to express these emotions, they nonetheless experience them in the same way as a neurotypical person. People with ASD also struggle with “developing, maintaining, and understanding relationships.” App. 1444 (quoting DSM-5). For this reason, they have difficulty “acclimating to various social settings, have problems in making and maintaining friendships, and in some cases lack interest in their peers.” App. 1445.

Other traits common to ASD include: inflexible adherence to routine, experiencing extreme distress when that routine is interrupted; hyper or hypo-reactivity to sensory inputs, such as sound, touch, smell, or sight; difficulty in fluid reasoning (defined as the ability to apply skills and information to novel situations or to use previously learned information to problem-solve); difficulty with working memory (defined as the ability to hold and manipulate multiple pieces of information in conscious thought at one time; and difficulty with executive functioning); the ability to direct and sustain attention, plan, organize, and inhibit behavioral responses. App. 1444–45.

B.      Diagnosing Autism Spectrum Disorder

ASD is diagnosed by professional administration of diagnostic tests such as the Autism Diagnostic Observation Schedule, Second Edition (“ADOS-2”) combined with observations of those who have known the subject, and accounts of behavior during the subject’s early developmental period, especially in the first five years of life. The ADOS-2 is a semi-structured instrument that allows the examiner to observe the subject’s communication, social interactions, imagination, and responses to the environment. Information about the onset of traits during the early developmental period is a critical component of both recognizing a potential ASD disability

and confirming a diagnosis. App. 1446.

Gary B. Mesibov, Ph.D., a psychiatrist specializing in ASD, reviewed school records and affidavits from individuals who knew Mr. Daniel as a child. App. 1441–42. He conducted interviews with Mr. Daniel's mother, sister, aunt, and a childhood friend. App. 1441. He also interviewed Mr. Daniel about his family background, personal history and experiences, and his mental and emotional state at the time of the interview. App. 1441–42. Finally, he conducted an evaluation of Mr. Daniel, using the ADOS-2. App. 1457–61. Following his evaluation, Dr. Mesibov concluded that Mr. Daniel has ASD, displaying "language and cognitive impairments" necessary for the diagnosis, "significant problems with social communication and social interaction," and "rigid, narrow and perseverative behaviors and routines." App. 1470–71.

Moreover, various ASD symptoms demonstrated in Mr. Daniel's background as recounted by his family and friends include: impairments in his ability to interact socially, including disinterest or discomfort in playing with other children or joining group activities; a preference for being alone; difficulty initiating conversation and responding when spoken to, difficulty in reciprocating during conversations; difficulty making and maintaining eye contact; a need for predictable daily routines coupled with inflexibility to adapt to changes; obsessions and fixations on inanimate objects and unusual interests; behavior demonstrating self-injury, including rubbing his skin raw; inability to understand humor and difficulty in understanding complex jokes; an aversion to physical contact, including hugs and physical affection; hypersensitivity and atypical reactions to sensory stimuli; evidence of a genetic history of ASD; comorbidity with other mental disorders, such as depression; and an inability to manifest typical demonstrations of emotion.[16]

---

[16] Because of page restrictions, Mr. Daniel does not recount with specificity his extensive history of symptoms evidencing ASD, which support Dr. Mesibov's diagnosis. However, a thorough description of the full range of symptoms as they manifested throughout Mr. Daniel's life may be

### 1. Depression and Self-Medication

Comorbid mental disorders, like depression, are common among people with ASD. DSM-5 58. Approximately seventy percent of individuals on the spectrum will experience at least one comorbid mental disorder and forty percent experience two or more. *Id.* Individuals with ASD experience depression and suicidal ideation at higher rates than the neurotypical population, and adolescents with ASD are particularly "prone to anxiety and depression." *Id.* at 55–56. This depression stems from a number of ASD symptoms. For example, people with ASD experience social isolation, have difficulty communicating, and have difficulty forming and maintaining relationships. As a result they are often confronted with social settings they struggle to understand and navigate and often retreat to isolation as an escape. Moreover, because of their difficulties with communication, depression and suicidal ideation often go undiagnosed in people with ASD.

Mr. Daniel suffered a history of depression throughout his adolescence, in conjunction with his ASD. He exhibited self-harming behavior, including rubbing himself with a rubber eraser in class until his skin was raw. App. 1455. He also attempted suicide on multiple occasions. By the time of the trial Mr. Daniel was diagnosed with Major Depressive Disorder and Substance Abuse Disorder.

As a result of his debilitating depression, Mr. Daniel turned to drugs and alcohol, as a form of self-medication, to mitigate the paralyzing anxiety he experienced in social settings. App. 1417, 1563. He began using alcohol and marijuana as early as ten years old and continued using them both, regularly, until his arrest. App. 1555. Marijuana was particularly helpful in reducing the anxiety produced by Mr. Daniel's struggle with ASD. App. 1556. By age fourteen, Mr. Daniel began using LSD, mushrooms, and dextromethorphan (found in cough syrup), and he began inhaling

---

found in the initial application in state habeas as supported by affidavits submitted to this Court. *See* App. 714–36; App. 1386–1419, 1494–1544; Supp. App. 1886.

compressed air canisters, which contain agents that produce effects similar to alcohol. App. 1556–57. Mr. Daniel's drug use was so pervasive at this point that he would contrive reasons to not join his family on outings, such as camping trips, so that he could stay home and get high. App. 1397–98. And to cope with the anxiety he suffered at school, he was consuming enough cough syrup that he was repeatedly sent home sick from school. App. 1536.

By age eighteen, Mr. Daniel began using cocaine and pain pills, including opioids. App. 1557. The cocaine produced a sense of high energy, and well-being, while the pain pills reduced anxiety. App. 1557. At this time, Mr. Daniel also began regularly using MDMA or ecstasy to help him cope with his anxiety in social situations. App. 1417. MDMA is particularly attractive for people who suffer from depression because it mimics the effects of anti-depressants, raising the serotonin concentration in the brain, which "produces feelings of wellbeing, euphoria, and sensitivity to the environment." App. 1558. Moreover, MDMA benefits people with ASD because it can "boost confidence, heighten bonding, and increase awareness and understanding of social cues," thereby mitigating some of ASD's most debilitating symptoms. App. 1574–75.

In the months before the offense, Mr. Daniel started using alprazolam or Xanax following a breakup with his longtime girlfriend. "Xanax is a sedative that is prescribed to relax a person [who experiences] acute anxiety and panic disorders." App. 1560. By increasing Gamm-Amino-Butyric-Acid ("GABA"), a brain chemical that suppresses the firing of nerve cells, Xanax suppresses fear and anxiety. App. 1560. *See* Claim VII, *infra*.

### 2.     Atypical Demonstrations of Emotion

People with ASD have deficits in social-emotional reciprocity and have limitations in sharing emotions. DSM-5 50. As discussed above, deficits in Theory of Mind may cause a person with ASD to appear to lack emotions such as empathy and remorse. App. 1444. This causes people with ASD to be misunderstood as cold or detached. App. 1468. However, the science shows that while people

with ASD struggle to demonstrate or express these emotions in the same way that neurotypical people commonly do, people with ASD nonetheless equally experience these emotions. App. 1444.

Because of his disability, Mr. Daniel struggled throughout his life to express his emotions. App. 1394, 1408, 1414–15, 1417, 1459–60, 1524–25; Supp. App. 1886. His family and friends recount that he rarely showed emotion and, when he did, it was a limited range. App. 1394; 1408; Supp. App. 1886. Even when he recognized that others were sad or upset, Mr. Daniel was unable to respond in a way to comfort them, and became visibly uncomfortable when others expressed their emotions. App. 1394. As a result, rather than expressing the empathy he was feeling for others, Mr. Daniel would become very rigid, guarded, and distant. For example, Samantha Daniel recounts that she was upset when her dog died and looked to her older brother for comfort. However, though Ms. Daniel knew that her brother cared about her and empathized with her loss, he was unable to demonstrate his commiseration. Instead, he became very uncomfortable. App. 1394. Similarly, when Mr. Daniel's girlfriend, Jenna Feland, learned about her grandmother's passing Mr. Daniel knew to put his hand on her knee, in an attempt to comfort her, yet his faced remained neutral. App. 1394.

C. **Trial Counsel Failed to Adequately Investigate, Develop, and Present Evidence of Mr. Daniel's Autism Spectrum Disorder.**

Capital trial counsel have a duty to investigate and present mitigating evidence. *Wiggins*, 539 U.S. at 523-24. Evidence of background and character is particularly important in developing mitigation evidence, *Penry*, 492 U.S. at 319, and, as discussed above, vital in making an ASD diagnosis. "In assessing the reasonableness of an attorney's investigation . . . a Court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527. This because the "principal concern" in determining whether trial counsel "exercised 'reasonable professional judgment[t]' is not whether counsel should have presented a mitigation case" but "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [petitioner's]

background was *itself reasonable.*" *Id.* at 522–23 (citation omitted) (quoting *Strickland*, 466 U.S. at 691). While counsel's strategic choices "made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Hinton v. Alabama*, 571 U.S. 263, 274 (2014) (internal quotation marks omitted) (quoting *Strickland*, 466 U.S. at 690–91) (explaining that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."); *see also Williams,* 529 U.S. at 395 (holding that counsel was ineffective for "fail[ing] to conduct an investigation that would have uncovered extensive records graphically describing [Petitioner's] nightmarish childhood").

Here counsel were on sufficient notice that they needed to further investigate whether Mr. Daniel suffered from ASD. From the earliest stages of preparation, trial counsel were alerted to a potential ASD diagnosis. As early as December 2012, just eight months after the offense and more than a year before trial, Alicia Amezcua-Rodriguez, Esq., the mitigation specialist initially assigned to the case, informed trial counsel that an ASD diagnosis was possible. App. 1617–18. She explained that Mr. Daniel "exhibited certain characteristics that . . . can be associated with ASD" such as "impaired social interactions," "difficulty building interpersonal relationships," "social[] awkward[ness]," speech that "lacked emotion" and a "flat affect." App. 1617–18. Had trial counsel followed-up on this observation and suggestion by the mitigation specialist, they could have requested, among other things, Mr. Daniel's medical records from the Travis County Sheriff's Office. During Mr. Daniel's intake, on the day of the offense, a progress note "wonder[ed] about a possible Asperger's dx." App. 1143. And a second progress note on May 31, 2012 indicated that Mr. Daniel presents with "unusual affect (possibly due to Aspergers v. personality d/o) that makes it difficult to connect/communicate with him." App. 1145.

Despite these early indications of a possible ASD diagnosis, trial counsel did not ask their experts, Harold Scott, M.D., and William Lee Carter, Ed.D., their opinions about ASD until January 20, 2014, a mere week before voir dire was scheduled to begin and *after* all their experts had already evaluated Mr. Daniel. App. 1195–96. Moreover, because trial counsel failed to conduct the background investigation that is so vital to constructing a compelling mitigation package, *see* Claim V, they did not provide their experts with the background material that is necessary to properly conduct an assessment and diagnosis of ASD. Trial counsel's records show that, of the material they sent to Dr. Carter, the only background material consisted of Mr. Daniel's academic records, employment records, and disciplinary records from Colorado State University, and academic and disciplinary records from high school. App. 1150. There were no records or historical accounting of Mr. Daniel's developmental years.

Dr. Scott, the psychiatrist who evaluated Mr. Daniel, affirmed in an affidavit that he did not receive any of the background material, including "Mr. Daniel's family and life history" and other "developmental information [which] is particularly important for diagnosing ASD." App. 1547. In addition to failing to provide the experts with any information related to Mr. Daniel's background, including his developmental years, which is necessary to conduct an ASD evaluation, trial counsel did not alert either of their experts to the possible diagnosis prior to their meetings with Mr. Daniel. It was not until January 20, 2014, just seven days before voir dire was scheduled to begin, that Mr. Hunt finally reviewed Mr. Daniel's medical records from the Travis County Sheriff's County Office, and sent the medical experts an email noting the "possible Asperger's dx." App. 1195–96. It was at this point that the experts were finally alerted that Mr. Daniel potentially suffered from ASD.

Given that trial counsel did not even notice the potential ASD diagnosis from Mr. Daniel's intake until just a week before voir dire was scheduled to begin, it is no wonder then that the experts did not receive sufficient background material to properly diagnosis Mr. Daniel. It is apparent from

communications prior to trial that, until December, 23, 2013, counsel believed they would receive a plea agreement for a life sentence. On December 20, 2013, Mr. Hunt emailed Mr. Urrutia, Dr. Cecil Reynolds (a consulting neuropsychologist), and Ms. Lawrence to update them on the "[c]urrent status," notifying them that Travis County District Attorney "Rosemary [Lehmberg] is meeting with victim family on Monday morning," and that the "DA's office victim-witness coordinator seems hopeful that we can do a deal and he has been in frequent contact with victim family." App. 1191. Three days later Mr. Hunt emailed again, notifying the same recipients that "Rosemary has decided to continue to seek the death penalty" and that they now "need to prepare to go forward with the trial." App. 1193.

It was here, just a month before voir dire was scheduled to begin, that preparation for both guilt and penalty phase finally began in earnest, with Mr. Hunt noting that Ms. Lawrence and Mr. Urrutia would make their first (and only) trip to Colorado, that Dr. Walter Harell would "go see Brandon and do his testing" related to brain trauma, and that Mr. Hunt still needed to "contact an adolescent psychologist [he had] in mind, Dr. Lee Carter, and the addiction [specialist] Doctor Matthew Masters to get them on board." App. 1193. This is supported by court records which show that Dr. Carter was not appointed until December 30, 2013, less than a month before voir dire, and Dr. Scott was not appointed until November 20, 2013, just two months before the start of voir dire.

Further, as late as November 2013, mitigation specialist Lisa Lawrence expressed her frustration at the stagnancy of the case and the lack of mitigation investigation, emailing trial counsel that she had been "left in limbo." App. 1190; *see also* Supp. App. 1860 (Ms. Lawrence declaring that she asked trial counsel "to try to make time to see Brandon more frequently" and that the team needed to "spend more time with him to build a trusting relationship."). She further reproached trial counsel, reminding them that they "are well into November and are supposed to go to trial after the first of the year," but that "funding for mitigation hasn't been renewed despite [her] repeated

97

requests since August." App. 1190. Ms. Lawrence had "been requesting to travel to Colorado to interview witnesses since March" and had not yet received an answer. *Id.* That visit to Colorado, which was Ms. Lawrence's first opportunity to do the background investigation necessary for an ASD diagnosis, did not happen until January 13–14, 2014, just two weeks before voir dire, and after both Dr. Scott and Dr. Carter had already met and assessed Mr. Daniel without incorporating any investigation into Mr. Daniel's childhood or developmental years. On the contrary, counsel did not "seek out [Mr. Daniel's] classmates or friends from when he was a child," focusing the investigation, instead, on the time that Mr. Daniel was at Colorado State University. Supp. App. 1860.

Dr. Scott has since acknowledged that he did not have the background material necessary to make an assessment of ASD for Mr. Daniel. After reviewing the background material gathered during state habeas counsel's investigation, Dr. Scott concluded that the information was "unequivocally sufficient to preliminarily establish the diagnosis of ASD." App. 1546. And after reviewing Dr. Mesibov's affidavit, and meeting again with Mr. Daniel, Dr. Scott "revise[d his] diagnosis." App. 1547. Dr. Scott explained that his earlier diagnosis of Avoidant Personality Disorder, based on "Mr. Daniel's substantiated impairments in socialization," was "better explain[ed]" by ASD. App. 1547. As Dr. Scott explained, Dr. Mesibov "had more access to Mr. Daniel's family and life history than was available" to the experts at the time of trial, and that "[s]uch developmental information is particularly important for diagnosing ASD" and "is a critical component to confirming, or even suspecting, that a person has ASD." App. 1547.

Dr. Scott's affidavit and corrected diagnosis demonstrate that had counsel conducted the background investigation that is necessary for all defendants facing the death penalty, their experts would have ultimately diagnosed Mr. Daniel with ASD.

Though trial counsel assert that "[a] number of experts were retained to assist with preparation" and that they "discussed numerous issues," "[i]ncluding, the the [sic] possibility of

Brandon's having Asperger's syndrome or another disorder in the autism spectrum on several occasions," App. 1433, they fail to acknowledge that they did not ask their experts about ASD until after the experts had met with Mr. Daniel. And Ms. Lawrence, the mitigation specialist on the team, who would have been present for the team meetings and the "several" alleged discussions related to ASD does not "recall if [they] had a specific discussion bout investigating Autism as a mitigating theme for trial." Supp. App. 1860. Nor do counsel explain how, logistically, they were able to have discussions related to ASD "on several occasions" when they first asked their experts about a potential ASD diagnosis just a week before voir dire commenced. App. 1195. Finally, neither trial attorney even addressed Dr. Scott's affidavit affirming that had he had access to the background material that trial counsel failed to investigate and develop, he would have diagnosed Mr. Daniel with ASD.

Trial counsel does not meet *Strickland*'s constitutional mandate by hiring experts a month or two before trial, giving them a sparse background package consisting only of a handful of school records from their client's adolescence and early adulthood, and then asking them about a vital diagnosis *after* those experts have met with the client, and just days before the trial is set to begin. Developing a comprehensive and thorough social history is vital to a defense mitigation strategy precisely because it will provide the background information necessary to support mitigating diagnoses. Counsel were pursuing a plea until nearly the eve of trial, and only began a mitigation investigation after that plea was no longer an option. At that point, counsel had less than a month remaining to develop the sort of background investigation that would have taken approximately seven hundred hours to successfully and thoroughly conduct. App. 1637–38.

The failure to conduct a thorough investigation of Mr. Daniel's childhood and developmental years suggests that counsel were preoccupied and distracted with preparing for trial, rather than making any strategic decision about that investigation and potential diagnoses it might

uncover. *See Wiggins*, 539 U.S. at 534 ("Counsel's pursuit of bifurcation until the eve of sentencing and their partial presentation of a mitigation case suggest that their incomplete investigation was the result of inattention, not reasoned strategic judgment."). Counsel's performance respecting an ASD diagnosis was deficient.

### D. There is a Reasonable Probability That the Jury Would Have Found the Diagnosis and Explanation of Autism Spectrum Disorder Mitigating.

By failing to have Mr. Daniel properly diagnosed with ASD, to educate the jury about common symptoms of, and impairments associated with, ASD, and to contextualize the circumstances surrounding the offense and Mr. Daniel's response to it, trial counsel missed an opportunity to present compelling mitigation evidence.

First, though defense counsel elicited testimony showing Mr. Daniel's history of depression, that history lost much of its power and persuasion divorced from Mr. Daniel's ASD. Unlike depression, ASD is a pervasive and persistent lifelong developmental disability, with symptoms first appearing in the early developmental period. DSM-5 at 50. Jurors are more likely to see individuals with a developmental disability as less morally culpable or blameworthy than someone who simply suffers from depression. Explaining to the jury that Mr. Daniel suffered throughout his childhood, adolescence, and young adult life with an undiagnosed condition that caused him to have difficulties developing relationships, and which led to a lifetime of isolation and loneliness, alone could have been mitigating. Coupled with his ASD, Mr. Daniel's depression and inability to cope explained why he turned, at a very young age, to drugs as a form of self-medication. Providing context for Mr. Daniel's well-documented history of drug use, and particularly his use of Xanax on the day of the offense, could have helped to mitigate the circumstances surrounding the offense. Given this history of drug use, as explained by the ASD diagnosis, the jury would have understood that Mr. Daniel was impaired on the night of the crime, not because of a hedonistic attraction to drug use, but as the result of another day trying to cope with the isolation, loneliness, and anxiety of his undiagnosed

condition.

Most significantly, evidence of ASD would have informed the jury's understanding of Mr. Daniel's remorse, despite his inability to demonstrate that remorse in the same way as a neurotypical person. Under Texas law, the sentence of death turns on the jury's finding that the accused poses a threat of future danger. And "[a] jury may . . . infer a defendant's future dangerousness from evidence showing a lack of remorse." *Buntion v. State*, 482 S.W.3d 58, 66-67 (Tex. Crim. App. 2016)). The state focused extensively at both the guilt phase and penalty phase on Mr. Daniel's alleged lack of remorse. For example, at the guilt phase, Detective Robinson testified that when she met Mr. Daniel he "plainly stated," "I killed a cop," in a "very matter of fact" way and with "no emotion." ECF 4-32, 19 RR 114. Christopher Lester, an EMT at the scene, similarly testified that Mr. Daniel's "affect" was "very blank, very cold, really no emotion to things that were going on or things that had happened." ECF 4-31, 18 RR 224. Without the context of Mr. Daniel's disability, the descriptions of his affect as showing "no emotion," or as "very blank, very cold" created the inaccurate impression for the jury that Mr. Daniel did not experience remorse simply because he was unable to express his remorse in a typical manner. The Supreme Court has recognized and cautioned against the danger that arises when a defendant's disability "may create an unwarranted impression of lack of remorse for [his] crime[]." *Atkins*, 536 U.S. at 320-21.

Even more problematic, at the penalty phase, the state's psychologist, Dr. Marisa Mauro, testified that Mr. Daniel's "affect or his expression that he showed on his face was very flat, markedly flat, throughout the entire nearly three hour interview. It was very emotionless, there was no change in expression no matter what topic or content we were discussing." ECF 4-39, 26 RR 16. Dr. Mauro also testified that Mr. Daniel's "providers have not documented any change in their objective observations of him" and that "he is still continuing to present with a flat affect." ECF 4-39, 26 RR 58. She further testified that she was "specifically restricted from using" tests for

"psychopathy," which she described as presenting with "restricted of shallow range of affect, lack of empathy, being conning and manipulative, callousness, disregard for the rights of others." ECF 4-39, 26 RR 36–37. This testimony was clearly intended to imply that Mr. Daniel's "emotionless" and "markedly flat" affect was demonstrative of psychopathy. Without the ASD diagnosis to explain Mr. Daniel's affect, the jury was left with a damaging and inaccurate perception that Mr. Daniel's inability to express his remorse was evidence that he lacked remorse.

The state capitalized on the misinformation and misperceptions in its closing argument. It reminded the jury that "Dr. Mauro read to you the definition of psychopathy; someone with a flat affect, someone with no remorse, someone with no empathy," before arguing that "there's nothing more telling as to the behavior of April 6th that he is a future danger, and there is not one good reason not to sentence him to death." ECF 4-39, 26 RR 128. The state also described Mr. Daniel as "cold-blooded," arguing that he "didn't cry . . . didn't get sad," that "[h]e wasn't remorseful" and that he "was never remorseful about it." ECF 4-39, 26 RR 183, 187–88. The state also contested the defense's argument "about how much remorse he has," arguing that "he clearly does not." ECF 4-39, 26 RR 210.

Not only did trial counsel fail to contest the false and unfounded implications that Mr. Daniel was a psychopath, they were unable to demonstrate that the symptoms used to create that implication were, in reality, a distortion of Mr. Daniel's true disability—ASD. And the state was successful in utilizing Mr. Daniel's ASD, and his inability to express remorse, as evidence that he lacked remorse. As one juror reported, "the state repeatedly referenced that Mr. Daniel lacked remorse" and "[t]he jurors felt that his demeanor did not reflect remorse and he seemed unemotional given the gravity of the proceeding." App. 1549. According to this juror "it was hard to tell what effect, if any the crime had" on Mr. Daniel and "[t]his was . . . something that came up during our deliberations." App. 1549. A second juror concurred, stating she found "Mr. Daniel's

behavior to be strangely distant" that he "appeared unemotional throughout the proceedings" and that information about his ASD "would have helped [her] understand his behavior." App. 1604. Critically, this juror acknowledged that information about Mr. Daniel's ASD would have been "helpful when deciding if [he] had the potential to be a future danger." App. 1604.

Trial counsel were ineffective for failing to conduct the background investigation necessary to insure that Mr. Daniel could have been properly diagnosed with ASD. With a properly conducted investigation, they could and should have utilized the ASD diagnosis to contextualize and explain a number of critical issues related to the circumstances surrounding the offense and mitigation. The jury would have understood that Mr. Daniel's disability contributed substantially to his long-term efforts, dating back to his childhood, to self-medicate. Information as to common attributes of ASD would have also explained Mr. Daniel's seemingly indifferent demeanor immediately after the offense and during trial, and would have served as powerful mitigating evidence. But for trial counsel's failure to conduct a proper background investigation, there is a reasonable probability that at least one juror would have found Mr. Daniel's disability mitigating and would have voted for life.

### E.    State Court Proceedings

Mr. Daniel raised this claim in his initial application. App. 707–59. The trial court denied the state habeas application, adopting verbatim the state's proposed findings of fact and conclusions of law. App. 78–81. The CCA affirmed. App. 04–05.

The state court process was unreasonable and unfair because the trial judge: never held an evidentiary hearing to consider Petitioner's well pleaded claim, which was supported by affidavits and expert reports; prevented Petitioner from challenging the credibility of trial counsel's affidavits; adopted verbatim the state's proposed findings of fact and conclusions of law, crediting affidavits in support of the state's opposition, while ignoring affidavits in support of the habeas petition. The process was also unreasonable because the CCA adopted these findings in its opinion. *See* Standard

of Review under AEDPA, parts B and C, *supra*. Accordingly, this Court should review this claim de novo.

To the extent that the state court ruling is nevertheless reviewed under 28 U.S.C. § 2254(d), the decision was an unreasonable determination of both fact and law.

### 1. The state court decision rested on an unreasonable determination of fact.

Both of Mr. Daniel's trial counsel filed affidavits asserting that they were not ineffective. App. 1427–38. The state court credited those affidavits and found, based solely on the affidavits, that counsel's investigation was reasonable and they made reasonable strategic decisions based on that investigation. App. 03–04. The state court ruling was unreasonable.

While crediting the state's affidavits, the state court never even acknowledged, let alone addressed, the affidavits and reports submitted by state habeas counsel in support of the petition. For example, the state court credited trial counsel's affidavits alleging that they had conducted a sufficient background investigation, provided their experts with adequate material to make a diagnosis, and that no expert thought that an ASD diagnosis would be credible. App. 4; *see also* App. 1428, 1433–34. The state court specifically found that "Dr. Scott indicated that applicant properly did not suffer from Asperger's." App. 4. However, the state court never addressed Dr. Scott's affidavit submitted by state habeas counsel that directly contradicts the affidavits on which the state court relied. Dr. Scott affirmed that he did not have access to "Mr. Daniel's family and life history" which is "a critical component to confirming, or even suspecting, that a person has ASD." App. 1547. Moreover, having reviewed this material, he "revise[d his] diagnosis," the very diagnosis which the state court referenced in denying the claim, concluding that the background information was "unequivocally sufficient to preliminarily establish the diagnosis of ASD." App. 1546. In relying on the state's affidavit in rejecting the claim, the state court did not find Dr. Scott's affidavit incredible,

nor did it find Dr. Scott's affidavit insufficient to support the claim. The court simply ignored Dr. Scott's affidavit.

The court similarly ignored Dr. Mesibov's affidavit, which diagnosed Mr. Daniel with Autism and extensively described the ASD symptoms evident in Mr. Daniel's behavior. App. 1470–71. Though the state court found that counsel acted reasonably when they determined that "a diagnosis of ASD was not supported," App. 04, it entirely failed to address the diagnosis made by an ASD expert. Again, the state court did not find Dr. Mesibov's diagnosis incredible, nor did it find the diagnosis unsupported by the background material that state habeas counsel provided to its expert. The state court simply never addressed Dr. Mesibov's affidavit outlining Mr. Daniel's symptoms of ASD and the diagnosis.

Given that the state court ignored any evidence inconvenient to the state's argument in opposition to habeas relief, the state court's factual determination was "not fairly supported by the record as a whole." *Jefferson*, 560 U.S. at 290 (quoting *Townsend*, 372 U.S. at 313. Instead of resolving disputed facts "in a full and fair hearing," *id.*, the state court simply credited the state's affidavits while ignoring Petitioner's. Such an incomplete and insufficient review process resulted in factual findings that are unsupported by the record as a whole and are, thus, unreasonable.

## 2. The state court decision was an unreasonable application of clearly established law.

In *Strickland* and its progeny, the Supreme Court has made clear that adequate investigation is a necessary component of adequate representation. In *Williams*, the Court found that counsel's performance was deficient because "trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background." 529 U.S. at 396. Similarly, in *Wiggins*, the Court held that the reviewing court's focus on such cases should be on "whether the investigation supporting counsel's decision not to introduce mitigating evidence . . . was itself reasonable." 539

U.S. at 523; *see also Lockett v. Anderson*, 230 F.3d 695, 715 (5th Cir. 2000) ("'[T]he assertion of a 'strategic decision' must be rejected because no *informed* decision was made.")

In concluding that counsel acted reasonably when they discounted any possibility of a potential ASD diagnosis, the court failed to address counsel's inadequate investigation into Mr. Daniel's background, which would have uncovered the information necessary for such a diagnosis. *See* VI.C. *supra*. Counsel's belief that an ASD diagnosis would not be credible was not supported by a thorough investigation into Mr. Daniel's social history. The only records counsel provided to their experts from Mr. Daniel's early years were school and employment records. App. 1150, 1547. There was no historical accounting of Mr. Daniel's childhood and developmental years, which are critical to coming to an informed decision about a potential ASD diagnosis.

Despite the extensive arguments state habeas counsel raised related to trial counsel's failure to provide the necessary background material, and the affidavit from Dr. Scott affirming that he was not provided with Mr. Daniel's social history and, if he had been, it "unequivocally" would have been sufficient to "preliminarily establish the diagnosis of ASD," the state court failed to address or analyze whether counsel conducted a sufficient investigation pursuant to federal constitutional law. Instead the state court simply concluded that trial counsel reasonably relied on their experts' opinions that an ASD diagnosis was not available. However, the court did not consider "whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527. And, here, with two separate individuals—the mitigation specialist and the DOC psychologist who did Mr. Daniel's intake evaluation—suggesting a possible ASD diagnosis early in the pre-trial period, trial counsel were ineffective when they failed to do the necessary social history investigation to secure the type of background material that could support such a diagnosis, and failed to ask their experts about a possible ASD diagnosis until nearly the eve of trial and after every single expert had

already met and concluded their analysis of Mr. Daniel. *See Strickland*, 466 U.S. at 691. The state

court's conclusion to the contrary was and unreasonable application of *Strickland* and its progeny.

For all these reasons, habeas relief should be granted as to sentencing.

## VII. TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE AND PRESENT EVIDENCE OF THE ADVERSE EFFECTS OF XANAX IN VIOLATION OF MR. DANIEL'S SIXTH AMENDMENT RIGHT TO COUNSEL, FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS, AND EIGHTH AMENDMENT RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHEMNT.

Xanax is prescribed to relax a person with acute anxiety disorder and panic disorder. It is a

disinhibitor, meaning that the general and intended effect of Xanax is to suppress fear and panic by

acting on the parts of the brain that cause those feelings. App. 1560. Dating back as far as the

1970s, however, there have been several studies which show that for a small portion of the

population, Xanax causes an adverse reaction which can lead to violence and aggression, known as

"rage reaction" or "paradoxical reaction." App. 1738. By 2014, at the time of Mr. Daniel's trial, it

was well documented that Xanax could cause or contribute to violence. App. 1208.

Trial counsel failed to consult or present an expert to explain this adverse reaction to Xanax

intoxication at either the guilt or penalty phase of the trial. Their entire presentation about the effects

of Xanax was limited to Dr. Matthew Masters, who described the effects of Xanax as being similar to

alcohol, making no reference to the potential for paradoxical reaction. ECF 4-34, 21 RR 19-33. Had

the jury heard from an expert who could have explained this adverse reaction, they would have seen

that Mr. Daniel's behavior was consistent with this very real and well-documented neurological

response caused by an adverse reaction to Xanax intoxication. Instead, they were left with the

impression that Mr. Daniel was really nothing more than a bad drunk. ECF 4-34, 21 RR 14.

It is reasonably probable that a jury would have found that Mr. Daniel's behavior on the night

of the incident was consistent with paradoxical reaction. Because even the casual user expects Xanax

to relax or sedate, had the jury heard about this uncommon adverse reaction, there is a likelihood that

they would have factored that in to their deliberation at guilt phase, finding that Mr. Daniel suffered from a sort of "involuntary intoxication." Furthermore, evidence of this adverse reaction causing behavioral abnormalities goes directly to Mr. Daniel's future dangerousness and moral culpability in relation to this crime. Had the jury heard about this adverse reaction, there is a reasonable probability that they would have spared Mr. Daniel's life.

Failing to present an expert to explain paradoxical reaction was an objectively unreasonable omission by trial counsel. Mr. Daniel was prejudiced by this omission because the jury was left with the impression that Xanax intoxication was no different than alcohol intoxication. Trial counsel fell below the standard established in *Strickland*, 466 U.S. at 688, and violated Mr. Daniel's due process rights. Mr. Daniel should receive a new trial or, at the very least, a new penalty hearing.

### A.    Adverse Effects of Xanax

Xanax is the brand name for the drug alprazolam which is in a class of drugs called benzodiazepines. Benzodiazepines work by increasing the action of a brain chemical that suppresses the firing of nerve cells. This chemical is called Gamma-Amino-Butyric-Acid ("GABA") and it is present in the areas of the brain that involve memory, disinhibition, and executive function (judgment, decision-making, and anticipating consequences). App. 1734. By enhancing the actions of GABA, Xanax suppresses fear and anxiety. *Id.*

### 1.    Paradoxical Reaction

There have been numerous studies documenting adverse reactions to Xanax. By 2014, it was well documented that for some of the population, Xanax can produce behavioral abnormalities, including rage and mania. App. 1210. By inducing mania, Xanax is especially likely to cause bizarre or outrageous, and oftentimes violent, behavior. *Id.* This adverse effect is known as a paradoxical reaction because "these drugs typically reduce, or [are] expected to reduce, the emotional conditions from which hostility might emerge." App. 1738. Although paradoxical reaction is uncommon, certain

people under certain circumstances are more prone to it: "pre-existing hostility level is one determinant, as is depressive affective disorder, as is a past history of poor impulse control." *Id.*

Negative reactions to drugs are documented in Adverse Event Reports (AERs). A 2010 study of AERs of 200 drugs concluded that Xanax was associated with significant increases in serious violence. App. 1214. Robert Wise, an official at the FDA, specifically studied instances where Xanax led to hostility or violence. Wise concluded that "an increase in the annual frequency of 'rage' reports with alprazolam prompted us to compare hostility reports more generally across several anxiolytic benzodiazepines. Alprazolam appears to have an excessive reporting rate for events coded with hostility." App. 1361. Benzodiazepines generally can lead to aggressive impulses with the emergence of hostility and rage, resulting in criminal acts such as assault and rape. App. 1214. Reports show that Xanax, specifically, can lead to violence and even murder. App. 1214.

When Xanax is combined with alcohol, the effect is potentiated. App. 1566. That means that because both Xanax and alcohol act on the GABA receptor, the combined effect is greater than either would be alone. Alcohol alone can cause disinhibition and rage; but, when combined with Xanax, the worst effects of Xanax, including violence and mania, can be potentiated. App. 1215. The combination of benzodiazepines and alcohol is particularly likely to lead to a paradoxical reaction, with the user often experiencing complete or partial amnesia of the event. App. 1645.

### 2. Paradoxical reactions under circumstances of frustration

Scientific studies show that Xanax is more likely to cause a person to act violently when there is a triggering incident. Dr. Jonathan Lipman, a neuropharmacologist, explains that "[r]age and violent dyscontrol are a special case of GABA agonist-induced disinhibition. The production of violent rage requires both a lack of self-restraint and the presence of a motivating anger." App. 1738. Dr. Lipman goes on to say that "extreme interpersonal frustration is a recognized trigger of GABA agonist associated hostile outbursts." *Id.* A study by the American Psychiatric Association reported that

"[h]ostility has been noted in some patients who receive benzodiazepines, especially under conditions of frustration." App. 1211.

### 3. How alcohol differs from Xanax

Although both alcohol and Xanax act on the GABA receptor and cause one to feel disinhibited, Xanax disinhibition differs in some ways from alcohol disinhibition: "[Xanax] disinhibition can occur without a noticeable sedative intoxication, such as slurred speech, lack of coordination, or impaired consciousness." App. 1209.

Furthermore, prescribed medication such as Xanax has what Dr. Peter Breggin calls "the spellbinding effect." The Xanax user, unlike the alcohol user, does not expect the drug to harm him or her in any way, so "the patient is less able to understand or manage potentially overwhelming feelings of anger or violence or other untoward emotional responses. . . . Benzodiazepines are very spellbinding, so individuals often suffer from toxic effects on their brains and minds without appreciating or recognizing them." *Id.*

While the casual user may not be under a doctor's care when taking the drug, the casual user likewise would expect Xanax to have a sedating effect, and even the casual user would not expect a paradoxical reaction.

### B. It was Objectively Unreasonable for Trial Counsel to Fail to Present an Expert to Present Evidence of Paradoxical Reaction.

Trial counsel has a duty to conduct a reasonable investigation and present mitigating evidence. *ABA Standards*, Section 4-4.1; *Texas Guidelines*, Guideline 11.1; *Wiggins v. Smith*, 539 U.S. 510, 523-24 (2003). Studies of paradoxical reaction were widely available to the medical and legal community in 2014. Trial counsel presented an expert to talk about the effects of Xanax, but that expert compared Xanax to alcohol, and told the jury nothing about this uncommon but well documented adverse reaction.

The jury needed to understand why Mr. Daniel would behave in such an unexpected and bizarre manner the night of the offense. It does not make sense for Mr. Daniel, an otherwise non-violent person, to bring a loaded gun to a Walmart, try to shoplift, flee as soon as someone tried to apprehend him, and kill a police officer once he was tackled and caught. As Detective Robinson said in her interrogation: "[w]e're trying to make some sense of it, try to have somebody understand why. Okay? And right now what we're left with is, is there's an officer who is dead for vegetables." *See* Police Interrogation Video.

Mr. Daniel did not have a prior history of violence. All of the State's witnesses who knew Mr. Daniel agreed that he had never brought his gun out of the house. ECF 4-35, 22 RR 96-96; ECF 4-35, 22 RR 122-23. Every police officer and corrections officer who interacted with Mr. Daniel and testified at the trial described him as deferential, docile, and submissive to authority. ECF 4-35, 22 RR 23; ECF 4-35, 22 RR 169-70; ECF 4-36, 23 RR 17; ECF 4-37, 24 RR 11; ECF 4-37, 24 RR 22; ECF 4-37, 24 RR 35. Everything about Mr. Daniel's behavior that night was out of character. Trial counsel were ineffective for not investigating what could have caused Mr. Daniel to behave in this uncharacteristic way. If they had done proper investigation, trial counsel would have discovered that Mr. Daniel's reaction was consistent with paradoxical reaction. It was critical for the jury to understand how Xanax and violence are related. Trial counsel were objectively unreasonable for not presenting this evidence to the jury through a qualified expert.

### C.    Mr. Daniel was Prejudiced by Trial Counsel's Failure to Present an Expert to Explain Paradoxical Reaction.

Mr. Daniel's toxicology report shows he had ten times the recommended dosage of Xanax in his system at the time of the incident. App. 1564. Mr. Daniel's roommate witnessed him drinking tequila in the hours before the offense. ECF 4-35, 22 RR 124, 130. Additionally, Mr. Daniel has Asian ancestry. Upjohn, the company that produces Xanax, has documented in its drug disclosure that "maximal concentrations and half-life of [Xanax] are approximately 15% and 25% higher in

Asians compared to Caucasians." App. 1318. Mr. Daniel also suffers from depression. *See* discussion in Claim V. The same disclosure warns that "[e]pisodes of hypomania and mania have been reported in association with the use of Xanax in patients with depression." App. 1323.

Had the jury heard about paradoxical reaction, there is a reasonable probability that they would have found that Mr. Daniel's behavior that night was consistent with experiencing an adverse reaction to Xanax intoxication. Additionally, the jury was likely to find that the adverse reaction was exacerbated by Mr. Daniel's use of alcohol, his Asian heritage, his depression, and the triggering effect of breaking up with his girlfriend of several years.

Instead of presenting an expert to explain paradoxical reaction, how it works, and who is likely to suffer from it, trial counsel presented Dr. Masters, an internal medical doctor, at trial. In his description of how Xanax worked, he stated "Xanax is a sedative-hypnotic. A sedative is something that we give to somebody to calm them down, to sedate them, to relax them. A hypnotic is something that puts people to sleep. Alcohol is a sedative-hypnotic. Xanax is a sedative-hypnotic." ECF 4-34, 21 RR 10. When specifically asked about the effect of Xanax on someone who has not been prescribed Xanax, Dr. Masters testified that "[t]hey are using it to get high. The high from Xanax would be similar to alcohol intoxication." *Id.* at 14. Dr. Masters hammered home this point even further during the following exchange:

> DEFENSE COUNSEL: Is it very much like alcohol intoxication, some people are quiet drunks, some people are excited drunks, or angry drunks, or ugly drunks?

> DR. MASTER: That is very accurate, yes.

*Id.* There was no testimony about the fact that some people have an adverse reaction to Xanax which causes rage and violence. Likewise, trial counsel provided no expert testimony to explain how alcohol intoxication was different than Xanax intoxication.

This omission prejudiced Mr. Daniel because the jury was left with the impression that Xanax intoxication was almost exactly the same as alcohol intoxication. Alcohol intoxication is a common phenomenon to which a jury can relate. It was only too easy for Mr. Daniel's jury to reason that they knew people who have gotten very drunk, or they themselves had gotten very drunk, and they did not act violently or bizarrely as Mr. Daniel did.

Had the jury heard from an expert who could explain how Xanax adversely affects some people, they could have used that information at both the guilt and the penalty phase. Despite the studies available in scientific journals, the drug companies have an incentive to try to make their drugs look relatively safe. App. 1212. Although these adverse side effects are published in scientific journals, a casual user would have no idea about the uncommon side effect of paradoxical reaction, nor that he may suffer from it. Had the jury heard about this effect, they could have found that Mr. Daniel was experiencing a sort of "involuntary intoxication" and factored that into their decision during the guilt phase of the trial.

Even if the jury had not found that Mr. Daniel was involuntarily intoxicated, paradoxical reaction goes directly to Mr. Daniel's future dangerousness and moral culpability. There is a reasonable probability that knowing about this effect could lead to a "no" answer for Special Issue one, or a "yes" answer to Special Issue two, either way sparing his life. Without expert testimony explaining the adverse reaction to Xanax intoxication, the jury was left with the impression that Mr. Daniel was just an "ugly drunk," completely ignoring the very real and unexpected neurological reaction he was likely experiencing. He is entitled to a new trial and penalty phase.

### D.    State Habeas Counsel Were Ineffective for Failing to Raise this Claim.

For the reasons above, Mr. Daniel's ineffective-assistance-of-trial-counsel ("IATC") claim is meritorious. This claim was not presented or adjudicated in the state habeas proceedings. To the extent the claim is deemed procedurally defaulted, the ineffective assistance of state habeas counsel

establishes cause and prejudice that overcome the default as is elaborated upon in the "Exceptions to Procedural Default" Section, *supra*. *Martinez*, 566 U.S. at 17; *Trevino*, 133 S. Ct. at 1918, 1921.

### 1. Deficient performance

Trial counsel did not consult a neuropharmacologist in order to understand the well documented adverse effect that Xanax can have, causing an otherwise peaceful person to react violently. Had trial counsel consulted the appropriate expert to understand this adverse effect, they could have called such an expert at trial to educate the jury on this adverse reaction, and the fact that Mr. Daniel was likely experiencing such a reaction when the incident occurred. Mr. Daniel was profoundly high on Xanax when he committed this crime. It is inexcusable for his lawyers not to have consulted an expert to understand how Xanax affects the brain. There is no strategy decision that can account for this failure.

Although state habeas counsel consulted an expert with a Ph.D. in Physiology to address Mr. Daniel's Xanax consumption, they did not talk to their expert about whether Mr. Daniel's Xanax consumption could have caused an adverse reaction to the Xanax. Supp. App. 1892. There is no strategy decision that accounts for this failure. Supp. App. 1892. Accordingly, state habeas counsel were ineffective for failing to conduct this investigation for the same reason trial counsel were ineffective.

### 2. Prejudice

As discussed at length in Section C, *supra*, Mr. Daniel was prejudiced by the deficient performance of trial counsel because the jury never heard that Mr. Daniel's actions that night were likely caused by his adverse reaction to Xanax. For the same reasons that Mr. Daniel was prejudiced by trial counsel's failing to investigate and present evidence about the paradoxical reaction, he was prejudiced by state habeas counsel's ineffectiveness. Mr. Daniel should receive habeas relief, conditioned on a new trial and or a new penalty phase, on this ground.

## VIII. TRIAL COUNSEL WERE INEFFECTIVE FOR ABANDONING THEIR MOTION TO SUPPRESS MR. DANIEL'S INADMISSIBLE ORAL STATEMENTS IN VIOLATION OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL, FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS, FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION, AND EIGHTH AMENDMENT RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT.

Mr. Daniel's extreme intoxication was profound and obvious from the moment he entered Walmart on April 6, 2012, around 2:00 a.m., until the end of his police interrogation, over four hours later. Earlier that night, Mr. Daniel drank tequila, smoked marijuana, and took more than ten times the therapeutic dose of Xanax. After he was detained, Mr. Daniel made a number of statements to Walmart employees and while being transported to the police station. Though still extremely intoxicated, Mr. Daniel was interrogated by detectives at the police station. Mr. Daniel's statements were used against him to establish elements of the crime in the guilt phase and to secure a death verdict in the penalty phase.

At this level of intoxication, Mr. Daniel's statements were not the voluntary product of his free will. His statements were wholly unreliable—they were inconsistent, full of holes, and inaccurate. Additionally, when he waived his *Miranda* rights, he lacked the mental capacity to do so voluntarily, knowingly, and intelligently. Under state and federal law, Mr. Daniel's statements were inadmissible against him and violated his due process rights to a fair trial. *See* U.S. Const. amend. V*;* U.S. Const. amend. VI*;* U.S. Const. amend. XIV*; Miranda v. Arizona*, 384 U.S. 436, 467 (1966); *Jackson v. Denno*, 378 U.S. 368, 376 (1964); Tex. Code Crim. Proc. art. 38.21.

Mr. Daniel's attorneys made the preliminary step of filing a motion to suppress the statements. However, they never requested a hearing to litigate the motion. At a pretrial hearing, trial counsel could have presented an expert to explain why the statements were involuntary and unreliable, and why Mr. Daniel was unable to make a knowing, intelligent, and voluntary waiver of

his *Miranda* rights. Had they done so, it is likely that the statements both before and during the interrogation would have been suppressed.

Trial counsel were also ineffective for failing to ask for jury instructions to which Mr. Daniel was entitled, informing the jurors that if they had a reasonable doubt about whether the statements were voluntary and whether they were obtained in violation of Mr. Daniel's rights, the jurors were prohibited from considering them. *See* Tex. Code Crim. Proc. art. 38.22 and 38.23; *Texas Guidelines*, Guideline 11.1(B)(2)(h); *ABA Guidelines*, Guideline 5.1 and 10.1. Counsel failed to protect Mr. Daniel's constitutional right not to have his statements used against him, an omission that was objectively unreasonable.

The admission of his involuntary, unreliable, and unlawfully obtained statements allowed the state to offer evidence that Mr. Daniel knew that Officer Padron was a police officer, an element of the offense. Furthermore, the state used his statements at the penalty phase to argue that Mr. Daniel had planned the crime, knew Officer Padron, and lacked remorse. Because the state relied heavily on the inadmissible statements in both the guilt and penalty phases of Mr. Daniel's trial to obtain a conviction for capital murder and then a death sentence, Mr. Daniel was prejudiced by his attorneys' deficient performance. Mr. Daniel met his burden under *Strickland*, 466 U.S. at 688. He is entitled to a new trial.

### A. Mr. Daniel's Incapacitating Intoxication and His Statements

#### 1. Extreme intoxication as evidenced by Mr. Daniel's behavior in Walmart

The evidence introduced at trial included evidence that trial counsel could have used to support a motion to suppress Mr. Daniel's statements. On the night of April 5, 2012, Mr. Daniel called his mother. "He sounded completely out of it," she remembers. App. 1541. Mr. Daniel "was slurring his words, talking nonsense, and [she] could hear the phone falling from his face." *Id.* At 12:32 a.m., on the morning of the offense, he sent a garbled text message to his ex-girlfriend: "All

ul know is that 100 yes. From know I'll u remember you, my dreams. But that will bs enough, just dreams. Life is pani." App. 1140.

At 1:57 a.m., Mr. Daniel pulled his motorcycle into the parking lot of the Walmart.[17] *See* Walmart Surveillance Video. Over the next twenty-five minutes, Mr. Daniel stumbled through the store, swerving through aisles, and walking into store displays. At one point he twice knocked into the same cooler, nearly toppling it. He attempted to use flimsy produce bags to hold heavy groceries, which fell to the floor, again and again, and which Mr. Daniel then abandoned. About fifteen minutes into his visit, Mr. Daniel approached a store clerk to watch his bags while he went outside to get his keys. Outside, searching for his motorcycle, he spun around and crashed into Walmart's mailbox before colliding with a flagpole. He stood at his bike for a moment before returning to the entrance, barreling into the store's brick wall on the way. When Mr. Daniel re-entered the store, Walmart employee Archie Jordy called 311 to report him as a drunken shopper, telling the operator, "We got a guy here that's drunker than Cooter Brown." *See* 311/911 Call from Walmart.

### 2. Extreme intoxication as evidenced by the toxicology reports

These signs of inebriation were borne out by Mr. Daniel's blood test. App. 1189. At 9:22 a.m., his blood level of Xanax was 160 nanograms per millileter—more than nine times the therapeutic level—an extreme level of intoxication that would have knocked most people out. At the time of the shooting, seven hours before his blood was drawn, his intoxication would have been greater still, ten times more than a therapeutic dose. App. 1564. The blood test also evidenced Mr. Daniel's recent use of marijuana.

---

[17] The fact that Mr. Daniel could still operate his motorcycle is not a reflection of his level of intoxication. Procedural memory, or recollection of previously-learned actions, is among the least affected aspects of Xanax-intoxication. App. 1735.

Xanax is prescribed to relax a person with acute anxiety disorders and panic disorders. It affects the areas of the brain involved in memory, behavioral disinhibition, and executive function (judgment, decision-making, and anticipating consequences). App. 1733-1734. In large quantities, it also impairs motor functions and a person's ability to make plans and reason. Signs of Xanax intoxication include loss of balance and coordination, lightheadedness, confusion, slurred speech, and loss of judgment. App. 1560.

Marijuana in addition to Xanax compounds memory problems and dysfunction of one's higher cognitive system. App. 1565-66. When Xanax is taken with alcohol, the effects normally seen with Xanax alone are increased. *Id.* Mr. Daniel's roommate witnessed him drinking a substantial amount of tequila in the hours before the offense. ECF 4-35, 22 RR 124, 130. By the time of Mr. Daniel's blood test, however, the alcohol had already left his bloodstream so it did not show up on the blood test, an unsurprising result. App. 1566-67.

Mr. Daniel displayed classic signs of Xanax intoxication. App. 1563. At these extreme levels, Mr. Daniel had impaired motor functions, a greatly reduced sense of caution, amnesia for events, a decreased ability to perceive his surroundings, difficulty with planning, a reduced ability to appropriately respond to external stimuli, an inability to inhibit inappropriate impulses, and an inability to reason and access cognitive functioning. App. 1573.

**B.    Mr. Daniel's Statements and How They Were Used at Trial**

Despite the fact that Mr. Daniel's statements were unreliable, involuntary, and inadmissible, the state used the statements he made during his arrest and transport to the police station, and the statement given after interrogation, throughout the guilt and penalty phase of the trial to support its contentions that Mr. Daniel planned to kill a police officer that night, that Mr. Daniel knew Officer Padron was a police officer, and that he lacked remorse.

**1.    Statements made during arrest and transportation to the police station**

Mr. Daniel was arrested at around 2:30 a.m. on April 6, 2012. At 2:39 a.m., he was seated in the back of a police car. Officer Cory Knop testified, "It [was] clear to me he [was] on some kind of depressant." ECF 4-31, 18 RR 48-49. Officer Knop also noticed that Mr. Daniel's pupils appeared large in a photograph taken at the time he was arrested. *Id.* at 47. Mr. Daniel's speech was "quite slurred and thick," and at times in the car, he curled up, lied down, or pressed "his face against the glass where he [wa]s kind of mushed up against the Plexiglas." ECF 4-32, 19 RR 48; *see also* Police Transportation Video.

Over the next hour and a half, Mr. Daniel made numerous statements on the in-car video, primarily talking incoherently to himself or asking "Mr. Officer?" over and over without receiving any response. *Id.* However, the state fixated on only a few of the statements. At 2:55 a.m., Mr. Daniel speculated, "I'll probably go away for the rest of my life." At 2:59 a.m., he said, "At least I get free food and don't have to work again." At 3:40 a.m., he asked if Officer Knop recognized him. He asked the officers at 3:42 a.m. if they were riding "two deep" because he blasted one of them. And finally, at 3:55 a.m., "You guys pissed that I capped one of your other friends? That's probably it. Well—if there's any consolation I met him before. He's a dip-shit." This assertion, that Mr. Daniel had met Officer Padron before, turned out to be false, according to Officer Christopher Kroger.[18] ECF 4-37, 24 RR 195.

### 2. Statements made during interrogation

At 4:05 a.m., Mr. Daniel was placed in an interrogation room at the Austin Police Department. See Police Interrogation Video. Detective Robinson read Mr. Daniel his *Miranda* warnings at 4:16 a.m. *Id.* Almost immediately after, at 4:17, Mr. Daniel told the detective, "Umm, I

---

[18] The state implied that Officer Padron had met Mr. Daniel during a prior investigation of an abandoned car. Officer Kroger, who was also present during that investigation, said that Mr. Daniel was not there when they investigated the car.

was drinking at home and I had taken some drugs." *Id.* He said he had taken "four bars" of Xanax but testimony later suggested that he had taken at least six and as many as ten. *Compare* ECF 4-35, 22 RR 125, *with* ECF 4-33, 20 RR 56. His toxicology report indicates he took more than eight two-milligram bars. App. 1733.

Throughout police interrogation, Mr. Daniel's speech remained slow, slurred, and thick. Police Interrogation Video. He also told Detective Robinson that his memories for the night were, at best, incomplete. *Id.* Mr. Daniel told Detective Robinson that parts and pieces of his memory were "missing." *Id.* He said "[e]verything is more just blurry." *Id.*

The state played Mr. Daniel's entire interrogation during the trial. *Id.* He made several inaccurate and contradictory statements. When asked what time he arrived at the Walmart, he said, "It's hard to recall. 8:00 or 8:30," and confirmed that it had just gotten dark when he arrived. *Id.* However, the surveillance video showed that Mr. Daniel arrived at 1:57 a.m. Mr. Daniel had lost six hours of memory. He asked Detective Robinson, "What time is it here in Austin?" *Id.* When she informed him that it was after 4:00 a.m., he replied, "Seems like it's 11:00," and told her it was "more just hard to keep track" of the time. *Id.* When asked for his phone number, Mr. Daniel could not remember it. He estimated that he had spent ten minutes in Walmart, whereas the actual time was around thirty minutes. *Compare* Police Interrogation Video *with* Walmart Surveillance Video. He did not remember exiting and re-entering the Walmart. State's Exhibit 59. Mr. Daniel was also confused about the amount of money he brought to Walmart. He said, "I had enough for what I was going to plan on buying." *Id.* Later, though, Mr. Daniel told Detective Fugitt he had "Like $1 in my pocket." *Id.* In actuality, Mr. Daniel had $11. ECF 4-32, 19 RR 44. In spite of these obvious signs of Mr. Daniel's incapacitation, the interrogation continued.

Mr. Daniel's recollection of the shooting itself was inaccurate in several significant aspects. Mr. Daniel described himself in a standing position, facing Officer Padron, stating he had "pulled

[the gun] up directly to his face," and shot him "[s]quare in the face." *Id.* He even physically demonstrated his standing and shooting position for the detective. *Id.* Detective Robinson asked Mr. Daniel how many times he had fired the gun, and he responded, "One." *Id.* Mr. Daniel agreed with Detective Fugitt that he had been standing when he fired one shot. *Id.* He recounted, "And then the other officers tackled me and it was over." He believed that one of the people to tackle him, after he fired one shot, was wearing a blue jumpsuit. Mr. Daniel said, "The gun, I must have dropped it right after I shot him." *Id.* At other times he stated that "two or three people" tackled him, and yet another time he said "there were at least four guys and they were all on top of me." *Id.*

The video told a completely different story. Mr. Daniel was tackled by Officer Padron alone, from behind, *before* any shots were fired. *See* Wallmart Surveillance Video. He never pointed a gun at Officer Padron's face. There were three shots fired, one that struck Officer Padron's neck, and all while Mr. Daniel and Officer Padron were both lying on the floor, entangled, not while they were standing as Mr. Daniel recounted. *Id.* There was no one wearing a blue jumpsuit, and there were only two Walmart employees present, neither of whom tackled Mr. Daniel. *Id.* A Walmart employee kicked the gun out of Mr. Daniel's hand. *Id.*

During the interrogation, Mr. Daniel was also asked on several occasions if he knew Officer Padron was a police officer *before* the shooting to which he answered yes. *Id.* He was also asked why he brought a gun to the Walmart that night and answered "just in case an altercation happened." *Id.* However, there is no reason to believe that these statements, statements that go to the heart of the state's case, are any more reliable than the other clearly erroneous statements.

### 3.   How the statements were used at trial

#### i.   Guilt phase

On the first day of trial, in its opening statements, the state announced its intention to use Mr. Daniel's statement against him: "You will see an interview of Mr. Daniel conducted at the

Austin Police Department where he indicated to detectives, I saw his face and I shot him. I knew he was a police officer." ECF 4-31, 18 RR 11.

True to its word, throughout the trial, the state used Mr. Daniel's involuntary and unlawfully obtained statements against him, and trial counsel failed to lodge any objection. The state's second witness, Lincoln LeMere, testified that Mr. Daniel, after shooting Officer Padron and passing out, looked at Officer Padron, laughed, and said, "I killed a cop." ECF 4-31, 18 RR 64. On the second day of trial, the state introduced and published to the jury the in-car video with Mr. Daniel's intoxicated and often incoherent mumblings, complete with subtitles. ECF 4-32, 19 RR 39; Police Transport Video. Multiple witnesses also testified that Mr. Daniel said he had killed a police officer. *See, e.g.*, ECF 4-32, 19 RR 98 (Detective Nelson testifying that Mr. Daniel said "I guess I got that cop's blood on my hands"); *see also* ECF 4-32, 19 RR 113 (Detective Robinson testifying that the first statement she heard Mr. Daniel make as he entered the police department was, "I killed a cop").

The importance of Mr. Daniel's statements to the state's case was highlighted in closing arguments. As the state rightly pointed out, "The video does not show him actually pulling the trigger." ECF 4-34, 21 RR 56. The state used Mr. Daniel's statements about why he brought a gun that night to show that he entered the store with the intent to kill, arguing that Mr. Daniel "went to the Walmart with the expectation that someone may have confronted him when he went shoplifting." ECF 4-34, 21 RR 60-61.

The state also relied almost exclusively on Mr. Daniel's statements to show that Mr. Daniel knew Officer Padron was a police officer at the time he shot him, an element the state had to prove in order to establish capital murder. After improperly stating that defense attorneys were not convinced Mr. Daniel knew he shot a police officer, *see* Claim XII, the state argued that "Brandon Daniel is convinced that Brandon Daniel knew. We're going to look at all the different

times he kept insisting that he knew, that he knew, that he knew." ECF 4-34, 21 RR 65.

Throughout its argument, the state laboriously recited and paraphrased the portions of Mr.

Daniel's interrogation that supported its theory:

> He talks about . . . on the way out a cop saw me and I panicked and then I pulled my gun out and shot him. He said the cop saw me. Then he says, when I walked out, I saw one officer and one plainly clothed loss prevention associate, making the distinction.
> . . .
> Then he talks about what the officer said. The officer said, will you please step next to me, will you please follow me. This is what he is saying.
> . . .
> Brandon Daniel says, he grabbed me, I turned around, I saw his face, then I shot him. He doesn't say, no, no, it wasn't the officer, it was a Walmart security person in a blue jumpsuit. He said, all I saw was one officer who was down and that one officer who I shot was down.
> . . .
> He's talking about them yelling out, police, it's the police. He says this over and over again. And then he talks about turns and ran and the officer saying, I'm a cop. All of this is right there in his interview when he is talking.

ECF 4-34, 21 RR 65-68.

In its final minutes of closing arguments, the state suggested that Mr. Daniel knew Officer

Padron before their encounter at Walmart. The state based this argument on Mr. Daniel's drug-

infused interrogation statement: "He doesn't say wife and kids. Isn't that odd? He just said this

officer who has kids. Doesn't say a kid or a child. Kids, like at least two." *Id.* at 67. The state

connected this statement to the in-car video from the police car:

> He asked, are you guys pissed that I capped one of your other friends? . . . He says, well, if there's any consolation, I've met him before, talking about Jaime Padron, and he calls him a dip shit. He said this dip shit who he has met before he is glad he is dead.

*Id.* at 71-72 (quoting from Police Transportation Video). The state's suggestion that Officer

Padron had met Mr. Daniel before, as it turns out, was a misrepresentation, based on testimony

that came out at the penalty phase. ECF 4-37, 24 RR 195. But by the time the truth came out, the

damage had already been done. Mr. Daniel had been convicted of capital murder.

After the defense's closing arguments, the state reiterated, "That man right there [Mr. Daniel] knew Jaime Padron was a police officer. As [prosecutor] Mr. Cobb pointed out, he said it again and again and again." *Id.* at 93.

### ii.  Penalty phase

During the penalty phase, the state relied heavily on Mr. Daniel's statements in its closing arguments to suggest that Mr. Daniel lacked remorse, that life in prison was an insufficient punishment, and that Mr. Daniel was proud of killing a police officer. First, the state used Mr. Daniel's police interrogation statements to paint the picture that he had planned to shoot a police officer. It recounted, "He said he took his gun there in case someone tried to stop him. . . . That was going to be a gunfight[.]" ECF 4-39, 26 RR 186-87. Then, the state argued that Mr. Daniel had not shown remorse, arguing:

> He didn't get sad. . . . First thing he said when he laid on that floor[,] I killed a cop. Ha, ha, ha. . . . And then in the car you hear him say, I killed a cop. He gets to the police station and says, I killed a cop. He was telling everybody who was listing [sic], not being sad about it, but just says, I killed a cop.

*Id.* at 188. Finally, the state argued that Mr. Daniel's statements in the back of the police car showed that prison would not be punishment enough for him. "What was it he said in the car? This is after he had killed a police officer and is being driven to the police station. He says, I guess I don't have to work anymore. Somebody else is going to pay for my food." The state ended its discussion of Mr. Daniel's statements by recapping the most inflammatory examples: "He says to those officers, are you guys pissed that I capped one of your other friends? So we call that not remorse, but we call that bragging about what you have done. . . . [H]e calls the officer a dipshit and says, I'm glad he's dead. He's never stopped being glad he's dead." *Id.* at 210-11.

Mr. Daniel's trial attorneys did not seek to suppress the inadmissible statements. They did not object. And the jury returned a death sentence.

### C.  Mr. Daniel's Statements Were Inadmissible.

Mr. Daniel's statements were unreliable. As described above, what he recounted to the detectives when being interrogated did not match reality. Aside from being unreliable, Mr. Daniel's statements were inadmissible under multiple legal theories, all of which trial counsel should have employed to prevent their admission in evidence. First, Texas Code of Criminal Procedure Article 38.22, the Texas "Confession Statute," prohibits any involuntary statement made by a defendant from admission against him at trial. All of Mr. Daniel's statements were inadmissible under article 38.22. Additionally, Mr. Daniel's confession was involuntary and in violation of his due process rights. Finally, Mr. Daniel's interrogation violated his constitutional privilege against self-incrimination because Mr. Daniel was unable to voluntarily, intelligently, and knowingly waive his *Miranda* rights.

Taking into account the totality of the circumstances, Mr. Daniel's severe intoxication prevented him from making voluntary statements. Texas Code of Criminal Procedure Article 38.22 provides greater protection to defendants than the federal constitutional standard for the admission of a defendant's statements at trial. Whereas the protections of *Miranda* and due process are only invoked during custodial interrogation, Article 38.22 applies to "all cases where a question is raised as to the voluntariness of a statement of an accused." *State v. Terrazas*, 4 S.W.3d 720, 727 (Tex. Crim. App. 1999).

Any statement of an accused must be shown to be "freely and voluntarily made without compulsion or persuasion" in order to be admitted against him at trial. Tex. Code Crim. Proc. art. 38.21. While intoxication is relevant to the determination of the voluntariness of a statement, it is not *per se* determinative of this issue. *Jones v. State*, 944 S.W.2d 642, 651 (Tex. Crim. App. 1996). Instead, the question becomes whether the defendant's intoxication rendered him incapable of making an independent, informed decision, making the statement involuntary. *Id.* at 651.

It is indisputable that Mr. Daniel was severely intoxicated. This deprived him of his faculties, preventing him from being able to reason, inhibit his actions, and understand the implications and the consequences of his actions and words. App. 1573. Mr. Daniel's statements, both during and before his custodial interrogation, were not voluntary, their admission violated Article 38.22, and they should have been suppressed.

Moreover, because the totality of the circumstances was unchanged from the time of Mr. Daniel's arrest until his custodial interrogation, the same considerations apply to his police interrogation and confession. A confession is only voluntary if it is "the product of an essentially free and unconstrained choice by its maker." *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961). For the reasons stated above, his confession was not the product of an independent, informed decision of free will. Consequently, Mr. Daniel's confession was taken in violation of his right to due process, and its admission against him deprived him of the right to a fair trial. "It is axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession." *Jackson*, 378 U.S. at 376.

Additionally, Mr. Daniel's statements made during his custodial interrogation were required to comply with *Miranda*. 384 U.S. at 467. Though Mr. Daniel said the words agreeing to waive his Fifth and Sixth Amendment, or *Miranda*, rights, his intoxication prevented him from knowingly, intelligently, and voluntarily waiving them. The overwhelming influence of the intoxicants Mr. Daniel took prevented him from making conscious and rational decisions. He could not anticipate or appreciate the consequences of his choices — in effect, they were not choices, they were meaningless strings of words. App. 1726. Though not every violation of *Miranda* results in inadmissible statements, when the admission of the evidence under the circumstance would frustrate *Miranda*'s central concern and objectives, exclusion of the statements is proper. *Martinez v.*

*State*, 272 S.W.3d 615, 624 (Tex. Crim. App. 2008). In Mr. Daniel's case, the admission of his interrogation statements frustrated the purpose of the *Miranda* rule. Exclusion of the interrogation statements was warranted.

Finally, Mr. Daniel was entitled to a jury instruction "that unless the jury believes beyond a reasonable doubt that the statement was voluntarily made, the jury shall not consider such statement for any purpose nor any evidence obtained as a result thereof." Tex. Code Crim. Proc. art. 38.22. Moreover, regarding Mr. Daniel's police interrogation, he was entitled to an instruction that if the jury "believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained." *Id.* at art. 38.23. *see also Oursbourn v. State*, 259 S.W.3d 159, (Tex. Crim. App. 2008) (because defendant claimed that he was bipolar and in a depressed or manic state and therefore unable to waive his Miranda rights, the issue of voluntariness was raised sufficiently that a voluntariness instruction should have been given.) Mr. Daniel was entitled to these jury instructions but did not receive them because his lawyers never asked for them.

### D. Trial Counsel's Abandonment of Their Motion to Suppress Mr. Daniel's Inadmissible Statements Constitutes Deficient Performance.

On April 9, 2012, trial counsel filed two motions: a Motion to Suppress Oral Statements and Defendant's Request for Notice of Intent to Offer Statements Allegedly Made by the Defendant. CR at 24-27, 30-32. At a pretrial hearing on December 10, 2012, and again on August 6, 2013, the court offered to rule on defense's pretrial motions, but counsel did not request a ruling or a hearing on the Motion to Suppress. ECF 4-16, 3 RR 8, 14-15; ECF 4-17, 4 RR 4, 6, 12. On December 30, 2013, the trial court asked if there was anything that needed to be decided before trial, but trial counsel yet again failed to raise the unconstitutionality of Mr. Daniel's statements. ECF 4-18, 5 RR 4-10. Before the trial began, on January 17, 2014, the state included one of Mr.

Daniel's statements from the police in-car video on the state's Notice of Intent to Introduce Evidence of Extraneous Conduct. Counsel again did nothing.

Counsel knew about, and presented evidence of, Mr. Daniel's extreme intoxication. Yet trial counsel failed in a fundamental way—they failed to follow through on their motion by arguing that there was a critical link between the intoxication and Mr. Daniel's ability to make voluntary statements or waive his *Miranda* rights. Reasonable counsel would have sought to preclude the State from using the statements on the basis of his intoxication, and would have sought the assistance of an expert who would have explored the neurological effect of Mr. Daniel's intoxication.

In the affidavits they prepared for the state habeas proceedings, trial counsel stated that they did not try to suppress Mr. Daniel's statements because there did not appear to be a legal basis for their suppression, and because they wanted to use the statements as evidence of extreme intoxication. App. 1429; 1435. Not only was counsel wrong about there being no legal basis for suppression, as discussed at length above, the very fact that Mr. Daniel was extremely intoxicated provided the foundation for the argument that the statements should be suppressed. Additionally, the toxicology report, the eyewitness testimony of Kelvin Davis, and the Walmart video provided ample evidence of extreme intoxication without the use of Mr. Daniel's statements. There was no defense strategy that was improved by allowing the admission of Mr. Daniel's inflammatory statements in evidence. They only prejudiced him, which is exactly why the state used them against him over and over again.

If counsel had sought a hearing, the burden would have been on the state to prove the voluntariness of the statements by a preponderance of the evidence. *United States v. Reynolds*, 367 F.3d 294, 297-98 (5th Cir. 2004). And, if counsel had sought a hearing and ruling, the trial court would have found the statements to be inadmissible. At a hearing, a neuropharmacologist could

have explained why Mr. Daniel's statements were unreliable.[19]App. 1726-1739.  Due to the amnesic

effect of the drug, Mr. Daniel's memory of events surrounding the crime was impaired. He was

unable to form new memories while he was so intoxicated. App. 1735. Individuals with such

impaired memory often try to "fill in the gaps," or confabulate. Confabulation is the brain's

involuntary way of fabricating imaginary experiences to compensate for gaps in a person's memory.

App 1734. Confabulations are false memories –untruths which are not intentional lies but which do

not correspond with objective reality. *Id.* Mr. Daniel was confabulating throughout his statements.

In effect, Mr. Daniel's confession was an unintentional "drug-assisted interview," a

technique that was at one time deliberately employed by law enforcement where an officer used a

GABA agonist drug, also known as "truth serum," to facilitate the interview.  App. 1734. The

Central Intelligence Agency has rejected the use of drug-assisted interviews because "even under the

conditions most favorable to the interrogator, output will be contaminated by fantasy, distortion,

and untruth … No such magic brew as the popular notion of truth serum exists. " App. 1734-1735.

The state cherry-picked certain statements from Mr. Daniel that were convenient to them

to establish that he knew Officer Padron was a police officer, to show that Mr. Daniel intended to

shoot someone that night, and to show his lack of remorse. The state ignored the statements that

were clearly inaccurate. *However, there is no reason to believe that the statements the state relied on to make their

case were any more accurate than the statements that are demonstrably wrong.* An expert could have explained

that because of the confabulation, there is no reason to believe that *any* of the statements were

reliable, as they were all coming from the same place—Mr. Daniel's drug-addled brain. *Id.*

The state attempted to address the reliability of Mr. Daniel's statements during trial by

eliciting Detective Robinson's thoughts on whether Mr. Daniel seemed to understand what he was

---

[19] Neuropharmacology is the study of how drugs affect the nervous system.

saying and what he was doing. ECF 4-32, 19 RR 118-20. Detective Robinson had no expertise in the neurological effects of Xanax. Furthermore, she was an interested, biased witness. She was an Austin police officer, working for an arm of the state, trying to get an inculpatory statement from a person accused of killing her colleague (all things trial counsel failed to highlight in their closing argument). Her observation that Mr. Daniel seemed "pretty cognizant of not only his actions but the actions of others," *id.* at 119, and that Mr. Daniel was "very specific in details about the sequencing of events, the actions he took, and the actions others took," *id.*, were clearly wrong and contradicted by the video as discussed above. Trial counsel attempted to cross-examine Detective Robinson by simply asking if she could see that Mr. Daniel was falling and stumbling in the actual interrogation room. However, when Detective Robinson said she didn't see that or remember that, counsel displayed further ineffectiveness by moving on to a different topic rather than confronting her with the incontrovertible video evidence. ECF 4-32, 19 RR 126. At a pretrial hearing, these biased opinions of a lay witness could have been countered with expert testimony so the trial court could make an informed decision on admissibility.

As discussed above, due to his extreme intoxication and inability to access his cognitive functions, Mr. Daniel's statements were not voluntary nor was he able to knowingly, voluntarily, and intelligently waive his *Miranda* rights. At a pretrial hearing, an expert could have explained all of this to the court.

Trial counsel presented the testimony of Dr. Matthew Masters, a doctor who specialized in addiction, to explain Mr. Daniel's mental state on the night and early morning of the shooting. However, Dr. Matthews was presented during trial, after the statements had already been admitted. Although Dr. Masters briefly opined during trial on Mr. Daniel's intoxication and the reliability of his statements, the bulk of Dr. Masters's testimony was about depression and addiction. ECF 4-34, 21 RR 24-32. Dr. Matthews also admitted that he had not actually viewed the Walmart video of the

shooting. ECF 4-34, 21 RR 38. Counsel never used Dr. Masters, or any other expert, to attempt to establish the inadmissibility of the statements.

Trial counsel should have known that under state and federal law the statements were inadmissible against Mr. Daniel. They should have also known to seek a jury instruction on the voluntariness and legality of his statements. *Texas Guidelines*, Guideline 11.1(B)(2)(h). Counsel had no excuse for allowing the state to use their client's involuntary and unlawfully obtained statements to convict and sentence Mr. Daniel to death. Trial counsel's failure to protect Mr. Daniel's rights was objectively unreasonable. Consequently, trial counsel's performance was deficient.

### E. Trial Counsel's Failure to Protect Mr. Daniel from the Admission of His Involuntary and Unlawfully Obtained Statements Prejudiced Him.

Had trial counsel performed competently, Mr. Daniel's involuntary statements would have been suppressed, and both the guilt and penalty phases would have been different. There is a reasonable probability of a different outcome at his trial.

To convict Mr. Daniel, the state was required to prove beyond a reasonable doubt that Mr. Daniel knew that Officer Padron was a police officer. To prove this, the state used Mr. Daniel's own unreliable and involuntary statements. Without the statements, the state was left with the video and eyewitness testimony. A confession is the most potent evidence that the state can wield in a criminal trial. *See Miranda*, 384 U.S. at 466. Mr. Daniel's statements that he knew Officer Padron was a police officer *before* the shooting were the lynch-pin in the state's case against him, and the state treated them that way. His statements improperly established an element of the offense that the state could not otherwise prove. The state's numerous references to Mr. Daniel saying "I killed a cop" *after* the shooting only show that Mr. Daniel learned that detail *after the fact*. This is not surprising considering the numerous calls of "officer down," Archie Jordy telling the dispatcher inches away from Mr. Daniel that an officer had been shot, or the general scene

following the shooting. ECF 4-31, 18 RR 153, *see* Walmart Surveillance Video. Only Mr. Daniel's statements from the interrogation addressed his knowledge *before* the shooting.

Moreover, in convincing the jurors to sentence Mr. Daniel to death, the state relied again on his statements, discussed at length above, using the most inflammatory arguments to appeal to the jurors' emotions. Neither the surveillance video, nor the eyewitnesses, nor the victim impact testimony could tell the jurors that Mr. Daniel said he was glad that Officer Padron was dead. Or that Officer Padron was "a dipshit." These types of statements, offensive as they are, gave the jurors an emotional basis for sentencing Mr. Daniel to death.

There is a reasonable probability that absent trial counsel's constitutionally deficient neglect of Mr. Daniel's state and federal rights, the jury would have been unable to find Mr. Daniel guilty of capital murder or, at a minimum, would have been unable to sentence him to death. As a result, their deficient performance prejudiced Mr. Daniel and deprived him of the effective assistance of counsel.

###    F.    The State Court's Decision Should Not Receive AEDPA Deference.

####    1.    The state courts' adoption of the prosecution's proposed findings, combined with the state habeas court's ex parte communications with the prosecution, were unreasonable and require de novo review.

Mr. Daniel raised this claim in his Initial Application for Writ of Habeas Corpus in state court. App. 830-869. The trial court denied the state habeas application, adopting nearly verbatim the state's proposed findings of fact and conclusions of law. App. 6. The CCA affirmed, relying on the trial court's findings and conclusions. App. 3, 6. For the reasons articulated in the Standard of Review under AEDPA sections B and C *supra*, de novo review is the appropriate standard of review.

However, Mr. Daniel focuses herein on those findings and conclusions and shows that the state court decision was at best unreasonable in light of clearly established Supreme Court precedent, and in light of the state court record as explained in Standards of Review Under the AEDPA

Section A, *supra*. Finally, Mr. Daniel also argues that the CCA's determination of the facts was unreasonable in light of the evidence presented.

### 2. The State Court's Decision is an Unreasonable Application of Clearly Established Federal Law.

The CCA rejected the claim that counsel were ineffective for failing to suppress applicant's inadmissible oral statement on the ground that Mr. Daniel "failed to show by a preponderance of the evidence that his counsel's representation fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense." *Id.* Applying a look-through analysis, the CCA relied on the trial court's conclusion that Mr. Daniel failed to show that the statements were involuntary, that they were part of the *res gestae* of his arrest and therefore admissible under Art. 38.22 §5 of Texas Code of Criminal Procedure, and that the decision not to challenge the statements was objectively reasonable based on the facts and the applicable law. App. 83-84. The court found that counsel's decision not to challenge the statements was based on their determination that a motion to suppress would be meritless, and that they wanted to use the statements to show that Mr. Daniel was highly intoxicated at the time of the offense. *Id.* at 8-9. These conclusions are flawed and unreasonably applied clearly established federal law governing claims of ineffective assistance of counsel.

With the possible limited exception of the statement Mr. Daniel made while being handcuffed and apprehended, none of the statements used by the state are the *res gestae* of the crime or the offense, none were voluntary, and many of them were the result of a custodial interrogation in which Mr. Daniel was too intoxicated to knowingly waive his *Miranda* rights. In *Williams v. Great Southern Lumber Co.*, 277 U.S. 29 (1928), the Supreme Court held that an inculpatory statement made by a homicide defendant 10-15 minutes after the killing took place was not part of the *res gestae* of the crime because the crime was completed. The statement was properly excluded from evidence. *Id.* Mr. Daniel's two hour Mirandized statements which took place over an hour after Mr. Daniel was

transported to the police station likewise do not constitute the *res gestae* of his arrest. The statements that Mr. Daniel made in the back of the police car, after he had been arrested and handcuffed, searched, taken outside, and moved to a different car likewise do not constitute the *res gestae* of his arrest. All of the statements Mr. Daniel made still need to be voluntary to be admissible. None of Mr. Daniel's statements were voluntary because Mr. Daniel's intoxication rendered him incapable of making independent, informed choices about what he said.

It is unreasonable to conclude that trial counsel made a reasonable strategic decision not to challenge the voluntariness of Mr. Daniel's statements. The obligation to provide effective assistance extends to a pretrial hearing. In *Kimmelman v. Morrison*, 477 U.S. 365 (1986), the Supreme Court held that, although a criminal defendant has no right to federal habeas review of a Fourth Amendment violation (*see Stone v. Powell*, 428 U.S. 465 (1976)), a habeas court may review a claim of counsel ineffectiveness in litigating or failing to litigate a motion to suppress evidence on the basis of a Fourth Amendment violation. *Kimmelman*, 477 U.S. at 382-83. In Morrison's case, his attorney's failure to file a timely motion to suppress, based upon counsel's failure to conduct appropriate discovery, was deficient performance. *Id.* at 385-87.

The Court of Appeals for the Third Circuit applied *Kimmelman* in *Thomas v. Varner*, 428 F.3d 491, 496, 501 (3d Cir. 2005), where counsel filed a motion to suppress an identification but then withdrew it, and, because of his ignorance of the law, failed to renew it when the witness made an identification at trial. The court found counsel's conduct objectively unreasonable because the Petitioner had a colorable claim that the identification was the product of suggestion. *Id.* at 501-02; *accord Tice v. Johnson*, 647 F.3d 87 (4th Cir. 2011) (counsel ineffective for failing to investigate interrogating officer's notes, which he had in his own file, and failing to move to suppress confession on ground suggested by notes); *Owens v. United States*, 387 F.3d 607 (7th Cir. 2004) (counsel ineffective in litigating motion to suppress, making unreasonable argument that deprived

his client of Fourth Amendment standing); *United States v. Alanis*, 88 F. App'x 15, 18, 2004 WL

249594 (5th Cir. 2004) (post-conviction petitioner entitled to evidentiary hearing on counsel's

ineffectiveness for failing to investigate validity of warrantless search and move to suppress fruits);

*Joshua v. DeWitt*, 341 F.3d 430, 440-41 (6th Cir. 2003) (counsel ineffective, despite vigorous argument

in support of motion to suppress, for failing to raise valid ground for suppression).

It is not reasonable to determine that it was a sound trial strategy to forgo a motion to

suppress Mr. Daniel's involuntary statements in order to use those statements as evidence of his

intoxication. There is no defense theory that is improved with those inculpatory statements coming

in to evidence. Counsel had ample, more reliable measures to show Mr. Daniel's extreme

intoxication including witness testimony by Kelvin Davis, witness testimony of all of the Walmart

employees, the Walmart video itself, and most importantly, the toxicology report. *See* ECF 4-35, 22

RR 115, ECF 4-31, 18 RR 18-153, Walmart Surveillance Video. Mr. Daniel's statements do not add

anything to show extreme intoxication, they only detract.  They provide the State with the means to

advance arguments supporting elements of the offense that the state could otherwise not make out,

and equally important, they convey an insensitive and ugly impression. Everything trial counsel

wanted to accomplish to show intoxication could have been established without exposing the jury to

Mr. Daniel's inflammatory statements.

In *Northrop v. Trippett*, 265 F.3d 372 (6th Cir. 2001), the United States Court of Appeals for

the Sixth Circuit granted  relief under §2254(d)(1) and held that trial counsel fell below the standard

established in *Strickland* by choosing not to litigate a motion to suppress the search of appellant's bag

which contained cocaine. Trial counsel stated that it was a strategic decision not to litigate the

motion to suppress because after their investigation they did not think a motion to suppress would

be granted, and instead felt the best way to deal with the bag was to argue that it did not belong to

the defendant. *Id.* at 378. The court reasoned that "it is difficult to imagine what tactical advantage,

or cost, could justify [trial counsel's] decision to let the stop go without challenge." *Id.* at 383. The same holds true in Mr. Daniel's case: there is no tactical advantage, or cost, that justifies trial counsel's decision to let the statements go without challenge.

Mr. Daniel was severely intoxicated when he made his involuntary statements and waived his *Miranda* warnings. Those statements were used against him to establish an element of the crime in the guilt phase, an element that the state could not otherwise have established absent his words. Those statements were used to show his lack of remorse at the punishment phase, supporting the central theme of the state's penalty phase argument. A motion to suppress those statements would have been meritorious, as discussed in section C, *supra*, and there is a reasonable probability that without them Mr. Daniel would not have been convicted of the capital murder of a police officer and would not have been sentenced to death.

Trial counsel's performance fell below an objective standard of reasonableness, and Mr. Daniel was prejudiced by this deficient performance. The state court's contrary holding was an unreasonable application of *Strickland* and its progeny. *Strickland v. Washington*, 466 U.S. 668 (1984).

### 3. The State Court's Decision is an Unreasonable Determination of the Facts in Light of the Evidence Presented.

In its statement of the facts, the CCA's only reference to any statement made by Mr. Daniel was the one alleged statement made after the shooting to witness Archie Jordy, "I killed a cop." App. 2, *Ex parte Daniel* at *1. Ironically, the one statement included in the statement of facts was the only statement not written down by the detectives. ECF 4-31, 18 RR 88. Applying a look-through analysis, the trial court determined that trial counsel decided not to file a motion to suppress or have a hearing on a motion to suppress that did not have any merit, and that defense counsel used Mr. Daniel's statements to reinforce their theory that he was highly intoxicated at the time of the incident. App. 83-84.

It was an unreasonable determination of the facts to say that trial counsel did not file a motion to suppress. Trial counsel filed a "Motion to Suppress Oral Statements" on April 9, 2012. CR at 24-27. They failed, however, to request a hearing on that motion and needlessly abandoned it. *See* Section B.i., *supra*.

Furthermore, it was an unreasonable determination of the facts for the CCA to omit Mr. Daniel's entire formal statement to the detectives from its determination of the facts when the state showed the jury the entire video of the interrogation and relied on statements from the interrogation throughout the trial. The state court's ruling should not receive deference because of this unreasonable determination of the facts. For that reason and all the reasons above, Mr. Daniel should receive habeas relief on this claim.

## IX. TRIAL COUNSEL WERE INEFFECTIVE AT BOTH GUILT AND PENALTY PHASES FOR FAILING TO CHALLENGE EVIDENCE AND ARGUMENT PRESENTED BY THE STATE THAT MR. DANIEL INTENTIONALLY KILLED OFFICER PADRON, IN VIOLATION OF MR. DANIEL'S SIXTH AND EIGHTH AMENDMENT RIGHTS.

The crux of the state's case was that Mr. Daniel was a "cold-blood[ed]" killer who went to the Walmart with the intent to kill a law enforcement officer. As part of this narrative, the state presented an eyewitness, Alma Ramirez Gutierrez,[20] who testified that Mr. Daniel intentionally placed the gun to Officer Padron's neck and fired. Trial counsel failed to challenge this testimony, despite the evidence showing that the gun went off while Mr. Daniel and Officer Padron were wrestling, and that Ms. Gutierrez was looking away and could not have seen the purposeful movement to which she, alone, testified. The state also offered testimony that hollow point bullets, which were in the firearm, are designed to cause excessive damage. Trial counsel, likewise, failed to

---

[20] Ms. Gutierrez is identified during the investigation as Alma Ramirez and by the time of trial as Alma Ramirez Gutierrez. For purposes of consistency and clarity all reference in this petition will be to Ms. Gutierrez.

challenge this mistaken testimony, with evidence that the purpose of the design of such bullets is to keep the bullet from passing through the target and harming bystanders. Had defense counsel challenged the mistaken and misleading evidence that Mr. Daniel purposefully placed a gun, loaded with bullets that cause excessive damage, to a person's neck and fired, there is a reasonable probability that the jury would have evaluated the circumstances surrounding the offense differently, and would have spared Mr. Daniel's life.

> **A.** **Evidence Presented by the State That Mr. Daniel Purposefully Shot Officer Padron in the Neck, With Bullets Designed to Cause the Most Damage, Was Misleading.**

> **1.** **Alma Gutierrez's testimony was erroneous**

At trial, Ms. Gutierrez testified that, after Officer Padron tackled Mr. Daniel, she "heard a loud noise" and saw what she thought was confetti. She then "saw . . . when the gun was put to the neck of the officer and was shot again." ECF 4-31, 18 RR 119. Ms. Gutierrez was the only witness who testified that she observed Mr. Daniel intentionally place the gun under Officer Padron's neck and fire.

From the earliest moments of the investigation, however, it was apparent that Ms. Gutierrez was confused. Officer Anthony Nolen, who interviewed Ms. Gutierrez at the scene, reported that she "was very upset as [he] spoke to her and she had a hard time relaying what she observed." G.O. App. 1133. According to Officer Nolen, he "had to clarify" Ms. Gutierrez's story "several times because parts of the story did not add up." App. 1134. In fact, Officer Nolen described the statement he recorded from Ms. Gutierrez as "the best [he] could ascertain from her." App. 1134.

That statement was made in error, as the video shows that Ms. Gutierrez was looking away when the critical shot was fired and could not have seen the purposeful movement to which she testified. App. 1771–74. A careful examination of the evidence leads to the inexorable conclusion that Ms. Gutierrez turned away from the scene just prior to the gun firing, that Ms. Gutierrez did

not turn to look at the scene until she heard the first gunshot, that the first two shots were fired in rapid succession while Mr. Daniel and Officer Padron were wrestling on the ground, and that Officer Padron was shot before Ms. Gutierrez was able to return her gaze to the scene upon hearing the first gunshot.

### a. Evidence that the bullets were fired in such rapid succession

#### i. Forensic evidence

Both evidence of the bullets' trajectory and the location from where they were retrieved demonstrate that the first and second gunshots were fired in rapid succession.

The evidence shows that the two bullets traveled similar paths from left to right across Officer Padron's body. App. 1771–74. As the Medical Examiner, David Dolinak, M.D., explained, the entrance and exit wounds were consistent with the bullet traveling from left to right. ECF 4-33, 20 RR 111–114. And Detective Brett Bailey testified that he inspected Officer Padron's shirt and determined that there was a "defect in the shirt pocket that went into the shirt pocket and then exited underneath the arm," similarly suggesting that the bullet moved from left to right across Officer Padron's vest. ECF 4-32, 19 RR 73.

Moreover, there was evidence at the scene that the first and second bullets—the bullet that struck Officer Padron's vest and the fatal bullet—landed in the same vicinity. App. 1771–72. The first bullet, which struck Officer Padron's vest, entered the ceiling "just to the south" of the Styrofoam chests in which the second projectile was found. ECF 4-32, 19 RR 71. The scaled rendering offered at trial showed that the two bullets—identified on the illustration as numbers twelve and fifteen—were located right next to each other. ECF 4-41, 27 RR 21; ECF 4-32, 19 RR 72. And, as Detective William White noted in his report, the "proximity of where the fired projectile was found" suggests that it was "likely" the "two shots [were] very close together." App. 1136.

#### ii. Witness statements and video evidence

Detective Bailey reported that Detective Fugitt, who was interviewing witnesses, "advised [that] the store employees only recall hearing two shots[:] one after Officer Padron falls and one after the manager fell on top of Brandon Daniel." App. 1129; *see also* 1136 (Detective White reporting that the "employees only recalled hearing two shots. One was when Officer Padron fell on top of the suspect. The second shot was when one of the employees grabbed the suspect."). Detective White likewise reported that "[g]iven . . . the witnesses only recalled hearing two shots and that Officer Padron had been shot twice, Det[ective] Bailey and I believed it likely that the first shot they heard was likely to have been two shots very close together, both of which struck Officer Padron." App. 1136.

Lincoln LeMere, who was the Walmart employee closest to the scene and disarmed Mr. Daniel, testified that he "thought there w[ere] only two shots, the fatal shot and the one that went by [his] head" as he was disarming Mr. Daniel. ECF 4-31, 18 RR 84. Anna Nornberg, another Walmart employee, also told investigators that she only heard two shots. App. 1197. And Monica Lawson, the Walmart employee standing right next to Ms. Gutierrez, affirmed that, though she heard all three shots, the "second shot [was] right after the first one." App. 1607.

The video of the offense visually illustrates where those two shots occurred. On the video, the Walmart employees react to the sound of gunfire only twice—once right after Officer Padron and Mr. Daniel fall to the floor, *see* Walmart Surveillance Video – Slow Motion at 4:04, and once again after the Walmart employee is on top of Mr. Daniel in his efforts to disarm him, *id.* at 11:26. The video also shows that by the time the Walmart employee is on top of Mr. Daniel disarming him, Officer Padron is already shot. *id.* at 9:00. Thus, the first two bullets must have already been fired by that point. App. 1771–73.

         **b.**      **Ms. Gutierrez was looking away from the scene at the time of the offense and could not have witnessed Mr. Daniel intentionally place the gun to Officer Padron's neck.**

In the statement she gave police, unlike her trial testimony, Ms. Gutierrez acknowledged that, after Officer Padron and Mr. Daniel "went to the ground," she turned away from the scene because she "was trying not to look." App. 1148. The video corroborates that Ms. Gutierrez had turned away, showing that Ms. Gutierrez's back was to the scene beginning at 4:00, while Officer Padron and Mr. Daniel were on the floor. Again, in her statement, Gutierrez says that she turned back to look at the scene "when [she] heard a 'pop.'" App. 1148. This is also corroborated by the video which shows that, after the Walmart employees react to the first shot, as discussed above, Ms. Gutierrez begins to turn and is finally looking at the scene at 5:03. However, by the time she turns around and is looking at the scene, the Walmart employees are no longer reacting to the sound of gunfire and Officer Padron has already been shot.

The fact that Officer Padron was already shot by the time Ms. Gutierrez turned to look at the scene is further corroborated by her statement to police. She stated that when she turned to observe the scene, after being alerted to the sound of gunfire, she saw Officer Padron "lying on his left side" and Mr. Daniel "was lying more on his right side as if they were facing each other." App. 1148. As can be seen on the video, by the time Officer Padron was lying on his left side and Mr. Daniel on his right, such that they were facing each other, Officer Padron was already shot *see* Walmart Surveillance Video – Slow Motion at 7:00. The forensic evidence discussed, *supra*, showing that both bullets went from left to right across Office Padron's body and landed in the same place, also supports the conclusion that Officer Padron was already shot by the time he was lying on his left side. App. 1771–74.

Moreover, Ms. Lawson, who was standing next to Ms. Gutierrez at the time of the shooting, and who did not look away from the scene until after the shooting, affirms she never saw Mr. Daniel intentionally place the gun to Officer Padron's neck as Ms. Gutierrez testified. App. 1607. Unlike Ms. Gutierrez, Ms. Lawson watched the scene without turning away prior to the shooting. After

Officer Padron tackled Mr. Daniel, Ms. Lawson saw he had a gun "around the waist," that Officer Padron "kept trying to get the gun," and that as he was trying to get the gun, she heard two shots. ECF 4-31, 18 RR 95-96; *see also* App. 1606 (affirming that Mr. Daniel "was holding [the gun] down by his waist" and that Officer Padron was "grabbing for the gun . . . by the man's waist area" when it went off). Ms. Lawson, who was looking at the scene at the time of the shooting, affirms that she never saw "the man aim the gun at the officer or put the gun under the officer's chin." App. 1607.

Thus, Ms. Gutierrez's testimony that she watched Mr. Daniel intentionally place the gun to Officer Padron's neck and fire is mistaken.

### 2.  Witness Testimony Related to Hollow Point Bullets

Two separate witnesses testified that hollow point bullets "cause more damage" and are "branded or marketed" for that purpose. ECF 4-32, 19 RR 62–63; ECF 4-33, 20 RR 115–16. Dr. Dolinak testified that "the hollow point nature of the bullet . . . is designed so that when it hits an object that the bullet actually expands . . . creating a larger path of tissue damage" and that this "would be a selling point of a hollow point bullet." ECF 4-33, 20 RR 116. And in closing, the prosecutor argued that the gun was "loaded with hollow points, rounds of ammunition designed to cause the most damage." ECF 4-39, 26 RR 123–24. This testimony and argument supported the state's theory that Mr. Daniel went into the store that evening with the intent to kill.

However, according to forensic expert Robert Tressel, hollow point bullets are not designed "primarily to do the most damage." App. 1773–74. Rather, the primary purpose of their design is "to keep the projectile from exiting and inflicting injury to other bystanders." App. 1774. Thus, though the "collapsing or mushrooming effect will create more tissue damage" the primary purpose of the design is to "keep the projectile within its target" so that it will not cause further harm. App. 1774 (internal quotation marks omitted). For this reason, hollow point bullets are typically used for self-defense. As Mr. Tressel reports, hollow point bullets "have been [the] standard ammunition for

over four decades," and that "the vast majority of ammunition sold in the United States is jacketed or semi-jacketed hollow point bullets." App. 1774. (internal quotation marks omitted).

## B.    Deficient Performance

Trial counsel's failure to investigate the forensic and ballistics evidence was unreasonable "under prevailing professional norms." *Strickland*, 466 U.S. at 688. Reasonable attorney performance may demand consultation with experts to understand the prosecution's case and develop expert testimony to challenge it. *See Hinton v. Alabama*, 571 U.S. at 273; *Draughon v. Dretke*, 427 F.3d 286, 296 (5th Cir. 2005) (explaining that trial counsel was deficient in failing to obtain a forensic examination related to the path of the fatal bullet which 'deprived [the defendant] of a substantial argument" challenging the state's theory that he intended to kill); ABA Death Penalty Guidelines, Commentary to Guidelines 10.4, p. 108 ( "With the assistance of appropriate experts, counsel should . . . aggressively re-examine all of the government's forensic evidence, and conduct appropriate analyses of all other available forensic evidence.").

In *Draughon*, the Fifth Circuit reasoned that counsel's failure to challenge the eyewitness' testimony that the defendant shot when he was "about ten running steps" away from the victim, with forensic evidence showing that he was "from thirty to one hundred yards" away from the victim, was deficient performance. 427 F.3d at 290, 292, 296. As the court reasoned, counsel "familiar with the evidence in the case" would have understood "the centrality" of the evidence related to distance, and that counsel's decision not to retain forensic experts "deprived [the petitioner] of a substantial argument, and set up an unchallenged factual predicate for the state's main argument." *Id.* at 296.

Similarly, here, any advocate familiar with this case, and in particular the eyewitness statements and the video, would have understood that Ms. Gutierrez's testimony was integral. She was the only witness who testified that Mr. Daniel made a purposeful movement to shoot Officer

Padron in the neck. It was vital to challenge her testimony in order to challenge the state's theory of the case that Mr. Daniel intentionally shot Officer Padron in the neck. And given the "hard time" Ms. Gutierrez had "relaying what she observed," the fact that Officer Nolen "had to clarify" her story "several times because parts of the story did not add up," and the fact that Officer Nolen himself acknowledged that the story he finally recorded from Ms. Gutierrez was "the best [he] could ascertain from her," it is no wonder that Ms. Gutierrez was mistaken about what she actually saw. These statements coupled with a simple viewing of the recording, which shows Ms. Gutierrez looking away from Officer Padron and Mr. Daniel while they were wrestling on the floor, and when the first and second shots occurred, would have led competent defense counsel to carefully investigate, and to hire an expert to pinpoint exactly where Ms. Gutierrez was looking at the time the shots occurred. *Draughon*, 427 F.3d 296. Counsel had no reasonable basis for failing to do this investigation.

Moreover, defense counsel did not object when two state witnesses, who had not been qualified as ballistics experts, testified that hollow point bullets are designed to cause more damage. Had trial counsel enlisted a forensic expert to analyze the evidence from the crime scene, that expert also could have also testified that hollow point bullets are standard ammunition and are designed so as to not cause additional injury to people from potential pass through gunshots.

Nor can the failure to hire an expert be dismissed as a strategic choice, because trial counsel failed to conduct any investigation into the possibility of challenging the intentionality of the act. In fact, as Mr. Urrutia himself acknowledged, he had given up on challenging anything as to the intentionality of the offense because it "was captured on video," and, thus, "there was little question of Brandon's guilt, at the very least of murder." App. 1436. Counsel's fatalistic failure to conduct the necessary investigation to contest the state's theory of the case with readily available evidence was deficient performance.

## C.     Prejudice

Ms. Gutierrez's inaccurate testimony was profoundly damaging. She was the only witness who testified to seeing Mr. Daniel intentionally fire the gun at Officer Padron. And the state used this as a vital piece of evidence, arguing in closing that Ms. Gutierrez "saw [Mr. Daniel] hold the gun up to [Officer Padron's] neck and pull the trigger. ECF 4-34, 21 RR 56. In the state's argument about intent—that Mr. Daniel had a "conscious objective or desire as far as pulling the trigger"—the prosecutor exhorted the jury to "remember the words of the witness, the young lady who said, I saw him put the gun up to his neck and pull the trigger. It wasn't an accidental shooting. . . . It was him pointing a gun, him voluntarily pulling the trigger. That is what intentional is about." *Id.* at 59. Ms. Gutierrez's crucial testimony was the crux of the state's argument as to intent, as the prosecutor went on to argue that "a reasonable person [would] know that pulling the trigger of a gun that was pointed at someone's face would cause the result that occurred." *Id.* at 60; *see also id.* (arguing "[a]nybody with common sense knows that if you point a gun at someone's head and pull the trigger it will cause a result").

Without Ms. Gutierrez's testimony, the state's argument that Mr. Daniel intentionally placed the gun at Officer Padron's head, demonstrating his intent to kill the officer, would have been without evidentiary support. Debunking Ms. Gutierrez's mistaken testimony that Mr. Daniel purposefully shot Officer Padron in the neck at the guilt phase was vital to challenging the state's theory of the case, as to the circumstances surrounding the offense, at penalty phase. If the jury understood that Mr. Daniel, rather than meaning to kill Officer Padron, had acted rashly, while exceptionally impaired, and accidentally fired in the course of a struggle, that narrative could have mitigated the circumstances surrounding the offense during penalty phase deliberations.[21]

---

[21] Moreover, the defense was built on the theory that Mr. Daniel did not know Officer Padron was a police officer when he fired the shot. Ms. Gutierrez's testimony that Mr. Daniel had both the

There is a reasonable probability that, without the testimony, the jury would have accepted the defense theory or had a reasonable doubt about whether the state's theory was true. At the very least, had counsel demonstrated that the shooting was not intentional, at least one juror would have spared Mr. Daniel's life. Counsel's deficiency therefore prejudiced Mr. Daniel at both phases of trial.

### D. State Habeas Counsel Were Ineffective for Failing to Raise this Claim.

For the reasons above, Mr. Daniel's ineffective-assistance-of-trial-counsel claim is meritorious. This claim was not presented or adjudicated in the state habeas proceedings. To the extent the claim is deemed procedurally defaulted, the ineffective assistance of state habeas counsel establishes cause and prejudice that overcome the default. *Martinez*, 566 U.S. at 17; *Trevino*, 133 S. Ct. at 1918, 1921.

As Mr. Daniel's post-conviction counsel explained, they had no strategic reason for failing to examine the intentionality of the offense, to carefully examine the video, to hire a forensic expert, and to challenge the state's most damaging testimony related to intentionality. *See* Supp. App. 1884 and 1893. As discussed in Claim IX.A, *supra*, counsel's performance falls below reasonable standards when he fails to challenge an eyewitness' testimony, the reliability of which would be apparent were counsel familiar with the evidence in the case, and, thus, would have understood the centrality of the evidence to the state's argument. Had the jury been provided with evidence that Mr. Daniel did not intentionally place the gun at the victim's neck, there is a reasonable probability that Mr. Daniel would have received a life sentence. *See* Claim IX.B, *supra*.

---

time and the wherewithal during the struggle to intentionally place the gun to the officer's neck and fire flies in the face of the defense's argument that the shooting happened too quickly and Mr. Daniel was too impaired to recognize that he was shooting an officer. An investigation of the forensic evidence could have produced evidence that rebutted the state's case and supported the defense's theory that Mr. Daniel could not have known the person tackling him was an officer prior to the shooting.

Because Mr. Daniel's state habeas counsel failed to raise this substantial ineffective-assistance-of-trial-counsel claim, their ineffective assistance establishes cause and prejudice that overcome such procedural default under *Martinez*, 566 U.S. at 17–18, and *Trevino*, 133 S. Ct. at 1918, 1921.

X.  **COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE AND PRESENT EVIDENCE IN SUPPORT OF MR. DANIEL'S ASSERTION THAT HE CARRIED A GUN FROM "TIME TO TIME" BECAUSE OF DEATH THREATS AND THAT HE PREVIOUSLY ASSISTED POLICE IN COLORADO. MR. DANIEL WAS DENIED HIS RIGHTS TO DUE PROCESS, EFFECTIVE ASSISTANCE OF COUNSEL, AND FREEDOM FROM CRUEL AND UNUSUAL PUNISHMENT.**

During the guilt and penalty phases of Mr. Daniel's trial the state sought to portray him as a cold-blooded killer who carried a gun to Walmart with the specific intention of killing a police officer. Shortly after he was arrested, Mr. Daniel told detectives that he sometimes carried the gun because he was worried about death threats he had received. Mr. Daniel followed up by stating that he had previously worked as a confidential informant for police in Colorado. At trial, witnesses for the state testified that there was no record of Mr. Daniel ever having worked as an informant for the police. Mr. Daniel was thus portrayed to the jury as a liar, whom fabricated a past relationship with police to justify his possession of the gun and to mitigate the state's argument that Mr. Daniel hated the police. Counsel both failed to investigate Mr. Daniel's statement and were unprepared to rebut the state's inaccurate portrayal of him. Counsel were also ineffective for failing to investigate Nikki Nance and present evidence of Facebook messages between Nance state that would have supported Mr. Daniel's assertion that he had recently been threatened and was carrying the gun for this reason. Counsel were ineffective, and Mr. Daniel was denied his right to due process.

A.  **Mr. Daniel's Statements That He Worked as a Confidential Informant and Evidence Presented at Trial**

At trial, the state introduced Mr. Daniel's statement to the police. When asked if he regularly carried a gun, Mr. Daniel responded that he carried the gun "from time to time because I have

gotten threats before." Police Interrogation Video. Mr. Daniel then explained that he had worked

with police officers in Colorado as a drug informant. *Id.* Mr. Daniel said, "Yes, I brought down one

drug dealer who has been a major drug dealer for a decade…and apparently it was a pretty big bust."

*Id.* at 13. Mr. Daniel described working with police as an informant in Douglas and Larimer counties

in Colorado "for about a year and a half" and having worked for the "Larimer County Drug task

force." *Id.* at 12.

On cross-examination of Detective Fugitt, trial counsel attempted to establish that Mr.

Daniel had worked as an informant. Detective Fugitt replied that he had requested records from

Colorado but found no evidence that Mr. Daniel worked as an informant.

> He during the course of the interrogation indicated that he had worked as an informant for the Douglas County Sheriff's Office as well as the Larimer County Sheriff's Office. I contacted both agencies and requested any records or documentation that they have. The records that were obtained from Douglas County were primarily juvenile records, so they were not sent to me, they were sent to the district attorney's office. There wasn't any indication in those records that he had actually worked as a CI, which is not surprising. I don't necessarily know how they go about documenting confidential informants. **And none of the records that we obtained from Larimer County indicated that he worked as a CI.** 20 RR 17-18 (emphasis added).

The state introduced additional evidence at the penalty phase through Officer Knop that Mr.

Daniel had also previously suggested that he had been an informant when he was arrested for

driving while intoxicated in Austin. 22 RR 27. Again, neither the state nor the defense suggested that

there was any corroboration for Mr. Daniel's statement that he worked as an informant.

In arguing for a conviction for capital murder, the prosecutor told the jury that Mr. Daniel

possessed the gun because he was "foreseeing trouble with the cops." 21 RR 69. In arguing for

death, the prosecutor referred to the killing as a "cold-blooded assassination," 22 RR 183; that Mr.

Daniel "only wanted to kill the officer," *id.* at 187; and that his unfounded suggestion that he was an

informant for police was nothing more than an attempt to manipulate the system in his favor. The

prosecutor argued: "You-all remember that, how he was in the back negotiating with Officer Knop?

I used to work in Colorado as an informant. Can you do something to help me get out of this? All about helping him get out of it." *Id.* at 198. The prosecutor continued along this theme, arguing that Mr. Daniel is a person "who has always kind of mocked the police." *Id.* at 213.

**B.      Counsel Were Ineffective and Mr. Daniel was Prejudiced.**

Counsel failed to investigate and present evidence that corroborated Mr. Daniel's assertion that he had worked as an informant in Colorado and that he carried the gun when he faced death threats. Counsel also failed to investigate and present evidence that Mr. Daniel was carrying the gun at the time of the incident because he had been threatened in a drug related dispute. Had counsel investigated Mr. Daniel's claim, counsel would have learned valuable information that Mr. Daniel had in fact worked undercover as a confidential informant in Colorado. Specifically, counsel would have uncovered testimony and records concerning Mr. Daniel's time working with Detective Eric Lintz on a Drug Task Force in Colorado.  Detective Lintz would have told counsel and testified to the fact that Mr. Daniel began working with him after he was arrested for a misdemeanor offense, and that Mr. Daniel's cooperation led to multiple arrests of drug dealers. Supp. App. 1887-1888.

Mr. Daniel was prejudiced by counsel's failure to investigate. As discussed at length above, the state used Mr. Daniel's police interrogation statements to paint the  picture that he had planned to shoot a police officer, and that he was a manipulative liar, who has always "mocked" police. Counsel would have been able to rebut the state's image of Mr. Daniel by presenting evidence that Mr. Daniel had actually helped police in the past, and had previously carried the gun when he felt threatened.

Mr. Daniel was also prejudiced by counsel's failure to present this evidence in conjunction with Facebook messages between Mr. Daniel and Ms. Nance a short time before the incident, where Ms. Nance told Mr. Daniel to carry his gun because drug dealers were possibly intending to harm him. App. 1165-66. Evidence from Facebook and from Ms. Nance, coupled with evidence that Mr.

Daniel worked as an informant in drug cases, would have corroborated Mr. Daniel's statement and supported the defense's position that Mr. Daniel was carrying the gun, not with the intention of shooting a police officer, but because he felt threatened and was overcome with paranoia and depression and was attempting to self-medicate with drugs and alcohol. Instead, because of counsel's deficient performance, the jury was left with an uncorroborated statement by Mr. Daniel that made him look like a self-serving liar. Had counsel performed effectively there is a reasonable probability that the outcome at both the guilt and penalty phases would have been different. Mr. Daniel was denied his right to due process and Sixth Amendment right to effective assistance of counsel under *Strickland*.

### C. Mr. Daniel's Due Process Rights Under *Brady* Were Violated.

To the extent the state possessed information supporting Mr. Daniel's claim that he had worked as a drug informant, or that he carried the gun when he was paranoid or threatened, Mr. Daniel's rights were violated pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963); *United States v. Bagley*, 473 U.S. 667 (1985); *see also Giglio v. United States*, 405 U.S. 150 (1972). The state's *Brady* violation deprived Mr. Daniel of due process under the Sixth and Fourteenth Amendments.

### D. State Habeas Counsel Were Ineffective for Failing to Raise this Claim.

For the reasons above, Mr. Daniel's ineffective-assistance-of-trial-counsel ("IATC") claim is meritorious. This claim was not presented or adjudicated in the state habeas proceedings. To the extent the claim is deemed procedurally defaulted, the ineffective assistance of state habeas counsel establishes cause and prejudice that overcome the default as is elaborated upon in the "Exceptions to Procedural Default" Section, *supra. Martinez*, 566 U.S. at 17; *Trevino*, 133 S. Ct. at 1918, 1921.

#### 1. Deficient performance

Counsel has a duty to perform reasonable investigation or to make reasonable decisions that investigation is unnecessary. *Hinton*, 571 U.S. at 274. Neither trial counsel nor state habeas counsel

conducted an investigation in Colorado to determine whether and to what extent Mr. Daniel cooperated with law enforcement, nor did any prior counsel utilize the Facebook messages showing that Mr. Daniel was fearful that he was the target of others in the drug trade. State habeas counsel was ineffective for failing to conduct this investigation and they had no strategy reason for this failure. Supp. App. 1893. The prosecution went to great lengths to make it appear that Mr. Daniel only had a gun for violent, nefarious reasons. Investigation would have revealed that Mr. Daniel had cooperated with police and been threated, a non-violent legitimate reason why Mr. Daniel had purchased a gun. Both trial counsel and state habeas counsel were ineffective for failing to investigate and present evidence of this explanation.

### 2. Prejudice

For the same reasons presented in Section B, *supra*, discussing why Mr. Daniel was prejudiced by counsel's failure to investigate and present evidence confirming that Mr. Daniel had a reasonable non-violent explanation for purchasing a gun, Mr. Daniel was prejudiced by state habeas counsel's ineffectiveness as well. Because Mr. Daniel can establish cause and prejudice under *Martinez* and *Trevino* to overcome default, this Court's review of this claim is de novo, and Mr. Daniel should receive habeas relief on this claim conditioned on a new penalty phase.

## XI. TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO OBJECT TO INADMISSIBLE VICTIM IMPACT EVIDENCE AT THE GUILT AND PENALTY PHASES OF TRIAL, THUS DENYING MR. DANIEL DUE PROCESS, A FAIR TRIAL, AND HIS RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.

At the close of its *guilt* phase case-in-chief, the state presented Officer Padron's brother, Johnny Padron, to describe the impact that the killing had on him, the Padron family, his friends, and the community. Mr. Daniel's trial counsel failed to object to this inadmissible victim impact testimony at the guilt phase. Trial counsel were ineffective. Virtually all of Mr. Padron's testimony consisted of irrelevant, prejudicial evidence that was inadmissible at the guilt phase. The purpose of

the testimony was clear: it was victim impact testimony meant to convey the emotional impact of his death on the Padron family, friends, and the community at the guilt phase. Admission of this irrelevant, emotional testimony prejudiced Mr. Daniel. Counsel's failure to preclude the introduction of this evidence at the trial deprived Mr. Daniel of due process and his rights under the Sixth, Eighth, and Fourteenth amendments of the Constitution.

### A.    Relevant Facts

Prior to Mr. Padron's testimony, counsel were made aware that the state intended to present him as a witness at the guilt phase. Mr. Padron was not an eye-witness to the incident and given his close familial relationship to the decedent, the threat that his testimony would amount to inadmissible victim impact testimony was clear. Despite this knowledge, counsel never sought an offer of proof as to the substance of Mr. Padron's testimony, never filed a motion *in limine* to preclude his testimony at the guilt phase, failed to object to Mr. Padron's inadmissible testimony, and failed to ask for a mistrial.

At trial, Mr. Padron described in emotional detail the positive impact that Officer Padron had on his family and his community. Mr. Padron testified that his brother served as a U.S. Marine who fought in the Gulf War and then was honorably discharged with commendations as a corporal. ECF 4-33, 20 RR 169-71. Mr. Padron testified that his brother served his community as a correctional officer before joining the San Angelo Police Department, where he worked for fourteen years, earning commendations, working in a gang task force unit, and achieving the rank of detective. *Id.* at 173.

Mr. Padron also testified that Officer Padron volunteered at a middle school, where he "made a great impact" with the students, and that Officer Padron ultimately turned down a higher paying job so he could continue serving his community as a police officer. *Id.* at 176-77. Mr. Padron

testified about his brother's love for his daughters, "I didn't know a better father than him. He loved these girls tremendously." *Id.*

Mr. Padron then emotionally described his last conversation with Officer Padron, and how he learned that his brother had died. *Id.* at 177-80. He also testified about having to tell his parents, siblings, and Officer Padron's friends of his death, all of whom were devastated. *Id.* at 180-81. Mr. Padron testified that upwards of 1,700 police officers came to meet him and his family prior to the funeral and that these police officers told him that they had loved Officer Padron very much. *Id.* at 181. Trial counsel allowed all this testimony without objection.

In closing argument at the penalty phase, the prosecutor repeatedly invoked the evidence provided by Mr. Padron to impermissibly contrast Officer Padron's life to that of Mr. Daniel. ECF 4-39, 26 RR 180-189. *See also* Claim XII (describing the prosecutor's refrain that Officer Padron's death impacted society as a whole).

### B.    Trial Counsel Were Deficient.

At the guilt phase of Mr. Daniel's trial, the jury had a very specific duty: to determine whether the state proved the elements of capital murder beyond a reasonable doubt. In making this determination, the jury is meant to consider only evidence that is relevant to the fact-finding determinations before it. Mr. Padron's testimony in no way illuminated any questions concerning Mr. Daniel's intent or guilt. Mr. Padron's testimony was classic victim impact testimony.

Under Texas law, victim impact evidence is evidence that does not have "any tendency to make more or less probable the existence of any fact of consequence at the guilt stage of trial." *Miller-El v. State*, 782 S.W.2d 892, 895 (Tex. Crim. App. 1990) (en banc). As such, victim impact evidence is relevant only to the penalty phase. The Texas Court of Criminal Appeals has explained that "victim impact evidence is that which concerns the effect of the crime on the victims or their families. Victim impact evidence is generally inadmissible during the guilt phase because such

evidence does not logically enhance the likelihood of ascertaining the truth about whether the accused is guilty of the charged offense" *Davis v. State*, No. 73,458, 2002 WL 34082308, at *3 (Tex. Crim. App. Oct. 23, 2002). The CCA has stated that this is true not just of victim impact evidence, but of any evidence that goes to the character of the victim. *Id.* ("victim character evidence is not admissible during the guilt phase of the trial because it is not relevant; it does not tend to make a fact of consequence more or less likely").

Counsel were alerted on the first day of the trial that Mr. Padron would testify "on behalf of the family." This should have been a clear red flag to counsel that the state might elicit inadmissible character and background evidence from him during the guilt phase. Despite this warning, counsel took no steps to insure that the jury did not hear highly emotional and otherwise inadmissible victim-impact testimony.

In their affidavits, trial counsel stated that they did not object to the victim impact testimony because they were worried about "turning off" the jury considering Mr. Daniel was going to be found guilty anyway. App 380; App 1436. If counsel were concerned about upsetting the jury by objecting to Mr. Padron's testimony while he was on the witness stand, they could have objected to his testimony outside the presence of the jury. Counsel did not file a motion *in limine* to preclude the state from presenting inadmissible victim impact testimony. A motion *in limine* would have been litigated outside the presence of the jury. Counsel also could have asked for the state to provide an offer of proof as to the substance of Mr. Padron's testimony before he testified, also outside the presence of the jury. Counsel were on notice that Judge Kennedy preferred to argue the merits of objections outside the presence of the jury because her "Order on Counsel Conduct" which was given to counsel specifically states that "The Court will not entertain argument on the objections within the hearing of the jury." Supp. App. 1855.

Counsel had no reasonable basis for failing to preclude victim impact testimony at the guilt phase. Their failure to move to preclude Mr. Padron's inadmissible testimony constitutes deficient performance. *See, e.g., Vela v. Estelle*, 708 F.2d 954, 963-65 (5th Cir. 1983) (counsel ineffective for failing to object to good character evidence of decedent that had no bearing on any material issues in the case and its only purpose was to inflame the minds of the jury); *Lyons v. McCotter*, 770 F.2d 529, 534 (5th Cir. 1985)(counsel ineffective for failing to object to inadmissible evidence).

### C.     Mr. Daniel Was Prejudiced.

The state's presentation of Mr. Padron's victim impact testimony impermissibly shifted the jury's focus away from determining whether Mr. Daniel was guilty of capital murder based solely on the relevant and admissible evidence. Instead, the jury was invited to consider and deliberate on its justifiable sympathy for Officer Padron and his family. Mr. Padron's testimony was the last the jury heard from the state. Counsel's failure to preclude this inadmissible victim impact testimony exposed Mr. Daniel to the high risk that the jurors convicted him based on emotion rather than the evidence, thus depriving him of due process and a fair trial.

There is a reasonable probability that if trial counsel had properly objected to the victim impact evidence at the guilt phase of Mr. Daniel's trial, the state would have been precluded from presenting Mr. Padron's emotional victim impact testimony, and the outcome of Mr. Daniel's trial would have  been different. There is a reasonable probability that Mr. Padron's moving description of his brother's legacy of service to his family, his church, his community, and his country impacted the jury's decision.

Counsel's failure to preclude this inadmissible victim impact testimony also prejudiced Mr. Daniel during the penalty phase. The state emphasized Mr. Padron's testimony in its closing argument to compare the impact of Officer Padron's life to Mr. Daniel's. Contrasting the life and character of the decedent with the defendant is not a permissible sentencing factor under Texas law

or the federal constitution. In *Payne v. Tennessee*, the Supreme Court explained that comparing the character of the victim with others was outside the boundaries of what was permissible with victim impact testimony. *Payne v. Tennessee*, 501 U.S. 808, 823 (1991); see *also Mosley v. State*, 983 S.W.2d 249, 262 (Tex. Crim. App. 1998) ("When the focus of the evidence shifts from humanizing the victim and illustrating the harm caused by the defendant to measuring the worth of the victim compared to other members of society then the state exceeds the bounds of permissible testimony"); *see also* Claim XIII, Section D, *infra*.

Mr. Daniel was denied a fair punishment phase when counsel failed to preclude the prosecutor from referencing Mr. Padron's guilt phase victim impact testimony in closing arguments of the penalty phase.

### D. The State Court's Decision Should Not Receive AEDPA Deference.

#### 1. Mr. Daniel Is Entitled to De Novo Review.

Mr. Daniel raised this claim in his Initial Application. App. 881- 892. The trial court denied the state habeas application, adopting nearly verbatim the state's proposed findings of fact and conclusions of law. App. 86-88, trial court's FFCL; App.192-94, State's Proposed FFCL. The CCA affirmed, relying on the trial court's findings and conclusions. App. 3, 6. For the reasons articulated in the Standard of Review under AEDPA Sections B and C, *supra*, the state court's rulings were unreasonable and de novo review is the appropriate standard of review.

Furthermore, Mr. Daniel establishes that those findings and conclusions by the state court are at best unreasonable in light of clearly established Supreme Court precedent and the state court record as explained in Standards of Review Under the AEDPA, Section A, *supra*.

#### 2. The State Court's Decision Was an Unreasonable Application of Clearly Established Federal Law.

Where trial counsel fails to protect a capital client from irrelevant and prejudicial victim impact testimony, it is unreasonable to rule that counsel's performance was not deficient.

The state habeas court denied this claim, acknowledging that portions of Mr. Padron's testimony were inadmissible, finding trial counsel made a strategic decision "not to object to Johnny Padron's testimony because it was brief, *partly admissible*, and uncontested that [Mr. Daniel] caused the death of Jaime Padron." App. 87 (emphasis added). The state court's analysis was at best unreasonable. As discussed above, the evidence was wholly inadmissible under Texas law. It is unreasonable in light of the state court record under 28 U.S.C. § 2254(d)(2) to suggest that trial counsel made a reasonable, strategic decision to allow inadmissible, prejudicial, and lengthy testimony about the devastation caused by the victim's death. As discussed above, trial counsel did not have to make objections in front of the jury. A motion *in limine* to preclude victim impact was a safe option for trial counsel if they were worried about alienating the jury by cutting off Mr. Padron. In fact, pursuant to the trial judge's own rules, she would have preferred that. An objection at sidebar or in chambers was an obvious option for trial counsel.

In their affidavits, both attorneys, like the trial court, conceded that portions of Mr. Padron's testimony were inadmissible victim impact evidence. App. 1430 (Hunt Affidavit); 1436 (Urrutia Affidavit). The only excuses counsel give for failing to object was that the testimony was brief and they did not want to alienate the jury with an objection. These grounds are not reasonable. As discussed above, Mr. Padron's testimony was wholly improper at the guilt-innocence phase and spanned pages of the transcript, and counsel could have moved to preclude it outside the presence of the jury. Hearing from the Officer's Padron's brother gave the jury an emotional basis for finding Mr. Daniel guilty - a basis that is wholly impermissible at that stage. The Supreme Court held that "a state may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it *at the sentencing phase* evidence of the specific harm caused by the defendant." *Payne*, 501 U.S. at 825 (emphasis added). There is no state court or federal court that allows victim impact testimony or anything like it at the guilt phase.

Counsel was simply unprepared to challenge the inadmissible testimony once it started. The state court credited counsel's affidavits and found, based solely on the affidavits, that counsel's investigation was reasonable, and they made a reasonable strategic decision. App. 87-88. The excuse given by trial counsel in their affidavits is not reasonable, and the state court's acceptance of their reasoning was also unreasonable.

The court's holding is an unreasonable application of *Strickland* and its progeny. *Strickland,* 466 U.S. 668; *Hinton,* 134 S. Ct. 1081. This Court should grant a new penalty phase on these bases.

## XII. THE PROSECUTOR COMMITTED MISCONDUCT AND COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO THE STATE'S IMPROPER ARGUMENTS AT THE GUILT PHASE, WHICH IMPUGNED THE CREDIBILITY OF COUNSEL AND STRUCK AT MR. DANIEL OVER THE SHOULDER OF HIS COUNSEL, DENYING MR. DANIEL DUE PROCESS, A FAIR TRIAL AND HIS RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS.

During closing argument at the guilt stage, the prosecutor made improper comments about trial counsel that likely inflamed the passions of the jurors and led them to base their decisions on emotion rather than the relevant evidence and law. Counsel failed to object to this prosecutorial misconduct and failed to request a mistrial. Mr. Daniel was prejudiced by the prosecutor's improper arguments and was denied due process and the right to a fair trial. Furthermore, trial counsel's failure to object to the prosecutor's remarks deprived Mr. Daniel of the effective assistance of counsel. Mr. Daniel's constitutional rights under the Sixth and Fourteenth Amendments were violated. Mr. Daniel is entitled to a new trial.

### A.    Relevant Facts

In closing, the prosecutor impermissibly attacked the credibility of defense counsel. First, the prosecutor argued that counsel were unreasonable and foolish in their defense of Mr. Daniel, stating that, "The dispute is right over here [at defense counsel table], because no matter what evidence we

put on, we can't convince the defense attorneys by proof beyond a reasonable doubt." ECF 4-34, 21

RR 65.

The prosecutors continued their *ad hominem* attacks on counsel by arguing that counsel were

fabricating evidence:

> What Mr. Urrutia says to you is not evidence. . . . He has to tell you that because he has to
> make some argument to try to appease you to wonder why we are here. . . . He tried to tell
> you we are here because there is facts [sic] in dispute. We are here because in a case where
> the State seeks the death penalty it must be tried before a jury. We have to present it to you,
> not because we have any doubt, not because there is any doubt, not because any doubt
> exists, but because we have to[.] [Mr. Urrutia] doesn't want you to believe what everyone in
> this courtroom, except Mr. Urrutia, believes.

ECF 4-34, 21 RR 92-93.

### B. The Prosecutor Committed Misconduct by Impugning the Character and Credibility of Counsel and Striking Mr. Daniel "Over the Shoulder" of Counsel.

A prosecutor commits misconduct, inter alia, when he or she uses inflammatory language,

expresses a personal opinion, relies on matters outside the record, or otherwise distracts the jury

from its task of deciding the case upon the evidence. The Court of Criminal Appeals of Texas

explained "[p]ermissible jury argument is limited to four areas: 1) summation of the evidence; 2)

reasonable deductions from the evidence; 3) responses to opposing counsel's argument; and 4) plea

for law enforcement. Generally, when an argument falls outside these areas, error occurs." *Dinkins v.*

*State*, 894 S.W.2d 330, 357 (Tex. Crim. App. 1995). Comments that destroy the objectivity and

impartiality of the factfinder, infecting the trial with unfairness and causing the verdict to be the

product of emotion rather than reflective judgment, violate due process.

The prosecuting attorney in a criminal case plays a special role with heightened ethical duties.

A prosecutor:

> is the representative not of an ordinary party to a controversy, but of a sovereignty whose
> obligation to govern impartially is as compelling as its obligation to govern at all; and whose
> interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice
> shall be done. . . . But, while he may strike hard blows, he is not at liberty to strike foul ones.

It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States*, 295 U.S. 78, 88 (1935). As stated in *Darden v. Wainwright*, 477 U.S. 168 (1986), "the relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" (citing *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974).

Here, the prosecutor argued that counsel were attempting to mislead the jurors by fabricating evidence and manufacturing an illegitimate defense with the ultimate goal of diverting the jury from the truth. The argument that counsel could not be convinced of an obvious truth, was tantamount to saying that counsel's job required him to willfully ignore the truth, and the takeaway conclusion was that counsel's arguments to the jury were intrinsically not trustworthy. This impermissible argument also erroneously led the jury to believe that the judge must also know that Mr. Daniel was guilty. These inappropriate comments about counsel amounted to a strike at Mr. Daniel over the shoulders of his counsel, and so infected the trial with unfairness that the resulting conviction amounted to a denial of due process.

## C. Counsel Were Ineffective.

Counsel had no reasonable basis for failing to object to these inappropriate comments by the prosecutor. Counsel was on notice that the trial judge would sustain any objections to such comments, as she published to both sides an "Order on Counsel Conduct" which included item (9) which stated "Counsel will try the lawsuit upon the law and facts and not engage in striking at the parties through their attorney. Therefore, Counsel will not engage in insinuations, insults, or derogatory remarks regarding opposing counsel." Supp. App. 1856.

The comments by the prosecutor were designed to inflame the jury and distract it from considering counsel's credible and important arguments challenging the state's proof that Mr. Daniel was guilty of capital murder. Furthermore, by failing to object, counsel were signaling to the jury that

there was nothing wrong with the prosecutor's argument. For all the reasons addressed in this claim, the prosecutor's arguments violated Texas and federal constitutional law, and counsel were ineffective for failing to object and to request a mistrial.

### D. Mr. Daniel Was Prejudiced by Counsel's Deficient Performance.

The failure to object to the prosecution's personal attacks on counsel's veracity prejudiced Mr. Daniel and rendered his trial fundamentally unfair. The prosecutor's improper closing arguments, without any objections, were the last comments that the jurors heard before they retired to deliberate. ECF 4-34, 21 RR 93, 99.

In *Gomez v. State*, 704 S.W.2d 770, 771 (Tex. Crim. App. 1985), the CCA explained that it has "shown a special concern for final arguments that constitute uninvited and unsubstantiated accusations of improper conduct directed at a defendant's attorney." The CCA went on to explain that "the public [does] not generally understand that a defense attorney must follow an ethical obligation to undertake the defense of a person regardless of his personal opinion as to the guilt of the accused." *Id.* Citing *Boyde v. State*, 513 S.W.2d 588, 592 (Tex. Crim. App. 1974), the CCA explains the prejudicial effect of such statements on the jury: "This general misunderstanding by the public serves to contribute to the prejudicial effect of an argument by a prosecutor which strikes at a member of the bar for representing a person accused of crime." *Id.*

Counsel presented a defense at the guilt phase that Mr. Daniel, due to his intoxication, was unable to perceive that Officer Padron was a police officer, an element required for the state's charge of capital murder. While a defense attorney's credibility and integrity is important in any case, here it was crucial. Counsel Urrutia, whom the state personally accused of deceitfulness, cross-examined eleven of the state's witnesses and presented the testimony of one defense witness. Mr. Urrutia also argued on behalf of Mr. Daniel in closing arguments, summing up the defense's theory

that Mr. Daniel was unable to form the necessary intent to kill a police officer. It was critical to Mr. Daniel's guilt defense that the jurors find trial counsel to be credible.

Unfortunately, once the prosecutor attacked the truthfulness of counsel, doubt was cast over the entirety of the defense's conduct throughout the trial. As a result, trial counsel's failure to object and seek a remedy to the inflammatory closing arguments prejudiced the whole of Mr. Daniel's trial. The state's *ad hominem* attack on Mr. Daniel's trial counsel in closing arguments struck at Mr. Daniel over the shoulder of his counsel and rendered his trial fundamentally unfair. There is a reasonable probability that at least one juror's verdict would have been different had counsel objected. Mr. Daniels was denied his right to due process and a fair trial.

E.     **The State Court's Decision Should Not Receive AEDPA Deference.**

1.     **Mr. Daniel Exhausted this Claim in his State Habeas Petition**

Mr. Daniel raised these claims in his Initial Application for Writ of Habeas Corpus. App. 892-900. The trial court denied the state habeas application, adopting nearly verbatim the state's proposed findings of fact and conclusions of law. App. 6. The CCA affirmed, relying on the trial court's findings and conclusions. App. 3, 6. For the reasons articulated in the "Standard of Review under AEDPA" sections B and C *supra*, de novo review is the appropriate standard of review.

However, Mr. Daniel focuses herein on those findings and conclusions and shows that the state court decision was at best unreasonable in light of clearly established Supreme Court precedent, and in light of the state court record as explained in Standards of Review Under the AEDPA Section A, *supra*.

2.     **The State Court's Decision is an Unreasonable Application of Clearly Established Federal Law**

The Court of Criminal Appeals of Texas rejected the claim that counsel was ineffective for failing to object to the state's improper arguments at the guilt phase which struck at Mr. Daniel over the shoulder of his counsel on the ground that Mr. Daniel "failed to show by a preponderance of

the evidence that his counsel's representation fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense." *Id.*

Applying look-through analysis to the trial court's opinion, however, the trial court found that there was not ineffective assistance of counsel because trial counsel determined in their experience and judgment that the state's jury argument did not strike at applicant over the shoulder of counsel and therefore did not warrant an objection, because the state did not accuse counsel of lying, and because the state's argument merely reflected a different interpretation of the evidence. App. 88-89.

It is unreasonable to conclude that trial counsel was not ineffective. When the prosecutor stated "What Mr. Urrutia says to you is not evidence. . . . He has to tell you that because he has to make some argument to try to appease you to wonder why we are here" he was accusing defense counsel of lying. He was stating that because Mr. Urrutia is a defense attorney, he had to fabricate a defense because that was his job. These are the exact sorts of arguments that the Criminal Court of Appeals has considered reversible error. *See Gomez v. State*, 704 S.W.2d 770 (Tex. Crim. App. 1985) (prosecutor's statements that defense counsel was trying to make the jury lose sight of the fact that he was getting paid to get the defendant off the hook was reversible error); *Bell v. State*, 614 S.W.2d 122, 123 (Tex. Crim. App. 1981) (prosecutor's statements that defense counsel does not have the same duty as a prosecutor, his duty is to get his client off even if it means putting on witnesses who are lying was reversible error even with a corrective instruction).

There is no scenario, especially in a capital murder case, where the prosecutor is allowed to make ad hominem attacks on defense counsel. Moreover, there is no situation where a prosecutor is allowed to state or imply that defense counsel is less than truthful, or unable to see the truth, especially because of his role as defense counsel. This is just one of many reasons why the trial judge prohibited this conduct in her "Order on Counsel Conduct." The CCA itself recognized the

unique prejudice that comes with implying that a defense attorney is untrustworthy. Despite what trial counsel now says to explain this deficiency, this was not a mere interpretation of evidence: it was an attack directed at trial counsel personally. It was deficient performance to fail to object to these attacks, and this deficient performance prejudiced Mr. Daniel. The court's holding is an unreasonable application of *Strickland* and its progeny. Habeas relief should therefore be granted on this ground unless the state grants Mr. Daniel a new trial on guilt or innocence and penalty.

XIII.    **THE PROSECUTOR COMMITTED MISCONDUCT AND TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO THE STATE'S IMPROPER CLOSING ARGUMENTS AT THE PENALTY STAGE, DENYING MR. DANIEL DUE PROCESS, A FAIR SENTENCING, AND HIS RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.**

Prosecutorial misconduct continued into the penalty phase, where the prosecution made a series of impermissible arguments that deprived Mr. Daniel of due process and a fair trial. Counsel failed to object when the prosecutors compared the value of Officer Padron's life to that of Mr. Daniel, invoked the community's desire for a death sentence, and again struck at Mr. Daniel over the shoulder of his counsel by attacking the credibility of counsel. Additionally, the state's improper closing arguments inflamed the passions of the jury and injected arbitrary sentencing factors into the jury's deliberations. The prosecutor's misconduct deprived Mr. Daniel of due process, and trial counsel's performance was constitutionally deficient and prejudiced Mr. Daniel, entitling him to a new penalty phase.

A.    **The Prosecution Argued That Mr. Daniel's Defense Attorneys Were Not Trustworthy and Had Fabricated Evidence.**

As with his closing argument at the guilt phase, the prosecutor attacked the credibility of counsel in his penalty phase closing. This prosecutorial misconduct undercut the credibility of counsel, the reliability of the defense's evidence, and argument presented by the defense in the penalty phase on behalf of Mr. Daniel. The prosecutor's arguments served no legitimate or relevant purpose.

In closing, the prosecutor focused the jury's attention on the credibility of defense counsel, arguing that counsel personally appeared unconvinced of the state's evidence because it did not serve "their interests" and that "it appears that even at this late stage we have failed to convince the defense attorneys that their client should be appropriately punished." *Id.* at 179-80. The prosecution then continued its assault on the credibility and the reliability of counsel as a means of undermining the evidence presented on behalf of Mr. Daniel in mitigation in a series of impermissible arguments that spanned the entirety of the state's closing argument.

- "I know for the defense attorneys making a decision on the future danger issues is really easy. Just say no, send their client to prison where with his lack of impulse control he will do whatever he wants to, according to their experts. So that's an easy answer for them because it serves their interest." *Id.* at 180.

- "Remember all that stuff they told you about Xanax and there was brain damage and all that other stuff? They believe all the crazy stuff he says about falling at 18 months and bumping his head, but they don't believe him when he says, I knew what I was doing." *Id.* at 188.

- "Let's talk about what the defense attorneys knew versus what the defendant told them. You know why they are so focused on proving that he didn't know Jaime Padron before the night he killed Jaime Padron? Because it makes him look bad." *Id.* at 197.

- "They don't want to—they have been telling you that he didn't know [Officer Padron was a police officer], he didn't know it. And he told them, I knew it, I knew it. Why don't they believe that? They believe all the craziness about the brain damage and all the other crazy stuff... They don't want to admit that to you, do they?" *Id.* at 210–11.

- "[A]ll that stuff [the defense attorneys] have made up is not sufficient mitigation." *Id.* at 21.

These attacks insinuated that counsel presented evidence that was false, and implied that the defense's goals were based on self-interest and not the interest of the community. The prosecutors sought to undermine Mr. Daniel's mitigation case by illegitimately attacking counsel's credibility rather than by merely challenging the substance of the mitigation evidence itself. As discussed at length above, this method of "striking over the shoulder" is prohibited under Texas law and the United States constitution. As stated in *Darden*, 477 U.S. 168, "the relevant question is whether the

prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" (citing *Donnelly,* 416 U.S. 637); *see also* Claim XII.

### B.     Counsel Were Ineffective, and Mr. Daniel Was Prejudiced.

The impermissible attacks from the prosecutor in the guilt phase closing argument put counsel on notice that the prosecutor would likely take the same approach at the penalty phase closing argument. Still, counsel took no action to prevent the prosecutor from making these arguments. Counsel failed to move *in limine* and failed to object at the first instance of the misconduct.

 Nearing the end of the prosecution's closing, counsel finally lodged an objection in response to yet another over the shoulder strike on counsel.

> MR. COBB:  [Mr. Daniel] says, well, if there's any consolation, I met him before. They don't want to believe that he knew this officer. But their client is telling them, if they will just listen, just like he was telling them all along, I knew it was a police officer, I tried to kill the police officer— MR. HUNT: Your Honor, I object to the prosecutor striking at the defendant over the shoulders of the defense counsel. That's exactly— this type of argument is inappropriate.
>
> MR. COBB: It is not. That's exactly how the evidence showed.
>
> THE COURT: Five minutes.

*Id.* at 210. Despite objecting to this portion of the prosecutor's argument, counsel failed to insure that the court issued a ruling on his objection, and the issue was not preserved on appeal. Counsel then failed to object after the prosecution leveled several additional *ad hominem* attacks on counsel. *Id.* at 210-11, 213. Counsel's performance was deficient.

Mr. Daniel was prejudiced by counsel's failure to object to the misconduct. By undercutting the credibility of counsel, the prosecution told the jury that it could not trust the mitigating evidence that was presented on behalf of Mr. Daniel. Had counsel precluded or objected to this prosecutorial misconduct, there is a reasonable probability that Mr. Daniel's sentence would have been different. Mr. Daniel was denied due process, a fair trial, and effective assistance of counsel.

### C. The State Instructed the Jurors to Base Their Verdict On the Community's Alleged Desire for a Death Sentence.

In its closing argument at the penalty phase, the prosecution argued that a death sentence was favored by the community. This argument led the jury to consider factors beyond those which are permitted by the federal Constitution and by the Texas capital sentencing scheme. Mr. Daniel's right to due process and his rights under the Sixth and Eighth Amendments were violated. *See Sochor v. Florida*, 504 U.S. 527, 532 (1992); *Espinosa v. Florida*, 505 U.S. 1079, 1081 (1992); *Stringer v. Black*, 503 U.S. 222, 230 (1992); *Clemons v. Mississippi*, 494 U.S. 738, 748 (1990).

The prosecutor began by suggesting that the community of police officers favored a sentence of death and were counting on the jury to deliver a death sentence. The prosecutor argued, "[d]on't you know that this room could be filled to overflowing with police officers if we wanted to try to intimidate you in some way." ECF 4-39, 26 RR 192. Given that the offense concerned the murder of a police officer, invoking the notion of police widely supporting a death sentence was particularly prejudicial.

The prosecutor continued with this theme of community support for the death penalty, arguing,

> Think about what you are going to say about your burden. Because you see how many people have been in this courtroom. You know the community has a great deal of interest in what's going to happen with this case. It's not just police officers who are interested. It's people who are in the stores who are interested, people all around who are interested. . . . You have to say yes to the future danger issue. [Not] only is there not sufficient mitigating circumstance, there's not really mitigating circumstance. . . . This is about doing what's right for our community.

ECF 4-39, 26 RR 207-09.

This argument, that the community favored a death sentence for Mr. Daniel, led the jury to consider unconstitutional factors in deciding to sentence him to death. As noted, due process and the Eighth Amendment prohibit a jury from being influenced by factors beyond what is proscribed

in a state's capital sentencing scheme. The prosecutor's remarks deprived Mr. Daniel of those constitutionally protected rights.

For the same reasons, counsel were deficient for failing to object and for failing to ask for a cautionary instruction and/or a mistrial.

The message sent by the state was that death is what the community, the police, and courtroom audience demanded. Mr. Daniel was prejudiced by this impermissible argument that focused the jury's decision-making on inflammatory innuendo and facts that were not in evidence. There is a reasonable probability that the outcome would have been different had counsel objected to the state's impermissible and unconstitutional arguments.

### D.    The State Compared the Value of Officer Padron's Life to that of Mr. Daniel.

The prosecution also committed misconduct and violated Mr. Daniel's constitutional rights when it told the jury to weigh the value of Officer Padron's life against Mr. Daniel's. The state went to great lengths to list Officer Padron's achievements, heroism, and legacy, and lasting impact, ensuring that an arbitrary sentencing factor—the comparative value of Officer Padron's life—was injected into the sentencing deliberations. Counsel were ineffective for failing to object to the state's inflammatory arguments to the jury, and there is a reasonable probability of a different outcome had they effectively done so.

In closing argument, the prosecution argued:

Let's talk about what the community has lost, because you have two individuals here…Jaime Padron when he was 17 years of age signed up to serve our country in wartime…He went and survived a war in the desert, then he came back and decided he wanted to serve his community…He joined the police department and rose up through the ranks, eventually becoming a detective…And you heard about his relationship with his family, with his father and his mother, with his brother. Even to the end, he'd been in contact with his brother talking about how, I'm divorced from my wife now, but I have a new lady in my life. I'm going to bring her up next week to meet you. That's how important family and community was for him. He could have left the police department and taken a job with his brother making more money, being part of that family business, but he didn't. He loved police work. Remember how in San Angelo he went into a burning building to save two kids and

> unfortunately he didn't save the kids, then he ran back a second time into a burning building to save a police officer, a fellow officer? That's the kind of person Jaime Padron was.

ECF 4-39, 26 RR 180-82. While extolling the many attributes of Officer Padron's life as a person dedicated to community service, family service, and military service, the prosecutor contrasted the life of Mr. Daniel as that of someone who only acted in self-interest and who "all his life he's been trying to pretend that he is somebody who will follow the rules and do good in society." *Id.* at 180. The prosecutor continued its juxtaposition of the two men by arguing that Mr. Daniel allegedly wanted to rob a convenience store, fought in school, did drugs, carried a gun and a spare magazine to Walmart for the purpose of confronting a police officer, and lacked remorse. *Id.* at 183-89.

The prosecutor then explicitly spelled out that he was asking the jurors to balance Mr. Daniel's life against Officer Padron's: "So when we talk about getting balance back into our community, that's what we are talking about. Look at what we have lost. Look at what he has cost us and now he plans to profit from that." *Id.* at 189; and:

> [T]he way you answer those questions will answer a third question for all of our community[,] which is, in these circumstances, for a person who has lived the kind of life he's lived . . . **everybody will know whether you think Officer Jaime Padron's life is worth the same as this man's**.

*Id.* at 213 (emphasis added).

Finally, after the improper argument had gone on for much of the state's closing argument, trial counsel objected. *Id.* at 214. However, counsel never sought, nor received, a ruling on his objection. Nor did counsel ask that the improper argument be struck and the jurors instructed to disregard the prosecutor's invitation to weigh Mr. Daniel's life against Officer Padron's. Nor did counsel ask for a mistrial. Without obtaining a ruling, the prosecutor merely continued with his argument, and then continued, "And if that is what passes for justice in this community [sentencing Mr. Daniel to life without parole], we should tear that flag down, we should blow up this courthouse because that is wrong." *Id.*

The prosecution's argument was clearly improper. Evidence about the victim may not be offered to suggest that "defendants whose victims were assets to their community are more deserving of punishment than those whose victims are perceived to be less worthy." *Mosley v. State*, 983 S.W.2d 249, 261 (Tex. Crim. App. 1998) (citing *Payne*, 501 U.S. at 823). The Supreme Court "has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake." *Eddings v. Oklahoma*, 455 U.S. 104, 118 (1982) (O'Connor, J., concurring). Moreover, the Eighth Amendment requires that a capital defendant receive an individualized sentencing determination. *See, e.g., Lockett v. Ohio*, 438 U.S. 586 (1978). Where, as here, the state shifts the sentencing focus away from the defendant and to the victim, the Eighth Amendment is violated. Thus, the failure of Mr. Daniel's trial counsel to timely object and obtain a ruling on that objection fell below the *Strickland* threshold and violated Mr. Daniel's due process and Eighth Amendment rights. There is a reasonable probability that the outcome would have been different had counsel properly objected to this evidence.

### E. The State Committed Misconduct When it Made Improper Arguments for the Purpose of Inflaming the Passions of the Jury and Injected Arbitrary and Unconstitutional Sentencing Factors Into the Jury's Deliberations.

The prosecutor repeatedly made improper arguments that were intended to inflame the passions of the jury, denying Mr. Daniel's due process and his Eighth Amendment rights. Counsel were ineffective for failing to object, and request a mistrial and/or cautionary instructions.

While a prosecutor "may strike hard blows, he is not at liberty to strike foul ones." *Berger*, 295 U.S. at 88. Limits on prosecutorial argument are imposed by constitutional imperative. *Darden v. Wainwright*, 477 U.S. 168 (1986). A prosecutor is prohibited from using inflammatory language, relying on matters outside the record, or otherwise distracting the jury from its task of deciding the case upon the evidence. *See, e.g., Tucker v. Zant*, 724 F.2d 882, 886 (11th Cir. 1984) ("A prosecutor

may not attempt to inflame jurors faced with this awesome choice [between life and death] by playing on their passions, prejudices, and fears."); *Newlon v. Armontrout*, 885 F.2d 1328, 1335-38 (8th Cir. 1989) (prosecutorial arguments that appeal to jurors' fears are improper and require that death sentence be vacated). A sentence of death cannot stand when it results from prosecutorial comments which may mislead the jury into imposing the sentence for irrelevant or impermissible reasons. *Caldwell v. Mississippi*, 472 U.S. 320 (1985). Here, the prosecution's closing arguments were rife with attempts to inflame the passions of the jury and to have it weigh considerations that are not permitted under Texas law or the federal constitution.[22] The prosecutor impermissibly:

- Inflamed the passion of the jury by referring to the incident as a "cold blooded assassination" and also argued facts not in evidence by comparing the shooting to other hypothetical incidents: "And I know when you first heard this, if you hadn't followed it in the news before, you probably thought there will be something kind of odd or strange about the circumstance or perhaps maybe there was a shootout at a bank or something like that or some kind of chase where he was shooting back and shot the officer. I bet you never knew it was going to be just a cold-blooded assassination, which is exactly what it was, a cold-blooded assassination." ECF 4-39, 26 RR 183.

- Implied that there were other incidents of violence during Mr. Daniel's youth that had not been presented in evidence. *Id.* at 84.

- Inflamed the passion of the jury by arguing that it "seemed like what he was planning to do was turn the Walmart into a Columbine" *Id.* at 186.

- Inflamed the passions of the jury and argued facts not in evidence by speculating about Mr. Daniel's comfort in prison: "He's not concerned about prison life because he knows in prison, whereas we frown on people who kill police officers, in prison those criminals, those murderers, rapists, robbers who have fought with the police all of their life, they think that's a good thing. That's something that they would have wanted to do if they had only had the courage to do it." *Id.* at 189-90.

- Discussed his experience with handling death penalty cases and argued considerations prohibited under Texas's capital sentencing scheme to inflame the passions of the jury: "And I know how it is with death penalty cases because I handle death penalty cases, I know that jurors -- citizens have this main concern, that criminals are getting away with too much and

---

[22] Many of the examples addressed in previous subsections were inflammatory in addition to the other grounds of impropriety already address. They are incorporated here by reference.

we might be victimized. That's what you have when you are out in the community." *Id.* at 191.

- Inflamed the jury by arguing that Mr. Daniel would kill again if sentenced to life in prison, implying that it would be the jury's fault if he is sentenced to life and that the jury will face public scrutiny and media coverage for its decision. "But you send him to a life without parole and he gets his hands on some drugs and alcohol, you will see a headline, cop killer kills again." *Id.* at 203.

- Diminished Mr. Daniel's mitigation case by comparing it to other hypothetical mitigation cases, once again asking the jury to make not an individualized sentencing determination but rather one that was based on factors that are not permitted under Texas law or federal constitutional law: "Let's look at some of the issues, some of the mitigation factors that are not present. We get a lot of people up here that do really bad things because some of them have grown up in really bad households. They were sexually abused, physically abused. Maybe they have been poor and hungry all of their life. They make bad decisions because they're trying to get something that they never could have. He didn't have any of that. He had the best household." *Id.* at 205-06.

- Argued misleadingly that the mitigation was simply a bad "excuse" for the crime. *Id.* at 207.

- Inflamed the passion of jury and demanded the jury consider impermissible factors in their sentencing determination. "Think what else, if you send him to prison for life without parole, what else would go on. You knows, who pays for the price of -- pays for him to be retired at 25 and living the dream, who pays for him not to have to work anymore? We as taxpayers do. We do that. So for the rest of his life, we will pay those costs. So even after we're all dead, if he's still living in prison, okay, then you know who else will be paying that with other taxpayers? Jaime Padron's daughters. Isn't that just an odd, crazy thing to have happen? The man who murdered your father in cold blood, you will as an adult, once you start paying taxes, you will pay for his room and board as long as he lives there. You will pay for him to be able to watch TV and, as Mr. Rogers said, eat his Blue Bell ice cream. You will pay for him to be at the top of the pecking order in prison. That's just unfair." *Id.* at 209.

- Inflamed the passion of the jury by arguing that considering mitigation and arriving at a sentence of life is tantamount to the jury doing "something for (Mr. Daniel) because he wants us again to do something for him." *Id.* at 209.

- Inflamed the passion of the jury by referencing Mr. Daniel as "taking a bow for killing those two girls' daddy. For killing a man who served our country." *Id.* at 212.

- Inflamed the passions of the jury by arguing that Mr. Daniel pitted one Texas county against another in terms of the value they might place on the life of a "murdered police officer." *Id.* at 213.

- Concluded his closing by arguing that the "community" would thank the jury if it mades the "right decision" by sentencing Mr. Daniel to death rather than life. *Id.* at 214.

The prosecutor's arguments satisfy the *Darden* due process test.

**F.     Counsel Were Ineffective And Mr. Daniel Was Prejudiced.**

Counsel failed to object to any of these impermissible arguments at Mr. Daniel's sentencing. As set forth above, the prosecutor made arguments that inflamed the passion of the jury, referenced facts not in evidence, and called on the jury to consider factors that are not permitted under Texas law or the federal constitution at capital sentencing proceedings. The prosecutor's arguments prevented the jury from giving meaningful effect to mitigating evidence that may have justified imposing of a life sentence rather than a death sentence. *See Brewer v. Quarterman*, 550 U.S. 286, 289 (2007) (emphasis added); *see also Smith v. Texas*, 543 U.S. 37, 43-44 (2004); *Eddings v. Oklahoma*, 455 U.S. 104 (1982). Counsel could have no reasonable basis for failing to object to the pervasive prosecutorial misconduct at the penalty phase closing argument. Counsel's failure to object and to seek a mistrial prejudiced Mr. Daniel because there is a reasonable probability that at least one juror would otherwise have voted for life.  Mr. Daniel was denied due process and his rights under the Sixth and Eighth Amendments.

**G.     The State Court's Decision Should Not Receive AEDPA Deference.**

**1.     Mr. Daniel Exhausted this Claim in his State Habeas Petition**

This Mr. Daniel raised these claims in his Initial Application for Writ of Habeas Corpus. App. 900-912. For the reasons articulated in the Standard of Review under AEDPA, Sections B and C *supra*, Mr. Daniel argues that de novo review is the appropriate standard of review.

However, Mr. Daniel focuses herein on those findings and conclusions and shows that the state court decision was at best unreasonable in light of clearly established Supreme Court precedent, and in light of the state court record as explained in the Standards of Review Under the AEDPA, Section A, *supra*.

**2.     The State Court's Decision is an Unreasonable Application of Clearly Established Federal Law**

Applying look-through analysis to the trial court's opinion, the trial court found that there was no ineffective assistance of counsel because the state's arguments were not improper and therefore not worthy of objection, because the state's arguments were proper rebuttal to defense counsel's arguments that Mr. Daniel did not constitute a future danger to society, and because when looked at as a whole, defense counsel's representation did not fall below an objective standard of reasonableness. App. 89-90.

It was unreasonable to conclude that the prosecutor's arguments were proper jury arguments and did not warrant an objection. In *Shurn v. Delo*, 177 F.3d 662 (8th Cir. 1999), the United States Court of Appeals for the Eighth Circuit granted habeas relief and held that petitioner was entitled to a new penalty hearing because the prosecutor made improper arguments in the penalty phase that violated petitioner's right to due process. The improper arguments cited included, among other things, that it was improper for the prosecutor to (1) "emphasize [the prosecutor's] position of authority as prosecuting attorney;" (2) "attempt[ ] to link [the defendant] with several known mass murderers;" and (3) appeal to the juror's personal fears and emotions." *Id.* at 666. Yet in Mr. Daniel's case, trial counsel allowed these very same statements without objection.

Just as in *Shurn*, the prosecutor in Mr. Daniel's case emphasized his position of authority as prosecuting attorney when stating "And I know how it is with death penalty cases because I handle death penalty cases, I know that jurors -- citizens have this main concern, that criminals are getting away with too much and we might be victimized. That's what you have when you are out in the community". ECF 4-39, 26 RR 191. Just as in *Shurn*, the prosecutor attempted to link the defendant with mass murders when he stated that "seemed like what he was planning to do was turn the Walmart into a Columbine." *Id.* at 186. And just like in *Shurn*, the prosecutor appealed to the jurors' personal fears and emotions in all of his improper statements, including stating "But you send him

to a life without parole and he gets his hands on some drugs and alcohol, you will see a headline, cop killer kills again." *Id.* at 203

These examples, along with all of the examples included above, served no purpose other than to inflame the passions of the jurors. They did not address future dangerousness, they did not reflect upon the evidence that was presented, and they only served to enrage the jurors. It was deficient performance to fail to object to these attacks, as these objections would have been sustained and the statements would have been stricken.  This deficient performance prejudiced Mr. Daniel because there is a reasonable probability that Mr. Daniel would not have been sentenced to death had these inflammatory statements been kept out.  The court's holding is an unreasonable application of *Strickland* and its progeny. *Strickland v. Washington*, 466 U.S. 668 (1984).

For all these reasons, Mr. Daniel should receive habeas relief.

## XIV.  MR DANIEL'S RIGHTS TO DUE PROCESS AND TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED WHEN THE STATE OBTAINED A DEATH SENTENCE THROUGH THE KNOWING USE OF FALSE EVIDENCE. TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE AND PRESENT EVIDENCE TO REBUT THE STATE'S FALSE EVIDENCE.

The state violated Mr. Daniel's right to due process when it used false and misleading evidence to secure a death sentence against him. *See* U.S. Const. amend. XIV; *Napue v. Illinois*, 360 U.S. 264 (1959); *Johnson v. Mississippi*, 486 U.S. 578, 585 (1988); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). Alternatively, counsel was ineffective for failing to expose the state's many falsehoods. *See* U.S. Const. amend. VI & VIII; *Strickland v. Washington*, 466 U.S. 668 (1984).

First, the state presented false testimony that minimized security precautions taken by the prison system to manage individuals sentenced to life without parole. Second, it gave the jury the false impression that Mr. Daniel was writing down names of correctional officers while in jail to either injure them or escape. Third, it offered false testimony through Louis Escalante that Mr. Daniel had concocted a plan to escape by shooting up the courthouse. The state used this false

testimony to portray Mr. Daniel as someone who was more likely to be a future danger by posing a risk in the prison system and to argue that mitigating circumstances did not exist. Because the state violated Mr. Daniel's due process rights by relying on false testimony to obtain a death sentence, he is entitled to a new penalty phase. *See Napue*, 360 U.S. at 269.

Mr. Daniel's right to effective counsel was also violated when his lawyers failed to rebut the state's false evidence regarding prison classifications and failed to explain why Mr. Daniel took note of the names of the correctional officers. *See* U.S. Const. amend. VI, XIV; *Strickland v. Washington*, 466 U.S. 668 (1984), *Hinton v. Alabama*, 571 U.S. 263 (2014); *Rompilla v. Beard*, 545 U.S. 374 (2005).

### A.      The Presentation of False Testimony Violates Due Process of Law.

A defendant's right to due process under the Fourteenth Amendment includes protection against the state using false evidence, either at the guilt or penalty phase of trial. *Mooney v. Holohan*, 294 U.S. 103, 112 (1935). If the prosecution improperly informs the jury that the false testimony was accurate or relies on it during argument, a due process violation is more likely to result. *See Banks v. Dretke*, 540 U.S. 668, 681 (2004); *Beltran v. Cockrell*, 294 F.3d 730, 735 (5th Cir. 2002); *United States v. Sanfilippo*, 564 F.2d 176, 178 (5th Cir. 1977).

The state has a duty to correct testimony that it knows to be false, and a defendant's due process rights are violated if the prosecution "allows [false evidence] to go uncorrected when it appears." *Napue*, 360 U.S. at 269.

The false testimony must be material to constitute a due process violation. Evidence is material "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103. This standard is lower than the familiar *Brady* materiality standard of "reasonable probability."

### B.      False Testimony Regarding the Prison System

#### 1.      The State presented false testimony regarding the prison system.

The state presented false testimony during the penalty phase regarding Mr. Daniel's pending incarceration in the TDCJ. Specifically, Mr. Stephen Rogers, who was retained by the state as an expert witness regarding TDCJ testified falsely in three respects: (1) he incorrectly testified that correctional officers are unaware of which offenders have life without parole sentences; and (2) he under-represented the restrictions that are placed on inmates sentenced to life without parole in TDCJ. App. 1199. The state relied on this false testimony to secure a death sentence against Mr. Daniel, and the misleading nature of this testimony results in a reasonable likelihood that the false testimony could have affected the judgment of the jury and Mr. Daniel would not have been sentenced him to death had the jury known the truth.

>    a.    **The State presented false testimony that correctional officers do not know which inmates are serving life without parole sentences.**

During Mr. Rogers's testimony, the state asked whether correctional officers would know that an inmate is serving a life without parole sentence:

> Q: So do the guards even know what a person is in prison for? Like with that G3,[23] do they know that that person is in there for life without parole?
> A: No, sir.
> Q: Would [correctional officers] know that that person might be [in a TDCJ unit] for killing a police officer?
> A: These officers look at offenders as these guys wear white, they're in here for— they've been found guilty of a felony, they're in prison. There's no sign on the offender. There's no public announcement that, hey, this guy is a—he's a credit card abuser, this guy is a killer. Unless the offender tells them or officers may come from this area and they have read it in the newspaper or something; otherwise, there's nothing written on the offender or there's nothing delineated to say, hey, this guy is a life without parole and here's what he did to get in there.

ECF 4-36, 23 RR 136-37.

---

[23] TDCJ inmates are classified into various groups, based on a number of criteria, from G1, the least restrictive custody housing, to G5, the most restrictive. There are other classifications available in some circumstances, including administrative segregation and death row. G3 is the lowest custody level that a person sentenced to life without parole can receive.

Mr. Rogers's testimony that correctional officers are unaware of whether an inmate is serving a sentence of life without parole was unequivocally false. TDCJ has a specific policy designed to ensure that correctional officers are aware of inmates serving life without parole sentences. TDCJ's Administrative Directive AD-04.11 (rev. 4), which was applicable at the time of Mr. Daniel's trial, describes the mandatory process of recording which inmates are serving life without parole sentences and establishes protocols for ensuring that correctional officers are notified when coming into contact with those inmates. App. 1200-02. The Directive identifies a code, "Security Precaution Designator," that is used for inmates who may pose special management issues for TDCJ. *Id.* An inmate serving a life without parole sentence receives that designator, which is referred to in TDCJ records as "SPD LWOP." App. 1200-01

The Directive also describes the process for documenting the SPD LWOP label in the inmate's records and protocol for notifying the staff of that designation. It instructs TDCJ employees that "[s]ecurity supervisors shall ensure correctional officers are aware of each offender with a recorded SPD who is assigned at the correctional officer's duty post." App. 1201-02. To ensure that correctional officers are aware of which inmates have received SPD's, those designations appear on a number of documents that correctional officers have daily access to, including rosters of inmates on cell blocks and inmates moving within the facility. *Id.* There are multiple, daily reminders for correctional officers which inmates are serving life without parole sentences. Mr. Rogers's testimony was false.

> **b.** **The State presented false testimony by under-representing the restrictions that are placed on inmates sentenced to life without parole in TDCJ.**

Mr. Rogers misled the jury about the restrictions that are placed on G3 level inmates, which is the lowest classification level that a person sentenced to life without parole can receive. Mr. Rogers testified about the conditions for inmates without parole, stating that it was "pretty much

178

[like] general population" and that, except for a prohibition working on maintenance without prior approval from the warden, LWOP prisoners "get[] the same privileges as everybody else." ECF 4-36, 23 RR 155-57.

In fact, TDCJ places much more significant restrictions on G3 level inmates than Mr. Rogers claimed. There is a specific policy outlining what restrictions are in place for G3 and inmates at other custody levels, the Unit Classification Procedure 2.0. App. 1204. Mr. Rogers' testimony was misleading because it did not accurately describe restrictions placed on G3 offenders regarding where they can be housed at the prison and what jobs and vocational assignments are available to them.

Mr. Rogers did not inform the jury about multiple restrictions regarding housing assignments. Contrary to his testimony, the Unit Classification Procedure specifies that:

c. General Population Level III (G3) custody offenders shall not be assigned to a trusty camp;
d. General Population Level III (G3) custody offenders shall only be assigned to housing areas that are specifically designated for General Population Level III (G3) custody offenders. However, in exceptional circumstances, General Population Level III (G3) and General Population Level II (G2) offenders may be housed together upon prior approval of the housing scheme by the Chairperson of the SCC [State Classification Committee].

App. 1204-05. Mr. Rogers did not explain to the jury that G3 offenders cannot be assigned to trusty camps, and that they are housed in areas specially designated for them.

Job assignments that G3 inmates are eligible for are also more restricted than what Mr. Rogers claimed. In his testimony, he stated that maintenance worker was the only prohibited job assignment, and that other restrictions could be imposed by the warden. ECF 4-36, 23 RR 155-57. In contrast to Mr. Rogers's testimony, "G3 offenders are prohibited from being a maintenance worker, a staff support inmate, holding any clerk position, being a dock worker, 'or any job where the offender would have access to multiple areas of the unit.'" App. 1205. Thus, TDCJ policies place

strict limits on the warden's ability to place offenders in specific work programs; similarly, wardens are restricted in their ability to place G3 inmates in vocational programs.

G3 offenders also are placed under restrictions that G1, the lowest custody inmates, are not. G1 offenders are eligible for contact visits with anyone on their visitation list, while G3 inmates are only eligible for contact visits with immediate family members. App. 1205-06. G3 inmates are required to have heightened supervision by correctional staff, and G1 inmates are not. *Id.* Mr. Rogers did not explain either of these restrictions to the jury. Mr. Rogers's statement that for a life-sentenced offender, it is "pretty much general population," and a life-sentenced inmate "gets the same privileges as everybody else with those few exceptions" omitted significant restrictions from his explanation to the jury. ECF 4-36, 23 RR 155-57.

The prosecutors themselves need not have actual knowledge that the testimony was false, as the state is attributed knowledge of information that is known, or should be known, by actors working on their behalf. *See Kyles*, 514 U.S. at 437. Mr. Rogers was a paid agent working on behalf of the state to secure a death sentence against Mr. Daniel. Therefore, the state is imputed knowledge of information that Mr. Rogers was, or should have been, aware of. As he held himself out as an expert on TDCJ and its classification system, Mr. Rogers should have been aware of the policies and procedures in place at TDCJ.[24]

### 2.    The False Testimony About The Prison System Was Material.

---

[24] The state also presented false evidence that inmates on death row have access to color television, showing the jury a video of death row inmates watching color television. Mr. Rogers's assertion that death row inmates have access to television is false. The video that the jury saw depicted a death row inmate at the Ellis Unit; however, in 1999 Texas's death row was moved to the Polunsky Unit. App. 1203. At the Polunsky Unit, persons on death row have no access to television, let alone color television, including while in the dayroom. *Id.*

False testimony is material "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103. In the instant case, the jury struggled to reach an agreement as to whether Mr. Daniel was a future danger, and sent a note to the trial court requesting clarification on what that term meant during deliberations. *See* Claim II. The false testimony presented by the state regarding the prison system is directly relevant to the jury's determination of whether Mr. Daniel was a future danger. It suggested to the jury that he would be at a higher risk for violence in TDCJ than is true, and thus that he would be more likely to be a future danger.

When determining whether the false testimony was material, this Court should consider that the state was duty-bound to correct the false testimony that it presented. *Napue*, 360 U.S. at 269. Thus, this Court should consider whether the jury could have been affected by the state having to repeatedly correct Mr. Rogers's false testimony, explain to the jury that he was wrong, and then accurately explain the TDCJ prison system to the jury. This false testimony would have diminished Mr. Rogers's credibility in the mind of the jury, a relevant factor when determining the materiality of the false testimony. *See id.* at 269. On balance, it cannot be said that the false testimony presented by the state could not have affected the jury. *See Agurs*, 427 U.S. at 103.

### C. Trial Counsel Were Ineffective for Failing to Investigate Prison Classification.

Counsel has a duty to investigate at all stages of litigation. *See Strickland*, 466 U.S. at 691; *Rompilla*, 545 U.S. at 389; ABA Guideline 10.7; *see also Wiggins*, 539 U.S. at 524. This duty includes an obligation to conduct legal research applicable to one's client and case. *See Hinton v. Alabama*, 571 U.S. 263, 274 (2014).

In addition, the prosecution's case and the type of testimony it elicits may demand that trial counsel consult with experts to understand and challenge it. *See Hinton*, 571 U.S. at 273; *see also Draughon v. Dretke*, 427 F.3d 286, 296 (5th Cir. 2005). Counsel did not consult with experts, nor did

counsel take steps to research, investigate, object, strike, correct, rebut the warden's testimony or familiarize themselves with TDCJ classifications. *See Rompilla*, 545 U.S. at 389.

For years, expert witnesses on TDCJ and prison classifications have been routinely retained by the state and defense, and often are called to testify. *See, e.g., Coble*, 330 S.W.3d at 287; *Estrada v. State*, 313 S.W.3d 274, 286 (Tex. Crim. App. 2010); *Prystash v. State*, 3 S.W.3d 522, 528 (Tex. Crim. App. 1999). This is because a Texas jury must determine "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Code Crim. Proc. art. 37.072 § 2(b)(1). Because the only sentencing options for someone convicted of capital murder are life without parole or death, the jury must evaluate this question while considering that the defendant will be in prison for the rest of his life. According to Frank AuBuchon, the former head of Classification at the TDCJ:

> Because TDCJ has its own rules and terminology, and because of the State's common practice in death penalty cases of using its own experts to talk about classification of inmates and the opportunities for violence that exist in prison, defense attorneys have for many years recognized the need for specialized assistance when dealing with questions of classification and other issues that may be relevant to sentencing. Consequently, former TDCJ employees like me are in demand to assist on cases such as Mr. Daniel's.

App. 1206.

On December 18, 2013, the state provided the defense with official notice that it intended to call Mr. Stephen Rogers, an expert on TDCJ and its classification system, at Mr. Daniel's trial. CR at 128. After that notification, objectively reasonable trial counsel would have recognized the need to investigate the classification system independently and/or obtain their own expert in the field. However, Mr. Daniel's counsel did not do so.

These failures demonstrate deficient performance arising from ignorance of key issues at the penalty phase. *See Hinton*, 571 U.S. at 274; *Andrews*, 159 S.W.3d at 102–04; *see also Rompilla*, 545 U.S. at 389. Trial counsel could have challenged the testimony by objecting, moving to strike, and/or

moving for a mistrial, and reasonable counsel would have raised Rule 401,402, 403, due process, Eighth Amendment, and state constitutional grounds. *See Estrada*, 313 S.W.3d at 287 (citing Eighth Amendment, due process, and state case law, and applying standard of a "fair probability that [a] death sentence was based upon [a warden's] incorrect testimony . . . ."); *Napue*, 360 U.S. at 269 (1959) ("[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment."); *id.* ("The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.")

Reasonable trial counsel also would have cross-examined or otherwise rebutted this false testimony by presenting to the jury the actual policies that rebut Mr. Rogers's testimony. *See Hinton*, 571 U.S. at 275-76; *Rompilla*, 545 U.S. at 389; *Draughon*, 427 F.3d at 296. Alternatively, trial counsel could have alerted the state to the falsehoods to correct on its own. *Cf. Estrada*, 313 S.W.3d at 287 (noting that state recommended relief). Counsel had not conducted reasonable research and investigation. Counsel had no strategy for failure to take any of these approaches, nor could one reasonably justify the failure.[25]

There is a reasonable probability that counsel's failure to retain an expert on TDCJ affected the jury's decision to sentence Mr. Daniel to death. *See Strickland*, 466 U.S. at 694. As fully explained above, the state presented materially false, misleading testimony to the jury regarding TDCJ and its classification system through Mr. Rogers. Mr. Daniel herein incorporates the full explanation of Mr. Rogers's false and misleading testimony from that section A, *supra*. Had counsel retained an expert, such as Mr. AuBuchon, regarding TDCJ and its classification system, they would have been able to

---

[25] Mr. Daniel requests an evidentiary hearing for trial counsel to testify regarding preparation and trial. Undersigned counsel has not found the then-applicable TDCJ policy in trial counsel's files.

effectively cross-examine Mr. Rogers and establish that he was testifying falsely, which would have demolished his credibility. Alternatively, they could have presented testimony from Mr. AuBuchon, or someone similar, to accomplish the same. Doing so would have made the jury less likely to determine that Mr. Daniel was a risk for committing criminal acts of violence in prison, thus increasing the likelihood that he would have received a life sentence.

### D. The State Gave The Jury A False Impression Regarding the Reason Mr. Daniel Was Keeping Track Of Names Of Correctional Officers.

The state presented testimony from various correctional officers that Mr. Daniel was recording their names on a piece of paper in his cell. An officer who viewed the page said that it described one of the officers as "the devil," one was "short," and another "follow[ed] the rules." ECF 4-35, 22 RR 81. This was concerning, according to another correctional officer, because it meant Mr. Daniel could be planning a "[p]ossible escape or assault on a staff [member]." ECF 36, 23 RR 107. Another corrections officer agreed with the state that Mr. Daniel's actions were a "safety issue." ECF 4-37, 24 RR 26. Mr. Rogers, the state's expert on the prison system, also explained that such actions were threatening because they suggested that the inmate "wants to do something he's not supposed to be doing" and that because inmates do not "have horns, tails, and, you know, breathe fire," correctional officers should watch out for them. ECF 4-36, 23 RR 161-62. The state also highlighted for the jury in closing argument that Mr. Daniel was writing down the names of the correctional officers. ECF 4-39, 26 RR 205.

The state, through this testimony, gave the jury the impression that Mr. Daniel's recording the names of correctional officers was a threat to their safety. In fact, Mr. Daniel was recording the names of correctional officers at his mother's suggestion, to document his mistreatment while he was in jail. During telephone calls from jail, he and his mother discussed his actual reasons for recording names, which included complaints about the officers copying his legal materials, waking him up late at night, seizing his property, and holding him for significant periods of time in

psychiatric observations cells with nothing more than a paper gown and a blanket. At various points, Mr. Daniel's mother asked him to write the officers' names down to facilitate her talking with Mr. Daniel's trial counsel or the media about the issue, to bring light to his mistreatment. Thus, the state's failure to include this critical fact gave the jury a false impression regarding why Mr. Daniel was writing down the names of the correctional officers. *Alcorta*, 355 U.S. at 31.

The state knew that it was giving the jury a false impression because it recorded the phone conversations and kept them in its possession throughout Mr. Daniel's pretrial incarceration and trial. Detective Fugitt testified during the penalty phase that he not only monitored Mr. Daniel's mail, email, and visitation videos, but he listened to "every call that's been completed." ECF 36, 23 RR 71. Because the truth was within the state's possession and control, it had knowledge that it was providing a false impression to the jury.

There is a reasonable likelihood that the false impression affected the jury's decision to sentence Mr. Daniel to death. *See Agurs*, 427 U.S. at 103. The state's misleading impression unfairly bolstered its case that Mr. Daniel represented a future danger, as it created the illusion that Mr. Daniel was writing down the names of the correctional officers to either escape or facilitate some sort of assault against them.

E.     **Trial Counsel Were Ineffective For Failing To Explain To The Jury Why Mr. Daniel Was Writing Down The Names Of Correctional Officers.**

Counsel had access to information that explained Mr. Daniel's true reason for writing down the names of correctional officers. The state turned over to them, as part of the discovery process, the taped conversations between Mr. Daniel and his mother in which she suggested that he write down the names.

Counsel's failure to rebut the state's evidence and argument that Mr. Daniel was recording names to either facilitate an escape or an assault on the staff was deficient performance. Prevailing professional norms require that "[c]ounsel should use available discovery mechanisms to ascertain

the aggravating and rebuttal evidence the prosecution intends to introduce, and then thoroughly investigate to determine whether this evidence can be excluded, rebutted or undercut." *ABA Guidelines*, Guideline 10.11, cmt. Yet counsel failed to rebut the state's evidence by using the tapes in rebuttal, or calling Ms. O'Dell as a witness to explain why she had asked her son to write down the names of correctional officers. Objectively reasonable counsel would have utilized the information that they received from discovery to rebut the state's evidence and argument.

There is a reasonable probability that this omission had an impact on the jury's decision to sentence Mr. Daniel to death. *See Strickland*, 466 U.S. at 694. Counsel's failure to challenge the state's evidence left the jury with the unrebutted theory that Mr. Daniel was recording the names of the officers either to harm them or to escape. The state's incorrect theory would invariably have been viewed as aggravating to the jury and facilitated their finding that Mr. Daniel was a future danger. Because Mr. Daniel was deprived of the effective assistance of counsel, he is entitled to a new penalty phase.

### F. The State Presented False Testimony of Mr. Escalante.

The state additionally presented knowingly false, material testimony through its witness Louis Escalante at the penalty phase. Mr. Escalante testified falsely when he claimed that Mr. Daniel and another inmate hatched a plan to have a relative bring guns to the courthouse and have a shootout to allow them to escape. ECF 4-36, 23 RR 36-38. In reality, what Mr. Escalante reported to correctional officers before trial was that the *other* inmate had planned to overtake guards at the jail to allow an escape, making no mention of guns or the courthouse. ECF 4-37, 24 RR 209, 211-18. Furthermore, Mr. Escalante falsely testified that no deal for his testimony had been brokered, and the state allowed him to testify without correction. This testimony was material to the jury's verdict as to the special issues, particularly because it presented some of the only evidence the jury heard regarding Mr. Daniel's likelihood to commit acts of violence in the future. Based on the paltry

evidence the state presented suggesting that Mr. Daniel was a future danger, there is a reasonable likelihood that Mr. Escalante's false testimony could have affected the jury's verdict. *See Agurs*, 427 U.S. at 103. Thus, the presentation of this false testimony violated Mr. Daniel's due process rights. *See also* Claim 15, detailing the state's *Brady* violations with regard to Mr. Escalante and Supp. App. 1879-81.

### G. The Cumulative Materiality of the State Presentation of False Evidence and Trial Counsel's Ineffectiveness Requires a New Sentencing Hearing.

Mr. Daniel has presented multiple instances of the state's reliance on false testimony to secure a death sentence against him: it falsely presented evidence about the TDCJ system, it gave the jury a false impression as to why he was recording names of correctional officers, and it permitted Mr. Escalante to testify falsely about a purported escape plan and that he did not have a deal for his testimony from the state. Counsel's failure to correct the state's false testimony further prejudiced Mr. Daniel. Even if this Court is not convinced that one area, standing alone, is enough to mandate reversal, cumulating the harm between these areas certainly does. *Dodson v. Stephens*, 611 F. App'x 168, 178-79 (5th Cir. 2015). The appropriate remedy for this violation of his constitutional rights is for Mr. Daniel to receive a new penalty phase.

### H. State Court Proceedings

Mr. Daniel raised the instant claims in his Initial Application for Writ of Habeas Corpus. App. 912-24. Despite multiple pleadings by Mr. Daniel demonstrating that crucial facts were in issue, indeed hotly contested, and despite his request for a full and fair hearing, the state habeas corpus court failed to hold a hearing on Mr. Daniel's claims, and instead adopted, nearly verbatim, the state's versions of events. The CCA affirmed, relying on the trial court's findings and conclusions. App. 3, 6. As stated in section Standard of Review under AEDPA, *supra*, this Court's review is de novo.

As to the instant substantive claims alleging that prosecutors knowingly put false and misleading evidence before the jury, the state habeas court found the claims to be defaulted. App. 98 ("Applicant's claims in his third and fourth grounds for relief have been procedurally defaulted and are not cognizable on an application for writ of habeas corpus."). Having found the claim defaulted and having failed to grant a hearing, the court found alternatively on the merits that "Applicant fails in his burden to show that the State knowingly or unknowingly used false evidence at trial." *Id.* Addressing the related ineffective assistance of counsel claims, the court simply accepted counsel's untested and patently unreasonable assertions as to why they utterly failed to challenge the state's highly damaging and false evidence as "sound" and "reasoned" expressions of "professional" judgment. *See* App. 91 ("As a matter of sound trial strategy to discredit Louis Escalante, defense counsel determined not to object to testimony from Louis Escalante."); *id.* at 18 ("As a matter of reasoned, professional judgement (sic), defense counsel determined that utilizing an additional prison classification expert was not necessary;" App. 95 ("Defense counsel's decision to not call Mary O'Dell as a witness to explain the reason for the alleged notes was a matter of sound trial strategy.").

The CCA affirmed, relying on the trial court's findings and conclusions. App. 3, 6. Consequently, it failed to address the false testimony claim at all, presumably as it was found defaulted by the lower court. As to the ineffective assistance claims, the CCA found that "Applicant fails to meet his burden under *Strickland v. Washington*, 466 U.S. 668 (1984). He fails to show by a preponderance of the evidence that his counsel's representation fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense." App. 3.

## I.     The State Court's Fact-Finding on Both Claims was Unreasonable.

The state court's fact-finding was unreasonable under any standard. In the absence of a full and fair hearing, the state court's reliance on key facts as proffered by the state—that prisoners

convicted of murder are invariably a future danger because they granted unfettered freedoms in prison, and that Mr. Daniel himself was a danger because he ostensibly plotted an escape and was planning retaliation against guards—was unreasonable. Had the court allowed Mr. Daniel's counsel to contest these facts it would have found the state's "expert" was ill-informed and provided patently false testimony about the conditions of confinement. Rather, there are substantial limitations placed on those convicted of murder, and the line officers are notified of the status of their wards. It would have learned that Mr. Escalante was unworthy of belief, and that claims of a "plot" were false or mischaracterized. Finally, it would learned that Mr. Daniel was routinely victimized by a correctional culture that feels at liberty to impose extra-judicial punishment on those alleged to have killed a peace officer, and in order to grieve these civil rights violations, it was necessary for Mr. Daniel to keep contemporaneous notes on the perpetrators. Had he been granted a fair fact-finding process, Mr. Daniel could have demonstrated he was exercising his right to complain of the abuse and that the state's narrative that he was planning retribution against these officers was a false one designed to further suppress evidence of this mistreatment.

Similarly, the state court's fact-finding regarding the performance of counsel was also unreasonable. The state court simply adopted of counsels' professed and untested claims that they had a "strategy" in mind when they utterly failed to test state's case against their client. Rather, a host of facts that went unpresented could have undermined the state's claims of future dangerousness, facts which if allowed to be presented would have cast counsels' performance in a different light. Regarding Mr. Roger's testimony, the court adopted the state's argument – based on counsel's affidavits -- that trial counsel "was aware that Rogers would testify as an expert and that Rogers was a very knowledgeable prison classification expert. Defense counsel therefore determined that an additional classification expert was not necessary to educate the jury about behavior controls

in the prison." *Id.* The court concluded that defense counsel was reasonable for not utilizing an additional, cumulative prison classification expert. App. 93.

The state court focused exclusively on counsel's "failure to retain an expert on prison classification." App. 3. But counsel was ineffective for several reasons other than their misplaced reliance on Mr. Rogers as a "very knowledgeable expert." First, just because an expert is knowledgeable, counsel is not relieved of their constitutional duty of investigation. Counsel had a duty to know the rules and regulations themselves in order to cross-examine the state's expert on his misrepresentations and misstatements. Second, counsel could not possibly have made an informed decision that was solely comprised on the illogical conclusion that the state expert's testimony could not be challenged because he was "knowledgeable." In fact, as described above, Mr. Rogers made several misrepresentations and misstatement regarding the classification of life prisoners and prisoners on death row. But because counsel chose not to educate themselves about the relevant TDCJ policies and practices, they were unable to correct Mr. Roger's false testimony. Third, both counsel and the lower courts misunderstand the import of consulting an expert. It is not to present cumulative evidence, but rather, it is to test the state's evidence and correct misstatements so that the juror understands the truth about the differences between sentencing Mr. Daniel to death or life without parole. *Strickland* requires assessment of all relevant facts. Properly applied, *Strickland* requires that courts "evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding" and re-weigh that evidence against the evidence that the Commonwealth produced in aggravation. *Williams*, 529 U.S. at 397–98, 120 S. Ct. 1495. By focusing solely on the failure to retain an expert, the state courts failed to evaluate the deficient performance by trial counsel in challenging the state's witness.

Second, the state court credited trial counsel's affidavits and the state's argument that trial counsel's theory was that the notes tracking and naming the jailers allegedly written by Mr. Daniel

did not exist. App. 94-95. Counsel indicated a host of reasons why they did not want to call Mr. Daniel's mother to testify about telling him to write down their names so she could follow up on their mistreatment of her son. App. 1432, 1437-38. But counsel's parade of horribles was a list of irrelevant factors which could have been excluded through by way of a motion *in limine*. For example he feared disclosure of bad acts already ruled inadmissible by the court. App. 1432. Nothing in the mother's testimony would have "opened the door" to the admission of irrelevant harmful evidence. Moreover, counsel did not provide an explanation as to why they could not have played the recorded conversation from the jail between Mr. Daniel and his mother when she told him to write down the names of officers who were mistreating him. Playing the tape, provided by the state and admissible to show Mr. Daniel's state of mind and motive for writing down the names, would have allowed counsel to present a non-nefarious reason for the notes and would not have had any of the pitfalls of having Mr. Daniel's mother testify. Counsel's lack of consideration of such a logical course shows that counsel did not make an informed, reasonable, strategic decision when considering how to defend Mr. Daniel from the state's allegation that he was a future danger because he tracked the officers.

A hearing was required before any fact-finding can be deemed "reasonable." *Townsend v. Sain*, 372 U.S. 293, 313 (1963) (requiring an evidentiary hearing when "the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing" or "there is a substantial allegation of newly discovered evidence").

The state's fact-finding process was further marred by its failure to recognize that counsel's performance would likely have been altered had the state not remained silent in the face of false evidence, as was their constitutional duty. *See, e.g.*, *Michael Williams v. Taylor*, 529 U.S. 420, 432, (2000) (noting that diligent efforts to develop the facts might be "thwarted, for example, by the conduct of

another or by happenstance"); *id.*, at 434 (noting that the prosecution might have "concealed the facts" supporting "a claim which was pursued with diligence").

**J.**     **Mr. Daniel Can Prove Cause and Prejudice for Any Default of His Napue Claims.**

As discussed above in section H, the state habeas court found Petitioner's claims that the state knowingly presented false evidence to be defaulted. Mr. Daniel can prove cause and prejudice for the default of the substantive claims alleging knowing presentation of false evidence thus the merits of this claim must be reviewed de novo, and relief granted.

Mr. Daniel's burden to show cause and prejudice for failing to raise his false evidence claims is no greater than that for a *Brady* claim. For *Brady* claims, "a petitioner shows 'cause' when the reason for his failure to develop facts in state-court proceedings was the state's suppression of the relevant evidence." *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (citing *Strickler*, 527 U.S. at 281). *Banks* held that cause for a defaulted *Napue/Giglio* claim is even "stronger" than cause for a typical *Brady* claim because "each time [the prosecution witness] responded untruthfully [and "repeatedly misrepresented his dealings with police"], the prosecution allowed his testimony to stand uncorrected." *Banks*, 540 U.S. at 694. Similarly, if Mr. Daniel can demonstrate that the falsehoods were material he had demonstrated "prejudice" sufficient to overcome the default.

Likewise, even if the responsibility for the default was laid at counsel's feet, **i**neffective assistance of counsel, addressed *infra*, would satisfy the cause and prejudice standard. *United States v. Carter*, 114 F.3d 1184 (5th Cir. 1997). As demonstrated below, Mr. Daniel has shown as well counsel was ineffective.

The standard of review for the false testimony claim is de novo.

**K.**     **Due Process and the Right to be Free from Cruel Punishment was Violated by the Presentation of Materially False Evidence.**

Crucial to the death verdict was the state's claim that Mr. Daniel's presented a future danger, thus failing to put him to death would pose a future risk to others. But its case was built on lies, misrepresentations and omissions, all of which the state was aware.

A defendant's right to due process under the Fourteenth Amendment includes protection against the state using false evidence, either at the guilt or penalty phase of trial. *Mooney v. Holohan*, 294 U.S. 103, 112 (1935); *Johnson v. Mississippi*, 486 U.S. at 585. Similarly, because a death sentence is qualitatively different than any other criminal penalty, the Eighth Amendment requires heightened reliability in sentencing in capital cases.

The jury's exposure to this evidence not only violated due process, but the Eighth Amendment, because it resulted in "a death sentence imposed by a jury that was allowed to consider materially inaccurate evidence." *Tuggle v. Netherland*, 516 U.S. 10, 14 (1995) (per curiam) (citing *Johnson v. Mississippi*, 486 U.S. at 590). The Eighth Amendment violations are even clearer because the misrepresentations facilitated by the prosecution's suppression of the true evidence meant that the jury's verdict was not based upon evidence that was "properly adduced at the sentencing hearing" and its evidence presented in aggravation was not "fully subject to explanation by the defendant." *Tuggle*, 516 U.S. at 13. Moreover, the false inference precluded the jury from giving full effect to other mitigation that would have supported a life sentence. *Penry v. Lynaugh*, 492 U.S. 302, 307 (1989); *Hitchcock v. Dugger*, 481 U.S. 393, 394 (1987); *Skipper v. South South Carolina*, 476 U.S. 1, 4 (1986); *Eddings v. Oklahoma*, 455 U.S. 104, 110-12 (1982); *Lockett v. Ohio*, 438 U.S. 586, 605 (1978). *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) ("[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. . . . Because of that qualitative difference, there is a

corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.").

If the prosecution improperly informs the jury that the false testimony was accurate or relies on it during argument, a due process violation is more likely to result. *See Banks v. Dretke*, 540 U.S. 668, 681 (2004); *Beltran v. Cockrell*, 294 F.3d 730, 735 (5th Cir. 2002); *United States v. Sanfilippo*, 564 F.2d 176, 178 (5th Cir. 1977).

The state has a duty to correct testimony that it knows to be false, and a defendant's due process rights are violated if the prosecution "allows [false evidence] to go uncorrected when it appears." *Napue*, 360 U.S. at 269.

The false testimony must be material to constitute a due process violation. Evidence is material "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103. This standard is lower than the familiar *Brady* materiality standard of "reasonable probability."

Here, the state knew its expert's testimony was at odds with established prison protocols and regulations.[26] Rogers himself professed to be an expert on TDCJ policy and its classification system, thus was aware his testimony was false. Its argument was that the prison placed insufficient constraints on murder offenders and thus prison guards and other inmates would be at risk. But this simply was not true. Even the least restrictive classification put substantial limitations on who Mr. Daniel might encounter, limited access to tools that might be weaponized, and sufficiently warned guards of the nature of his crime.

---

[26] The prosecutors themselves need not have actual knowledge that the testimony was false, as the state is attributed knowledge of information that is known, or should be known, by actors working on their behalf. *See Kyles*, 514 U.S. at 437. Mr. Rogers was a paid agent working on behalf of the state to secure a death sentence against Mr. Daniel. Therefore, the state is imputed knowledge of information that Mr. Rogers was, or should have been, aware of.

The state also knew that Mr. Escalante misrepresented to the jury Mr. Daniel's role in the alleged escape plot. It knew that Escalante reported to correctional officers before trial was that it was someone else who had planned to overtake guards at the jail to allow an escape. Furthermore, Mr. Escalante falsely testified that no deal for his testimony had been brokered, and the state allowed him to testify as such. This testimony was material to the jury's verdict as to the special issues, particularly because it presented some of the only evidence the jury heard regarding Mr. Daniel's likelihood to commit acts of violence in the future.

That the "list" of guards could be construed as a retributive "hit" list of some sort was pure fabrication, one without basis in fact. If the prosecution is to argue inferences, they must fairly derive from the evidence, not its imagination. *United States v. Young*, 470 U.S. 1, 8, n.5 (1985) ("The prosecutor may argue all reasonable inferences from evidence in the record. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.") (quoting ABA Standards for Criminal Justice 3–5.8 (a) (2d ed. 1980)).  The Fifth Circuit has condemned the urging of inferences not supported by the facts:

> The role of the attorney in closing argument is "to assist the jury in analyzing, evaluating and applying the evidence. It is not for the purpose of permitting counsel to 'testify' as an 'expert witness.' The assistance permitted includes counsel's right to state his contention as to the conclusions that the jury should draw from the evidence." *United States v. Morris*, 568 F.2d 396, 401 (5th Cir. 1978). (emphasis in original).  To the extent an attorney's closing argument ranges beyond these boundaries it is improper.

*United States v. Garza*, 608 F.2d 659, 662–63 (5th Cir. 1979).

False testimony is material "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103. In the instant case, the jury struggled to reach an agreement as to whether Mr. Daniel was a future danger, and sent a note to the trial court requesting clarification on what that term meant during deliberations. *See* Claim II. The false testimony presented by the state regarding the prison system is directly relevant to the jury's

determination of whether Mr. Daniel was a future danger. It suggested to the jury that he would be at a higher risk for violence in TDCJ than is true, and thus that he would be more likely to be a future danger.

When determining whether the false testimony was material, this Court should consider that the state was duty-bound to correct the false testimony that it presented. *Napue*, 360 U.S. at 269. Thus, this Court should consider whether the jury could have been affected by the state having to repeatedly correct Mr. Rogers's false testimony, explain to the jury that he was wrong, and then accurately explain the TDCJ prison system to the jury. This false testimony would have diminished Mr. Rogers's credibility in the mind of the jury, a relevant factor when determining the materiality of the false testimony. *See id.* at 269. On balance, it cannot be said that the false testimony presented by the state could not have affected the jury. *See Agurs*, 427 U.S. at 103.

### L. Exhaustion

The above ineffectiveness claims were exhausted in state habeas. App. 917-24, 932-49. Mr. Daniel's claim that his due process rights were violated when the state obtained a death sentence through the knowing presentation of false evidence was likewise exhausted during state habeas.

## XV. THE STATE VIOLATED MR. DANIEL'S RIGHTS TO DUE PROCESS AND TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT UNDER BRADY V. MARYLAND AND ITS PROGENY.

The state failed to disclose material exculpatory and/or impeachment evidence concerning a jailhouse snitch and penalty phase witness, Louis Escalante. Mr. Escalante was promised and afterwards received a reduced sentence for a serious felony offense in exchange for testifying at trial. *See* Claim XIV. The state failed to disclose the terms of Mr. Escalante's agreement. As a result, Mr. Daniel was deprived of the opportunity to impeach a critical witness against him with material evidence of his bias and his motivation to give false testimony under *Brady v. Maryland*, 373 U.S. 83 (1963); *United States v. Bagley*, 473 U.S. 667 (1985); *see also Giglio v. United States*, 405 U.S. 150 (1972).

The state's *Brady* violation deprived Mr. Daniel of due process under the Fifth, Sixth, and Fourteenth Amendments.

### A. The State Promised Escalante A Reduced Sentence in Exchange for His Testimony Against Brandon Daniel.

In March 2012, Mr. Escalante was charged with a serious felony: possession of cocaine with the intent to deliver. Supp App. 1899. While in custody in October 2012, Mr. Escalante was placed in the Health Services Building in the Travis County Jail in Del Valle as a trustee. ECF 4-36, 23 RR 31. It was during this period that Mr. Escalante made reports to officers about conversations he had allegedly overheard between Mr. Daniel and Troy Williams while they were in isolation cells at Del Valle concerning their plans to escape. Mr. Escalante's allegations about the escape were false. Supp. App. 1879-1881.*See also* Claim XIV.

On August 4, 2012, Escalante was arrested again—this time for felony theft; and then again in December 2013, for having violated the conditions of his deferred adjudication. Supp App. 1959, 1908-1985. Mr. Escalante was back in Travis County Jail while the state was preparing to try Mr. Daniel for capital murder.

Prior to his testimony against Mr. Daniel, Mr. Escalante received visits from Detective Fugitt and the district attorney, Bill Bishop, as well as his attorney, Silvia Acosta. ECF 4-36, 23 RR. 59, 62. Mr. Escalante made it clear that during these discussions that he did not want to testify because he did "not want to be labeled a snitch," and that he would only testify if promised that he would get out of jail." Supp App. 1895-1896.[27] Mr. Escalante was promised by the state and his attorney that if he testified to what they wanted him to say about Brandon Daniel he would get out of prison. *Id.* This agreement between Mr. Escalante and the state was never disclosed to Mr. Daniel or his

---

[27] Mr. Escalante had also been told by Corrections Officers that time additional prison time could be added to his sentence if he failed to cooperate. Supp. App. 1895.

counsel.

On February 25, 2014, the state called Mr. Escalante to testify during the second day of the punishment phase. *Id.* at 30. In response to a question from Mr. Bishop as to whether any offers had been made to him in exchange for his testimony, Mr. Escalante testified that he did not have any deal with the state. *Id.* at 32. This testimony was false. Supp. App. 1895-1896.

Because Mr. Escalante had an interest in getting out of jail early by providing helpful testimony for prosecution, his trial testimony expanded upon, and indeed diverged considerably from, the reports he had made to correctional officers about Mr. Daniel in October 2012.[28] Mr. Escalante testified that Mr. Daniel, while in an isolation cell, had showed Mr. Escalante a newspaper clipping about the crime. ECF 4-36, 23 RR at 33–35, 42, 66–67. Mr. Escalante also claimed that Mr. Daniel was "smirking and laughing" about the crime and that Mr. Escalante had counseled him: "You know, at this point I already explained to him, I told him, your life is on the line, you know, capital murder." *Id.* at 35. Escalante further volunteered that "And, you know, basically I had asked him if he had any remorse or, you know, sympathy for the guy or anything. He just nodded his head no." *Id.* at 36.

Mr. Escalante then testified about a plot between Troy Williams and Mr. Daniel to escape from the courthouse via a shootout with police that was told to him by Troy Williams. This testimony contradicted reports made by the correctional officers in October 2012 (See Supp App. 2014-2015). Escalante's testimony about the escape plot was false. *See* Claim XIV. Supp. App 1879-1881

---

[28] See Supp App. 2014-2015. Correctional Officers Crim and Ferguson reported in October 2012 that Mr. Esclante approached them and told them that he heard Mr. Daniel and Troy Williams discussing a plan to obtain the keys of a correctional officer because Mr Daniel said he was "bored" and wanted "to get out of hear."

On May 7, 2014, a little over two months after Mr. Escalante testified so dramatically about Mr. Daniel's lack of remorse in jail and his plan for a courthouse shootout, an order was issued with respect to Mr. Escalante's felony possession-with- intent-to-deliver-cocaine charge from March 2012. Supp App. 1931-1932.). The condition requiring him to complete the "Intermediate Sanctions Facility Cognitive Track" or "ISF" was deleted and he was instead only obligated to "[s]uccessfully complete Relapse IOP through Developmental Counseling." *Id.* at 1932. The latter, unlike ISF, is an outpatient program. Thus, Mr. Escalante received the benefit that he had been promised for his testimony – a reduced jail sentence. Evidence of this sentencing reduction and how it came to be were not disclosed to Mr. Daniel.

### B. The State's failure to disclose its promise to Mr. Esclanate violated Mr. Daniel's due process rights.

The Due Process Clause requires a prosecutor to disclose evidence to the accused that is favorable to the defense and material to guilt or punishment. *Brady v. Maryland,* 373 U.S. 83, 87 (1963); accord *Banks v. Dretke*, 540 U.S. 668, 690 (2004); *Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Giglio v. United States*, 405 U.S. 150, 153-56 (1972). The duty to enforce *Brady v. Maryland* "with painstaking care is never more exacting than it is in a capital case." *Kyles*, 514 U.S. at 422.

To establish a *Brady* violation, a defendant must show that favorable evidence was suppressed by the government, either intentionally or inadvertently, and that the suppressed evidence was material. *Brady*, 373 U.S. at 87. [29]

---

[29] See *Tassin v. Cain*, 517 F.3d 770, 780 (5th Cir. 2008) ("deal need not have been a 'firm promise' to trigger [prosecutor's] Brady [obligation]."); *id.* at 778 (under *Giglio* and *Napue*, "the crux of a Fourteenth Amendment violation is deception. A promise is unnecessary.")

Of particular relevance here, suppressed information related to pre-trial discussions between the prosecution and a witness regarding promises, inducements, incentives, possible rewards, expectations of leniency, and leniency contingent on testifying for the prosecution is impeachment evidence that qualifies as *Brady* material under the long-standing Supreme Court precedent of *Giglio*. The *Giglio* Court held that evidence of any understanding or agreement as to a future prosecution would be relevant to [a prosecution witness] credibility and the jury was entitled to know of it. *Giglio*, 405 U.S. at 154-55. This includes any facts bearing on a witness motivation that would likely affect the judgment of a jury, *id.* at 154, including any possible agreements or arrangements for prosecutorial leniency, *id.* at 151, any implication that cooperation would [be] reward[ed], *id.* at 153 n.4, and/or some understanding for leniency.[30] *Id.* Thus in *Giglio* the Supreme Court made clear that prosecution inducements to key witnesses must be disclosed to the defense.

Here, the state offered Mr. Escalante the opportunity to get out of jail more quickly if he "testified to what they wanted me to say." Supp App. 1895-1896. Mr. Escalante agreed and provided misleading and damaging testimony against Mr. Daniel at the penalty phase.

The withheld evidence of Mr. Escalante's deal with the state was material. Under *Brady*, "favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles*, 514 U.S. at 433 (quoting *Bagley*, 473 U.S. at 682 (opinion of Blackmun, J.)). The Supreme Court in *Kyles* explained that under the "reasonable probability" standard, the "touchstone of materiality is . . . not whether the defendant

---

[30] Cf. *Napue v. Illinois*, 360 U.S. 264, 270 (1959) (discussing importance of prosecutions failure to disclose whether prosecution witness might have believed that [the prosecution] was in a position to implement. . . any promise of consideration because that may have led the jury to conclude that [the witness] had fabricated testimony in order the curry the favor of [the prosecution]. Here, the state violated *Napue* when the prosecutor elicited and failed to correct Escalante's testimony that he had not been made any promises by the state in exchange for his testimony. ECF 4-36, 23 RR 32.

would more likely or not have received a different verdict with the [suppressed] evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 434. Thus, for materiality purposes, a petitioner does not need to "demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id.* at 435. See also *id.* at 435 n.8 ("sufficiency of [the remaining] evidence [is not] the touchstone" of materiality). Instead, the question is whether the defendant "received a . . . trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the Government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.* at 434 (quoting *Bagley*, 473 U.S. at 678).

Mr. Daniel did not receive a fair sentencing proceeding "worthy of confidence." There is a reasonable probability that had the jury been aware of Mr. Escalante's deal with the state, at least one juror would have disregarded his testimony and ultimately reached a different verdict as to Mr. Daniel's sentence. The state emphasized the point of Mr. Escalante's testimony about Mr. Daniel's planned violent escape in its closing argument: ECF 4-39, 26 RR 205.

As discussed in Section II *supra*, the jury struggled with the question of future dangerousness. The false testimony presented by Mr. Escalante that Mr. Daniel planned a violent escape was a prominent piece of the state's evidence that Mr. Daniel was a future danger. It is therefore likely that at least one juror was swayed by Escalante's testimony that Mr. Daniel presented an escape risk. Had the jury known that Mr. Escalante was testifying in exchange for a reduced jail sentence, there is a reasonable possibility that it would not have concluded that Mr. Daniel posed an escape threat or was a future danger. There is a reasonable likelihood that the jury would have sentenced Mr. Daniel to life.

### C.    The State Court's Decision is Not Entitled to AEDPA Deference

Mr. Daniel raised and exhausted this claim in state court in his Initial Application for Writ of Habeas Corpus. App. 973-981. The trial court denied the state habeas application, adopting nearly verbatim the state's proposed findings of fact and conclusions of law. App 101. The CCA affirmed, relying on the trial court's findings and conclusions. App. 5. For the reasons articulated in the Standard of Review under the AEDPA, Sections B and C *supra*, Mr. Daniel argues that de novo review is the appropriate standard of review.

### D.    The State Court's Decision is an Unreasonable

To the extent that the state court ruling here is reviewed under 28 U.S.C. § 2254(d), that decision is "contrary to" or "an unreasonable application of" clearly established Supreme Court law, and involves an "unreasonable determination of the facts." *See Williams v. Taylor*, 529 U.S. 362, 412 (2000). The Court of Criminal Appeals of Texas rejected the claim that Mr. Daniel's due process rights were violated when prosecutors violated Brady because they stated that "applicant must do more than state mere conclusions of law or allegations of error; applicant must support his claim with adequate facts." App. 5.

The Court of Criminal Appeal's conclusion is unreasonable as a matter of fact and law.  As indicated above, Mr. Escalante was promised and afterwards received a reduced sentence for a serious felony offense in exchange for testifying at trial. *See* Claim XIV. The state failed to disclose the terms of Mr. Escalante's agreement. As a result, Mr. Daniel was deprived of the opportunity to impeach a critical witness against him with material evidence of his bias and his motivation to give false testimony under *Brady v. Maryland*, 373 U.S. 83 (1963); *United States v. Bagley*, 473 U.S. 667 (1985); *see also Giglio v. United States*, 405 U.S. 150 (1972).  Thus, contrary to the state court's conclusion, Mr. Daniel has presented facts in support of his *Brady* claim and "not merely conclusions of law or allegations of error." The state court unreasonably misconstrued United States

Supreme Court precedent and unreasonably applied the facts before it. Mr. Daniel is entitled to a new sentencing proceeding and should be granted habeas relief.

## XVI. TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE INADMISSIBLE HEARSAY TESTIMONY OF MR. ESCALANTE IN VIOLATION OF MR. DANIEL'S RIGHTS TO DUE PROCESS AND TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT.

At the penalty phase, the state elicited inadmissible hearsay statements from jailhouse informant Louis Escalante. He testified that a fellow inmate, Troy Williams, told him that he and Mr. Daniel were planning an escape from the Travis County Jail together. Trial counsel had a duty to object to this highly prejudicial hearsay. Mr. Daniel's trial counsel failed to object, an unreasonable and constitutionally deficient omission that violated his due process rights. This failure prejudiced Mr. Daniel because the hearsay testimony went directly to the two special questions in the penalty phase. Mr. Daniel met his burden under *Strickland v. Washington*, 466 U.S. 668 (1984). Accordingly, Mr. Daniel's sentence must be reversed.

### A. Mr. Daniel's Trial Counsels' Failure to Object was Deficient Performance.

Hearsay is inadmissible unless it is covered by an exception. Tex. R. Evid. 801. At Mr. Daniel's trial, Mr. Escalante testified, "Troy Williams was the one that actually explained [the escape plan] to me. He's the one that sat there and told me everything." ECF 4-36, 23 RR 38. Mr. Escalante testified that Mr. Williams told him:

> [T]hey were trying to plan an escape. . . . [S]upposedly he had a court hearing or a court appearance at that time in January, I don't know what date, to start planning the escape from here. It was supposed to be that somebody was supposed to come here with a gun and start shooting and—was one of his plans to escape from here.

ECF 4-36, 23 RR 36-37. Mr. Escalante's testimony was plainly hearsay. Mr. Escalante testified to what Mr. Williams told him at the jail. The state presented Mr. Escalante's testimony for the truth of Mr. Williams's statements. Thus, it was inadmissible. Trial counsel did not object. Had trial counsel objected, the court would have sustained the objection. Trial counsel has a duty to object

to inadmissible evidence or improper argument and establish a record reflecting adverse rulings. Trial counsel's failure to object was objectively unreasonable.

## B.   Mr. Daniel Was Prejudiced.

There is a reasonable probability that at least one juror's decision-making would have been different if trial counsel had objected and excluded this highly damaging testimony. Under Texas law, the jury was required to answer two special issues during the penalty phase: (1) whether there is a probability that the defendant constitutes a continuing threat to society; (2) and whether, considering all the evidence, there are sufficient mitigating circumstances to warrant a sentence of life imprisonment without parole. Tex Code Crim. Proc. art. 37.071, § 2(b)(1), (e)(1). If the jurors believed that Mr. Daniel was at risk of escaping from prison, this likely colored their decision-making regarding special issue one, his future dangerousness.

The state made certain to highlight this possibility in its closing argument: "The escape plan he had, I don't know about if that witness got his escape plans mixed up, if he had more than one escape plan. It doesn't matter. The fact is he was clearly making plans, which he will continue to make." ECF 4-39, 26 RR 205.

Even an attempted escape is extremely prejudicial because jurors are naturally concerned with capital defendants' likelihood of returning to society. The threat of an escape is particularly harmful in the penalty phase of a capital case because the jurors must contemplate a defendant's future dangerousness. In Mr. Daniel's case, the evidence of past violent behavior was very weak. Mr. Daniel's only history of violent behavior was as a child, and it was relatively mild. As discussed in Section II *supra*, we know the jury struggled with the question of future dangerousness. It is therefore likely that at least one juror was swayed by the inadmissible hearsay that Mr. Daniel presented an escape risk. The failure to object to the hearsay clearly prejudiced Mr. Daniel.

Furthermore, the jurors were permitted to consider Mr. Escalante's hearsay testimony when answering the mitigation special issue. Testimony that Mr. Daniel was associated with an escape plan, possibly one involving violence, was likely weighed by the jurors in determining Mr. Daniel's moral blameworthiness and character. There is therefore a reasonable likelihood that at least one juror's decision-making would have changed without the admission of the inflammatory hearsay testimony. Because Mr. Daniel was prejudiced by the deficient performance of his counsel, he is entitled to a new penalty phase.

### C.  The State Court's Decision Should Not Receive AEDPA Deference.

#### 1.  The State Habeas Court's Unexplained Ruling Should Receive De Novo Review

Mr. Daniel raised this claims in his Initial Application for Writ of Habeas Corpus. App. 912-917. The trial court denied the state habeas application, adopting nearly verbatim the state's proposed findings of fact and conclusions of law. App 6. The CCA affirmed, relying on the trial court's findings and conclusions. App. 3, 6. For the reasons articulated in the Standard of Review under the AEDPA, Sections B and C *supra*, Mr. Daniel argues that de novo review is the appropriate standard of review.

However, Mr. Daniel focuses herein on those findings and conclusions and shows that the state court decision was at best unreasonable in light of clearly established Supreme Court precedent, and in light of the state court record, as explained in Standards of Review Under the AEDPA Section A, *supra*.

#### 4.  The State Court's Decision is an Unreasonable Application of Clearly Established Federal Law.

The Court of Criminal Appeals of Texas rejected the claim that counsel was ineffective for failing to object to the inadmissible hearsay testimony of Louis Escalante on the grounds that Mr. Daniel "failed to show by a preponderance of the evidence that his counsel's representation fell

below an objective standard of reasonableness and that the deficient performance prejudiced the defense." *Id.* Applying look-through analysis to the trial court's opinion, however, the trial court found that there was not ineffective assistance of counsel because Louis Escalante's statements about Mr. Daniel's escape plan were not hearsay because they were an admission by a party opponent, and that it was sound trial strategy to not object to Mr. Escalante's hearsay and instead try to discredit Mr. Escalante. App. 90-92.

It is an incorrect to state that Mr. Escalante's statements were admissions by a party opponent. When Mr. Escalante testified to what Mr. Daniels told Troy Williams and Troy Williams told him, there were two levels of hearsay: what Mr. Daniel told Troy Williams (one level), and then what Troy Williams told Louis Escalante (second level). Each level of hearsay would need its own exception.

Had Mr. Daniel himself told Louis Escalante that he had an escape plan, and Mr. Escalante testified to what Mr. Daniel told him, that would be an non-hearsay admission by a party opponent. If Troy Williams had testified at trial about what Mr. Daniel told him, that too would be a non-hearsay admission by a party opponent. But when Mr. Escalante testified about what Troy Williams told him that Mr. Daniel told him about an escape plan, that was inadmissible hearsay. Mr. Escalante did not testify as to what Mr. Daniel said, he testified to what Troy Williams told him Mr. Daniel said.

There is no exception to the hearsay rule that allowed Mr. Escalante to testify to what Troy Williams told him. Troy Williams was not a party opponent. Troy Williams's statements were not subject to cross-examination. It was simply inaccurate for the trial court to characterize the second-hand statements of Troy Williams as told through Louis Escalante as non-hearsay testimony of a party opponent. Accordingly, none of the safeguards that exist in the exceptions to the hearsay rule were present here – there was no way to cross-examine Troy Williams about these statements to

assure they were reliable. And those safeguards exist for a reason. Troy Williams has denied that he and Mr. Daniel had ever discussed an escape plan of any sort. Supp. App. 1879-1881. Mr. Williams denies telling Mr. Escalante anything about an escape plan, and maintains that there was no way Mr. Escalante could have heard him and Mr. Daniel talking about an escape plan because that never happened. Supp App. 1879-1991. This is exactly why the Constitution protects an accused's right to confront witnesses, *Crawford v. Washington*, 541 U.S. 36 (2004), and why the Texas Rules of Evidence prohibit hearsay. Tex. R. Evid. 801.

Furthermore, it is illogical to say that it is sound trial strategy to not object to hearsay testimony so that it can come in and be discredited, rather than object to the testimony as hearsay and keep it from being admitted in the first place. Louis Escalante's only purpose was to testify to the hearsay statements of Troy Williams about the escape plan. The easiest way to "discredit" that testimony was to keep the jury from hearing it in the first place, which would have happened had counsel objected. There is no reason to try to "unring" a bell that you can keep from ringing in the first place.

As discussed in Section B, *supra*, the hearsay statements went directly to Mr. Daniel's future dangerousness and painted him as a violent person. The state referenced the "escape plan" in its closing argument because it was so damaging. The state court should not receive deference because it incorrectly stated that Mr. Escalante's statements were not hearsay when in fact they were. It was objectively unreasonable for trial counsel to fail to object to Louis Escalante's hearsay testimony. This deficient performance prejudiced Mr. Daniel. The court's holding is an unreasonable application of *Strickland* and its progeny. *Strickland v. Washington*, 466 U.S. 668 (1984). Mr. Daniel should accordingly receive habeas relief on this claim unless the state grants him a new trial on penalty.

## XVII. MR. DANIEL'S FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED WHEN HE WAS SENTENCED

**TO DEATH UNDER TEXAS'S UNCONSTITUTIONAL SENTENCING STATUTE.**

A.     **Mr. Daniel's Constitutional Rights Were Violated when the Trial Court was Prohibited from Instructing the Jury that a Vote by One Juror would Result in a Life Sentence.**

Pursuant to Texas law, in Mr. Daniel's case two special issues were submitted to the jury during the penalty phase: (1) whether there is a probability that the defendant constitutes a continuing threat to society; and (2) whether, considering all of the evidence, there are sufficient mitigating circumstances to warrant life without parole rather than death. Tex. Code Crim. Proc. art. 37.071,§ (2)(b)(1)-(2), (e)(1). A defendant is to be sentenced to death if the jury answers "Yes" on the first issue and "No" on the second issue. If the jury returns a "No" answer to the first special issue or a "Yes" answer to the second issue, or if the jury is unable to answer both questions submitted to them under the statute, the court shall sentence the defendant to life without parole. Tex. Code Crim. Proc. art. 37.071, § 2(g).

The Texas sentencing statute requires the jury to receive inaccurate, incomplete instructions about the requirements for a life sentence. It requires the jury be instructed: (1) that the prosecution must prove the first special issue beyond a reasonable doubt; (2) the jury shall return a verdict of "Yes" or "No" on the first special issue; the jury may not return a "Yes" verdict unless it is unanimous, and it may not return a "No" verdict unless ten or more jurors agree. Tex. Code Crim. Proc. art. 37.071, § 2(c) & (d). Mr. Daniel's jury was so instructed. ECF 4-39, 26 RR 113-19. On the second special issue, the statute requires the jury to be instructed: (1) the jury shall return an answer of "Yes" or "No"; (2) the jury may not return a "No" unless it is unanimous and may not return a "Yes" unless at least ten jurors agree. Tex. Code Crim. Proc. art. 37.071, § 2(e)(2). Mr. Daniel's jury was so instructed. *Id.* The statute expressly bars the jury from being instructed that if the jury is unable to reach a unanimous or at-least-ten verdict on either of the special issues, the trial court is

required to sentence the defendant to life in prison. Tex. Code Crim. Proc. art. 37.071, § 2(a). The trial court complied with the statute.

The statute and the confusing instructions created a farcical scenario in which the opposite of "unanimous" is "ten people agree." Deliberations in a jury room on a death sentence could reach multiple outcomes that fall into neither category: a vote of nine to three, eight to four, and so on. However, juries are given no instruction on how to proceed if that likely scenario plays out. Instead, jurors are instructed that, in order to make the predicate findings that would result in a sentence of life imprisonment, "ten (10) or more jurors [must] agree." Thus, the statute requires that the jury instructions tell a lie. The truth is that if even one juror would answer the second issue "Yes" and all eleven others would answer it "No," that finding would also result in a sentence of life imprisonment. The instruction thus violates *Mills v. Maryland*, 486 U.S. 367, 384 (1988). This is precisely the kind of ambiguity that the Constitution does not tolerate in a capital sentencing scheme. *Lockett v. Ohio*, 438 U.S. 586, 605 (1978).

This portion of the jury instruction, which suggests that it requires the agreement of ten out of twelve jurors to find "No" on the first special issue and to find "Yes" on special issue two, unconstitutionally diminished each juror's individual sense of responsibility in the sentencing process in violation of the Eighth Amendment. For this reason, this instruction is also a violation of *Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985). Moreover, capital sentencing instructions amount to constitutional error if "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990). And, by actively misleading potential holdout jurors (even a large majority of holdouts fewer than ten) to believe their individual votes would not change the outcome, the instruction injects arbitrariness and unfairness into the penalty phase, in violation of Petitioner's right to due process. *See Simmons v.South Carolina*, 512 U.S. 154 (1994).  The Texas capital sentencing

scheme, on its face and as applied to Petitioner, violates the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**B.      Mr. Daniel's Death Sentence was Arbitrarily and Capriciously Assigned Based on the Jury's Answer to the Unconstitutionally Vague Special Issue.**

Article 37.071 of the Texas Code of Criminal Procedure statute requires a trial court to submit the following special issue to the jury: whether there is a probability that the defendant constitutes a continuing threat to society. Tex. Code Crim. Proc. art. 37.071, § 2(b)(1), (e)(1). Neither the Texas capital sentencing statute nor the required jury charge define the terms "probability," "criminal acts of violence," or "continuing threat to society." *See* Tex. Code Crim. Proc. art. 37.071, § 2(b)(1).13. This contravenes the Eighth Amendment principle that a state's aggravating factors may not be defined in such a way that people of ordinary sensibilities could find that nearly every murder meets the stated criteria. *Godfrey v. Georgia*, 446 U.S. 420, 428-29 (1980). Moreover, the use of "probability" in an issue that the jury is instructed to determine beyond a reasonable doubt improperly lessens the State's burden to prove the aggravating factors beyond a reasonable doubt, which is required by the Sixth Amendment. *See Ring v. Arizona*, 536 U.S. 584, 602-09 (2002).

This concern is particularly troublesome in Mr. Daniel's case. As explained in Claim II *supra*, the jury sent out a note to the trial court asking for clarification regarding the terms of this special issue, because the jury was unclear as to what those terms meant. App. 1549-1550.

**C.      Mr. Daniel's Death Sentence Should Be Vacated Because the Penalty Phase Jury Instruction Restricted the Evidence That the Jury Could Determine Was Mitigating.**

"[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). The

*Lockett* decision was animated by "the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty," and it accordingly found unconstitutional a state statute that "prevent[ed] the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation." *Id.* at 605. Texas's statute governing capital trials gives rise to this risk by expressly limiting the evidence that jurors may consider mitigating. *See* Tex. Code Crim. Proc., art. 37.71. As applied to Mr. Daniel, this statute violated Mr. Daniel's rights under the Eighth and Fourteenth Amendments, and related provisions of the Texas Constitution. Accordingly, Mr. Daniel's sentence should be vacated.

Article 37.071 of the Texas Code of Criminal Procedure statute requires a trial court to submit the following special issue to the jury: whether, considering all the evidence, there are sufficient mitigating circumstances to warrant a sentence of life imprisonment without parole. Tex. Code Crim. Proc. art. 37.071, § 2(b)(1), (e)(1). In addition to these procedural instructions, Texas law requires the court to instruct the jury that it "shall consider mitigating evidence to be evidence that a juror might regard *as reducing the defendant's moral blameworthiness*." Tex. Code Crim. Proc. art. 37.071, § 2(f)(4) (emphasis added). No definition of "moral blameworthiness" is provided, nor are additional instructions given as to the relationship between this instruction and the demands of the special issue itself. The trial court so instructed the jury in Mr. Daniel's case. CR at 186–88.

The avenues of mitigation open to a capital jury cannot be limited to evidence that relates solely to the defendant's culpability, the nature of his crime, or what the crime says about that individual defendant. *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007). At the penalty phase, Mr. Daniel presented evidence that bore no relationship to his legal or moral blameworthiness for the capital crime. *See, e.g.,* ECF 4-38, 25 RR 21–35 (testimony from his Aunt explaining her memories

of Mr. Daniel). Such evidence is equally meaningful for jurors as background and character evidence when deciding whether to impose a sentence of death. *See Penry v. Lynaugh*, 492 U.S. 302, 327.

Texas's statutorily-mandated instruction fatally undermines the jury's capacity to give effect to this broader type of mitigating evidence, evidence unrelated to Mr. Daniel's "moral blameworthiness," a limitation wholly at odds with three decades of U.S. Supreme Court precedent. Were any of Mr. Daniel's jurors to credit such evidence—that is, evidence they found to warrant a life sentence but that did not reduce Mr. Daniel's moral blameworthiness for the crime—that juror necessarily and untenably would violate the court's instructions. *Penry v. Johnson*, 532 U.S. 782, 800 (2001) (*Penry II*). Because "[w]e generally presume that jurors follow their instructions," there exists a reasonable probability that the result of Mr. Daniel's trial would have been different had a constitutionally adequate instruction been given. *Id.* at 799.

### D. Mr. Daniel's Death Sentence Is Unconstitutional Because It Was Assigned Based on Texas's Arbitrary System of Administering the Death Penalty.

A small minority of Texas's counties are responsible for an overwhelming majority of the death sentences that have been assessed in the past thirty-nine years. In addition to this geographic disparity—a disparity that cannot be explained merely by reference to county populations—Texas's system of administering the death penalty also reflects disparities based on race and ethnicity. Thus, whereas sentences of death should be reserved only for the most egregious offenses, in Texas this determination is, to a degree both substantial and improper, an arbitrary one. Mr. Daniel's sentence therefore violates his applicable rights under the Texas and United States Constitutions, as well under Texas statutory law and United States Supreme Court and Texas case law. Accordingly, Mr. Daniel's sentence should be reversed.

Capital punishment schemes must have "objective standards to guide, regularize, and make rationally reviewable the process for imposing a sentence of death." *Woodson v. North*

*Carolina*, 428 U.S. 280, 303. When these schemes lack such standards, or when such standards fail in their application, or when "[t]here is no principled way to distinguish [a] case, in which the death penalty was imposed, from the many cases in which it was not," it cannot be maintained that the imposition of a death sentence was "based on reason rather than caprice or emotion." *Godfrey v. Georgia*, 446 U.S. 420, 433.

Since 1976, 1,101 defendants have been sentenced to death in Texas.[31] Collectively, less than half of Texas's 254 counties account for these 1,101 sentences (listing 120 Texas counties). Four counties—Harris, Dallas, Bexar, and Tarrant—account for over 50% of these defendants, as well as for over 49% of those who have been executed (274 out of 555). In the past thirty-nine years, 83% if counties have sentenced someone to death three times or less, or not at all (212 out of 254.)

The experience of the last forty years has shown that the practical consequence of prosecutorial discretion has not been to narrow the field of death-eligible defendants to the most serious and heinous cases. The influence of geographical factors within Texas's capital punishment system has undermined the Supreme Court's expectations that this system would be an "evenhanded, rational, and consistent" one. *Jurek v. Texas*, 428 U.S. 262, 276 (1976).

In addition to geography, studies continue to show that race is a motivating factor behind jury verdicts in capital cases.[32] One study specific to Texas examined the influence of race

---

[31] All statistics are taken from Tex. Dep't Crim. Justice, http://www.tdcj.state.tx.us/death_row/ (last visited September 29, 2018)

[32] *See, e.g.*, David Baldus, et al., *Race and Proportionality Since* McCleskey v. Kemp *(1987): Different Actors with Mixed Strategies of Denial and Avoidance*, 39 COLUM. HUM. RTS. L. REV. 143 (2007); Isaac Unah, *Choosing Those Who Will Die: The Effect of Race, Gender, and Law in Prosecutorial Decision to Seek the Death Penalty in Durham County, North Carolina*, 15 MICH. J. RACE & L. 135 (2009) (finding that prosecutors were more likely to pursue capital cases for white victims than black victims).

in Harris County capital cases from 1992 to 1999. Scott Phillips, *Racial Disparities in the Capital of Capital Punishment*, 45 HOUS. L. REV. 807 (2008). Using statistical techniques to control for potential confounders, the study showed that "black defendants who committed crimes *less* likely to lead to a death trial tended to face a capital trial *more* frequently than their white and Hispanic counterparts." AM. BAR ASS'N, THE TEXAS CAPITAL PUNISHMENT ASSESSMENT REPORT (2013). A defendant also faced increased odds of receiving a death sentence if he was black than if he was white or Hispanic. Phillips, 45 HOUS. L. REV. at 834. The study also confirmed that, in Harris County within the eight-year period, those convicted of killing a white victim were more likely to receive death than those convicted of killing a black victim. *Id.*

The conclusion compelled by this study and the other studies mentioned is inescapable: race continues to influence the imposition of the death penalty, regardless of whether that influence is conscious or unconscious. When a law is applied in such a way that it becomes more directed at a "particular class of persons"—particularly when that class of persons is distinguished by race—the application of that law violates an individual's right to equal protection under the law. *See Yick Wo v. Hopkins*, 118 U.S. 356, 373 (1886). For the foregoing reasons, Texas's death penalty scheme is unconstitutional as applied to Mr. Daniel and Mr. Daniel's sentence of death should be vacated.

### E. The State Court's Decision Should Not Receive AEDPA Deference.

### 5. Mr. Daniel Exhausted these Claims in his State Habeas Petition.

Mr. Daniel raised this claims in his Initial Application for Writ of Habeas Corpus. App. 988-1019. The trial court denied the state habeas application, adopting nearly verbatim the state's proposed findings of fact and conclusions of law. App 6. The CCA affirmed, relying on the trial

court's findings and conclusions. App. 3, 6. For the reasons articulated in the Standard of Review under AEDPA, Sections B and C *supra*, Mr. Daniel argues that de novo review is the appropriate standard of review.

However, Mr. Daniel focuses herein on those findings and conclusions and shows that the state court decision was at best unreasonable in light of clearly established Supreme Court precedent, and in light of the state court record as explained in Standards of Review Under the AEDPA, Section A, *supra*.

### 6. The State Court's Decision is an Unreasonable Application of Clearly Established Federal Law

As detailed in the above analysis, the four claims collectively challenge violations of *Mills v. Maryland*, 486 U.S. 367, 384 (1988); *Lockett v. Ohio*, 438 U.S. 586, 605 (1978); *Godfrey v. Georgia*, 446 U.S. 420, 428-29 (1980); *Jurek v. Texas*, 428 U.S. 262, 276 (1976); and *Yick Wo v. Hopkins*, 118 U.S. 356, 373 (1886). The state court's dismissal of these claims is an unreasonable application of Federal law.

## XVIII. MR. DANIEL'S SENTENCE OF DEATH VIOLATES THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.

### A. The Presentation of Evidence of "Extraneous" Conduct Violates the Fifth, Sixth, Eighth and Fourteenth Amendments.

Under Art. 37.07 and Art. 37.071, the state is permitted wide latitude to introduce evidence of "extraneous" offenses during the penalty phase. The state may introduce "any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act." Art. 37.07 §3 (a)(1), including "an extraneous crime or bad act that has not resulted in a final conviction in a court of record or a probated or suspended sentence," Art. 37.07 § 3(g). Normal evidentiary rules are relaxed during the penalty phase, so that the state may introduce "any evidence the court deems relevant to

sentence." Art. 37.071 §2 (a)(1). The "extraneous" evidence may be considered by the jury in deciding both of the special issues. The presentation of extraneous conduct to support a finding of the first special issue violates the Fifth Amendment's presumption of innocence, the Sixth Amendment's jury trial guarantee, and creates a risk of arbitrary and unreliable capital sentencing in violation of the Eighth and Fourteenth Amendments.

The Supreme Court has held that death-eligibility factors are the functional equivalent of elements of a greater offense, and must be found by the jury beyond a reasonable doubt. *Ring v. Arizona*, 536 U.S. 584, 609 (2002). The sentencing scheme, however, permits the prosecution to offer evidence of unadjudicated offenses and charges that did not lead to a conviction, and does not require the jury to find beyond a reasonable doubt that the defendant is guilty of those offenses, before the jury may consider them in deciding the special issues. Instead, the jury must decide the first special issue, a broad question about "continuing threat to society," beyond a reasonable doubt; the jury may also consider the extraneous offenses in considering the second special issue. This collective consideration of unadjudicated offenses and charges that have not led to a conviction invites arbitrariness into the capital sentencing decision, because there are no procedural safeguards attached to the extraneous offenses.

In Mr. Daniel's penalty phase, the state introduced evidence of three unadjudicated offenses or offenses where Mr. Daniel was arrested but not found guilty of a crime: a 2007 arrest for Eluding a Police Officer, Possession of Marijuana, and traffic offenses, ECF 4-36, 23 RR 7-18, a 2010 arrest for theft and fraud charges, ECF 4-40, 27 RR 109-11, and 2012 arrest for DUI, ECF 4-35, 22 RR 19.

**B.    Mr. Daniel's Death Sentence Is Inconsistent with the Evolving Standards of Decency That Mark the Progress of a Maturing Society.**

Petitioner's death sentence is unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution because capital punishment defies evolving standards of decency, operates arbitrarily, fails to serve any valid penological purpose, and inflicts torture. There is a national

trend towards abolition, accompanied by the belief that the death penalty is excessive. Texas's capital punishment regime is out of step with the international community's consensus against the death penalty, and has failed to ensure reliability, consistency, and equal protection of the law.

Texas sentenced Petitioner to death under an arbitrary process that failed to limit the death penalty to the worst offenders and instead channeled and fostered discrimination on the basis of race. *Furman v. Georgia*, 408 U.S. 238, 242, 256 (1972). Petitioner's death sentence and continued confinement deprive him of his rights to due process, equal protection, and freedom from the infliction of torture and cruel and unusual punishment, as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; decisional law and other mandatory rules; and international law as set forth in treaties, customary law, and international human rights law. Petitioner's death sentence is also unconstitutional because he has been and will continue to be confined for a gratuitously long time under torturous, inhumane conditions. *See Glossip v. Gross*, 135 S. Ct. 2726, 2756, 2764-72 (2015).

It is well established that what is constitutionally tolerable under the Eighth Amendment is not static. "The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop*, 356 U.S. at 100-01. And of course, "the Clause forbidding 'cruel and unusual' punishments 'is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice.'" *Gregg*, 428 U.S. at 171.

### C.     State Habeas Counsel Were Ineffective for Failing to Raise this Claim.

For the reasons above, Mr. Daniel's ineffective-assistance-of-trial-counsel ("IATC") claim is meritorious. This claim was not presented or adjudicated in the state habeas proceedings. To the extent the claim is deemed procedurally defaulted, the ineffective assistance of state habeas counsel establishes cause and prejudice that overcome the default as is elaborated upon in the "Exceptions to Procedural Default" Section, *supra*. *Martinez*, 566 U.S. at 17; *Trevino*, 133 S. Ct. at 1918, 1921.

### 1. Deficient performance

State habeas counsel did not raise the fact that it was unconstitutional for the jury to hear about Mr. Daniel's unadjudicated offenses, despite the fact that he had not been found guilty of those offense beyond a reasonable doubt. Furthermore, state habeas counsel did not raise the fact that the death penalty is inconsistent with evolving standards of decency.

State habeas counsel had no reasonable basis for failing to raise the unconstitutionality of both allowing the jury to hear about Mr. Daniel's unadjudicated offenses, and for failing to raise the unconstitutionality of the death penalty because it is inconsistent with evolving standards of decency. Supp App. 1894. Likewise, there was no strategy decision for omitting these arguments. Supp. App. 1894.

### 2. Prejudice

Mr. Daniel was prejudiced by state habeas counsel's deficient performance. There is a reasonable probability that, had state habeas counsel included these arguments, Mr. Daniel would have been granted relief. Because Mr. Daniel can establish cause and prejudice under *Martinez* and *Trevino* to overcome default, this Court should grant Mr. Daniel habeas relief unless the state provides him a new trial and penalty phase.

## XIX. THE CUMULATIVE PREJUDICIAL EEFFECT OF THE ERRORS AT BOTH THE GUILT AND PENALTY PHASE DESCRIBED HEREIN DENIED MR. DANIEL DUE PROCESS AND EFFECTIVE ASSISTANCE OF COUNSEL.

Each claim presented herein individually entitles Mr. Daniel to relief from his conviction and sentencing. Even if this Court finds that Mr. Daniel is not entitled to relief based on any particular claim, he is nevertheless entitled to relief because the cumulative effect of these errors acted to deny Mr. Daniel a fair trial.

Due process claims are considered cumulatively as well as individually, and cumulative errors may provide a basis for relief whether or not the effect of the individual errors warrants relief. When

the court finds cumulative error or prejudice, it eliminates the need to analyze the individual prejudicial effect of each deficiency.

The circumstances of this case demonstrate the cumulative effect of counsel's serious failures, and the constitutional errors committed by the trial court and the prosecutor so undermined the fairness of the trial that Mr. Daniel's convictions cannot stand. *Dodson v. Stephens*, 611 F. App'x 168, 178-79 (5th Cir. 2015). Collectively and cumulatively, the errors set forth denied Mr. Daniel his right to due process of law and his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Though each constitutional violation detailed herein alone is sufficient for this Court to grant relief, considered cumulatively, they compel the conclusion that relief must be granted.

## REQUEST FOR RELIEF

Wherefore, based on the foregoing, Mr. Daniel respectfully requests that the Court grant him the following relief:

(1) Such discovery as is necessary for full and fair resolution of the claims contained in this Petition;

(2) An evidentiary hearing on all claims involving disputed issues of fact;

(3) Should it assist the Court, a status conference to discuss the timing of the above;

(4) An order holding in abeyance the federal proceedings should the Court deem it appropriate for Mr. Daniel to first exhaust any claim or portion thereof in state court;

(5) Should it assist the Court, schedule oral argument regarding Petitioner's request for an evidentiary hearing, discovery, abeyance, claims for relief, or any other matter the Court deems necessary; and

(6) Issue a Writ of Habeas Corpus to vacate Mr. Daniel's convictions and sentences.

Respectfully Submitted,

  /s/ Shawn Nolan
Shawn Nolan
Federal Community Defender for the
Eastern District of Pennsylvania
Suite 545 West, The Curtis Center
601 Walnut Street
Philadelphia, PA 19106
(215) 928-0520

Dated: March 4, 2019

## **CERTIFICATE OF SERVICE**

I hereby certify that on this date, I served the foregoing on the following person

by ECF:

Katherine Hayes
Assistant Attorney General
Office of the Attorney General
Post Office Box 12548
Austin, Texas 78711-2548

/s/ Shawn Nolan
Shawn Nolan

Dated: March 4, 2019