# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| BRANDON DANIEL, | § | |
| | § | |
| Petitioner, | § | |
| | § | CIVIL NO. A-17-CV-1069-LY |
| v. | § | |
| | § | * DEATH PENALTY CASE * |
| LORIE DAVIS, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

---

# REPONDENT'S ANSWER TO
# PETITIONER'S CONSOLIDATED AND AMENDED PETITION
# FOR WRIT OF HABEAS CORPUS

---

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

MARK PENLEY
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

KATHERINE D. HAYES
Assistant Attorney General
Criminal Appeals Division
*Counsel of Record*
TX Bar No. 00096729

Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
(512) 936-1400
(512) 320-8132 fax
katherine.hayes@oag.texas.gov

---

ATTORNEYS FOR RESPONDENT

---

# TABLE OF CONTENTS

TABLE OF CITED AUTHORITIES ...............................................................i

RESPONDENT'S ANSWER............................................................... 1

CLAIMS FOR RELIEF .................................................................. 1

STATEMENT REGARDING THE RECORD ................................ 4

STATEMENT OF THE CASE............................................................. 5

I.    Factual Background.............................................................. 5

    A.    Daniel's capital crime............................................................ 5

    B.    Evidence at punishment ................................................ 8

        1.    The State's case-in-chief............................................... 8

            a.    Daniel's extraneous offenses, prior bad acts, and lack of remorse .................................................... 8

            b.    Daniel's misconduct in jail, continued lack of remorse, and plans to profit by his crime ....................... 12

            c.    Evidence regarding the prison classification system and prison society ......................................... 14

            d.    Testimony from Officer Padron's family ......................... 17

        2.    The defense's case-in-chief at punishment ................................. 17

            a.    Daniel's behavior in jail .................................... 18

            b.    Daniel's background and positive qualities .................... 20

            c.    Testimony from experts .................................... 23

        3.    The State's case in rebuttal............................................... 28

        4.    The defense's case in surrebuttal............................................... 30

II.   Procedural Background ................................................................. 30

STANDARD OF REVIEW ........................................................................ 32

ARGUMENT ........................................................................................... 36

I.    Daniel is Not Entitled to Habeas Corpus Relief on His Claims Alleging
      Judicial Bias. ................................................................................ 36

      A.    Background .......................................................................... 36

      B.    Daniel's Eighth Amendment claim is unexhausted, defaulted, and
            waived for inadequate briefing. ........................................... 40

      C.    Daniel's claim of judicial bias during pre-trial is unexhausted,
            defaulted, and alternatively meritless. ................................ 41

            1.    The claim is unexhausted and defaulted. ................... 41

            2.    Alternatively, the instant claim is without merit. ..... 42

      D.    Daniel's claim of judicial bias during state habeas proceedings is
            not cognizable and relief is barred under *Teague*. .............. 45

II.   Daniel is Not Entitled to Habeas Corpus Relief on His Claims Regarding
      Supplemental Jury Instructions. ................................................... 46

      A.    State court disposition ........................................................ 47

      B.    Daniel's Fifth, Sixth, and Eighth Amendment claims are
            unexhausted and defaulted. ................................................ 48

      C.    Daniel's Fifth and Eighth Amendment claims are waived by
            virtue of inadequate briefing. ............................................. 49

      D.    The remainder of Daniel's jury instruction claim is barred and
            alternatively lacks merit. ................................................... 49

            1.    The jury instruction claim that Daniel exhausted in state
                  court is nevertheless procedurally barred. .............. 49

            2.    In the alternative, Daniel fails to present a claim that
                  merits relief. ......................................................... 50

III. Daniel is Not Entitled to Habeas Corpus Relief on His Claims Challenging the Constitutionality of State Habeas Proceedings....................55

    A.    The claims are unexhausted, defaulted, and waived in part for inadequate briefing. ...........................................................55

    B.    In the alternative, Daniel's due process claim is meritless. ................56

IV. Daniel's Complaints of Inadequate Funding and Counsel Working Under a Flat Fee Agreement Do Not Merit Habeas Corpus Relief. ..............59

    A.    Background...........................................................................60

    B.    Daniel's claim challenging the trial court's funding is defaulted and alternatively meritless....................................................62

        1.    Habeas review is barred under the *Gardner* rule. ....................62

        2.    In the alternative, Daniel's inadequate-funding claim does not merit relief. ............................................................63

    C.    Daniel's conflict of interest claim does not merit relief under AEDPA...................................................................................65

V. Daniel is Not Entitled to Habeas Corpus Relief on His Claims Challenging Trial Counsel's Investigation and Presentation of the Mitigation Case. ................................................................68

    A.    Daniel's Eighth Amendment claim is unexhausted, defaulted, and waived by inadequate briefing.............................................69

    B.    Daniel's IATC claim does not merit relief under AEDPA. ..................69

        1.    Standard of review for IATC claims ..........................................69

        2.    Daniel fails to show that the state-court adjudication is an unreasonable application of *Strickland*.....................................71

            a.    This Court's review of the state-court adjudication is limited to the record before the state court. ....................72

            b.    The TCCA reasonably concluded that Daniel failed to satisfy *Strickland*'s deficient-performance prong........74

|  |  | c. | The TCCA reasonably concluded that Daniel failed to satisfy *Strickland*'s prejudice prong. ........................... 85 |

**VI.** Daniel is Not Entitled to Habeas Corpus Relief on His Claims Alleging Trial Counsel Failed to Investigate and Present Evidence of Autism Spectrum Disorder (ASD). .................................................................................. 87

A. Daniel's Eighth Amendment claim is unexhausted, defaulted, and waived for inadequate briefing. ...................................................... 88

B. Daniel's IATC claim does not merit relief under AEDPA. .................. 89

   1. This Court's review of the state-court adjudication is limited to the record before the state court. ............................... 90

   2. Daniel fails to show that the state-court adjudication is an unreasonable application of *Strickland*. ..................................... 91

      a. The TCCA reasonably concluded that Daniel failed to satisfy *Strickland*'s deficient-performance prong........ 92

      b. The TCCA reasonably concluded that Daniel failed to satisfy *Strickland*'s prejudice prong. ........................... 96

**VII.** Daniel is Not Entitled to Habeas Corpus Relief on His Claims Challenging Trial Counsel's Investigation and Presentation of Evidence Regarding the Adverse Effects of Xanax........................................................ 99

A. Daniel's Eighth and Fourteenth Amendment claims are unexhausted, defaulted, and waived for inadequate briefing. ............ 99

B. Daniel's IATC claim is unexhausted, defaulted, and plainly meritless. ............................................................................................. 100

   1. Daniel's defaulted IATC claim is not substantial. ................... 100

      a. Daniel fails to show deficient performance.................... 100

      b. Regardless, Daniel fails to prove prejudice................... 105

   2. State habeas counsel were not ineffective for failing to raise this plainly meritless IATC claim............................................ 107

VIII. Daniel is Not Entitled to Habeas Corpus Relief on His Claim Challenging Trial Counsel's Strategic Decision to Not Pursue a Motion to Suppress His Oral Statements. .................................... 108

    A.    Daniel's Eighth Amendment claim is unexhausted, defaulted, and waived for inadequate briefing. .......................... 108

    B.    The state-court adjudication of Daniel's IATC claim is entitled to AEDPA deference. .................................... 109

IX. Daniel is Not Entitled to Habeas Corpus Relief on His Claims Alleging Trial Counsel Failed to Investigate the State's Evidence that His Killing of Officer Padron was Intentional. .................................. 116

    A.    Daniel's Eighth Amendment claim is unexhausted, defaulted, and waived for inadequate briefing. .......................... 117

    B.    Daniel's IATC claim is unexhausted, defaulted, and utterly without merit. .................................... 117

        1.    Daniel's defaulted IATC claim alleging failure to challenge eyewitness testimony is plainly meritless. .............................. 118

            a.    Daniel fails to show deficient performance. ................... 119

            b.    Daniel also fails to show prejudice. ............................... 122

        2.    Daniel's defaulted IATC claim alleging failure to challenge testimony regarding hollow point bullets is plainly meritless. .................................... 125

        3.    State habeas counsel were not ineffective for failing to raise these plainly meritless IATC claims. ......................... 129

X. Daniel is Not Entitled to Habeas Corpus Relief on His Claims that Trial Counsel Failed to Investigate and Present Evidence to Support Several Assertions Made by Him During His Custodial Interview and that His Due Process Rights Under *Brady* Were Violated. ......................... 129

    A.    Daniel's IATC claim is unexhausted, procedurally defaulted, and plainly meritless. .................................... 130

        1.    Daniel's claim that counsel failed to investigate whether he carried a gun from time to time is utterly meritless. ............... 131

2.    Daniel's claim that counsel failed to investigate his working as a confidential informant is plainly meritless. ....... 133

3.    State habeas counsel were not ineffective for failing to raise these utterly meritless IATC claims. ........................................ 135

B.    Daniel's *Brady* claim is unexhausted, procedurally barred, and meritless in the alternative. .............................................................. 136

XI.    Daniel is Not Entitled to Habeas Corpus Relief on His Claims Challenging Trial Counsel's Failure to Object to Alleged Victim Impact Evidence at the Guilt Phase of Trial. .............................................................. 138

A.    The Eighth and Fourteenth Amendment claims are unexhausted, defaulted, and waived for inadequate briefing. ........... 139

B.    The TCCA's denial of relief is consistent with *Strickland*. ................ 139

1.    Daniel failed to prove deficient performance ............................ 140

2.    Daniel also failed to prove prejudice ......................................... 143

XII.    The Court Should Deny Habeas Corpus Relief on Daniel's Claims Regarding the Prosecutor's Closing Arguments at the Guilt Phase. ............ 144

A.    Daniel's prosecutorial misconduct claim is unexhausted and defaulted, and alternatively does not merit relief. ............................. 144

B.    The TCCA's rejection of Daniel's IATC claim on the merits is entitled to AEDPA deference. .............................................................. 147

1.    Daniel failed to prove deficient performance ............................ 148

2.    Daniel also failed to prove prejudice ......................................... 152

XIII.    Daniel is Not Entitled to Habeas Corpus Relief on His Claims Regarding the Prosecutor's Closing Arguments at the Penalty Phase ........................... 153

A.    Daniel's procedural misconduct and Eighth Amendment claims are unexhausted, defaulted, and alternatively without merit. .......... 154

B.    The TCCA's decision denying relief on the merits of Daniel's IATC claim deserves ADPA deference ......................................................... 156

1.  This Court's review of the state-court adjudication is limited to the record before the state court. ............................ 157

2.  The TCCA's denial of relief on the merits of the IATC claim was a reasonable application of *Strickland*. ............................ 159

   a.  Daniel failed to show counsel were ineffective for not objecting to arguments allegedly attacking their credibility. ............................................................ 160

   b.  Daniel failed to show counsel were ineffective for not objecting to arguments allegedly urging a verdict based on community demands. ....................................... 165

   c.  Daniel failed to show counsel were ineffective for not objecting to arguments allegedly comparing the value of lives. ................................................................ 168

   d.  Daniel failed to prove *Strickland* prejudice. ................. 172

XIV.  Daniel is Not Entitled to Habeas Corpus Relief on His Claims of False Testimony and Ineffective Assistance of Trial Counsel. ............................. 173

   A.  Daniel's Eighth Amendment claim of false testimony is unexhausted and defaulted. ................................................ 174

   B.  Daniel's due process claim of false testimony is *Gardner*-barred and alternatively without merit. ........................................ 175

   1.  Daniel's false-testimony claim is *Gardner*-barred. ................. 177

   2.  Procedural bar notwithstanding, Daniel's false testimony claim fails on the merits. .......................................... 178

   a.  The State did not present false testimony regarding the prison system. (Daniel's claim 14B)........................ 178

      (1)  No false testimony was presented regarding which offenders are serving life without parole sentences. .................................................. 178

      (2)  No false testimony was presented regarding the restrictions placed on offenders serving LWOP sentences. .................................................. 180

b.  The State did not give the jury a false impression regarding Daniel's taking notes of correctional officers' names. (Daniel's claim 14D) ............................ 182

c.  The State did not present false testimony from Louis Escalante. (Daniel's claim 14E)..................................... 185

C.  The state court adjudication of Daniel's two claims of ineffective assistance merits AEDPA deference. .................................. 188

1.  Daniel fails to show deficient performance and prejudice based on trial counsel's purported failure to investigate prison classification. (Daniel's claim 14C).............................. 189

2.  Daniel fails to show deficient performance and prejudice based on counsel's failing to explain to the jury why Daniel was writing down names of correctional officers. (Daniel's claim 14E) ................................................................. 192

XV.  Daniel's Claim that His Eighth and Fourteenth Amendment Rights Were Violated Under *Brady* Does Not Warrant Habeas Corpus Relief. ...... 195

A.  Daniel's Eighth Amendment claim is unexhausted, defaulted, and waived for inadequate briefing. .................................. 196

B.  The TCCA's rejection of Daniel's *Brady* claim for lack of merit is entitled to AEDPA deference. ............................. 196

XVI.  Daniel is Not Entitled to Habeas Corpus Relief on His Claims Regarding Trial Counsel's Handling of Testimony from State's Witness Louis Escalante. ................................................................... 200

A.  Daniel's Eighth and Fourteenth Amendment claims are unexhausted, defaulted, and waived for inadequate briefing. ........... 201

B.  The TCCA's rejection of Daniel's IATC claim on the merits is entitled to AEDPA deference. ............................. 201

XVII.  Daniel is Not Entitled to Habeas Corpus Relief on His Claims Challenging the Constitutionality of Texas's Death Penalty Scheme. ......... 204

A.  Daniel's claim challenging the constitutionality of Texas's "10-12" Rule was reasonably denied on the merits by the TCCA. .................. 205

B.    The TCCA reasonably denied on the merits Daniel's claim that the future dangerousness issue is unconstitutionally vague. ............ 208

C.    The TCCA reasonably denied the merits of Daniel's claim that the punishment phase instructions unconstitutionally restricted the jury's consideration of mitigating evidence. ....................................... 210

D.    Daniel's claim that his death sentence is unconstitutional because capital punishment is arbitrarily administered was reasonably denied on the merits by the TCCA. ................................. 212

XVIII. Daniel is Not Entitled to Habeas Relief on His Claims Challenging the Constitutionality of His Death Sentence. ...................................................... 216

A.    Both claims are unexhausted and defaulted....................................... 217

B.    Regardless, Daniel's claim challenging evidence of extraneous offenses is meritless and *Teague*-barred. ........................................... 217

C.    Daniel's claim that his death sentence violates evolving standards of decency is also meritless and *Teague*-barred. ................................. 220

XIX.   Daniel's Claim of Cumulative Error is Unexhausted, Defaulted, and Alternatively Meritless. .................................................................................... 223

A.    This claim is unexhausted and defaulted........................................... 223

B.    In any event, since no error occurred, there is no error to cumulate. ............................................................................................. 223

OPPOSITION TO REQUEST FOR AN EVIDENTIARY HEARING ...................... 224

CONCLUSION.................................................................................................... 225

CERTIFICATE OF SERVICE .............................................................................. 226

**RESPONDENT'S ANSWER**

In 2014, a Texas jury convicted and sentenced to death Petitioner Brandon Daniel for the capital murder of Austin police officer Jaime Padron. Daniel has challenged the constitutionality of his conviction and sentence by filing a Consolidated and Amended Petition for Writ of Habeas Corpus (Am. Pet.) pursuant to 28 U.S.C. § 2254. (ECF No. 18). For the reasons set forth below, Daniel fails to demonstrate that he is entitled to relief. Respondent Lorie Davis (the Director) therefore requests that the Court deny Daniel's amended habeas corpus petition and decline to certify any issue for appeal.

## CLAIMS FOR RELIEF

1. The trial judge engaged in multiple ex parte communications with prosecutors, which repeatedly demonstrated her bias against Daniel, in violation of his Eighth and Fourteenth Amendment rights.

2. The trial judge gave supplemental instructions to the jury outside the presence of counsel, in violation of Daniel's Sixth Amendment right to counsel and a public trial, Fifth and Fourteenth Amendment rights to due process, and Eighth Amendment right to be free from cruel and unusual punishment.

3. Daniel was denied due process and a full and fair opportunity to litigate his constitutional claims under Texas state habeas law, when the trial judge, after engaging in ex parte communications with the prosecutor about the merits of Daniel's state habeas petition, denied Daniel a hearing, ignored the affidavits he submitted in support of his petition, and adopted the State's proposed order verbatim, in violation of the Eighth and Fourteenth Amendments.

4. Daniel's rights to due process, effective assistance of counsel, and immunity from cruel and unusual punishment were violated by the trial court's failure to properly fund his defense and trial counsel's agreement to work on Daniel's case under a flat fee

structure created a conflict of interest between Daniel and his attorneys.

5.    Daniel's rights to effective assistance of counsel and immunity from cruel and unusual punishment were violated by trial counsel's failure to investigate and present mitigating evidence.

6.    Daniel's rights to effective assistance of counsel and immunity from cruel and unusual punishment were violated by trial counsel's failure to investigate and present evidence that Daniel had autism spectrum disorder, which would have mitigated the circumstances surrounding the offense and would have explained his apparent lack of remorse.

7.    Trial counsel were ineffective for failing to investigate and present evidence of the adverse effects of Xanax in violation of Daniel's Sixth Amendment right to counsel, Fourteenth Amendment right to due process, and Eighth Amendment right to be free from cruel and unusual punishment.

8.    Trial counsel were ineffective for abandoning their motion to suppress Daniel's inadmissible oral statements in violation of his Sixth Amendment right to effective assistance of counsel, Fourteenth Amendment right to due process, Fifth Amendment right against self-incrimination, and Eighth Amendment right to be free from cruel and unusual punishment.

9.    Trial counsel were ineffective at both guilt and penalty phases for failing to challenge evidence and argument presented by the State that Daniel intentionally killed Officer Padron, in violation of Daniel's Sixth and Eighth Amendment rights.

10.    Counsel were ineffective for failing to investigate and present evidence in support of Daniel's assertion that he carried a gun from "time to time" because of death threats and that he previously assisted police in Colorado. Daniel was denied his rights to due process, effective assistance of counsel, and freedom from cruel and unusual punishment.

11.    Trial counsel provided ineffective assistance by failing to object to inadmissible victim impact evidence at the guilt and penalty phases of trial, thus denying Daniel due process, a fair trial, and his rights under the Sixth, Eighth, and Fourteenth Amendments.

12. The prosecutor committed misconduct and counsel were ineffective for failing to object to the State's improper arguments at the guilt phase, which impugned the credibility of counsel and struck at Daniel over the shoulder of his counsel, denying Daniel due process, a fair trial, and his rights under the Sixth and Fourteenth Amendments.

13. The prosecutor committed misconduct and counsel were ineffective for failing to object to the State's improper closing arguments at the penalty stage, denying Daniel due process, a fair sentencing, and his rights under the Sixth, Eighth, and Fourteenth Amendments.

14. Daniel's rights to due process and to be free from cruel and unusual punishment were violated when the State obtained a death sentence through the knowing use of false evidence. Trial counsel were ineffective for failing to investigate and present evidence to rebut the State's false evidence.

15. The State violated Daniel's rights to due process and to be free from cruel and unusual punishment under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.

16. Trial counsel were ineffective for failing to object to the inadmissible hearsay testimony of Louis Escalante in violation of Daniel's rights to due process and to be free from cruel and unusual punishment.

17. Daniel's Fifth, Sixth, Eighth, and Fourteenth Amendment rights were violated when he was sentenced to death under Texas's unconstitutional sentencing statute.

    A. Daniel's constitutional rights were violated when the trial court was prohibited from instructing the jury that a vote by one juror would result in a life sentence.

    B. Daniel's death sentence was arbitrarily and capriciously assigned based on the jury's answers to the unconstitutionally vague future dangerousness special issue.

    C. Daniel's death sentence should be vacated because the penalty phase jury instruction

restricted the evidence that the jury could determine was mitigating.

    D.    Daniel's death sentence is unconstitutional because it was assigned based on Texas's arbitrary system of administering the death penalty.

18.    Daniel's sentence of death violates the Fifth, Sixth, Eighth, and Fourteenth Amendments.

    A.    The presentation of evidence of "extraneous" conduct violates the Fifth, Sixth, Eighth, and Fourteenth Amendments.

    B.    Daniel's death sentence is inconsistent with evolving standards of decency that mark the progress of a maturing society.

19.    The cumulative prejudicial effect of the errors at both the guilt phase and the penalty phase described herein denied Daniel due process of law and the effective assistance of counsel.

Am. Pet. at 25-219 (ECF No. 18 at 36-230).

## STATEMENT REGARDING THE RECORD

The Director filed with the Court a copy of the state-court record from Daniel's direct appeal and two writ proceedings. (ECF No. 4; ECF No. 38). Three CDs containing the audio/video exhibits from the direct appeal record were submitted to the district clerk and Daniel's federal habeas counsel. Based on the state-court record and the submissions of the parties, the Court should have all the records necessary for conducting its review.

Additionally, the Director uses the following abbreviations to represent the state-court record: "CR" is the clerk's record from the primary case trial; "RR" is the reporter's record of transcribed testimony and exhibits; "SX" or "DX" are a State's

4

exhibit or Defendant's exhibit from trial; and "SHCR" is the state habeas clerk's record from the initial ("-01") and subsequent ("-02") state habeas proceedings. Citations are preceded by volume number and followed by page reference or exhibit. Parallel citations indicate where the records are located in the ECF filings.

## STATEMENT OF THE CASE

I. **Factual Background**

A. **Daniel's capital crime**

The Texas Court of Criminal Appeals (TCCA) gave the following summary of the evidence in its published opinion on direct appeal:

> The evidence showed that on the evening of April 5, 2012, [Daniel] was at his apartment in Austin with his roommate, Kelvin Davis. Davis testified that, while they were drinking alcohol and smoking marijuana in their apartment, [Daniel] wondered aloud "what it would be like to hit a store" and "how much money would they keep in the cash drawer." [Daniel] also remarked that he had already gotten away with "worse shit." Davis observed [Daniel] drinking a large quantity of tequila and taking several Xanax pills throughout the course of the evening. He also heard [Daniel] crying and talking to his mother on the phone about [Daniel's] ex-girlfriend, Jenna Feland. Davis testified that [Daniel] was still in their apartment when Davis went to sleep around 9:30 p.m.

> [Daniel] drove his motorcycle to a Walmart store later that night. Several store employees, including Sean McCarthy, Lincoln LeMere, and Archie Jordy, testified that [Daniel] appeared to be intoxicated. Sometime between midnight and 1:00 a.m. on April 6th, [Daniel] approached McCarthy, who was re-stocking water inside the store, and asked him to watch his bags while he went outside to get something. [Daniel] exited the store for a few minutes, then came back inside, retrieved his bags, and continued walking through the aisles. Jordy testified that [Daniel] was "drifting from side to side" with a "glazed look" in his eyes, attempting to pick up items and dropping them on the floor. After observing [Daniel's] behavior, LeMere called the police "to keep him from driving" while intoxicated. LeMere waited outside for the police to arrive, and Jordy remained inside the store and watched [Daniel].

Uniformed police officer Jaime Padron arrived at the Walmart, and LeMere accompanied him inside the store. LeMere testified that he pointed out [Daniel], who was approximately 100 yards away with Jordy behind him. Padron told [Daniel] that he was from the Austin Police Department, and added "[S]top, I need to talk to you." [Daniel] then began running towards the front exit. Padron tackled [Daniel], and they fell to the ground. LeMere testified that he never saw Padron remove his gun from his holster; however, LeMere, Jordy, and other store employees heard a gunshot as Padron and [Daniel] fell to the ground. Employee Alma Ramirez Gutierrez testified that she saw [Daniel] put a gun to Padron's neck and fire a second shot. She then ran to the customer service area and called 9-1-1.

LeMere testified that he "immediately jumped onto" [Daniel], who raised his arm and fired a third shot that passed by LeMere's ear. LeMere pushed [Daniel's] arm to the ground and Jordy stepped on [Daniel's] hand, causing him to release the gun. Jordy then kicked the gun away. LeMere testified that [Daniel] "laid his head down" and appeared to pass out "for a second." [Daniel] then raised his head and looked at Padron, who was lying on the floor bleeding profusely from his neck. [Daniel] laughed and said, "I killed a cop."

When Officer Christopher Kroger arrived at the Walmart, [Daniel] was still was on the ground. Kroger handcuffed [Daniel], and he and Sergeant Scott Perry performed CPR on Padron until EMS personnel arrived. Perry observed three shell casings and a gun on the ground, and he testified that Padron's gun was still in its holster in a locked position. EMS personnel attempted to resuscitate Padron, but he died at the scene. The medical examiner who performed Padron's autopsy testified that he died from a gunshot wound to the neck which fatally damaged his carotid and vertebral arteries. The "muzzle imprints and the gunpowder soot" around the wound indicated that the gun barrel was pressed against Padron's neck at the time of the shooting. Padron also had a hole in his shirt, but there did not appear to be any damage to the armored vest he was wearing underneath.

The evidence indicated that [Daniel] used a Jimenez Arms .380 pistol with hollow point bullets to shoot Padron. The medical examiner testified that hollow point bullets typically "cause more damage" on impact than regular bullets. Greg Karim, a firearm and toolmark examiner, testified that the first shot [Daniel] fired want through Padron's shirt, the second shot went through Padron's neck, and the third shot went through the roof of the Walmart.

The police searched [Daniel] at the scene and found a magazine containing six .380 hollow point bullets in his pocket. He also had a backpack containing $56.90 worth of unpaid items, including food and alcoholic beverages. [Daniel] was taken outside and placed in the back of Officer Albert Arevalo's patrol car. Arevalo testified that [Daniel] smiled and winked at him when he was inside the patrol car. [Daniel] asked Arevalo if they were in Travis or Williamson County, and he inquired whether one county was more lenient than the other. He also wanted to know if he would get a life or death sentence for what he had done, how long it would take and how much it would cost to get bailed out of jail, where his motorcycle would be taken, and how long it would take to retrieve it. Arevalo noticed that [Daniel] seemed lethargic, and he had slurred speech and red, watery eyes. At one point, [Daniel] was removed from the patrol car for EMS worker Christopher Lester to examine him. Lester testified that [Daniel] did not smell like alcohol, and [Daniel] denied that he had consumed any alcohol or drugs. [Daniel] also asked Lester "if he was going to get life in prison for this." Lester described [Daniel] as "blank," "cold," and emotionless during their conversation.

Officer Cory Knop transported [Daniel] to the police station in his patrol car. Knop testified that at times [Daniel] pressed his face against the glass divider and lay down in the car, his speech was slurred, and he appeared to be "on some kind of depressant." Arevalo testified that when [Daniel] arrived at the police station, he saw an old police motorcycle and remarked that it was "cool," and he spontaneously said, "[H]ey, I killed a cop." [Daniel] also asked Knop if he remembered him, which Knop did because he had previously arrested appellant for DWI in February 2012. Knop testified that [Daniel] said, "[T]he next time I see you I'll be 70 years old." Detective Anthony Nelson also testified that when [Daniel's] blood was drawn, he looked down at his hands, chuckled, and said, "I guess I got that cop's blood on my hands."

[Daniel] gave a recorded statement to police in which he admitted that he killed Padron. He said that in the hours before the offense, he drank alcohol, smoked marijuana, and took "[f]our bars" of Xanax. [Daniel] stated that he went to the Walmart intending "to shoplift a bunch of items" and brought his gun with him "in case there was some altercation" because he "was foreseeing cops preventing [him] from leaving the store." While [Daniel] was there, he could tell that store employees were "eyeballing" him, and he knew that they were going to "confront" him. [Daniel] explained "The officer told me to stop and I knew what he was after, and I had a .380 in my pocket so I figured that the consequences might be worse so I ran, the cop grabbed me and . . . I

turned around and shot him." [Daniel] stated that his gun was cocked and fully loaded. He admitted that he "pulled [the gun] up directly to [the officer's] face," and he fired one "pointblank shot to the face." He asked if he would spend the rest of his life in jail for what he did, and he stated that he should "[p]robably be put to death" because he "killed a cop." When Detective David Fugitt asked [Daniel] why he decided to pull the trigger, he answered "umm, it's a lame excuse, but I'm basically blaming it on the drugs."

*Daniel v. State*, 485 S.W.3d 24, 26-28 (Tex. Crim. App. 2016) (ECF No. 4-71 at 2-6).

## B.  Evidence at punishment

### 1.  The State's case-in-chief

During its opening statement, the prosecution argued that Daniel's personality has two sides—one that "always seemed nice and polite and kind to people" and the other that "kind of enjoyed being a criminal, enjoyed running from the police, kind of luring them on"—and that Officer Padron underestimated the threat Daniel posed and paid for it with his life. 22 RR 7 (ECF No. 4-35 at 7). In making its case for a death sentence, the prosecution presented evidence of Daniel's extraneous offenses, prior bad acts, and lack of remorse, his misconduct in jail and plans to profit by his capital crime, evidence regarding the inmate classification system and prison society, and testimony from Officer Padron's family.

#### a.  Daniel's extraneous offenses, prior bad acts, and lack of remorse

In November 1999, Daniel threatened a former classmate when they were in the sixth grade. Caresa Marino testified that Daniel ran up to her during recess, told her to lock her doors and windows because "he was going to come in [her] house and rape [her]," then cursed at her. 23 RR 21-24 (ECF No. 4-36 at 21-24). Marino was "too

scared" to tell anyone about it at school, but her mother reported the incident and Daniel stayed away from Marino afterwards. *Id*. at 23 (ECF No. 4-36 at 23).

On October 9, 2001, a 13-year-old Daniel assaulted a student in a locker room. 25 RR 159, 176 (ECF 4-38 at 159, 176). During the State's cross-examination of Dr. William Lee Carter, the witness agreed that Daniel "sucker punch[ed]" the other student, that Daniel reached out his hand in an apparent effort to reconcile but then punched the student three times, and the other student did not respond physically at all. *Id*. at 176 (ECF No. 4-38 at 176). A disciplinary report noted concern over the number of times and way in which Daniel assaulted the student and Daniel's not showing "any remorse." 27 RR at SX-98 at entry dated "10/09/2001" (ECF No. 4-66).

When Daniel was 19 years old, he failed to stop for a police officer while speeding on his motorcycle near Denver Colorado. Officer Shawn Wycoff testified that on January 25, 2007, he clocked Daniel going 80 miles an hour in a 55-mile-an-hour zone. 23 RR 7-11 (ECF No. 4-36 at 7-11). Daniel accelerated rapidly when Wycoff tried to stop him, making numerous lane changes and traveling at a high rate of speed. *Id*. at 9, 14 (ECF No. 4-36 at 9, 14). Daniel eventually stopped and was cited for eluding a police officer, failing to have an endorsement for a motorcycle license, and possession of marijuana. *Id*. at 10-13 (ECF No. 4-36 at 10-13). Daniel told Wycoff he was "out joyriding," racing a friend on the interstate, and "just didn't want to get caught" or "lose his license or his motorcycle[.]" *Id*. at 12 (ECF No. 4-36 at 12).

Two years later, in February 2009, Daniel purchased a .380 caliber Jiminez Arms (the eventual murder weapon) from a pawn shop in Fort Collins, Colorado. 20

RR 60-61 (ECF No. 4-33 at 60-61); 27 RR at SX-62 (ECF No. 4-42). Police searched Daniel's computer after his arrest for capital murder and recovered four photographs taken in Spring 2009. 22 RR 45-48 (ECF No. 4-35 at 45-48); 27 RR at SX-73 to SX-76 (ECF No. 4-42). Two pictures showed Daniel[1] holding the gun (SX-73, SX-74); one showed him pointing the gun at a wall or ceiling, with a bullet hole visible (SX-75), and one showed a bullet hole with a hand holding a quarter next to it (SX-76).

On December 27, 2011, Daniel was stopped for speeding on Interstate 27 between Amarillo and Lubbock, Texas. 22 RR 166-68 (ECF No. 4-35 at 166-68). State Trooper Charles Hoover testified that when he stopped the vehicle and made contact with Daniel, he smelled a very strong odor of burnt marijuana. *Id.* at 171-72 (ECF No. 4-35 at 171-72). Hoover seized a "marijuana grinder," a pipe, and three pill bottles for prescription marijuana from Colorado that were not in Daniel's name. *Id.* at 173-74 (ECF No. 4-35 at 173-74); 27 RR at SX-81, SX-82 (ECF No. 4-42). Videotaped evidence from this arrest supported Hoover's testimony that Daniel was "very respectful and compliant" and told the officer he wanted to be a "productive member of society." 22 RR 168-73 (ECF No. 4-35 at 168-73); 27 RR at SX-80 (ECF No. 4-42).

On February 2, 2012, Daniel was arrested in Austin, Texas, for driving while intoxicated. 22 RR 19-20 (ECF No. 4-35 at 19-20). Officer Cory Knop conducted the field sobriety tests, found Daniel too intoxicated to drive, and transported him to jail, all of which was videotaped. *Id.* at 21, 24-26 (ECF No. 4-35 at 21, 24-26); 27 RR at

---

[1] Based on Daniel's tattoo of a spider on the inside of his right forearm, 27 RR at SX-83 (ECF No. 4-42), Detective David Fugitt testified that Daniel was the person holding the gun in the photographs. 23 RR 72-73 (ECF No. 4-36 at 72-73).

SX-72 (ECF No. 4-42). During the encounter, Daniel made polite conversation and said he was a "productive member of society" and not a bad guy. 22 RR 28, 40 (ECF No. 4-35 at 28, 40). Daniel also said he worked as a police informant in Colorado, asked Officer Knop to not impound his vehicle, and asked if there was anything Knop could do to help him with the charges. *Id*. at 27-28, 40 (ECF No. 4-35 at 27-28, 40).

On April 6, 2012, Officer Cory Knop transported Daniel from the capital murder crime scene to the Austin Police Department (APD). 22 RR 18 (ECF No. 4-35 at 18). As Knop was escorting Daniel to an interview room, he heard Daniel nonchalantly tell another officer, "I killed a cop." *Id*. at 18-19 (ECF No. 4-35 at 18-19). Daniel asked Officer Knop if he remembered him, which he did based on the prior DWI arrest. *Id*. at 19 (ECF No. 4-35 at 19).

Kristina ("Nikki") Nance testified with an immunity agreement. 22 RR 87-88 (ECF No. 4-35 at 87-88). In late 2011 or early 2012, she met Daniel through a posting on Craigslist and was involved with him for two or three months. *Id*. at 89-90 (ECF No. 4-35 at 89-90). During that time, they used "all kinds of drugs," including Xanax, cocaine, acid, mushrooms, and Ecstasy, which Daniel usually bought for them. *Id*. at 90 (ECF No. 4-35 at 90). Nance stated that their friendship ended after she fronted Daniel $600 to buy drugs and he never paid her back. *Id*. at 93-95 (ECF No. 4-35 at 93-95). She testified that she saw Daniel's gun approximately ten times, that Daniel thought having a gun looked "cool," Daniel said it was strictly for protection, and she never saw him take it outside the apartment. *Id*. at 95-96 (ECF No. 4-35 at 95-96). Nance further testified that Daniel bragged he could drive really fast on his

motorcycle and had outrun the police in Colorado. *Id*. at 97 (ECF No. 4-35 at 97).

In addition to the evidence already before the jury regarding Daniel's shoplifting at the Walmart, *see* Part I.A. above, during cross-examination of Jenna Feland, Daniel's former girlfriend, the State elicited testimony that Daniel "has stolen in the past." 26 RR 108 (ECF No. 4-39 at 108). Feland testified that (1) Daniel told her that when he was in high school, he grabbed various items at a Blockbuster video store and ran out without paying; (2) she bought Daniel an Xbox at a Walmart, Daniel used the packaging to return a broken Xbox, and got a free Xbox in return; and (3) Daniel purchased an Xbox at Best Buy and later returned the box for a refund but had put rocks or weights inside. *Id*. at 108-11 (ECF No. 4-39 at 108-11). For the theft at Best Buy, Daniel was charged with criminal simulation, but the case was dismissed. *Id*. at 110-11 (ECF No. 4-39 at 110-11).

### b. Daniel's misconduct in jail, continued lack of remorse, and plans to profit by his crime

The TCCA provided the following summary of the State's evidence in its opinion on direct appeal:

> The State introduced evidence of [Daniel's] behavior while in jail following the instant offense. On May 20, 2012, [Daniel] approached a corrections officer and told him that he "had found a bunch of orange and green pills" in the dayroom, and he "had taken them trying to commit suicide." He was taken to the hospital for evaluation. The hospital records stated that [Daniel] admitted "taking a bag of pills he found taped under a chair in a suicide attempt." Although he "required intubation and mechanical ventilation for respiratory distress," his "urine and serum drug screens were negative."[2] The hospital records

---

[2]     Dr. Harold Scott, a psychiatrist who interviewed [Daniel] and reviewed his records, suspected that [Daniel] might have taken "haloperidol," a generic form of Haldol, which Scott testified is "the most common psych drug in a institutional

stated that [Daniel] suffered "poisoning" by drugs and "medical substances."

In June 2012, corrections officer Dustin Rade found "hooch" hidden behind the toilet in [Daniel's] cell. In August 2012, Rade inspected [Daniel's] cell and found "six pills in the window ledge," and he believed that [Daniel] was hoarding prescriptions pills. [Daniel] also kept a list in his cell with names and details about jailers and their shifts, which led Rade to believe that [Daniel] was monitoring the jail operation.

While [Daniel] was housed in the health services building, fellow inmate Louis Escalante expressed curiosity as to why [Daniel] was in jail. [Daniel] asked Escalante if he had seen him on the news, and he showed Escalante a picture of himself at the time of the offense. [Daniel] smirked, and he stated that he was "the one that murdered a cop." Escalante testified that, when he asked [Daniel] if he had any remorse or sympathy for the victim, [Daniel] "just nodded his head no." Escalante also testified that, on another occasion, he overheard [Daniel] talking to another inmate about an escape plan.

Corrections officer[s] Timothy Parrish [and Donald MacIntyre] testified about an incident that occurred in August 2013, when inmates in the dayroom were watching television news coverage of [Daniel's] case. At the completion of the news story, the inmates applauded for [Daniel], who "took a bow in front of everybody." Parrish testified that one of the inmates "screamed out fuck the police," and [Daniel] "acknowledged him by raising his fist in the air."

The State further introduced evidence of [Daniel's] verbal and written communications with his mother, his sister, and his ex-girlfriend (Feland). He told his mother that he had been joking when he reported being depressed and suicidal in jail. [Daniel] also expressed to his sister that he was sent to the hospital after making a joke, and he added, "Sometimes these guys are so stupid." [Daniel] talked to his mother and Feland about corresponding in code in order to bypass security at the jail. He also sent Feland a letter telling her not to talk to anyone about him without his permission. He told Feland, "I know what I'm doing," and he instructed her to "let me run the defense and just help me by only doing what I say directly."

---

setting." Scott testified that the hospital did not screen [Daniel's] blood for Haldol.

Detective Fugitt testified that [Daniel] had an online profile on "meet-an-imate.com." Fugitt testified that [Daniel] wrote his mother asking her "to make [him] sound more bad" in his profile because the website visitors might be looking for someone more "criminalish." [Daniel] also conversed with his mother about "murderabilia" and selling his artwork in jail. He told his mother that "as far as the prison pecking order goes in relation to crimes committed, I think I may be at the top." In a jail visit with Feland, he discussed selling his story for one hundred thousand dollars. He also wrote a letter to Feland in which he stated, "Just living the dream, I'm retired at 25."

*Daniel*, 485 S.W.3d at 30-31 (ECF No. 4-71 at 10-12) (footnote by the court).

Detective Fugitt further testified that after he received a report that Daniel was planning an escape, he began checking Daniel's phone calls daily for the officers' safety. 23 RR 83-84 (ECF No. 4-36 at 83-84). He listened to approximately 16 hours of recorded telephone conversations, read Daniel's mail and emails, and watched videos of Daniel's visitations. *Id*. at 84 (ECF No. 4-36 at 84). Detective Fugitt testified that the only semblance of remorse expressed by Daniel throughout the course of the entire investigation when he said he felt horrible after being prodded for a response by Detective Heather Robinson. *Id*. The first time Daniel was asked about how the crime made him feel, he told Robinson he felt like his life was over. *Id*.

c. **Evidence regarding the prison classification system and prison society**

Stephen Rogers, a former correctional officer, warden, and member of the State Classification Committee (now retired), testified regarding Texas's prison classification system based on his 30 years' experience at the Texas Department of Criminal Justice (TDCJ). 23 RR 119-22, 128 (ECF No. 4-36 at 119-22, 128). According to Rogers, the classification system determines where an inmate is going to be housed

according to a custody assignment based on established criteria. *Id.* at 129-30 (ECF No. 4-36 at 129-30). In general, the lower level of custody or supervision an inmate needs, the more privileges the inmate gets. *Id.* at 130 (ECF No. 4-36 at 130).

Rogers testified an inmate sentenced to life without parole (LWOP) is classified as a "G3," meaning general population level 3, 23 RR 123, 130, 134, 137 (ECF No. 4-36 at 123, 130, 134, 137), although the assignment could be lower, like G4 or G5, if warranted by an inmate's behavior in jail or during transport to TDCJ. *Id.* at 137 (ECF No. 4-36 at 137). A G3 inmate is restricted from working near the outer fence of the prison and cannot live in dorms between the main building and outer fence. *Id.* at 135 (ECF No. 4-36 at 135). Otherwise, a G3 has all the privileges of a minimum security G2 inmate, including going to church, school, the recreation yard, the dining hall, or medical appointments, eligibility for contact visits, and access to the commissary. *Id.* at 133, 135-36 (ECF No. 4-36 at 133, 135-36). Prisoners in general population can watch television in the dayroom, purchase a radio from the commissary, make phone calls, receive print outs of emails, and have contact with family members. *Id.* at 160, 190-91 (ECF No. 4-36 at 160, 190-91).

Regarding security in general population, Rogers agreed there was "no sign on the offender" and "no public announcement" of the underlying crime to warn officers that the offender might be someone they do not want to let get close. 23 RR 136-37 (ECF No. 4-36 at 136-37). G3 inmates have the same contact with prison staff and volunteers as a G2, and they walk the hallways without handcuffs. *Id.* at 136 (ECF No. 4-36 at 136). Many staff members in the prison system are female correctional

officers. *Id.* at 140 (ECF No. 4-36 at 140). Cell doors are controlled by a central system, although sometimes the system has been "popped" and guards have found inmates inside cells where they should not be. *Id.* at 143-44 (ECF No. 4-36 at 143-44). Rogers testified regarding inmates having weapons or making weapons or shanks, *id.* at 150-54 (ECF No. 4-36 at 150-54), and possessing contraband like cell phones, illegal drugs, and alcohol (aka hooch or chalk). *Id.* at 157-59 (ECF No. 4-36 at 157-59). As a warden, Rogers would have concern if an inmate was writing things in code or tracking movements of officers, and such conduct poses a safety concern for officers and other inmates. *Id.* at 159-61 (ECF No. 4-36 at 159-61). In Roger's opinion, if an inmate had animosity towards police or correctional officers, there would be an opportunity to hurt such officers in general population. *Id.* at 164 (ECF No. 4-36 at 164).

During Roger's testimony, the State admitted into evidence a video recording (SX-96) showing the movements of prisoners in general population and on death row. 23 RR 138 (ECF No. 4-36 at 138); 27 RR at SX-96 (ECF No. 4-66). Rogers testified that a prisoner under a death sentence is classified like an administrative segregation prisoner. 23 RR 137-38 (ECF No. 4-36 at 137-38). An inmate on death row is confined to his cell "23 hours a day, seven days a week," he gets one hour out to recreate, officers take meals to the inmate's cell and place it inside a food chute for the inmate to retrieve, officers strip search and handcuff an inmate before he leaves his cell, and they follow the same procedures when he returns. *Id.* at 138-40, 145-46 (ECF No. 4-36 at 138-40, 145-46). A death row inmate is escorted by two guards with handcuffs and pepper spray, but no guard carries a gun. *Id.* at 141 (ECF No. 4-36 at 141).

#### d. Testimony from Officer Padron's family

Linda Diaz, Jaime Padron's older sister, testified that Padron enlisted in the Marine Corps when he was just 17 years old and still in high school. 23 RR 210 (ECF No. 4-36). After service with the Marines, Padron worked for their father at a dairy farm, became a correctional officer at the Eden Detention Center, then worked as a police officer for 14 years with the San Angelo Police Department. *Id.* at 210-11 (ECF No. 4-36 at 210-11). As a rookie police officer, Padron twice ran into a burning building to try to save victims and managed to save a fellow rookie officer who had not emerged from the burning home. *Id.* at 212 (ECF No. 4-36 at 212). Padron later moved to Austin to work for the airport police, then became an APD officer. *Id.* at 211 (ECF No. 4-36 at 211). Killed at age 40, Padron had given more than half his life to serving his country and his community and protecting the public. *Id.* Diaz described her brother as a very honorable man, a dedicated father to his two girls (ages six and ten), and a loving son to their parents. 23 RR 211-14 (ECF No. 4-36 at 211-14). While working full time, Padron continued his education, earning degrees in psychology and criminal justice, and graduating with honors. *Id.* at 213 (ECF No. 4-36 at 213). Padron had a positive impact on his nieces and nephews, and one nephew was following in his footsteps and had enlisted in the Marines. *Id.*

#### 2. The defense's case-in-chief at punishment

During opening statements, defense counsel highlighted mitigating evidence that was forthcoming—that Daniel was highly intelligent and had a bright professional future in computer programming, he suffered from major depression and

addiction for much of his life, had limited social skills, suicide attempts, instances of self-mutilation, multiple head injuries and possible frontal lobe damage, no parental acknowledgement of his problems, and no parental support. 22 RR 11-15 (ECF No. 4-35 at 11-15). Defense counsel argued that a 26-year-old facing the rest of his life in prison is "real punishment," that Daniel has done well on medication and in the controlled environment of jail, and that his behavior would not pose a threat to anyone in prison. *Id.* at 16 (ECF No. 4-35 at 16). In making their case for a life sentence, defense counsel presented evidence of Daniel's behavior in jail, his background and positive qualities, and expert testimony.

### a. Daniel's behavior in jail

Daniel called several correctional officers with the Travis County Sheriff's Office (TCSO) who testified that in their dealings with Daniel, he was compliant, polite, and respectful, and followed the instructions given him while incarcerated at jail awaiting trial—Richard Low, 24 RR 10-11 (ECF No. 4-37 at 10-11); Brad Peyton, *id.* at 18-22 (ECF No. 4-37 at 18-22); and Trey Long, *id.* at 32-35 (ECF No. 4-37 at 32-35). However, on cross-examination, they acknowledged that inmates are not compliant if they make intoxicating beverages, hoard prescription pills, give themselves tattoos, send coded messages, or track movements and activities of correctional officers. *Id.* at 14-15, 25-26, 39-40 (ECF No. 4-37 at 14-15, 25-26, 39-40).

The defense also presented evidence regarding Daniel's possible suicide attempts in jail. Deputy Trey Long testified that he was told about an incident of Daniel fastening a noose in one of his cells. 24 RR 36 (ECF No. 4-37 at 36). He further

testified that Daniel had been moved from the health services building for a suicide attempt and was placed in a violent cell, or slick cell, for observation. *Id.* at 27-28 (ECF No. 4-37 at 27-28). Deputy Stephen Crim testified that on August 26, 2012, he found Daniel on top of his bunk with his hands in the air vent at the top of the cell. *Id.* at 197-200 (ECF No. 4-37 at 197-200). He searched Daniel's cell and found torn bedsheets that were fastened into a makeshift noose and a three-foot-long rope. *Id.* at 201 (ECF No. 4-37 at 201). The noose was in the air vent. *Id.*

The defense additionally presented evidence to try to discredit testimony from State's witness Louis Escalante regarding Daniel's plan to escape. Deputy Stephen Crim testified that Escalante told him he overheard two inmates—Troy Williams and Daniel—"talking about trying to get out of jail or escape from jail," the inmates "said they were tired of being in jail and they wanted to get out," and the next time an officer opened up the door, Williams was going to "overtake the officer and take his keys and then let [Daniel] out." 24 RR 203 (ECF No. 4-37 at 203). Crim affirmed that was all the information Escalante provided and Crim reported it to his supervisor and made a written report. *Id.* Deputy Crim expressly denied ever being told of a plan for Daniel and Williams to coordinate their court dates and have someone come shoot up the courthouse. *Id.* at 203-04 (ECF No. 4-37 at 203-04).

Joseph Ferguson, a senior correctional officer, testified that he works the same shift with Deputy Crim. 24 RR 211-12 (ECF No. 4-37 at 211-12). Deputy Ferguson testified that on October 25, 2012, inmate Louis Escalante stated that Daniel and another inmate (Williams) were speaking to each other, Daniel reportedly was going

to give Williams a plastic spoon (something Williams was not allowed to have), and they made reference to "attempting to grab an officer's unit keys when the food chute was open." *Id.* at 215-16 (ECF No. 4-37 at 215-16). The deputy stated that Escalante never told him Daniel and Williams were planning to coordinate court dates and have someone shoot up the courthouse. *Id.* at 217 (ECF No. 4-37 at 217). Ferguson testified that if Escalante had told him such information, it would have been included in the report and given to the supervisor. *Id.* at 217-18 (ECF No. 4-37 at 217-18).

### b. Daniel's background and positive qualities

Sherri Schuck, Daniel's maternal aunt, was the only family member who testified on Daniel's behalf. Schuck testified that Daniel was born in Kansas, that he lived there until about 5 or 6 years old, that his family moved to California, then later to Colorado. 25 RR 22, 24-25 (ECF No. 4-38 at 22, 24-25). Daniel's parents sent him to a private military school in Kansas for a period of time when he was 16 years old. *Id.* at 57 (ECF No. 4-38 at 57). After he "went AWOL" from military school, Daniel lived with Schuck's family for a few months, attended high school, and worked at the local MacDonald's. *Id.* at 25-26, 57 (ECF No. 4-38 at 25-26, 57). She described that Daniel was always "pretty quiet" and "polite," but the longer he stayed in Kansas, he became "really sad," would stay in his room, and not engage with others unless they initiated it. *Id.* at 26 (ECF No. 4-38 at 26).

Schuck testified that Daniel's mother had a liberal attitude towards marijuana and drinking and treated Daniel like an adult and an equal, and that Daniel seemed to think he could drink alcohol whenever he wanted. 25 RR 27-28, 30 (ECF No. 4-38

at 27-28, 30). Despite Schuck telling Daniel he could not drink or take drugs while staying at her home, he took alcohol from her refrigerator. *Id.* at 27, 29 (ECF No. 4-38 at 27, 29). Schuck had a strained relationship with her sister that broke down before trial; Schuck only learned about Daniel's arrest from a police investigator and did not know where her sister was at the time of trial because she had no contact with her. *Id.* at 30-31, 58-59 (ECF No. 4-38 at 30-31, 58-59). Schuck testified that her sister is a "very closed person" and it was not surprising she refused to have Daniel psychiatrically evaluated. *Id.* at 32 (ECF No. 4-38 at 32). Finally, Schuck testified that Jenna Feland, Daniel's ex-girlfriend, seemed to adore Daniel and he seemed "pretty happy," but Daniel's mother did not think Jenna was good enough for Daniel and criticized the relationship. *See id.* at 33-34 (ECF No. 4-38 at 33-34).

Dr. James Ascough, a research hydraulic engineer with the United States Department of Agriculture, testified regarding Daniel's intelligence and capabilities as a computer programmer. 24 RR 42-68 (ECF No. 4-37 at 42-68). He hired Daniel through a work-study program at Colorado State University, *id.* at 45-48 (ECF No. 4-37 at 45-48), and worked with him for approximately 18 months, from 2009 to Christmas 2010. *Id.* at 56 (ECF No. 4-37 at 56). He described Daniel as a "sharp kid," who was "very easy to work with," and an "extremely good programmer. Well above average." *Id.* at 49 (ECF No. 4-35 at 49). Dr. Ascough testified that he was most impressed with Daniel's developing an interface that allowed scientists to run multiple models on a single platform. *Id.* at 49-51 (ECF No. 4-35 at 49-51). The two co-authored a chapter in a book entitled *Advances in Nitrogen Management for Water*

*Quality*. *Id*. at 53-54 (ECF No. 4-35 at 53-54). Although he encouraged Daniel to continue working with him and attend graduate school, Daniel took a job with Hewlett-Packard in Austin and the two ceased contact in early to mid-2011. *Id*. at 57-58 (ECF No. 4-35 at 57-58). Dr. Ascough was "stunned" when he heard about Daniel killing Officer Padron. *Id*. at 59 (ECF No. 4-35 at 59).

Neeraj Arora, a software development manager at Hewlett-Packard, testified that he supervised Daniel for seven or eight months when Daniel joined his project team in Austin, Texas. 24 RR 177-78 (ECF No. 4-37 at 177-78). Daniel worked for the company before joining Arora's team, had been promoted, likely received a raise, and was probably making $65,000 to $70,000. *Id*. at 179-80 (ECF No. 4-35 at 179-80). Arora found Daniel to be a good programmer who did the work assigned and knew what he was doing on technical matters. *Id*. at 180 (ECF No. 4-35 at 180). Daniel would occasionally work from home a couple of days a week after calling in sick or for some other personal reason. *Id*. at 181-82 (ECF No. 4-35 at 181-82). Arora saw no signs of Daniel being intoxicated at work, knew nothing about Daniel's being arrested for DWI in February 2012, and learned about Daniel's prior drug use after reading about it in the newspaper after the arrest. *Id*. at 182-83 (ECF No. 4-35 at 182-83). Arora was shocked to hear about the incident. *Id*. at 183 (ECF No. 4-35 at 183).

Billy Little, a software engineer for Hewlett-Packard, testified that he began working with Daniel in April 2011 when the company was developing a new product. 25 RR 5-7 (ECF No. 4-38 at 5-7). He found Daniel to be one of the people who was most adept at the new technology and who had a talent for tackling problems. *Id*. at

9-11 (ECF No. 4-38 at 9-11). Little was stunned when he learned about Daniel's arrest. *Id*. at 11-12 (ECF No. 4-38 at 11-12). He had no idea about Daniel's previous arrests and got no indication Daniel might have been under the influence of drugs during their conversations. *Id*. at 12 (ECF No. 4-38 at 12). Little did not have a personal relationship with Daniel, but after his arrest, Little and his wife began visiting him, writing, and ministering to him in jail. *Id*. at 12-14 (ECF No. 4-38 at 12-14). Little brought a letter with him that Daniel had written, and Little's wife framed a drawing Daniel sent. *Id*. at 15-16 (ECF No. 4-38 at 15-16); 27 RR at DX-17 (ECF No. 4-67). Little testified that he wanted to impress on Daniel that he had a friend who was concerned for the situation he was in and wanted to make Daniel aware of his choices for eternity. 25 RR 14, 19 (ECF No. 4-38 at 14, 19). He stated that Daniel sort of questions religion, but he felt encouraged because Daniel had not rejected their efforts. *Id*. at 16-19 (ECF No. 4-38 at 16-19).

### c. Testimony from experts

Psychologist William Lee Carter evaluated Daniel for the defense and created a "Life History and Psychological Study" to explain his findings. 24 RR 78 (ECF No. 4-37 at 78).[3] Dr. Carter interviewed Daniel on two occasions in January and early February of 2014, and reviewed numerous records, transcripts, and recordings. *Id*. at 83, 94-95 (ECF No. 4-37 at 83, 94-95). Based on his assessment, Dr. Carter testified that Daniel never felt connected to his family or had much contact with extended

---

[3]      Dr. Carter's testimony largely followed his PowerPoint presentation, a copy of which was admitted for record purposes. 27 RR at DX-16 (ECF No. 4-67 at 72-81 to ECF No. 4-68 at 1-22).

family, he became emotionally isolated and withdrew in early adolescence, he was generally quiet and introverted by nature, he fell into a pretty deep depression (major depression) by age 12 or 13, it is possible to get psychological treatment for depression at that age that is successful, but Daniel did not know how to ask for help because he did not have a strong support system. *Id.* at 88-94, 160 (ECF No. 4-37 at 88-94, 160). Daniel started experimenting with drugs in junior high between the ages of 12 or 13 to escape his depression. *Id.* at 95-96 (ECF No. 4-37 at 95-96). Dr. Carter testified that Daniel tended to keep to himself, avoided people, was not an "emotionally expressive person," and was rather humorless, serious, and often alone. *Id.* at 96 (ECF No. 4-37 a 96). As a teenager, Daniel felt isolated and lonely. *Id.* at 101 (ECF No. 4-37 at 101). Dr. Carter thought Daniel's depression probably worsened into his teenaged years, and that Daniel felt hopeless and suicidal and hated his life. *Id.* at 106 (ECF No. 4-37 at 106). However, Dr. Carter did not believe that Daniel was depressed to the point of psychosis. *Id.* at 118 (ECF No. 4-37 at 118).

Dr. Carter also testified that a "common theme" in Daniel's life was his trying "to be somebody he's not by bragging, by pushing limits." 24 RR 102 (ECF No. 4-37 at 102).[4] He acknowledged that Daniel had power struggles with adults and "other authority figures, including police," and that "he is thumbing his nose at the law, speeding. . . doing whatever he wants when he goes to college, despite disciplinary

_____

[4] On cross-examination, Dr. Carter acknowledged that Daniel assaulted another boy in the locker room in high school, and a disciplinary report stated that he had no remorse for the that incident. 24 RR 159 (ECF No. 4-37 at 159).

warnings, that sort of thing." *Id*. at 103 (ECF No. 4-37 at 103). Nevertheless, he opined that Daniel could respond well to a structured prison environment because "[m]any of the things that influenced him and pushed him into a negative state during his childhood, youth, [and] early adulthood will be absent from him [in prison], particularly the substance abuse problems." *Id*. at 149 (ECF No. 4-37 at 149).

Dr. Thomas Walter Harrell, a psychologist who specializes in neuropsychology and rehabilitative psychology, testified that he interviewed Daniel four times and reviewed various records provided by the defense. 25 RR 239-40 (ECF No. 4-38 at 239-40). Dr. Harrell stated that he became involved in the case "to try to make sense out of a fundamentally senseless act." *Id*. at 234 (ECF No. 4-38 at 234). The expert was particularly interested in a possible connection between substance abuse and history of traumatic head injury or untreated psychiatric disorders. *Id*. at 234, 236 (ECF No. 4-38 at 234, 236). Based on Daniel's self-reported frontal lobe injuries[5] and medical records regarding a skateboarding accident,[6] Dr. Harrell opined that Daniel experienced traumatic brain injuries which could have contributed to his drug use

---

[5]     Dr. Harrell testified on voir dire that Daniel reported to him that he (1) fell in the bathtub when he was 18 to 24 months old and got a knot on his forehead, (2) fell off a "motorcycle" with training wheels when he was three years old, and (3) drove his bicycle into a parked car, was knocked unconscious, and got a laceration on his head. 24 RR 241-42 (ECF No. 4-37 at 241-42). The expert believed the last injury occurred before Daniel reached middle school. 25 RR 86 (ECF No. 4-38 at 86). No records were offered to substantiate Daniel's account.

[6]     When Daniel was 15 years old, his father took him to the hospital after Daniel fell from his skateboard, hit his head on the concrete, and had a loss of consciousness. 24 RR 251, 268-70 (ECF No. 4-37 at 251, 268-70). However, the brain scan taken of Daniel at the hospital following the accident was normal. 25 RR 79 (ECF No. 4-38 at 79).

and depression. *Id.* at 234-40, 242-45 (ECF No. 4-37 at 234-40, 242-45). Dr. Harrell gave Daniel a "smell identification test" and found that he does not discriminate smells particularly well. *Id.* at 246 (ECF No. 4-37 at 246). From a neuropsychological standpoint, Dr. Harrel found the result very significant because it clinically correlates with behavioral disinhibition, poor self-control, and mood instabilities, and "raises the index of suspicion" that Daniel could have a frontal lobe brain deficit. *Id.* at 246-48 (ECF No. 4-37 at 246-48).

Dr. Harrell further testified that the frontal lobe is involved in mood regulation, that Daniel's depression really manifested itself by age 11 or 12, but that he likely "had been struggling with depression and sadness virtually all of his life." 24 RR 248-49 (ECF No. 4-37 at 248-49). His review of school records showed indications of Daniel's early suicide attempts, gestures of self-harm such as cutting or burning himself, and explicit statements to school or to classmates about killing himself. *Id.* at 249-50 (ECF No. 4-37 at 249-50). Dr. Harrell testified that the school district wanted Daniel's parents to follow up with psychological testing, but they refused to do so. *Id.* at 250-51 (ECF No. 4-37 at 250-51). The expert also testified that Daniel had a substance abuse disorder that could be an expression of frontal lobe damage or have its own impact on the frontal lobe by interfering with development. *Id.* at 255 (ECF No. 4-37 at 255). Daniel self-reported that he started drinking alcohol and smoking marijuana in the third grade, and even reported that he used drugs with his parents and did cocaine with his father. *Id.* at 255-56 (ECF No. 4-37 at 255-56). While Dr. Harrell believed Daniel has frontal lobe damage, he did not think Danial

was so damaged that he was incapable of controlling his behavior. *Id.* at 266 (ECF No. 4-37 at 266). Dr. Harrell opined that Daniel "will do okay" in a structured prison environment. *Id.* at 268 (ECF No. 4-37 at 268).

Dr. Harold Scott, a psychiatrist, interviewed Daniel five times, reviewed records and videos, and interviewed Daniel's father. 25 RR 176-78 (ECF No. 4-38 at 176-78). He tried to interview Daniel's mother, but got no response ("radio silence") and exchanged some text messages with Daniel's sister. *Id.* at 184 (ECF No. 4-38 at 184). Dr. Scott testified initially to rebut the suggestion that Daniel had faked a suicide attempt while awaiting trial, explaining that Daniel had likely taken an overdose of Haloperidol (a generic form of Haldol), Haldol is commonly used in institutional settings, the hospital did not screen Daniel's blood for Haldol, and Daniel could not have faked his symptoms. 25 RR 145-75 (ECF No. 4-38 at 145-75).

Dr. Scott diagnosed Daniel with "major depression, severe" that was recurrent possibly since childhood, but at least through adolescence. 25 RR 178 (ECF No. 4-38 at 178).[7] He also diagnosed Daniel with avoidant personality disorder, and suspected that he was heavily addicted to drugs. *Id.* at 180, 208, 219-20 (ECF No. 4-38 at 180, 208, 219-20). Dr. Scott testified that (1) Daniel has a history of substance abuse, untreated depression, and suicide attempts, *id.* at 200-03, 208-09, 216 (ECF No. 4-38 at 200-03, 208-09, 216); (2) Daniel's parents did not seek help and apparently self-medicated with drugs and alcohol, *id.* at 208 (ECF No. 4-38 at 208); (3) Daniel's

---

[7]     Daniel was also diagnosed with "major depressive disorder" by Dr. Tara Wagner, the psychiatric consultant to the jail. 25 RR 206 (ECF No. 4-38 at 206).

mother was controlling, emotionally unavailable, and mistrustful of doctors, which contributed to Daniel's psychological issues, *id.* at 185-93 (ECF No. 4-38 at 185-93); (4) Daniel was "highly addictive," having used substances since age 9 to "obliterate reality" and self-medicate for his depression, *id.* at 208-09 (ECF No. 4-38 at 208-09); (5) Daniel used alcohol, cough syrup, marijuana, and computer duster (an inhalant) by age 13, *id.*; and (6) Daniel's depression after his breakup with his girlfriend and limited coping skills led to his use of Xanax. *Id.* at 210-13 (ECF No. 4-38 at 210-13). Finally, Dr. Scott testified that he thought Daniel could make a positive adjustment to life in prison. *Id.* at 225-28 (ECF No. 438 at 225-28).

### 3.    The State's case in rebuttal

APD Detective David Fugitt testified that in Daniel's phone calls, letters, and visitations in jail, Daniel showed a fascination with major criminal events that had occurred since his commission of capital murder. 25 RR 248 (ECF No. 4-38 at 248). Daniel often spoke of the shooting in a movie theater in Aurora, Colorado, the Sandy Hook Elementary School shooting, the Boston Marathon bombing, and the Washington, D.C., shooting on the capitol mall, and he was intrigued with the number of casualties and the types of weapons used. *Id.* at 248-49 (ECF No. 4-38 at 248-49). Detective Fugitt also testified that Daniel's mother said she felt sorry for the shooter in the movie theater massacre in Colorado. *Id.* at 249 (ECF No. 4-38 at 249).

Dr. Marisa Mauro, a licensed psychologist, interviewed Daniel on February 17, 2014, regarding his depression, family background, and substance abuse before, during, and after this offense; his prognosis for recovery from depression and

substance abuse; and his adjustment to incarceration. 26 RR 13-15 (ECF No. 4-39 at 13-15). Daniel provided Dr. Mauro with little information and was very emotionless. *Id.* at 16 (ECF No. 4-39 at 16). Dr, Mauro found no evidence of psychosis, and she disagreed with the diagnosis of major depression, severe and recurrent. *Id.* at 17 (ECF No. 4-39 at 17). She opined that Daniel's alleged suicide attempt of taking pills in jail was more of a gesture, and the circumstances raised questions for her regarding Daniel's intent. *Id.* at 20 (ECF No. 4-39 at 20). After Daniel broke off his relationship with his former girlfriend, he threatened to kill himself with his gun but that was only a ruse to get her back. *Id.* at 24-25 (ECF No. 4-39 at 24-25).

Dr. Mauro did not believe that depression impacted Daniel before, during, or after the capital offense. 26 RR 31 (ECF No. 4-39 at 31). She testified that the jail records recorded that Daniel stated he had made a noose to "mess with" Dr. Wagner, the jail psychiatrist, and another time said he did it hoping he would get a cell change to one with a window where he could get better radio reception. *Id.* at 69 (ECF No. 4-39 at 69). Dr. Mauro found that Daniel displayed "shockingly little difficulty" adjusting to jail and was sleeping appropriately, socialized with other inmates, engaged in daily activities such as reading and writing, and referred to the other inmates as his "friends." *Id.* at 19, 25-26, 36 (ECF No. 4-39 at 19, 25-26, 36).

Daniel told Dr. Mauro that he had a "pretty normal" childhood with difficult issues being his parents' divorce, few friends, and a sometimes emotionally abusive mother. 26 RR 22-23 (ECF No. 4-39 at 22-23). He reported to Dr. Mauro substantially more drug use then documented in his records. *Id.* at 28 (ECF No. 4-39 at 28). Daniel

reported using substances daily and using every classification of drug, from prescription pills to opium, methadone, street drugs, Ecstasy, Xanax, and alcohol. *Id.* Despite Daniel's stated use of drugs and alcohol, the records do not indicate that he experienced any withdrawal symptoms in jail. *Id.* at 29 (ECF No. 4-39 at 29). Dr. Mauro knew from her work in prison systems that inmates have access to alcohol and to narcotics "pretty much all the time." *Id.* at 70 (ECF No. 4-39 at 70). Dr. Mauro testified that psychiatric medications were valuable in prison and used for favors. *Id.* In this case, Dr. Mauro was specifically restricted from giving any opinion as to Daniel's future dangerousness. *Id.* at 36-37 (ECF No. 4-38 at 36-37).

### 4. The defense's case in surrebuttal

The defense called Jenna Feland and her mother, Wendy Nesbitt, who both testified that Daniel sent Feland a letter (DX-18) expressing his remorse for the offense. 26 RR 71-86 (ECF No. 4-39 at 71-86); 27 RR at DX-16 (ECF No. 4-68).

## II. Procedural Background

On February 21, 2014, a Travis County, Texas, jury convicted Daniel of the capital murder of peace officer Jaime Padron. 1 CR 184 (ECF No. 4-1 at 184). Based on the jury's answers to the special issues on future dangerousness and mitigation, on February 28, 2014, the trial judge sentenced Daniel to death. *Id.* at 189, 198-99 (ECF No. 4-1 at 189, 198-99).

The TCCA affirmed Daniel's conviction and sentence on direct appeal. *Daniel v. State*, 485 S.W.3d 24 (Tex. Crim. App. Feb. 10, 2016) (ECF No. 4-71). Daniel did not petition for certiorari review.

On February 12, 2016, the Office of Capital and Forensic Writs (OCFW) filed a 300-plus page "Initial Application for Writ of Habeas Corpus," on Daniel's behalf raising eleven claims, SHCR-01 at 431-776 (ECF No. 4-81 at 8 to ECF No. 4-84 at 26), supported by thirty exhibits. *Id.* at 2-430 (ECF No. 4-78 at 4 to ECF No. 4-81 at 7; *see also* ECF No. 38). Daniel moved for recusal of the trial judge from presiding over his writ application. *Id.* at 777-836 (ECF No. 4-84 at 29-88). The motion was denied on April 14, 2016, after a hearing. *Id.* at 930 (ECF No. 4-84 at 182). Daniel moved for leave to file an original writ of mandamus challenging the ruling. *Ex parte Daniel*, No. WR-83,459-02, SHCR-02 at Motion for Leave (ECF No. 4-97), and Petition for Writ of Mandamus (ECF No. 4-98). The TCCA denied leave without written order on July 27, 2016. *Id.* at cover (ECF No. 4-108).

The habeas trial court adopted the amended findings of fact and conclusions of law submitted by the State and recommended that relief be denied. SHCR-01 at 1806-35 (ECF No. 4-89 at 108-37). On October 18, 2017, the TCCA denied habeas corpus relief based on the findings and conclusions and the TCCA's own review. *Ex parte Daniel*, No. WR-83,459-01, 2017 WL 4675772, at *3 (Tex. Crim. App. 2017) (ECF No. 4-96 at 6). The Supreme Court denied Daniel's petition for certiorari review. *Daniel v. Texas*, 138 S. Ct. 1328 (Mar. 26, 2018) (Mem.).

On October 15, 2018, Daniel filed a federal habeas petition (ECF No. 7) with six volumes of exhibits (ECF Nos. 7-1 to 7-6). On March 4, 2019, Daniel filed a Consolidated and Amended Petition for Writ of Habeas Corpus (ECF No. 18), and submitted a seventh volume of exhibits (ECF No. 20). This answer now follows.

## STANDARD OF REVIEW

The Anti-terrorism and Effective Death Penalty Act (AEDPA) governs this Court's review of Daniel's amended habeas petition claims. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). "Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (internal quotations and citations omitted); *Beazley v. Johnson*, 242 F.3d 248, 263 (5th Cir. 2001) (petitioner must exhaust all claims prior to requesting federal collateral relief). "The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court." *Morris v. Dretke*, 413 F.3d 484, 491 (5th Cir. 2005) (citation omitted). Under AEDPA, a federal court lacks the power to grant habeas relief on unexhausted claims, but it may deny an unexhausted claim on the merits. 28 U.S.C. § 2254(b)(2).

For federal constitutional claims that were adjudicated on the merits in state court, AEDPA "imposes a highly deferential standard of review for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks and citations omitted). This review "is limited to the record that was before the state court" and "focuses on what a state court knew and did." *Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011). Under § 2254(d), as amended by AEDPA, a federal court may not grant habeas relief unless the state-court adjudication:

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

This is an intentionally difficult standard to meet that "stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *Harrington v. Richter*, 562 U.S. 86, 102 (2011) (citation omitted).

With regard to § 2254(d)(1), the Supreme Court has concluded the "contrary to" and "unreasonable application" clauses have independent meanings. *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000); *id.* at 410 ("an *unreasonable* application of federal law is different from an *incorrect* application of federal law") (emphasis in original). Under the "contrary to" clause, a federal habeas court may grant relief if the state court (1) "applies a rule of law that contradicts the governing law set forth in [the Supreme Court's] cases," or (2) confronts facts that are "materially indistinguishable" from such precedent yet reaches an opposite result. *Id.* at 405-06.

An "unreasonable application" occurs if the state court identifies the correct governing legal precedent from the Supreme Court's decisions but unreasonably applies it to the facts of the case. *Williams*, 529 U.S. at 407-09. In evaluating whether a rule application was unreasonable, a federal court "must determine what arguments or theories supported or. . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision

of [the Supreme] Court." *Richter*, 562 U.S. at 102. The "rule's specificity" must be considered because "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (quoting *Alvarado*, 541 U.S. at 664); *see also Woodford v. Visciotti*, 537 U.S. 19, 27 (2002) (federal habeas relief is only merited where the state-court decision is both incorrect and objectively unreasonable, "whether or not [the reviewing federal court] would reach the same conclusion.").

Moreover, it is the state court's "ultimate decision" that is to be tested for reasonableness, and "not every jot of its reasoning." *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001); *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) (federal habeas court is authorized by § 2254(d) "to review only a state court's 'decision,' and not the written opinion explaining that decision"). And even where the state court fails to cite to applicable Supreme Court precedent or is unaware of such precedent, AEDPA's deferential standard of review nevertheless applies "so long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]." *Early v. Packer*, 537 U.S. 3, 8 (2002).

Through § 2254(d)(2) and § 2254(e)(1), AEDPA also significantly restricts the scope of federal habeas review of a state court's factual findings. Similar to a state court's determination regarding clearly established federal law, a state court's factual

determination is not unreasonable under § 2254(d)(2) "merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding) on habeas review, this does not suffice to supersede the trial court's factual determination. *Id*. Under § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed correct," unless the petitioner rebuts the presumption with "clear and convincing evidence."

Evidentiary hearings are precluded on claims adjudicated on the merits by the state court. *Pape v. Thaler*, 645 F.3d 281, 288 (5th Cir. 2011). In certain other situations, an evidentiary hearing is unwarranted because the inmate has not diligently developed the state-court record. (*Michael*) *Williams v. Taylor*, 529 U.S. 420, 437 (2000). If diligence is not an issue, then an inmate may not obtain a hearing unless (1) an inmate's claims rely on a new rule of constitutional law or a factual predicate previously undiscoverable through the exercise of due diligence; and (2) the inmate establishes by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty. 28 U.S.C. § 2254(e)(2). Even if a petitioner is not barred from obtaining an evidentiary hearing by § 2254(e)(2), factual development is unwarranted if sufficient facts exist in the record to make an informed decision on the merits. *Schriro v. Landrigan*, 550 U.S. 465, 474-75.

Finally, AEDPA did not subsume prior precedent that forecloses habeas corpus relief if a claim is defaulted as a consequence of a failure to comply with state law

procedural rules, *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); is barred by the doctrine of non-retroactivity, *Teague v. Lane,* 489 U.S. 288, 310 (1989);[8] or is based on trial court error that did not have a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

## ARGUMENT

### I. Daniel is Not Entitled to Habeas Corpus Relief on His Claims Alleging Judicial Bias.

Daniel contends the trial judge engaged in "multiple ex parte communications" with prosecutors through emails sent during pretrial and state habeas review. Am. Pet. at 25-34 (ECF No. 18 at 36-45). By his account, the ex parte emails "repeatedly demonstrated" the trial judge's bias against Daniel, in violation of his Eighth and Fourteenth Amendment rights. *Id*. at 25 (ECF No. 18 at 36). The Court should deny relief because Daniel's Eighth Amendment claim is unexhausted, defaulted, and waived for inadequate briefing; his Due Process claim of judicial bias at trial is unexhausted, defaulted, and alternatively meritless; and his Due Process claim of judicial bias during state habeas proceedings is not cognizable on habeas review.

#### A. Background

On February 16, 2016, four days after filing Daniel's state habeas application, the OCFW moved for recusal of the trial judge, Judge Brenda Kennedy, from presiding over the writ proceedings. SHCR-01 at 777-836 (ECF No. 4-84 at 29-88).

---

[8] For purposes of *Teague*, Daniel's conviction and sentence became final on May 10, 2016, when the time elapsed for petitioning for certiorari review of the TCCA's decision on direct appeal. *Caspari v. Bohlen*, 510 U.S. 383, 390 (1994).

The motion alleged that Judge Kennedy was "a material fact witness" for resolving several claims[9] and "her impartiality might reasonably be questioned." *Id*. at 778 (ECF No. 4-84 at 30). Daniel expressly stated that he was not alleging Judge Kennedy "harbors actual bias or prejudice concerning any party" and asserted that the specific circumstances in his case required recusal under Texas Rules of Civil Procedure, Rules 18(b)(1) and 18(b)(3). *See id*. at 779, 789-96 (ECF No. 4-84 at 31, 41-48). On March 4, 2017, the Presiding Judge of the Third Administrative Judicial Region appointed the Honorable Judge Doug Shaver, Senior Judge of the 262nd Judicial District Court, to hear Daniel's motion. *Id*. at 862-63 (ECF No. 4-84 at 114-15).

On March 30, 2016, Daniel supplemented his motion for recusal to include a claim of judicial bias based on an ex parte email sent by Judge Kennedy on March 9, 2016, to the Travis County District Attorney's Office regarding the recusal motion. SHCR-01 at 873-84 (ECF No. 4-84 at 125-36). Daniel also moved for discovery of all communications between Judge Kennedy and the District Attorney's Office, and Judge Shaver granted the request. *Id*. at 865-71, 905 (ECF No. 4-84 at 117-23, 157).

A hearing was held on the recusal motion on April 14, 2016, during which Daniel admitted into evidence five email chains that included four ex parte emails written by Judge Kennedy:

1. A December 18, 2013 (6:28 p.m.) pre-trial email from Judge Kennedy stating she would have Daniel brought to court that afternoon, the court reporter and defense attorneys would be on call and available, asking that she be notified after the District Attorney's Office concluded its meeting with the victim's

---

[9] Daniel's claims concerned Judge Kennedy's handling of a "jury note" and her decisions regarding funding. SHCR-01 at 778-79 (ECF No. 4-84 at 30-31).

family, and the sooner the court knows what is happening (about a plea bargain) the better because the court was already experiencing some difficultly in managing persons assigned to the jury pool as far as adequate turnout, SHCR-01 at 1237 (ECF No. 4-86 at 239);

2. A June 1, 2015 (2:33 p.m.) post-trial email to prosecutor Gary Cobb and defense trial counsel Brad Urrutia and Russ Hunt, Jr., in which Judge Kennedy stated she had discharged OCFW as writ counsel, Daniel sent her at least three requests to fire OCFW and waive his appeals, she was going to have Daniel brought to court to see if he makes the request in person and, if so, have him examined by a psychiatrist to see if he is competent to make that decision, SHCR-01 at 1223-24 (ECF No. 4-86 at 225-26);

3. A February 29, 2016 (9:31 a.m.) post-trial email regarding the recusal motion on state habeas in which Judge Kennedy wrote that she had never seen the motion, nor had it been set, presented, or discussed with her, SHCR-01 at 1226 (ECF No. 4-86 at 228); and

4. A March 9, 2016 (11:10 a.m.) post-trial email regarding the recusal motion on state habeas in which Judge Kennedy asked if she needed to be available for the hearing on the motion, that she had read the motion and had "no idea of the source of the facts alleged, however, it is all fiction and did not occur[,]" and asking whether she needed to be present or "do an affidavit," SHCR-01 at 1228-29 (ECF No. 4-86 at 230-31).

Judge Shaver denied Daniel's recusal motion at the close of the hearing, SHCR-01 at 1221 (ECF No. 4-86 at 223), and by written order, *id.* at 930 (ECF No. 4-84 at 182). Daniel moved the TCCA for leave to file an original writ of mandamus challenging the ruling. *Ex parte Daniel*, No. WR-83,459-02, SHCR-02 at Motion for Leave (ECF No. 4-97) and Petition for Writ of Mandamus (ECF No. 4-98). The TCCA denied leave without written order on July 27, 2016. *Id.* at cover (ECF No. 4-108).

On October 10, 2016, Daniel moved to supplement the record of recusal proceedings. SHCR-01 at 1137-1510 (ECF No. 4-86 at 139 to ECF No. 4-88 at 12). The

motion included a "Table of *Ex Parte* Emails Received from Judge Kennedy and the Travis County District Attorney's Office by Discovery and Public Information Act Request" listing thirteen emails. *Id.* at 1143 (ECF No. 4-86 at 145). Eight of the emails were written by Judge Kennedy—the four described above and four additional emails:

1. A February 11, 2014 (4:12 p.m.) pre-trial email from Judge Kennedy to prosecutors Bill Bishop and Gary Cobb stating that she has the original of a document they need to sign, the defense has already signed it, and she would keep it at the bench for signing at the next setting, SHCR-01 at 1178 (ECF No. 4-86 at 180);

2. A June 1, 2015 (6:04 p.m.) post-trial email from Judge Kennedy to prosecutor Gary Cobb forwarding an email from OCFW and stating "[t]his is the latest from the writs office," she does not believe they are entitled to a hearing (on competency to waive writ counsel and the habeas appeal), and asking that Cobb notify the appellate office of OCFW's intentions, SHCR-01 at 1173 (ECF No. 4-86 at 175);

3. A June 1, 2015 (6:12 p.m.) post-trial email to prosecutor Gary Cobb where Judge Kennedy stated that she would not talk with Daniel until June 19th and would make the decision to have him examined on that date if he still wanted to fire his writ lawyer and, if so, she intended to appoint Dr. Burrows to examine Daniel and render an opinion, SHCR-01 at 1173 (ECF No. 4-86 at 175); and

4. A June 19, 2015 (1:03 p.m.) post-trial email from Judge Kennedy to ADA Scott Taliaferro regarding a "Brandon Daniel Competency Exam Order" and stating she would be here until about 2:30 p.m. if he got a staff member to drop the order off, SHCR-01 at 1249 (ECF No. 4-86 at 251).

The state court did not grant Daniel's motion to supplement the record.

There is no claim raised in Daniel's initial writ application alleging judicial bias as a ground for habeas relief. SHCR-01 at 431-774 (ECF No. 4-81 at 8 to ECF No. 4-84 at 26). On November 30, 2016, the state court issued its amended findings

of fact and conclusions of law recommending the denial of Daniel's writ application. *Id.* at 1806-35 (ECF No. 4-89 at 108-37). In his objections to the findings and conclusions, Daniel raised the issue of judicial bias by arguing the denial of his recusal motion was an abuse of discretion in part because the above-described emails gave rise to an appearance of impropriety. *E.g.*, App. 15-18, 23, 29, 42-49 (ECF No. 7-1 at 21-24, 29, 35, 48-55). No Eighth Amendment argument or claim of judicial bias at pre-trial or trial appears to have ever been made. *See id.* The TCCA denied habeas relief based on the trial court's findings and conclusions and its own review. *Ex parte Daniel*, 2017 WL 4675772, at *3 (ECF No. 4-96 at 6).

**B.    Daniel's Eighth Amendment claim is unexhausted, defaulted, and waived for inadequate briefing.**

Daniel did not raise an Eighth Amendment claim in seeking recusal or as a basis for state habeas relief (*see* Argument, Part I.A., *supra*), so the claim is unexhausted. 28 U.S.C. § 2254(b)(2). If he tried to raise it in a successive state habeas application, the TCCA would dismiss it as an abuse of the writ. *See Williams v. Thaler*, 602 F.3d 291, 305-06 (5th Cir. 2010) (explaining requirements of Texas's successive writ statute). "Because Texas would preclude a successive state habeas claim, the claim is procedurally barred for failure to exhaust." *Beazley,* 242 F.3d at 264 (citing Tex. Code Crim. Proc. art. 11.071, § 5(a)).

A procedural default may be excused by showing cause and actual prejudice or else demonstrating that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. Daniel does not attempt to make this showing, so his Eighth Amendment claim is procedurally defaulted.

Yet even if this claim is not defaulted, Daniel's only mention of the Eighth Amendment is found in the caption of his claim. Am. Pet. at 25 (ECF No. 18 at 36). His attending argument cites only to an alleged violation of due process. *Id.* at 31 (ECF No. 18 at 42). Daniel's Eighth Amendment claim is therefore waived for inadequate briefing. *United States v. Green*, 508 F.3d 195, 203 (5th Cir. 2007) (claim asserted in a single sentence without further elaboration was deemed waived for inadequate briefing); *Smith v. Cockrell*, 311 F.3d 661, 679 n.12 (5th Cir. 2002) ("Issues not briefed, even if raised on appeal, are considered waived or abandoned.").

### C. Daniel's claim of judicial bias during pre-trial is unexhausted, defaulted, and alternatively meritess.

#### 1. The claim is unexhausted and defaulted.

Daniel argues that Judge Kennedy engaged in ex parte communications related to a potential plea during pre-trial proceedings. Am. Pet. at 29 (ECF No. 18 at 40). However, there was no claim made in Daniel's state habeas application alleging judicial bias at trial as a ground for relief. SHCR-01 at 431-774 (ECF No. 4-81 to ECF No. 4-84). Instead, Daniel alleged judicial bias in a motion seeking recusal of the trial judge from presiding over his state habeas application. *E.g.*, SHCR-01 at 777-836 (ECF No. 4-84 at 29-88). Daniel also did not claim judicial bias at trial when he sought leave to file a petition for writ of mandamus challenging the denial of his motion for recusal. *Ex parte Daniel*, No. WR-83,459-02, SHCR-02 at Motion for Leave (ECF No. 4-97) and Petition for Writ of Mandamus (ECF No. 4-98).

Accordingly, Daniel failed to exhaust state remedies as required by § 2254(b)(2). If he tried to now raise the claim in state court, the TCCA would dismiss

it as successive. *Williams*, 602 F.3d at 305-06. Daniel's unexhausted claim of judicial bias is thus procedurally barred. *See Beazley,* 242 F.3d at 264 (citing Tex. Code Crim. Proc. art. 11.071, § 5(a)).

### 2. Alternatively, the instant claim is without merit.

Even if Daniel's claim is not defaulted, it does not warrant habeas corpus relief. "[T]he Due Process Clause clearly requires a 'fair trial before a fair tribunal,'" *Withrow v. Larkin*, 421 U.S. 35, 46 (1975), before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997) (citing *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821-22 (1986); *Tumey v. Ohio*, 273 U.S. 510, 523 (1927)). Actual bias is rarely a basis for recusal unless the facts at trial show "a deep-seated, extreme favoritism or antagonism." *Buntion v. Quarterman*, 524 F.3d 664, 673 (5th Cir. 2008) (citing *Liteky v. United States*, 510 U.S. 540, 555 (1994)). "Presumptive bias occurs when a judge may not be actually biased, but has the appearance of bias such that 'the probability of actual bias . . . is too high to be constitutionally tolerable.'" *Richardson v. Quarterman*, 537 F.3d 466, 475 (5th Cir. 2008) (citing *Buntion*, 524 F.3d at 672) (quoting *Withrow*, 421 U.S. at 47)). The Supreme Court has found presumptive bias when a decision maker (1) "has a direct personal, substantial and pecuniary interest in the outcome of the case;" (2) "has been the target of personal abuse or criticism from the party before him;" or (3) "has the dual role of investigating and adjudicating disputes and complaints." *Bigby v. Dretke*, 402 F.3d 551, 559 & n. 1 (5th Cir. 2005) (citations omitted). To demonstrate such a due process violation and secure relief

based thereon, Daniel must establish that a genuine question exists concerning Judge Kennedy's impartiality. *Id.* (citing *Liteky*, 510 U.S. at 552).

Daniel fails to make this showing. He alleges judicial bias based on five emails related to a potential plea bargain during pre-trial, only one of which was sent by Judge Kennedy. Am. Pet. at 29-30 (ECF No. 18 at 40-41). Four of the emails are from December 18, 2013, and one is from December 23, 2013. *See id.* (citing App. 469, 471-73, 493 [ECF No. 7-3 at 23, 25-27, 47]).[10] Considered in their entirety, Daniel's evidence does not demonstrate actual or presumptive bias, nor does it raise any genuine question about Judge Kennedy's impartiality.

The first email identified by Daniel occurred on December 18, 2013. App. 471 (ECF No. 7-3 at 25). Manuel P. Garcia, the Victim/Witness Counselor for the 403rd District Court, emailed District Attorney Rosemary Lehmberg, ADA Bishop, ADA Neal, ADA Magallanes, and Judge Kennedy, and stated: "I just spoke to Johnny Padron, brother of the victim. I told him that DA Lehmberg, ADA Bishop, and ADA Cobb need to speak to the family. They will be here on 12/23/13 @ 0900 for the meeting." *Id.* A second email from December 18, 2013, was sent by Manuel Garcia to the group (now including ADA Cobb), and stated: "Judge Kennedy will have the Defendant brought from jail that day. If this can be worked out, we can conclude this case in the afternoon of 12/23/13." App. 469 (ECF No. 7-3 at 23). A third email from December 18, 2013, was sent to the group by Judge Kennedy and stated:

---

[10]     The emails were exhibits to Daniel's motion to supplement his motion for recusal. App. 441, 453-613 (ECF No. 7-2 at 185; ECF No. 7-3 at 7-67).

I am going to have the defendant brought that afternoon (1:30 pm). We don't have a regular docket that morning, so when you all have determined what's going to happen after meeting with the family, just call me on my cell, ------------, and I will be available for any proceedings that we might need to have that afternoon. The court reporter *and the defense attorneys will be on call and available* as well. So, once you notify me, I will in turn notify them that they need to be at the courthouse at a specific time that afternoon. The defendant will be brought and kept at the jail just in case we need him that afternoon. If they choose a different date to come down, or, if they want to keep the setting of the 30th or otherwise, please let me know that as well after the meeting has concluded. Since they are traveling several hours, I want to the prepared just in case they want to get something done on that date that they will be in town and not have to make an extra trip. So, just let me know what's up after the meeting.

We are already experiencing some difficulties in managing the persons who have been assigned to the jury panel for January 6th as far as having an adequate turnout and willing participants in the process. The sooner we know what's happening the better.

App. 472-73 (ECF No. 7-3 at 26-27) (emphasis added, phone number omitted). A fourth email from December 18th consists of a forwarded message from District Attorney Lehmberg that states, "Judge Kennedy, it is highly unlikely the case will be disposed of on 12-23. RL." App. 472 (ECF No. 7-3 at 26). The final email identified by Daniel was sent by ADA Bishop to Judge Kennedy on December 23, 2013, and states, "Following our meeting with the family, Rosemary [Lehmberg] has elected to continue to seek the death penalty on Daniel. Just wanted to give you the heads up," to which Judge Kennedy responded: "Thanks." App. 493 (ECF No. 7-3 at 47).

Daniel argues that trial counsel were not privy to these emails and contends it is not clear whether counsel knew at that point a plea had been rejected. Am. Pet. at 30 (ECF No. 18 at 41). This evidence does not prove bias or prejudice. Despite the fact that defense counsel were not listed as email recipients, they were apparently

contacted about the meeting. Daniel overlooks Judge Kennedy's December 18, 2013, email which states that "the defense attorneys will be on call and available as well." App. 473 (ECF No. 7-3 at 27). Daniel's speculation that counsel might not have known whether a plea bargain had been rejected cannot form the basis for habeas relief. *See Lincecum v. Collins*, 958 F.2d 1271, 1279 (5th Cir. 1992) (denying relief where petitioner "offered nothing more than the conclusory allegations in his pleadings").

Additionally, it is undisputed that ex parte communications should be avoided. The Texas Code of Judicial Conduct provides that, except as authorized by law, a judge "shall not directly or indirectly initiate, permit, or consider *ex parte* or other [private] communications. . . concerning the merits of a pending or impending judicial proceeding." Tex. Code Jud. Conduct, Canon 3(B)(8), reprinted in Tex. Gov't Code Ann., tit. 2, subtit. G, app. B. However, that subsection does not prohibit "communications concerning uncontested administrative or uncontested procedural matters." *Id*. A plain reading of the emails described above reflects that they were a part of the trial judge's efforts at courtroom administration. "A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune" to claims of bias or prejudice. *Liteky*, 510 U.S. at 555-56. As a result, Daniel's unexhausted and defaulted claim of judicial bias at pretrial should alternatively be denied for lack of merit.

### D. Daniel's claim of judicial bias during state habeas proceedings is not cognizable and relief is barred under *Teague*.

Daniel alleges Judge Kennedy engaged in ex parte emails with the prosecution regarding his recusal motion in state habeas and his competency to waive OCFW as

writ counsel. Am. Pet. at 26-29 (ECF No. 18 at 37-40). He contends the ex parte emails demonstrated Judge Kennedy's partiality to the State and bias against him, particularly her March 9, 2016, email regarding his recusal motion in which she wrote that she had "no idea of the source of the facts alleged, however, it is all fiction and did not occur." *Id*. at 31-34 (ECF No. 18 at 42-45); SHCR-01 at 1228-29 (ECF No. 4-86 at 230-31). This is not a cognizable claim and relief is *Teague* barred.

The trial court's alleged error in the conducting of state habeas proceedings does not raise a ground for federal habeas relief in connection with Daniel's trial and sentencing. The Fifth Circuit has long held that "infirmities in state habeas proceedings do not constitute grounds for relief in federal court.'" *Rudd v. Johnson*, 256 F.3d 317, 319 (5th Cir. 2001) (citations omitted); *Trevino v. Johnson*, 168 F.3d 173, 180 (5th Cir. 1999). "This is because an attack on the state habeas proceeding is an attack on a proceeding collateral to the detention and not the detention itself." *Rudd*, 256 F.3d at 320 (citing *Nichols v. Scott*, 69 F.3d 1255, 1275 (5th Cir. 1995)). Similarly, an attack on a habeas trial judge's conduct during state habeas proceedings would also necessarily fail to raise a constitutionally cognizable claim. Daniel cites no clearly established Supreme Court authority holding that Due Process is violated in such instance. As argued in response to Claim III below and incorporated herein, there is no Due Process right to state collateral review. To hold otherwise would call for the creation of a new rule in violation of *Teague*'s non-retroactivity doctrine.

## II.  Daniel is Not Entitled to Habeas Corpus Relief on His Claims Regarding Supplemental Jury Instructions.

Daniel alleges the trial court "secretly" provided a supplemental instruction to

the jury during its punishment-phase deliberations, without notice to Daniel or his counsel and without making the supplemental instruction and response a part of the record. Am. Pet. 34-45 (ECF No. 18 at 45-56). He maintains that the trial judge's ex parte communication with the jury violated his Sixth Amendment right to counsel and to a public trial, his Fifth and Fourteenth Amendment rights to due process, and his Eighth Amendment right to be free from cruel and unusual punishment. *Id*. at 34 (ECF No. 18 at 45). The Court should deny habeas relief because Daniel's claims are partly unexhausted and defaulted, partly waived for inadequate briefing, and the remainder is procedurally barred and meritless in the alternative.

## A.    State court disposition

Daniel's state habeas claim asserted a violation of his due process rights under the Texas and Federal Constitutions. SHCR-01 at 679 (ECF No. 4-83 at 13). He argued the trial court violated the requirements of Article 36.27 of the Texas Code of Criminal Procedure, which governs when jurors may communicate with the court, and that such a statutory violation "amounts to a denial of due process." *Id*. at 681-84 (ECF No. 4-83 at 15-18). On state habeas review, Daniel's evidence of the alleged note consisted of an affidavit from juror Jessica Trevino, which states in part:

> During our deliberations, we were unclear of the meaning of future dangerousness and we submitted a question to the judge requesting clarification. We received a note back from the judge when we were in the jury room that answered our question, but I do not remember exactly what her response said.

*Id*. at 250-51 (ECF No. 4-80 at 2-3). The state court entered findings and conclusions recommending that Daniel's claim be rejected on procedural and merits-based

grounds. SHCR-01 at 1825-27 (ECF No. 4-89 at 127-29). The TCCA expressly held that Daniel's claim was barred because statutory violations are not cognizable on habeas review and neither are due process claims based on the Texas Constitution. *Ex parte Daniel*, 2017 WL 4675772, at *1 (ECF No. 4-96 at 2-3) (citing *Ex parte Graves*, 70 S.W.3d 103, 116-17 (Tex. Crim. App. 2002); *Sadberry v. State*, 864 S.W.2d 541, 542 (Tex. Crim. App. 1993); *Ex parte Dutchover*, 779 S.W.2d 76, 77 (Tex. Crim. App. 1989)). Based on the trial court's findings and conclusions and the TCCA's own review, the TCCA denied habeas relief. *Id.* at *3 (ECF No. 4-96 at 6).

## B.   Daniel's Fifth, Sixth, and Eighth Amendment claims are unexhausted and defaulted.

Daniel's state habeas claim was based solely on alleged violations of Texas statutory law and his due process rights. SHCR-01 at 679-86 (ECF No. 4-83 at 13-20). Daniel did not allege any violation of his Fifth, Sixth, and Eighth Amendments rights as he does now in this Court. *Compare id. with* Am. Pet. at 34, 37-42 (ECF No. 18 at 45, 48-53). Claims are not exhausted "if a petitioner presents new legal theories or entirely new factual claims in his petition to the federal court." *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001). If Daniel tried to raise these previously available claims in state court, the TCCA would dismiss any such writ application as successive. Tex. Code Crim. Proc. art. 11.071, § 5(a); *Williams*, 602 F.3d at 305-06. Daniel's unexhausted claim of judicial bias is thus procedurally barred on federal habeas review. *See Beazley,* 242 F.3d at 264.

A procedural default may be excused if a petitioner demonstrates cause and prejudice, or a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. Daniel

contends that if any portion of his claim was not sufficiently exhausted, then "state habeas counsel's ineffectiveness in failing to raise the claim excuses any procedural default." Am. Pet. at 45 (ECF No. 18 at 56) (citing *Martinez v. Ryan*, 566 U.S. 1, 17 (2012), and *Trevino v. Thaler*, 569 U.S. 413, 428 (2013)). *Martinez* created a "narrow exception" to the *Coleman* rule that applies only to claims of ineffective assistance of trial counsel (IATC). *Martinez*, 566 U.S. at 9-18; *see also Davila v. Davis*, 137 S. Ct. 2058, 2065 (2017) (declining to extend *Martinez* to claims alleging ineffective assistance of appellate counsel). It does not excuse the procedural bar against Daniel's Fifth, Sixth, and Eighth Amendment claims.

## C. Daniel's Fifth and Eighth Amendment claims are waived by virtue of inadequate briefing.

The caption of Daniel's amended federal habeas claim lists that his Fifth and Eighth Amendment rights were violated. Am. Pet. 34 (ECF No. 18 at 45). Daniel provides no further briefing on either claim, *see id*. at 34-45 (ECF No. 18 at 45-56), and waives any alleged error. *Green*, 508 F.3d at 203 (claim asserted in a single sentence without further elaboration was deemed waived for inadequate briefing); *Trevino,* 168 F.3d at 181 n. 3 (undeveloped arguments are considered waived).

## D. The remainder of Daniel's jury instruction claim is procedurally barred and alternatively lacks merit.

### 1. The jury instruction claim that Daniel exhausted in state court is nevertheless procedurally barred.

"[I]t is well settled that federal review of a claim is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural default." *Fisher v. Texas*, 169 F.3d 295, 300 (5th Cir.

1999) (citing *Coleman*, 501 U.S. at 729). "A state court expressly and unambiguously bases its denial on a state procedural default even if it alternatively reaches the merits of a defendant's claim." *Id.* (citing *Harris v. Reed*, 489 U.S. 255, 264 n. 10 (1989); *Ellis v. Lynaugh*, 873 F.2d 830, 838 (5th Cir. 1989)).

Daniel's jury instruction claim is defaulted because the TCCA "clearly and unambiguously" based its denial of relief on a state procedural ground. As explained above, the TCCA held the claim "is barred because statutory violations are not cognizable on habeas review" and neither are "due process claims based on the Texas Constitution[.]" *Ex parte Daniel*, 2017 WL 4675772, at *1 (ECF No. 4-96 at 2-3) (citations omitted). Daniel does not address the procedural bar. He instead asserts that the state-court process was "unreasonable and unfair" because the trial court never held an evidentiary hearing, adopted verbatim the State's proposed findings and conclusions, and ignored the juror affidavit offered in support. *See generally* Am. Pet. at 43-45 (ECF No. 54-56). These arguments do not satisfy the *Coleman* standard, so Daniel's claim remains defaulted.

> ### 2. In the alternative, Daniel fails to present a claim that merits relief.

Daniel alleges he was denied his right to due process when the trial court communicated ex parte with the jury. Am. Pet. at 42-43 (ECF No. 18 at 53-54). The state habeas court entered findings and conclusions recommending that Daniel's claim be rejected on procedural and merits-based grounds. SHCR-01 at 1825-27 (ECF No. 4-89 at 127-29). The TCCA held that Daniel's claim was barred and denied habeas relief "[b]ased upon the trial court's findings and conclusions and [the TCCA's] own

review[.]" *Ex parte Daniel*, 2017 WL 4675772, at *3 (ECF No. 4-96 at 6). To the extent the state-court adjudication includes an alternative denial on the merits, it is entitled to AEDPA deference and Daniel fails to show otherwise.

First, Daniel complains the trial court gave supplemental jury instructions without notice to Daniel or his counsel and without making the question and response a part of the record. *See generally* Am. Pet. at 35-37, 39 (ECF No. 18 at 46-48, 50). He identifies no clearly established federal law which dictates the specific procedures a trial court must follow regarding a jury question. Instead, the issue is one of state law—in this case, state statutory law. Tex. Code Crim. Proc. art. 36.27. Daniel's instant claim is therefore not cognizable on federal habeas review. "To obtain review of a state court judgment under § 2254, a prisoner must assert a violation of a federal constitutional right." *Lowery v. Collins*, 988 F.2d 1364, 1367 (5th Cir. 1993). Federal habeas corpus relief "is available only for the vindication of rights existing under federal law; not rights existing solely under the rules of state procedure." *Manning v. Blackburn*, 786 F.2d 710, 711 (5th Cir. 1986) (citing *Nelson v. Estelle*, 642 F.2d 903, 905-06 (5th Cir. 1981)). It will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also present. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). The relief Daniel seeks calls for the creation of a new rule in violation of *Teague*'s non-retroactivity doctrine.

To the extent Daniel raises a federal due process claim not based on the notification requirements of Article 36.27, then it fails on the merits. As an initial matter, Daniel's supporting evidence is largely barred from review. Daniel continues

to rely on the state habeas affidavit from juror Trevino, App. 642-43 (ECF No. 7-3 at 196-97), but also supports his claim with declarations from three additional jurors and one from his former defense trial counsel, Bradley Urrutia:

1.  PX-68: Declaration of Sharon Gaston (Oct. 2, 2018), App. 1604-05 (ECF No. 7-6 at 225-26);

2.  PX-91: Declaration of Bradley G. Urrutia (Feb. 28, 2019),  Supp. App. 1862-63 (ECF No. 20-1 at 46-47);

3.  PX-93: Declaration of Kumi Takasumi (Feb. 23, 2019), Supp. App. 1868-70 (ECF No. 20-1 at 52-54); and

4.  PX-94: Declaration of Richard Hernandez (Feb. 3, 2019), Supp. App. 1871-72 (ECF No. 20-1 at 55-56).

*E.g.*, Am. Pet. at 35-36 (ECF No. 18 at 46-47) (citing same).

The declarations were made long after Daniel's initial state habeas application was denied on October 18, 2017 (ECF No. 4-96 at 6), so they are not part of the record before the state court. In *Pinholster*, the Supreme Court instructed "that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits" and that "evidence introduced in federal court has no bearing on § 2254(d)(1) review." 563 U.S. at 185. "The same rule necessarily applies to a federal court's review of purely factual determinations under § 2254(d)(2), as all nine Justices acknowledged." *Blue v. Thaler*, 665 F.3d 647, 656 & n. 26-27 (5th Cir. 2011). Daniel's new exhibits are therefore irrelevant to this Court's review under § 2254(d).

Daniel must instead overcome the limitation of § 2254(d)(1) "on the record that was before the state court." *Pape*, 645 F.3d at 288 (quoting *Pinholster*, 563 U.S. at

185). He cannot make that showing regarding the state court's adjudication of the instant claim. It is undisputed that "ex parte communications between judge and jury are to be avoided." *United States v. Jones*, 664 F.3d 966, 983 (5th Cir. 2011) (citing *United States v. Gypsum Co.*, 438 U.S. 422, 460 (1978)). However, there is no automatic presumption of harm just because an ex parte communication occurred. *See Rushen v. Spain*, 464 U.S. 114, 118-19 (1981) (rejecting lower court's holding that "an unrecorded ex parte communication between trial judge and juror can never be harmless error"). To be entitled to habeas corpus relief due to trial court error, Daniel must instead show that the error actually prejudiced him. *Brecht*, 507 U.S. at 637.

In state court, Daniel failed to present competent evidence of a jury note. Daniel relied on an affidavit from juror Jessica Trevino to prove the existence of an alleged jury note. SHCR-01 at 250-51 (ECF No. 4-79 at 77 to ECF No. 4-80 at 3). Juror Trevino stated that the jurors "were unclear of the meaning of future dangerousness" and submitted a question to the judge "asking for clarification." *Id*. The State answered Daniel's claim and provided affidavits from the court reporter, the former deputy bailiff, and the lead prosecutor attesting they did not recall a note being sent out by the jury during deliberations and describing the procedures that are followed if a note is submitted. SHCR-01 at 1068-76 (ECF No. 4-86 at 70-78). The state court found "[t]he trial court did not provide any additional or supplemental written instruction to the jury during its deliberations beyond what was contained in the court's charge." SHCR-01 at 1825-26 (ECF No. 4-89 at 127-28). That factual finding is entitled to a presumption of correctness under § 2254(e)(1).

Even if the jury sent out a note and the trial court responded, the communication alleged as error by Daniel is harmless. In her affidavit, juror Trevino stated: "We received a note back from the judge when we were in the jury room that answered our question, but I do not remember exactly what her response said." SHCR-01 at 251 (ECF No. 4-80 at 3). There is nothing on this record that raises an inference of prejudice. Additionally, the State's evidence showed that any alleged error was harmless. The State submitted an affidavit from Richard Hernandez, the jury foreperson, in which he attested that during deliberations, one or more jurors had a question about what "future danger to society" meant, more so focusing on the word "society"; that the jury called in the bailiff and asked if the judge could give them a legal definition of exactly what was meant; and that when the bailiff returned, she explained "that the Judge said that she could not give us a definition and that we[,] the jury[,] had to decide what that term meant for ourselves. We then, as a jury came up with our own definition of what 'future danger to society' meant and continued with our deliberations." *Id*. at 1078-79 (ECF No. 4-86 at 80-81). The habeas trial court thus reasonably concluded that Daniel's claim should be denied because he failed to show how the alleged error so infected the punishment proceedings that he was denied a fair and impartial trial. *Id*. at 1827 (ECF No. 4-89 at 129).

While ex parte communications are to be avoided, the trial court's informing the jury that it could not give a definition is harmless error at best. In a different context, the Fifth Crcuit has held that the terms "probability," "criminal acts of violence," and "continuing threat to society" "have a plain meaning of sufficient

content that the discretion left to the jury is no more than that inherent in the jury system itself." *Paredes v. Quarterman*, 574 F.3d 281, 294 (5th Cir. 2009); *see also Leal v. Dretke*, 428 F.3d 543, 552-53 (5th Cir. 2005) (listing numerous Fifth Circuit opinions rejecting complaints about the failure of Texas courts to define the same terms). The Court should deny habeas relief because Daniel's claim is largely unexhausted, defaulted, and waived for inadequate briefing, and Daniel fails to show that the state court's alternative decision rejecting his claim on the merits is contrary to clearly established Supreme Court precedent.

## III. Daniel is Not Entitled to Habeas Corpus Relief on His Claims Challenging the Constitutionality of State Habeas Proceedings.

Daniel argues that he was denied due process and a full and fair opportunity to litigate his constitutional claims under Texas state habeas law. Am. Pet. at 45 (ECF No. 18 at 56). Specifically, he complains the trial judge denied him a hearing, "ignored" his affidavits, and adopted the State's proposed findings of fact and conclusions of law verbatim, and that the cumulative effect of these failures violated his Eighth and Fourteenth Amendment rights. *Id.* at 45-46 (ECF No. 18 at 56-57). This claim presents no cognizable basis for federal habeas corpus relief.

### A. The claims are unexhausted, defaulted, and waived in part for inadequate briefing.

Daniel contends he exhausted "this claim" during state habeas proceedings. Am. Pet. at 47 (ECF No. 18 at 58). Instead of citing to where his specific arguments are included in the state-court record, Daniel directs the Court to the section of his amended federal habeas petition entitled "Standard of Review Under the AEDPA."

*Id.* There, however, Daniel appears to only raise legal arguments regarding why AEDPA deference should not apply to any claims adjudicated in state court. *See id.* at 6-14 (ECF No. 18 at 17-25). As a result, he fails to show that his due process and Eighth Amendment claims were ever presented to the TCCA. Because Daniel would be barred from proceeding on a successive state habeas application, the claims are defaulted on habeas review. *Williams*, 602 F.3d at 305-06; *Beazley,* 242 F.3d at 264.

Daniel's Eighth Amendment claim should also be considered abandoned because his only mention of it is found in the caption of his amended federal habeas petition claim. Am. Pet. at 45 (ECF No. 18 at 56). Daniel waives any claim of error by inadequate briefing. *Green*, 508 F.3d at 203.

## B. In the alternative, Daniel's due process claim is meritless.

Daniel argues that the state court's failure to follow "mandatory" statutory procedures for adjudicating habeas claims violated his right to due process. *See generally* Am. Pet. at 45-47 (ECF No. 18 at 56-58). He does not present this Court with any precedent that specifically holds that a Texas court's failure to comply with Article 11.071 constitutes a due process violation. *See* Am. Pet. at 45-47 (ECF No. 18 at 56-58). His claim is not cognizable and the relief he seeks is barred by *Teague*.

Furthermore, there is no Constitutional right to postconviction proceedings in the first place. As Justice O'Connor stated:

> A postconviction proceeding is not part of the criminal process itself, but is instead a civil action designed to overturn a presumptively valid criminal judgment. Nothing in the Constitution requires the States to provide such proceedings, *Pennsylvania v. Finley*, 481 U.S. 551 . . . (1989), nor does it seem to me that the Constitution requires the States to follow any particular federal role model in these proceedings.

*Murray v. Giarratano*, 492 U.S. 1, 13 (1989) (O'Connor, J., concurring); *see also Finley*, 481 U.S. at 557 (states have no obligation to provide collateral review of convictions). "State collateral proceedings are not constitutionally required as an adjunct to the state criminal proceedings and serve a different and more limited purpose then either the trial or appeal." *Giarratano*, 492 U.S. at 10. Instead, "[t]he additional safeguards imposed by the Eighth Amendment at the trial stage of a capital case are . . . sufficient to assure the reliability of the process by which the death penalty is imposed." *Id*.

But most importantly, where a State allows for postconviction proceedings, "the Federal Constitution [does not] dictate[] the exact form such assistance must assume" and "States have substantial discretion to develop and implement programs to aid prisoners seeking to secure postconviction review." *Finley*, 481 U.S. at 559; *cf. Estelle*, 502 U.S. at 67-68 ("federal habeas corpus relief does not lie for errors of state law"). Indeed, "[f]ederal courts may upset a State's postconviction procedures only if they are fundamentally inadequate to vindicate the substantive rights provided." *Dist. Atty's Office for the Third Judicial Dist. v. Osborne*, 557 U.S. 52, 69 (2009). Those circumstances do not exist here.

Daniel does not contend that the Texas habeas statute violates the Fourteenth Amendment on its face. He instead argues he was denied due process by the trial court adopting the State's proposed findings and conclusions verbatim, "ignoring" his evidence, and denying him a full and fair opportunity to develop and present evidence. Am. Pet. at 45, 47 (ECF No. 18 at 56, 58). In his Standard of Review section,

he argues the Court should not apply AEDPA's presumption of correctness or deference to the state court decisions for the same reasons. *See generally id.* at 6-14 (ECF No. 18 at 17-25). These complaints are of no avail.

Circuit precedent forecloses Daniel's complaint that the trial court adopted the State's findings and conclusions verbatim. Am. Pet. at 6-9, 47 (ECF No. 18 at 17-20, 58). The Supreme Court "has criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties, particularly when those findings have taken the form of conclusory statements unsupported by citation to the record." *Anderson v. City of Bessemer City*, 470 U.S. 564, 572 (1985) (citations omitted); *see also Jefferson v. Upton*, 560 U.S. 294, 294-95 (2010). "But despite criticizing the practice, the Supreme Court has never found it to violate due process or to entitle a state court's decision to less deference under the AEDPA." *Green v. Thaler*, 699 F.3d 404, 416 (5th Cir. 2012). The Fifth Circuit has thus rejected the argument that habeas findings adopted verbatim from those submitted by the State are not entitled to deference. *Id.* at 416 n.8 (citing *Trevino*, 168 F.3d at 180; *Nichols*, 69 F.3d at 1277).

Daniel's complaint that the habeas trial judge ignored unspecified affidavits fails. Am. Pet. at 47 (ECF No. 18 at 58). Conclusory allegations fail to demonstrate a due process violation and should be rejected outright. *See Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir. 1990) (conclusory allegations fail to establish a valid claim and do not warrant remand for an evidentiary hearing).

Circuit precedent also forecloses Daniel's arguments that he was denied a "full and fair" consideration of his claims. Am. Pet. at 9-14, 47 (ECF No. 18 at 20-25, 58).

AEDPA's amendments to § 2254 "jettisoned all references to a 'full and fair hearing' from the presumption of correctness accorded state court findings of fact[.]" *Valdez v. Cockrell*, 274 F.3d 941, 950 (5th Cir. 2001). As a result, the Fifth Circuit has held that "a full and fair hearing is not a precondition to according § 2254(e)(1)'s presumption of correctness to state habeas findings of fact nor to applying § 2254(d)'s standards of review." *Id.* at 951; *see also Morrow v. Dretke*, 367 F.3d 309, 315 (5th Cir. 2004) (AEDPA's presumption applies "even if the hearing was a 'paper' hearing and may not have been full and fair."). Regardless, Daniel received an opportunity to be heard in the state habeas court. Daniel's writ counsel—the OCFW—were certainly not ignorant of the state-court procedures and were not restricted in the evidence they could attach to Daniel's state habeas application. They filed a writ application on Daniel's behalf supported by 30 exhibits, submitted affidavits introducing new evidence to support his arguments, and had the opportunity to submit proposed findings of fact and conclusions of law. Because Fifth Circuit precedent does not require a full and fair hearing, and because the record reflects that Daniel had ample opportunity to develop his claims before the state court, the Court should deny Daniel's Due Process claim and apply § 2254 deference in its review of the state habeas court's findings of fact and conclusions of law.

## IV. Daniel's Complaints of Inadequate Funding and Counsel Working Under a Flat Fee Agreement Do Not Merit Habeas Corpus Relief.

Daniel argues the trial court failed to properly fund his defense in violation of his rights to due process, effective assistance of counsel, and freedom from cruel and unusual punishment. Am. Pet. at 47-53 (ECF No. 18 at 58-64). He additionally

contends that trial counsel's agreement to work on his case under a flat fee structure created an actual conflict of interest. *Id.* at 47-48, 53-55 (ECF No. 18 at 58-59, 64-66). These allegations were raised as separate claims on state habeas review where they were denied on procedural and merits-based grounds. *Ex parte Daniel*, 2017 WL 4675772, at *1, *3 (ECF No. 4-96 at 2-3, 6); *see* SHCR-01 at 1814-15, 1829-30 (ECF No. 4-89 at 116-17, 131-32). This Court should deny relief because Daniel's initial claim is procedurally barred and alternatively meritless, and Daniel fails to demonstrate that the state court's rejection of his conflict-of-interest claim was contrary to, or an unreasonable application of, Supreme Court precedent.

## A. Background

Daniel committed capital murder in the early morning hours of April 6, 2012 and was arrested later that same day. "Attorney Bradley Urrutia was appointed to represent Daniel from the day of his arrest." SHCR-01 at 1807-08 (ECF No. 4-89 at 109-10). On April 9, 2012, the trial court appointed Bill White as lead counsel. 1 CR 14 (ECF No. 4-1 at 14). The defense team was assisted by investigator David Watson and mitigation specialist Alicia Amezcua-Rodriguez. (*See* ECF No. 38 at 87-91).[11]

On November 27, 2012, defense counsel filed an "Ex parte, Verified, and Confidential Motion for Relief to Provide Constitutionally Mandated Protection and Resources." (ECF No. 38 at 3-62). Daniel's attorneys requested the trial court make written findings that certain guidelines regarding fees in capital cases applied in

---

[11] For Daniel's exhibits that were filed under seal in state court, there is no SHCR-01 designation. The records were later unsealed and filed as ECF No. 38.

Texas,[12] that an additional 700 hours of work at the rate of $100 per hour was required and reasonable by the mitigation specialist, and that the mitigation specialist would be paid a specified amount. (*See id*.). The trial court denied the requests and ordered that it would "pay according to the schedule approved by the Travis County District Courts and the approved rates after review of the vouchers submitted for services performed in accordance with the specified guidelines." (*Id*. at 65-66). On December 5, 2012, lead defense counsel Bill White, the mitigation specialist, and the investigator all withdrew from Daniel's case. (*Id*. at 67-87).

The trial court appointed Russell D. Hunt, Jr. as lead counsel while Bradley Urrutia continued representing Daniel as second-chair. 1 CR 103 (ECF No. 4-1 at 103). In a letter to the trial court dated January 6, 2014, Mr. Hunt stated that on the day of his appointment, the trial judge indicated her intention to pay the defense team a total of $175,000; that Mr. Hunt would receive $100,000 and Mr. Urrutia $75,000; and that the trial judge indicated she would pay half the agreed-upon amount up front. (ECF No. 38-1 at 84). Mr. Hunt ended his letter by saying, "I appreciate your agreeing to provide adequate compensation given the importance of the work that Brad and I have performed and continue to perform on behalf of Mr. Daniel." (*Id*.). In January 2013, the trial court granted the initial requests for payment of $50,000 to Mr. Hunt and $37,500 to Mr. Urrutia. (*Id*. at 116, 119).

---

[12] American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913 (2003); State Bar of Tex., *Guidelines and Standards for Texas Capital Counsel*, 69 Tex. B.J. 966 (2006).

In February 2013, counsel filed an ex parte motion seeking $7,500 to hire Lisa Lawrence, a mitigation specialist, at $75 per hour, (ECF No. 38-1 at 97-106), which was granted. (*Id.* at 107). Daniel states that Ms. Lawrence was paid $13,587.42. Am. Pet. at 51 (ECF No. 18 at 62).[13] In March 2013, counsel submitted invoices seeking final payments of $50,000 and $37,500, which were granted. (ECF No. 38 at 117-18).

## B. Daniel's claim challenging the trial court's funding is defaulted and alternatively meritless.

### 1. Habeas review is barred under the *Gardner* rule.

Daniel did not allege in a motion for new trial or on direct appeal that his defense was improperly and deficiently funded. Instead, he raised the issue as Claim 5 in his state habeas application. SHCR-01 at 707-26 (ECF No. 4-84 at 41-60). The TCCA held that Daniel's claim was barred because "habeas is not a substitute for matters which should have been raised at trial or on direct appeal." *Ex parte Daniel*, 2017 WL 4675772, at *1 (ECF No. 4-96 at 2-3) (citing *Ex parte De La Cruz*, 466 S.W.3d 855, 864 (Tex. Crim. App. 2015), and *Ex parte Townsend*, 137 S.W.3d 79, 81 (Tex. Crim. App. 2004) (holding that even a constitutional claim is forfeited if the applicant had an opportunity to raise the issue on appeal)).

The instant claim is defaulted. Texas law "is well-settled 'that the writ of habeas corpus should not be used to litigate matters which should have been raised on direct appeal.'" *Ex parte Gardner*, 959 S.W.2d 189, 199 (Tex. Crim. App. 1998) (quoting *Ex parte Goodman*, 816 S.W.2d 383, 385 (Tex. Crim. App. 1991)). This

---

[13] On state habeas, Daniel provided a chart of invoice amounts by cause number and derived the figure from there. SHCR-01 at 298 (ECF No. 4-80 at 50).

procedural rule was firmly established long before Daniel was sentenced to death. A federal court may not review a claim "that the state court denied based on an adequate and independent state procedural rule." *Davila*, 137 S. Ct. at 2064. "[T]he *Gardner* rule sets forth an adequate state ground capable of barring federal habeas review." *Dorsey v. Quarterman*, 494 F.3d 527, 532 (5th Cir. 2007) (citing *Busby v. Dretke*, 359 F.3d 708, 719 (5th Cir. 2004), and cases cited therein); *Halprin v. Davis*, 911 F.3d 247, 259 (5th Cir. 2018) (citing *Busby*), *cert. denied.*, 140 S. Ct. 167 (2019).

Daniel does not mention the *Gardner*-bar and instead argues the state court's decision is not entitled to AEDPA deference. Am. Pet. at 55-56 (ECF No. 18 at 66-67). The Court should deny habeas relief outright on this defaulted claim.

### 2.    In the alternative, Daniel's inadequate-funding claim does not merit relief.

Daniel argues initially that "governing standards"—specifically, the ABA Guidelines—prohibit the use of flat fees and caps on funding in capital cases. Am. Pet. at 52 (ECF No. 18 at 63). He also argues the same "governing standards" require authorizing sufficient funds to conduct the necessary mitigation investigation. *Id.* However, the Supreme Court has never defined what funding for capital representation is reasonable, nor has it expressly precluded compensation through a flat fee. Daniel fails to identify any clearly established Supreme Court precedent requiring the States to adopt one method of compensating counsel in death penalty cases. As a result, Daniel has not shown constitutional error in his conviction and sentence due to counsel's compensation, and a finding otherwise would require the creation of a new federal rule in violation of *Teague*. *Batiste v. Davis*, No. H-15-1258,

2017 WL 4155461, at *29 (S.D. Tex. Sept. 19, 2017) (not reported) (summarily rejecting *Teague*-barred claim that the trial court violated federal and state law by compensating counsel through a flat fee arrangement).

Daniel's reliance on ABA Guidelines as mandating a level of funding (and later as a basis for establishing IATC claims) is misplaced. The Supreme Court has soundly rejected the notion that the bar association guidelines are an "inexorable command with which all capital defense counsel must fully comply" to be constitutionally effective. *Bobby v. Van Hook*, 558 U.S. 4, 8 (2009) (per curiam) (internal quotation marks omitted). The Court recognized that *Strickland*[14] "stressed . . . that 'American Bar Association standards and the like' are 'only guides' to what reasonableness means, not its definition." *Id*. The Court emphasized that the same was true of all state and private organization rules, noting that they are "free to impose whatever specific rules they see fit to ensure that criminal defendants are well represented," but "the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." *Id*. at 9 (internal quotation marks omitted). There is no clearly established Supreme Court precedent holding States must provide funding in capital cases in accordance with ABA Guidelines, so relief is barred by *Teague*.

Daniel also fails to meet his burden of pleading and proving facts to entitle him to relief. Citing ABA Guidelines, Daniel asserts that flat fee arrangements provide "disincentives for comprehensive investigation and pre-trial preparation." Am. Pet. at 52 (ECF No. 18 at 63). However, defense counsel's letter to the trial court refutes

---

[14]     *Strickland v. Washington*, 466 U.S. 668 (1984)

Daniel's speculation that funding in his case was improper or insufficient. Lead defense counsel Mr. Hunt states in his letter, "I appreciate your agreeing to provide adequate compensation given the importance of the work that Brad and I have performed and continue to perform on behalf of Mr. Daniel." (ECF No. 38-1 at 84).

There is also no evidence that counsel conducted an insufficient investigation due to lack of funding or being paid on a flat fee basis. The defense team consisted of two highly qualified lawyers, at least four experts, and investigators who assisted with preparing and presenting the case, including Dr. Cecil Reynolds, a consulting neuropsychologist, Dr. Walter Harrell, a neuropsychologist, Dr. Harold Scott, a psychiatrist, Dr. William Lee Carter, a psychologist, and Lisa Lawrence, a mitigation specialist. Furthermore, the state-court record reflects that counsel were fully aware of potential mitigating evidence for Daniel. *See* Argument, Part V, below. This included a possible Autism Spectrum Disorder diagnosis, which Daniel's defense team rejected after reasonable investigation and careful consideration by his mental health experts. *See* Argument, Part VI, below. And as set forth in the Statement of the Case, defense counsel presented substantial mitigating evidence at punishment, but it was insufficient to overcome the facts of the capital crime and the State's additional evidence at punishment. The Court should deny therefore habeas relief on Daniel's defaulted and alternatively meritless claim of insufficient funding.

## C. Daniel's conflict of interest claim does not merit relief under AEDPA.

Daniel argues that trial counsel's flat fee agreement created an actual conflict of interest. Am. Pet. at 53 (ECF No. 18 at 64). He contends that an actual conflict of

interest is "inherent" in a flat fee structure because with each hour spent, counsel's wages decrease, and that such fee agreements are contrary to professional norms. *Id.* at 54-55 (ECF No. 18 at 65-66).[15] Daniel raised these allegations as Claim 1-D in his state habeas application. SHCR-01 at 623-30 (ECF No. 4-82 at 125-32). The TCCA rejected the claim on the merits. *Ex parte Daniel*, 2017 WL 4675772, at *3 (ECF No. 4-96 at 6). The Court should deny relief because Daniel fails to demonstrate that the state court's rejection of his claim was contrary to, or an unreasonable application of, Supreme Court precedent.

Citing *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980), Daniel asserts that prejudice should be presumed where counsel actively represented conflicting interests and an actual conflict of interest adversely affected counsel's performance. *See* Am. Pet. at 54 (ECF No. 18 at 65). However, the Fifth Circuit expressly limited the holding of *Cuyler* to actual conflicts resulting from a lawyer's representation of multiple defendants. *Beets v. Scott*, 65 F.3d 1258, 1271 (5th Cir. 1995) (en banc). The *Beets* court also rejected *Cuyler*'s presumed-prejudice analysis for determining whether a conflict exists between a lawyer's self-interest and that of his client, in favor of the two-prong test in *Strickland* that governs claims of ineffective assistance of counsel. *Id.* at 1274 (finding that Beets was not prejudiced by her attorney's actions regarding a media rights contract); *see United States v. Newell*, 315 F.3d 510, 516 (5th Cir, 2002) (holding *Strickland* "more appropriately gauges an attorney's alleged

---

[15]    As argued in the preceding section and incorporated herein, Daniel's reliance on ABA Guidelines is unavailing.

conflict of interest arising not from multiple client representation but from a conflict between the attorney's personal interest and that of his client").

In *United States v. Cronic*, the Supreme Court discussed in dicta a narrow category of situations in which prejudice may be presumed. 466 U.S. 648, 658-61 (1984). Such a presumption applies only when there has been an "[a]ctual or constructive denial of the assistance of counsel altogether," when there are "various kinds of state interference with counsel's assistance," or when counsel is burdened by an actual conflict of interest. *Strickland*, 466 U.S. at 692. Daniel argues that counsels' flat fee agreement "virtually guaranteed the failure to conduct a reasonable mitigation investigation." Am. Pet. at 55 (ECF No. 18 at 66). In arguing as he does, Daniel does not contend that counsel entirely failed to oppose the prosecution, but only that counsel failed to do so at specific points. The Supreme Court has never extended *Cronic* to cover this type of situation. *Bell v. Cone*, 535 U.S. 685, 697-98 (2002) (claims challenging counsel's failure to adduce mitigating evidence or waiver of closing argument "are plainly of the same ilk as other specific attorney errors we have held subject to *Strickland*'s performance and prejudice components").

Daniel's claim is governed by *Strickland*, but he fails to make this showing. *Newell*, 315 F.3d at 516. He essentially incorporates by reference two of his other IATC claims alleging that trial counsel were ineffective in other respects (*e.g.*, for failing to investigate and present mitigating evidence, and for failing to investigate evidence of Autism Spectrum Disorder) *because* they accepted a flat fee agreement. Am. Pet. at 55 (ECF No. 18 at 66). But as discussed in response to Claims V and VI

below, Daniel fails to show that trial counsel were ineffective in any respect. Therefore, his effort to bolster this IATC claim by asserting that counsel failed to adequately investigate and present evidence fails. Nonetheless, as discussed below, Daniel's trial counsel conducted an extensive investigation and presented a cohesive mitigation case founded on a reasonable trial strategy. Consequently, Daniel's claims fail because he cannot show that trial counsel's representation was deficient. For the same reason, Daniel fails to show that he was prejudiced, as he does not show that the result of his trial would have been any different if his attorneys had accepted an hourly fee rather than a flat fee.

Daniel raised the conflict of interest claim in his state habeas application, SHCR-01 at 623-30 (ECF No. 4-82 at 125-32), and it was rejected. As the state court found, trial counsel zealously represented Daniel, defense counsel Bradley Urrutia investigated whether the fee structure was appropriate and adequate, counsel felt adequately compensated for their representation, and the fee arrangement did not create any conflict of interest between Daniel and counsel. *Id.* at 1814-15 (ECF No. 4-89 at 116-17). The state court's findings are entitled to § 2254(e)(1)'s presumption of correctness. Because Daniel fails to rebut the state court's findings or show that the state court's adjudication was contrary to or an unreasonable application of *Strickland*, the Court should deny habeas corpus relief.

## V.     Daniel is Not Entitled to Habeas Corpus Relief Based on His Claims Challenging Trial Counsel's Investigation and Presentation of the Mitigation Case.

Daniel claims that his rights to effective assistance of counsel and immunity

from cruel and unusual punishment were violated by trial counsel's failure to investigate and present mitigating evidence. Am. Pet. at 56 (ECF No. 18 at 67). Specifically, he argues that his attorneys conducted a truncated investigation just weeks before trial that failed to uncover relevant evidence of his background and social history. *See id.* at 76-83 (ECF No. 18 at 87-94). Daniel further asserts that counsel's lack of investigation and preparation prejudiced him because the mitigation case that was presented "barely scratched the surface of [his] life," *id.* at 83 (ECF No. 18 at 94), and deprived the jury of the opportunity to learn of his family's instability, the genetic transmission of trauma, and parental neglect regarding his depression, drug abuse, and disability. *Id.* at 84 (ECF No. 18 at 95); *see generally id.* at 57-76 (ECF No. 18 at 68-87). These allegations do not merit habeas corpus relief.

### A. Daniel's Eighth Amendment claim is unexhausted, defaulted, and waived for inadequate briefing.

Daniel raised an IATC claim on state habeas but not an Eighth Amendment claim. SHCR-01 at 513-84 (ECF No. 4-82 at 15-86). If he tried to do so now, the TCCA would dismiss any such writ application as successive. *Williams*, 602 F.3d at 305-06. His Eighth Amendment claim is defaulted. *See Beazley,* 242 F.3d at 264.

In any event, Daniel's only mention of the Eighth Amendment is in the caption of his federal habeas claim. Am. Pet. at 56-88 (ECF No. 18 at 67-99). The issue is consequently waived due to inadequate briefing. *Green*, 508 F.3d at 203.

### B. Daniel's IATC claim does not merit relief under AEDPA.

#### 1. Standard of review for IATC claims

The familiar standard of *Strickland v. Washington* governs IATC claims. To

prove ineffectiveness, a petitioner must establish that counsel's actions were deficient and that such deficiency prejudiced the defense. 466 U.S. at 687. A failure to prove either requirement results in denial of the claim. *Id.* at 697.

To establish deficient performance, a petitioner must show that counsel's representation "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Yet "[t]here are countless ways to provide effective assistance in any given case," and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id.* at 689. Recognizing that it is "all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence," *id.*, the Supreme Court established in *Strickland* that counsel should be "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. This presumption requires that courts not simply "give [a petitioner's] attorneys the benefit of the doubt, but to affirmatively entertain the range of possible reasons [that] counsel may have had for proceeding as they did." *Pinholster*, 536 U.S. at 196.

Concerning prejudice, a petitioner must demonstrate "a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is one sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. To determine prejudice in the context of

mitigation evidence, a reviewing court "reweigh[s] the evidence in aggravation against the totality of available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). The prejudice inquiry asks whether there is "a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695; *see also Riley v. Cockrell*, 339 F.3d 308, 315 (5th Cir. 2003) (petitioner "has the difficult burden of showing a reasonable probability that the jury would not have imposed the death sentence in the absence of errors by counsel") (internal quotation marks omitted)).

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Even under de novo review, the standard for judging counsel's representation is a most deferential one." *Richter*, 562 U.S. at 105. Where IATC claims were adjudicated on the merits in state court, a federal habeas court must review the claims under the "doubly deferential" standards of both *Strickland* and § 2254(d). *Knowles v Mirzayance*, 556 U.S. 111, 123 (2009). "The *Strickland* standard "is a general one, so the range of reasonable applications is substantial." *Richter*, 562 U.S. at 105. However, unreasonableness under *Strickland* does not equate with unreasonableness under § 2254(d). *See id*. As a result, when § 2254(d) applies, the question is not whether defense counsel's performance fell below *Strickland*'s standards, but whether the "the state court's application of the *Strickland* standard was unreasonable." *Id*. at 101.

2.      **Daniel fails to show that the state-court adjudication is an unreasonable application of *Strickland*.**

During state habeas proceedings, Daniel raised an IATC claim alleging that counsel failed to investigate and present readily available mitigating evidence. SHCR0-01 at 513-84 (ECF No. 4-82 at 15-86). He asserted that defense counsel failed to investigate his life and family background and, consequently, deprived the jury "of he opportunity to learn the complex history behind a deeply troubled young man with a family history rooted in war, subjugation, mental illness, abuse, and generations of dysfunction." *Id.* at 513-14 (ECF No. 4-82 at 15-16). The TCCA held that Daniel "fail[ed] to meet his burden under *Strickland*" by failing to show deficient performance and prejudice, *Ex parte Daniel*, 2017 WL 467577, at *1 (ECF No. 4-96 at 3), and denied relief based on the state court's findings and conclusions and the TCCA's own review. *Id.* at *3 (ECF No. 4-96 at 6); *see* SHCR-01 at 1808, 1811-13 (ECF No. 4-89 at 110, 113-15). For the reasons set forth below, Daniel fails to demonstrate that—on the record before the state court—the TCCA's denial of his IATC claim on the merits was contrary to, or an unreasonable application of, *Strickland*.

### a. This Court's review of the state-court adjudication is limited to the record before the state court.

The mitigating-evidence IATC claim that was raised, and rejected on the merits, on state habeas review was supported by various records and affidavits. SHCR-01 at 513-84 (ECF No. 4-28 at 15-86).[16] Daniel uses the same exhibits to

_____

[16]     Daniel provided affidavits from (1) Dr. Gary Mesibov, SHCR-01 at 5-60 (ECF No. 4-78 at 7-62); (2) Dr. Wilkie Wilson, *id*. at 61-113 (ECF No. 4-78 at 63-116); (3) Daniel's sister Samantha Daniel, *id*. at 154-72 (ECF No. 4-78 at 156-74); (4) Daniel's friend Jennifer Duniphan, *id*. at 173-80 (ECF No. 4-78 at 175 to ECF 4079 at 7); (5) Daniel's former girlfriend Jenna Feland, *id*. at 181-87 (ECF No. 4-79 at 8-

support his amended federal habeas petition IATC claim. *E.g.*, App. 1386-1426, 1439-1544, 1551-1603 (ECF No. 7-6 at 7-47, 60-165, 172-224). But Daniel also relies on evidence that he never presented in state court:

1. PX-90: Declaration of Lisa Lawrence (Feb. 13, 2019), Supp. App. 1860-61 (ECF No. 20-1 at 44-45);

2. PX-92: Declaration of Jenna Lynn Feland (Feb. 13, 2019), Supp. App. 1864-67 (ECF No. 20-1 at 48-51);

3. PX-95: Declaration of Robert Anthony Long (March 3, 2019), Supp. App. 1873-74 (ECF No. 20-2 at 1-2);

4. PX-96: Declaration of Wendy Nesbit (Feb. 12, 2019), Supp. App. 1875-78 (ECF No. 20-2 at 3-6); and

5. PX-99: Declaration of Haley Heaps Stevenson (Feb. 28, 2019), Supp. App. 1886 (ECF No. 20-3 at 3).

*E.g.*, Am. Pet. at 64, 72, 79, 82-83 (ECF No. 18 at 75, 83, 90, 93-94) (citing same). Because the state court did not have these five exhibits when adjudicating Daniel's IATC claim, they cannot be considered by this Court. *Pinholster* limits review under § 2254(d)(1) "to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 185. The Supreme Court explained that "allow[ing] a petitioner to overcome an adverse state-court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively do novo" "would be contrary to [the] purpose" of AEDPA's exhaustion requirement. *Id.* at 182. The same rule necessarily applies to review of

---

14); (6) Daniel's paternal aunt Nina Hall, *id.* at 188-94 (ECF No. 4-79 at 15-21); (7) Jenna Feland's mother, Wendy Nesbit, *id.* at 195-98 (ECF No. 4-79 at 22-25) (8) Daniel's mother Mary O'Dell, *id.* at 199-249 (ECF No. 4-79 at 26-76); and (9) Daniel's maternal step-grandmother Karla O'Dell, *id.* at 288-96 (ECF No. 4-80 at 40-48).

purely factual determinations under § 2254(d)(2). *Blue*, 665 F.3d at 656 & n. 26-27. Daniel's new exhibits are irrelevant and outside the scope of this Court's review.

> **b.  The TCCA reasonably concluded that Daniel failed to satisfy *Strickland*'s deficient-performance prong.**

Daniel claims that trial counsel's failure to uncover and present relevant mitigating evidence constitutes deficient performance.[17] Am. Pet. at 76-78, 81 (ECF No. 18 at 87-89, 92). He complains that trial counsel's investigation was "unreasonably truncated" and did not include a thorough investigation into his social history. *Id.* at 78-83 (ECF No. 18 at 89-94). Because these allegations do not raise any reasonable argument that counsel's performance satisfied *Strickland*'s deficient-performance standard, the Court should deny habeas corpus relief.

"In investigating potential mitigating evidence, counsel must either undertake a reasonable investigation or make an informed strategic decision that investigation is unnecessary." *Charles v. Stephens*, 736 F.3d 380, 389 (5th Cir. 2013) (numbering and citation omitted). A petitioner who claims a failure to investigate on

---

[17]    Although Daniel cites to ABA guidelines and professional standards to show that counsel performed deficiently, the Supreme Court has admonished:

> Prevailing norms of practice as reflected in [ABA] standards and the like. . . are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.

*Strickland*, 466 U.S. at 688-89; *see also Van Hook*, 558 U.S. at 8.

the part of his counsel "must allege with specificity what the investigation would have reveled and how it would have altered the outcome of the trial." *Druery v. Thaler*, 647 F.3d 535, 541 (5th Cir. 2011). However, *Strickland* "does not force defense lawyers to scour the globe on the off chance something will turn up." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005). In assessing the reasonableness of counsel's investigation, a court makes a "context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Wiggins*, 539 U.S. at 523 (citing *Strickland*, 466 U.S. at 689). A court considers "not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id*. at 527.

The record in this case supports the state court's finding that "[d]efense counsel thoroughly investigated [Daniel's] past and his family background and history." SHCR-01 at 1811-12 (ECF No. 4-89 at 113-14). In preparing for trial, Daniel's attorneys "assembled a defense team with multiple experts to assist in the investigation and presentation of this case," retaining "Dr. Cecil Reynolds, a consulting neuropsychologist, Dr. Walter Harrell, a neuropsychologist, Dr. Harold Scott, a psychiatrist, Dr. William Lee Carter, a psychologist, and Lisa Lawrence, a mitigation specialist." *Id*. at 1808 (ECF No. 4-89 at 110).[18] The state court's findings are entitled to § 2254(e)(1)'s presumption of correctness

---

[18] Defense counsel also retained Dr. Matthew Masters, a board certified physician in addiction medicine and internal medicine, who testified at guilt-innocence about the effects of Xanax intoxication, depression, and treatment for addiction. 21 RR 4-31 (ECF No. 4-34 at 4-31).

Clear from the testimony of these experts, a competent and coordinated investigation of Daniel's background and social history was undertaken. As described above, the experts interviewed Daniel on multiple occasions, reviewed extensive records, conducted testing, and testified regarding the information they learned, their reported results, and their clinical impressions. *See* Statement of the Case, Part I.B.2.c., above. As an example, Dr. Carter summarized his findings in a PowerPoint presentation entitled "Life History and Psychological Study" that covers almost all the mitigating evidence Daniel faults counsel for not investigating and presenting, including his childhood family life, childhood personality, adverse effects of Daniel's family life (*e.g.*, failure to complete school, use of drugs and alcohol, severe depression, lack of emotional stability, and lack of psychological care even after it was recommended to his family), his relationship with females, psychological state at the time of the offense (*e.g.*, high intelligence, introverted nature, severe depression, and voluntary intoxication), and his personal strengths and weaknesses. 24 RR 78-153 (ECF No. 4-37 at 78-153); 27 RR at DX-16 (ECF No. 4-67 at 73 to 4-68 at 1).

The record also supports the state court's findings that the mitigation specialist, Lisa Lawrence, "investigated and gathered information regarding [Daniel's] childhood, friends, family, and employment history," and that defense attorney Bradley Urrutia and Ms. Lawrence "travelled to Colorado to search for further mitigating evidence and interview potential witnesses identified in the mitigation investigation." SHCR-01 at 1811 (ECF No. 4-89 at 113). In his affidavit, Mr. Urrutia attested that Ms. Lawrence "[g]athered information on [Daniel's]

childhood, his friends, his family, and his work life" and "made contact with many friends, teachers, college professors, and family." SHCR-01 at 1539 (ECF No. 4-88 at 41). Mr. Urrutia stated that he and the investigator traveled to Colorado to interview the witnesses they felt were most important, to contact others who did not return phone calls or for whom they only had physical addresses, and to search for additional mitigating evidence and witnesses. *Id.* According to Mr. Urrutia, they visited with Daniel's teachers and college professors; met with professor Jim Ascough who they found to be particularly helpful and who agreed to, and did, testify; met twice with Daniel's girlfriend, Jenna, and she testified; and they searched for several of Daniel's friends but were unable to locate them. *Id.* Again, the state court's findings are entitled to § 2254(e)(1)'s presumption of correctness that is not rebutted by Daniel.

In turn, the record fully supports that trial counsel's presentation of the mitigation case was not deficient. As described in the Statement of the Case, Part I.B. above, counsel presented a robust mitigation case using Daniel's family, friends, co-workers, and experts to describe his upbringing, dysfunctional family life, lack of support, untreated severe depression, suicide attempts, use (and later abuse) of alcohol and drugs, dependency on drugs and alcohol to self-medicate, head injuries, possible frontal lobe damage, high intelligence, accomplishments as a computer programmer and software engineer, and testimony to rebut Daniel's potential for violence while incarcerated. Even though the jury ultimately answered the mitigation special issue negatively, "the fact that a particular strategy may prove to be unsuccessful does not by itself establish ineffective assistance." *Gray v. Lucas*, 677

F.2d 1086, 1094 (5th Cir. 1982); *see also Strickland*, 466 U.S. at 687 (must be shown "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."). Daniel failed to establish deficient performance and the state court adjudication denying his IATC claim on the merits was not an unreasonable application of *Strickland*.

Daniel's arguments to the contrary do not warrant federal habeas relief. He contends that counsel conducted a truncated investigation of the mitigation case because the defense team (1) spent barely one-quarter of the hours necessary for an effective investigation, as assessed by the first mitigation specialist who initially worked for Daniel but later withdrew from the case; (2) conducted only one trip outside of Texas to Colorado to interview witnesses shortly before trial, and (3) failed to build the necessary relationships with critical family members to allow them access to crucial mitigating evidence. Am. Pet. at 78-81 (ECF No. 18 at 89-94). He also asserts that trial counsel failed to conduct a thorough investigation into his social history. *Id.* at 81-82 (ECF No. 18 at 92-93). These allegations do not warrant relief.

Importantly, Daniel's IATC claim is not that counsel utterly failed to investigate and present mitigating evidence. He instead contends that trial counsel performed deficiently by conducting a delayed, abbreviated investigation into mitigating circumstances. *See generally* Am. Pet. at 78-84 (ECF No. 18 at 89-95). The gist of his IATC claim is that the defense team did not begin the mitigation investigation soon enough, did not travel out of state earlier to interview witnesses, and did not find and bring enough punishment witnesses to the trial. *See id.* These

arguments rely on the very sort of "second-guessing" that courts must avoid. *See Strickland*, 466 U.S. at 689. As the Fifth Circuit has cautioned: "We must be particularly wary of arguments that essentially come down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing." *Carty v. Thaler*, 583 F.3d 244, 258 (5th Cir. 2009) (quoting *Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000) (quotation marks and alterations omitted)); *see also Kitchens v. Johnson*, 190 F.3d 698, 703 (5th Cir. 1999).

Furthermore, when reviewing a claim challenging counsel's failure to investigate, the Court makes a "context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Wiggins*, 539 U.S. at 523 (citing *Strickland*, 466 U.S. at 689). The relevant inquiry focuses on what counsel did to prepare, what evidence was accumulated, what additional leads counsel had, and the results counsel might reasonably have expected from those leads. *Cf. Neal*, 286 F.3d at 237. Daniel's claim does not help the Court in making this determination.

Daniel fails to present any evidence establishing that the extent of his defense team's pre-trial investigation was itself objectively unreasonable. While Daniel's arguments largely focus on the investigation conducted by Lisa Lawrence, he conspicuously ignores whatever evidence was accumulated by the first mitigation specialist, Alicia Amezcua-Rodriguez. As explained in response to Claim IV above, she withdrew from the case on December 5, 2012, after the trial court refused to authorize an additional 700 hours of mitigation investigation at a $100 per hour rate.

(ECF No. 38-1 at 65-66).[19] Daniel does not provide any details regarding the mitigation evidence discovered by this investigator, other than she contacted Daniel's mother. Am. Pet. at 82 (ECF No. 18 at 93). In her affidavit, Ms. Amezcua-Rodriguez states that she conducted "close to 150 hours of mitigation investigation-related work" on Daniel's case that included "interviewing the client, locating and interviewing witnesses in the local area, conferencing the case with the defense team (via in-person meeting, phone calls and electronic correspondence), conducting records collection, [and] drafting a preliminary investigation plan and witness lists." (*Id*. at 33-34). She also conducted computer database searches to locate information regarding witnesses, family history, and records. (*Id*. at 34-35). Her billing records include entries for work done between May 5, 2012 and November 8, 2012, including meetings and phone calls with the defense team and defense counsel, phone conferences and interviews with various "life-history" witnesses, meetings with Daniel, and a list of "investigation-related expenses" for records. (*Id*. at 111-15). Daniel's attorney Bradley Urrutia was appointed to represent Daniel on the day he was arrested, he served as counsel throughout the entire time Ms. Amezcua-Rodriguez was investigating the mitigation case, and he served as one of Daniel's two trial counsel. Daniel's counsel would necessarily have been aware of what evidence was accumulated and what additional leads were available.

---

[19]     As explained in response to Claim IV above, Daniel's former lead counsel Bill White moved for funding and attached an affidavit from the mitigation specialist. (ECF No. 38-1 at 4-38). The motion was denied. (*Id*. at 65-66).

Even if Daniel's complaints are considered, they do not show that the state court's rejection of his IATC claim was an unreasonable application of *Strickland*. Daniel initially argues that counsel's investigation was "unreasonably truncated" because the defense team "spent barely one-quarter of the hours necessary for an effective investigation." Am. Pet. at 78 (ECF No. 18 at 89). By "necessary," Daniel means that the defense team did not undertake the 700 hours of additional investigative work that was proposed by Alicia Amezcua-Rodriguez, the former mitigation specialist, and denied by the trial court. *See id.* at 79 (ECF No. 18 at 90). He then asserts that because Lisa Lawrence, the second mitigation specialist, billed 181 hours, the investigation was necessarily deficient. *Id.* at 80 (ECF No. 18 at 91). Daniel identifies no Supreme Court precedent holding that an attorney is ineffective for not following a recommendation of a former investigator. His comparing the number of hours proposed for additional work versus the number of hours actually worked proves nothing. Daniel must "allege with specificity what the investigation would have reveled and how it would have altered the outcome of the trial." *Druery*, 647 F.3d at 541. He fails to make this showing because he never identifies any matter identified by the first investigator that should have been undertaken, much less explain how it would have altered his receiving a death sentence.

Daniel additionally argues that counsel's investigation was deficient because "nearly every potential mitigating witness with knowledge about" him lived outside of Texas but counsel only made one trip to Colorado shortly before trial and failed to interview witnesses while there. Am. Pet. at 78-80 (ECF No. 18 at 89-91). To prevail

on an IATC claim based on counsel's failure to interview and call a witness, the petitioner must (1) name the witness, (2) demonstrate that the witness was available to testify and would have done so, (3) set out the content of the witness's proposed testimony, and (4) show that the testimony would have been favorable to a particular defense. *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009). Daniel fails to make this showing. The only witness Daniel identifies as not being interviewed is Wendy Nesbitt, Jenna Feland's mother. Am. Pet. at 78-79 (ECF No. 18 at 89-90). Even if she was not interviewed in Colorado, counsel apparently did so later because she testified for the defense during its case in surrebuttal at the penalty phase regarding a letter Daniel wrote to her daughter. 26 RR 71-86 (ECF No. 4-39 at 71-86). Daniel argues that if counsel had better prepared her to testify, they could have elicited testimony that she thought he was a "sweet misunderstood person" and she felt "maternal towards him." Am. Pet. at 79 (ECF No. 18 at 90). This is the very sort of "second-guessing" that *Strickland* was intended to avoid. *See Strickland*, 466 U.S. at 689.

Daniel next argues that counsel's investigation was deficient because "they failed to build the necessary relationships with critical family members to allow them access to crucial mitigating evidence." Am. Pet. at 78 (ECF No. 18 at 89). He does not identify any family member, much less a "critical" one, for whom this claim might apply, nor does he identify the allegedly "crucial mitigating evidence" the family member could have provided. *See id*. Because Daniel fails to set forth "what the investigation would have reveled and how it would have altered the outcome of the trial," *Druery*, 647 F.3d at 541, the Court should reject his conclusory claim.

Finally, Daniel argues that trial counsel failed to conduct a thorough investigation into his social history, including a "family history of violence, alcohol and drug abuse, and trauma," and Daniel's "personal history of drug and alcohol abuse, depression, and disability." Am. Pet. at 81, 83 (ECF No 18 at 92, 94). He alleges that counsel did not seek out "relatives" to explain the family tree and "friends" to detail Daniel's drug and alcohol abuse. *Id.* at 83 (ECF No. 94). He does not name any friends or relatives (other than his mother, Mary O'Dell) that he believes should have been contacted, nor does he explain what the investigation would have revealed and how it would have altered the outcome at trial. *Druery*, 647 F.3d at 541.

Daniel's failure-to-investigate IATC claim also fails regarding Mary O'Dell. Citing ABA Guidelines and the like concerning the development of a relationship of trust and establishing rapport, Daniel contends that counsel's failure to maintain the relationship with Ms. O'Dell fell below prevailing professional norms. Am. Pet. at 81-82 (ECF No. 18 at 92-93). According to Daniel, "[t]he last minute and abbreviated nature of the investigation" undertaken by trial counsel was apparent to Ms. O'Dell and led to a breakdown in the relationship between her and counsel. *Id.* at 82 (ECF No. 18 at 93). Daniel provides an affidavit from Ms. O'Dell as evidence of counsel's allegedly deficient investigation. App. 1494-1544 (ECF No. 7-6 at 15-65).

Notwithstanding the post-conviction change in Ms. O'Dell now wishing she had testified at trial, App. 1544 (ECF No. 7-6 at 165), the record in this case fully supports the state court's finding that she "was uncooperative with defense counsel prior to and during trial in this case." SHCR-01 at 1824 (ECF No. 4-89 at 126). In his affidavit,

defense trial counsel Bradley Urrutia attested that Ms. O'Dell "was not speaking to us at the time of trial and claimed she wasn't in town." *Id*. at 154 (ECF No. 4-88 at 44). The trial record shows that Ms. O'Dell was nonresponsive to the efforts of Dr. Scott, one of Daniel's expert witnesses, to meet with her and talk to him regarding Daniel. 25 RR 184, 190 (ECF No. 4-38 at 184, 190). Ms. O'Dell did not appear at trial; Sherri Schuck, O'Dell's sister, testified that she did not know where O'Dell was or whether O'Dell had been in Austin recently. 25 RR 52-53 (ECF No. 4-38 at 52-53). "Competence does not require an attorney to browbeat a reluctant witness into testifying, especially when the facts suggest that no amount of persuasion would have succeeded." *Mirzayance*, 556 U.S. at 125; *accord Carty*. 583 F.3d at 263-64. Counsel cannot be considered deficient where potential witnesses refused to cooperate.

Even though counsel were stymied by O'Dell, they were not deficient in their mitigation investigation, and the state court was not objectively unreasonable in so finding. SHCR-01 at 1811-12 (ECF No. 4-89 at 113-14). Daniel's trial counsel provided affidavits attesting that the defense team did not fail to investigate Daniel's past or his family background. *Id*. at 1063-64 (ECF No. 4-86 at 66); *id*. at 1539 (ECF No. 4-88 at 41). According to lead counsel Russell Hunt: "We did not believe that telling a story about [Daniel's] immigrant ancestors from war-torn countries was a particularly compelling mitigating story. We felt that the history of murders, robbery and violen[ce] and drug crime in [Daniel's] family background were potentially aggravating factors that would tend to make a jury see [Daniel] as being more of a danger to the community than less of one." *Id*. at 1063 (ECF No. 4-86 at 65). According

to second-chair counsel Bradley Urrutia: "Our decision not to present evidence of the violent crimes committed by other members of [Daniel's] family was a strategic one. Not one of oversight." *Id*. at 1539 (ECF No. 4-88 at 41). Rather than present this potentially damaging evidence, defense counsel made the reasonable, strategic decision to present a compelling, acceptable picture of Daniel for the jury. *Id*. at 1064 (ECF No. 4-86 at 66). In counsel's professional judgment, a more compelling picture of Daniel was "a brilliant young person, a computer genius . . . who just happened to have untreated mental health issues" compounded by a substance abuse problem. *Id*. Defense counsel made the objectively reasonable, strategic decision to not present the factors Daniel raises in his habeas petition. "[S]trategic choices" like those made here "after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690.

### c. The TCCA reasonably concluded that Daniel failed to satisfy *Strickland*'s prejudice prong.

Daniel contends that his attorneys presented a mitigation case that "barely scratched the surface of [his] life." Am. Pet. at 83 (ECF No. 18 at 94). He asserts that counsel presented a "disjointed picture of an intelligent man with some depression and drug use that made him do something out of the ordinary," *id.*, instead of compelling mitigating evidence regarding the genetic transmission of trauma, his family's instability, and parental neglect regarding his depression, drug use, and "significant developmental disability." *Id*. at 84 (ECF No. 18 at 95). To the contrary, Daniel was not prejudiced by counsel's investigation and presentation of the mitigation case, and the state court was not objectively unreasonable in so finding.

Daniel's allegations about omitted mitigating evidence do not show a reasonable probability that, but for the failure of trial counsel to investigate and present such evidence, the jury would have determined that death was not an appropriate sentence. As described above, Daniel's trial counsel presented multiple witnesses who testified regarding his upbringing, dysfunctional family life, lack of support, untreated severe depression, introversion, suicide attempts, use and abuse of alcohol and drugs, dependency on drugs and alcohol to self-medicate, head injuries, possible frontal lobe damage, high intelligence, accomplishments as a computer programmer and software engineer, and testimony to rebut Daniel's potential for violence while incarcerated. *See* Statement of the Case, Part I.B., *supra*. Daniel's contention that counsel failed to present mitigating evidence of family instability, parental neglect, depression, and drug use is belied by the record. Am. Pet. at 84 (ECF No. 18 at 95). He cannot show prejudice by counsel's purported omission where additional mitigating evidence would have been substantially redundant and cumulative of mitigating evidence the jury had already heard. *Lincecum*, 958 F.3d at 1280 (holding that no prejudice occurred where the unpresented evidence would have been cumulative of evidence already presented).

The only complained-of, omitted mitigating evidence identified by Daniel concerns the "genetic transmission of trauma." Am. Pet. at 84 (ECF No. 18 at 95).[20] The affidavit of Mary O'Dell sets out family history information. App. 1494-1544

---

[20] Daniel also claims counsel failed to present evidence of his "developmental disability." Am. Pet. at 84 (ECF No. 18 at 95). This is addressed in response to Daniel's Claim VI, his IATC claim regarding Autism Spectrum Disorder.

(ECF No. 7-6 at 15-65). However, Daniel does not identify any expert or witness who was willing, and able, to testify about the existence of this theory of trauma or how it applies in this case. Daniel cannot establish prejudice with mere speculation or conjecture. *Bradford v. Whitley*, 953 F.2d 1008, 1012 (5th Cir. 1992). Regardless, as explained above, defense counsel had strategic reasons for not presenting "potentially aggravating factors" regarding the history of murders, robbery, violent offenses, and trauma in Daniel's family background. *E.g.*, SHCR-01 at 1539 (ECF No. 4-88 at 41). Just as in this case, counsel's decision not to present double-edged evidence during the punishment phase will rarely support a finding of prejudice under *Strickland*. *See Ibarra v. Davis*, No. 17-70014, 2019 WL 4019933, at *5 (5th Cir. Aug. 26, 2019) (evidence of poverty and violent upbringing is a double-edged sword in terms of proving future dangerousness); *Trevino v. Davis*, 829 F.3d 328, 337 (5th Cir. 2016) (evidence showing long history of alcohol and drug abuse and criminal misconduct was double-edged mitigating evidence). The Court should therefore deny habeas corpus relief based on Daniel's failure to show that the state-court adjudication of his IATC claim was an unreasonable application of *Strickland*.

## VI. Daniel is Not Entitled to Relief on His Claims Alleging Trial Counsel Failed to Investigate and Present Evidence of Autism Spectrum Disorder (ASD).

Daniel argues that his rights to effective assistance of counsel and freedom from cruel and unusual punishment were violated by trial counsel's failure to investigate and present evidence that Daniel has ASD. Am. Pet. at 88 (ECF No. 18 at 99). By his account, such evidence would have mitigated the circumstances

surrounding the capital offense and explained his apparent lack of remorse. *Id.; see id. at* 88-107 (ECF No. 18 at 99-118).[21] The Court should deny habeas corpus relief because Daniel's Eighth Amendment claim is procedurally barred and any error is waived and Daniel fails to show that the state court's rejection of his IATC claim resulted in an unreasonable application of *Strickland.*

### A. Daniel's Eighth Amendment claim is unexhausted, defaulted, and waived for inadequate briefing.

Daniel asserts that he "raised this claim in his initial [state habeas] application." Am. Pet. at 103 (ECF No. 18 at 114). The IATC claim was raised but not the Eighth Amendment claim. SHCR-01 at 461-512 (ECF No. 4-81 at 38 to ECF No. 4-82 at 15). If Daniel tried to raise the claim now, the TCCA would dismiss any such writ application as successive. *Williams*, 602 F.3d at 305-06. Daniel's Eighth Amendment claim is thus defaulted on habeas review. *See Beazley,* 242 F.3d at 264.

In any event, Daniel's only mention of the Eighth Amendment is in the caption of his federal habeas claim. Am. Pet. at 88 (ECF No. 18 at 99). Any alleged error is

---

[21]     Daniel states that "[b]ecause of page restrictions, [he] does not recount with specificity his extensive history of symptoms evidencing ASD" and proposes that "a thorough description of the full range of symptoms . . . may be found in the initial state habeas application supported by affidavits submitted to this Court." Am. Pet. at 91 n.16 (ECF No. 18 at 102). The Court should reject Daniel's implicit attempt to incorporate by reference the description of the evidence of ASD symptoms contained in his state habeas application. *See Yohey v. Collins*, 985 F.2d 222, 225 (5th Cir. 1993) (holding that a petitioner may not incorporate by reference arguments made in other pleadings); *Perillo v. Johnson*, 79 F.3d 441, 443 n. 1 (5th Cir. 1996) (citing *Yohey* in concluding that attempt to incorporate by reference a district court habeas petition was insufficient to preserve error and waived the issues on appeal); *but see Ramey v. Davis*, No. 18-70034, 2019 WL 5677788, at *3 (5th Cir. Nov. 1, 2019) (COA grant holding that *Batson* claim raised in amended petition related back to skeletal petition that incorporated by reference post-conviction briefs that set out the facts).

waived by Daniel's failure to adequately brief the claim. *Green*, 508 F.3d at 203.

## B. Daniel's IATC claim does not merit relief under AEDPA.

During state habeas proceedings, Daniel raised an IATC claim alleging that counsel were ineffective for failing to investigate and present evidence that Daniel has ASD. SHCR-01 at 461-513 (ECF No. 4-81 at 38 to ECF No. 4-82 at 15). He asserted that had his attorneys conducted a comprehensive investigation of his early developmental years, they would have discovered evidence of Daniel's ASD that could have been presented to their mental health experts. *Id*. at 461 (ECF No. 4-81 at 38). Daniel also asserted that had counsel performed reasonably, "they would have utilized qualified expertise in ASD" in his defense. *Id.* Daniel argued that evidence of ASD could have been used at guilt/innocence to show that he lacked the required culpable mental state to commit capital murder or was insane at the time of the offense, *id*. at 502-03 (ECF No. 4-82 at 4-5), and that ASD could also have been used during the punishment phase as powerful mitigating evidence, *id*. at 505-12 (ECF No. 4-82 at 7-14). Daniel largely supported his claim with an affidavit from psychologist Dr. Gary Mesibov, who concluded in 2016 on state habeas review that Daniel fits the diagnostic criteria for ASD, *id*. at 5-37 (ECF No. 4-78 at 7-37), and an affidavit from one of Daniel's trial experts, psychiatrist Dr. Harold Scott, in which Scott revised his diagnosis to include ASD, *id*. at 252-55 (ECF No. 4-80 at 4-7).

The TCCA denied habeas relief after concluding that Daniel failed to show both deficient performance and prejudice under *Strickland. Ex parte Daniel*, 2017 WL 467577, at *2 (ECF No. 4-96 at 3-5). In reaching this decision, the TCCA found that

counsel did not fail to investigate whether Daniel suffered from ASD, that counsel's decision to not present evidence of a possible ASD diagnosis was objectively reasonable, and that Daniel failed to show a reasonable probability that the result of proceedings would have been different with the presentation of a possible ASD diagnosis. *Id.* For the reasons set forth below, Daniel fails to demonstrate that—based on the record before the state court—the TCCA's rejection of his IATC claim on the merits was contrary to, or an unreasonable application of, *Strickland*.

1. **This Court's review of the state-court adjudication is limited to the record before the state court.**

Daniel's state habeas claim was supported by affidavits or declarations from (1) Dr. Gary Mesibov, (2) Dr. Wilkie Wilson, (3) Samantha Daniel, (4) Jennifer Duniphan, (5) Jenna Feland, (6) Nina Hall, (7) Wendy Nesbitt, (8) Mary O'Dell, (9) juror Jessica Trevino, and (10) Dr. Harold Scott. SHCR-01 at 461-513 (ECF No. 4-81 at 38 to ECF No. 4-82 at 15). He relies on these exhibits to support his federal habeas IATC claim, but also relies on exhibits never presented to the state court:

1. PX-36: TCSO Progress note (April 12, 2012), App. 1143-44 (ECF No. 7-5 at 127-28);

2. PX-37: TCSO Progress note (May 31, 2012), App. 1145-464 (ECF No. 7-5 at 129-30);

3. PX-40: Letter from Russell Hunt to Dr. Carter (Jan. 1, 2014), App. 1150 (ECF No. 7-5 at 133);

4. PX-47: Email from Lisa Lawrence to Brad Urrutia (Nov. 10, 2013), App. 1190 (ECF No. 174);

5. PX-48: Email from Russell Hunt to Lisa Lawrence (Dec. 20, 2013), App. 1191 (ECF No. 175);

6. PX-50: Email from Russell Hunt to Harold Scott (Dec. 23, 2013), App. 1193 (ECF No. 177);

7. PX-51: Email from Dr. Carter to Russell Hunt (Jan. 20, 2014), App. 1194-96 (ECF No. 7-5 at 178-80);

8. PX-68: Declaration of Sharon Gaston (Oct. 2, 2018), App. 1604-05 (ECF No. 7-6 at 225-26);

9. PX-90: Declaration of Lisa Lawrence (Feb. 13, 2019), Supp. App. 1860-61 (ECF No. 20-1 at 44-45); and

10. PX-99: Declaration of Haley Heaps Stevenson (Feb. 28, 2019), Supp. App. 1886 (ECF No. 20-3 at 3).

Because Daniel's IATC claim was adjudicated on the merits in state court, *Pinholster* precludes the Court from considering the above-listed exhibits on federal habeas review. *See* Argument, Part V.B.2.a., *supra*.

### 2. Daniel fails to show that the state-court adjudication is an unreasonable application of *Strickland*.

Daniel argues that trial counsel unreasonably failed to conduct a complete and thorough investigation of his childhood. Am. Pet. at 99 (ECF No. 18 at 99). He asserts that had counsel done so, they could have provided the evidence they uncovered to their trial experts, which would have led one of the experts to diagnose Daniel with ASD. *Id.* Daniel argues that he was prejudiced by counsel's deficient investigation because evidence of ASD that would have mitigated the circumstances surrounding the offense and explained his apparent lack of remorse. *Id.*; *see generally id.* at 88-107 (ECF No. 99-118). These allegations do not merit habeas relief.

Defense counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*,

466 U.S. at 691. There is a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id*. at 690. When assessing the reasonableness of an attorney's investigation, a reviewing court "must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527. Even if Daniel could prove deficient performance, he also needed to show that there is a reasonable probability that, but for counsel's failure to present evidence of ASD, the outcome at punishment would have been different. *Strickland*, 466 U.S. at 694.

### a. The TCCA reasonably concluded that Daniel failed to satisfy *Strickland*'s deficient performance prong.

Based on its review of the record, the TCCA reasonably concluded that "[t]rial counsel did not fail to investigate whether Daniel suffered from ASD." *Ex parte Daniel*, 2017 WL 467577, at *2 (ECF No. 4-96 at 4).

> The record shows that the entire defense team, consisting of four doctors and a mitigation specialist, considered whether [Daniel] had Asperger's syndrome or another disorder within the autism spectrum. Trial counsel specifically investigated whether a credible diagnosis could be made in this case. Dr. Scott and psychologist Dr. William Lee Carter both interviewed and completed evaluations of [Daniel]. Dr. Scott indicated that [Daniel] probably did not suffer from Asperger's. Dr. Carter firmly believed that [Daniel] did not suffer from ASD. Mitigation specialist Lisa Lawrence investigated and gathered mitigation and early childhood information regarding [Daniel]. Trial counsel provided that information to the mental health professionals on the defense team.

*Id*. Evidence of ASD was not presented to the jury because trial counsel determined, based on the investigation and the opinions of the mental health experts, "that a diagnosis of ASD was not supported." *Id*.

The TCCA's decision is fully supported on the record before the state habeas court. In his affidavit, lead defense counsel Russell Hunt, Jr., attested that in preparing the case, he wanted to obtain "as much reliable and useful information and opinion as possible," and that he hired four experts "to assist with the preparation and presentation of the case, including Dr. Cecil Reynolds, a consulting neuropsychologist, Dr. Walter Harrell, a neuropsychologist, Dr. Harold Scott, a psychiatrist, Dr. William Lee Carter, a psychologist, and Lisa Lawrence, a mitigation specialist." SHCR-01 at 1062 (ECF No. 4-86 at 64). According to Mr. Hunt:

> The entire defense team discussed the possibility of [Daniel's] having Asperger's syndrome or another disorder in the autism spectrum on several occasions. I asked Doctors Scott and Carter specifically to tell me whether or not they believed that such a diagnosis could be made because both doctors interviewed [Daniel]. Doctor Scott indicated that he felt [Daniel] probably did not have Asperger's syndrome. Doctor Carter adamantly indicated that he thought [Danie] did not suffer from ASD. Doctor Carter sent the Defense team an email on January 20, 2014 in which he stated:
>
>> Let me offer a bit of elaboration about the question of whether or not [Daniel] may have Asperger's or a related disorder. I strongly believe he does not. Some people are too quick to bring up that matter when a person is socially flawed or displays inappropriate affect.

Id. at 1062-63 (ECF No. 4-86 at 64-65). Mr. Hunt did not recall the defense experts "asking for additional information regarding Daniel's childhood with an eye towards making an autism diagnosis" and did not recall their ever suggesting that additional testing should be sought to determine whether Daniel suffered from ASD. Id.

Counsel is not deficient when, after retaining pertinent experts and providing them with the relevant background material, such experts do not discover the

underlying mental health issue that should have supposedly been presented at trial. *See Couch v. Booker*, 632 F.3d 241, 246 (6th Cir. 2011) ("Trial counsel may rely on an expert's opinion on a matter within his expertise when counsel is formulating trial strategy."); *McClain v. Hall*, 552 F.3d 1245, 1252 (11th Cir. 2008) ("McClain's counsel reasonably relied on Dr. Maish's opinion that McClain suffered from 'Antisocial Personality Disorder' but did not suffer from a frontal lobe disorder or from any 'significant emotional disorder.'"); *Sims v. Brown*, 425 F.3d 560, 585-86 (9th Cir. 2005) ("[A]ttorneys are entitled to rely on the opinions of mental health experts, and to impose a duty on them to investigate independently of a request for information from an expert would defeat the whole aim of having experts participate in the investigation."); *Dowthitt*, 230 F.3d at 747-48 (counsel may rely upon their retained experts and need "not canvass[] the field to find a more favorable defense expert"); *Hendricks v. Calderon*, 70 F.3d 1032, 1038 (9th Cir. 1995) ("In general, an attorney is entitled to rely on the opinions of mental health experts in deciding whether to pursue an insanity or diminished capacity defense."). The fact that Daniel's experts at trial did not diagnose him with ASD or suggest that another expert was needed to properly take into account evidence of his developmental history ends the matter at counsel's performance.

Additionally, while evidence of ASD was not presented, the TCCA reasonably concluded that counsel's presentation of the mitigation case was not deficient:

> At trial and punishment, trial counsel presented substantial evidence of [Daniel's] mental health issues, related substance abuse issues, and social impairment that were determined to be verified by evidence from [his] background and mental health experts. Trial counsel relied upon

the opinions of their four mental health experts in developing a credible defense and presented expert testimony at trial regarding [Daniel's] mental health issues and substance abuse problems and how such issues affected his behavior and how such issues affected his statements to police.

*Ex parte Daniel*, 2017 WL 467577, at *2 (ECF No. 4-96 at 4). Again, the TCCA's decision is fully supported by the record.

In his affidavit, lead counsel Russell Hunt attested that the defense team used the investigation into Daniel's mental health issues and background to develop the most appropriate mitigation case. SHCR-01 at 1063 (ECF No. 4-86 at 65). Counsel believed they could "tell a powerful mitigating story about the failure, primarily of [Daniel]s mother, to seek treatment for [Daniel's] clear psychological issues when he was a young child." *Id.* Without a diagnosis of ASD, counsel reasonably determined they could not present "a clear, powerful story about autism spectrum disorders[.]" *Id.* Defense counsel further concluded that even if Daniel fell somewhere on the spectrum of the disorder, it seemed that his disorder fell on the mild range. *Id.* With his own expert witness of the opinion that people are too quick to use ASD or Asperger's to explain a person's socially awkward or inappropriate behavior, trial counsel's decision to not present evidence of ASD was objectively reasonable. "[S]trategic choices made after a thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. This strategic decision in this case was not simply a lack of investigation or preparation as Daniel suggests, but a chosen tactic in light of the evidence.

The Court should be mindful that Daniel's complaint is not that counsel

entirely failed to investigate ASD. Instead, he contends that defense counsel did not review records soon enough, did not contact the experts earlier regarding the possibility of an ASD diagnosis, and did not uncover enough supporting evidence from Daniel's childhood. Just as with Daniel's mitigation-based IATC claim, these arguments rely on the very sort of "second-guessing" that courts must avoid. *See Strickland*, 466 U.S. at 689. Courts "must be particularly wary of arguments that essentially come down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing." *Carty*, 583 F.3d at 258 (quoting *Dowthitt*, 230 F.3d at 743) (quotation marks and alterations omitted).

### b. The TCCA reasonably concluded that Daniel failed to satisfy *Strickland*'s prejudice prong.

Even if Daniel could show deficient performance, he failed to show prejudice and the state court was not objectively unreasonable in so finding. *Ex parte Daniel*, 2017 WL 467577, at *2 (ECF No. 4-96 at 5). Daniel contends that had his counsel adequately investigated his background, they would have uncovered evidence supporting an ASD diagnosis, the omission of which prejudiced him. Yet Daniel had not been diagnosed with ASD during his childhood and adolescence or prior to trial. One of Daniel's trial experts, Dr. Harold Scott, a board-certified psychiatrist, did not diagnose Daniel with ASD despite having reviewed his records and meeting with Daniel multiple times.[22] He instead diagnosed Daniel with Major Depressive

---

[22]    Through no fault of defense counsel, Dr. Scott was not able to fully interview Daniel's father and investigate his social history in that regard due to

Disorder, Substance Use Disorder, and Avoidant Personality Disorder. SHCR-01 at 252 (ECF No. 4-80 at 252). Daniel essentially faults counsel for not presenting a medical diagnosis that had not been made prior to trial.

Dr. Scott has now presented Daniel with an affidavit revising his diagnosis of Daniel, but it is important to note the specifics of that revision. Dr. Scott attests that his new diagnosis of ASD replaces only his diagnosis of Avoidant Personality Disorder, as "ASD better explains [Daniel's] substantiated impairments in socialization." SHCR-01 at 254 (ECF No. 4-80 at 6). Dr. Scott does not attest that ASD explains why Daniel committed this offense or his behavior after the offense. And there was substantial evidence at trial of Daniel's impairments in socialization. *See* Statement of the Case, Part I.B., *supra*. There is no reasonable probability that the outcome of this trial would have been any different with this new, limited diagnosis from Dr. Scott.

Daniel takes the same evidence that counsel presented regarding depression, substance abuse, dysfunctional family background and the like, asserts that it should be considered evidence of ASD, contends counsel were ineffective for not presenting evidence of that disorder, and that he was prejudiced as a result. This case was already a battle of dueling forensic experts on Daniel's mental health and intoxication issues. Much of Dr. Mesibov's discussion on Daniel's symptomology in his affidavit, SHCR-01 at 5-37 (ECF No. 4-78 at 7-37), is cumulative of evidence already presented

---

Daniel's father's fatal illness. *See* SHCR-01 at 252 (ECF No. 4-80 at 252). At trial, Dr. Scott testified that he tried to interview Daniel's mother, but got no response ("radio silence"). 25 RR 184 (ECF No. 4-38 at 184).

at trial through the defense's expert witnesses and based on the same material. *See United States v. Harris*, 408 F.3d 186, 191 (5th Cir. 2005) ("This Court has previously refused to allow the omission of cumulative testimony to amount to ineffective assistance of counsel."). Because the jury heard evidence of Daniel's symptomology and how it affected his behavior and statements to police, there is no reasonable probability that the outcome at punishment would have been different by virtue of telling the jury these behaviors and symptoms might be labelled ASD. That autism or Asperger's syndrome may have been an issue in other cases across the country does not render it relevant, nor does it lead to different result in this case.

Finally, Daniel cannot show prejudice where the complained-of, omitted mitigating evidence—an actual ASD diagnosis—is double-edged and can be viewed as more aggravating then mitigating. *E.g.*, *Vasquez v. Thaler*, 389 F. App'x 419, 429 (5th Cir. Aug. 11, 2010) (unpublished) (evidence of mental impairment, including post-traumatic stress disorder, attention deficit disorder, drug addiction, Fetal Alcohol Syndrome, learning disabilities, and borderline I.Q., can be double-edged); *Johnson v. Cockrell*, 306 F.3d 249, 253 (5th Cir. 2002) (holding no showing of prejudice made where trial counsel failed to introduce double-edged evidence regarding the defendant's brain injury, abusive childhood, and drug and alcohol problems); *Santellan*, 271 F.3d at 198 (holding no showing of prejudice from counsel's failure to present evidence of organic brain damage). On the record in this case, the Court should therefore deny habeas corpus relief because the TCCA's reception of Daniel's IATC claim on the merits was a reasonable application of *Strickland*.

## VII. Daniel is Not Entitled to Habeas Corpus Relief on His Claims Challenging Trial Counsel's Investigation and Presentation of Evidence Regarding the Adverse Effects of Xanax.

Daniel argues that trial counsel were ineffective for failing to investigate and present evidence regarding the adverse effects of Xanax, in violation of his Sixth Amendment right to counsel, Eighth Amendment right to be free from cruel and unusual punishment, and Fourteenth Amendment right to due process. Am. Pet. at 107 (ECF No. 18 at 118). The Court should deny habeas relief because the entire claim is unexhausted and defaulted, several allegations are waived for inadequate briefing, and Daniel cannot overcome the procedural bar.

### A. Daniel's Eighth and Fourteenth Amendment claims are unexhausted, defaulted, and waived for inadequate briefing.

Daniel concedes that his claim is unexhausted and argues that ineffective assistance of state habeas counsel establishes cause and prejudice to excuse any default under *Martinez* and *Trevino*. Am. Pet. at 113-14 (ECF No. 18 at 124-25). *Martinez* "qualifie[d] *Coleman* by recognizing a narrow exception that applies only to claims of ineffective assistance of counsel at trial and only when, under state law, those claims must be raised in an initial-review collateral proceeding." *Davila*, 137 S. Ct. at 2065-66 (quotations omitted). It does not excuse the procedural bar of Daniel's unexhausted and defaulted Eighth and Fourteenth Amendment claims.

In any event, Daniel's briefing consists of listing the constitutional provisions in the caption of his claim and elsewhere stating counsel "violated [his] due process rights." Am. Pet. at 107-08 (ECF No. 18 at 118-19). His failure to adequately brief the claims waives any error. *Green*, 508 F.3d at 203; *Trevino*, 168 F.3d at 181 n. 3.

**B.** **Daniel's IATC claim is unexhausted, defaulted, and plainly meritless.**

Daniel cannot overcome the procedural default of his admittedly unexhausted IATC claim. Under *Martinez*, a petitioner may demonstrate "cause" for a default by showing "(1) that his claim of ineffective assistance of counsel at trial is substantial—i.e., has some merit—and (2) that habeas counsel was ineffective in failing to present those claims in his first state habeas proceeding." *Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013).[23] Making this showing alone is insufficient to overcome a procedural bar because a petitioner must also show actual prejudice. *Coleman*, 501 U.S. at 750. The *Strickland* inquiry governs both Daniel's underlying IATC claim and whether state habeas counsel was ineffective in failing to raise the IATC claim. To establish a claim of ineffective assistance, Daniel must show both deficient performance and prejudice. *Strickland*, 466 U.S. at 687. Daniel cannot make this showing. His underlying IATC claim is not substantial and state habeas counsel were not ineffective for failing to raise such a plainly meritless claim.

**1.** **Daniel's defaulted IATC claim is not substantial.**

**a.** **Trial counsel did not perform deficiently.**

Daniel argues that trial counsel were ineffective for failing to consult or present an expert to explain that for a small portion of the population, Xanax causes an adverse reaction which can lead to violence and aggression, known as "rage reaction"

---

[23] However, "the mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise a claim despite recognizing it, does not constitute cause for a procedural default." *Smith v. Murray*, 477 U.S. 527, 535 (1986) (citation omitted).

or "paradoxical reaction." Am. Pet. at 107 (ECF No. 18 at 118). He contends that studies of rage reaction were widely available to the medical and legal community in 2014 and expert testimony should have been presented on this matter to assist the jury in understanding why Daniel behaved in such an "unexpected and bizarre manner" on the night of the offense. *Id.* at 110-11 (ECF No. 18 at 121-22). These arguments do not show that trial counsel's representation "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.

Importantly, Daniel's claim is not that counsel failed to investigate or present expert testimony regarding the adverse effects of Xanax. Such a claim would fail because defense counsel retained Dr. Matthew E. Masters, Jr., a board certified physician in addiction medicine and internal medicine, and presented his testimony during the guilt phase regarding the adverse of effects of Xanax and addiction. 21 RR 4-32 (ECF No. 4-34 at 4-32). Daniel's claim instead is that counsel did not present *enough* information about the effects of Xanax and should have presented expert testimony regarding an "uncommon adverse reaction" to the drug that is experienced by a "small portion of the population." Am. Pet. at 107 (ECF No. 18 at 118). His argument relies on "second-guessing" which must be avoided. *See Strickland*, 466 U.S. at 689. Courts "must be particularly wary of arguments that essentially come down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing." *Carty*, 583 F.3d at 258 (quoting *Dowthitt*, 230 F.3d at 743).

Daniel argues that if counsel had done a proper investigation, they would have discovered that his behavior on the night of the capital murder was consistent with rage reaction. *See* Am. Pet. at 107-11 (ECF No. 18 at 118-22). He contends that he did not have a prior history of violence, that everything about his behavior on the night of the murder was "out of character," and it was critical for the jury to understand how Xanax and violence are related. *Id.* at 111 (ECF No. 122). However, Daniel overlooks the fact that no witness testified that he was ever violent, enraged, or aggressive during the months he was using Xanax or that he was acting that way at the Walmart Store shortly before the capital crime.

Kristina (Nikki) Nance, Daniel's most recent ex-girlfriend, affirmed that she saw behavior changes when Daniel took Xanax, that there was no violence between the couple, that Daniel sometimes would be a little harsh in the way he spoke to her, and that sometimes Daniel got rude and uncaring when he did Xanax. 21 RR 105-06 (ECF No. 4-35 at 105-06). Daniel's roommate, Kelvin Davis, did not describe any violent or aggressive conduct by Daniel after having taken Xanax although he testified that Daniel used Xanax quite often, that Daniel regularly used Xanax three times a week, and that Daniel took six Xanax pills between 6:00 and 7:00 p.m. on the night of the murder. *Id.* at 122-22, 127 (ECF No. 4-25 at 121-22, 127). Sean McCarthy, a former produce stocker at Walmart, testified that on April 6, 2012, he approached Daniel and spoke with him inside the Walmart store, Daniel "was really nice" and not aggressive, he did not feel threatened by anything Daniel was doing, and did not see Daniel as posing any kind of a threat. 18 RR 18-19, 22-23 (ECF No. 4-31 at 18-19,

22-23). William Garlow, an inventory control specialist at Walmart, testified there was nothing about Daniel's behavior that made him fear he would be a threat to someone's life. *Id.* at 154-55, 163-64 (ECF No. 4-31 at 154-55, 163-64). Christopher Lester, a paramedic with Austin-Travis County EMS, testified that during his examination of Daniel shortly after the shootings, Daniel answered all the questions appropriately and "was very polite." *Id.* at 214-15, 222 (ECF No. 4-31 at 214-15, 222). Trial counsel cannot be ineffective for failing to investigate or present evidence of an uncommon adverse "rage reaction" to Xanax that apparently did not affect Daniel.

Additionally, Daniel complains that trial counsel were ineffective because, by only presenting testimony about Xanax from Dr. Masters, the jury was left with the impression that Daniel was "really nothing more than a bad drunk." Am. Pet. at 107 (ECF No. 18 at 118). His description is belied by the record. Unlike the unsupportable rage reaction theory proposed by Daniel, the testimony defense counsel elicited during the guilt/innocence stage from Dr. Masters regarding the adverse effects of Xanax was specifically tailored to the facts of Daniel's case. *See generally* 21 RR 4-32 (ECF No. 4-34 at 4-32).

Dr. Masters testified that Xanax or alprazolam is a sedative-hypnotic which is given to calm somebody down, relax them, or put them to sleep. 21 RR 10 (ECF No. 4-34 at 10). There are several features of Xanax that cause it to be highly addictive, including that it crosses the blood brain barrier readily, delivers "quite a punch," and has a short half-life so the high occurs quickly. *Id.* at 11-12 (ECF No. 4-34 at 11-12). Dr. Masters testified that Xanax or benzodiazepines can cause a wide range of

disturbances in a person's mood or affect. *Id.* at 14 (ECF No. 4-34 at 14). This type of drug can lead to anterograde amnesia or memory loss, starting from when the drug is taken. *Id.* at 15 (ECF No. 4-34 at 15). A person on Xanax may say or do things they normally would not, due to the frontal lobe disinhibition it causes. *Id.* at 17 (ECF No. 4-34 at 17). Dr. Masters testified that even if a person is taking large quantities of the drug, they may still be able to perform certain tasks with reasonable efficiency if they had muscular memory or automatic cognitive memory, but then not even remember it. *Id.* at 17-18 (ECF No. 4-34 at 17-18). Based on his review of a portion of the crime scene video, Dr. Masters testified that what he saw of Daniel getting off his motorcycle and stumbling around was consistent with a person who is intoxicated from using benzodiazepines. *Id.* at 19 (ECF No. 4-34 at 19).

Dr. Masters further testified that a therapeutic dose of Xanax is between 7 and 40 nanograms per ML, a toxic level is greater than 100 nanograms per ML, and the amount of Xanax in Daniel's blood seven hours after the offense was 160 nanograms, indicating he was still intoxicated. 21 RR 20 (ECF No. 4-34 at 20). He found the lab results were consistent with Daniel ingesting 8 to 10 Xanax pills at 6:00 p.m. the preceding evening, and such a dose would put a normal person to sleep. *Id.* at 21-22 (ECF No. 4-34 at 21-22). Dr. Masters testified that a person under a large dose of the drug would confabulate memories to make up for gaps, almost as if they were behaving like a person with dementia. *Id.* at 23 (ECF No. 4-34 at 23). Dr. Masters opined that Daniel was intoxicated when he gave his statement to police. *Id.* at 24 (ECF No. 4-34 at 24). He also addressed evidence that Daniel was trying to self-

regulate his ingestion of the drug, which indicated Daniel's recognition of an addiction to the drug, but Dr. Masters testified that the likelihood of success is slim to none without assistance from a recovery program. *Id*. at 25-27 (ECF No. 4-34 at 25-27).

The fact that counsel did not elicit testimony from Dr. Masters about rage reaction or did not seek out an additional expert to testify on this matter does not overcome the strong presumption that counsel's conduct falls within the wide range of reasonably professional assistance. *Strickland*, 466 U.S. at 687-91. *Strickland* does not require counsel to "canvas[ ] the field to find a more favorable defense expert." *Dowthitt*, 230 F.3d at 748. Decisions regarding whether to retain an expert or how to use the expert are the very sort of trial decisions that are insulated from IATC claims and disfavored on habeas review because they are matters of strategy.

Because Daniel fails to establish deficient performance, his IATC claim is plainly meritless. *Strickland*, 466 U.S. at 697 (failure to prove either requirement results in denial of the claim). Daniel's default cannot be excused under *Martinez*.

### b.    Regardless, Daniel fails to prove prejudice.

Daniel argues that he was prejudiced by counsel's failure to present expert testimony regarding rage reaction because, if such evidence had been presented, the jury might have found that Daniel was experiencing some sort of "involuntary intoxication" that factored into their decision at guilt-innocence. Am. Pet. at 113 (ECF No. 18 at 124). He also asserts that such evidence "goes directly" to the issues of future dangerousness and moral culpability. *Id*. To satisfy *Strickland*'s prejudice prong, Daniel must establish a reasonable probability that, but for the objectively

unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. That showing is not made here.

Daniel cannot show that he was prejudiced by counsel's failure to present expert testimony during trial regarding rage reaction. Under Texas law, "[v]oluntary intoxication does not constitute a defense to the commission of crime." TEX. PENAL CODE, § 8.04(a). While involuntary intoxication may be a defense to criminal culpability, it must be shown that: (1) the accused had exercised no independent judgment or volition in taking the intoxicant; and (2) as a result of his intoxication, the accused did not know that his conduct was wrong or was incapable of conforming his conduct to the requirements of the law he allegedly violated. *Torres v. State*, 585 S.W.2d 746, 749 (Tex. Crim. App. 1979). In this case, because Daniel took the Xanax volitionally, he could not rely on an involuntary-intoxication defense at trial.

Finally, Daniel fails to show prejudice resulting from counsel's failure to present expert testimony at the penalty phase regarding rage reaction. For the reasons explained above, the evidence in this case does not support that Daniel had any sort of adverse reaction to Xanax, much less one that led to violence and aggression. Even if experts were willing to testify about rage reaction, there is no reasonable probability that the jury would have reached a different verdict at sentencing. Any such testimony would have been effectively negated by the fact that no witness testified that Daniel's demeanor was ever violent, enraged, or aggressive during the months he was using Xanax or that he was acting that way at the Walmart Store before he shot and killed Officer Padron. As a result, even if Daniel could show

counsel performed deficiently, his *Strickland* claim fails for lack of prejudice. *Strickland*, 466 U.S. at 697 (failure to prove either requirement results in denial of the claim). Because Daniel fails to establish prejudice, his IATC claim is plainly meritless and his procedural default cannot be excused under *Martinez*.

### 2. State habeas counsel were not ineffective for failing to raise this plainly meritless IATC claim.

Apart from his failure to present a substantial claim for relief, as required by *Martinez*, 566 U.S. at 14, Daniel also fails to demonstrate that state habeas counsel were ineffective "in failing to present" the IATC claim "in his first state habeas proceeding." *Garza*, 738 F.3d at 676. The effectiveness of appellate counsel is measured by the same *Strickland* standard applied to trial counsel: whether the performance was objectively reasonable and whether the appeal was prejudiced thereby—that is, whether "with effective counsel, there is a reasonable probability that [Daniel] would have won on appeal." *Moreno v. Dretke*, 450 F.3d 158, 168 (5th Cir. 2006) (citing *Smith v. Robbins*, 528 U.S. 259, 285 (2000)). "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

Daniel's state habeas counsel, the OCFW, filed a 300-plus page "Initial Application for Writ of Habeas Corpus," raising eleven grounds for relief with multiple sub-claims, supported by thirty exhibits including thirteen affidavits and declarations, and Daniel's school records, hospital records, military records and probation records. *See* Statement of the Case, Part II, *supra*. Simply because counsel did not raise claims that Daniel, in hindsight, now contends should have been raised does not render habeas counsel's investigation or performance inadequate. *Smith*,

528 U.S. at 285 (holding appellate counsel is not ineffective merely because he fails to raise issues that his client requests him to raise); *Jones v. Barnes*, 463 U.S. 745, 750 (1983) (holding that appellate counsel is only constitutionally obligated to raise and brief those issues that are believed to have the best chance of success).

State habeas counsel were not ineffective in failing to raise a plainly meritless IATC claim. Daniel has presented no evidence that he was experiencing a rage reaction when he killed Officer Padron and the trial record regarding his behavior before and after the crime refutes any such claim. Thus, any related claim regarding trial counsel's failure to present expert testimony on this matter would not have been successful. The Court should therefore hold that Daniel fails to make both showings required under *Martinez* and that his IATC claim remains procedurally defaulted.

## VIII. Daniel is Not Entitled to Habeas Corpus Relief on His Claim Challenging Trial Counsel's Strategic Decision to Not Pursue a Motion to Suppress His Oral Statements.

Daniel argues that his attorneys were ineffective for abandoning the motion they filed to suppress oral statements, in violation of his Sixth Amendment right to effective assistance of counsel, Fifth Amendment right against self-incrimination, Eighth Amendment right to be free from cruel and unusual punishment, and Fourteenth Amendment right to due process. Am. Pet. at 115 (ECF No. 18 at 126). The Court should deny habeas corpus relief because Daniel's Eighth Amendment claim is unexhausted, defaulted, and any error is waived, and his IATC claim does not warrant relief under AEDPA.

### A. Daniel's Eighth Amendment claim is unexhausted, defaulted, and waived for inadequate briefing.

The IATC claim raised by Daniel during state habeas proceedings did not allege a violation of his Eighth Amendment rights. SHCR-01 at 584-623 (ECF No. 4-82 at 86-125). Consequently, the claim is unexhausted and defaulted. *Wilder,* 274 F.3d at 259 (Claims are not exhausted "if a petitioner presents new legal theories or entirely new factual claims in his petition to the federal court."); *Beazley,* 242 F.3d at 264 (unexhausted claims are procedurally defaulted). Daniel does not attempt to show cause and prejudice to excuse the procedural bar. *Coleman*, 501 U.S. at 750.

In any event, Daniel's briefing consists of listing the Eighth Amendment in the caption of his federal habeas claim. Am. Pet. at 115 (ECF No. 18 at 126). Because the issue is inadequately briefed, any claim of error is waived. *Green*, 508 F.3d at 203; *Trevino,* 168 F.3d at 181 n. 3.

## B. The state-court adjudication of Daniel's IATC claim is entitled to AEDPA deference.

After Daniel shot and killed Officer Padron, he made statements when he was detained inside the Walmart store, in the police car when he was being transported to APD headquarters, and during his custodial interrogation by detectives. Daniel's original lead defense trial counsel, Bill White, moved to suppress Daniel's oral statements and requested notice of the State's intent to offer any such statements at trial. 1 CR 24-26, 30-32 (ECF No. 4-1 at 24-26, 30-32). No hearing was requested on the motion to suppress. Daniel's statements were later introduced into evidence without objection.[24]

---

[24]    The video recordings of Daniel's ride to the police station (SX-15) and

Daniel argues that his attorneys were ineffective for abandoning their motion to suppress statements. Am. Pet. at 115-37 (ECF No. 18 at 126-148). He alleges that he was severely intoxicated at the time he made the statements, that his intoxication renders his statements involuntary and inadmissible under Article 38.22 of the Texas Code of Criminal Procedure, that his confession was taken in violation of his right to due process, and that his intoxication prevented him from knowingly, intelligently, and voluntarily waiving his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Am. Pet. at 125-129 (ECF No. 18 at 136-140). He also asserts that counsel should have called a neuropharmacologist to explain why Daniel's statements were unreliable. *Id.* at 129 (ECF No. 18 at 140). Daniel argues that he was prejudiced because if counsel had performed competently, there is a reasonable probability the statements would have been suppressed and the outcome at both stages of trial would have been different. *Id.* at 131 (ECF No. 18 at 142). The IATC claim was raised in Daniel's initial state habeas application and rejected on the merits after the TCCA concluded that Daniel failed to make both showings required under *Strickland*. *Ex parte Daniel*, 2017 WL 467577, at *1 (ECF No. 4-96 at 3); *see* SHCR-01 at 1813-14 (ECF No. 4-89 at 115-16). This Court should deny relief because Daniel fails to show that the state-court adjudication was an unreasonable application of, *Strickland*.

The record fully supports that defense counsel made a "strategic decision" to not challenge the admissibility of Daniel's statements. Daniel's attorneys filed

---

his custodial interview (SX-59) were admitted into evidence and published to the jury. 19 RR 39 (ECF No. 4-32 at 39, 141). The State provided a transcript of the interview (SX-60) for record purposes. *Id.* at 141-42 (ECF No. 4-32 at 141-42).

affidavits attesting to their evaluation of the facts and the law regarding Daniel's statements to the police. SHCR-01 at 1064 (ECF No. 4-86 at 66); *id.* at 1540 (ECF No. 4-88 at 42). In counsels' professional judgment, Daniel's statements were clearly admissible and there was no reason to have a hearing on meritless issues. *See id.* Counsel has wide latitude in making tactical decisions. *Strickland*, 466 U.S. at 689. This includes formulating "a strategy that was reasonable at the time." *Richter*, 562 U.S. at 107. For the reasons that follow, Daniel fails to overcome the presumption that, under the circumstances, trial counsel's conduct was "sound trial strategy," *Strickland,* 466 U.S. at 690, and also fails to show a reasonable probability of a different result had counsel pursued the suppression motion.

First, Daniel fails to show that counsel were ineffective for not seeking a hearing to contest the admissibility of statements made at Walmart after the shooting or while he was being transported to APD. As defense counsel both attested, Daniel made a number of res gestae statements in the police car that were not made in response to any questioning and, consequently, were "clearly admissible." SHCR-01 at 164 (ECF No. 4-86 at 66); *id.* at 1540 (ECF No. 4-88 at 42). The same would necessarily hold true for statements Daniel made immediately after the shooting. Texas law has long held that "acts and declarations which are part of the res gestae are admissible notwithstanding the fact that they may not be admissible as confessions or admissions, for the rule of res gestae is independent of, superior to and cannot be limited by the rules relating to confessions of admissions after arrest." *Jones v. State*, 458 S.W.2d 654, 655 (Tex. Crim. App. 1970) (citations omitted).

Furthermore, "[i]f a statement is admissible as res gestae, the fact that it was made in response to an inquiry or while under arrest does not render the testimony inadmissible." *Id.* at 656.

Daniel argues that "all of [his] statements are inadmissible under" Texas Code of Criminal Procedure Article 38.22. Am. Pet. at 125 (ECF No. 18 at 136). However, Section 5 of the article provides that nothing in this article precludes the admission of a statement that is either (1) res gestae of the arrest or offense, (2) a statement that does not stem from custodial interrogation, or (3) a voluntary statement, whether or not the result of custodial interrogation. Tex. Code Crim. Proc. art. 38.22, § 5. Challenging the admissibility of Daniel's *res gestae* statements would have amounted to a useless act. As such, counsel were not ineffective. *See Wood v. Quarterman*, 503 F.3d 408, 413 (5th Cir. 2007) (counsel has no duty to raise meritless arguments).

Second, Daniel fails to show that trial counsel were ineffective for not seeking a hearing to challenge the admissibility of statements made during the custodial interview based on due process grounds. Citing *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961), Daniel argues that his confession was not the product of an independent, informed decision of free will, but rather the result of severe intoxication. Am. Pet. at 126 (ECF No. 18 at 137). Under Texas law, intoxication does not render a confession involuntary per se. *Jones v. State*, 944 S.W.2d 642, 651 (Tex. Crim. App. 1996) (citation omitted). For Fourteenth Amendment purposes, the Supreme Court has held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). "[A] defendant's

mental condition, by itself and apart from its relation to official coercion" is not determinative of the issue of voluntariness. *Id.* at164. Daniel does not allege coercive police conduct. And Daniel's trial counsel found no evidence of police overreaching.[25] Daniel's evidence of intoxication does not raise any constitutional voluntariness issues because it does not involve police coercion or other official over-reaching. Challenging the admissibility of Daniel's custodial statement on Fourteenth Amendment grounds would have amounted to a useless act. Counsel were not ineffective for failing to raise meritless arguments. *See Wood*, 503 F.3d at 413.

Third, Daniel fails to show that trial counsel were ineffective for not seeking a hearing to challenge the admissibility of Daniel's custodial statement under *Miranda*. "[An] accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [*Miranda*] rights when making the statement.'" *Berghuia v. Thompkins*, 560 U.S. 3370, 382 (1979) (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)). The waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon it." *Id.* at 382-83 (quoting *Moran v. Burbine*,

---

[25] In his affidavit, Russell Hunt stated that trial counsel "did not feel that the police used coercive techniques to get [Daniel] to talk with them or that they overbore his will." SHCR-01 at 1064 (ECF No. 4-86 at 66). Bradley Urrutia further attested that Daniel "appeared to speak with [the detectives] freely and clearly understood the gravity of the situation." *Id.* at 1540 (ECF No. 4-88 at 42).

475 U.S. 412, 421 (1986)). Federal courts look to the totality of the circumstances to determine whether a confession was the product of free and rational choice. *Withrow v. Williams*, 507 U.S. 680, 689 (1993).

The trial record supports that Daniel gave his confession freely, voluntarily, and without compulsion or inducement. The police read Daniel his *Miranda* warnings prior to interviewing him to be certain he understood his rights. 19 RR 117 (ECF No. 4-32 at 117). After being warned of his rights, Daniel agreed to speak to police. *Id.* at 118 (ECF No. 4-32 at 118). Detective Robinson testified, based on her experience interviewing persons as a police officer, that Daniel understood her questions, was appropriate in his responses to her questions, appeared to be intelligent, was cognizant of his actions and the actions of others, used proper terminology, and did not appear mentally ill. *Id.* at 118-119 (ECF No. 4-32 at 118-19). As explained above, there is no evidence that law enforcement coerced any of Daniel's statements. Such evidence supports counsel's evaluation that Daniel's statement was clearly admissible. At the hearing on the voluntariness of a confession, the trial court is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Vigneault v. State*, 600 S.W.2d 318, 329 (Tex. Crim. App. 1080). Daniel fails to show that a reasonably probability exists that had counsel pursued the suppression motion, there is a substantial likelihood the trial judge would have found his confession involuntary based on the totality of the circumstances.

Fourth, Daniel fails to show that trial counsel were ineffective for not obtaining a suppression hearing during which they could have called a neuropharmacologist to

explain why Daniel's statements were unreliable. Am. Pet. at 129 (ECF No. 18 at 140). Daniel supports his IATC claim with a "Report of Neuropharmacological Opinion" by Dr. Jonathan J. Lipman dated October 2, 2018. App. 1726-39 (ECF No. 7-6 at 347-360). However, Dr. Lipman's report was generated almost a year after Daniel's initial state habeas application was denied on October 18, 2017. *Ex parte Daniel*, 2017 WL 4675772, at *3 (ECF No. 4-96 at 6). Because the exhibit was not part of "the record that was before the state court," *Pinholster*, 563 U.S. at 185, the Court is precluded from considering it on federal habeas review. In any event, Dr. Lipmann does not state that he was available to testify on Daniel's behalf. App. 1726-39 (ECF No. 7-6 at 347-360). Counsel cannot be ineffective for failing to call this expert at a suppression hearing, *see Day*, 566 F.3d at 538. nor can Daniel show prejudice when his evidence is barred on federal habeas review by *Pinholster*.

Finally, Daniel largely ignores that as a matter of trial strategy, defense counsel decided to utilize certain aspects of his statements to reinforce their case. Defense counsel argued to the jury that because of Daniel's intoxication, he did not intend to kill Officer Padron or know that he was a police officer and that his statements otherwise were not believable. 21 RR 75-76, 78, 88-91 (ECF No. 4-34 at 75-76, 78, 88-91). That Daniel killed Officer Padron was not a contested issue, but counsel used evidence of his impairment to argue that he did not know he killed a police officer and was guilty only of murder. 21 RR 91-92 (ECF No. 4-34 at 91-92). Defense counsel also challenged the accuracy of Daniel's statement to police given his apparent impairment. 19 RR 121-30 (ECF No. 4-32 at 121-30); 20 RR 36-55 (ECF No.

4-33 at 36-55). Dr. Matthew Masters testified regarding the intoxicating effects of Xanax. 21 RR 4-32 (ECF No. 4-34 at 4-32); *see* Argument, Part VII, *supra*. He also described Daniel's mental state the night of this offense and gave his opinion that based on the "toxic" level of alprazolam (Xanax) tested in Daniel's blood, that Daniel's statement to police was totally unreliable. *Id.* at 24, 31 (ECF No. 4-34 at 24, 31). Daniel fails to show that counsel's strategic decisions constituted ineffective assistance. Although counsel's strategy proved unsuccessful, "[t]rial counsel are not to be critically judged with the benefit of hindsight." *Winfrey v. Maggio*, 664 F.2d 550, 552 (5th Cir. 1981); *see Gray*, 677 F.2d at 1094 (fact that strategy ultimately proves unsuccessful does not render counsel's assistance ineffective). Because Daniel failed to show both deficient performance and prejudice, the TCCA's rejection of his claim on the merits was a reasonable application of *Strickland*.

## IX. Daniel is Not Entitled to Habeas Corpus Relief on His Claims Alleging Trial Counsel Failed to Investigate the State's Evidence that His Killing of Officer Padron was Intentional.

Daniel asserts that his attorneys were ineffective for failing to challenge evidence and argument that he intentionally killed Officer Padron, in violation of his Sixth and Eighth Amendment rights. Am. Pet. at 137 (ECF No. 18 at 148). Specifically, he complains that trial counsel failed to challenge testimony from eyewitness Alma Ramirez Gutierrez that Daniel placed the gun to Officer Padron's neck and fired, and testimony that hollow point bullets, like those in Daniel's firearm, are designed "to cause excessive damage." *Id.* Daniel contends that if counsel had done so, there is a reasonable probability the jury would have evaluated the

circumstances surrounding the offense differently and would have spared his life. *Id.* at 138 (ECF No. 18 at 149). The Court should deny habeas corpus relief because the instant claims are unexhausted, procedurally barred, and utterly meritless.

## A. Daniel's Eighth Amendment claim is unexhausted, defaulted, and waived for inadequate briefing.

Daniel concedes that his entire claim is unexhausted and argues that ineffective assistance of state habeas counsel establishes cause and prejudice to excuse any default under *Martinez* and *Trevino*. Am. Pet. at 146 (ECF No. 18 at 157). *Martinez* created a "narrow exception" to the *Coleman* rule that applies only to certain defaulted IATC claims. *Martinez*, 566 U.S. at 9-18. It cannot serve as cause to excuse the procedural bar of Daniel's unexhausted Eighth Amendment claim.

In any event, Daniel has waived any claim of error by failing to adequately brief the issue. *Green*, 508 F.3d at 203. He contends that his Eighth Amendment rights were violated, but his attending arguments refer only to ineffective assistance of counsel. *See generally* Am. Pet. at 137-47 (ECF No. 18 at 148-58).

## B. Daniel's IATC claim is unexhausted, defaulted, and utterly without merit.

Daniel concedes that his claim is unexhausted and argues that his default should be excused under *Martinez* and *Trevino*. Am. Pet. at 146 (ECF No. 18 at 157). He is mistaken. *Martinez* establishes cause only if a petitioner shows that his defaulted IATC claim "is substantial" and that state habeas counsel was ineffective in failing to present the claim in the first state habeas proceeding. *Garza,* 738 F.3d at 676. Daniel cannot make this showing because, as explained below, his IATC claim

is plainly meritless because he satisfies neither prong of *Strickland*. In such instance, Daniel fails to show that his state habeas counsel—the OCFW—were ineffective for failing to present such a meritless claim in his first writ application and that there is a reasonable probability he would have been granted state habeas relief had the claim been presented. *See Moreno*, 450 F.3d at 168 (when petitioner challenges appellate counsel's performance, he must show "a reasonable probability that he would have won on appeal."). As a result, the Court should hold that Daniel procedurally defaulted his IATC claim on federal habeas review.

### 1. Daniel's defaulted IATC claim alleging failure to challenge eyewitness testimony is plainly meritless.

Daniel contends that Ms. Gutierrez was mistaken when she testified during guilt/innocence that she saw him intentionally place the gun under Officer Padron's neck and fire. Am. Pet. at 138 (ECF No, 18 at 149). He maintains that a careful examination of the video recording of the shooting shows that Ms. Gutierrez turned away from the scene just prior to the gun firing, that she did not turn to look until she heard the first gunshot, that the two gunshots occurred in rapid succession while Daniel and Officer Padron were wrestling on the floor, and that Officer Padron was shot before Ms. Gutierrez was able to return her gaze to the scene. *Id.* at 138-39 (ECF No. 18 at 149-50). Daniel argues that trial counsel were ineffective for failing to conduct a sufficient investigation and hire an expert to pinpoint exactly where Ms. Gutierrez was looking at the time the shots occurred. *Id.* at 144 (ECF No 18 at 155). He further asserts that he was prejudiced because, without Ms. Gutierrez's testimony, the State had no evidence to support that it was an intentional killing and

if the jury thought the gun was fired accidentally in the course of a struggle, it could have mitigated the circumstances during the penalty phase. *Id.* at 145 (ECF No. 18 at 156). These allegations do not establish a substantial *Strickland* claim.

### a.   Daniel fails to show deficient performance.

Trial counsel did not perform deficiently by not challenging Ms. Gutierrez's testimony in the manner Daniel suggests. On direct examination, Ms. Gutierrez testified that Daniel tried to run as he was being escorted out of the store, the police officer tried to stop him and they both went to the ground, she heard a loud noise and saw confetti[26] or paper in the air, then she saw Daniel put the gun to the neck of the officer and he was shot again. 18 RR 118-19 (ECF No. 4-31 at 118-19). She affirmed that after she heard the first "pop," she saw Daniel holding the gun in his hand and saw him put the gun to the officer's neck and shoot him. *Id.* at 120 (ECF No. 4-31 at 120). Monica Lawson, another eyewitness to the shooting, did not see the gun as it was placed to Officer Padron's neck. However, her testimony largely corroborated Ms. Gutierrez's account. Ms. Lawson testified that the officer was trying to get the gun away from Daniel, the officer and Daniel were wrestling, there was a shot and she thought it was a fake gun because she saw confetti, a second shot happened and she

---

[26]   Officer Padron was initially shot in the chest but was wearing an armored vest and did not suffer damage to his body from the gunshot. 20 RR 112 (ECF No. 4-33 at 112). The medical examiner testified that the bullet passed through the right front breast pocket of Officer Padron's uniform, shredding some of the paper that was in his pocket. *Id.* Detective Brett Bailey testified that he noted "little pieces of paper scattered all over the floor to the south of Officer Padron, almost like confetti-looking," and that the same confetti was found when the medical examiner opened Officer Padron's shirt. 19 RR 73 (ECF No. 4-32 at 73).

knew the gun was real because she saw blood come out the officer's mouth, and she remembered also hearing a third shot. *Id*. at 96-97, 105-06 (ECF No.4-31 at 96-97, 105-06). While Daniel argues that the two shots occurred in rapid succession, Am. Pet. at 139 (ECF No. 18 at 150), there was apparently enough time between them that both witnesses saw what appeared to be confetti before the second shot occurred.

Daniel argues that counsel's investigation was deficient because Ms. Gutierrez acknowledged in her statement to police that she "turned away from the scene because she was trying not to look." Am. Pet. at 141 (ECF No. 18 at 152) (citing App. 1148, ECF No. 7-5 at 132). Ms. Gutierrez's statement does not support Daniel's claim that she did not actually see the fatal shot. According to her statement:

> Both the officer and the subject went to the ground. The officer was to the left side of the subject and appeared to be lying on his left side. The subject was lying more on his right side as if they were facing each other. I was trying not to look when I heard a "pop." I turned and observed a silver gun in what I believe was the male subject's right hand. I observed what appeared to be white confetti in the air. I at first thought the gun may have been a toy. The silver gun appeared to be square in shape and approximately medium in size. The gun also appeared to be a semi-automatic pistol. I saw the male subject place the gun just below the officer's chin. I then heard another shot.

App. 1148, ECF No. 7-5 at 132. Although she was "trying not to look," she nevertheless reports seeing the "confetti" and then seeing Daniel place the gun below Officer Padron's chin before he fired the second shot.

Trial counsel did not perform deficiently by failing to challenge Ms. Gutierrez's testimony based on the video recording of the shooting. The video recording (SX-5) was introduced into evidence and published to the jury. 18 RR 138 (ECF No. 4-31 at 138). Contrary to Daniel's argument, it does not show that Ms. Gutierrez was "looking

away" and could not have seen him place the gun to Officer Padron's neck. Am. Pet. at 137 (ECF No. 18 at 148). Although she did turn away briefly, Ms. Gutierrez quickly looked back over her shoulder to where the events were transpiring.[27]

Daniel asserts that trial counsel were ineffective for not hiring an expert to pinpoint exactly where Ms. Gutierrez was looking at the time the shots occurred. Am. Pet. at 144 (ECF No. 18 at 155). He does not name any expert, prove the witness would have been available to testify, allege what the expert's testimony would have been, and explain how the proposed testimony would have been beneficial. *Day,* 566 F.3d at 538; *see Druery*, 647 F.3d at 541 (IATC must "allege with specificity what the investigation would have reveled and how it would have altered the outcome of the trial."). At best, Daniel cites to several pages from a report by Robert Tressel, a forensic investigator. Am. Pet. at 138-41 (ECF No. 18 at 149-52), citing App. 1771-74 (ECF No. 7-6 at 392-95). However, Tressel never states that he was available to testify on Daniel's behalf, App. 1767-74 (ECF No. 7-6 at 388-395), and Daniel fails to show that any of his proposed testimony would be beneficial in light of the Director's arguments raised herein.

Considered together, Daniel's arguments fail to overcome the strong presumption that counsel rendered effective assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland*, 466U.S. at 690. Largely ignored by Daniel, defense counsel took steps to suggest that Ms.

---

[27]    The Director submitted a copy of the video recording directly to the clerk's office when the state court records were filed electronically, and it may be viewed by the Court.

Gutierrez's recollection about events may not be correct. During cross examination, counsel elicited testimony that this was a very emotional and chaotic event in her life, and some of the details she reported may have been "a little jumbled up," 18 RR 123 (ECF No. 4-31 at 123). Counsel questioned her about details in her written statement to police that were not consistent with other evidence, including her believing that Daniel was being escorted out by two uniformed officers and two more associates. *Id.* at 123-24 (ECF No. 4-31 at 123-24). Counsel did not perform unreasonably by not questioning her about whether she actually saw Daniel place the gun under Officer Padron's chin. To challenge Ms. Gutierrez's testimony on this matter would require counsel to replay the video record before the jury, in slow motion, drawing unwanted attention to the negative, emotional event.

### b. Daniel also fails to show prejudice.

Even if Daniel could satisfy *Strickland*'s deficient performance prong, he fails to show a reasonable probability that, had counsel challenged Ms. Gutierrez's testimony, the jury would have reached a different verdict at either stage of trial. Regardless of whether Ms. Gutierrez testified or not, the State had ample evidence to show that Daniel intentionally killed Officer Padron.

To hold Daniel criminally liable for capital murder, the State had to prove that he committed murder, as defined under Section 19.02(b)(1) of the Texas Penal Code, and that Daniel murdered a peace officer who was "acting in the lawful discharge of an official duty" and who Daniel knew was a peace officer. Tex. Penal Code, §19.03 (a)(1). As incorporated into the capital murder statute, Section 19.02(b)(1) provides

the culpable mental state for the crime, defining it as "intentionally or knowingly" causing the death of an individual. TEX. PENAL CODE, §19.02 (b)(1). "Intentional" and "knowing" conduct are further defined as follows:

> (a)     A person acts intentionally, or with intent, with respect to the nature of his conduct or to the result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

> (b)     A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result pf his conduct when he is aware that his conduct is reasonably certain to cause the result.

TEX. PENAL CODE, § 6.03.

In Texas, direct evidence of intent or knowledge is not required. *See Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002). Instead,

> [a] jury may infer intent from any facts which tend to prove its existence, including the acts, words, and conduct of the accused, and the method of committing the crime, and from the nature of the wounds inflicted on the victims. A jury may also infer knowledge from such evidence. This has been the rule in Texas for over 100 years.

*Id*. (quoting *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999) (citations omitted)). A jury may also infer requisite intent from the use of a deadly weapon, unless it is reasonably apparent that serious bodily injury or death could not result from the particular manner of its use. *Jones,* 944 S.W.2d at 647; *see Godsey v. State*, 719 S.W.2d 578, 581 (Tex. Crim. App. 1986) (stating that "[i]f a deadly weapon is used in [a] deadly manner, the inference is almost conclusive that [the appellant] intended to kill") (quoting *Hatton v. State*, 21 S.W. 679 (Tex. Crim. App. 1983)).

In this case, Daniel has never said that his shooting of Officer Padron was unintentional or accidental, not even during his custodial interview.[28] Had he made such a claim, the record showed otherwise. Testimony at trial established that just after the shooting, Daniel "kind of laughed, chuckled, and said 'I killed a cop.'" 18 RR 64, 151 (ECF No. 4-31 at 64, 151). During the video recording of Daniel's transport to APD headquarters (SX-15), he talked to himself, made a comment about "blasting" one of the officers, and asked if the officers were pissed off that he had capped one of their friends. 19 RR 39, 45 (ECF No. 4-32 at 39, 45). A jury could infer intent based on Daniel's words and conduct following the shooting. *Manrique*, 994 S.W.2d at 649.

The jury also heard that the Jiminez Arms .380 used by Daniel was fired three times—twice at Officer Padron and once toward the Walmart employees.  18 RR 60-61, 96-97, 105-06 (ECF No. 4-31 at 60-61, 96-97, 105-06), and that the gun could not have discharged accidentally. APD Detective David Fugitt testified that Daniel's gun is a "semiautomatic [weapon], so it is a single-action firearm" and that once a round is in the chamber, the hammer has to be cocked in order to discharge the firearm. 20 RR 49 (ECF No. 4-33 at 49). The jury could thus infer intent from Daniel's using a deadly weapon in a deadly manner. *Godsey*, 719 S.W.2d at 581.

Most importantly, the jury heard testimony from the medical examiner that the gunshot wound to Officer Padron's neck was a "contact-type gunshot wound

---

[28]    As previously explained, the video recordings of Daniel's transport to the police station (SX-15) and his custodial interview (SX-59) were admitted into evidence. 19 RR 39 (ECF No. 4-32 at 39, 141). The State provided a transcript of the interview (SX-60) for record purposes. *Id.* at 141-42 (ECF No. 4-32 at 141-42).

because of the muzzle imprints and the gunpowder soot." 20 RR 123 (ECF No. 4-33 at 123). Black gunpowder soot encircled the entrance wound on Officer Padron's neck, confirming that Daniel placed the gun against his skin when he fired. *Id.* at 122 (ECF No. 4-33 at 122). There were also small tears at the edges of the wound caused by hot gasses coming out of the gun under pressure and forcing the skin apart, which is consistent with a contact-type gunshot wound. *Id.* at 124 (ECF No. 4-33 at 124). The medical examiner had "no doubt" that Daniel pressed the gun barrel up against Officer Padron's neck when he shot him. *Id.* The jury could infer intent from the nature of the wounds inflicted on Officer Padron. *Hart*, 89 S.W.3d at 64.

As a result, even if Ms. Gutierrez was somehow mistaken about what she viewed at the scene, the forensic evidence proved the shooting occurred just as she testified. Daniel cannot show that trial counsel performed deficiently and cannot show *Strickland* prejudice because there is no reasonable likelihood of a different result had counsel challenged Ms. Gutierrez's testimony.

### 2. Daniel's defaulted IATC claim alleging failure to challenge testimony regarding hollow point bullets is plainly meritless.

Next, Daniel complains that his attorneys performed deficiently by failing to challenge "mistaken" testimony offered by two State's witnesses that hollow point bullets "cause more damage" and are "branded or marketed" for that purpose. Am. Pet. at 137-38, 144 (ECF No. 18 at 148-49, 155). He argues that counsel should have called a forensic expert to testify that hollow point bullets "are standard ammunition and are designed so as to not cause additional injury to people through potential pass

through gunshots." *Id.* at 144 (ECF No. 18 at 155). These allegations do not establish a substantial *Strickland* claim.

Daniel's IATC claim should be rejected from the outset because he fails to address *Strickland* prejudice. The section of his briefing entitled "Prejudice" only concerns counsel's handling of testimony from eyewitness Alma Ramirez Gutierrez, addressed immediately above. Am. Pet. at 145-46 (ECF No. 18 at 156-57). "A failure to establish either element of *Strickland* is fatal to a petitioner's claim." *Charles*, 736 F.3d at 388 (citing *Strickland*, 466 U.S. at 697).

Regardless, Daniel also fails to prove the counsel's representation was objectively unreasonable in not challenging testimony regarding hollow point bullets because the testimony was not mistaken or objectionable. When Daniel was searched at the crime scene, police found a magazine with six .380 hollow point bullets in his pocket. 19 RR 34 (ECF No. 4-32 at 34). Daniel's Jiminez Arms .380 still contained a magazine in the grip of the weapon; one live .380 cartridge was in the chamber and another was in the magazine indicating the firearm was capable of firing two more rounds. *Id.* at 64-66 (ECF No. 4-32 at 64-66). During direct examination of Detective Brett Bailey, he testified that "in layman's terms," a hollow point bullet "is going to mushroom or close down and kind of spread out; whereas, the opposite of that, a lead ball ammo type is going to stay more intact and not typically be as deformed upon impact of something. So hollow points spread out and typically cause more damage." *Id.* at 62-63 (ECF No 4-32 at 62-63). He also affirmed that was "kind of how" hollow points "are branded or marketed." *Id.* at 63 (ECF No. 4-32 at 63). Additionally, the

medical examiner testified that a hollow point bullet will cause more damage going into a person's body as opposed to a regular-type of bullet, agreed that a selling point of hollow points is that they can do more damage and have more stopping power, and explained that a hollow point bullet is designed so that when it hits an object, it "actually expands, expands open creating a larger part of tissue damage." 20 RR 115-16 (ECF No. 4-33 at 115-16).

Daniel asserts that counsel were ineffective for not presenting a forensic expert like Robert Tressel to testify that hollow point bullets are not designed "primarily to do the most damage." Am. Pet. at 142 (ECF No. 18 at 153). According to Tressel, their design is "an attempt to keep the projectile from exiting and inflicting injury to other bystanders." App. 1774 (ECF No. 7-6 at 3). Tressel states that "[t]he 'collapsing' or 'mushrooming' effect will create more tissue damage along the trajectory path but will keep the projectile within its target when used in a small caliber weapon such as the Jiminez .380 in this case." *Id.* When counsel is faulted for failing to investigate and present testimony like that offered by a particular witness, a petitioner must not only name the witness and allege what the testimony would have been, but he must also show that witness would have been available to testify and explain how the proposed testimony would have been beneficial. *Day*, 566 F.3d at 538. Tressel never states that he was available to testify, App. 1767-74 (ECF No. 7-6 at 388-395), and Daniel fails to show that any of his proposed testimony would be beneficial.

Assuming arguendo Robert Tressel was available to testify at trial, counsel did not provide ineffective assistance by failing to call him, nor can Daniel show prejudice

by the omission. Tressel's acknowledgement that the "collapsing and mushrooming effect [of hollow point bullets] will create more tissue damage" corroborates testimony provided by Detective Bailey and the medical examiner, as set out above. App. 1774 (ECF No. 7-6 at 395). Counsel cannot be ineffective for failing to present testimony regarding the extensive damage caused by hollow points when it only reflects on Daniel's choice of ammunition.

The only matter raised by Tressel that was not testified to at trial is his contention that the primary purpose behind the design of hollow points is to "keep the projectile within its target" so there is a lower risk of inflicting injury to other bystanders. App. 1774 (ECF No. 7-6 at 395). Tressel's assertion does nothing to offset his concession that hollow points "create more tissue damage" in the targeted subject which is *why* there is a lower risk of a pass-through shot. *See id*. However, there was no pass-through shot in this case. Instead, one shot was deflected by Officer Padron's armored vest. The second shot occurred when Daniel pressed the muzzle of his gun to Officer Padron's neck and shot him with a hollow point bullet that traveled through his voice box, fractured his fifth cervical vertebra (neck bone), and created tears in two arteries that carried blood to his brain, causing rapid hemorrhaging and death. 20 RR 113-18 (ECF No. 4-33 at 113-18). A third shot by Daniel just missed striking the right ear of Lincoln LeMere, a Walmart manager who had jumped on Daniel to try and disarm him. 18 RR 61, 133-34 (ECF No. 4-31 at 61, 133-34). Counsel certainly did not perform deficiently by failing to elicit irrelevant testimony that hollow point bullets have less of a risk of passing through the target to hit bystanders, especially

if the implicit assumption is that Daniel was showing concern for the safety of others by his choice of ammunition.

### 3. State habeas counsel were not ineffective for failing to raise these plainly meritless IATC claims.

Apart from his failure to present a substantial claim for relief, as required by *Martinez*, 566 U.S. at 14, Daniel also fails to demonstrate that state habeas counsel were ineffective "in failing to present" the above-described IATC claims "in his first state habeas proceeding." *Garza*, 738 F.3d at 676. In sum, because Daniel's complaints regarding trial counsel's representation concerning eyewitness testimony and hollow point bullets are plainly meritless, the failure of the OCFW to raise the same complaints of ineffective assistance in the initial state habeas proceedings does not bring the procedurally defaulted IATC claim within the narrow scope of *Martinez* and *Trevino*. *See* Argument, Part VII.B.2., *supra*. The Court should therefore hold that Daniel fails to make both showings required under *Martinez* and that his IATC claims remains procedurally defaulted.

## X. Daniel is Not Entitled to Habeas Corpus Relief on His Claims that Trial Counsel Failed to Investigate and Present Evidence to Support Several Assertions Made by Him During His Custodial Interview and that His Due Process Rights Under *Brady* Were Violated.

Daniel argues that trial counsel failed to investigate and present evidence to support several of his assertions made during his custodial interview—specifically, that he sometimes carried a gun because he was worried about death threats and that he previously worked as a confidential informant in Colorado. Am. Pet. at 147 (ECF No. 18 at 158). He further contends that counsel were ineffective for not

investigating and presenting evidence of Facebook messages between himself and Nikki Nance that occurred about five weeks before the capital offense where Nance told him "to carry his gun because drug dealers were possibly intending to harm him." *Id.* at 149 (ECF No. 18 at 160). Daniel asserts that he was prejudiced because his attorneys were unable to rebut the State's portrayal of him "as a manipulative liar" who always "mocked the police," when he had actually helped the police in the past and carried the gun when he felt threatened. *Id.* Also Daniel asserts that "[t]o the extent the State possessed information supporting" these matters, then his due process rights under *Brady* were violated. *Id.* at 150 (ECF No. 18 at 161). These claims are unexhausted, defaulted, and entirely without merit.

## A. Daniel's IATC claim is unexhausted, procedurally defaulted, and plainly meritless.

Daniel concedes that his IATC claim is unexhausted and argues that if it is "deemed procedurally defaulted," then he can show cause and prejudice under *Martinez.* Am. Pet. at 150 (ECF No. 18 at 161). To demonstrate "cause," Daniel must show that his defaulted IATC claim "is substantial" and that habeas counsel was ineffective in failing to present the claim in the first state habeas proceeding. *Garza,* 738 F.3d at 676. Daniel cannot make this showing because his underlying IATC claim is plainly meritless. State habeas counsel cannot be ineffective for failing to raise a meritless claim. At the very least, Daniel cannot demonstrate this claim was more meritorious then the eleven multi-part claims originally raised by the OCFW. For the reasons that follow, the Court should hold that Daniel has procedurally defaulted his IATC claim on federal habeas review.

### 1. Daniel's claim that counsel failed to investigate whether he carried a gun from time to time is utterly meritless.

*Strickland*'s first prong "sets a high bar." *Buck v. Davis*, 137 S. Ct. 759, 775 (2017). To demonstrate deficient performance, Daniel must show that, in light of the circumstances as they appeared at the time of the conduct, "counsel's representation fell below an objective standard of reasonableness" as measured by "prevailing professional norms." *Strickland*, 466 U.S. at 687-88. Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. Daniel's argument fails to overcome that presumption.

Initially, Daniel argues that counsel failed to investigate and present evidence to support his assertion that he carried a gun from time to time when he was worried about death threats. Am. Pet. at 147 (ECF No. 18 at 158). For claims of deficient investigation, Daniel "must allege with specificity what the investigation would have revealed and how it would have altered the outcome of trial." *Druery*, 647 F.3d at 541 (citation omitted). To date, Daniel has not produced any evidence to substantiate that he ever carried his gun with him on any occasion in Austin (besides when he shot and killed Officer Padron), much less that he did so because of death threats. Daniel's former roommate, Kelvin Davis, testified that he discovered Daniel had a gun when he saw it in the closet of their apartment, but did not testify about ever seeing Daniel with the gun. 22 RR 122-23 (ECF No. 4-35 at 122-23). Additionally, Nikki Nance testified that she saw Daniel's gun approximately ten times, Daniel said it was strictly for protection meaning home protection, she never saw Daniel take the gun

outside the apartment, he never took it when they went to play pool or to meet a drug supplier, and the gun was always kept in Daniel's closet. *Id*. at 95-96, 107-08 (ECF No. 4-35 at 95-96, 107-08).

Counsel did not perform deficiently for allegedly failing to investigate and present evidence of Facebook messages sent between Daniel and Nikki Nance, nor can Daniel show he was prejudiced by counsel's performance. Am. Pet. at 147, 149 (ECF No. 18 at 158, 160). Daniel argues the messages would have supported his assertion "that he had recently been threatened and was carrying the gun for that reason." *Id*. at 147 (ECF No. 18 at 158). He asserts that in the Facebook messages, "Nance told Daniel to carry his gun because gun dealers were possibly intending to harm him." *Id*. at 149 (ECF No. 18 at 160). To the contrary, the Facebook messages show that Nikki Nance wanted Daniel to bring a gun for *her* protection because she was concerned for her safety. Nance told Daniel "bring your gun" "just in case" because she "want[ed] protection when I tell them to leave the house." App. 1165 (ECF No. 7-5 at 149). There is no indication who "they" refers to, much less that it is actually drug dealers. In the second page of messages, Nance says, "I just want to have protection just in case," and asks Daniel "to pick [her] up and be there while I ask them to leave" "so they don't hurt me." App. 1166 (ECF No. 7-5 at 150). Daniel cannot show deficient performance or prejudice because the complained-of, omitted evidence does not support his assertion that he was threatened in any manner or sometimes carried a gun because of death threats.

## 2. Daniel's claim that counsel failed to investigate his working as a confidential informant is plainly meritless.

Daniel also fails to demonstrate that counsel performed deficiently and that he was prejudiced by counsel's alleged failing to investigate his previously working as a confidential informant. Am. Pet. at 147-49 (ECF No. 158-60). He argues that if counsel had done so, they would have uncovered "testimony" and unspecified "records" concerning Daniel's time working with Detective Eric Lintz on a Drug Task Force in Colorado. *Id.* at 149 (ECF No. 18 at 160). Daniel maintains that "Detective Lintz would have "told counsel and testified" to the fact that Mr. Daniel began working with him after he was arrested for a misdemeanor offense, and that Mr. Daniel's cooperation led to multiple arrests of drug dealers." *Id.*

For a claim challenging counsel's failure to investigate, the Court must make a "context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Wiggins*, 539 U.S. at 523 (citing *Strickland*, 466 U.S. at 689). The relevant inquiry focuses on what counsel did to prepare, what evidence was accumulated, what additional leads counsel had, and the results counsel might reasonably have expected from those leads. *Cf. Neal*, 286 F.3d at 237. Daniel does not state ever told defense counsel about his work as a confidential informant, much less that he provided names of any individuals to contact.

Where counsel is faulted for not investigating and calling a particular witness, an inmate must name the witness, prove the witness would have been available to testify, allege what the witness's testimony would have been, and explain how the proposed testimony would have been beneficial. *Day*, 566 F.3d at 538. Daniel does not

meet these requirements. Although he names Detective Lintz as a possible witness, he does not show that he ever told defense counsel about this individual. He also provides no credible proof of the substance of his proposed testimony. Instead, Daniel relies on inadmissible hearsay contained in an affidavit from a federal habeas investigator. Supp. App. 1887-88 (ECF No. 20-3 at 4-5). Even then, the investigator does not state that the detective was available and willing to testify. *See id*. Daniel offers no explanation why the federal habeas investigator could not have obtained an affidavit from Detective Lintz to substantiate the hearsay statements. Daniel cannot show deficient performance or prejudice where there is no admissible evidence to support this portion of his IATC claim.

Daniel contends that counsel's alleged failure to investigate prejudiced his defense because his attorneys were unable to counter the State's portrayal of him as a "manipulative liar." Am. Pet. at 149 (ECF No. 18 at 160). The State never argued that Daniel was falsely claiming that he worked an informant. Instead, through questioning of Officer Cory Knop, the State elicited testimony that Daniel was trying to evade arrest for a DWI by telling the officer he worked as an informant, asking that his vehicle not be impounded, and whether there was anything Officer Knop could do to help him out with the charges. 22 RR 27-28 (ECF No. 4-35 at 27-28). Additionally, Detective David Fugitt testified that after Daniel indicated that he worked as an informant for Sheriff Departments in two counties in Colorado, he contacted both agencies but did not get anything responsive. 20 RR 17-18 (ECF No. 4-33 at 27-28). Detective Fugitt did not assert that Daniel lied about being an

informant, but rather, gave several reasons why he may not have gotten anything responsive, including that Daniel did not give a precise time frame or a name of an individual that he worked for and it is not terribly unusual for confidential informant to be confidential. *See id*. at 18 (ECF No. 4-33 at 18). There was no reason for trial counsel to try to rebut or refute the above-described testimony.

Finally, Daniel overlooks that trial counsel elicited testimony from Jenna Feland that she remembered Daniel working as an informant for one of the police departments when he was in Colorado, that Daniel may have started working as an informant after he got pulled over with some Ecstasy in his car, and that he was not on probation or anything like that as a result of being pulled over with drugs. *See* 20 RR 193-94 (ECF No. 4-23 at 193-94). While Daniel might wish counsel had presented more evidence on this matter, he has not presented any evidence that would be admissible. He fails to demonstrate prejudice from the lack of additional evidence.

Because Daniel cannot show that trial counsel's representation fell below an objective standard of reasonableness and that any omission resulted in prejudice, both his IATC claims are plainly meritless and they remain defaulted.

### 3. State habeas counsel were not ineffective for failing to raise these utterly meritless IATC claims.

Apart from his failure to present a substantial claim for relief, as required by *Martinez*, 566 U.S. at 14, Daniel also fails to demonstrate that state habeas counsel were ineffective "in failing to present" the IATC claims "in his first state habeas proceeding." *Garza*, 738 F.3d at 676. As noted, Daniel's claim that trial counsel failed to investigate and present evidence to support that he carried a gun from time to time

is refuted by trial testimony and not supported by credible evidence. Daniel's IATC claim regarding his working as an informant fails because it is supported by inadmissible hearsay. Had the OCFW raised the claims in Daniel's initial state habeas petition, the claims would not have been successful. Because state habeas counsel were not ineffective in failing to raise the claims and Daniel fails to show prejudice as required under *Martinez*, the Court should therefore hold that Daniel's IATC claims remains procedurally defaulted.

### B. Daniel's *Brady* claim is unexhausted, procedurally barred, and meritless in the alternative.

Although Daniel concedes that his IATC claim is unexhausted, he fails to mention that his *Brady* claim is also unexhausted. *See* Am. Pet. at 150 (ECF No. 18 at 161). Federal courts may not grant habeas relief on unexhausted claims. 28 U.S.C. § 2254(b)(1)(A). Unexhausted claims become procedurally defaulted if "the state court to which the prisoner would have to present his claims in order to exhaust them would find the claims procedurally barred[.]" *Kittelson v. Dretke*, 426 F.3d 306, 315 (5th Cir. 2005). If Daniel tried to raise the claim in a successive state habeas application, the TCCA would dismiss it pursuant to Texas Code of Criminal Procedure Article 11.071, Section 5. *Williams*, 602 F.3d at 305-06; *Beazley*, 242 F.3d at 264. Daniel's unexhausted *Brady* claim is thus procedurally barred.

Even if the claim was not defaulted, it would not merit habeas relief. In *Brady*, the Supreme Court announced that due process requires the State to disclose material, exculpatory evidence to the defense. 373 U.S. at 87. In order to establish a *Brady* violation, Daniel must demonstrate that (1) the prosecution suppressed

evidence, (2) that evidence was favorable to the defense, and (3) the evidence was material to either guilt or punishment. *Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Graves v. Cockrell*, 351 F.3d 143, 153-54 (5th Cir. 2003). The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *United States v. Bagley*, 473 U.S. 667, 684 (1985). Daniel cannot demonstrate a violation of *Brady*.

Daniel does not claim that the State suppressed information about his working as an informant or that he carried a gun when he felt threatened. Am. Pet. at 150 (ECF No. 18 at 161). Instead, he asserts that "[t]o the extent the [S]tate possessed information" on these matters but did not disclose it, then his rights were violated. *See id*. "Allegations that are merely 'conclusory" or are purely speculative cannot support a *Brady* claim." *Hughes v. Johnson*, 191 F.3d 607, 629-30 (5th Cir. 1999).

In any event, Daniel fails to demonstrate suppression. The evidence that Daniel alleges may have been withheld is evidence that was obviously known and available to Daniel. There exists no *Brady* obligation where evidence is fully available to the defendant through the exercise of due diligence. *Kutzner v. Cockrell,* 303 F.3d 333, 336 (5th Cir. 2002) (government need not "furnish a defendant with exculpatory evidence that is fully available to the defendant through the exercise of reasonable diligence.") Nothing prevented Daniel from telling his defense attorneys about his prior work as an informant or his carrying a gun when he felt threatened. Daniel's ability to obtain information regarding his *own* prior conduct was not dependent on a disclosure by the prosecution.

Daniel also fails to prove the allegedly suppressed evidence was favorable and material. As explained above in response to Daniel's related IATC claim, he overstates the significance of the evidence that he faults counsel for not presenting. The Facebook messages between Daniel and Nikki Nance do not show that he was being threatened or that he carried his gun to the Walmart because he was afraid of death threats. And his "proof" of working as a confidential informant consists of the inadmissible hearsay contained in the affidavit of a federal habeas investigator. Daniel fails to show that the evidence was suppressed or favorable, much less that if it had been disclosed to the defense, that there be any probability the result of proceedings would have been different. *Bagley*, 473 U.S. at 684. The Court should therefore deny habeas relief on Daniel's unexhausted, defaulted, and alternatively meritless *Brady* claim.

## XI.     Daniel is Not Entitled to Habeas Corpus Relief on His Claims Challenging Trial Counsel's Failure to Object to Alleged Victim Impact Evidence at the Guilt Phase of Trial.

Daniel asserts that trial counsel provided ineffective assistance by failing to object to inadmissible victim impact testimony from Officer Padron's older brother, Johnny Padron, thus denying him due process, a fair trial, and his rights under the Sixth, Eighth, and Fourteenth Amendments. Am. Pet. at 151 (ECF No. 18 at 162). He also claims the alleged harm was increased during the punishment phase when the State emphasized Johnny Padron's testimony during closing argument. *Id*. at 155-56 (ECF No. 18 at 166-67). Daniel's Eighth and Fourteenth Amendment claims are procedurally barred and any error is waived, and he fails to show the state court's rejection of his IATC claim was an unreasonable application of *Strickland*.

### A. The Eighth and Fourteenth Amendment claims are unexhausted, defaulted, and waived for inadequate briefing.

In his initial state habeas application, Daniel raised trial counsel's failure to object as a Sixth Amendment IATC claim. SHCR-01 at 635-46 (ECF No. 4-82 at 137-48). This claim did not fairly present the issue of whether counsel were also ineffective under the Eighth and Fourteenth Amendments. *See id.* If Daniel tried to raise these claims now, they would be dismissed as an abuse of the writ. Tex. Code Crim. Proc. art. 11.071, § 5(a); *Williams,* 602 F.3d at 305-06. Daniel's unexhausted claims are therefore defaulted on federal habeas review. *See Beazley,* 242 F.3d at 264.

In any event, the entirety of Daniel's briefing on the Eight and Fourteenth Amendment consists of his listing them in the caption of his claim, and elsewhere making a one-sentence conclusory statement of the same ilk. Am. Pet. at 151, 152 (ECF No. 18 at 162, 163). Any claim of error is waived by Daniel's failure to brief the issues adequately. *Green*, 508 F.3d at 203; *Trevino,* 168 F.3d at 181 n. 3.

### B. The TCCA's denial of relief is consistent with *Strickland*.

On state habeas review, the TCCA rejected Daniel's IATC claim after concluding that Daniel failed to make both showings required under *Strickland*. *Ex parte Daniel*, 2017 WL 467577, at *2 (ECF No. 4-96 at 3-4). The TCCA denied habeas corpus relief based on the trial court's findings and conclusions and the TCCA's own review. *Id*. at *3 (ECF No. 4-96 at 6). This Court reviews the state court adjudication under the "doubly deferential" standards of both *Strickland* and § 2254(d). *Pinholster*, 563 U.S. at 190. Applying those standards in tandem, the Court should deny habeas relief because the TCCA's adjudication was a reasonable application of *Strickland*.

### 1.     Daniel failed to show deficient performance.

To establish deficient performance, Daniel needed to show not only that trial counsel's performance fell below an objective standard of reasonableness but also needed to rebut the presumption that his trial counsel's decision were based on sound trial strategy. *See Strickland*, 466 U.S. at 689. Daniel failed to make this showing, and the state court was not unreasonable in so finding. SHCR-01 at 1816-18 (ECF No. 4-89 at 118-20).

Victim impact evidence is generally recognized as evidence concerning the effect of the accused's crime on others, particularly the victim's family members. *See Salazar v. State*, 90 S.W.3d 330, 335 (Tex. Crim. App. 2002) (describing impact evidence as that which is designed to remind the jury that the defendant's conduct has foreseeable consequence to the community and victim's family). One subset of victim impact evidence, victim character evidence, concerns the good qualities of the victim; it is "designed to give the jury 'a quick glimpse of the life that the [defendant] chose to extinguish, to remind the jury that the person whose life was taken was a unique human being.'" *Id.* at 335 (quoting *Payne v. Tennessee*, 501 U.S. 808, 830-31 (1991)). Victim impact and victim character evidence typically are irrelevant at the guilt/innocence phase of trial, but such evidence may be admissible as a "circumstance of the offense" or if the testimony "would have a tendency to make more or less probable a fact of consequence at the guilt stage; that is, whether [the accused] committed the crimes at all." *Longoria v. State*, 148 S.W.3d 657, 660 (Tex. App.—Houston [14th Dist.] Oct. 19, 2004, pet. ref'd). During the punishment phase, victim

impact evidence is generally admissible when it "has some bearing on the defendant's personal responsibility and moral culpability," subject to the provisions of Tex. R. Evid. 403. *Salazar*, 90 S.W.3d at 335-36; *Mosley v. State*, 983 S.W.2d 249, 261-65 (Tex. Crim. App. 1998).

The trial record demonstrates that defense counsel made a strategic decision to not object to testimony from Johnny Padron. This strategic choice was not simply a lack of direction or preparation as Daniel suggests. Daniel's attorneys provided affidavits during the state habeas proceedings that explained their decision to not object. According to lead counsel Russell White:

> First, Officer Padron's brother testimony was very brief, covering only fourteen pages of the transcript. Second, some portions of his testimony were clearly admissible and not objectionable. Third, the amount of victim impact evidence in the testimony was fairly minimal. Sometimes in trial some victim impact evidence comes in, and rather than turning off the jury by objecting to a highly sympathetic witness, a defense attorney will let a little of this type of evidence come in. In this case, a guilty verdict was very likely anyway, and more victim impact type evidence was going to come in during the punishment phase, se we felt it was better to give the witness a little leeway rather than objecting, seeming unfair to the witness, and turning off the jury.

SHCR-01 at 1065 (ECF No. 4-86 at 67). Bradley Urrutia attested to further reasons for the decision:

> As the killing of Officer Padron was captured on video, there was little question of [Daniel's] guilt, at the very least of murder. In fact, as I recall, the defense was going to argue that [Daniel] lacked the specific intent to kill officer Padron, making it murder not capital murder. As such, rather than objecting to the testimony of Officer Padron's brother, a clearly sympathetic witness, and lose credibility with the jury, a small amount of impact evidence was allowed. The majority of the testimony was not objectionable. It is my opinion that it was better to not alienate the jury to any possible defense that would be argued later.

SHCR-01 at 1541 (ECF No. 4-88 at 43).

Counsel made a sound, strategic choice, based on their professional experience, after thorough consideration of the law, facts, and circumstances of this case to not object to Johnny Padron's testimony. Trial counsels' decision is reasonable, especially their wanting to maintain credibility with the jury in light of the arguments there were making on Daniel's behalf. "Although through hindsighted review other counsel might have handled this matter differently, this Court is prohibited from second guessing counsel's strategy." *Youngblood v. Maggio*, 696 F.2d 407, 409 (5th Cir. 1983); *see Solis v. State*, 792 S.W.2d 95, 100 (Tex. Crim. App. 1990) (TCCA "will not use hindsight to second guess a tactical decision made by trial counsel which does not fall below the objective standard of reasonableness").

The record also supports lead counsel Russell Hunt's determination that "some portions of his testimony were clearly admissible and not objectionable." SHCR-01 at 1065 (ECF No. 4-86 at 67). As part of its burden at guilt/innocence, the State had to prove beyond a reasonable doubt that Jaime Padron was "a peace officer who was acting in the lawful discharge of an official duty[.]" 1 CR 100 (ECF No. 4-1 at 100). His brother's testimony was admissible under Rule 401 of the Texas Rules of Evidence because it was relevant to the issue of whether Jaime Padron was a peace officer, a fact that defense counsel recognized in his affidavit. SHCR-01 at 1541 (ECF No. 4-88 at 43). One of the few issues contested in this case was whether Daniel knew he was killing a peace officer.

Furthermore, evidence regarding Officer Padron's background was admitted

during guilt/innocence through Daniel's statement to police. In his interview with police (SX-59), Daniel said the officer "has kids." *See* 27 RR at SX-60 (transcript) at 27. It was also revealed during the interview that Jaime Padron "had two kids," that he was "[s]omebody's son, a father, a good friend, [and] part of a community of police officers who is now dead" because Daniel shoplifted groceries. *Id*. at 139. That the family of Officer Padron would be saddened and affected by his untimely, violent death was a matter of common knowledge. A jury would know that even without testimony. *See e.g. Carter v. State*, 614 S.W.2d 821, 823 (Tex. Crim. App. 1981) (matters of common knowledge may be incorporate into final argument without express support in the evidence). Trial counsel did not perform deficiently for failing to object to limited testimony from Johnny Padron on these matters.

## 2. Daniel also failed to prove prejudice.

Even if Johnny Padro's testimony amounts to victim impact testimony, Daniel is unable to show prejudice under current law. To satisfy the prejudice prong, Daniel needed to show that counsel's deficiency rendered the "result of the trial unreliable or the proceeding fundamentally unfair." *Strickland*, 466 U.S. at 687. Considering the totality of the evidence supporting his conviction, the trial record does not support a finding that there was a reasonable probability that the outcome of the trial would have been different if there had been an objection to victim impact testimony. *See* Statement of the Case, Part I.A., *supra*.

Finally, the State's punishment argument that addressed Johnny Padron's testimony was proper, contrary to Daniel's suggestion that it caused harm. Am. Pet.

at 153 (ECF No. 18 at 164). Since both federal and Texas courts allow victim impact evidence to be admitted in the punishment phase of a trial as being relevant to moral culpability or blameworthiness, Daniel is unable to show deficient performance by counsel's failure to object nor prejudice in the punishment phase by the admission of such evidence. *Payne,* 501 U.S. at 827; *Salazar*, 90 S.W.3d at 335-36.

## XII. The Court Should Deny Habeas Relief on Daniel's Claims Regarding the Prosecutor's Closing Arguments at the Guilt Phase.

Daniel alleges the prosecution committed misconduct, and counsel were ineffective for failing to object, when the State made improper closing arguments at the guilt phase, thus denying him due process, a fair trial, and his rights under the Sixth and Fourteenth Amendments. Am. Pet. at 158 (ECF No. 18 at 169). Specifically, he contends the prosecution's arguments impugned the credibility of counsel and struck at Daniel over the shoulder of his counsel. *Id.* Daniel is not entitled to habeas relief because his prosecutorial misconduct claim is unexhausted, defaulted, and alternatively meritless, and his IATC claim was reasonably denied on the merits in a state-court adjudication that warrants AEDPA deference.

### A. Daniel's prosecutorial misconduct claim is unexhausted and defaulted, and alternatively does not merit relief.

In his initial state habeas application, Daniel raised an IATC claim based on trial counsel's failure to object to prosecutorial argument. SHCR-01 at 646-54 (ECF No. 4-82 at 148-56). He did not raise an independent claim of prosecutorial misconduct. *See id.* Instead he included a paragraph in his IATC claim in which he asserted that the prosecutor's arguments rendered his trial fundamentally unfair in

violation of his right to due process. *Id.* at 652-53 (ECF No. 4-82 at 154-55).

"[A] claim is not exhausted . . . unless the applicant present[s] his claims before the state courts in a procedurally proper manner according to the rules of the state courts." *Mercadel v. Cain*, 179 F.3d 271, 275 (5th Cir. 1999) (quotation marks and citations omitted); *Beazley*, 242 F.3d at 263 (to fairly present claims, "the applicant must present his claims in a procedurally correct manner") (quotation marks and citation omitted). Daniel's prosecutorial misconduct claim was not fairly presented in state court. Under Texas law, when an appellant "combin[es] more than one legal theory in a single ground, [he] risks rejection on the ground that nothing is presented for review." *Thomas v. State*, 723 S.W.2d 696, 697 n.2 (Tex. Crim. App. 1986) (citing *Brooks v. State*, 642 S.W.2d 791, 793 (Tex. Crim. App. 1982)). The same holds true for combining more than one contention in a single point of error. *Sterling v. State*, 800 S.W.2d 513, 521 (Tex. Crim. App. 1990). This appears to be what happened in this case, although there is no state-court finding on the matter. The TCCA denied relief on Daniel's *Strickland* claim but did not address the prosecutorial misconduct claim. *Ex parte Daniel*, 2017 WL 467577, at *1, *3 (ECF No. 4-96 at 3-4, 6).

Daniel's claim is unexhausted and federal habeas relief may not be granted on unexhausted claims. 28 U.S.C. § 2254(b)(1)(A). If Daniel tried to raise a prosecutorial misconduct claim now in state court, it would be dismissed as successive. Tex. Code Crim. Proc. art. 11.071, § 5(a); *Williams*, 602 F.3d at 305-06. Daniel's unexhausted claim is therefore defaulted on federal habeas review. *See Beazley,* 242 F.3d at 264.

To the extent Daniel's claim is considered sufficiently presented and not

defaulted, it is nonetheless procedurally barred for different reasons. Trial counsel did not object to the alleged improper argument, thus failing to preserve error for appeal.[29] "[A] defendant's failure to object to a jury argument or a defendant's failure to pursue to an adverse ruling his objection to a jury argument forfeits his right to complain about the argument on appeal." *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996); *see also Threadgill v. State*, 146 S.W.3d 654, 670 (Tex. Crim. App. 2004) (failure to object to an allegedly "manifestly improper" jury argument forfeits the right to raise the issue on appeal). While some fundamental absolute rights cannot be waived for failure to preserve an objection, improper jury argument does not fall into that category. *See Ladd v. State*, 3 S.W.3d 547, 569-70 (Tex. Crim. App. 1999) (complaint about State's argument violating defendant's right to due process was waived for failure to object).

Furthermore, if the TCCA had decided to reach the merits of Daniel's prosecutorial misconduct claim on state habeas review, it would have found the issue barred because habeas is not a substitute for matters which should have been raised at trial or on direct appeal. *De La Cruz*, 466 S.W.3d at 864. Because appellate review was foreclosed by failure to preserve error and the prosecutorial misconduct claim could not be raised for the first time on state habeas review, Daniel's claim remains procedurally defaulted.

---

[29]    In arguing that trial counsel's failure to object waives this ground for review, the Director is not conceding that Daniel's IATC claim has merit. As argued in Part XII.B. below, Daniel's claim was reasonably denied by the TCCA for his failure to make both showings under *Strickland*.

Even if the Court finds the prosecutorial misconduct claim is not procedurally barred or that Daniel's default should be excused, he is not entitled to habeas relief. For purposes of determining whether there has been prosecutorial misconduct, the Supreme Court has stated that "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "A trial is fundamentally unfair if 'there is a reasonable probability that the verdict might have been different had the trial been properly conducted.'" *Barrientes v. Johnson*, 221 F.3d 741, 753 (5th Cir. 2000) (quoting *Foy v. Donnelly*, 959 F.2d 1307, 1317 (5th Cir. 1992)). As argued in response to his IATC claim that follows, the State's jury arguments were proper as reasonable deductions from the evidence and as responses to argument from opposing counsel. Just as Daniel fails to prove his IATC claim, he necessarily fails to show that his trial was rendered fundamentally unfair by jury argument that was proper and not objectionable. The Court should thus deny habeas relief on Daniel's unexhausted, defaulted, and ultimately meritless claim of prosecutorial misconduct.

**B. The TCCA's rejection of Daniel's IATC claim on the merits is entitled to AEDPA deference.**

Daniel's IATC claim raised on state habeas alleged that trial counsel were ineffective for failing to object to the prosecutor's arguments which struck at him by implying that his attorneys were lying about evidence. SHCR-01 at 646-54 (ECF No. 4-82 at 148-56). He cited to the State's closing arguments at 21 RR 65, 92-93 (ECF No. 4-34 at 65, 92-93). Defense counsel provided affidavits explaining their reasons

for not objecting. SHCR-01 at 1065-66 (ECF No. 4-86 at 67-68); *id* at 1541 (ECF No. 4-88 at 43). The TCCA determined that Daniel failed to make both showings required by *Strickland* and denied relief. *Ex parte Daniel*, 2017 WL 467577, at *1, *3 (ECF No. 4-96 at 3-4, 6); *see* SHCR-01 at 1818-19 (ECF No. 4-89 at 120-21). This Court should deny habeas relief on Daniel's claim under § 2254(d) because the state court's decision was a reasonable application of *Strickland*.

### 1. Daniel failed to prove deficient performance.

To satisfy *Strickland*'s deficient performance prong, Daniel needed to show that counsel's representation fell below an objective standard of reasonableness. 466 U.S. at 688. A failure to object does not constitute deficient representation unless a sound basis exists for objection. *See Emery v. Johnson*, 139 F.3d 191, 198 (5th Cir. 1997). However, even if grounds for objecting exist, an attorney may render effective assistance if the failure to object was a matter of trial strategy. *Burnett v. Collins*, 982 F.2d 922, 930 (5th Cir. 1993) (noting that a failure to object may be a matter of trial strategy as to which courts will not second-guess counsel); *Drew v. Collins*, 964 F.2d 411, 423 (5th Cir. 1992) ("A decision not to object during a closing argument is a matter of trial strategy."). A reviewing court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance and, under the circumstances, that the challenged action might be considered sound trial strategy. *Strickland*, 466 U.S. at 689.

Daniel contends that his attorneys were ineffective for not objecting to the prosecutor's closing arguments in two instances. Am. Pet. at 158 (ECF No. 18 at 169).

First, he asserts that the prosecutor attacked the credibility of defense counsel by arguing that counsel were unreasonable and foolish in their defense of Daniel, in stating that, "The dispute is right over here [at counsel table], because no matter what evidence we put on, we can't convince the defense attorneys by proof beyond a reasonable doubt." 21 RR 65 (ECF No. 4-34 at 65). Second, he asserts that the prosecutors continued their *ad hominem* attacks on counsel by arguing that counsel were fabricating evidence:

> What Mr. Urrutia says to you is not evidence. . . . He has to tell you that because he has to make some argument to try to appease you to wonder why we are here. . . . He tried to tell you we are here because there is facts [sic] in dispute. We are here because in a case where the State seeks the death penalty it must be tried before a jury. We have to present it to you, not because we have any doubt, not because there is any doubt, not because any doubt exists, but because we have to[.] [Mr. Urrutia] doesn't want you to believe what everyone in this courtroom, except Mr. Urrutia, believes.

*Id*. at 92-93 (ECF No. 4-34 at 92-93).

Defense counsel did not provide ineffective assistance by failing to object to the prosecutor's jury arguments, and the state court was not unreasonable in so finding. "[P]roper jury argument generally falls within one of four general areas: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to an argument of opposing counsel, and (4) plea for law enforcement." *Freeman v. State*, 340 S.W.3d 717, 727 (Tex. Crim. App. 2011). "[A] prosecuting attorney is permitted in his argument to draw from the facts in evidence all inferences which are reasonable, fair and legitimate[.]" *Borjan v. State*, 787 S.W.2d 53, 57 (Tex. Crim. App. 1990). Counsel is generally afforded wide latitude in doing so. *Coble v. State*, 871

S.W.2d 192, 205 (Tex. Crim. App. 1993). That a prosecutor's argument might be aggressive does not render it improper. *See Berry v. State*, 233 S.W.3d 847, 860 (Tex. Crim. App. 2007). On the other hand, jury argument "that strikes at a defendant over the shoulders of defense counsel is improper." *Gallo v. State*, 239 S.W.3d 757, 767 (Tex. Crim. App. 2007); *see also Borjan*, 787 S.W.2d at 56-57 (improper argument injects new facts harmful to the accused into the trial proceedings).

The record in this case supports the state court's finding that defense counsel determined in their experience and professional judgment that the prosecutor's jury arguments did not warrant an objection. SHCR-01 at 1818-19 (ECF No. 4-89 at 120-21). In his affidavit, lead defense counsel Russell Hunt attested that he was cognizant of the State's arguments, did not consider them as striking at Daniel over counsel's shoulders because they did not imply the defense was lying, and felt the State's arguments just indicated their disagreement with the defense's interpretation of the evidence. SHCR-01 at 1066 (ECF No. 4-86 at 68). Bradley Urrutia also provided an affidavit addressing Daniel's claim and attested that "The [S]tate's argument did not imply the defense was lying but rather disagreed with our interpretation of the evidence and in my opinion did not strike at [Daniel] over my shoulders." *Id.* at 1541 (ECF No. 4-88 at 43). Failure to make frivolous objections does not cause counsel's performance to fall below an objective standard of reasonableness. *See Green v. Johnson*, 160 F.3d 1029, 1037 (5th Cir. 1998). Daniel fails to overcome the strong presumption that counsel exercised reasonable professional judgment in deciding to not object. *Strickland*, 466 U.S. at 690.

When the two complained-of arguments identified by Daniel are considered in context, they provide additional support for counsel's decision to not object. Contrary to Daniel's description, the prosecutor did not attack defense counsel with his argument and did not insinuate any misconduct or fabricated evidence. Instead, the prosecutor's argument was in response to the defensive theory of this case that Daniel did not know Jaime Padron was a police officer when Daniel's own statement to the police showed that Daniel knew Jaime Padron was a police officer when he killed him. *Id*. at 64-65 (ECF No. 4-34 at 64-65). In context, the argument stated: "The odd part about these two sides is that they are both at this table right here, because *no matter what evidence we put on, we can't convince the defense attorneys by proof beyond a reasonable doubt* that Brandon Daniel knew. It's clear they don't believe Brandon Daniel knew." *Id*. at 65 (ECF No. 4-34 at 65) (italicized portion is the argument cited by Daniel). The prosecutor's argument further addressed the numerous statements made by Daniel that he knew Jamie Padron was a police officer. *Id*. at 65-72 (ECF No. 4-34 at 65-72). The prosecutor's argument drew reasonable inferences from the record. *See Freeman*, 340 S.W. 3d at 727; s*ee Coble*, 871 S.W.2d at 205 (prosecutor's jury remark that counsel was arguing "something ridiculous" was not improper in light of the record). And there is no evidence of bad faith on the part of the State.

Defense counsel were also not ineffective for failing to object the prosecutor's jury argument at 21 RR 92-93 (ECF No. 4-34 at 92-93). The argument was clearly in response to defense counsel's closing argument. The prosecutor's argument correctly stated the law that argument by the attorneys "is not evidence." *Id*. at 92 (ECF No.

4-34 at 92). Daniel omits that the prosecutor continued by stating: "You can't make an inference that someone told [Daniel] Jamie Padron was a police officer after that shot was fired because no one sat here and said that was ever said. No witness sat here and told you that." *Id.* This is a proper statement of the law; referring to facts that are neither in evidence nor inferable from the evidence is improper argument. *Borjan*, 787 S.W.2d at 57. And the last portion of the prosecutor's argument that is cited by Daniel, "*He doesn't want you to believe what everyone in this courtroom, except Mr. Urrutia, believes*" is out of context and omits the important continuation, "That man [Daniel] right there knew Jaime Padro was a police officer. As Mr. Cobb pointed out, he said it again and again and again." 21 RR 93 (ECF No. 4-34 at 93). On this record, when considered in context, the State's arguments were clearly proper and not subject to objection.

## 2. Daniel also failed to prove prejudice.

In state court, in addition to proving deficient performance, Daniel needed to also satisfy *Strickland*'s prejudice prong by showing "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In this context, it means showing there is reasonable probability that the outcome at trial would have been different if counsel had made the proposed objections to the prosecutor's closing argument.

Since the State's jury arguments were not improper, Daniel cannot show that he was prejudiced by counsel's failure to raise ultimately meritless objections. Regardless, even if counsel's performance in not objecting was objectively

unreasonable, Daniel still fails to show prejudice. Daniel's jury was instructed that "it is only from the witness stand that the jury is permitted to receive evidence regarding the case, or any witness therein," 1 CR 182 (ECF No. 4-1 at 182), and there is no reason to believe they disregarded that instruction. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions."); *see United States v. Ebron*, 683 F.3d 105, 142 (5th Cir. 2012) (rejecting claim of prosecutorial misconduct where*, inter alia*, the trial court instructed the jury that arguments made by the lawyers are not evidence). Consequently, Daniel cannot show that he was prejudiced by the lack of an objection to the prosecutor's closing argument.

Moreover, Daniel cannot demonstrate that given the facts of the crime and the overwhelming evidence against him including a video recording of his capital murder,[30] an objection would have any reasonable likelihood of achieving a different outcome at the guilt phase of trial. *See Strickland*, 466 U.S. at 694; *see Richter*, 562 U.S. at 112 (The "likelihood of a different result must be substantial, not just conceivable."). Because the TCCA reasonably concluded that Daniel failed to show both deficient performance and prejudice, the state-court adjudication is entitled to AEDPA deference on federal habeas review.

## XIII. Daniel is Not Entitled to Habeas Corpus Relief on His Claims Regarding the Prosecutor's Closing Arguments at the Penalty Phase.

Daniel argues the prosecutor committed misconduct, and trial counsel were ineffective for failing to object, when the State made improper closing arguments at

---

[30] *See* Statement of the Case, Part I.A., *supra*.

the penalty phase, thus denying him due process, a fair sentencing, and his rights under the Sixth, Eighth, and Fourteenth Amendments. Am. Pet. at 164 (ECF No. 18 at 175). More specifically, he contends the prosecution (1) argued that Daniel's attorneys were not trustworthy and had fabricated evidence, (2) instructed the jurors to base their verdict on the community's alleged desire for a death sentence, (3) compared the value of Officer Padron's life to his, and (4) made improper arguments to inflame the passions of the jury and inject arbitrary and unconstitutional sentencing factors into the jury's deliberations. *Id.* at 164-73 (ECF No. 18 at 175-84). However, Daniel defaulted his prosecutorial misconduct and Eighth Amendment claims, and he fails to demonstrate that the TCCA's adjudication of his IATC claim resulted in an unreasonable application of *Strickland*.

### A. Daniel's procedural misconduct and Eighth Amendment claims are unexhausted, defaulted, and alternatively without merit.

As Claim One(H) in his initial state habeas application, Daniel alleged: "Trial counsel were ineffective for failing to object to the State's improper closing arguments at the punishment phase." SHCR-01 at 654 (ECF No. 4-82 at 156). He did not raise an independent claim of prosecutorial misconduct. *See id.* at 654-66 (ECF No. 4-82 at 156-68). Instead, buried in his IATC claim was the unrelated statement that "[i]n the event that evidence [about victims] is introduced at the punishment phase, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Id.* at 663 (quoting *Payne*, 501 U.S. at 825) (ECF No. 4-82 at 165).

Daniel also did not raise an independent claim of an Eighth Amendment violation. SHCR-01 at 654-66 (ECF No. 4-82 at 156-68). At best, he mentioned the

Eighth Amendment in passing in his IATC claim, stating that it "requires that a capital defendant receive an individualized sentencing determination," citing *Lockett v. Ohio*, 438 U.S. 586 (1978), and where the State "shifts the sentencing focus away from the defendant and to the victim, the Eighth Amendment is violated." SHCR-01 at 663-64 (ECF No. 4-82 at 165-66).

Daniel's prosecutorial misconduct and Eighth Amendment claims are unexhausted because they were not "fairly presented" in state court and the claims are procedurally defaulted because Daniel would be barred under Texas's abuse-of-the writ statue from exhausting the claims now. *See* Argument, Part XII.B., *supra*. (procedural default of claim of prosecutorial misconduct at the guilt phase).

Regardless, Daniel's claims are also procedurally defaulted because trial counsel did not object to the allegedly improper jury argument and failed to preserve error for appeal.[31] *See* Argument, Part XII.B., *supra*. If the TCCA had decided to reach the merits of Daniel's prosecutorial misconduct or Eighth Amendment claims on state habeas review, it would have found the issues barred because habeas is not a substitute for matters which should have been raised at trial or on direct appeal. *De La Cruz*, 466 S.W.3d at 864. Because appellate review is foreclosed by failure to preserve error and the instant claims could not be raised for the first time on state habeas review, Daniel's claims remain procedurally defaulted.

---

[31] The Director's procedural bar argument is not a concession that trial counsel were ineffective for failing to object. As argued in Part XIII.B. below, the state court adjudication of Daniel's IATC claim was a reasonable application of *Strickland*.

In the alternative, if the Court finds that Daniel's claims are not procedurally barred or that his default should be excused, it should nevertheless deny habeas corpus relief because Daniel cannot establish that "the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 643). As argued in response to Daniel's IATC claim that follows, the State's jury arguments were proper as summations of evidence, reasonable deductions from the evidence, responses to argument from opposing counsel, and pleas for law enforcement. *Freeman*, 340 S.W.3d at 727. Just as Daniel fails to prove his IATC claim, he necessarily fails to show that his trial was rendered fundamentally unfair by jury argument that was proper and not objectionable and fails to show "'a reasonable probability that the verdict might have been different had the trial been properly conducted.'" *Barrientes*, 221 F.3d at 753 (quoting *Foy*, 959 F.2d at 1317). The Court should therefore deny habeas relief on Daniel's unexhausted, defaulted, and alternatively meritless claims.

B.  **The TCCA's decision denying relief on the merits of Daniel's IATC claim deserves ADPA deference.**

Daniel raised an IATC claim in his initial state habeas application alleging that trial counsel were ineffective for failing to object to the prosecutor's jury arguments during the penalty phase that (1) attacked the credibility of counsel, (2) encouraged the jury to base their verdict on the community's desire for a death sentence, and (3) compared the value of Officer Padron's life to Daniel's. *See* SHCR-01 at 654-66 (ECF No. 4-82 at 156-68). Defense counsel provided affidavits explaining their reasons for not objecting. *Id.* at 1066 (ECF No. 4-86 at 68); *id.* at 1541 (ECF No.

4-88 at 43). The TCCA concluded that Daniel failed to make both showings required under S*trickland* and denied habeas relief based on the trial court's findings and conclusions and the TCCA's own review. *Ex parte Daniel*, 2017 WL 4675772, at *1, *3 (ECF No. 4-96 at 3, 6); *see* SHCR-01 at 1819-20 (ECF No. 4-89 at 121-22). This Court should deny habeas corpus relief on Daniel's claim under § 2254(d) because the state court's decision was a reasonable application of *Strickland*.

### 1. This Court's review of the state-court adjudication is limited to the record before the state court.

Because Daniel raised a claim alleging IATC for failure to object to the prosecution's closing argument, this claim is exhausted, and the TCCA's conclusion that Daniel failed to meet his burden under *Strickland* is entitled to deference by this Court. *See Ex parte Daniel*, 2017 WL 4675772, at *1 (ECF No. 4-96 at 3). However, Daniel now alleges thirteen new instances of IATC for failure to object to closing arguments made to "inflam[e] the passions of the jury" and "inject arbitrary and unconstitutional sentencing factors into the jury's deliberations." Am. Pet. at 170-73 (ECF No. 18 at 181-84). He should be foreclosed from doing so pursuant to *Pinholster,* which holds that federal habeas review of an issue is limited to the record that was before the state court that adjudicated the claim on the merits. 563 U.S. at 180-81.

Daniel's case is similar to *Robertson v. Davis,* where the petitioner raised a false-testimony claim in state court citing five instances of testimony from one witness's entire testimony. 715 F. App'x 387, 389 (5th Cir. 2017), *vacated and remanded on other grounds,* 729 F. App'x 361 (5th Cir. 2018). In his federal habeas petition, the petitioner cited two additional concerns regarding the witness's

testimony, which the district court determined, pursuant to § 2254(d), it could not consider because the new evidence and arguments were not submitted to the TCCA on appeal. 715 F. App'x at 389-90; *see Pinholster,* 563 U.S. at 186 ("Provisions like §§ 2254(d)(1) and (e)(2) ensure that federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." (internal quotations and alterations omitted)). The Fifth Circuit denied COA, agreeing with the district court's application of *Pinholster* to bar the new claims. *Robertson*, 715 F. App'x at 392-93.

Like the false-testimony claims in *Robertson, Pinholster* should also bar Daniel's additional IATC claims. State habeas counsel challenged trial counsel's failure to object to fifteen instances of the prosecution's closing arguments. SHCR-01 at 654-66 (ECF No. 4-82 at 156-68). In federal habeas, Daniel reasserts the same fifteen instances, albeit by arguing it as more a claim of prosecutorial misconduct.[32] Am. Pet. at 164-70 (ECF No. 18 at 175-81). He then includes thirteen new instances of IATC for failure to object to arguments made to "inflame[e] the passions of the jury" and "inject arbitrary and unconstitutional sentencing factors into the jury's deliberations." *Id.* at 170-73 (ECF No. 18 at 181-84). But because a claim challenging counsel's failure to object to the state's closing arguments was adjudicated by the

---

[32]    For example, Daniel argues "the relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Am. Pet. at 165-66 (quoting *Darden*, 477 U.S. at 181) (ECF No. 18 at 176-77). To the contrary, Daniel's claim is an IATC claim and the relevant question for this Court under § 2254(d) is whether "the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S. at 101.

state court, *see Ex parte Daniel*, 2017 WL 4675772, at *1 (ECF No. 4-96 at 3), AEDPA deference is owed to the state court determination that counsel was not ineffective. Daniel should not be able to escape AEDPA deference by reconfiguring his claim with "new" evidence and argument, based upon the same record.[33]

### 2. The TCCA's denial of relief on the merits of the IATC claim was a reasonable application of *Strickland*.

Daniel argues that his attorneys were ineffective for failing to object to the prosecutor's improper closing argument that (1) Daniel's attorneys were not trustworthy and had fabricated evidence, (2) instructed the jurors to base their verdict on the community's alleged desire for a death sentence, and (3) compared the value of Officer Padron's life to that of Daniel's. Am. Pet. at 164-70 (ECF No. 18 at 175-81). To succeed on his IATC claim in state court, Daniel needed to demonstrate that counsel's failure to object constituted deficient performance and that his defense was prejudiced as a result. *Strickland*, 466 U.S. at 687, 694. In this context, prejudice meant showing that "an objection would have had a reasonable likelihood of achieving a different outcome at the punishment phase of trial." *Vasquez v. Thaler*, 505 F. App'x 319, 330 (5th Cir. 2013) (unpublished). The TCCA reasonably denied Daniel's IATC claim after holding that he failed to make both showings. *Ex parte Daniel*, 2017 WL 4675772, at *1 (ECF No. 4-96 at 3).

---

[33] Because of page limitations, the Director does not address the merits of Daniel's thirteen new instances of IATC. Am. Pet. at 170-73 (ECF No. 18 at 181-84). If the Court determines that the examples should be considered on the merits, the Director respectfully requests the chance to provide supplemental briefing.

a. **Daniel failed to show counsel were ineffective for not objecting to arguments allegedly attacking their credibility.**

Daniel initially alleges the prosecution struck at him over the shoulder of counsel by arguing that defense counsel were not trustworthy and had fabricated evidence. Am. Pet. at 164-66 (ECF No. 18 at 175-77). He cites to the seven excerpts from the prosecution's closing argument. *See id.*, citing 26 RR 179, 180, 188, 197, 210, 210-11, 213 (ECF No. 4-39 at 179, 180, 188, 197, 210, 210-11, 213). The record reveals that in context, the jury arguments were proper and did not merit an objection.

First, trial counsel's failure to object to the prosecutor's argument, "So it appears that even at this late stage we have failed to convince the defense attorneys that their client should be appropriately punished," 26 RR 179-80 (ECF No. 4-39 at 179), was not deficient representation. The argument was made directly in response to defense counsel's argument that "the future dangerousness question, it's fairly easy, no, he's not a future danger." *Id*. Proper jury argument includes a response to the argument of opposing counsel. *Freeman*, 340 S.W.3d at 727. Because any objection to the prosecutor's argument would not have been sustained, Daniel cannot demonstrate that trial counsel's omission constituted deficient performance. *See Ries v. Quarterman,* 522 F.3d 517, 530-31 (5th Cir. 2008) ("In order to show that counsel was deficient for failing to object under the first prong of *Strickland*, the objection must have merit.") (citing *Turner v. Quarterman*, 481 F.3d 292, 298 (5th Cir. 2007)).

Second, Daniel's attorneys did not perform deficiently by failing to object to the prosecutor's argument, "I know for the defense attorneys making a decision on the

future danger issues is really easy. Just say no, send their client to prison where with his lack of impulse control he will do whatever he wants to, according to their experts. So that's an easy answer for them because it serves their interest." 26 RR 180 (ECF No. 4-39 at 180). As with the preceding example, the prosecutor's argument was made in response to opposing counsel's argument that "the future dangerousness question, it's fairly easy, no, he's not a future danger." *Id*.; *Freeman*, 340 S.W.3d at 727. Daniel cannot demonstrate that counsel's failure to raise a meritless objection constitutes deficient performance. *See Ries,* 522 F.3d at 530-31 (citing *Turner*, 481 F.3d at 298).

Third, trial counsel did not perform deficiently by failing to object to the prosecutor's argument, "Remember all that stuff they told you about Xanax and there was brain damage and all that other stuff? They believe all the crazy stuff he says about falling at 18 months and bumping his head, but they don't believe him when he says, I knew what I was doing." 26 RR 188 (ECF No. 4-39 at 188). Initially, the prosecutor's argument was a reasonable summation of the evidence. On cross-examination of Dr. Thomas Walter Harrell, the defense expert was asked about his conclusion that Daniel has frontal lobe damage. 25 RR 83-84 (ECF No. 4-38 at 83-84). Dr. Harrell testified that his opinion was based in part on Daniel's "prior concussions" including Daniel's self-reporting that he fell in the bathtub when he was 18 to 24 months old and had a concussion, which the expert accepted as true without confirmation. *Id*. at 84-86, 93 (ECF No. 4-38 at 84-86, 93). Given the unlikelihood that Daniel would independently remember what happened to him at such a young age, the prosecutor's argument was not improper in light of the record as a whole. *See*

*Coble*, 871 S.W.2d at 205 (prosecutor's jury remark that defense counsel was arguing "something ridiculous" was not improper in light of the record). The prosecutor's argument was also proper because it was a response to defense counsel's argument, that "[Daniel] reported other significant concussions." 26 RR 151-52 (ECF No. 4-38 at 151-52). Further, the prosecutor's argument that defense counsel "don't believe [Daniel] when he says, I knew what I was doing," *Id.* at 188 (ECF No. 4-39 at 188), was a response to the defense's theory that Daniel's statements about knowing that Jaime Padron was a police officer when he shot and killed him should not be believed as a result of his Xanax intoxication and other factors. *See id.* at 158-63 (ECF No. 4-38 at 158-63). Counsel's failure to raise a meritless objection does not prove deficient performance. *See Ries,* 522 F.3d at 530-31 (citing *Turner*, 481 F.3d at 298).

Fourth, trial counsel's failure to object to the prosecutor's jury argument, "Let's talk about what the defense attorneys knew versus what the defendant told them. You know why they are so focused on proving that [Daniel] didn't know Jaime Padron before the night he killed Jaime Padron? Because it makes [Daniel] look bad," 26 RR 197 (ECF No. 4-39 at 197), was not deficient representation. While Daniel was being transported to APD after the shooting, the in-car video recorded Daniel asking the officers if they were pissed that he had capped one of their friends, then Daniel said that if it was any consolation, he had met him [Padron] before, called him a "dip shit' and said he was glad the officer was dead. *See* 21 RR 71-72 (ECF No. 4-34 at 71-72), referring to SX-15 (DVD, Knop In-car video at 3:55:03). The prosecutor's argument was both a summation of the evidence and a reasonable deduction from the evidence

presented during trial. *Freeman*, 340 S.W.3d at 727.Because it was not improper, trial counsel's decision not to object was not deficient.

Fifth, Daniel's attorneys did not perform deficiently by failing to object to the prosecutor's argument, "They don't want to—they have been telling you that he didn't know [Officer Padron was a police officer], he didn't know it. And he told them, I knew it, I knew it. Why don't they believe that? They believe all the craziness about the brain damage and all the other crazy stuff... They don't want to admit that to you, do they?" Am. Pet. at 165 (ECF No. 18 at 176), citing 26 RR 210-11 (ECF No. 4-39 at 210-11). Before the last sentence, Daniel omits the prosecutor's argument, "So, yeah, he did know that officer." 26 RR 211 (ECF No. 4-39 at 211). For the same reasons cited in Daniel's third example addressed above, the prosecutor's argument here was made in response to the continuing defensive theory of this case that Daniel's statements about knowing Officer Padron was a police officer when he shot and killed him should not be believed as a result of his Xanax intoxication and other factors. *See id*. at 158-63 (ECF No. 4-38 at 158-63).

Sixth, trial counsel's failure to object to the prosecutor's argument that "all that stuff [the defense attorneys] have made up is not sufficient mitigation," 26 RR 213 (ECF No. 4-39 at 213), was not deficient. During the defense's case in surrebuttal, Jenna Feland testified that she received a letter from Daniel postmarked April 20, 2012 (DX-18) in which he wrote that he was "unbelievably remorseful." *Id*. at 78, 81, 86. (ECF No. 4-39 at 78, 81, 86). The prosecutor's cross-examination questioned whether the letter really had come from Daniel since it was not photocopied by the

staff at the jail and elicited that Feland gave the letter to Daniel's attorneys after watching a live streaming broadcast in which she heard people say Daniel was remorseless. *See id.* at 92-94 (ECF No. 4-39 at 92-94, 101-03). Defense counsel argued that "the government is going to argue . . . [e]ither it's a made-up letter somehow or it's simply there to somehow manipulate the jury." *Id.* at 165 (ECF No. 4-39 at 165). The prosecutor's use of the phrase "made up" appears to be both a response to the argument of trial counsel and a reasonable deduction from the evidence. *See Freeman*, 340 S.W. 3d at 727. Again, counsel does not perform deficiently for failing to raise a meritless objection. *See Ries,* 522 F.3d at 530-31 (citing *Turner*, 481 F.3d at 298).

Finally, Daniel argues that trial counsel lodged an objection to an "over the shoulder strike on counsel," but performed deficiently by not obtaining a ruling. Am. Pet. at 166 (ECF No. 18 at 177). The record reflects the following:

> MR. COBB: [Daniel] says, well, if there's any consolation, I met him before. They don't want you to believe that he knew this officer. But their client is telling them, if they will just listen, just like he has been telling them all along, I knew it was a police officer, I tried to kill the police officer—

> MR. HUNT: Your Honor, I object to the prosecutor striking at the defendant over the shoulders of defense counsel. That's exactly—this type of argument is inappropriate.

> MR. COBB: It is not. That's exactly how the evidence showed.

> THE COURT: Five minutes.

26 RR 210 (ECF NO. 4-39 at 210). Trial counsel did not perform deficiently by failing to secure a ruling because counsel's objection was lodged for a different purpose. As lead defense trial counsel Russell Hunt attested:

> I felt that the state's argument that led to my "striking over the shoulders" objection was heading toward being objectionable. Additionally, I recall that the prosecutor was physically approaching the defense table. My objection was designed to deter the State's argument from becoming objectionable, and by standing to make the objection to the court, to physically back the prosecutor away from the Defense table, myself, and the Defendant.

SHCR-01 at 1066 (ECF No. 4-86 at 68). Lodging an objection served counsel's intended purposes irrespective of whether the court issued a ruling. Reviewing courts are not to second-guess counsel's strategic decision through the distorting lens of hindsight but instead are to employ a strong presumption that the conduct falls within a wide range of reasonable assistance. *Strickland*, 466 U.S. at 689. In any event, the prosecutor's argument that defense counsel did not want the jury to believe that Daniel knew Officer Padron was a police officer even though Daniel kept saying that he did was a proper summation of the evidence, as well as a response to the argument of opposing counsel. *See Freeman*, 340 S.W.3d at 727.

### b. Daniel failed to show counsel were ineffective for not objecting to arguments allegedly urging a verdict based on community demands.

Next, Daniel contends the State instructed the jurors to base their verdict on the community's alleged desire for a death sentence. Am. Pet. at 167-68 (ECF No. 18 at 178-79). He asserts that he was prejudiced because the prosecution's closing arguments led the jury to consider unconstitutional factors in deciding to sentence him to death. *Id.* at 167 (ECF No. 18 at 178). These allegations do not entitle Daniel to habeas corpus relief, as the state court reasonably concluded.

The state court found that defense counsel, in their professional judgment

during trial, determined that the State's jury arguments were not improper. SHCR-01 at 1818 (ECF No. 4-89 at 121). Daniel's attorneys gave affidavits explaining that they did not object because the State did not argue the community's desire for a death sentence but instead argued the community was paying attention to the case, and counsel did not feel this was an objectionable argument. *Id.* at 1066 (ECF No. 4-86 at 68); *id.* at 1541 (ECF No. 4-88 at 43). "A decision not to object to a closing argument is a matter of trial strategy." *Drew*, 964 F.2d at 423. A reviewing court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance and, under the circumstances, that the challenged action might be considered sound trial strategy. *Strickland*, 466 U.S. at 689. Daniel failed to overcome that presumption in state court, so this Court should deny habeas relief.

Daniel initially asserts that the State suggested that the community of police officers favored a sentence of death and were counting on the jury to deliver a death sentence when the prosecutor argued, "[d]on't you know that this room could be filled to overflowing with police officers if we wanted to try to intimidate you in some way." Am. Pet. at 167 (ECF No. 18 at 178), citing 26 RR 192 (ECF No. 4-39 at 192). Daniel has taken the State's argument out of context. The State first reminded the jurors that they promised to "follow the law and the evidence" and "not let emotions affect [them]." 26 RR 192 (ECF No. 4-39 at 192). The State further argued that the jury should not let persons in the courtroom affect them in reaching their decision:

> You notice there were few police officers in the room? Don't you know that this room could be filled to overflowing with police officers if we wanted to try to intimidate you in some way. We're not going to do that. What we're going to ask is that you do what you promised to do, which

is follow the law and the evidence in this case. You all agreed and you took an oath that you would do that. Now if you do that, you're going to vote I such a way that the death penalty will be imposed on this defendant.

*Id*. at 192-93 (ECF No. 4-39 at 192-93). Therefore, the prosecutor's argument was proper and defense counsel could not have rendered ineffective assistance by failing to object to a proper argument. Failure to make frivolous objections does not cause counsel's performance to fall below an objective standard of reasonableness. *See Green*, 160 F.3d at 1037.

Daniel additionally complains that the prosecutor continued with a theme of community support for the death penalty, arguing:

> Think about what you are going to say about your burden. Because you see how many people have been in this courtroom. You know the community has a great deal of interest in what's going to happen with this case. It's not just police officers who are interested. It's people who are in the stores who are interested, people all around who are interested. . . . You have to say yes to the future danger issue. [Not] only is there not sufficient mitigating circumstance, there's not really mitigating circumstance. . . . This is about doing what's right for our community.

Am. Pet. at 167 (ECF No. 18 at 178), citing 26 RR 207-09 (ECF No. 4-39 at 207-09). Once again, Daniel has taken the argument out of context. When the two-plus pages of argument is considered as a whole, it demonstrates that the prosecutor reminded the jury that they are the "voices of the community" and of the proper verdict in this case. 26 RR 207 (ECF No. 4-39 at 207). The prosecutor argued for imposition of the death penalty based on the evidence in this case and to send a message to the community what "the price [is] if someone decides to kill a police officer." *Id*. at 208-09 (ECF No. 4-39 at 208-09). The State's punishment argument constituted proper

pleas for law enforcement based on reasonable deductions and summaries of the evidence at trial. *Martinez v. State*, 17 S.W.3d 677, 692 (Tex. Crim. App. 2000). Counsel could not have rendered ineffective assistance by failing to object to a proper argument, or by failing to make frivolous objections. *See Green*, 160 F.3d at 1037.

### c. Daniel failed to show counsel were ineffective for not objecting to arguments allegedly comparing the value of lives.

Finally, Daniel asserts that his attorneys provided ineffective assistance by failing to object to the State's jury argument that compared the value of Officer Padron's life to his. Am. Pet. at 168-70 (ECF No. 18 at 179-81). He cites to the seven arguments from the prosecution's closing argument. *Id.*, citing 26 RR 180-89, 213 (ECF No. 4-39 at 180-89, 213). These allegations do not entitle Daniel to relief.

The record reflects that the prosecution did make a brief argument comparing the value of the two lives and that Daniel's trial counsel did not object. 26 RR 180-82 (ECF No. 4-38 at 180-82). Lead defense trial counsel Russel Hunt gave an affidavit on state habeas explaining the reasons why no objection was made:

> The state's argument about the value of the two lives was a brief portion of their argument, not greatly emphasized. If the state had tried to further develop this argument I would likely have objected, but not objecting to this one minor mention of the state's argument would only have served to highlight the argument in the jurors' minds.

SHCR-01 at 1066 (ECF No. 4-86 at 68). The state court found that "[a]s a matter of strategy, defense counsel determined not to object to the State's argument about the value of [Daniel's] life and Jaime Padron's life so as not to draw attention to that brief portion of the State's argument." SHCR-01 at 1820 (ECF No. 4-89 at 122). That

factual finding is entitled to a presumption of correctness under § 2254(e)(1). "A decision not to object during a closing argument is a matter of trial strategy." *Drew*, 964 F.2d at 423. A reviewing court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance and, under the circumstances, that the challenged action might be considered sound trial strategy. *Strickland*, 466 U.S. at 689. Daniel failed to overcome that presumption in state court, so his initial claim fails.

Trial counsel did not perform deficiently by failing to object to the prosecutor's arguments describing that Daniel wanted to rob a convenience store, assaulted and threatened girls, sucker punched a boy in school, did drugs, carried a gun with two clips of ammunition to the Walmart for the purpose of confronting a police officer, and was never remorseful about killing Officer Padron. 26 RR 183-89 (ECF No. 4-39 at 183-89). Daniel contends the prosecutor's arguments "continued its juxtaposition of the two men," but he is mistaken. Am. Pet. at 169 (ECF No. 18 at 180). The State's argument was both a proper summation of the evidence supporting an affirmative finding on the future dangerousness special issue and reasonable deduction from the evidence. *Freeman*, 340 S.W. 3d at 727. The State's arguments were in response to the argument of opposing counsel, that "Mr. Cobb told you you could rely on past behavior to predict the future. He told you that. What have they shown you about [Daniel's] past behavior that would lead you to believe that? Not a thing." 26 RR 144 (ECF No. 4-39 at 144). Because the State's arguments were proper, *Freeman*, 340 S.W. 3d at 727, counsel did not provide deficient representation in failing to object.

Further, trial counsel did not perform deficiently by failing to object to the prosecutor's argument, "So when we talk about getting balance back into our community, that's what we are talking about. Look at what we have lost. Look at what [Daniel] has cost us and now he plans to profit from that." 26 RR 189 (ECF No. 18 at 189). Daniel asserts that prosecutor's argument "explicitly spelled out that he was asking the jurors to balance Mr. Daniel's life against Officer Padron's." Am. Pet. at 169 (ECF No. 18 at 130). The prosecutor's argument was not about balancing the value of lives, but about "getting balance back into our community," 26 RR 189 (ECF No. 4-39 at 189), which constitutes a proper plea for law enforcement. *See Freeman*, 340 S.W. 3d at 727. The prosecutor's argument, "Look at what we have lost. Look at what [Daniel] has cost us," is also a plea for law enforcement. 26 RR 189 (ECF No. 4-39 at 189). And the prosecutor's argument that Daniel "plans to profit from that [crime]," *id.*, is a proper summation of evidence from trial showing that Daniel talked about being at the top of the pecking order when he goes to prison, he discussed selling his story for $100,000, and was interested in "murderabilia" and selling his artwork to profit from murdering a police officer. *See id.* at 188-89.[34] Because the State's arguments were proper, *Freeman*, 340 S.W. 3d at 727, defense counsel did not provide deficient representation in failing to lodge a meritless objection.

---

[34]     As the TCCA summarized in its opinion on direct appeal: "Detective Fugitt testified that Daniel conversed with his mother about 'murderabilia' and selling his artwork in jail. He told his mother that 'as far as the prison pecking order goes in relation to crimes committed, I think I may be at the top.' In a jail visit with Feland, he discussed selling his story for one hundred thousand dollars. He also wrote a letter to Feland in which he stated, 'Just living the dream, I'm retired at 25.'" *Daniel*, 485 S.W.3d at 31 (ECF No. 4-71 at 12).

Further, when the prosecutor argued, "[T]he way you answer those questions will answer a third question for all of our community[,] which is, in these circumstances, for a person who has lived the kind of life he's lived . . . everybody will know whether you think Officer Jaime Padron's life is worth the same as this man's," defense counsel objected that the prosecutor was arguing "that one life is worth more than another." 26 RR 213-14 (ECF No. 4-89 at 213-14). Daniel argues that counsel performed deficiently by failing to seek a ruling or asking that the improper argument be struck. Am. Pet at 169 (ECF No. 18 at 180). Counsel was not ineffective for failing to do so in this case. The State noted in its jury argument, in response to defense counsel's objection, that it was not arguing that one life was more valuable than another. 26 RR 214 (ECF No. 4-39 at 214). As the prosecutor stated, "I'm making the opposite argument. Let's be clear, no life is worth more than another." *Id.* The prosecutor's argument effectively eliminated the need to obtain a ruling.

Finally, trial counsel did not perform deficiently by failing to object to the prosecutor's argument, "And if that is what passes for justice in this community, we should tear the flag down, we should blow up the courthouse because that is wrong." 26 RR 214 (ECF No. 4-39 at 214). Considered in context, the prosecutor's argument was not objectionable. In its entirety, the prosecutor argued:

> But once you make the decision to take a life, you don't get to decide if it is best that you continue living. And every day that you allow him to live and we have to pay for it and Jaime Padron's daughters have to pay for it and the other police officers and other citizens and all of those who care in this community have to pay for [Daniel] to not work and live the dream and be retired at 25, that's a shame. And if that is what passes for justice in this community, we should tear the flag down, we should blow up the courthouse because that is wrong

*Id*. The prosecutor made a proper plea for law enforcement based on the fact that Daniel had taken the life of Officer Padron. *Freeman*, 340 S.W.3d at 727. The prosecutor's arguments about the community having "to pay for [Daniel] to not work and live the dream and be retired at 25," were a proper summation of the evidence at trial. *See* note 36 *supra*.

### d.    Daniel failed to prove *Strickland* prejudice.

In state court, in addition to proving deficient performance, Daniel needed to also satisfy *Strickland*'s prejudice prong by showing "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In this context, it means showing there is reasonable probability that the outcome at punishment would have been different if counsel had made the proposed objections to the prosecutor's closing argument. He cannot make that showing.

Since the State's jury arguments were not improper, Daniel cannot show that he was prejudiced by counsel's failure to raise ultimately meritless objections. Yet even if any of the complained-of closing arguments had a sound basis for objection and counsel's strategic decision for not doing so was objectively unreasonable, Daniel still fails to show prejudice. Daniel's jury was instructed at the guilt phase that "it is only from the witness stand that the jury is permitted to receive evidence regarding the case, or any witness therein," 1 CR 182 (ECF No. 4-1 at 182), and there is no reason to believe they disregarded that instruction. *Weeks*, 528 U.S. at 234 ("A jury is presumed to follow its instructions."). Consequently, Daniel cannot show that he

was prejudiced by the lack of an objection to the prosecutor's closing argument.

Daniel also fails to demonstrate that given the facts of the crime and State's case overwhelming evidence against him,[35] an objection would have a reasonable likelihood of achieving a different outcome at the punishment phase. *See Strickland*, 466 U.S. at 694; *see Richter*, 562 U.S. at 112 (The "likelihood of a different result must be substantial, not just conceivable."). Because the TCCA reasonably concluded that Daniel failed to show both deficient performance and prejudice, the state-court adjudication is entitled to AEDPA deference on federal habeas review.

## XIV. Daniel is Not Entitled to Habeas Corpus Relief on His Claims of False Testimony and Ineffective Assistance of Trial Counsel.

Daniel argues that his rights to due process and to be free from cruel and unusual punishment were violated when the State obtained a death sentence through the knowing use of false testimony, and that trial counsel were ineffective for failing to investigate and present evidence to rebut the State's false evidence. Am. Pet. at 175 (ECF No. 18 at 186). More specifically, he contends the State knowingly presented false testimony about (1) security precautions in prison, (2) the reasons why he was writing down names of correctional officers, and (3) that he had an escape plan. *Id.* at 176-81, 184-87 (ECF 18 at 187-92, 195-98). He also asserts that trial counsel were ineffective for failing to retain an expert on prison classification and failing to explain to the jury why Daniel was writing down the names of correctional officers. *Id.* at 181-84, 185-86 (ECF 18 at 192-95, 196-97). Daniel raised his claims of

---

[35]     *See* Statement of the Case, Part I.B.1., *supra.*

false testimony and IATC as separate grounds for state habeas relief.[36] This Court should deny habeas corpus relief because Daniel's false testimony claims are defaulted and meritless, and his IATC claims were denied on the merits in a state-court adjudication that is entitled to AEDPA deference.

## A. Daniel's Eighth Amendment claim of false testimony is unexhausted and defaulted.

As Claim Three in his initial state habeas application, Daniel asserted that his "due process rights were violated when the State obtained a death sentence through the knowing use of false evidence." SHCR-01 at 247 (ECF No. 4-83 at 20). He did not allege any violation of his Eighth Amendment rights as he does now in this Court. *Compare id.* at 247-64 (ECF No. 4-83 at 20-37) *with* Am. Pet. at 175, 192-96 (ECF No. 18 at 186, 203-07).

Daniel's Eighth Amendment claim is unexhausted and federal habeas relief may not be granted on unexhausted claims. 28 U.S.C. § 2254(b)(1)(A). Because Daniel would be cited for abuse of the writ if he tried to raise this claim in a successive habeas petition, Tex. Code Crim. Proc. art. 11.071, § 5(a), it is procedurally barred. *Beazley,* 242 F.3d at 264. Daniel argues that he can prove cause and prejudice to overcome any default from the TCCA finding his *Napue*[37] claim barred. Am. Pet. at 192 (ECF No 18 at 203). The argument does not apply to the instant claim because it is unexhausted

---

[36] The false testimony allegations were Claim Three in Daniel's state habeas application, SHCR-01 at 686-703 (ECF No. 4-83 at 20-37), while the IATC claims were Claims One (J) and One (K). *Id.* at 671-76 (ECF No. 4-83 at 5-11).

[37] *Napue v. Illinois*, 360 U.S. 264 (1959)

and not part of the state-court procedural bar ruling. As a result, Daniel's Eighth Amendment claim is defaulted on federal habeas review.

## B. Daniel's due process claim of false testimony is *Gardner*-barred and alternatively without merit.

Daniel applied for state habeas relief on a claim alleging that his due process rights were violated by the State's knowing use of false testimony regarding security precautions in prison, his writing down names of correctional officers, and his having an escape plan. SHCR-01 at 247-64 (ECF No. 4-83 at 20-37). The habeas trial court found that Daniel's claim was procedurally defaulted and meritless. SHCR-01 at 1827-29 (ECF No. 4-89 at 129-31). The TCCA held that Daniel's claim is "procedurally barred" and denied relief based on the trial court's findings and conclusions and on the TCCA's own review. *Ex parte Daniel*, 2017 WL 4675772, at *1, *3 (ECF No. 4-96 at 2-3, 6). This Court should deny habeas corpus relief because Daniel's false testimony claim is *Gardner*-barred and meritless in the alternative.

### 1. Daniel's false-testimony claim is *Gardner*-barred.

The TCCA held that Daniel's claim of false testimony is "procedurally barred because habeas is not a substitute for matters which should have been raised at trial or on direct appeal." *Ex parte Daniel*, 2017 WL 4675772, at *1 (ECF No. 4-96 at 2-3) (citing *De La Cruz*, 466 S.W.3d at 864, and *Townsend*, 137 S.W.3d at 81)). Texas law has long held that record-based claims not raised on direct appeal will not be considered on state habeas. *Gardner*, 959 S.W.2d at 199. The *Gardner* rule "sets forth an adequate state ground capable of barring federal habeas review." *Dorsey*, 494 F.3d at 532 (citing *Busby*, 359 F.3d at 719, and cases cited therein); *Halprin*, 911 F.3d at

259 (citing *Busby*). Just as Daniel defaulted his federal habeas claim regarding funding, he likewise defaults his false testimony claim because it too is *Gardner*-barred. *See* Argument, Part IV, *supra*.

Daniel argues that he can demonstrate cause and prejudice to excuse any default by demonstrating that the claimed falsehoods were material. Am. Pet. at 192 (ECF No. 18 at 203). For this proposal, he relies on the Supreme Court's comment that the cause and prejudice components of procedural default parallel the suppression and materiality components of an alleged *Brady* violation. *Id.* (quoting *Banks*, 540 U.S. at 691 (citing *Strickler v. Green*, 527 U.S. 263, 281 (1999)). He further asserts that even if the responsibility for the default rests with counsel, then his related IATC claims should satisfy the cause and prejudice standard. Am. Pet. at 192 (ECF No. 18 at 203).

His arguments do not suffice to overcome the *Gardner* bar. Daniel fails to show that a finding of cause and prejudice under *Banks* would excuse the default of his false evidence claim under *Napue*. Those claims are legally distinct and have different elements. Regardless, it is obvious there was no prejudice from whatever factors prompted the default because the underlying false testimony claims have no merit, as argued in the alternative below. Daniel's assertion that ineffective assistance of trial counsel will also serve to excuse the default is mistaken. Even though he raised the related IATC claims in his state habeas application, that does not alter the fact that his claims of allegedly false testimony were *Gardner*-barred *because* the claims were not raised at trial or on direct appeal. Arguing ineffective assistance only affirms

the correctness of the procedural bar ruling.

### 2. Procedural bar notwithstanding, Daniel's false testimony claim fails on the merits.

In addition to finding Daniel's false-testimony claim defaulted, the habeas trial court recommended denying relief on the merits. SHCR-01 at 1828-29 (ECF No. 4-89 at 130-31). In doing so, the habeas court concluded that the State did not use material false evidence to procure Daniel's conviction or sentence, that Daniel failed in his burden to show the State knowingly used false evidence at trial in the testimony of Stephen Rogers, Louis Escalante, or in regard to notes of correctional officers' names, and that Daniel failed to prove by a preponderance of the evidence that false evidence was material to the verdicts. *Id.* Although the TCCA found Daniel's claim to be procedurally barred, it denied habeas relief based on the findings and conclusions and on its own review. *Ex parte Daniel*, 2017 WL 4675772, at *1, *3 (ECF No. 4-96 at 2-3, 6). To the extent the state-court adjudication includes an alternative denial on the merits, it is entitled to AEDPA deference and Daniel fails to show otherwise.

A criminal defendant is denied due process when the state knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected. *Giglio v. United States*, 405 U.S. 150, 153-54 (1972); *Napue*, 360 U.S. at 269-70. To obtain relief, Daniel must show "[1] the testimony was actually false, [2] the state knew it was false, and [3] the testimony was material." *Canales v. Stephens*, 765 F.3d 551, 573 (5th Cir. 2014). "Testimony is material if 'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Id.* (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976), citing *Giglio*, 405 U.S. at 1540).

Daniel alleges the State obtained his death sentence through the knowing use of false testimony about (1) security precautions in prison, (2) the reasons why he was writing down names of correctional officers, and (3) that he had an escape planned. Am. Pet. at 176-81, 184-87 (ECF 18 at 187-92, 195-98). The State did not use material, false evidence to procure Daniel's conviction or sentence, and the state court was not unreasonable in so concluding. SHCR-01 at 1828 (ECF No. 4-89 at 130). The examples of allegedly false testimony cited by Daniel are neither actually false nor misleading when the testimony is considered as a whole and not taken out of context. Consequently, Daniel cannot demonstrate the State knew testimony was false and that any false testimony likely affected the jury's verdict. *Agurs*, 427 U.S. at 103.

### a. The State did not present false testimony regarding the prison system. (Daniel's claim 14B).

Daniel maintains that Stephen Rogers, a retired warden and former member of the State Classification Committee, presented false testimony regarding security precautions in prison. Am. Pet. at 176-81 (ECF No. 18 at 187-92). The record in this case fully supports the state court's conclusion that Daniel failed in his burden to show that the State knowingly used false evidence at trial in the testimony of Rogers. SHCR-01 at 1828 (ECF No. 4-89 at 130).

### (1) No false testimony was presented regarding which offenders are serving life without parole sentences.

First, Daniel contends Rogers incorrectly testified that correctional officers are unaware of which offenders have life sentences without parole. Am. Pet. at 177 (ECF No. 18 at 188). He cites to testimony at 23 RR 136-37 (ECF No. 4-36 at 136-37). When

the cited passage is viewed in context, it does not support a claim of false testimony.

In his testimony, Rogers correctly testified that an inmate serving life without parole (LWOP) is assigned to "G3" custody, meaning general population level 3. 23 RR 123 (ECF No. 4-36 at 123). He then noted that LWOP inmates basically have the same contact with everybody else in the prison system that the general population has contact with, including volunteers, chaplains, guards, librarians, kitchen staff, and medical staff. *Id.* at 135-36 (ECF No. 4-36 at 135-36). By way of example, Rogers testified that when an LWOP goes to chow, he is not handcuffed and is with other inmates as they walk the hallway to go eat. *Id.* at 136 (ECF No. 4-36 at 136). It was in this regard that Roger testified a guard would not know an inmate was incarcerated for LWOP. *Id.* Rogers noted that offenders all wear white with no designation on their uniforms of their crime or status. *Id.*[38] He added there is nothing written on the offender to delineate LWOP. *Id.* at 137 (ECF No. 4-36 at 137).

Daniel argues that Roger's testimony was false because TDCJ Administrative Directives describe the mandatory process of recording which inmates are serving LWOP sentences, including using the code "Security Precaution Designation" that is included in prison records as "SDS LWOP." Am. Pet. at 178 (ECF No. 18 at 189). Rogers was not addressing inmate records or other prison documents that may indicate an inmate's status. As set forth above, his testimony addressed routine visual contact within the general prison population. Daniel cannot establish that his due

---

[38]     Specifically, Rogers testified, "There's no sign on the offender. There's no public announcement that hey, this guy is a . . . credit card abuser, this guy is a killer." 23 RR 136 (ECF No. 4-36 at 136).

process rights were violated because Roger's testimony was neither false nor misleading when viewed in context.

> **(2)** **No false testimony was presented regarding the restrictions placed on offenders serving LWOP sentences.**

Daniel next asserts that Rogers presented false or misleading testimony by underrepresenting the restrictions that are placed on G3/LWOP inmates in TDCJ. Am. Pet. at 178 (ECF No. 18 at 189). He supports his claim with an affidavit from Frank AuBuchon, the former head of Classification at TDCJ, App. 1198-1207 (ECF No. 7-5 at 182-91), to highlight that additional restrictions exist concerning housing assignments, job assignments, contact visits, and supervision that were allegedly not included in Roger's testimony. Am. Pet. at 179-80 (ECF No. 18 at 190-91).

At its crux, this is not a claim of false testimony, but rather a complaint that Rogers did not provide an exhaustive accounting of all possible restrictions available to TDCJ in handling G3/LWOP inmates. When Rogers's testimony is considered in context and taken as a whole, it did not leave the jury with a false impression about the Texas prison system. *See Alcorta v. Texas*, 355 U.S. 28, 31 (1957) (evidence is false if, taken as a while, it leaves the jury with a "false impression").

The record demonstrates that Rogers explained that inmates are classified according to certain criteria in a custody or housing area. 23 RR 129 (ECF No. 4-36 at 129). The custody designation is related to the level of supervision to which an inmate is subjected and, in turn, the level of supervision determines the privileges an inmate could receive. *Id.* at 129-30 (ECF No. 4-36 at 129-30). The classification ranks

for the general population are G1 to G5. *Id.* at 165 (ECF No. 4-36 at 165). Rogers testified that G2 was minimum custody, that G5 was for "constant troublemaker[s]" and more restrictive, and administrative segregation was the most restrictive custody. *Id.* at 130 (ECF No. 4-36 at 130). He explained that a person serving LWOP could never get a lower classification than a G3, i.e., he could never be a G1 or G2. *Id.* at 165 (ECF No. 4-36 at 165). In explaining the state classification system, Rogers testified about an offender with trustee status. *Id.* at 126 (ECF No. 4-36 at 126). Rogers explained that such an inmate walks around the prison and works outside the prison without an armed guard. *Id.* The testimony, as a whole, informed the jury that a G3/LWOP inmate is subject to greater supervision than G2 or G1 inmates.

Additionally, on direct and cross-examination, Rogers further compared restrictions imposed on the G2 and G3 offenders, including those on a G3 inmate's ability to move about the prison. He noted that a G3 offender cannot work near the outer fence or live in a dormitory outside the main prison like a G2 offender. 23 RR 135, 166 (ECF No. 4-36 at 135, 166). The least restrictive housing for a G3 inmate was an inside dorm. *Id.* at 166-67 (ECF No. 4-36 at 166-67). Rogers also noted that the G3 offender cannot work in areas where he has free and frequent access to the building or the outer fence. *Id.* at 135, 166 (ECF No. 4-36 at 135, 136). Rogers discussed the various industries in prison and stated that LWOP inmates could take vocational classes and work in the furniture shop. *Id.* at 156 (ECF No. 4-36 at 156). As an example of a limitation, Rogers noted that a LWOP inmate could not work in the maintenance department because if its location near the fence. *Id.* at 155, 166

(ECF No. 4-36 at 155, 166). A G3 inmate also could not drive semi-trucks, as G1 were allowed. *Id.* at 179, 188 (ECF No. 4-36 at 179, 188). Rogers testified that the warden could institute further restrictions on where a LWOP inmate could work. *Id.* at 156 (ECF No. 4-36 at 156).

The record demonstrates that when Rogers's testimony is considered in its entirety, it is neither false nor did it create a false impression by omitting or glossing over pertinent facts, as Daniel suggests. The substance of his testimony accurately reflected the policies and security precautions of the TDCJ prison system. *See generally* 23 RR 122-64, 188-92 (ECF No. 4-36 at 122-64, 188-92). Rather than reading specific provisions of governmental or prison regulations to the jury, Rogers explained the security precautions and restrictions in place in the prison system and utilized examples, both on direct and cross-examination, to further illustrate generally the different levels of supervision within the prison and particularly restrictions for a G3/LWOP inmate versus an inmate on death row.

> **b.** **The State did not give the jury a false impression regarding Daniel's taking notes of correctional officers' names. (Daniel's claim 14D).**

Daniel states that various correctional officers testified for the State that he was recording their names on a piece of paper in his cell and maintains that their testimony gave the jury the false impression that his actions were a security threat. Am. Pet. at 184 (ECF No. 18 at 195). He argues the State knew the testimony was false because investigators recorded a telephone call from jail during which Daniel and his mother discussed "the actual reasons for recording names," which included

his "mistreatment" by officers. *Id.* at 184-85 (ECF No. 18 at 195-96). The state court reasonably concluded that Daniel failed in his burden to show that the State knowingly used false evidence in regard to Daniel's notes of correctional officers' names. SHCR-01 at 1828 (ECF No. 4-89 at 130).

Deputy Dustin Rade testified that he was assigned to the health services building at the Travis County Jail when he had contact with Daniel who was housed in a psychiatric observation cell. 22 RR 63-64 (ECF No. 4-35 at 63-64). During defense counsel's cross-examination, Rade recalled finding handwritten notes with officers' names on it during a search of Daniel's cell. *Id.* at 79 (ECF No. 4-35 at 79). Rade described the note as having names and "some details about us[,]" but he would not speculate why Daniel had written the note. *Id.* Rade did not know if Daniel wrote the note in response to a request from his legal team about the officers watching him. *Id.*

On redirect examination, the State elicited further details regarding the note. Deputy Rade testified that it contained details about the officers on his shift, describing them.[39] 22 RR 81-82 (ECF No. 4-35 at 81-82). The note monitored the officers' movements and operations, such as how many inmates they brought in for night clean up and at what time. *Id.* at 82 (ECF No. 4-35 at 82). The note did not document officers' treatment of Daniel. *Id.*

Deputy Anthony Angel, of the security threat unit, testified mostly about screening inmates' mail. 23 RR 104 (ECF No. 4-36 at 104). He also testified that it

---

[39]     Rade testified the note said he equaled the devil, Officer Rico equaled short, and another officer followed the rules. 22 RR 81 (ECF No. 4-35 at 81).

was a general security concern if an inmate kept notes regarding the movements of guards in the Travis County Jail. *Id.* at 107 (ECF No. 4-36 at 107). And Officer Brad Peyton, a defense witness, testified on cross-examination that jailers would not want inmates tracking their movements because it was a safety issue, but he was not aware of Daniel doing that. 24 RR 25-26 (ECF No. 4-37 at 25-26).

The State's inquiry to its prison classification expert, Stephen Rogers, was also not specific as to Daniel. Rogers merely addressed why a warden would be concerned about an inmate who had a coded message system and tracked the activities of correctional officers. 23 RR 160-62 (ECF No. 4-36 at 160-62). Daniel has taken completely out of context Rogers's testimony about horns, tails, and breathing fire. *Id.* at 161-162 (ECF No. 4-36 at 161-62); *see* Am. Pet. at 184 (EF No. 18 at 195). Rogers noted that inmates do not have such characteristics, "are human beings like the rest of us[,]" and that it was "easy" for correctional officers to become complacent and sympathetic to a man's plight. 23 RR 162 (ECF No. 4-36 at 162).

As the record reflects, the evidence regarding Daniel's handwritten note was first offered by Deputy Rade during defense counsel's cross-examination. The note reflected descriptions of jail officers and of their movements and operations in the jail but not mistreatment by jail staff as Daniel claims. Further evidence showed that, in general, such a note would be a security concern within the jail and the prison systems. The evidence regarding the note was neither false nor misleading. The State was entitled to draw reasonable inferences from the evidence during closing argument. *See McFarland v. State*, 989 S.W.2d 749, 751 (Tex. Crim. App.) (proper

jury argument encompasses in part summation of the evidence and reasonable deductions therefrom). The state court reasonably concluded that Daniel failed to prove that the State used material, false evidence to procure his conviction or sentence. SHCR-01 at 1828 (ECF No. 4-89 at 130).

### c. The State did not present false testimony from Louis Escalante. (Daniel's claim 14E).

As his final claim, Daniel asserts that the State knowingly presented false testimony from fellow inmate Louis Escalante that Daniel and another inmate had a plan to escape from the jail and that the State had no deal with Escalante in exchange for his testimony. Am. Pet. at 186 (ECF No. 18 at 197-98). He argues that what Escalante reported to correctional officers was that *another* inmate had planned to overtake guards at the jail to allow an escape. *Id.* Daniel argues that Escalante's testimony of there being no deal with the State is proved false based on the allegations in his *Brady* claim, raised as Claim XV, below. *Id.* at 186-87 (ECF No. 18 at 197-98). The state court reasonably concluded that Daniel failed in his burden to show that the State knowingly used false testimony from Louis Escalante. SHCR-01 at 1828 (ECF No. 4-89 at 130).

The State did not present material, false testimony from Louis Escalante about an escape plan. Escalante testified that when he was working in the jail as a trustee, he observed Daniel and inmate Troy Williams "having a little secret talk." 23 RR 36 (ECF No. 4-36 at 36). Escalante testified that Williams and Daniel told him that they "were trying to plan an escape." *Id.* The plan was "that somebody was supposed to come here [to the courthouse] with a gun and start shooting[.]" *Id.* at 37 (ECF No.

4-36 at 37). Escalante confirmed that he could hear the two inmates discussing escape plans and testified that "Troy Williams was the one that actually explained it to me." 23 RR 38 (ECF No. 4-36 at 37). Escalante's testimony established exactly what Daniel claims it did not—that both Williams *and Daniel* initially told Escalante about having a plan to escape. *See* Am. Pet. at 186 (ECF No. 18 at 197).[40]

Furthermore, the defense presented the testimony of former corrections officer Stephen Crim, which corroborated Escalante's testimony. 24 RR 197 (ECF No. 4-37 at 197). Crim testified that Escalante told him that he heard Daniel and Williams discussing plans to escape. *Id.* at 202-03 (ECF No. 4-37 at 202-03). Escalante told Crim that Williams was going to overtake an officer, get his keys, and then let Daniel out. *Id.* at 203 (ECF No. 4-37 at 203). Escalante did not tell Crim the specifics of the escape, i.e. shooting up the courthouse. *Id.* at 203-04 (ECF No. 4-37 at 203-04). On Crim's cross-examination, the State established that what Escalante reported were "the words of inmate Williams[.]" *Id.* at 208 (ECF No. 4-37 at 208). Escalante only reported to Crim that Williams was going to overtake an officer so that he and Daniel could leave. *Id.* at 208-09 (ECF No. 4-37 at 208-09). The State confirmed that Escalante did not tell Crim that "[Daniel] said that he was going to do this and do that[.]" *Id.* at 209 (ECF No. 4-37 at 209). The record thus shows no disparity between the testimony of Escalante and Crim regarding the escape plan. Daniel's initial claim

---

[40]   Daniel presents a declaration from Troy Williams in an attempt to rebut there was an escape plan. Supp. App. 1879-81 (ECF No. 20-2 at 7-9). However, Williams's declaration reflects that it was signed on February 27, 2019, after Daniel's state habeas proceedings concluded and has not been presented in state court. *Pinholster* bars its consideration on federal habeas review. 536 U.S. at 185.

of false testimony is wholly without merit.

Daniel additionally argues that Escalante falsely testified that he had no deal with the State in exchange for his testimony. Am. Pet. at 186-87 (ECF No. 18 at 197-98). No false or misleading testimony was elicited from Escalante on this matter. Escalante confirmed, in response to the prosecutor's question, that the prosecutor had not made any offers to him to benefit his case. 23 RR 32 (ECF No. 4-36 at 32). In fact, the prosecutor did not contact Escalante until his case had been resolved in court. *Id.* On cross-examination, defense counsel also confirmed with Escalante that the prosecutor never offered him a benefit in exchange for his testimony, although Escalante hoped he could get 90 days taken off his ISF.[41] *Id.* at 60, 65 (ECF No. 4-36 at 60, 65). Former correctional officer Crim established that Escalante did not seek anything from him in exchange for the information. 24 RR 208 (ECF No. 4-37 at 208).

Also, the state court found that in responding to Daniel's *Brady* claim alleging a suppressed deal for testimony, the State presented "credible evidence" that Escalante was not promised a benefit in exchange for his testimony. SHCR-01 at 1831 (ECF No. 4-89 at 133). Bill Bishop, the lead prosecutor, attested that he did not offer Escalante a benefit in exchange for this testimony. *Id.* at 1075-76 (ECF No. 4-86 at 77-78). And Kelley West, a Probation Officer with the Travis County Adult Probation Department, provided an affidavit establishing that Escalante's conditions of supervision were modified to delete ISF not as a benefit for his testifying, but due to

---

[41] On January 22, 2014, Escalante was probated and ordered to complete the Intermediate Sanctions Facility (ISF). SHCR-01 at 1081 (ECF No. 4-86 at 83). Shortly after this, he was subpoenaed to testify in the Officer Padron case."

his receiving threats on his life for testifying in Daniel's trial. *Id*. at 1081 (ECF No. 4-86 at 83). On the record in this case, there was no false testimony and the state court was not unreasonable in so concluding. *Id.* at 1828 (ECF No. 4-89 at 130).

Daniel tries to go outside the record by arguing that Escalante's testimony is false based on the allegations made in his *Brady* claim. Am. Pet. at 186-87 (ECF No. 18 at 197-98). The state court rejected Daniel's *Brady* claim in part because it was not supported with adequate facts and was based on speculation. SHCR-01 at 1831 (ECF No. 4-89 at 133). Unlike the claim presented in state court, Daniel now includes a declaration from Louis Escalante dated February 27, 2019, to show that there was a deal for testimony. Supp. App. 1895-97 (ECF No. 20-3 at 12-13). However, this evidence is not part of the record before the state court that adjudicated Daniel's *Brady* claim. *Pinholster* bars its consideration on federal habeas review. 536 U.S. at 185. Daniel cannot rely on the 2019 declaration from Louis Escalante to support his *Brady* claim or his current claim of false testimony.

The Court should deny habeas corpus relief on the entirety of Daniel's false testimony claim because the state-court adjudication is not an incorrect or unreasonable application of clearly established Supreme Court precedent.

### C. The state court adjudication of Daniel's two claims of ineffective assistance merits AEDPA deference.

In his initial state habeas application, Daniel raised two separate IATC claims regarding prison—Claim One (J) alleging trial counsel were ineffective for failing to retain an expert on prison classification, SHCR-01 at 671-74 (ECF No. 4-83 at 5-8), and Claim One (K) alleging counsel were ineffective for failing to explain to the jury

why Daniel was writing down the names of correctional officers. *Id.* at 674-76 (ECF No. 4-83 at 8-10). Finding that Daniel failed to meet his burden under *Strickland* of showing deficient performance and prejudice, the TCCA denied habeas relief based on the trial courts findings and conclusions and the TCCA's own review. *Ex parte Daniel*, 2017 WL 4675772, at \*1, \*3 (ECF No. 4-96 at 3, 6); *see* SHCR-01 at 1822-25 (ECF No. 4-89 at 124-27). This Court should deny habeas corpus relief because Daniel fails to demonstrate that the state-court adjudication of either IATC claim was an unreasonable application of *Strickland*.

### 1. Daniel fails to show deficient performance and prejudice based on trial counsel's purported failure to investigate prison classification. (Daniel's claim 14C)

Daniel argues that trial counsel were ineffective "for failing to investigate prison classification." Am. Pet. at 181 (ECF No. 18 at 192). He contends that counsel "did not consult with experts and did not take steps to research, investigate, object, strike, correct, rebut Warden Roger's testimony, or familiarize themselves with TDCJ classification." Am. Pet. at 181-82 (ECF No. 18 at 192-93). Daniel argues that there is a reasonable probability that counsel's failure to retain an expert on TDCJ affected the jury's decision to sentence him to death. *Id.* at 183 (ECF No. 18 at 194).

When reviewing a claim challenging counsel's failure to investigate, the Court must make a "context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Wiggins*, 539 U.S. at 523 (citing *Strickland*, 466 U.S. at 689). The relevant inquiry focuses on what counsel did to prepare, what evidence was accumulated, what additional leads counsel had, and the results

counsel might reasonably have expected from those leads. *Cf. Neal*, 286 F.3d at 237. Daniel's claim does not help the Court in making this determination.

Daniel fails to present any evidence establishing that the extent of defense counsel's investigation was itself objectively unreasonable. The laundry list of complaints set out above are not supported by evidence, nor were the majority of Daniel's complaints raised in state court beyond his claim that counsel was ineffective for not hiring an expert on prison classification. *See* SHCR-01 at 671-74 (ECF No. 4-83 at 5-8). He asserts that after receiving notice that the State intended to call Stephen Rogers as an expert on TDCJ and its classification system, "objectively reasonable trial counsel would have recognized the need to investigate the classification system independently and/or obtain their own expert in the field." Am. Pet. at 182 (ECF No. 18 at 193). However, Daniel does not specify what "investigating the classification system independently" would have revealed or how it would have altered the outcome of trial so his claim of deficient investigation fails from the outset. *Druery*, 647 F.3d at 541 ("must allege with specificity what the investigation would have revealed and how it would have altered the outcome of trial").

Daniel's assertion that counsel's failure to retain an expert demonstrates deficient performance also fails. Am. Pet. at 182 (ECF No. 18 at 193). The fact that expert witnesses on TDCJ and prison classification have been retained in other capital cases and called to testify does not demonstrate that Daniel's counsel were ineffective in not doing so in this case. Decisions regarding whether to retain a defense expert or how to use the expert are the very sort of trial decisions that are

matters of strategy. In this case, defense counsel made an informed choice to not hire a prison classification expert. Lead defense counsel Russell Hunt attested that he has hired prison classification experts in some of his capital cases, counsel knew the State was going to present Stephen Rogers as a classification expert, and counsel was aware that Rogers "is a very knowledgeable classification expert." SHCR-01 at 1066-67 (ECF No. 4-86 at 68-69). This strategic choice to not hire an expert was not simply a lack of direction or "ignorance of key issues at the penalty phase" as Daniel suggests, Am. Pet. at 182 (ECF No. 18 at 193), but a chosen tactic at the time of trial that is entitled to a strong degree of deference. *See Murray v. Maggio*, 736 F,2d 279, 282 (5th Cir. 1984) (stating that a petitioner must overcome a strong presumption that trial counsel's decision in not calling a particular witness was a strategic decision). Indeed, defense counsel were not shy about hiring experts on other matters when they believed it necessary, as evidenced by their retaining Dr. Cecil Reynolds, a consulting neuropsychologist, Dr. Walter Harrel, a neuropsychologist, Dr. Harold Scott, a psychiatrist, Dr. William Lee Carter, a psychologist, and Dr. Matthew Masters, a board-certified addiction specialist. "Although through hindsighted review other counsel might have handled this matter differently, this Court is prohibited from second guessing counsel's strategy." *Youngblood*, 696 F.2d at 409.

Daniel fails to overcome the "strong presumption" that his counsel performed effectively. *Strickland*, 466 U.S. at 690. Through cross-examination of the State's classification expert, Mr. Hunt effectively conveyed to the jury that the prison system is highly controlled and has many ways to manage the behavior of inmates regardless

of their charges of conviction. 23 RR 165-88, 192-93 (ECF No. 4-36 at 165-88, 192-93). The cross-examination was informative rather than confrontational, effective, and established counsel's objectives. Calling another classification expert to testify regarding essentially the same material elicited on direct and cross-examination was unnecessary and would merely be cumulative.

For many of the same reasons, Daniel fails to show that there is a reasonable probability that, but for counsel's failure to retain a prison classification expert, the jury may not have decided to sentence him to death. *See Strickland*, 466 U.S. at 694. Daniel argues that had his attorneys obtained an expert "such as Frank AuBuchon," they would have been able to effectively cross-examine the State's expert, Stephen Rogers, and establish that he was testifying falsely, "which would have demolished his credibility." Am. Pet. at 183-84 (ECF No. 18 at 194-95). However, as argued at length above, Rogers's testimony was neither false nor misleading. *See* Argument, Part XIV.B.2.a, *supra*. Defense counsel had no reason to try to "demolish" Rogers's credibility because by doing so, it would have prevented them from being able to utilize the testimony of this "very knowledgeable classification expert" to establish counsel's objective of having the jury know that TDCJ has very extensive behavior control features built into the prison system. *See* SHCR-01 at 1067 (ECF No. 4-86 at 69). Because Daniel fails to show that the state-court adjudication of his IATC claim was an unreasonable application of *Strickland*, this Court should deny habeas relief.

> **2. Daniel fails to show deficient performance and prejudice based on counsel's failing to explain to the jury why Daniel was writing down names of correctional officers. (Daniel's claim 14E)**

In this claim, Daniel contends defense counsel performed deficiently by failing to rebut the State's evidence and argument that Daniel was recoding names of correctional officers to either facilitate an escape or an assault on correctional staff. Am. Pet. at 185 (ECF No. 18 at 196). He specifically faults defense counsel for not rebutting the State's evidence by using the tape recording of a conversation between himself and his mother, Mary O'Dell, during which "she suggested that he writ down the names," and for not calling his mother to the stand to explain why she asked her son to write down the names. *Id.* at 185-86 (ECF No. 18 at 196-97). Daniel argues there is a reasonable probability that counsel's omission had an impact of the jury's decision to sentence him to death. *Id.* at 186 (ECF No. 18 197). The TCCA reasonably rejected Daniel's claim because he failed to make both showings required under *Strickland*. *Ex parte Daniel*, 2017 WL 4675772, at *1, *3 (ECF No. 4-96 at 3, 6); *see* SHCR-01 at 1823-25 (ECF No. 4-89 at 125-27). Daniel fails to show that the adjudication does not merit AEDPA deference.

Defense counsel filed affidavits addressing this claim. SHCR-01 at 1067 (ECF No. 4-86 at 69); *id.* at 1542-43 (ECF No. 4-88 at 44-45). The evidence at trial showed that correctional officers did not write a report regarding these alleged notes. In closing arguments at the punishment phase, defense counsel argued to the jury that there was no report because the notes did not exist. 26 RR 136 (ECF No. 4-39 at 136). As lead defense counsel Russell Hunt attests in his affidavit: "Proving up why the notes were written would have undercut that argument and only served to have highlighted the notes' existence." SHCR-01 at 1067 (ECF No. 4-86 at 69).

Daniel fails to overcome the "strong presumption" that his counsel performed effectively. *Strickland*, 466 U.S. at 690. Reasonably effective counsel is judged by the viewpoint of counsel at the time he acted, rather than through hindsight. *Winfrey*, 664 F.2d at 552 ("Trial counsel are not to be critically judged with the benefit of hindsight."). *Strickland* recognizes "[t]here are countless ways to provide effective assistance in any given case," and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." 466 U.S. at 689. That another attorney might have pursued a different course will not support a finding of ineffectiveness. *See id.* Defense counsel's reason for not delving further into the notes was objectively reasonable in light of the circumstances at trial.

Moreover, defense counsel's decision to not call Mary O'Dell as a witness to explain why Daniel was allegedly writing the names of correctional officers was a matter of sound trial strategy. As defense counsel Bradley Urrutia attested, Ms. O'Dell "would not confirm that she was present in Austin during [Daniel's] trial," she was "very untrusting and uncooperative," and "she was not speaking with [defense counsel] at the time of trial and claimed she wasn't in town." SHCR-01 at 1542 (ECF No. 4-88 at 44). Counsel cannot be ineffective based on a lack of cooperative available witnesses at the time of trial.

Even if she had been available to testify, defense counsel's affidavits reflect that having O'Dell as a witness would have potentially opened the door to a number of areas highly damaging to Daniel, including O'Dell's inflammatory and profane criticisms in the news media of the Austin Police Department, her purposeful ducking

of the grand jury subpoena, her encouraging and agreeing with Daniel's desire to seek the death penalty, and Daniel's prior federal charges for possession of child pornography. SHCR-01 at 1067 (ECF No. 4-86 at 69); *see id.* at 1542 (ECF NO, 4-88 at 44). Ms. O'Dell had also been communicating in code with Daniel, which he did not disclose to the trial team, and without knowing what was in the notes, counsel felt it would have been "extremely dangerous" to put her on the stand. *Id.* at 1542-43 (EF No. 4-88 at 44-45). After hearing this evidence, O'Dell's testimony regarding the notes would be ineffective and likely disregarded by the jury, and her credibility damaged. Given these circumstances, calling O'Dell as a witness was not a plausible option.

Daniel fails to overcome the "strong presumption" that his counsel performed effectively. *Strickland*, 466 U.S. at 690. Counsel's decision whether to call a certain witness to testify is a matter of trial strategy, entitled to a strong degree of deference. *Murray*, 736 F.2d at 282 (stating that a petitioner must overcome a strong presumption that counsel's decision in not calling a particular witness was a strategic decision); *see also Williams v. Collins*, 16 F.3d 626, 632 (5th Cir. 1994) (finding counsel not ineffective for deciding not to call certain witnesses because of concern their testimony would have opened the door to more damaging evidence under cross-examination). The Court should deny relief because Daniel fails to show under § 2254(d) that the state-court adjudication was contrary to *Strickland*.

## XV. Daniel's Claim that His Eighth and Fourteenth Amendment Rights Were Violated Under *Brady* Does Not Warrant Habeas Corpus Relief.

Daniel contends the State violated his rights to due process and to be free from cruel and unusual punishment under *Brady* and its progeny by failing to disclose that

it promised Louis Escalante a reduced sentence in exchange for his testimony at trial. Am. Pet. at 196 (ECF No. 207). This Court should deny habeas relief because Daniel's Eighth Amendment claim is procedurally defaulted and the alleged error is waived, and Daniel's *Brady* claim was reasonably rejected on the merits by the TCCA.

## A. Daniel's Eighth Amendment claim is unexhausted, defaulted, and waived for inadequate briefing.

Daniel raised a due process claim under *Brady* that was denied on the merits on state habeas review. SHCR-01 at 727-37 (ECF No. 4-83 at 61-71). He did not assert an Eighth Amendment claim for relief. *See id.* If he tried to do so now, the TCCA would dismiss any such writ application as successive. Tex. Code Crim. Proc. art. 11.071, § 5(a); *Williams*, 602 F.3d at 305-06. This unexhausted Eighth Amendment claim is defaulted on federal habeas review. *See Beazley,* 242 F.3d at 264.

Regardless, Daniel's only mention of the Eighth Amendment appears to be in the caption of his federal habeas claim. Am. Pet. at 196-203 (ECF No. 18 at 207-14). He thus waives this claim due to inadequate briefing. *Green*, 508 F.3d at 203.

## B. The TCCA's rejection of Daniel's *Brady* claim for lack of merit is entitled to AEDPA deference.

In his state habeas application, Daniel raised a *Brady* claim asserting that documentary evidence supports a "reasonable inference" that Louis Escalante was promised or later received a reduced sentence in exchange for testifying falsely at trial. SHCR-01 at 727 (ECF No. 4-83 at 61). The TCCA denied habeas relief after finding that Daniel failed to "support his claim with adequate facts" and "the evidence before [the TCCA] contradicts his allegations that a deal ever existed." *Ex parte*

*Daniel*, 2017 WL 4675772, at \*2, \*3 (ECF No. 4-96 at 5, 6); *see* SHCR-01 at 1830-31 (ECF No. 4-89 at 132-33). This Court should deny habeas corpus relief because Daniel cannot show that the state court's decision was an unreasonable application of clearly established Supreme Court precedent.

In *Brady*, the Supreme Court announced that due process requires the State to disclose material, exculpatory evidence to the defense. 373 U.S. at 87. In order to establish a *Brady* violation, Daniel must demonstrate that (1) the prosecution suppressed evidence, (2) that evidence was favorable to the defense, and (3) the evidence was material to either guilt or punishment. *Banks*, 540 U.S. at 691; *Graves,* 351 F.3d at 153-54. The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Bagley*, 473 U.S. at 684. Daniel cannot make this showing.

Daniel argues that the State failed to disclose material exculpatory and/or impeachment evidence regarding punishment-phase witness Louis Escalante. Am. Pet. at 196 (ECF No. 18 at 207). According to Daniel, Escalante received a reduced sentence for a serious felony offense in exchange for testifying falsely at trial, the State failed to disclose the terms of the agreement, and Daniel was deprived of the opportunity to impeach Escalante with material evidence of his bias and motivation to testify falsely. *Id.*

Because the *Brady* claim was adjudicated on the merits, this Court's review on federal habeas is necessarily limited to "the record that was before the state court." *Pinholster*, 563 U.S. at 185. On state habeas, Daniel supported his *Brady* claim with

a May 7, 2014 order that amended the conditions of Escalante's community supervision by deleting the condition requiring completion of the "Intermediate Sanctions Facility—Cognitive Track" or "ISF" and requiring him to "[s]uccessfully complete Relapse IOP through Developmental Counseling." SHCR-01 at 93 (ECF No. 4-81 at 3). Daniel continues to rely on the order as support for his federal habeas *Brady* claim. Am. Pet. at 199 (ECF No. 18 at 210), citing App. 1932 (ECF No. 20-7 at 8). However, he also largely relies on additional exhibits:

1. PX-97: Declaration of Troy L. Williams (Feb. 27, 2019), Supp. App. 1879-81 (ECF No. 202 at 7-9);

2. PX-102: Declaration of Louis R. Escalante, Jr. (Feb. 27, 2019), Supp. App. 1895-96 (ECF No. 20-3 at 12-13);

3. PX-103: Louis Escalante Travis County Clerk's File, Supp. App. 1898-2013);

4. PX-104: Incident Report from Travis County Correctional Complex (Oct. 24, 2012), Supp. App. 2014-15 (ECF No. 20-18 at 6-7)

Am. Pet. at 197-200 (ECF No. 18 at 208-11) (citing same). With the exception of four pages of records contained in the 115-page Travis County Clerk's file which were used by Daniel as state habeas exhibits, SHCR-01 at 424-27 (ECF No. 4-81 at 104), the rest of the above-listed exhibits were never presented in state court. Because these declarations and records are not part of "the record that was before the state court," *Pinholster*, 563 U.S. at 185, this Court is precluded from considering the same.

On the record that was before the state court, Daniel fails to show that there was ever any deal for testimony, much less that the State suppressed evidence of the same. He argues that the May 7, 2014, order that deleted the requirement that

Escalante complete the ISF is evidence that Escalante "received the benefit that he had been promised for his testimony—a reduced jail sentence." Am. Pet. at 199 (ECF No. 18 at 210). Daniel's evidence does not establish a *Brady* violation.

Kelley West, a Community Supervision Officer, provided an affidavit attesting to the actual reasons for the amended order:

> On January 22, 2014, Louis Escalante Jr. was probated and ordered to complete the Intermediate Sanctions Facility (ISF). Shortly after this he was subpoenaed to testify in the Officer Padron case.
>
> On or about March 03, 2014, I was contacted by jail personnel and informed that there had been two (2) attempts "hits" on Mr. Escalante's life which they felt were in response to Mr. Escalante testifying. The jail personnel recommended getting Mr. Escalante transported to ISF as quickly as possible.
>
> I contacted Joseph Burke at ISF Administration and explained the situation. Mr. Burke was able to get Mr. Escalante on the transport list scheduled for March 13, 2014. However, when ISF Transport contacted the jail to notify them that they would be transporting clients that day. Transport was notified of the attempts on Mr. Escalante's life. Transport then notified the ISF Warden. The Warden's office contacted me, stating that the clients are housed in a dorm setting, since it's a therapeutic community, they could not ensure Mr. Escalante's safety, and therefore he would not be accepted into the program.
>
> I notified the Courts of Mr. Escalante's inability to enter ISF, A new TAIP assessment was requested and completed. On April 29, 2014, TAIP recommended Mr. Escalante for Relapse Intensive Outpatient Treatment (Relapse IOP).
>
> Therefore, on May 7, 2014, Mr. Escalante's Conditions of Probation were amended, deleting the Condition of ISF and adding the Condition for Completion of Relapse IOP.

SHCR-01 at 1081-82 (ECF NO. 4-86 at 83-84). As the state court found, "Credible evidence from Kelley West established that Louis Escalante's conditions of supervision were modified to delete ISF due to threats on Escalante's life for

testifying in [Daniel's] trial." SHCR-01 at 1831 (ECF No. 4-89 at 133). The state court's factual finding is fully supported by the record and entitled to a presumption of correctness under § 2254(e)(1).

The state court rejected Daniel's *Brady* claim in part because it was not supported with adequate facts and was based on speculation. SHCR-01 at 1831 (ECF No. 4-89 at 134). The same holds true here. "Allegations that are merely 'conclusory' or are purely speculative cannot support a *Brady* claim." *Hughes*, 191 F.3d at 629-30. The only evidence offered by Daniel in state court to substantiate his claim of a deal for testimony is the May 2014 order. The order does not establish that any deal existed because the order was issued for wholly unrelated reasons.

"The prosecution has no duty to turn over to the defense evidence that does not exist." *Brogdon v. Blackburn*, 790 F.2d 1164, 1168 (5th Cir. 1986); *see Todd v. Schomig*, 283 F.3d 842, 849 (7th Cir. 2002) (addressing a prisoner's claim that the government suppressed the existence of a cooperating witness's plea agreement and holding, "Todd cannot prove an agreement existed …. Without an agreement, no evidence was suppressed, and the state's conduct, not disclosing something it did not have, cannot be considered a *Brady* violation."). Because Daniel fails to show that on the record before it, the state court's decision was contrary to or an unreasonable application of *Brady*, this Court should deny habeas corpus relief.

## XVI. Daniel is Not Entitled to Habeas Corpus Relief on His Claims Regarding Trial Counsel's Handling of Testimony from State's Witness Louis Escalante.

Daniel argues that trial counsel was ineffective for failing to object to

inadmissible hearsay testimony from State's witness Louis Escalante, in violation of Daniel's rights to due process and to be free from cruel and unusual punishment. Am. Pet. at 203 (ECF No. 18 at 214). The Court should deny habeas relief because Daniel's Eighth and Fourteenth Amendment claims are procedurally defaulted and any error is waived, and he fails to demonstrate that the state-court adjudication of his IATC claim on the merits was an unreasonable application of *Strickland*.

### A. Daniel's Eighth and Fourteenth Amendment claims are unexhausted, defaulted, and waived for inadequate briefing.

In his state habeas application, Daniel challenged trial counsel's failure to object as purely an IATC claim. SHCR-01 at 666-71 (ECF No. 4-82 at 168 to ECF No. 4-83 at 5). He did not assert violation of his Eighth and Fourteenth Amendment rights, so the claims are unexhausted. If Daniel tried to do so now, the TCCA would dismiss any writ application as successive. *Williams*, 602 F.3d at 305-06. As a result, Daniel's unexhausted Eighth and Fourteenth Amendment claims are defaulted on federal habeas review. *See Beazley,* 242 F.3d at 264.

Regardless, Daniel merely lists the Eighth and Fourteenth Amendments in the caption of his federal habeas claim, thereby waiving any alleged error by failing to adequately brief the issues. *Green*, 508 F.3d at 203.

### B. The TCCA's rejection of Daniel's IATC claim on the merits is entitled to AEDPA deference.

In this ground, Daniel contends defense counsel rendered ineffective assistance by failing to object to inadmissible hearsay testimony from Louis Escalante that Daniel and fellow inmate Troy Williams were planning an escape from

the Travis County Jail. Am. Pet. at 203 (ECF No. 18 at 214). Daniel claims Escalante "testified that Mr. Williams told him" of the escape plan, citing the record at 23 RR 36-37 (ECF No. 4-36 at 36-37). However, the order in which Daniel has presented the facts underlying this claim suggests that the testimony came after Escalante testified that "Troy Williams was the one that actually explained [the escape plan] to me." *Id.*, citing 23 RR 38 (ECF No. 4-36 at 38), which is incorrect.

Escalante testified at the punishment phase that he observed Daniel and Williams engage in a "secret talk." 23 RR 36 (ECF No. 4-36 at 36). While on his fire watch, Escalante overheard Daniel tell Williams "the trustee is walking back up here, let's just don't say no more." *Id.* Escalante asked what the two were talking about and "they" finally told him that they were planning to escape. *Id.* Escalante testified that "Williams and him [meaning Daniel] had finally told me that they were trying to plan an escape." *Id.* (emphasis added). This testimony regarding Daniel's statements was not inadmissible hearsay. Under state law, it was an admission by a party-opponent. TEX. R. EVID. 801(e)(2)(A), just as the state court concluded. SHCR-01 at 1821 (ECF No. 4-89 at 123). If defense counsel had objected, the trial judge would have properly overruled that objection. A claim of IATC cannot be based on failing to raise a frivolous objection, as a hearsay objection would have been in this context. *Green,* 116 F.3d at 1125. As such, Daniel's IATC claim on the basis of hearsay fails because he can make neither showing required by *Strickland.*

At this point, after Escalante testified that Williams and Daniel told him they were trying to plan an escape, Escalante described the escape in testimony that

Daniel incorrectly attributes to coming from Williams alone. Am. Pet. at 203 (ECF No. 18 at 214), citing 23 RR 36-37 (ECF No. 4-36 at 36-37). From the record, it appears that both Daniel and Williams described the escape plan. It was later in his testimony that Escalante stated that Williams "was the one that actually explained it [the escape plan] to me," thus suggesting Escalante's testimony was hearsay. *Id*. at 38 (ECF No. 4-36 at 38). Even if defense counsel had objected at this point, any alleged error would be harmless. *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998) (erroneous admission of evidence is harmless when same evidence is admitted without objection). Daniel cannot show deficient performance or prejudice since evidence of the escape plan was already before the jury from non-hearsay testimony. The state court thus reasonably concluded that "[d]efense counsel did not err in failing to object to non-hearsay testimony from Louis Escalante." SHCR-01 at 1821 (ECF No. 4-89 at 123).

Furthermore, defense counsel made a reasoned, strategic decision to not object to portions of Escalante's testimony to "to show the jury how patently absurd and incredible Escalante's testimony was." SHCR-01 at 1066 (ECF No. 4-86 at 68). As part of that strategy, defense counsel used cross-examination of Escalante to discredit him. *Id*. The record establishes that lead trial counsel Russell Hunt vigorously cross-examined Escalante and exposed his motive for testifying. 23 RR 43-44, 59, 63 (ECF No. 4-36 at 43-44, 59, 63). Counsel also challenged the credibility of Escalante's testimony regarding the escape plan, as inmate Williams was known to swallow pens, pencils, and spoons. *Id*. at 47 (ECF No. 4-36 at 47). Also, counsel established that

Escalante was working in the Health Services Building when Williams was transferred to Vernon State Hospital because Williams was found incompetent, and it was not possible for Daniel and Williams to be going to court together as designed for their escape. *Id.* at 68 (ECF No. 4-36 at 68). Defense counsel were able to further challenge Escalante's credibility by undermining his testimony that he had reported the alleged escape plan to Officer Crim and Officer Ferguson, neither of whom made a report of it. *Id.* at 55-56 (ECF No. 4-36 at 55-56). In his punishment argument, defense counsel effectively used the testimony from his cross-examination to argue Escalante was a liar and to express anger that the State would use such evidence to garner a death penalty in this case. 26 RR 138-39 (ECF No. 4-39 at 138-39).

For all of the above reasons, Daniel fails to establish that defense counsel's representation fell below an objective standard of reasonableness and that there was a substantial likelihood of prejudice. The Court should deny habeas corpus relief because Daniel fails to demonstrate that the state-court adjudication was an unreasonable application of *Strickland*.[42]

## XVII. Daniel is Not Entitled to Habeas Corpus Relief on His Claims Challenging the Constitutionality of Texas's Death Penalty Scheme.

In four grounds for relief, Daniel challenges the constitutionality of various aspects of Texas's capital sentencing statute Texas Code of Criminal Procedure

---

[42]     In attempting to show that the state court's decision was unreasonable, Daniel cites to a declaration obtained from Troy Williams in 2019 in which he denies discussing an escape plan. Am. Pet. at 207 (ECF No. 18 at 218), citing Supp. App. 1879-81 (ECF No. 20-2 at 7-8). This evidence is not part of record before the state court and is barred by *Pinholster*.

Article 37.071: (1) the constitutionality of the "10-12" rule, (2) that the first special issue is unconstitutionally vague, (3) that the punishment phase jury instructions restricted the evidence the jury could consider was mitigating, and (4) that Texas's capital punishment scheme is arbitrarily imposed. Am. Pet. at 207-15 (ECF No. 18 at 218-26). The TCCA denied relief on the merits based on its prior precedent. *Ex parte Daniel*, 2017 WL 4675772, at ** 2-3 (ECF No. 4-96 at 5-6); *see* SHCR-01 at 1832-34 (ECF No. 4-89 at 134-36). This Court should deny habeas corpus relief because the state-court adjudication of the claims is consistent with Supreme Court precedent.

## A. Daniel's claim challenging the constitutionality of Texas's "10-12" Rule was reasonably denied on the merits by the TCCA.

In this ground, Daniel argues that his constitutional rights were violated when the trial court was prohibited from instructing the jury that a vote by one juror would result in a life sentence. Am. Pet. at 208 (ECF No. 18 at 219). He challenges the constitutionality of what is commonly referred to as the "10-12" rule in Article 37.071. Under Texas's capital sentencing scheme, a jury is instructed (1) that at least 10 jurors must agree before they may answer "No" to the future dangerousness issue or "Yes" to the mitigation issue, and (2) that all 12 jurors must agree before answering "Yes" to the future dangerousness issue and "No" to the mitigation special issue. Tex. Code Crim. Proc. art. 37.071, §§ 2(d)(2) & (f)(2). Daniel's jury was instructed in this manner. 1 CR 186-87 (ECF No. 4-1 at 186-87). While Texas law prohibits informing jurors of the effect of a failure to agree on a special issue, art. 37.071, § 2(a), Daniel's jury was charged that he "shall be punished by imprisonment in the Institutional Division of the Texas Department of Criminal Justice for life without parole or by

death." 1 CR 186 (ECF No. 4-1 at 186).

Daniel's claim that jurors should have been informed that a lack of unanimity during the penalty phase would result in a life sentence is foreclosed by Supreme Court and Fifth Circuit precedent. In *Jones v. United States*, 527 U.S. 373 (1999), the Supreme Court concluded that a jury need not be told what happens procedurally when a verdict cannot be reached. While the jury may not be "affirmatively misled regarding its role in the sentencing process," a court is not required to instruct the jury "as to the consequences of a breakdown in the deliberative process." *Id.* at 381-82. The Fifth Circuit has similarly held that no instruction is required. *Reed v. Stephens*, 739 F.3d 753, 779 (5th Cir. 2014) (no instruction required that a lack of unanimity during the penalty phase would result in a life sentence) (citing, *e.g.*, *Druery*, 647 F.3d at 542-45)). In Daniel's case, the jury instructions accurately recited the governing law, and no error occurred here.

Next, Daniel argues that Texas's 10-12 rule denied him his Eighth Amendment right to individualized sentencing because it may have misled jurors about their individual ability to give effect to their belief on mitigating circumstances. Am. Pet. at 209 (ECF No. 18 at 220) (citing *Mills* v. *Maryland*, 486 U.S. 367 (1988)). In *Mills*, the Supreme Court held that the Eighth Amendment was violated where jurors likely believed that they were required to agree unanimously on the existence of a specific mitigating circumstance. 486 U.S. at 384. Subsequently, the Supreme Court explained that "*Mills* requires that each juror be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a

sentence of death." *McKoy v. North Carolina*, 494 U.S. 433, 442-43 (1990).

However, the Fifth Circuit has repeatedly rejected arguments like Daniel's that Texas's 10-12 rule is unconstitutional and held that extending the principles of *Mills* and *McKoy* would violate *Teague*. *Hughes v. Dretke*, 412 F.3d 582, 593-94 (5th Cir. 2005) (rejecting argument that potential of the 10-12 rule to confuse jurors violates *Mills* and rejecting such an extension based on the non-retroactivity doctrine of *Teague*); *Alexander v. Johnson*, 211 F.3d 895, 897 (5th Cir. 2000) (rejecting petitioner's reliance on *Mills* and holding that any extension is barred by *Teague*); *Miller v. Johnson,* 200 F.3d 274, 288 (5th Cir. 2000) (holding that *Mills* is inapplicable to the Texas capital sentencing scheme).

Daniel argues the 10-12 rule creates an impermissible risk of a death sentence being arbitrarily imposed in violation of the Eighth Amendment and *Caldwell v. Mississippi*, 472 U.S. 320 (1985). Am. Pet. at 209 (ECF No. 18 at 220). The Fifth Circuit has recognized that *Caldwell* does not "clearly support" such an argument:

> In that case, the prosecution urged the jury not to view itself as finally determining whether petitioner would die, because a death sentence would be reviewed for correctness by the state supreme court. *Caldwell*, 472 U.S. at 323.... The Court held that this violated the Eighth Amendment since it led jurors to believe that "the responsibility for determining the appropriateness of the defendant's death rest[ed] elsewhere." *Id.* at 328-29[.]

*Druery*, 647 F.3d at 544. In this case, just like *Druery*, Daniel "does not explain how the jurors would believe that the responsibility to determine the propriety of a death sentence rested elsewhere. The [10-12] rules implicitly urge jurors toward consensus, but nothing in them suggests the ultimate responsibility to choose reposes in another

actor." *Id.* Daniel's reliance on *Caldwell* also fails because the jury instructions in his case did not misstate the role of the jury under Texas law. *Dugger v. Adams*, 489 U.S. 401, 407 (1989) ("[I]f the challenged instructions accurately described the role of the jury under state law, there is no basis for a *Caldwell* claim.")

Finally, if Daniel seeks to extend Supreme Court precedent, as he does regarding his allegation based on *Mills* and *McKoy*, relief is barred under *Teague*. Because controlling precedent is clearly against him, Daniel's claim should be denied.

### B. The TCCA reasonably denied on the merits Daniel's claim that the future dangerousness issue is unconstitutionally vague.

Daniel argues that the future dangerousness special issue is unconstitutionally vague and fails to provide constitutionally required guided discretion to the jury because the jury charge does not define the terms "probability," "criminal acts of violence," or "continuing threat to society." Am. Pet. at 210 (ECF No. 18 at 221); *see Godfrey v. Georgia,* 446 U.S. 420, 428-29 (1980). He also argues that the use of the word "probability" lessens the State's burden of proving aggravating factors beyond a reasonable doubt. *Id*.: *see Ring v. Arizona,* 536 U.S. 584, 602-09 (2002). The state court reasonably rejected Daniel's claim on the merits and that decision is entitled to AEDPA deference.

The future dangerousness special issue is part of the Texas capital-punishment scheme that has been repeatedly upheld by the United States Supreme Court against similar challenges. *See Johnson v. Texas,* 509 U.S. 350, 373 (1993); *Jurek v. Texas,* 428 U.S. 262 (1976); *see also Pulley v. Harris*, 465 U.S. 37, 50 n. 10 (1984) (stating that Texas's punishment issues are not impermissibly vague because they have a

"common sense core of meaning"). The Fifth Circuit has also repeatedly rejected claims that the words used in the punishment issues have such imprecise meanings in the context of a capital murder trial that the jury cannot discern what is being asked without having those terms defined in the jury instructions. *See Sprouse v. Stephens,* 748 F.3d 609, 622-23 (5th Cir. 2014) (denying COA on complaints about the lack of definitions of "probability," "criminal acts of violence," and "continuing threat to society" in a Texas capital sentencing jury charge); *Leal v. Dretke*, 428 F.3d 543, 552-53 (5th Cir. 2005) (listing numerous Fifth Circuit opinions rejecting complains about the failure of Texas courts to define the same terms).

The Fifth Circuit has specifically rejected Daniel's allegation that the undefined terms fail to channel the jury's discretion, and improperly lessen the State's burden to prove aggravating factors beyond a reasonable doubt, as required by *Ring. See* Am. Pet. at 210 (ECF No. 18 at 221). In *Turner,* the court explained that capital juries make two determinations: (1) eligibility for the death penalty; and (2) selection of penalty. 481 F.3d at 299; *see Tuilaepa v. California,* 512 U.S. 967, 971 (1994). During the eligibility determination, the jury must find an aggravating circumstance, which cannot be "unconstitutionally vague." *Turner,* 481 F.3d at 299 (citing *Tuilaepa*, 512 U.S. at 972). However, during the selection determination, "the jury must be allowed to make 'an individualized determination' and to consider 'relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime,' . . . [and] may even be given 'unbridled discretion in determining whether the death penalty may be imposed.'" *Turner,* 481 F.3d at 299

(citing *Tuilaepa,* 512 U.S. at 972, 979-80). In Texas, the eligibility determination takes place during the guilt-innocence phase. *Id.* But "[t]he terms about which [Daniel] complains are not invoked until after the defendant has been judged death-eligible and the jury is being instructed how to decide whether selection of the death penalty is appropriate." *Id.* at 299-300. "*Ring* is inapposite to any discussion of the constitutional requirements of the selection phase." *Id.* at 300.

Because controlling federal law upholds the constitutionality of the Texas future dangerousness issue, acceptance of Daniel's argument is barred by *Teague. See Scheanette,* 482 F.3d at 827. This Court should therefore deny habeas corpus relief on the meritless, *Teague*-barred claim.

### C. The TCCA reasonably denied on the merits Daniel's claim that the punishment phase instruction unconstitutionally restricted the jury's consideration of mitigating evidence.

Daniel argues that the jury instruction which defined "mitigating" evidence as "reducing the defendant's moral blameworthiness" is unconstitutional because it restricts the evidence that the jury could determine was mitigating. Am. Pet. at 210-12 (ECF No. 18 at 221-23). The state court reasonably denied this claim on the merits, and Daniel fails to show otherwise.

Texas statute defines mitigating evidence as evidence "a juror might regard as reducing the defendant's moral blameworthiness." Tex. Code Crim. Proc. art. 37.071 § 2(f)(4). The Fifth Circuit "considered, and rejected" Daniel's very line of argument in *Beazley*, where it held that the capital sentencing scheme presently codified in article 37.071 does not unconstitutionally preclude the jury from considering, as a

mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that a defendant proffers as a basis for a sentence of less than death." *Blue*, 665 F.3d at 666 (citing *Beazley*, 242 F.3d at 260) (quoting *Lockett*, 438 U.S. at 604) (footnote and internal quotation marks omitted). The Court "concluded that *all* mitigating evidence can be given effect under the broad definition of mitigating evidence found in § 2(e)(1) and that § 2(f)(4)'s definition of mitigation evidence does *not* limit the evidence considered under § 2(e)." *Blue*, 665 F.3d at 666 (footnotes and internal quotations omitted, original emphasis).

The Fifth Circuit has repeatedly held that § 2(f)(4)'s definition of mitigation "'encompasses virtually any mitigating evidence.'" *Roach v. Quarterman*, 220 F. App'x 270, 277 (5th Cir. 2007) (unpublished) (quoting *Beazley*, 242 F.3d at 260); *see Cantu v. Quarterman*, 341 F. App'x 55, 60-61 (5th Cir. 2009) (unpublished) (§ 2(f)(4) does not prevent the jury from considering relevant, mitigating evidence); *Jackson v. Dretke*, 181 F. App'x 400, 413-14 (5th Cir. 2006). Most importantly, "the Supreme Court has expressed approval of this method of instructing the jury concerning the consideration of mitigating evidence. *See Penry v. Johnson*, 532 U.S. 782, 803 (2001) (using the "clearly drafted catchall instruction" of Texas Code of Criminal Procedure article § 2(e)(1) as a frame of reference to compare its "brevity and clarity" against the confusing nature of the supplemental instruction given in that case)." *Cantu*, 341 Because controlling federal law upholds the constitutionality of the Texas definition of mitigating evidence, the Court should deny habeas relief on this meritless claim.

**D.** **Daniel's claim that his death sentence is unconstitutional because capital punishment is arbitrarily administered was reasonably denied on the merits by the TCCA.**

Daniel next argues that his death sentence is unconstitutional because his sentence was imposed based on Texas's arbitrary system of administering capital punishment. Am. Pet. at 212 (ECF No. 18 at 223). Specifically, he argues the death penalty in Texas is sought and imposed more often in large counties that have greater funding to devote resources to pursuing the death penalty in a capital cases, and that it is imposed more often against minority defendants than Caucasian defendants. *Id.* at 213-14 (ECF No. 18 at 224-25). This claim is without merit.

The Fifth Circuit has previously rejected the claim that the Constitution prohibits imposition of the death penalty because it is imposed disparately depending on the county in which the capital murder was committed. *Allen v. Stephens,* 805 F.3d 617, 628-31 (5th Cir. 2015). The *Allen* Court concluded that "no Supreme Court case has held that the Constitution prohibits geographically disparate application of the death penalty due to varying resources across jurisdictions." *Id.* at 629. Indeed, the Supreme Court has expressly acknowledged prosecutorial discretion and varying law-enforcement capabilities in holding that capital punishment is nonetheless permissible. *Id.* at 631 (citing *McCleskey v. Kemp*, 481 U.S. 279, 307 n.28 (1987)).

Additionally, the Supreme Court has held that "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision, whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434

U.S. 357, 364 (1978). So long as the crime fits within a constitutionally valid definition of a chargeable offense, "'the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation' so long as 'the selection was [not] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.'" *Hayes,* 434 U.S. at 364 (citing *Oyler v. Boles*, 368 U.S. 448, 456 (1962)). Indeed, prosecutorial discretion is essential to the criminal justice process. *See McCleskey*, 481 U.S. at 297. "Exceptionally clear proof" is required before courts will infer abuse of prosecutorial discretion. *Id.*

The decision to seek the death penalty ultimately boils down to prosecutor discretion, based upon an examination of all the facts. In *Jurek,* the Supreme Court rejected an argument alleging "that arbitrariness still pervades the entire criminal justice system of Texas from the prosecutor's decision whether to charge a capital offense in the first place and then whether to engage in plea bargaining, through the jury's consideration of lesser included offenses, to the Governor's ultimate power to commute death sentences" finding that "[t]his contention fundamentally misinterprets the *Furman*[43] decision." 428 U.S. at 275 (footnote added). In *Gregg v. Georgia*, the Supreme Court noted:

> The existence of these discretionary stages is not determinative of the issues before us. At each of these stages an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty. *Furman*, in contrast, dealt with the decision to impose the death sentence on a specific individual who had been convicted of a capital offense. Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution.

---

[43]     *Furman v. Georgia*, 408 U.S. 238 (1972).

428 U.S. 153, 199 (1976). The Supreme Court went on to say that "*Furman* held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant." *Id.* at 199. In a footnote, the Court explained that,

> [i]n order to repair the alleged defects pointed to by [Gregg], it would be necessary to require that prosecuting authorities charge a capital offense whenever arguably there had been a capital murder and that they refuse to plea bargain with the defendant. If a jury refused to convict even though the evidence supported the charge, its verdict would have to be reversed and a verdict of guilty entered or a new trial ordered, since the discretionary act of jury nullification would not be permitted. Finally, acts of executive clemency would have to be prohibited.

*Id.* at 199 n.50. The Court rejected such a system as it "would have the vices of the mandatory death penalty statutes" held unconstitutional in *Woodson v. North Carolina,* 428 U.S. 280 (1976), and *Roberts v. Louisiana,* 428 U.S. 325 (1976).

The Supreme Court also acknowledged the concerns of *Furman* that the imposition of the death penalty not be "arbitrary or capricious" and said that "a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance" will alleviate such. *Gregg,* 428 U.S. at 195. The *Furman* concerns were "best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information." *Id.* Daniel received a trial that comported with these requirements.

Consequently, his claim fails because he cannot show, in light of the Supreme Court precedent, that the state court unreasonably rejected the claim.

Daniel does not dispute that the prosecutor has discretion to seek or not seek the death penalty. He argues instead that the inclusion of financial considerations in the prosecutor's discretionary determination impermissibly injects arbitrariness into the Texas capital sentencing scheme and that minority defendants are sentenced to death at a higher rate than Caucasian defendants. Am. Pet. at 213-14 (ECF No. 18 at 224-25). But Daniel does not even allege that financial or racial considerations played any part in the prosecutor's decision to charge him with capital murder or the jury's unanimous verdict sentencing him to death. The fact remains, Daniel committed an act for which the United States Constitution and Texas laws permit the imposition of the death penalty. *McCleskey*, 481 U.S. at 297. And Daniel chose to commit this crime in Travis County. The decision to seek the death penalty was clearly within the prosecutor's discretion and Daniel fails to demonstrate that budgetary or racial considerations played any part in the decisionmaking, that a prosecutor would not have sought the death penalty if Daniel had only committed in a different county or if he was Caucasian, or that similarly-situated individuals of other races could have been prosecuted in a like manner but were not.

Daniel's claim fails because he does not attempt to show that the decisionmakers in his case acted with a discriminatory purpose. *McCleskey*, 481 U.S. 292. Rather, Daniel seeks to prove a culture of racial discrimination through law articles and statistics. However, the Fifth Circuit has rejected a similar argument:

> [R]elying on various newspaper articles and statistics, [petitioner] complains that he was the victim of racially discriminatory prosecution policies at the Dallas County District Attorney's Office. He makes no effort to prove purposeful discrimination against him or a discriminatory effect on him, as are required to make such a claim under [*McClesky*, 481 U.S. at 292]. In light of this fundamental failing, we cannot grant relief.

*Goss v. Johnson*, 199 F.3d 439, 1999 WL 1067676, at *5 (5th Cir. 1999) (unpublished); *see also Johnson v. Stephens*, No. H-11-2466, 2013 WL 4482865, at *23 (S.D. Tex. Aug. 19, 2013) (unpublished) (denying *McClesky* claim where petitioner relied on "various social-science studies and 'a long history of racial discrimination in the application of the death penalty in the United States' to argue that 'his chances of receiving the death penalty in the United States, and in particular Harris County, Texas, are far greater simply because he is an African-American'"); *White v. Thaler*, No. H-02-1805, 2011 WL 4625361, at *9 (S.D. Tex. Sept. 30, 2011) (unpublished) ("[T]he Supreme Court foreclosed this argument more than 20 years ago" in *McCleskey*). Because Daniel fails to show that the state court's rejection of his claim contrary to or an unreasonable application of clearly established Supreme Court precedent, the Court should deny habeas corpus relief.

## XVIII. Daniel is Not Entitled to Relief on His Claims Challenging the Constitutionality of His Death Sentence.

In two claims, Daniel argues that the presentation of evidence of extraneous conduct violates his constitutional rights and that his death sentence is inconsistent with evolving standards of decency. Am. Pet. at 215-18 (ECF No. 18 at 226-29). Daniel has defaulted his claims by failing to raise them on direct appeal or state habeas review. Even if the claims were not defaulted, they are both meritless and relief is

barred under *Teague*'s doctrine of non-retroactivity.

## A.    Both claims are unexhausted and defaulted.

Daniel acknowledges his claims were "not presented or adjudicated in the state habeas proceedings." Am. Pet. at 217 (ECF No. 18 at 228). If Daniel tried to raise these previously-available claims now by filing a third state habeas application, the TCCA would dismiss it as an abuse of the writ. *See Hughes*, 530 F.3d at 342. The unexhausted claims are thus procedurally barred. *Beazley*, 242 F.3d at 264.

Daniel asserts that he can establish cause and prejudice to overcome any default because state habeas counsel (the OCFW) were ineffective for failing not raising the claims. Am. Pet. at 217-18 (ECF No. 18 at 228-29) (citing *Martinez*, 566 U.S. at 17, and *Trevino*, 133 S. Ct. at 1919, 1921). While *Martinez* and *Trevino* stand for the proposition that ineffective assistance of state habeas counsel in an initial review proceeding may serve as cause to excuse the default of a substantial IATC claim, the defaulted claims here are not ones of ineffective assistance. Accordingly, Daniel's unexhausted claim remains procedurally defaulted.

## B.    Regardless, Daniel's claim challenging evidence of extraneous offenses is meritless and *Teague*-barred.

Daniel argues that the admission of "extraneous" offenses at the punishment phase of trial violated his Fifth Amendment right to a presumption of innocence, his Sixth Amendment jury trial guarantee, and his Eighth and Fourteenth Amendment right to reliable sentencing. Am. Pet. at 215-16 (ECF No. 18 at 226-27). The Court should deny relief because this claim is both meritless and *Teague*-barred.

Circuit precedent is clear, "the admission of unadjudicated offenses in the punishment phase of a capital trial does not violate the [E]ighth and [F]ourteenth amendments." *Williams v. Lynaugh,* 814 F.2d 205, 208 (5th Cir. 1987); *see also Beazley,* 242 F.3d at 262; *Harris v. Johnson,* 81 F.3d 535, 541 (5th Cir. 1996). "Evidence of . . . unadjudicated crimes is clearly relevant to the jury's task of determining whether there is a probability that [the defendant] would continue to commit acts of violence as required by [the] special [issues]." *Williams,* 814 F.2d at 208. And neither the Fifth Circuit nor the Supreme Court has held that the State must prove unadjudicated offenses beyond a reasonable doubt before they may be used at sentencing. *Harris,* 81 F.3d at 541. Therefore, any Eighth Amendment or due process challenge to the admission of unadjudicated extraneous offenses during the punishment phase of trial is *Teague*-barred. *Id.*

Daniel does not address this authority. Instead, as support for his entire constitutional claim, he cites only to *Ring,* 536 U.S. at 609, which holds that death-eligibility factors are the functional equivalent of elements of the greater offense and must be found by the jury beyond a reasonable doubt. Am. Pet. at 216 (ECF No. 18 at 227). Daniel argues that the Texas sentencing scheme, which permits presentation of unadjudicated offenses and charges that did not lead to conviction without requiring the jury to find the defendant committed those offenses beyond a reasonable doubt, invites arbitrariness into the sentencing decision. *Id.* Conspicuously absent from Daniel's briefing is any mention of Supreme Court or Circuit precedent extending *Ring* to the extraneous-offense context.

In fact, the Fifth Circuit has held that *Ring* has no impact on the Texas capital sentencing scheme because the concerns raised *Apprendi v. New Jersey,* 530 U.S. 466 (2000), and *Ring* are not implicated. Rather, as a prerequisite to reaching the punishment phase of trial, "[a]ll the elements of capital murder were put to the jury with instruction that the evidence had to persuade them beyond a reasonable doubt," the trial judge made no finding that exposed the petitioner to the death penalty, the jury was instructed that it could affirmatively answer the future dangerousness special issue only if they found so beyond a reasonable doubt, and there was no contention that the mitigating evidence could not find expression in the jury's answers to the special issues. *Granados v. Quarterman,* 455 F.3d 529, 536 (5th Cir. 2006). "[T]he state was required to prove beyond a reasonable doubt every finding prerequisite to exposing [the petitioner] to the maximum penalty of death." *Id; see also Scheanette,* 482 F.3d at 828. Indeed, *Ring* does not address the Texas special issues nor the constitutionality of the Texas capital sentencing scheme. "Constitutional rights are not defined by inferences from opinions which did not address the question at issue." *See Texas v. Cobb*, 532 U.S. 162, 169 (2001).

The Fifth Circuit considered "the unresolved question whether *Ring* and *Apprendi* apply to *any* fact found by a jury that bears on its ultimate decision to impose death, or merely those facts that increase the authorized punishment to death," but denied COA, reasoning that the decision not to require such an instruction was not contrary to established Supreme Court precedent. *Jackson,* 181 F. App'x at 411. Any extension of *Ring* to require extraneous offenses in the punishment phase

to be proven beyond a reasonable doubt would result in a new rule of constitutional law and would be barred by *Teague. See Woodard v. Thaler,* 702 F.Supp.2d 738, 782 (S.D. Tex. 2010) (citing *Jackson* in denying claim that *Apprendi* requires the jury to find a defendant committed any extraneous offense beyond a reasonable doubt because granting relief would create a new rule of constitutional law in violation of *Teague*). The Court should find this claim procedurally barred and, alternatively, *Teague*-barred and meritless.

### C. Daniel's claim that his death sentence violates evolving standards of decency is also meritless and *Teague*-barred.

Daniel contends that his death sentence is unconstitutional under the Eighth and Fourteenth Amendment because capital punishment defies evolving standards of decency, operates arbitrarily, serves no valid penological interest, and inflicts torture. Am. Pet. at 216 (ECF No. 18 at 227). The instant claim does not entitle Daniel to relief even if it was not procedurally defaulted.

Supreme Court precedent clearly forecloses any argument that capital punishment violates the Constitution in all circumstances as Daniel now contends. As it is understood by modern American society, as well as the Supreme Court, the death penalty is neither cruel nor unusual. *See*, *e.g.*, *Glossip v. Gross*, 135 S. Ct. 2726, 2732 (2015) ("[I]t is settled that capital punishment is constitutional."); *Baze v. Rees*, 553 U.S. 35, 61 (2008) ("This Court has ruled that capital punishment is not prohibited under our Constitution...."); *Gregg*, 428 U.S. at 169 (reaffirming that the death penalty "does not invariably violate the Constitution"). Whether this comports with the views of the international community is largely irrelevant, especially on

federal habeas review where relief is only available for violations of federal Constitutional law. Indeed, as the Supreme Court noted in *Baze*: "[r]easonable people of good faith disagree on the morality and efficacy of capital punishment, and for many who oppose it, no method of execution would ever be acceptable ... [But] [t]his Court has ruled that capital punishment is not prohibited under our Constitution[.]" 553 U.S. at 62. Most importantly, because the Supreme Court has repeatedly upheld the death penalty as constitutional, federal habeas relief is barred by the non-retroactivity doctrine of *Teague v. Lane* because it would require the creation of a new rule of constitutional law.

Daniel additionally maintains that his death sentence is unconstitutional because he "has been and will continue to be confined for a gratuitously long time" under unspecified conditions that are "torturous" and "inhumane." Am. Pet. at 217 (ECF No. 18 at 228). To date, Daniel has been incarcerated on Texas's death row for just over five-and-a-half years since he was convicted and sentenced in February 2014. *See* 1 CR 198-99 (ECF No. 4-1 at 198-99). However, the Fifth Circuit has found that no federal court has ever recognized such a theory of cruel and unusual punishment, and to grant relief "would require us to announce a new and retroactive procedural rule declaring that prolonged incarceration prior to execution of the death sentence violates the Eighth Amendment. *Teague* forecloses such a holding." *White v. Johnson*, 79 F.3d 432, 437-438 (5th Cir. 1996); *see also Lackey v. Johnson*, 83 F.3d 116 (5th Cir. 1996). Because Daniel points to no precedent that would require this Court to overturn his sentence of death due to his allegedly "prolonged incarceration,"

*Teague* once again forecloses relief on this issue.

Even if this Court were to consider Daniel's claim for relief, the analysis would be short because the Fifth Circuit has consistently rejected this claim for relief on the merits as well. *ShisInday v. Quarterman*, 511 F.3d 514, 526 (5th Cir. 2007) (rejecting claim that a twenty-five-year stay on death row constitutes cruel and unusual punishment); *Felder v. Johnson*, 180 F.3d 206, 215 (5th Cir. 1999) (finding claim that a twenty-year stay on death row constitutes cruel and unusual punishment bordered on the "legally frivolous"). As the Fifth Circuit explained in *White*:

> [T]here are compelling justifications for the delay between conviction and the execution of a death sentence. The state's interest in deterrence and swift punishment must compete with its interest in insuring that those who are executed receive fair trials with constitutionally mandated safeguards. As a result, states allow prisoners such as White to challenge their convictions for years. White has benefitted from this careful and meticulous process and cannot now complain that the expensive and laborious process of habeas corpus appeals which exists to protect him has violated other of his rights. Throughout this process White has had the choice of seeking further review of his conviction and sentence or avoiding further delay of his execution by not petitioning for further review or by moving for expedited consideration of his habeas petition.
>
> Even if much of the delay in this case is the fault of Texas, White cannot now complain of cruel and unusual punishment. White made no effort to inform the Texas courts that their delay was detrimental to him or to ask for expedited review of his petition and we cannot fault them for assuming that White would be grateful for or, at least, indifferent to the delay. White cannot expect Texas courts to know that he wants to get on with his execution without telling them.

79 F.3d at 439. In sum, Daniel appears to seek a permanent bar to his execution because he has successfully taken advantage of the mechanisms that are in place to assure that his conviction and sentence comply with every constitutional standard.

Because he provides no relevant support for such a frivolous allegation, his claim merits no relief from this Court.

## XIX. Daniel's Claim of Cumulative Error is Unexhausted, Defaulted, and Alternatively Meritless.

As his final ground for relief, Daniel asserts that the cumulative prejudicial effect of all the errors throughout the capital proceedings denied him due process and the effective assistance of counsel. Am. Pet. at 218-19 (ECF No. 18 at 229-30).

### A. This claim is unexhausted and defaulted.

Daniel never argued in state court that his rights were violated by the cumulative effect of the alleged errors. Even if he had done so, it would be to no avail because many of Daniel's amended federal habeas petition claims are unexhausted. The instant cumulative error claim is thus unexhausted and defaulted. *Beazley*, 242 F.3d at 263 (a petitioner must exhaust all claims in state court prior to requesting federal collateral relief); *id.* at 264 (unexhausted claims are procedurally barred). Because Daniel cannot establish cause and prejudice, or a fundamental miscarriage of justice, the Court should not excuse his procedural default.

### B. In any event, since no error occurred, there is no error to cumulate.

Federal habeas relief is only available for cumulative errors that are of a constitutional dimension. *Coble v. Dretke*, 444 F.3d 345, 355 (5th Cir. 2006) (citing *Livingston v. Johnson*, 107 F.3d 297, 309 (5th Cir.1997)). As discussed above, Daniel's claims are procedurally barred, *Teague*-barred, and without merit. Thus, there are no errors to cumulate. *See Westley v. Hudson*, 83 F.3d 714, 726 (5th Cir. 1996)

("Meritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised.") (citing *Derden v. McNeel*, 978 F.2d 1453, 1461 (5th Cir. 1992)). Therefore, Daniel's final claim for habeas corpus relief should be denied.

## OPPOSITION TO REQUEST FOR AN EVIDENTIARY HEARING

Daniel argues the Court should grant an evidentiary hearing because he did not fail to develop the factual basis of his claims in state court or else his failure should be excused because it resulted from his counsel's ineffectiveness. Am. Pet. at 15 (ECF No. 18 at 26). He also asserts that if the Court believes that any of his claims are defaulted, it should grant an evidentiary hearing so he "can show cause and prejudice and/or fundamental miscarriage of justice to overcome any default." *Id.* at 16 (ECF No. 18 at 27). The Court should not hesitate to deny Daniel a hearing.

Under the AEDPA, the proper place for development of the facts supporting a claim is in the state court. *Hernandez v. Johnson*, 108 F.3d 554, 558 n. 4 (5th Cir. 1997). To the extent Daniel wants to develop new evidence to attack the state court's resolution of his claims, his request should be denied because such factual development is precluded in federal court under *Pinholster*, 563 U.S. at 181-82 (must overcome the limitation of § 2254(d)(1) "on the record that was before the state court."). For Daniel's unexhausted claims, he clearly failed to develop the factual basis of his claims in state court. The claims do not rely on new, retroactive rules of constitutional law, § 2254(e)(2)(A), nor do they rely on facts that could not have been discovered with due diligence and such facts do not demonstrate actual innocence of the crime by clear and convincing evidence, § 2254(e)(2)(B).

To the extent Daniel argues that a hearing is necessary to help him establish cause and prejudice under *Martinez* to overcome the procedural default of his unexhausted IATC claims, the Court should deny the request. *Martinez* does not mandate an opportunity for additional fact-finding in support of cause and prejudice. *Segundo v. Davis*, 831 F.3d 345, 351 (5th Cir. 2016).

Regardless, even if Daniel was not barred from obtaining a hearing under § 2254(e)(2), each of Daniel's claims can be resolved on the merits by reference to the state court record, the submission of the parties, and relevant legal authority. There is thus no reason for the Court to hold an evidentiary hearing. *See Schriro*, 550 U.S. at 474 (recognizing that "an evidentiary hearing is not required on issues that can be resolved by reference to the state court record") (citation omitted).

## CONCLUSION

For the foregoing reasons, the Court should deny all relief requested in Daniel's amended habeas petition and decline to issue a COA on all issues.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

MARK PENLEY
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

/s/ Katherine D. Hayes
KATHERINE D. HAYES
Assistant Attorney General
Criminal Appeals Division
*Counsel of Record*
TX Bar No. 00796729

Office of the Attorney General of Texas
P. O. Box 12548, Capitol Station
Austin, TX 78711-2548
(512) 936-1400
(512) 320-8132 fax
katherine.hayes@oag.texas.go

COUNSEL FOR RESPONDENT

## CERTIFICATE OF SERVICE

I certify that on November 25, 2019, I electronically filed this Answer using the Court's CM/ECF system. The Notice of Electronic Filing that was generated constitutes service of this document on the following Filing Users:

*Shawn Nolan*
*Peter Walker*
Federal Community Defender for the
Eastern District of Pennsylvania
Suite 545 West, The Curtis Center
601 Walnut Street
Philadelphia, PA 19106
(215) 928-0520
shawn_nolan@fd.org
peter_walker@fd.org

*Gretchen Sims Sween*
Office of Capital and Forensic Writs
1700 N. Congress Ave., Suite 460
Austin, TX 78701
(512) 463-8522
(512) 463-8590 fax
gretchen.sween@ocfw.texas.gov

/s/ Katherine D. Hayes
KATHERINE D. HAYES
Assistant Attorney General
Criminal Appeals Division